Christina Taft
Plaintiff in Propria Persona
1700 Ala Moana Blvd Apt 2301
Honolulu, Hawaii 96815
Phone: 0623441766
Ceo.Taft@Rescue-Social.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

CHRISTINA TAFT,

        Plaintiff,

vs.

PAUL BARRESI, ADAM R WALDMAN, and DOES 1-10, inclusive,

        Defendants.

Case No.: 5:24-cv-01930-TJH(DTB)

**FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL**

1) Civil Conspiracy
2) Civil Rights Act, 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights
3) Civil RICO Act, Racketeering Activity, 18 U.S. Code 1961 & 18 U.S.C. § 1962
4) Invasion of Privacy, California Constitution, Article I, Section 1, 1800. CACI No. 1801, CACI No. 1802
5) Use of Name or Likeness, Civil Code, § 3344
6) Civil Harassment, California Code of Civil Procedure § 527.6
7) Negligence, Civil Rights
8) Intentional Infliction of Emotional Distress (IIED)
9) Negligent Infliction of Emotional Distress (NIED)

DEMAND FOR JURY TRIAL

## <u>FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL</u>

      Plaintiff, CHRISTINA TAFT, an individual, respectfully asserts rights to file this verified complaint in this Court, seeking redress for a series of egregious violations perpetrated by the Defendants.

The Defendants, Barresi and Waldman, and Does 1-10, engaged in obstructing the Plaintiff's lawful efforts to address critical matters of public safety and denying her equal protection under the law. Defendants' violations were related to suppressing and interfering with public safety reporting. They used consistent tactics and participants in their schemes and continuous harm as "Hollywood Fixers" to eliminate Plaintiff, potential witnesses, testimonies, and reporting victims, thus establishing a recognizable pattern. With repeating suppressive, coercive, and exploitative activities, Defendants prevented efficient rescue and life, liberty, and the pursuit of happiness to Plaintiff, witnesses, perceived competitors in investigations, potential witnesses, and former clients that may report them. Defendants Barresi and Waldman's behavior exceeds five years, over two and a half years to Plaintiff, and is continuous to this day.

This Verified Complaint encompasses rights protected for individuals under multiple statutes and Rule of Law, including under the Civil Rights Act, 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights, and Equal Protection and Petitioning the Government, Public Safety Reporting, as Defendants violated elements and predicate acts of Obstruction of Justice, Tampering with a Witness, Victim, or Informant, 18 U.S.C. § 1512(b)(1) and (2), Federal Interstate Communications Law, 18 U.S. Code § 875, Destruction, Alteration, or Falsification of Records, 18 U.S.C. § 1519, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952, as well as the Civil RICO Act, Racketeering Activity, 18 U.S. Code 1961 & 18 U.S.C. § 1962, and Obstruction of Justice 18 U.S.C. § 1503– Influence, Obstruct & Impede on Witnesses and Court Proceeding.

Due to Defendants violations, Plaintiff seeks relief for Invasion of Privacy, California Constitution, Article I, Section 1, privacy - Intrusion Into Private Affairs, CACI No. VF-1800, Intrusion Upon Seclusion and Intrusion Into Private Affairs CACI No. 1801, and CACI No.

1802, inclusive of exploitation of audio tapes, for coercion, Unauthorized Use of Name or Likeness, Civil Code § 3344, Civil Harassment, California Code of Civil Procedure § 527.6, claims of Negligence impacting Civil Rights, Intentional Infliction of Emotional Distress, IIED and Negligent Infliction of Emotional Distress, NIED. As a result of Defendants' actions, Plaintiff has suffered significant harm.

Plaintiff seeks to address elements and violations related to coercion, such as *New York Penal Law Section 135.60-65* as a guide to prevent similar coercive actions Nationwide and in California. New York's Coercion Law prohibits elements of apprehension of injury including to others, intimidation, exploitative coercion, use of another in harm to benefit another, property damage, withholding testimony or information, or another actor will, and undue influence to compel actions, abstain from lawful actions, or suppress rights. Plaintiff underscores the need for equivalent safeguards in California. Plaintiff aims to prevent coercion and protect individuals from being subjected to such unlawful and oppressive conduct in California, ensuring alignment with fundamental principles of justice and constitutional rights.

In addition, Plaintiff addresses elements related to Obstruction of Justice as outlined in 18 U.S.C. § 1512(b)(1) and (2), which prohibit witness tampering through intimidation, threats, and corrupt persuasion. These provisions are designed to protect the integrity of the justice system by preventing any attempts to unduly influence witnesses or hinder their ability to testify in legal proceedings. Obstruction of Justice, 18 U.S.C. § 1503, prohibits efforts to influence, obstruct, or impede witnesses and court proceedings. The Plaintiff emphasizes the importance of safeguarding the integrity of judicial processes and the rights of individuals participating in them. To ensure that the principles of impartiality and fairness in legal proceedings are upheld, Plaintiff conveys that a civilized society needs to prevent similar obstructive conduct from being

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   3

perpetuated. This action aims to reinforce the protection of witnesses, Plaintiff, and the judicial

system as a whole, even for those in relation to film, music, and the arts, to have more efficient

rescue, and give the people the right to petition the government.

Plaintiff hereby invokes the Court's jurisdiction to address these violations and seek

appropriate remedies for the harm suffered by Defendants including an award of punitive

damages to hold Defendants accountable for their malicious and reckless disregard of

Constitutional Rights, ensuring deterrence of such violations in the future, and hereby

respectfully sets forth and conveys as follows:

## I. JURISDICTION AND VENUE

**Federal Violations - Interstate Violations of the Law - Constitutional Violations**

1. Plaintiff asserts the following violations, Federal as well as Constitutional violations, which

establish jurisdiction in this Federal Court.

2. Plaintiff Ms. Christina Taft is a citizen of the United States of America, and is a citizen of the

State of Hawaii. Defendant Adam R. Waldman is a citizen of Washington DC, a resident of

District of Columbia, and Defendant Paul Barresi is a citizen of San Bernardino, California.

Therefore, there is complete diversity of citizenship between the parties. Both Defendants co-

conspired together across multiple state lines.

3.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Defendants violated multiple Federal Laws, Civil Laws, as well as State Laws, including but

not limited to violating Plaintiff's rights.

5. Defendants actions included:

> Tampering with a Witness, Victim, or Informant through Physical Force or Threat
> Tampering of Objects
> Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion
> Obstruction of Justice

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   4

Hindering Communication Through Physical Force or Threats of Physical Force
Hindering Communication Through Intimidation, Threats, or Corrupt Persuasion
Retaliating Against a Witness, Victim, or Informant,
Interfering and Corrupting Interstate Communications
Violating Civil Code § 3344 Use of Name or Likeness

6.  This Court may exercise personal and subject matter jurisdiction over this lawsuit because of Federal Violations which include interstate, not only intrastate, being subject matter to all parties, all individuals, and also witnesses residing in the following states: Hawaii, Washington DC, New York, Illinois, South Carolina, Utah, Tennessee, Florida, New Mexico, Virginia, Michigan, Tennessee, Indiana, Connecticut, and California.

7. The Court may exercise personal and subject matter jurisdiction over this lawsuit because of the following Federal Codes Specifically, 28 U.S. Code § 1331, 28 U.S. Code § 1391, and 28 U.S. Code § 1332.

8. This Court may exercise personal and subject matter jurisdiction due to 28 U.S. Code § 1331 Federal Question, establishing the authority of this Court to hear this case which arises under the Constitution, Federal Laws, and/or Treaties.

9. Pursuant to Federal Code 18 U.S.C. § 241, Mr. Barresi and Mr. Waldman both co-conspired across multiple state lines. Due to Mr. Barresi being a resident of California and having caused injuries to Ms. Taft and her businesses located in multiple states including California, and where Mr. Barresi and Mr. Waldman lay jurisdiction on for their activities, and where Mr. Waldman shows liabilities.

10. Defendants conspired, co-conspired, and continue to conspire and co-conspire as of today's date, by threatening to kill, continuously mentioning harm towards, civilly harass, invade privacy of, and intentionally and negligently inflicting emotional distress to Plaintiff Ms. Taft, as well as to multiple individuals.  Defendants are liable for acts of the agent, violating U.S.C. Interstate

Laws, violating U.S.C. Witness Tampering of Objects and corrupt persuasion, and interstate threats. Defendants still to this date, continuously do these actions against Ms. Taft, as well as multiple individuals across named states, within the United States.

11. This action arises under Federal Law, specifically violations of Civil Conspiracy, Civil Rights Act, 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights, elements of Obstruction of Justice as outlined in 18 U.S.C. § 1512(b)(1) and (2) involving Witness Tampering Through Intimidation, Threats, and Corrupt Persuasion, Obstruction of Justice 18 U.S.C. § 1503-Obstruct & Impede on Witnesses and Court Proceeding, Invasion of Privacy under California Constitution, Article I, Section 1, Unauthorized Use of Name or Likeness in violation of Civil Code § 3344, Civil Harassment as per California Code of Civil Procedure § 527.6. In addition, Negligence under Civil Rights, predicate acts of Federal Interstate Communications Law, 18 U.S.C. § 1952, Destruction, Alteration, or Falsification of Records, 18 U.S. Code § 875, Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1519, as well as the Civil RICO Act, Racketeering Activity, 18 U.S. Code 1961 & 18 U.S.C. § 1962, Intentional Infliction of Emotional Distress (IIED), and Negligent Infliction of Emotional Distress (NIED).

12. Jurisdiction is proper pursuant to 28 U.S. Code § 1331 - Federal Question Jurisdiction, as the claims arise under federal statutes and regulations.

13. Venue is proper in this district under 28 U.S. Code § 1391(b), as a substantial part of the events giving rise to the claim occurred within this district. 28 U.S. Code § 1332 - Diversity of citizenship, each party resides in a different state; and the amount in controversy is over $75,000.

14. Defendants engaged in a scheme to corruptly persuade Plaintiff by continuous fraudulent conduct, making false representations, causing continuous harm and intimidation tactics to

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   6

defraud and misrepresent purposively. Additionally, Defendants utilized interstate communications in furtherance of their fraudulent schemes, in violation of 18 U.S. Code § 875.

15. Defendants, in their "fixing" activities to benefit Mr. Depp, engaged in conduct to tamper with physical evidence relevant to investigations and potential investigations by the Police, Federal Authorities, and the FBI.

## II.  THE PARTIES

16. Plaintiff Christina Taft is an individual, a Citizen of the United States of America, and a resident of the State of Hawaii. Ms. Taft is a Humanitarian, Philanthropist, and Entrepreneur with 3 generations of family in the Film Business since the 1950s and the Golden Era of Hollywood.[1] She is the founder and CEO of Worldie Ltd. and Rescue Social Inc., a Public Safety investor, coordinator of SaveMeNow, former board member of Aedan, and videographer. SaveMeNow, founded by a former firefighter, had a contract with Ms. Taft for representation in California.

17. Defendant Paul Barresi is an individual in Rancho Cucamonga and a resident of the State of California at 9648 Nova Place, Rancho Cucamonga, CA 91730.

18.  Defendant Paul Barresi registered the fictitious business name Hollywood Confidential Investigations on September 15, 2008**.**

19.  Defendant Adam R Waldman is an individual in Washington DC and a resident of District of Columbia. He has the business The Endeavor Group at 1775 Pennsylvania Avenue, Nw Suite 350, Washington, DC 20006.

---

[1] Screenwriter/Actor Everett Debaun, Cameraman/Actor Larry Debaun, Model Marian Taft, and Socialite/Model/Actress Victoria Taft. *See* https://www.imdb.com/name/nm1209585

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   7

### III.  PRELIMINARY STATEMENT

20. Defendant, Paul Barresi, has masqueraded as the "Hollywood Fixer" while maiming competitors, potential witnesses and victims of civil and criminal cases, and consumers for decades since the 1990s.

21.  Defendant, Adam Waldman, actively directed and rewarded Barresi for his own "fixing" purposes. Mr. Waldman directs The Endeavor Group that claims, "We convert *imagination* and aspiration into tangible, powerful results."

22.  According to *Depp v. Heard*, *No. CL-2019-2911*, a jury found that Mr. Waldman was acting as John C. Depp's agent, and was guilty of defamation in the Daily Mail related to an alleged hoax among witnesses who were friends in that case.

23.  The California Bureau of Security and Investigative Services issued Paul Barresi a Private Investigator license (PI 26529) on September 2, 2009.

24.  Records indicate that this PI license #26529 issued to Paul Barresi was immediately revoked, and Barresi was placed on three years of probation.

25.  The accusations against Barresi, in the case revoking his license, included dishonesty or fraud-false statements, slander or libel in the course of business, manufacturing evidence, and making false reports.

26.  Records indicate that Barresi's Private Investigator license was permanently revoked on January 7, 2012.

27.  As indicated by Barresi, he has "directly worked for lawyers for many years," in an email from November 2022, and requires licensed supervision.

28. Ms. Taft as a former entrepreneur and having start-ups for the purpose of rescue within the
Field of Public Safety, which includes people in the film, music, and arts as part of the visual and
performing arts business.

## IV.  STATEMENT OF FACTS

29.  The Plaintiff spoke with and assisted witnesses, including former employees of the Viper
Room.

30.  Plaintiff has witnessed Mr. Barresi and Mr. Waldman's conspiracy, harassment, interstate
communications, invasion of privacy, and inflictions of emotional distress benefit each other and
actor Johnny Depp.

31.  Mr. Barresi and Mr. Waldman engaged each other in April 2020 onward and had financial
negotiations.

32.  Mr. Barresi published one of his phone calls with Mr. Waldman, who rewarded Mr. Barresi
with a call from Mr. Depp and published that he had spoken with and advised Mr. Depp.

33.  These negotiations transpired to travel to Washington DC and a Chartered Private Jet as
observed by JCB International and Security Consulting in July 2023.

34.  Paul Barresi and Adam Waldman coerced perceived competitors, including Ms. Taft, for
their private interests.

35.  Plaintiff to this day was continuously threatened, harassed, and has a fear for her life.

## V.  FACTS COMMON TO ALL CAUSES OF ACTIONS

36.  After losing her mother, former socialite and actress Victoria Taft, in a wildfire that
destroyed the town of Paradise, California in 2018, Ms. Taft devoted her business and
professional projects to solving, mitigating, and improving public safety and to motivate business

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   9

partners to improve systems of rescue. This included, prevention and detection of disasters and crimes, through improving communications among citizens and responders.

37. In 2019 Ms. Taft was providing frameworks for "Victoria Project," to improve rescue and prevention operations, including presenting a comprehensive system proposed by Aedan Inc to politicians, e.g., Assemblyman James Gallagher and Congressman Doug LaMalfa, who Ms. Taft had briefly assisted.

38. In March to April 2019, Ms. Taft was contacted by a potential witness in a relationship with a former staff member of actor Depp who checked on his wife. The potential witness wrote that many would testify against Mr. Depp and they did not know his wife. They lamented about the missing co-owner of the Viper Room Anthony Fox and his daughter crying for justice,[2] harms to humanitarian work, Mr. Waldman as a persona non grata, refusing to sign a new NDA, and of people sent by Mr. Waldman asking questions. The potential witness specifically stated

> *"We are replying directly to you" to Ms. Taft. Having lost her mother, a former actress, recently in a disaster without alerts and being reached out to in this way, it drew Ms. Taft's concern. The potential witness obscured their identity. Ms. Taft referred to this jarring experience as a case example for improving public safety for victims and witnesses.*

39. Ms. Taft became an investor of Aedan stocks in 2019. Wanting to confirm humanity, she briefly met Ms. Heard in October 2019 at an event for Richard Dawkins and Center of Inquiry in Arizona while on a birthday trip to see her uncle, Don Debaun in Sedona.

40. Remembering the potential witness, Ms. Taft stated to Ms. Heard that "Los Angeles is dangerous," to which Ms. Heard replied, "Hollywood is not liberal," without referencing the

---

[2] In direct messages to Ms. Taft the potential witness said that missing Mr. Fox of the Viper Room is a message that Mr. Depp's staff often receives. On April 8, 2019 the potential witness linked to Anthony Fox's missing person case at the Charley Project and stated, "**Case background (ignore the donation-cold case)**."
"Fox was scheduled to testify in court shortly after his disappearance." *See,* https://charleyproject.org/case/anthony-vivien-fox

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   10

city's safety disparities.

41.  In December 2019, Ms. Taft reached out to Mariana Dahan of World Identity Network which had Ms. Heard as an advocate.

42.  Ms.Taft offered that Aedan wanted to donate stocks to World Identity Network, along with National Emergency Network Association, while working on projects to improve accuracy and speed of rescue. The Chairman once considered Taft a possible CEO for this security and technology company, once in negotiations to be bought by CryptoCompany for $10 million. Ms. Taft eventually was voted onto the board. This company had wanted to sell to Elon Musk through an executive at Tesla and to build systems to save lives.

43.  SaveMeNow was founded by a former firefighter and rescue instructor Niko Sanchez. Ms. Taft started collaboration with SaveMeNow on August 4, 2020.

44. In October 2020, Ms. Taft wrote an article supporting Public Safety through Editor, Hollywood party frequenter, and Screenwriter Nitish Kannan of TrueHollywoodTalk.

45. Ms. Taft noticed signs of automation, including under an interview titled with "Adapt and Survive" after the outcome of the case of Depp v NGN in 2020 where some witnesses testified against Mr. Depp on violence. Ms. Taft and researchers studied independently.

46.  On June 22, 2021, Tomas Martinek of IOSI Global Organization for Security and Intelligence informed Ms. Taft there was a "case of suspicious activity-in money laundering" of an associate of Mr. Depp without going into identifying information.

47.  In July 2021, Ms. Taft promoted SaveMeNow and BrightAct to Denise Brown, the sister of Nicole Brown Simpson, as recommended by friend, Claire Moore.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   11

48.  From February 2022 Ms. Taft posted research from her team which drew interest from potential clients of the business in the visual and performing arts. Nevertheless, Ms. Taft has never been paid by anyone.

49.  In May 2022 to June 2022, Ms. Taft discovered allegations that Mr. Barresi and Mr. Waldman interfered with witnesses, then subsequently, after discovering witnesses of the Viper Room, became a victim herself.

50.  Approximately in May 2022, new friend Lauren Pena showed Ms. Taft that Mr. Mario Nitrini and Mr. Barresi had surfaced during the trial. Mr. Barresi claimed he was from the "underbelly of Hollywood." Ms. Pena sent to Ms. Taft that Mr. Barresi wrote:

*"TRAGIC DEATH OF TRANSVESTITE WHO EDDIE MURPHY PICKED UP IN HOLLYWOOD."*

51.  A man discusses in the video 'a year to the day she's dead.' This disturbed and alerted Ms. Taft.

52. Ms. Taft saw that Mr. Nitrini showed photos of email drafts about witnesses that Mr. Barresi had information on alleging

*"INTERVIEWS CONDUCTED BY HOLLYWOOD FIXER PAUL BARRESI."*

They were not testifying "through this very trying time." Ms. Taft dreaded what could be happening.

53. Ms. Taft saw two photos of texts from a complainant to Mr. Nitrini that alleged Mr. Waldman paid Mr. Barresi.

54. In May 2022, Ms. Taft spoke with potential witness Richard Albertini, a former employee of the Viper Room and former friend of Depp, Isaac Baruch, Ricky Beck Mahler, Paul Schindler, and Robert Pfiefer.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   12

55.  Ms. Taft saw complaints from Mr. Richard Albertini of Mr. Barresi threatening to shoot him and that he was tagging Mr. Waldman.

56. On May 12, 2022 Mr. Albertini showed Ms. Taft messages to him from Mr. Barresi including,

> *"If it wasn't me to have done her in, it would've been somebody else," and  "I am trying to reach you re, The Viper Room days and what you experienced; particularly re, Johnny Depp... i.e., regarding cigarette he allegedly put out in a woman's hand."*

57. Mr. Albertini again alleged to Ms. Taft that Mr. Waldman paid off Mr. Barresi.

58. Mr. Albertini provided his phone number to Ms. Taft and they spoke on the phone.

59.  On the Viper Room and on Depp with his associates, Mr. Albertini provided these names to Taft, which was provided to the Bureau of Security and Investigation Services in Sacramento and that complaint was given to FBI agents assigned to the first police report in 2022.

60.  The FBI report includes witnesses involved with events, and detailed information with events ranging from approximately 1991 to present.

61.  The witness list includes numerous named individuals, see footnote for identified names.

*Claudia Jamison*
*Stacy Lee Lopez*
*Jaylee Carter on Donna*
*Bruce Corkum*
*Faydra Corkum*
*missing Big Ray O'Hagan*
*Bruce Witkin*
*Tracy Jacobs*
*Cathy Duncan*
*Kurt Lush*
*Juliet*
*Carre Otis*
*Chris Stenco*
*Vincent Dinafo*
*Ricky Beck Mahler*
*Chuck Weis*
*Dean R Miller*
*Sal Jenco*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   13

*Seven McDonald*
*Paul Schindler*
*Kristen Mansen*
*'Death is Certain' Click*
*Jim Jarmush*
*Gibby Hanes*
*Bill Carder*
*Sal Jenco*
*Flea*
*Big Ed Shaw*
*Damien Echols*

62. Later Mr. Albertini gave additional names to Mike Ferril, a former bouncer at the Viper Room, Ina Ruxdana on James Franco, and Suzie Ariel, an artist.

63. Mario Nitrini, formally paid by Mr. Barresi, provided additional witness names to Ms. Taft given to him by Mr. Barresi to publish about and who only knew the actress: Joshua Cruz, Anna Feliz Barrett, Ivan Klousia. Formerly the latter few were named by the infamous broker, American Media Inc. Publicly, Jennifer Howell and Laura Divenere had been known, who both further knew information related to Elon Musk, including alleged paternity. Neither of their names were given by Albertini or Nitrini.

64. Mr. Albertini reiterated that Mr. Barresi threatened him during the trial, and that he had wanted to testify as a witness about a woman assaulted with a cigarette burn in the Viper Room by Depp. He further stated that after Mr. Barresi's blackmailing coercion attempts, Mr. Waldman promised to pay him to lie for Depp. Mr. Albertini on May 19 stated he wanted to testify against Depp.

65. In June 2020, Ms. Taft received emails, files, and documents from Mr. Nitrini.

66. In the emails Ms. Taft received from Mr. Nitrini, the documentation shows Mr. Barresi sending information to Mr. Waldman and being an agent for Mr. Waldman.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   14

67.  In the emails Ms. Taft received from Mr. Nitrini, the emails show Mr. Waldman and Mr. Barresi conspiring for Mr. Depp.

68.  The documentations, which Mr. Barresi has repeatedly confirmed are his, contain edited statements from audio recordings, communications, photographs, and emails related to potential witnesses.

69.  The documentations from Mr. Barresi to Mr. Nitrini contain continued "fixing" of cases for Mr. Depp, inconsistencies, and interference with potential witnesses.

70.  Ms. Taft, upon receiving files of a tampered investigation of witnesses, feared retaliation.

71.  Mr. Barresi discovered that Ms. Taft was speaking to Mr. Nitrini and Mr. Albertini.

72.  Mr. Barresi contacted Ms. Taft's friend Mr. Daniel Brummitt.

73.  On the phone, Mr. Barresi proceeded to misrepresent himself and offer to give Daniel Brummitt a job. He wanted to access Ms. Taft, he sent a file to Mr. Brummitt and wanted to make certain they stopped talking with witness Mr. Albertini.

74.  Mr. Brummit felt intimidated by Mr. Barresi as he indicated to Ms. Taft and concerned for the safety of his son. Mr. Brummitt stated Mr. Barresi told him he knew of his trip to New York and that Mr. Barresi left an aggressive voicemail including Mr. Brummit's home address.

75.  On June 8th, 2022 having been alerted to witness harms and due process ailments, Ms. Taft pleaded for an attorney to oversee an expert for investigations about witness harms. Ms. Taft knew of an expert that showed interest from 2021.

76.  On June 10th, 2022 the expert Mr. Neal Rauhauser, suggested that witness harms investigations could be part of an amicus, but the California attorney Mr. Antonio Sarabia advised that legally-that's not for appellate courts. Ms. Taft was worried about due process and started to finance an amicus brief from Mr. Thomas Urban of Fletcher, Heald & Hildreth, PLC in

Washington D.C.

77. On June 12th, 2022 Mr. Nitrini emailed Ms. Taft that he had called the attorneys for Mr. Gregg.

78. Mr. Nitrini informed Ms. Taft that he provided Gregg "Rocky" Brooks, injured by Mr. Depp on the set of City of Lies, information about Mr. Barresi working with Mr. Waldman to harm their case. Mr. Nitrini with attached documentation informed Ms. Taft that the witness list for that case initially had Ms. Heard as a witness.

79. Afraid of retaliation and not understanding the full issues of investigation needing licensure, on June 16th, Ms. Taft asked retired LAPD licensed private investigator Mike McCormick for assistance.

80. Mr. McCormick, trying to assist Ms. Taft and aid other witnesses, later provided witness phone numbers to Ms. Taft.

81. Mr. McCormick approved of reporting to the Bureau of Security and Investigative Services and to the FBI.

82. In June 2022, Ms. Taft discovered an audio recording of Mr. Waldman speaking with Mr. Albertini about Mr. Barresi in October 2019.

83. Ms. Taft provided the audio recording twice to the FBI in emails: once in October 2022, and once in February 2024.

84. Mr. Barresi obtained a copy of this recording from Rebecca Berry.

85. The audio recording of Mr. Waldman speaking with Mr. Albertini about Mr. Barresi in October 2019 included the following statements, listed in 85-90.

86. Mr. Waldman was aware that Mr. Barresi threatened people and brags about being dangerous.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   16

87. Mr. Waldman showed lack of concern about Mr. Barresi's audio tapes including of Mr. Albertini and Ed Shaw of the Viper Room that he used to coerce.

88. Mr. Albertini told Mr. Waldman that he thought 'Barresi is basically a hitman.'

89. Witnesses would call Mr. Waldman after Mr. Barresi contacted them and made them interpret the worst, making Mr. Barresi useful to Mr. Waldman.

90. Mr. Waldman wanted witnesses to cooperate with him for Mr. Depp and Mr. Barresi served this purpose.

91. Defendant Mr. Waldman conspires for his interest in Mr. Barresi to do unlawful harm, seen in the following sections of a phone call with Mr. Albertini:[3]

*Speaker 3 (Waldman): [00:00:07] Sorry, sorry. Yeah, I'm in the middle of a bunch of, a bunch of, like, client crises…*

*Speaker 3 (Waldman): [00:01:21] He's threatening you?…*

*Speaker 3 (Waldman): [00:02:08] Yep. And, and by the way, there's plenty of evidence that he has been investigating them because he's talked to a million witnesses.*

---

[3] *California Penal Code Section 633.5 Sections 631, 632, 632.5, 632.6, and 632.7 do not prohibit one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of the crime of extortion, kidnapping, bribery, any felony involving violence against the person, including, but not limited to, human trafficking, as defined in Section 236.1, or a violation of Section 653m, or domestic violence as defined in Section 13700.* Any felony involving violence against a person can be legally recorded in California. Mr. Albertini and his business partners, Mr. Robert Pfieffer and Mr. Nicherie were involved in the former private investigator Anthony Pellicano racketeering case that convicted some lawyers and imprisoned Mr. Pellicano. Using Mr. Barresi and accepting he can be seen as a hitman by witnesses could amount to Mr. Waldman aiding and abetting felonies against the person. *See,*"Pellicano, lawyer convicted of conspiracy" https://www.today.com/popculture/pellicano-lawyer-convicted-conspiracy-1C9411961

"**Speaker 2** (Albertini): [00:12:58] Um, look, I'm just going to put it out there and this is public information too. I've been fucked by so many lawyers in my life, you wouldn't even believe.
**Speaker 3** (Waldman): [00:13:06] Yes.
**Speaker 2** (Albertini): [00:13:06] Lawyers that work for me fucked me in ways you wouldn't even believe. I tried..
**Speaker 3** (Waldman): [00:13:11] Well, I've experienced this town, I could believe it.
**Speaker 2** (Albertini): [00:13:13] All right. I trust you, I trust you. Even one of my attorneys told me, he said, "Don't ever think for a minute that these guys care about your interest, they only care about Johnny's," and I know that, that's how it works. I, I've been represented, I know, I know that. . .
**Speaker 3** (Waldman): [00:13:28] Well, uh, no, I mean, by the way, your lawyer is exactly right. At the moment, um, you know, what I'm-, what I care about is Johnny's interest. That's true."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   17

*Speaker 2 (Albertini): [00:02:15] I put him on, I put him. . .*

*Speaker 3 (Waldman): [00:02:16]* **Because those witnesses just called me.**

*Speaker 2 (Albertini): [00:02:17]* **I put him on to those witnesses.**

*Speaker 3 (Waldman): [00:02:20] Yeah. I'm-, I mean, yes, and then he found others too and some of them are from the newspapers, whatever. But he has dropped by their houses, left some notes, left them voicemails, whatever. I can see that he is investigating. But what worries me* **when I hear the podcast and he's, you know, bragging about or seeming to brag about some really, really creepy stuff, you know, my mind goes and wonders if he has some other purpose** *besides just. . .*

*Speaker 2 (Albertini): [00:02:45] I think. . .*

*Speaker 3 (Waldman): [00:02:46] Because this is not the guy who would pick to investigate things.*

*Speaker 2 (Albertini): [00:02:48] Exactly. Well, that's my whole point. They know that* **this guy is basically a hitman and that they know that he worked for Pellicano**, *which I'm calling Anthony as soon as I can, I'm gonna get a hold of him and find out what his take is on all this shit.... What is he capable of? I don't know. Apparently, he's capable of pushing a transvestite out of a window.*

*Speaker 3 (Waldman): [00:03:25] Well, you know, assuming it's true. Like, the, the creepy way he says it in his podcast, if you listen to it, he denies it but he denies it in a very winking way. He's like, "I didn't do it, and if I. . ." Basically, "And if I did do it, I wouldn't tell you."*

*Speaker 2 (Albertini): [00:03:37] Let me read you. . .*

*Speaker 3 (Waldman): [00:03:37] He goes on to say, "I have, you know, all kinds of sources and methods, I'm the chameleon, I do whatever the situation warrants." I mean, what-, are you-, what is the takeaway? What is your interpretation of the things he's saying?* **I think he's trying to make you interpret, you know, the worst…**

*Speaker 3 (Waldman): [00:10:16] Um, but I asked him [Mr. Depp] about you and he said you were a nice kid and you were-, you know, he knew that you've been homeless and I told him that I've spoken with you. He said, "You know, we have to really take care of him,[4]' which by the way, he says about everybody…*

---

[4] Take care of him" turned into allegedly post-trial payments offered to Mr. Albertini and his former lawyer Magda Janicki while in negotiations with Mr. Waldman in January 2020. "Take care of it" to pay it off was witnessed by acting coach Kristina Sexton in a deposition video regarding the Hicksville Park incident. Bribery of witnesses was reported to California's Department of Consumer Affairs and these documents provided to the FBI.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   18

*Mr. Waldman showed resistance to journalists interviewing Mr. Albertini as he called him 'a little piece of the evidence' instead of a witness.*

**Speaker 3 (Waldman):** *[00:14:45] Well, just let, let me do this. Let me see where this reporter is and I'll let you know too. If, if he's, you know, it's not, it's not only based on you, you're just a little piece of the evidence.*

**Speaker 2 (Albertini):** *[00:14:55] Absolutely.*

**Speaker 3 (Waldman):** *[00:14:55] Well, not little. I mean, you're, you're a piece of the evidence that goes along with all the evidence I've already given him. .*

Mr. Waldman discussed witness James Franco. *"Oh, well, you know, James Franco lived in the building, that's why he was in the elevator," whatever works. And in the process, they confirmed that it's James Franco in the elevator."*

92. On June 17th, 2022, Ms. Taft inquired about negotiations of payment to witnesses and intimidation of witnesses by contacting Mr. Albertini's former lawyer, Ms. Magda Janicki, who he stated negotiated with Mr. Waldman. Mr. Albertini provided texts from Ms. Janicki that Mr. Waldman emailed her to meet.

93. On June 20th, 2022, Ms. Janicki emailed Ms. Taft claiming there were no financial negotiations. Ms. Taft stated there was an audio recording from January 2020 to the contrary. In the recording, Ms. Janicki stated to Mr. Albertini that Mr. Waldman offered him money after the trial and that Mr. Waldman would not be listing him as a witness.[5]

94. Ms. Taft wrote they would be reporting to law enforcement and cited the California law on recording felonies against people including bribery and extortion. Bribery of witnesses was reported to the Department of Consumer Affairs. Ms. Janicki then contacted Defendant Mr. Waldman.

---

[5] The allegations of bribery of witnesses was called "hush money" in 2019. Joey Davis, who Ms. Taft communicated with and who Mr. Barresi approached in February 2022, wrote his first article on the case about "hush money." Ms. Taft began to be suspiciously aware of Mr. Barresi when she saw he spoke with Mr. Davis. Bribery of witnesses had been forgotten by Ms. Taft. *See, In Court Petition, Johnny Depp is Accused of Making Hush Money Payments to Witnesses* https://thegeekbuzz.com/news/in-court-petition-johnny-depp-is-accused-of-making-hush-money-payments-to-witnesses.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL    19

95. On June 20th, 2022, Mr. Waldman through Mr. Stephen Braga threatened Mr. Albertini and Ms. Taft, included as any third party, with alleged conspiracy and authorities. Mr. Albertini responded with,

> *"Get Your Bitch Barresi Under Control. I am Represented. Do Not Contact Me Again. You Sure I was in California?" With a comment to Ms. Taft, Mr. McKinney, and his lawyer Mr. David Bigney, "Interesting Choice. He Is Using Damion Echols Lawyer to Intimidate Me."[6]*

96.  On June 27, 2022, Mr. Albertini calls Ina Ruxdana about the threats she stated happened to her and to witness James Franco. Ms. Ruxdana states intimidation is continuing.

Ms. Taft provided this to Mr. McCormick.

97.  Ms. Taft and Mr. Albertini started to find interviews and witness statements, true and correct copies, in unedited versions of emails; because Mr. Barresi had changed witness statements, including ones whom he sent to attorneys:

In a phone call correcting an email from July 28, 2019 titled with "COOPERATING WITNESS,"[7]

> **"Speaker 1 (Taft) [00:00:05]:** Albertini alleges as follows Johnny Depp DP physically assaulted actresses Winona Ryder, Carre Otis, Kate Moss and model Stacey Lopez.
>
> **Speaker 2 (Albertini) [00:00:15]:** Uh, no Stacy Lee Lopez..."

---

[6] Stephen Braga was the lawyer of Damien Echols, one of the men convicted of the West Memphis Three Murders of three boys. Mr. Depp was interested in them and created a documentary on them at Infinitum Nihil, *See CBS* "'West Memphis Three' freed after 18 years," https://youtu.be/1fKdY6qB6hU?si=-vGiz8XFoJRMoxNo

[7] As a previously verified key witness, Mr. Albertini testified for the prosecution in People v. Rademaker, where his friend, Rademaker, admitted to him to have killed Kimberly Pandelios, an aspiring model that applied to a fake photographer advertisement.
*"This evidence established that on February 27, 1992, appellant kidnapped and murdered Kimberly Pandelios... At trial, Richard Albertini testified that on at least five, perhaps ten, occasions, he and appellant discussed the ads appellant had placed in magazines and newspapers in which appellant held himself out as a photographer seeking models."*
*"Shortly after Albertini's testimony, appellant told Albertini, who also was in custody, that when appellant got out of jail, he was "going to come get your sister," whose existence appellant knew of and whom he may have met in the past."*
*See,* https://casetext.com/case/people-v-rademaker-1

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   20

98. Other notes by Mr. Barresi of cooperating witness Mr. Albertini's statements were corrected including those with potential criminal and civil liabilities.

99. Included in this recording is correcting that Mr. Depp's inner circle through the Viper Room did not pay protection fees to the mafia.

> **Speaker 1** *(Taft)[00:02:47] Albertini oversaw Viper Room protection fees paid to mob.*

> **Speaker 2** *(Albertini)[00:02:53]: No, because there were no protection fees paid to the mob. Um, that's part of the recorded tape with me and "Big Ed" Shaw. These want to be mobsters came into the club trying to get protection fees, and we told them to get the hell out of there. That's we threw them out that night. The next day they came back and put the gun in the guy's mouth and said Get the fuck out of here.*

100. Ms. Taft and several others reported Mr. Barresi to the Department of Consumer Affairs for being unlicensed and working against previous clients to harm witnesses with misrepresentation "on the behalf of Mr. Waldman" for their interest in Mr. Depp. Ms. Taft, with documentation, showed the communication between Mr. Waldman and Mr. Barresi to silence Mr. Albertini that he had information and/or testimony that could be perceived as against Mr. Depp.

101. Ms. Taft advised witnesses that Mr. Barresi was wrongfully and intentionally harming witnesses and it was not on behalf of Ms. Heard or Mr. Musk through implication, which was part of Mr. Barresi and Mr. Waldman's larger misrepresentation scheme to benefit Mr. Depp.

102. Mr. Albertini went into further details to Ms. Taft. For instance, that Bruce Corkum, a former assistant now living in Canada, had items thrown at him by Mr. Depp. He repeatedly stated that Paul Schindler, despite helping Ms. Stacy Lopez from the assault in the Viper Room, had been knowingly violent, had been cash paid, and bragged about killing Mr. Anthony Fox, a co-owner of the Viper Room who had been friends with O'Hagen, a sponsor of Mr. Depp. They had to nearly obtain bullet proof jackets in the Viper Room due to danger of violence increasing

including with Schindler. Schindler had a "JDTD" meaning "Johnny Depp Til Death" tattoo.

103. Mr. Albertini called Mr. Pat Harris, lawyer for Mr. Gregg "Rocky" Brooks, and he stated to Ms. Taft that the lawyer showed interest in him being a witness for his client who was injured by Mr. Depp on the set of the filming of City of Lies. The lawsuit settled days later on July 11th.

104. On July 11th, New York retired FBI agent Jin Kim from Daniel Ribacoff's International Investigative Group, Ltd. advised on a conference call with Ms. Taft that witnesses need to report intimidation. Ms. Taft relayed this advice by a retired FBI agent to Mr. Albertini.

105.  On July 15, 2022, Ms. Jamison from New York spoke with Ms. Taft as well as gave additional potential witness names from the Viper Room, and indicated the following:[8]

> *"Very, I was a ballet dancer and I was very, very innocent and and and um impressionable and I had no idea about the drug world or anything like that. And he, he [Albertini] hired me at the Viper Room and he protected me from seeing the the bad things..."*

> *"Um Bruce Quark, I met through him, and he's one of the numbers I'm getting and he was friends with Johnny. But Bruce, Bruce I think like me and we hung out a few times and, but I just thought it wasn't, that he wasn't my type at the time..."*

> *"Never once did I see see Richie do anything bad to anybody, but I did see him get very. . .he was very protective of Johnny at the time. But he told me things that he would do, like, he, I distinctly remember he said that Johnny put a cigarette out on a woman's forehead. I forget who it was, but he knows the name. Um he would tell me things once in a while how how abusive he got with his girlfriend. But he was, he was also very loyal to him at that point, so it was hard for him. He also asked me for Jack's number. Now, Jack and I was a lot closer too. Jack was um a bartender there. Humble and nice to me too."*

106.  Mr. Albertini, on July 28, 2022 from South Carolina with an authorized recording, told eye-witnessing testimony of an incident with assault in the Viper Room to Ms. Taft:

> "The night that the cigarette was put out on Stacy Lee Lopez, it would've been...my best guess is it would've been a Wednesday night, because there were so many models in the

---

[8] Ms. Jamison had other information about the Viper Room and social circles she enjoyed. However, she further expressed concerns about people being able to pay to kill others, which Ms. Taft assumed that if when related to the Viper Room, was connected to Paul Schindler.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   22

club. And, generally speaking, the models were there for the punk rock pajama party. It was after hours, and, uh, you know, Kate was on the dance floor dancing with, uh, Stacy Lee Lopez.

*Johnny was loaded. Johnny, I don't know what he was on. He was very drunk. I don't know what drugs he took that night. But he became very irate at the fact that Stacy was, I guess, kind of getting a little bit close to Kate, almost like a dirty dancing kind of thing. Johnny flew off into a rage, and he ran out into the dance floor, and he pushed Kate out of the way, and he grabbed Stacy Lee Lopez by her hair, and he put a cigarette out on her head.*

*Paul Schindler, interesting enough, was the one that ran in there and pulled Stacy Lee Lopez away from him. He took Stacy. He escorted her out of the club. Um, and then I can't remember who he kind of, like, turned her over to, but he made sure she was okay. When Paul Schindler came back into the club, Johnny flew off in a rage towards Paul Schindler. And he started yelling and screaming at Paul Schindler, "I'll kill you. I'll kill you if you ever do that again." And he started punching holes in the walls, in the downstairs corridor and in the private room.*

*Um, the next day, it was early that morning when Sal and Seven, Seven McDonald, were terrified that Paul was gonna come back and harm somebody at the club. Paul was very upset at the fact that Johnny had threatened to kill him. But at the same time, Paul Schindler would've never done anything to anybody there. He loved Johnny. Like, he was obsessed with Johnny. Um, right away they were trying to...Seven and Sal were trying to figure out how to make this little story go*
*away. The last thing anybody wanted was the big modeling agencies to know or the bookers to find out that this happened, because that would've dried up the pool of models to come hang out at the club."*

107. In the same recording, Mr. Albertini stated he said nothing to Mr. Barresi about Mr. Depp causing the death of Mr. Fox directly, and he eye-witnessed his friend Paul Schindler bragging about killing Mr. Fox.

108.  Mr. Barresi showed anger at Richard Albertini and Plaintiff Christina Taft discovering his agency to Adam Waldman, increasing his threats to make them recant that he had a financial arrangement with him to benefit actor Johnny Depp.

109.  On July 13th, 2022, Ms. Taft spoke with Ms. Ruxdana over the phone and over texts until October 2022. Over the phone, Ms. Ruxdana stated Mr. Franco was threatened with being killed

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   23

and he had seen Ms. Heard with a bruise on her face as a potential witness. Ms. Ruxdana's car was broken into at an event.

110. On July 8th, Mr. Barresi claimed with a subtle wish for death about Mr. Albertini,

*"His allegations against Johnny Depp are as baseless as he is. Not a more cowardly, weakling of a little man has ever breathed air."*

111. On July 11, 2022, Mr. Albertini texted more about the inner circles of Mr. Depp to Ms. Taft:

*"Pfieffer was a Very Good Friend of Depp that is How I Met Him"..."Pfieffer tried to get Paul Schindler to kill her [his wife Maria Pfiefer from Prague]" and "Pfieffer was also Alice Cooper's Manager that Signed him to Hollywood Records."... "Pfieffer Tried to Hire Johnnys bodyguard, My roommate. The guys in the News story telling Shafir he better have a Gun to Murder Maria. I found out and told Schindler if one hair on her head was Touched I would Bury him in the Dessert. He is the Guy Rumored to have killed Anthony Fox. He is the Guy Ed Shaw Said in the Recording Almost Got us all Killed."*

Alerted to danger, Ms. Taft provided these texts to the FBI in October 2022 with Mr. Barresi's audio recordings with his texts about killing and 10 million.

112. On their own accord, on July 13th 2022, Mr. Albertini, Mr. Palomeres, and Mr. McKinney filed their own police report in South Carolina that stated Albertini was a witness for a retrial that was then given to FBI agents. The report listed Mr. Depp with Mr. Barresi as suspects. Included in this police report were allegations of Mr. Barresi being a hitman and financial transactions of Mr. Barresi with Mr. Waldman, citing their email.

113. Former employee Olivia Barash was reached out to by Mr. Palomeres and stated that she had wanted to do a documentary on the Viper Room, but Mr. Barresi was preventing her from doing it. Both Ms. Barash and Mr. Albertini stated Mr. Depp did not kill Mr. Fox, however, only Mr. Barresi could speak. Ms. Taft texted Ms. Barash.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   24

114.  On July 28, 2022, Mr. Barresi called Mr. McCormick, indicating it was originally a private dispute before exposures. He admitted the documents were his and that he paid Mr. Nitrini and Mr. Gonzales.

> *Mr. Barresi claimed, "And they love, they love posting stuff on Twitter and having arguments and fights on Twitter. Uh, certainly, as a professional courtesy to you, I have no intention of revealing any names or anything like that…"*
>
> **"Speaker 1** *(Mike): [00:02:25]: Well, I'll go over everything. So, if I have any...*
> **Speaker 2** *(Barresi): [00:02:29]: Mike, are you...*
> **Speaker 1** *(Mike): [00:02:29]: ...questions or anything, I'll give you a call.*
> **Speaker 2** *(Barresi): [00:02:30]: Yes, sir. Yeah, that's wha-...that's, you know, the facts*
>
> **are in the documents. The documents were misleading…**
> *I paid Joey to house Mario for two weeks.[9]  And then when Mario had to leave his house, I gave money to Mario to stay at a hotel for a week."*

115.  The same day Ms. Taft received dozens of emails Mr. Barresi had sent to retired LAPD and licensed private investigator, Mr. McCormick.

116.  In the email from Mr. Barresi to McCormick dated July 27, 2022 titled:

> *"YOUR INVESTIGATION RE, JOHNNY DEPP V. AMBER HEARD"*

he wrote that he paid Nitrini,

> *"I gave him money, more than $1,200."*

117.  In another email Mr. Barresi sent to Mr. McCormick that Ms. Taft read including in the title, "Adam Waldman & You," there are text messages from October 2020 attached from Mr. Albertini to Mr. Nitrini that state Mr. Waldman and Mr. Barresi have a financial arrangement.

---

[9] "On May 15, 2020, Mr. Barresi commented to Joseph Gonzale's profile photo on Facebook, **"AL CAPONE,"** and then a menacing quote by the infamous mobster, **"I'm not a murderer, no matter what the undertaker says."**
Mr. Gonzales, a licensed PI, was reported to BSIS in December 2022 for Mr. Barresi, unlicensed, instructing him to gather information. Gonzales has never interacted with Ms. Taft, although he texted Mr. Nitrini, and Mr. Gonzales appeared to not travel with Mr. Barresi to Washington DC in July 2023.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   25

118. Mr. Albertini states Mr. Barresi "played both ends against the middle" in context of this arrangement with Mr. Waldman. Mr. Nitrini claimed on April 17, 2022 to Mr. Barresi that it's a "criminal allegation towards [Mr. Barresi] and Adam Waldman."

119. Mr. Barresi forwarded an email to Ms. Taft's Private Investigator Mr. McCormick on July 27, 2022 - (that he sent to Mr. Nitrini on April 26, 2022) alleged there was a rumor that Mr. Anthony Fox killed himself from financial woes.

120. An email from Mr. Barresi to Mr. McCormick that he sent to Mr. Nitrini on April 16, 2022 stated:

> *"The more you prolong a crisis the bigger pay day is how it works," in decades long history of swindling, seemingly of witnesses, clients and ex-spouses of clients at the same time.*

121. On July 28, 2022, Ms. Taft had a conversation with Jane Doe, of Tennessee, who stated private details into experiences of assault, including sexually and violently, by actor Martin Csokas while in New Orleans. Jane Doe had contacted Mr. Albertini in November 2020. Mr Albertini thought Mr Barresi harmed Doe as a "fixer."

122. Ms. Taft described obstruction of justice related to harmed witness testimony, packaged reports by Mr. Waldman, and compared it to Jane Doe's experience. Encouraged to record for evidence, Ms. Taft recorded understanding Doe was in a one-way state. *Jane Doe agreed for legal members to see their conversation. Taft provided Jane Doe a copy of the recording for her own records*.

123. Lori Allison in August 2022 publicly complained about Paul Barresi's alleged "findings" about her and that she had never spoken with him. Allison had a settlement with Mr. Depp as his first wife.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   26

124. On August 10, 2022, Ms. Taft messaged Ms. Ariel on LinkedIn asking if she gave a painting to J.D. called Greta Garbo and if she remembered Richie from the Viper Room.

125.  On August 10, 2022, Mr. Barresi admitted on video that Mr. Waldman emailed him and that they spoke over the phone.

> *"I got <u>an email</u> from Adam Waldman who said, "I really appreciate you coming clean. . ." Because the story is what we've already discussed, that I couldn't <u>find</u> anything bad about Johnny. He said, "I appreciate and Johnny appreciates you coming clean," <u>as if I was holding something, something back</u>. And then I-, we eventually <u>spoke on the phone</u>…"*

126.  On August 11, 2022, Neal Rauhauser, who had worked on Project Vigilant and as a federal informant, received two calls from the FBI in South Carolina and North Carolina simultaneously, informing Ms. Taft that it was likely an undercover agent.

127.  In August, Ms. Taft and Mr. Albertini discuss more potential witnesses from the Viper Room. Mr. Albertini describes a woman that he and his former roommate Jalee Carder, who Mr. Barresi claims he interviewed, named Donna.

> ***Speaker 2*** *(Albertini): [00:04:02.672] "She used to bring home some of these girls. She brought home this girl named Donna. Donna was...she was drop-dead gorgeous. She was from Kentucky, she talked like she was from Kentucky, and she was hot. She was very outgoing, and she was staying with us... Uh, she didn't know that I could introduce her, she...all she said is, "Richie, can I come to the club one night?" "Sure." She comes to the club, what do you know? Within minutes she knows Johnny Depp. And they're sitting downstairs, they're in the bar, they're getting to know each other, … And she was only in town, she was only around for about three weeks,.. She said, "But Johnny, you're from Kentucky and I'm from Kentucky." And when she said that, he flipped the fuck out, and he pushed her, and he called Big Ed Shaw over, and Big Ed Shaw fucking mangled her up, and threw her out of the club.[10] She stjill lived with me. She was... So I'm like, holy fuck. So later on that night, I go home. She's all bruised up, she's telling me that she had to have sex with, with Ed, and I don't even remember who else, maybe Josh Richman, um,*

---

[10] In files from Mr. Barresi to Mr. Nitrini that were received by Ms. Taft in June 2022, the lawsuit Rocky Leonard George Jr vs Viper Room Inc, Johnny Depp, and Does 1-50 cited that "Plaintiff ROCKY LEONARD GEORGE, JR visited the Defendant SAFE IN HEAVEN DEAD INC. dba VIPER ROOM in West Hollywood, California, as a lawful invitee/patron" and  "Defendant had received complaints of injuries inflicted by its security personnel from not less than nine (9) previous patrons."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   27

*but this is what was going on. And it was like, this is a girl that got abused, not in a relationship with Johnny, just manipulated with...by Johnny. Or I'm not even going to say that, just obsessed with Johnny, that she was willing to do anything just to meet him, and it...when he was done with her, he was done with her. And her name was Donna. "*

128.  On August 23, 2022, Mr. McKinney showed Ms. Taft a voicemail from Mr. Barresi, voicemail from June 19, 2022; this was an audio tape Mr. Barresi kept of Mr. Albertini discussing witnessing a death plot against Carre Otis and Christian Slater by Otis's ex Mickey Rourke and Paul Schindler, taking the job of hitman. Ms. Taft became aware of evidence that Mr. Barresi keeps audio tapes of potential witnesses for intimidation and leverage. Mr. McKinney took this as a threat to him and he was called by Mr. Barresi repeatedly for months.

129. Mr. Barresi recorded the following audio in a telephone call with a potential witness to violence, including hiring to kill, and that he replayed in an intimidating circumstance onto a voicemail after Ms. Taft spoke with that witness, Mr. Albertini:

*"**Speaker 2** (Albertini): [00:00:20] And we're out drinking, and we're drinking hard. We're drinking hard all night. We end up at this little kind of like, gangster/actor place in Hollywood, called the Three of Clubs. It's 4:00 in the morning, there's like a pound of blow sitting on the table, everyone's drinking, I'm drinking hardcore [inaudible 00:00:36] Um, Mickey Rourke is sitting there, trying to hire somebody to kill Carré Otis and Christian Slater. He wanted them both dead. Paul Schindler was stepping up, he was gonna take the job. I'm sitting there, and I'm like, what am I listening to? I'm a bad guy, but I'm no killer, and I don't get involved with this kind of shit. This isn't my problem. His family problems are not gangster problems."*

130.  Approximately August 25th, 2022, Ms. Taft met Mr. Albertini in-person in Los Angeles.

131.  Mr. Albertini and Mr. McKinney inquired to West Fernando police and San Bernardino police about where to file a report about intimidation by Mr. Barresi et al, related to witness harms benefiting Mr. Depp and Mr. Waldman.

132.  Ms. Taft introduced Mr. Albertini to Lori Mattix over the phone as he rattled off a number of names. Ms. Taft introduced him to friend Lauren Pena in-person. They watched "Stuff" short film with ruined property all over the room and mangled writings, including "kill pigs" on the

walls produced by a small group of friends, Scarmonga brothers and Mr. Depp in the 1990s.

133. On August 31, 2022, while in Los Angeles, Mr. Albertini became more descriptive to Ms. Taft about dark proclivities about Mr. Depp which scared Ms. Taft about the dangerousness of this testimony and information to know. In Ms. Taft's phone notes, "Art of Serial Killers - John Wayne Gaysey" and interest in Charles Manson corroborates the April 2019 potential witness that reached out to Ms. Taft that Mr. Depp shows interest in serial killers.[11]

134.  On September 8, 2022, Ms. Taft discovered a phone recording between Mr. Ben Chew from DC and Mr. Albertini.  In that recording Mr. Albertini reported to Mr. Chew that Mr. Barresi is involved in bribery, extortion, blackmail, and even to 'causing death', when used by a lawyer to eliminate witness testimony. Mr. Barresi later edited a published version of the recording to remove the statement of his deal with Mr. Waldman (Concealing to potential witnesses that he is an agent for Mr. Waldman):

> *"And he's now alluding to the fact that he was playing both sides of the fence and he <u>had a deal with Adam Waldman</u>, and that's why he went on record saying that he found nothing dirty in the Johnny Depp case."*

135.  Taft assisted Albertini with documentation for a Temporary Restraining Order in Burbank, California to stop the threats from Mr. Barresi, the "PI working for Johnny Depp," on September 15, 2022. A transcript of audio of Mr. Barresi threatening to hit Mr. Albertini across the head

---

[11] The potential witness in: April 28, 2019, "Johnny Depp is fascinated by serial killers. He even owned a painting by the..."
Another serial killer in Depp's interest was Charles Manson, which relates to the "kill pigs" written on the walls in "Stuff." In 2000, an article stated that Mr. Depp was writing to him to meet him in prison while allegedly researching a movie role. Mr. Albertini corroborated the unnamed witness from April 2019, adding that Johnathan Shaw and Johnny visited Charles Manson in prison.
*Source,* https://www.cinema.com/news/item/613/johnny-depp-writes-to-charles-manson.body
FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   29

was provided, supplementing the testimony that Mr. Barresi threatened to shoot him during the trial.

136.  On September 16, 2022 Mr. Barresi wrote, "Yeah a crooked PI who makes a half a million a year," under commentary related to cases of Mr. Depp's and about Mr. Fox's daughter Samantha.

137.  On September 22, 2022 the first complaint was submitted to the Department of Consumer Affairs Bureau of Security and Investigative Services with several contributors related to witness interference and "thwarting the judicial process."

138.  Mr. Barresi discovers the police report in South Carolina and the TRO, this is evident because on September 29, he emails the sheriff's office and publishes his email that included, "On behalf of Johnny Depp, his general counsel Adam Waldman," that he requested Mr. Nitrini to send the accounts of Albertini's posting on the arrangement between Mr. Waldman and Mr. Barresi, as well as anything he stated against Johnny Depp.

139.  Mr. Barresi escalated coercion tactics through pressuring people, including over the phone and texts. This included fabricated implications before exposure.

140. While in Ms. Taft's Los Angeles apartment in September, Ms. Taft witnessed Mr. Albertini call Faydra Corkum, Bruce Corkum's sister, on Facebook messenger to tell her that Mr. Depp was using Mr. Barresi.

141. On September 19, 2022 in Ms. Taft and Mr. Albertini's last discussion about witnesses, Mr. Albertini described a "kill list" that Mr. Schindler had to hire a hitman to kill people at his funeral and a suicide pact Schindler had with Mr. Depp. Largely removed from the social circle, only Ms. Allison went to his funeral.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   30

142.  Mr. Barresi breaches the Temporary Restraining Order by looking for Mr. Albertini and Plaintiff Ms. Taft's location. This search by him included questioning her alleged sexuality. Mr. Albertini and Ms. Berry report this to the police. On September 26, another "ever breathed air" death threat showed from Mr. Barresi.

143.  On September 27, 2022 a video surfaced that Mr. Waldman and Mr. Barresi intended to "END" Ms. Heard on appeal, which Mr. Barresi retweeted with words from his audio recordings of "Johnny Depp's consiglieri Adam Waldman"[12] on vandalism, break-ins and interference against witnesses that are "elaborate & extensive; not random and those targeted are connected." Ms. Taft and Mr. Brummitt feared if it literally meant "ending" her life.

144. On September 29, 2022 Mr. Barresi continued his death threats related to his fabricated notes of interviewed witnesses, *"Albertini is… Not a more vile and despicable human being has ever breathed air."*

145.  Ms. Taft was removed from Aedan's Board in October 2022 during Barresi's intensifying harassment. Ms. Taft had fear that Mr. Barresi and Mr. Waldman could harm any of her current or previous business partners or employers, including Aedan, which appears on her LinkedIn profile. Due to this, for approximately two years, Ms. Taft could not communicate with Aedan as they grew to 35 employees.

146.  Defendants' actions resulted in Ms. Taft's contract with SaveMeNow to languish, especially in the state of California, where NGA911 – contracted to update 911 centers in California - is located in Los Angeles.

147. On October 5th, 2022 Mr. Barresi wrote,

---

[12] Mr. Albertini, in an authorized recording with Ms. Taft, alleged that Mr. Waldman told him about two of his well-known [dangerous] clients when Mr. Albertini told him of mob lawyers. Ms. Taft chose to focus on eye-witnessing.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   31

*"I DON'T CARE WHAT THE UNDERTAKER SAYS" after "IM NOT A HITMAN."*

*Mr. Barresi then wrote referring to a friend of Ms. Taft's texting him with an image of a girl tied up in a room. Ms. Taft didn't know which friend.*

148. Ms. Taft tried to report the threatening image. She was still afraid to go into timeline details to LAPD officer Thomas #43990 at the Pacific Division of Culver City due to him asking if Amber was her friend after looking at the full posting of the photo. Next to Amber Heard's name is *"DIE-HARD."* She stated *"no"* and was advised to get a restraining order.

149. On October 10, 2022 Ms. Taft urgently submitted her additional report to the Department of Consumer Affairs Bureau of Security and Investigative Services and received Complaint Number: 1202022007624.

150. Mr. Barresi obtained audio tapes of Ms. Taft and Mr. Albertini.

151. Along with repeatedly discussing Ms. Taft's finances to exploit. Mr. Barresi implicated $10 million to Taft, which was reported to the FBI.[13]

152. In said recording, the following was stated:

> **Speaker 1 (Barresi) [00:01:03]**
> *The only difference between you and Christina Taft is you're not uh a multimillionaire, are you?*
> **Speaker 2 (Berry): [00:01:08] (Laughing) No.**
> **Speaker 1 (Barresi) [00:01:09] Did you know that she's got almost 10 million?[14]**

---

[13] $10 million is the judgment to appeal by Ms. Heard in both defendants' interest. Audio given in October 2022 to the FBI. Reported as connected to Ms. Taft and actress to the FBI in timeline given in 2024.

[14] Ms. Taft took this, including in context of the ongoing conduct and recordings removing witnesses, that this was implication of Ms. Taft's funds to Ms. Heard's funds while in tandem threatening to take anything she had. Ms. Taft had minimal interactions to know of Ms. Heard's naivete to Mr. Barresi's conduct. Mr. Albertini had reached out to Mr. Brandon Mcculloch, friend of Ms. Heard's of 20 years. Mr. Albertini and Ms. Taft before escalations of intimidation were to meet with Mr. Joe Dunn, previous Bar Association President and senator in California about stopping harms to witnesses and people being harassed. On October 12, Ms. Taft introduced Mr. Mcculloch to Mr. Dunn in email. The same day, Mr. Mcculloch ominously canceled their meeting with the email, "We (incl me!) have skeletons, but it doesn't help my friend." Mr. Mcculloch has never responded since. Ms. Taft was left to struggle on her own with some support from Mr. Dunn. Ms. Taft felt restricted and referenced without any answers what was occurring vaguely on November 17, "creates risk of financial crimes masked by fraud on the court... Also, I'm not

*Speaker 2 (Berry): [00:01:12] I know she got a lot of money, but. . .*
*Speaker 1 (Barresi) [00:01:15] Did you realize. . . did you hear she got 10 million?*
*Speaker 2 (Berry): [00:01:20] Um, no, I didn't know it was that much.*
*Speaker 1 (Barresi) [00:01:23] How much did you hear?*
*Speaker 2 (Berry): [00:01:24] I just knew it was over a million.*
*Speaker 1 (Barresi) [00:01:28] Yeah, well, that's, that's 10 million is over a million.*

153.  Mr. Barresi claims in this audio recording that the women, Stacy Lee Lopez and Donna, that Mr. Albertini saw assaulted by Mr. Depp in the Viper Room are irrelevant and may not exist. Mr. Barresi asked potential witness Jalee Carder about Mr. Depp, not Donna.

154.  In the same recording, Mr. Barresi offers money to Ms. Berry for audio recordings of Ms. Taft and Mr. Albertini, while stating Ms. Berry won't be implicated if she complies.  Mr. Barresi claimed he spoke with "hundreds of people" and/or accessed their information over the years. Mr. Barresi states, "Some people make $250,000 a week." In another recording, Mr. Barresi states he "mailed her a check." Ms. Berry is a nurse and occasionally an independent journalist.

155.  Ms. Taft began to experience aspects of extortionary tactics similar to types of crimes with little knowledge of what these are or of assistance.

156.  With Mr. Waldman's directions and rewards, Mr. Barresi, seeing Ms. Taft as a competitor clarifying communications, enacted invasion of privacy against Ms. Taft and others. Mr. Barresi invaded private affairs into alleged relationships and matters with unauthorized access to data.

157.  Approximately September to October 2022, Mr. Barresi obtained the audio recording of Ms. Taft and Jane Doe. *Ms. Taft did not want her audio accessed by Defendants for commercial gain.*

Ms. Taft to Jane Doe in the full recording reiterated

---

familiar very well with reporting financial crimes of large extent related overall to witness interference/tampering…"

*"it should never get out to anyone"* except her legal members and an investigator on her behalf and it should never be posted because she did not want any danger to her. *"I don't wanna put you in danger about any of that, so I would never want that posted."*

> **"Speaker 1** (Jane Doe): *"Yeah please, please, please. I'm like, trying not to cry right now because I, I can't. Just please don't post it, okay?*
>
> **Speaker 2** (Taft): No, I won't post it. No, it won't be posted."
> Before Mr. Barresi's exploitation of the audio of Ms. Taft and Jane Doe, they had pleasant interactions.

158. Mr. Barresi edited their audio to force accusations in his interpretations, which he sent to publicity agents and lawyers of the actor Mr. Depp, and sent to alarm his erstwhile client's lawyers and security. Mr. Barresi privately texted Ms. Taft about sending it to alleged security and did exposure. In his shortened edited audio, he implicated Mr. Depp and Mr. Waldman.

> § Ms. Taft and Ms. Berry feared danger when Mr. Barresi obtained the recording. Ms. Taft urgently reported to the Bureau of Security and Investigation Services the violations by Mr. Barresi.
>
> *§ In texts to Ms. Taft, Jane Doe asks if she should, "beg Barresi to stop" and it's a private affair. Ms. Taft stated there is a restraining order hearing upcoming, to please not contact him, and that he would exploit any information he obtains. Mr. Barresi obtained some text messages between Ms. Taft and Jane Doe. Mr. Barresi had communications with Jane Doe. As pressuring increased, Jane Doe texted that Ms. Taft should worry about the FBI and Ms. Taft blocked Jane Doe.*

159. In October 2022, former Atlanta police officer and paralegal Denise Newsome told Mr. Baresi in email to stop his harassment of Ms. Taft.

160. Ms. Newsome obtains text messages from Mr. Barresi claiming he was present at Shalimer's death who showed fear of him and he took a memento from her body that he later claimed was in Italy. He was questioned by the LAPD and refused a lie detector test.

161. Texts of Mr. Barresi included him wanting people to think he could have caused the death of one of his subjects, Ms. Seiuli. Texts between Mr. Barresi & Ms. Newsome from October 10, 2022 indicate the following:

Ms. Newsome: "So you're safe-- even if you did do it"

Mr. Barresi: "When she spotted me she got embarrassed and backed up to the roofs edge. She sat on the rail skirting the roof Not made for that Was flimsy. When she stood to wrap herself in the towel she lost her balance Backed up and fell Dead…"

Ms. Newsome: "I do tend to believe you actually…"

Mr. Barresi: "My only fault I took a momentous off her body and left the scene. That's when the LAPD took me in a few times to talk. I refused to take a lie detector test."

Ms. Newsome showed these texts to Ms. Taft, stating it was a confession and she was shaking, then she called the LAPD to report Mr. Barresi.

162. This text frightened Ms. Taft because Mr. Waldman and Mr. Barresi focused on her, specifically her location, and that they knew she lived in West Los Angeles. Defendants treated Plaintiff as if she was a subject of theirs as well.

163.  Rebecca Berry obtained audio of Paul Barresi discussing the death of Shalimer Seiuli, admitting to telling witnesses to being present at her death, claiming to them to throw her off a roof, and to smother a comedian actor.

> **"Speaker 1**(Barresi): [00:02:53] *Yeah, you know those texts about me killing her? Yeah, because he called me so many times saying, I know you kill that 'tranny'. I know you kill that 'tranny'. He says, I know you threw her off the roof. One time he called again and said, I know you threw her off out of the window. I hear -, Hold on. I said, I uh then I had a call coming in so I had to text him. I said I didn't throw that bitch off, out a window, **I said I threw her off the roof**."*

> About the death of the comedian actor Paul Lynde he stated he told, "*He deserved it. He deserved a pillow over his head.*"

This was relayed to Taft with the $10 million audio on October 28th and was alarming.

164. Ms. Taft submitted this audio to the assigned FBI agents and to BSIS Dept of Consumer Affairs.

165. On October 13th, 2022 Ms. Taft stayed the night at Ms. Pena's house on her birthday with paralyzing fear of the escalation of Defendants Mr. Barresi with Mr. Waldman and their influence on Mr. Albertini. Ms. Pena had witnessed harms increasing.

166.  Between October 13th to 18th 2022, Mr. Ryan Gardner and Ms. Amanda Gilmore, as

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   35

friends of Ms. Taft, emailed safety concerns for Ms. Taft including vandalism and break-ins to Mr. Barresi.

167. Ms. Taft was alarmed by Mr. Barresi's response to Ms. Gilmore implying he knew she lived in West Los Angeles.

168. On October 15, 2022, Mr. Barresi confirms Mr. Waldman told him words- from his phone calls with him, "He said the words word for word. And you can take that to the bank. That's all you need to know."

169. On October 25th, an audio surfaces of Ms. Taft speaking with Mr. Albertini as obtained by Mr. Barresi for commercial purposes to pressure into no witnesses of assaults by Mr. Depp of women, including Donna, known by Jaylee Carter.

170. Mr. Barresi wrote that Mr. Alberini after court on the restraining order hearing, where no witnesses attended due to increasing pressure and no documentation available, was "dead silent."

171. On October 17, 2022, Mr. Barresi pressured Ms. Taft to be afraid of the FBI and to withhold information from them.

> *"PLOT TO SABOTAGE JOHNNY DEPP'S DEFENSE WITH FABRICATED EVIDENCE & FALSE ALLEGATIONS. FBI INVESTIGATION UNDERWAY & THANKS TO SIMPLE-MINDED BATSHIT CRAZIES THE AQUAMAN STAR IS AT THE CENTER OF IT!" Attached was the photo of Ms. Taft and Ms. Heard from 2019. Ms. Taft did not know at the time that Mr. Barresi was quoting Mr. Waldman's direction of calling Ms. Taft "batshit" in a recorded call.*

172. On October 18, 2022, Ms. Taft applied for withdrawal from her Master's in Business program at American University, citing lack of care for harassment, related to approved harassment by defendants Mr. Waldman and Mr. Barresi.

173. On October 19, 2022, Mr. Barresi again refers to Mr. Albertini, "HAS EVER BREATHED AIR."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   36

174.  On October 22, 2022, Ms. Taft saw Mr. Barresi proclaim,

> *"ANOTHER JOHNNY DEPP TARGETED ATTACK. The Criminal Plot to Takedown A Hollywood Fixer. Gambino family gathering. Paul Barresi & Victoria Gotti. Al incite va il bottino." Attached is a photo of Mr. Barresi and allegedly Ms. Gotti. Ms. Taft is alerted by this mafia family implication,[15] is intimidated by it, and sees it as a threat to her to "Incite Al Gambino" when read quickly by an English speaker.  The same day, Mr. Barresi does a death threat about Ms. Taft, "HAS EVER BREATHED AIR," with an old photo of her attached.*

175.  Mr. Barresi attempted to get Ms. Taft to meet with him and contacted Ms. Newsome to attempt that arrangement. Mr. Barresi demanded Ms. Newsome to tell him where Ms. Taft was and her address.  After the threats, Mr. Barresi harming Ms. Taft and other people around her, Ms. Taft was alerted to exploitation increasing.

176.  On October 25, 2022, Sergeant Durl White from California State University, Chico's police department requested that the college newspaper, The Orion, assist Ms Taft against harassment from Mr. Barresi using her photos. Ms. Taft is an alumni in business administration. The Advisor requested Mr. Barresi not use her photos and that he violated their copyright. Mr. Barresi continued his harassment.

177.  In November 2022, Mr. Barresi sent a series of texts to Ms. Taft after she told Mr. Barresi to stop his harm towards her and others with criticisms of his practices that were ongoing while he was attached to Mr. Waldman. Additional pressuring occurred in emails. Ms. Taft saw this as coercion and blackmail into her private affairs.

178. Mr. Barresi sent 65 text messages and 17 emails to Ms. Taft between November to December 2022.

---

[15] Ori Spado communicated with witness Ian Herndon about witness Mr. Albertini and he was known by Ms. Jamison of the Viper Room. According to "The Accidental Gangster" his RICO indictment and interest by the FBI was for his connections to an American mafia family, Columbo, although he had connections to actors and singers, e.g. Frank Sinatra and Naomi Campbell who visited the Viper Room. **He was involved in debt collections and was called the "Mob boss of Hollywood" while implicated as a "Hollywood fixer."**

179. Mr. Barresi called Ms. Taft and attempted to get her on the phone. Ms. Taft did not answer. To Ms. Taft's knowledge, Mr. Barresi records many of his phone calls and Mr. Waldman is aware of Mr. Barresi's recording of phone calls.

180. On November 2, 2022: Ms. Taft told Mr. Barresi to stop his harms with awareness of his hostility.

181. Ms. Taft tried to get the exploitation to stop. She wrote to Mr. Barresi to *"stop harrass-racket-extorting"* in email and text.

182. Ms. Taft stated to Barresi he was targeting "witnesses - all on the behalf of Johnny Depp and Adam Waldman," and wrote:

> "You are under investigation with California State BSIS who are reaching out to me with an enforcement analyst. It's my complete right to report you."

183. Ms. Taft stated to Barresi he was targeting her and she had evidence of it.

> *"Eric George told my lawyer that you were not doing anything after June 2019 on their law firm's or Ms. Heard's behalf.[16] You Lied that you were doing anything on her behalf or under her lawyers for years."*

184. Ms. Taft stated to Barresi that he was doing "fraudulent concealment and working without a license. Worse, it's covering up witness interference, tampering, intimidation, and bribery - ALL of them. A racket of extortion and debt collection."

185. Ms. Taft stated to Barresi:

> *there is also an open FBI agent in SC still taking documentation... Richard Albertini saw women and men assaulted and abused by Johnny Depp. I have every single piece of evidence of his information, including Paul Schindler "JDTD"."*

---

[16] On October 5th, Ms. Taft begged her attorney Mr. Sarabia to write an email to Mr. Eric George: "Unfortunately, Ms. Taft has become the focus of a harassment campaign by Mr. Barresi. This campaign includes threatening messages and images." He asked Mr. George to confirm, "that your firm has absolutely no involvement in his recent conduct toward Ms. Taft. We request confirmation from you that Mr. Barresi has not been engaged by your firm since June 2019 on any matters related to Amber Heard." On October 6th, Mr. George wrote confirmation, "Hi Tony - Your understanding is entirely correct. Best, Eric"

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   38

186.  Ms. Taft stated that Mr. Barresi destroyed the "case" and "right to due process", and her trial - which critically needed witnesses in Depp's insider circle, Viper Room, and who saw any assaults of women or men by him.

187. "Stacy and Donna were models/strippers assaulted in the Viper Room by Johnny Depp." Ms. Taft stated Mr. Barresi was disturbingly:

> *"telling witnesses that you caused the deaths of one or two people - one who refused to recant against an actor. She and other witnesses very likely could have died from your actions. You already bloodthirstily CCed Nitrini who you tried to rope into your disgusting burying of her during her trial - expecting post-trial payoffs. I think it's interesting that you think I FUND Amber Heard. How much money do you think her FUNDER(S) have?" and that he should stop as he was causing Ms. Taft to be "into grave danger."*

188. Mr. Barresi emails to Ms. Taft that Mr. Albertini is in "the gutters," alarmingly to "stop chasing ghosts," about her alleged father's age, and that he tried to speak with her PI "at least a half dozen times."

189.  Two hours later, Mr. Barresi sends Ms. Taft threatening text messages regarding her mother, Victoria Taft, and the Gotti mafia family. This included risks of exposure and about death.

190. On November 2, in Mr. Barresi's first text to Ms. Taft, he claimed "Victoria Gotti told me your mother claimed she witnessed a mob hit."[17] Ms. Taft took this as a possible threat to her

---

[17] "At his peak, Gotti was one of the most powerful and dangerous crime bosses in the United States… He was later given the nickname "The Teflon Don" after three high-profile trials in the 1980s resulted in acquittals, though it was later revealed that the trials had been tainted by jury tampering, juror misconduct and witness intimidation. Law enforcement continued gathering evidence against Gotti, who reportedly earned between $5 million and $20 million per year as Gambino boss.[4] … In 1992, Gotti was convicted of five murders, conspiracy to commit murder, racketeering, obstruction of justice, tax evasion, illegal gambling, extortion and loansharking. " *See https://en.wikipedia.org/wiki/John_Gotti*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   39

that she could be at risk of a possible mob murder. He "got 8mm tapes and recordings to your crazy bitch." Mr. Barresi claimed her mother did porn and was a stripper.

191. Then hours later Mr. Barresi admitted he was not on the payroll of previous clients: "ended Sept 21 2019 where is your proof to the contrary"' Unlike to Mr. McCormick, Mr. Brummitt, and to potential witnesses, Mr. Barresi admitted to Ms. Taft that he was no longer under lawyers of Ms. Heard's case.

> *"**Adam has a residence in DC** He doesn't stay in hotels that I know of. I EMAILED you re **the.package deal** term you used What is that?"[18]*
>
> *Mr. Barresi criticized her private investigator for not listening to only him with a financial reference. "He banked on the hearsay dished by brain dead idiot…"*

192.  On November 5, 2022, Mr. Barresi emailed Ms. Taft that he could not go to New York as he had planned, and tried to persuade Ms. Taft into a meeting in California, to which Ms. Taft resisted stating her favorite lounge is in the Hays Adams in DC. Mr. Barresi mentions in emails in addition to his texts about a "deal," which is a word Ms. Taft never used. "And what do you mean when you say, "package deal" like Waldman did in LA--"

193.  Mr. Barresi sent quotes highlighting the audio tape he had of Ms. Taft speaking with Jane Doe referring to "report drop offs," as he linked it to Mr. Waldman, and reiterated "PACKAGE DEAL" in his title.

194. After highlighted audio tapes to pressure Ms. Taft, and forced to respond that "spun 'Deals'" to trap witnesses are not legitimate between private parties, Ms. Taft wrote to Mr. Barresi that she suspected that Mr. Albertini told numerous witnesses he was intimidating and he knew the director of the City of Lies. Mr. Barresi then wrote to Ms. Taft in email, "Brad Furman

---

[18] Mr. Barresi knows Mr. Waldman resides in DC and these texts implicate a "deal."
FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   40

is the director of City of Lies. I have him on tape for an hour."

195.  Mr. Barresi violated private affairs by forging "investigative findings" about Plaintiff's mother Victoria Taft's death, wealth transfer, alleged sexual activities, and coroner report to coerce Ms. Taft.  Ms. Taft had no idea who Gotti was and her mother had no connection to them according to witnesses.

196.  Ms. Taft's family friends, Joseph Triscari and Lori Mattix, state that what Mr. Barresi indicated about Victoria Taft and Gotti was falsified information. Ms. Mattix, who had worked for Mr. Depp's sister Christi Dembrowski prior as a fashion shopper, stated in text "no" on November 2, 2022 to Ms. Taft's mother ever talking to or knowing Victoria Gotti.

197.  Ms. Taft had relayed to her daughter that she had to testify about an incident on a private jet, related to narcotics. Ms. Taft had an optimistic- although modest- and sometimes timid view on life that it was "better than it was."[19] Ms. Taft had been in Malibu Hot Summer (an early Kevin Costner film), which she showed embarrassment of, among a number of films, TV shows, as well as Hollywood parties, mansions, and clubs like The Rainbow.[20]

198. November 5, 2022 Mr. Barresi texted Ms. Taft:

> "I'm a direct source available to educate you but you like your PI listen to idiots rather than the primary source" Ms. Taft thought she listened to witnesses and eye-witnesses. "Email this cant read and telk me what you meant by 'package deal' ".... "O really What about you answering me on what a package deal is? O and Hay Adam's Hotel? Doubt it"

---

[19] In her obituary in the Los Angeles Times, Victoria Taft "always thought the world was better than it was." https://www.legacy.com/us/obituaries/latimes/name/victoria-taft-obituary?id=8905961

[20] "Vicki was further involved with commercials and modeling, according to her brother, Donn… Vicki loved spending time socializing and partying in Beverly Hills, Laurel Canyon for the rock scene, Hollywood Hills, and Palm Springs with her friends – like Michelle Diamond and Lori Mattix. Vicki accompanied tennis star Roscoe Tanner on his tour in Europe, met rock stars, and was involved in the Hollywood scene. She traveled the world, went to Europe in the summers, and visited the South of France, Italy, England, Spain, Greece, Morocco, and Egypt. She attended Los Angeles Valley College, real estate school, and film training" and "she started acting at six-years-old in the play, "Gentleman Jane," with her real life dad, Larry, who was the male lead. Vicki grew up visiting her father, a cameraman, on sets for Paramount Pictures, Columbia Studios, MGM and later of the classic American television show "Happy Days."" Additionally, "Her paternal grandfather, Everett Debaun, had been a screenwriter for television. In the late 1960s, she was a publicity agent and rock groupie for The Doors."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   41

199. November 6, 2022 Ms. Taft asked,

> *"Is Joseph Gonzales working for Adam Waldman, since I am "DEAD wrong "?"*

200.  Mr. Barresi then continued to harass Ms. Taft and texted her:

> *"Who?? Did you fight with your mother before she died. What is the unexplained injury she sustained on her head? Let's talk REAL forensic evidence... What else Oh did you retrieve everything in your mom's safe before the fire or you took her life ? Why did you care more about rescuing the contents of the safe than your poor mom? Few more questions later Oh! Did you get you mom's 9MM handgun? Where do you keep it? Not to overwhelm. You but Amber's security are instructed to keep you distanced from her. Any other STUPID questions for me dimwit? Hey Amber knows you filed a bogus complaint against your sister at DCS Amber has an entire profile on you." He continued "There is do much more That's only a snippet what the special agent in LA shared with me. I wouldn't show your face near Amber if I were you. And change your nasty clothes once in a while. That's all for now. Watching Sizzle Beach tonite about a whore and a midget"*

201.  Mr. Barresi continued his harassment towards Ms. Taft, and stated:

> *"They wanted to know about your 'package deal' theory"* now claiming it *"sounds like police corruption."*

Mr. Barresi claimed to be communicating with a special agent and sending information to security profiling Ms. Taft that "FRIGHTENS" the ex-wife of Mr. Depp, opposition to Mr. Waldman and the former client of Browne George Ross LLP.

202. Mr. Barresi texted to Ms. Taft:

> *"Also the special agent"* that he claimed was *"in touch with her security leader who I know very well," "Alerted about some correlation you posted on twitter to another thing you told [Jane Doe] about method acting"*[21] then *"You've been warned Stay the fuck away from her"*

---

[21] Ms. Taft's facetious posting related to general method acting training that her mother Victoria Taft, with *Lee Strasberg Institute* on her resume, and others "#JamesFranco" "@sagaftra" did link a Modern Music Video with Sarah Walker from the Action-Comedy Television Show *Chuck* produced by Warner Bros. Two of Ms. Taft's friends knew Anna Strasberg, the wife of Lee Strasberg.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   42

203.  On November 6, Mr. Palomares, former Rampart LAPD police officer and on the first police report against Mr. Barresi and Mr. Depp, met Ms. Taft and informed Ms. Taft that Mr. Barresi had called his daughter in New York about him. Mr. Palomeres had recommended other private investigators to Ms. Taft and he eye-witnessed, at a restaurant in Hermosa Beach, the intimidating texts Mr. Barresi was sending to Ms. Taft.

204.  On November 7, 2022 Mr. Barresi sent to Ms. Taft "Stacey is your sister."[22]   Denying his false allegations from edited hearsay audio tapes, Ms. Taft wrote that if she had a half-sister, her in-laws are oil millionaires in Texas and avoided providing information to Mr. Barresi.

205. Mr. Barresi on November 7, 2022 claims there is a "psychological profile" of Ms. Taft, quoting an unconsented edited audio of a phone call of her alleged relative with a photo of her with an umbrella, megaphone, and sign stating, "save a life" with scientific graphs. Mr. Barresi claims the profile was "turned over to the FBI" and that his former client is "scared to death."

206. On November 8, Mr. Barresi sent to Ms. Taft:

> *"You carried out belongings to your car but left your injured mother? Doesn't add up. I'm investigating. Killer. You couldn't alert someone to help you with your mom? NO it was more IMPOR- ENT, as you pronounce the word, to get your belongings and leave poor mom to SUFFER a HORRIBLE death. You cant live with yourself. No wonder you are so hateful. You always have been sources say."*

207.  Ms. Taft interpreted Mr. Barresi's messages as threats to her and referring to audio tapes.

208.  On November 9, 2022 Ms. Taft communicated with Mr. Ian Herndon who had experienced harassment related to Mr. Barresi since 2021. Mr. Herndon knew of allegations that Mr. Barresi had paid Ms. Barash. Mr. Herndon had not requested Mr. Albertini to go into extensive details of what he eye-witnessed in the Viper Room or acts by Mr. Depp. Mr. Herndon asks Ms. Barash

---

[22] To cause intimidation to Ms. Taft by indicating he can contact all of her relatives and collect audio tapes.

about $20,000 offered to her for a "Depp documentary" role that never happened as seen in her texts to Mr. Albertini. The same day, Mr. Barresi calls Mr. Herndon, telling him to not contact her.

Mr. Herndon witnessed the harm Ms. Taft was experiencing from Defendants.

209.  On Ms. Taft's mother's birthday on November 11, Mr. Barresi revealed an exploitative audio recording using Ms. Taft's former hyphenated legal name with the threats of "lawyers & publicists WARNED" and "FBI ON HIGH ALERT!"

210.  Defendant Mr. Barresi invaded the alleged paternity and sexuality of Ms. Taft by contacting James Conner and audio recording that conversation.  Mr. Conner is a licensed private investigator in New Mexico. Defendant Mr. Barresi edited interpretations to make it appear that Mr. Conner did worse implications to claim that he was an FBI agent.

211.  In this recording, Mr. Barresi discusses a photo taken from Mr. Taft's cell phone of Ms. Taft and Ms. Heard, a former client of lawyers he worked for, claiming they're *"cuddly arm in arm"* to Mr. Conner.

212.  Mr. Barresi in this audio claims "a gun could fit in Ms. Taft's large purse".

213.  A shadowy unnamed detective figure, representing Mr. Conner, in the audio claims that Victoria Taft witnessed a mob murder by the Gottis.[23] Images of a dead man on the ground and three alleged men of the Gotti family are shown by Mr. Barresi.

---

[23] On July 14, 2018, Mr. Barresi was sued <u>for civil extortion with tactics similar</u> to the same terror Ms. Taft has experienced. In the lawsuit filed in Los Angeles, "Barresi's ploys began with his use of the false name, Paul Constantino, which corresponds to that of New York's <u>Gambino crime family boss whose life ended **with a "hit" ordered** by John Gotti</u>.... Barresi used that name when, in ***a claimed*** effort to locate and served Shelton he repeatedly contacted Shelton, his father, his single mother who has advanced lymphoma, and a friend of his mother who has not seen Shelton since he was 15 years old." "... Barresi obtained Shelton's mobile number and called it several times. On one occasion Barresi left Shelton a voice mail messages in which he made blatant misrepresentations and actionable threats."" "Such threats constitute extortion..."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   44

214. The figure claims Ms. Taft was a "closet person" afraid of many things including the mob murder.

215.  According to the edited audio, Mr. Conner shows concern for Ms. Heard's safety and life.

216. Upon information and belief, between approximately November 2022 to Present 2024, Mr. Barresi regularly contacted and called Mr. Albertini, to make him withhold his testimony as being a witness against Mr. Depp, to not be interviewed by the Department of Consumer Affairs, and to no longer report to the FBI.

217.  Further, this withholding by Mr. Albertini upon Mr. Barresi and Mr. Waldman's conspiracy was from communicating with Ms. Taft, being a witness against Mr. Depp for Ms. Heard and Mr. Gregg "Rocky" Brooks,[24] or for any other Plaintiff injured including Ms. Taft while asking invasive questions about Plaintiff Ms. Taft.

218.  On November 12, 2022  Mr. Barresi expressed his intent to have Ms. Taft flee:

> *intent to make Ms. Taft leave Los Angeles and Hollywood. "That B.TCH [Ms. Taft] needs to get out of town," and that his former client is now "DESERVEDLY DEATHLY AFRAID," claiming the two of them, "are cut from the same mold..."*

219. On Nov 12, 2022, with Mr. Waldman's approval of his intimidating conduct, Mr. Barresi sent an email to lawyer David Axelrod of Ballad Sphar with the beginning of the email stating, "Albertini saw women and men assaulted by Johnny Depp." Mr. Barresi stated a TRO was filed and law enforcement was used against him. He alleged he was tracking financial transactions. He claimed Ms. Taft was Mr. Axelrod's client's "acting agent" and that he was "raising funds" to sue his client, Ms. Heard. He again admitted that the documents that Mr. Nitrini sent to Ms. Taft were his.

---

[24] However, it was ultimately too late for the civil lawsuits after years of witness interference conspiracy between Mr. Barresi and Mr. Waldman.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   45

220. On Nov 15, 2022, Mr. Barresi, while referring that, "**while Adam Waldman is exploring ways to cut off the head of the snake**" he additionally refers to the contents of his audio recording of allegedly Mr. Conner, again invading the privacy of Ms. Taft's alleged paternity and affairs in another letter. He refers again to witness Mr. Albertini. Mr. Barresi threatened California Penal Code 182 conspiracy,

221. Mr. Barresi attached an email from Ms. Taft to Mr. Nitrini about witnesses, "also making a list of names given to Paul Barresi..." He stated that Axelrod should have Ms. Heard not have any ties to Ms. Taft and by implication any witnesses he was monitoring.

222. November 15 2022: Mr. Barresi wrote, "Anyone notice Richie Albertini's **dead silence**... Where oh where is that little coward…"

223. On November 15, 2022 Mr. Barresi wrote, "One down, about four more to go. And believe me they are goin' down. Johnny & **Adam Waldman are fully aware of who**," including Ms. Taft, and "what they are doing," stating they're "100% in my corner."

224. On Nov 17, 2022, Mr. Barresi, knowing it would please Mr. Waldman and Mr. Depp, stated he succeeded to intimidate Ms. Heard, "Axelrod has taken steps to rid Amber of Crazy Christina... As for her and her cohorts, I am dealing with them ONE BY ONE in true BARRESI fashion."

225. On November 19 2022, Mr. Barresi emails the Coroner's Report of Ms. Taft's mother, Victoria Taft, to her with threats, "What you told the press and why the coroner report says conflict bitch. Did you leave you mom to die?"

226. Ms. Taft saw this as a death threat mixed with blackmail with distress about her poor mom. Her accelerating stress was witnessed by her uncle Mr. Debaun. Only days later, amicus briefs

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   46

were to be filed in support of the appeal and Ms. Taft felt increasingly the pressure of belief that she could be killed.

227.  Mr. Barresi sends a visually disturbing and distressing email to Ms. Taft about her mother's death. Sun, Nov 20, 2022, 4:38 PM: "You have a hole in your heart Christina.  Your mother was wrong to think that she could fill it with all the love she held for you in hers.  Even after death Victoria did not stop believing it because after the fire her heart remained intact…"

228. On December 1, 2022, while quoting words of Mr. Waldman to him that Ms. Taft is a "bat," under his edited audio tape against Ms. Taft, Mr. Barresi responds, "It would matter if that <u>bat</u> shit crazy was knocking on your door." Commentator Haidi Shafik had written below the audio with "No violence! It does not matter!!!!" to which Mr. Barresi used directions of Mr. Waldman to want violence against Ms. Taft.[25]

229.  Ms. Taft discovers on December 5, 2022 that Defendant Mr. Waldman wrote "In memoriam" on June 14, 2020, about an email he received claiming Defendant Mr. Barresi was compiling "evidence against Johnny Depp for evidence to be used in court" including "violent behavior" and "ties" as well as no witnesses to say anything against him in another "In memoriam" writing. Nearly all names of potential witnesses were not included.

230.  In December, victim Ms. Taft and witness Denise Newsome, living in Alexandra, report to police in Virginia on Mr. Barresi, Mr. Waldman, and Mr. Albertini. Officer Bryan Smith is assigned and is amazed by the information Mr. Albertini knows. Ms. Taft states he knows information since he is a witness. Despite Mr. Barresi's shown intimidation in emails to lawyers, Officer Smith finds nothing wrong with Ms. Taft and Mr. Albertini talking with each other.

---

[25] Mr. Waldman's direction to Mr. Barresi that Ms. Taft is a "Bat" correlates to witnesses knowing of Mr. Depp's interests in Transylvania home decor, vampires, and general dark or gothic interests

231.  Ms. Taft explained to the officer that she was the donor to the amicus brief of 29 organizations and experts for due process.

232.  Throughout December 2022, Mr. Barresi emailed a series of intimidating, distressing, and outrageous emails to Ms. Taft.

233.  Mr. Barresi mockingly posted the song, "Mrs Grinch" referring to Ms. Heard in December 2022 while sending Ms. Taft disturbing emails in the context that he was allegedly not paid yet.

234.  Mr. Barresi on December 12, 2022 showed a photo, while calling Ms. Taft "DEAD WRONG," of an email that Mr. Waldman sent to him to "come clean" about Mr. Depp and to "open a new avenue of discovery" against his "*erstwhile* client."

235.  On December 12, 2022 at 3:58pm Mr. Barresi sent to Ms. Taft:

"INACT HEART, FRAGMENTED BONES & TEECH. ALL THAT WAS LEFT OF YOUR POOR MOM. BUT YOU MADE SURE YOU GOT AWAY WITH ALL YOUR BELOGINGS DIDN'T YOU WITCH? HOW CAN YOU LIVE WITH YOURSELF?"

236.  On December 12, 2022 at 4:23pm, Mr. Barresi emails edited audio tape links to Ms. Taft with intimidation about finances by repeating "Millionaire Christina Taft." This includes:

"Millionaire Christina Taft… finances and conspires… to attack Johnny Depp Witnesses" "Millionaire Christina Taft finances attacks" "Millionaire Christina Taft's own father says…" "Albertini cons Johnny Depp defense attorney Ben Chew."

237.  At 5pm, Mr. Barresi sends to Ms. Taft the email:

"*hahahahahahahahha. YOU… SHOULD BE LOCKED UP.*" Before a quote of Ms. Taft's text message sent to Jane Doe that Mr. Barresi obtained: "*Hi Angela, Barresi may be arrested tomorrow for breaking Richie's restraining order [stating Mr. Barresi works for Mr. Depp]. There's a warrant that will be issued… I also mailed in a report to consumer affairs/BSIS on Barresi yesterday Have a great night and sleep well!!*" Other text messages are quoted between them with no dates.

238.  On December 15, 2022, Mr. Barresi released an audio recording with Mr. Waldman.

239.  The audio recording is only a portion of a telephone call which was within a video edit.

240.  This audio was exposed by Mr. Barresi and Mr. Waldman themselves.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   48

241.  Mr. Barresi and Mr. Waldman both, in said audio recording, quoted items ranging from September 2022 exposing their conspiracy agreement:

*Speaker 1 (Barresi) [00:00:08]: Do you remember our first conversation with respect to William Hazlitt,[26] and if you want to create an unfavorable impression, it's not even necessary that what is said to be true, you can damage someone just by saying it. And there's an open case now in South Carolina for criminal threats and harassment, that's number one that I have to fight. Number two a ridiculous uh, TRO against me, which is also false, claiming that uh, Johnny hired me to turn over all my findings to to you. . .*

*Speaker 2 (Waldman) [00:00:44]: Reality is anybody in the world, and you know this better than I do, anybody can file a police report about anything against them....*

*Speaker 1 (Barresi) [00:01:52]: He and Christina Taft are joined at the hip. She's just obsessed fan. She's a stalker. She pays these convicted felons, like Albertini, Mario Nitrini, Aaron McKinney, and those two other Looney Tunes, Shannon Denise and that Daniel Brummett, to do her dirty work.*

*Speaker 2 (Waldman) [00:02:13]: Yeah I get it, she's **bat**shit crazy.*

*Speaker 1 (Barresi) [00:02:15]: And she was awarded a million dollars in wrongful death, a wrongful death lawsuit for leaving her blind mother to burn alive. So now she's got money to burn coming after you and I.*

*Speaker 2 (Waldman) [00:02:28]: The reason why I ask? I'll tell you why. Because witnesses in this case are getting harassed. And you were, uh, you were a witness; you didn't testify at trial, but you know what I mean, you were definitely a witness. And you were a player in all of this. And people who went against her getting harassed. A bunch of them, you know, pretty severely in a variety of complex and simple ways. You know, and, and I just wonder if somehow that's related because I think she's got beef with you.*

*Speaker 1 (Barresi) [00:02:58]: You said that people who are, who were, who sided with Johnny, uh, are going um, people are going after those people from Amber's side in a variety of different ways? That's a very eloquent way of putting it.*

*Speaker 2 (Waldman) [00:03:15]: I said, I said in ways simple and complex. Its complex, I mean some of it is very elaborate. You know, and some of it very expensive. And some of it is break ins, or, or uh, what do you call it? Vandalism of property, um. . .*

---

[26] William Hazlet, discussed in the telephone call between Adam Waldman and Paul Barresi about Ms. Taft and other witnesses, had an interest in the Art of Deception.
According to Mr. Hazlet, followed by Defendants, the Art of Deception must be habitual and uninterrupted for "blurring the line between reality and illusion."
*See,https://www.socratic-method.com/quote-meanings-interpretations/william-hazlitt-life-is-the-art-of-being-well-deceived-and-in-order-that-the-deception-may-succeed-it-must-be-habitual-and-uninterrupted*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   49

*Speaker 1 (Barresi) [00:03:30]: Yeah so it's not, it's not just me? Who else is it?*

*Speaker 2 (Waldman) [00:03:32]: Well, it's not random.* **It's not random. And it's, in ways simple and complex.** *And so it's, it's um, it's several people, you know, and I can't say, I can't even say it's all connected. But I'm not a huge believer in coincidences, and these people are connected by virtue of having been helpful witnesses, and they're people who she's got a particular grudge against.*

*Speaker 1 (Barresi) [00:03:57]: Am I, am I one of them?*

*Speaker 2 (Waldman) [00:04:02]: I, I woul–, I, I would think she has a grudge against you…*

242.  A video which includes the telephone recording of Mr. Waldman and Mr. Barresi was made public by Defendants.

243.  The video includes photos of a broken windshield and a break-in of a residence taking place, with a masked man, falsely claiming Ms. Taft is partially responsible.

244.  Mr. Barresi has posted this audio with Mr. Waldman and video, with different titles and commentary meant to harm Ms. Taft, her business, multiple times, and the latest is August 9, 2023 with "PI" then no "PI" in front of his name "Paul Barresi."

245.  On December 18, 2022, Mr. Barresi repeated his call with Mr. Waldman audio tape release with the title, "CHRISTINA TAFT C E O ATTACKS ON JOHNNY DEPP WITNESSES CALLED OUT BY ADAM WALDMAN" with the death threat, "Christina Taft, not a more vile, evil human has ever breathed air."

246.  Having just flown back into Los Angeles from Virginia after being there for nearly the entire time after Thanksgiving, when Ms. Taft saw that Mr. Barresi underneath Mr. Waldman's recorded phone call was searching for her location, she fled the state of California. Ms. Taft was afraid of Mr. Waldman conspiring with Mr. Barresi to enable more dangerous attacks. Already scheduled to visit Hawaii on vacation a few days later, Ms. Taft changed the ticket and went earlier on December 19. She was only in Los Angeles for hours.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   50

247.  On December 20, Mr. Barresi boasted about his abilities as the Hollywood Fixer to thwart the judicial process with intimidations.

> *"I have it on the best authority AH was compelled to settle largely in part due to blame placed on her for being the one behind vandalism, break-ins; false police reports & baseless TRO's filed against JD witnesses, financed by... Christina Taft."* Attached was a photo of Ms. Taft and Ms. Heard together from 2019.

> *"Adam Waldman's voice and the stuff he alleged about J witnesses being harassed and attacked in simple and complex ways was credible. I think it made the fuzzy back hairs rise on Amber's neck. She should thank Christina Taft before they take that crazy witch to the loony bin."*

> *"AH, her lawyers & her PR firm were WARNED Christina Taft... & others...Violation pursuant to CA PC Sec 182 CONSPIRACY. All of whom in the interest of justice will suffer the consequences of their actions."*

248.  Mr. Barresi and Mr. Waldman continued their coercion.

249.  Only days later on December 23, Mr. Barresi showed an image of vandalism of a guest's car, and falsely claimed Ms. Taft was implicated as "suspects" of it. Ms. Taft watched the escalation from Hawaii. "Christina Taft got my new home address from the process server when he served me bogus TRO."

250.  Hours later, again, Mr. Barresi quoted Mr. Waldman's directions to him "Witnesses in the case are getting harassed, [Paul] You didn't testify at trial but you were definitely a witness & you were a player in all of this & people that went against her [Amber] are getting harassed severely & in a variety of complex and simple ways.-Adam Waldman."

251.  On or approximately December 30, 2022, Mr. Waldman rewarded Mr. Barresi with a call from Mr. Depp before New Years. Ms. Taft saw the escalation from Lahaina, Maui. Mr. Barresi wrote, "Johnny was gracious enough to confide that it was Adam Waldman who nudged him suggesting that he reach out to me. 'Thanks Adam. What a way to bring into the New Year! 'He [Adam] always has been one to give credit where credit is due,' Johnny said."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   51

252. Ms. Taft's shock and fear intensified - that Mr. Depp called Mr. Barresi with Mr. Waldman's support after months of attacks on her. Ms. Taft decided to stay in Hawaii.

253. EaglePoint Funding, with federal funding for public safety companies, continually asked Ms. Taft for in-person meetings in Los Angeles. This was during the Defendants' schemes and harms against Ms. Taft and case witnesses which made her unable to collaborate or respond.

254. Ms. Taft could not communicate with Mr. Sanchez of SaveMeNow for many months to protect him and his company from "the Hollywood Fixer" and his connections to Mr. Waldman.

255. Ms. Taft was forced to relocate to Hawaii, and fear of Mr. Barresi based in California searching for her while attaching himself to Mr. Waldman, makes this contract difficult.

256. On February 9, 2023, Ms. Taft's attorney Mr. Urban reached Ms. Bredehoft about Mr. Barresi claiming that Ms. Taft is somehow dangerous to Ms. Heard. Ms. Bredehoft stated they did not communicate with Mr. Barresi or give him a platform, although he contacted her office on "various occasions."

257. On February 21, 2023, Mr. Urban received a response from Mr. Rottenborn about Mr. Barresi. Mr. Rottenborn stated Mr. Barresi emailed him "with some regularity" and he "did not email him back," but "I lately haven't read his emails closely."

258. On March 3, 2023, Mr. Jay Brown of Ballard Spahr replied in email that he "never communicated with Mr. Barresi."

259. Mr. David Axelrod, who Mr. Barresi had emailed about Ms. Taft and Mr. Albertini - while threatening Ms. Heard, never responded.

260. On February 26. 2023, Mr. Barresi states he imitates hitmen. "Is life imitating art or is art imitating life?" with a video titled "THE HITMAN'S VIOLIN." Underneath this, Mr. Barresi wrote in Italian.

261.  On March 11, 2023, Mr. Barresi stated Ms. Taft's location was in Hawaii. With Mr. Barresi's location of Ms. Taft, above this declaration is a video of Ms. Heard at trial.

262. Days later on March 17, 2023, Mr. Waldman replies to Mr. Barresi using his name and refers to a money laundering case "into Hollywood and to buy US policy at 2 White Houses."

263.  Ms. Taft saw this as she was moving boxes out of her West Los Angeles Apartment by Playa Vista. She was staying at a friend's guest house, fearing Mr. Barresi or Mr. Waldman knowing her address. This caused fear to Ms. Taft.

264.  During this time in March, Ms. Taft is pulled in for an interview in Ontario, California by investigators for the Department of Consumer Affairs about Mr. Barresi and questions. She provides printed documentations. Afterwards, she sees Ms. Howell is still worried about stalkers and threats,[27] and tired of this endless terror continuing, Ms. Taft messages her on Instagram that:

> "So sorry this is happening… Professional tools for a Breakin is not a normal thing. Who do you think can do that?" and "As for the vandalism, check your security cameras and/or install some. 3 years of fear is wrong and sadly people are telling falsehoods of where it's coming from, which is wrong for well-being… I think it's great that you used to give character references and what a mess everything became. Hopefully you have a sunnier day." Ms. Taft had Instagram goofs posting a lighthearted video 5 times, that included former playboy model Pamela Bryant who had been a friend of her mother's, and later saw that Ms. Howell deleted her posts about stalkers.

265. On April 5, 2023, during his accelerating interest in Mr. Depp's family members, Mr. Barresi writes that Mr. Depp is aware of everything he alleges, "Johnny tells me he reads

---

[27] Ms. Howell received a donation to her charity Art of Elysium from allegedly Mr. Musk as she believed. On October, 30, 2022, Mr. Barresi, proclaiming himself to witnesses, published that Mr. Musk paid "$100,000" to find abuse by Mr. Depp. "With $100,000 thanks to Elon Musk I found no evidence… I challenge anyone to produce proof to the contrary… bring it on or SHUT THE FUCK UP!" Lawyer Mr. Schwartz, at Mr. George's law firm, had told witnesses including Mr. Albertini, that billionaire Mr. Musk was paying for litigation as donations to Ms. Heard.

everything I put out there. lol." Ms. Taft understood this would include the injuries by Defendants against her.

266.  On May 2, 2023, potential named witness Ms. Ariel and Ms. Taft had pleasant exchanges on LinkedIn until July 14, 2023 including that she rescues pets and about her paintings.

267. On May 5th, Ms. Taft asked Superior PI in New Mexico to re-interview Mr. Conner.

268. On May 12, Mr. Herndon spoke with the Department of Consumer Affairs Investigator Mr. Jesse Adams about his report on Mr. Barresi. Mr. Herndon texts Ms. Taft that "a good society has strangers who will redirect the individual to *anywhere* that would or could lead to action."

269. Sometime between May 24 to May 28, Ms. Taft who was still exploited by Mr. Barresi's audio tape, showed fear in Colorado due to the fact that Mr. Barresi and Mr. Conner could work together, and also the mob death allegations implicating the actors. This was while visiting Joseph Triscari, a family friend and former love of her mother Victoria.

270. On June 2, 2023, Ms Taft texts and messages the investigator phone numbers from the Department of Consumer Affairs to Mr. Albertini.

*Ms. Taft saw Mr. Albertini's continuing Facebook messages showing Mr. Barresi and Mr. Waldman's influence on him.*

271. On June 12, Superior PI's Michael Kountz interviews Mr. Conner, who refutes the recording edited by Mr. Barresi. He did not know his alleged audio was being used, admitted to hearsay, disagreed with the audio, that he did not know the Tafts, and he did not give consent for the recording, the commercial use of it, or the publishing of it.

272.  Mr. Conner states to Mr. Kounz he was never an FBI agent. He makes allegations on the sexuality of Victoria by stating she was friends with Michelle.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   54

273.  To private investigator Mr. Kountz, he stated an adviser, allegedly an "agent," in hearsay interpreted that Mr. Barresi may have been a "case worker."

274.  Mr. Barresi misrepresented that Ms. Taft owed him $25,000 and he was there to collect.

275. Mr. Conner feared a contract on him, to kill him related to defendants.

276.  Information Mr. Barresi obtained from Mr. Conner was manipulated:

***Speaker 2 (James):*** *[00:37:51] You know? I really am, but no, I don't have. . . Those kinds of thoughts that that man was talking about, uh, about someone else and trying to make it like it's me. . .*

***Speaker 1 (Michael):*** *[00:38:05] Mhmm.*

***Speaker 2 (James):*** *[00:38:10] . . .he can go to prison for that shit because he's across the state line. Now, I know who he is. . ." He went further to commercial gain motives.*

***"Speaker 2 (James):*** *[00:40:03] . . .to get information and try to sell it, personal or otherwise, and, uh, that's what it looks like."*

***"Speaker 2 (James):*** *[00:54:36] . . .and, you know, they're going to check it. But the thing about it is, is some of these people like that guy, you can look him up on Wikipedia.*

***Speaker 1 (Michael):*** *[00:54:44] I will, I will.*

***Speaker 2 (James):*** *[00:54:45] His name and everything, and I don't even know what's his last name. But I think he's dangerous."*

***"Speaker 2 (James):*** *[01:00:13] He's, he's, he's a loose cannon.*

***Speaker 1 (Michael):*** *[01:00:18] It really seems that way.*

***Speaker 2 (James):*** *[01:00:20] He's invading a lot of people's privacy."*

***"Speaker 2 (James):*** *[01:01:22] That Amber Heard stuff and what's-, the guy, Johnny Depp and all that, that, uh, that they're looking for a way out and other people they've probably infringed on to blame it on somebody else."*

***Speaker 2 (James):*** *[01:02:04] And he was. . . The, the amount that he sent to me, 25,000 that she owes to him. I don't know if that to be true. And that he's trying to find a way to somehow collect and he's trying to get even with her because evidently, there's some complaints against him in the state of California. . .*

***Speaker 1 (Michael):*** *[01:02:26] Okay.*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   55

**Speaker 2** (James): [01:02:27] about his practices."

277. Mr. Conner stated to Mr. Kountz that he would be using an Alaska phone number.

278. Ms. Taft felt compelled to pay for security due to fears of Mr. Barresi and Mr. Waldman.

279. In June 2023, JCB International Training and Security Consulting sent texts to Ms. Taft that Mr. Barresi was under "federal authority watch."

280. After months of focusing on Mr. Depp's cousins and family members, Mr. Barresi posts an edited audio of a family member of missing co-owner of the Viper Room, Anthony Fox, to focus on funds given to his daughter Constance and a "conspiracy theory" related to his death before testifying.

281. June 20, 2023: "Mysterious Disappearance of Johnny Depp business partner Anthony Fox The Unheard Tapes - Part I… The endangered missing persons case remains open with the Ventura California Police Department. Three years ago, detectives reached out to Hollywood sleuth Paul Barresi. What Barresi learned was information that changed completely what we thought we knew about Anthony Fox's disappearance, and suggests that the circumstances of his disappearance was a cover up."

282. Ms. Taft becomes even more fearful of retaliation from Mr. Barresi, who was flying to different states, and Mr. Waldman, in his ability to financially negotiate to pay Mr. Barresi.

283. Ms. Taft knew of the danger of Mr. Schindler's dedication to the actor from the Viper Room witnesses and from the NGN Case about "how cheap and easy it would be to have someone knocked off," as blocked testimony from Mr. Depp's ex-wife as a witness.[28]

---

[28] July 20, 2020, in witness testimony for NGN against Mr. Depp, Ms Heard stated, "He also said what he would do to others he didn't like or was threatened by, detailing how he wanted to have someone tortured or how cheap and easy it would be to have someone knocked off." See, https://www.thesun.co.uk/news/uknews/12174118/johnny-depp-raw-meat-amber-heard-neck-hostage

284. After settlement payments given to charity from Depp v Heard, Mr. Barresi by July 6, 2023

went to Washington DC where Mr. Waldman resides.

285. On July 12th, 2023, Mr. Barresi went on a chartered private jet from Dulles Airport

signature support in District of Columbia to New York.

286. A Crew member of the private jet confirmed to Licensed Private Investigator Mr. Brooks

that another man was onboard with a briefcase before Mr. Barresi boarded.

287. Juan Brooks and JCB International Training and Security Consulting interpreted the

chartered private jet and briefcase as part of a "payoff/transaction that happened on the plane" to

Mr. Barresi from Mr. Depp.

288. Text Messages from Licensed Private Investigator Juan Brooks stated the activity of using

the private jet from Washington DC to New York was related to Mr. Depp's funds being used for

a financial transaction to Mr. Barresi.

289. On July 12th, 2023, Aurelia Barajas, President/CEO of Superior Investigations and Mr.

Kountz spoke with Jesse Adams at the Department of Consumer Affairs about Mr. Barresi and

Mr. Conner.

290. After the financial negotiations in Washington DC and Private Jet, on July 19, 2023 Mr.

Barresi published a second edited audio tape, suggesting that Mr. Fox's death was not covered

up. Before this second recording plays, there's music similar to what Mr. Barresi quoted Mr.

Waldman as telling him that Mr. Depp said:

> *"I wouldn't be surprised if Paul ended up being the hero at the end" from his 2022 notes*
> *referring to "sore losers" and "witnesses in the case are still getting harassed."*

291. On July 19, 2023 "Hollywood Fixer Paul Barresi, at the forefront of the Depp v. Heard trial,

has been assisting the Ventura Police Department in its Anthony Fox endangered missing

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   57

persons case for 3 years. Barresi has uncovered new clues which suggest Fox may still be alive and well."

292. Ms. Taft asked Mr. Brooks to interview Mr. Barresi after this, wanting no more harm and to continue with legal claims, including against Mr. Waldman in the District of Columbia, but he refused - choosing to watch Mr. Barresi.

293. Mr. Brooks claimed Mr. Barresi was acting "erratic" and Ms. Taft witnessed the continuing escalation of pressure with audio tapes, financial transactions, death implications, and witness information. Ms. Taft was unable to be released.

294. On July 23, 2023, Defendant Paul Barresi states he had multiple talks with Defendant Waldman and on Isaac:

- July 23:  **"During one of my talks with Adam Waldman**, he acknowledged that JD agreed Baruch is a career freeloader, but JD takes care of him." Mr. Barresi stated his interest in Italy while wanting to expose Mr. Depp's friend Mr. Baruch. "When you hear what Isaac Baruch's x wife Darcie had to say about how horribly he treated her during their short lived marriage... While I'm in Italy..."
- Later that day at 3:55pm he stated, "Baruch got hold of a lot of money only months before he testified."

295. On July 24th, 2023, Defendant Paul Barresi states Johnny Depp listens to him, including on donations and no more handouts.  Defendant Paul Barresi also states Johnny Depp listens to his advice, 27 freeloaders he found, take to the bank. In addition, there is admission to the purpose of the conspiracy:

- July 24 8am: "With my encouragement, now he donates strictly to legitimate charities. As for those looking for an easy hand out, no more."
- 10:54 am: "Actually I uncovered 27 freeloaders. Baruch however was on the top of the list."
- July 24: "To this day Johnny is under siege by freeloaders. Because I protected him, Johnny has more respect and admiration for me than any of those bums who have insinuated their way into his life over the years with their own self interests at heart."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   58

- 11am: "JD appreciates my advice & follows it with respect to freeloaders. You wont be seeing a Mooch like Baruch in his life ever again. And you can take that to the bank. As for testing the waters, I never test the waters. If my mind is made up to take the plunge I just do it."

- Mr. Barresi stated, "...They burdened JD financially, & a few even got him sued." Attached was a photo of the beginning of a 2002 lawsuit of Rocky Leonard George Jr vs Viper Room, Johnny Depp, and Does 1-50 inclusive (Case No. SC07372). This lawsuit was when bouncers at the Viper Room, co-owned by Mr. Depp, had assaulted Mr. George.

296.  Defendants stated he is becoming closer to the principle that Defendant Waldman works for:

- On July 27, Mr. Barresi showed a photo of three children and stated, "unpublished pics & never reported unimpeachable facts. Here is a never published photo of Johnny [on right] in Kentucky at age 7 with childhood friends."

- An hour later he stated in Italian: "Se la gente non mi ostacola, puoi comprare il mio libro ovunue sonora" translating to: "If people don't' get in my way, you can buy my [information] wherever I am."

297. This was near the time that Mr. Brooks alleged that Mr. Barresi went to an Italian airport where allegedly law enforcement were waiting for him then turned back, then headed to California after Georgia.

298.  In August 2023, Barresi posted 2 Audios telling Ms. Taft's name to Adam Waldman /DC/, Locating Taft.

299.  Mr. Barresi searched for Ms. Taft and showed ghosted photos of her with the audio tapes of his call with Mr. Waldman.

300. In August 2023, Private Investigator Brooks indicated Barresi returned to California after DC, NY, Georgia, claimed Italy visitation as well.

301.  On August 2, 2023 Mr. Barresi re-showed the email of "Consigliere"[29] Mr. Waldman to

---

[29] Consigliere (/ˌkɒnsɪliˈɛəri / KON-sil-ee-AIR-ee, Italian: [konsiʎˈʎɛːre]; plural consiglieri) is a position within the leadership structure of the Sicilian, Calabrian, and Italian-American Mafia, *See Wikipedia,*

1  him, engaging him in April 2020.

2  302. On August 7, 2023 JCB International and Security Consulting informed Ms. Taft that

3  they've met with "three federal agents with their superior" in their investigation into

4  "manipulative" Mr. Barresi with a task that is a "dangerous one."

5  303. On August 8th, Mr. Barresi posted on a SWAT RAID with his home area. Ms. Taft feared

6  that Mr. Barresi was trying to get her to go around his location to be violently attacked or falsely

7  set up for arrest. Ms Taft feared retaliation for the alleged federal investigation and discoveries.

8  304.  Considering prior mentioned 'Ghosted Images of Ms. Taft with a "bat" on the background',

9  on August 9, 2023, Mr. Barresi again releases the same tapes of him with Mr. Waldman to frame

10  Ms. Taft and falsely implicate her to "violence to witnesses" as part of "witness interference."

11  305.  Mr. Barresi and Mr. Waldman continue to invade her privacy of private affairs by

12  searching for her location and exploiting audio tapes.

13     *Attached to the Mr. Waldman and Mr. Barresi Audio Tape are admissions on attempts to falsely set up Ms. Taft for witness interference:*

14      *"...Waldman also <u>confides</u> to Barresi... that bad shit crazies <u>like Taft</u> <u>are attacking</u> Johnny's <u>witnesses in a variety of simple and complex ways,</u> from cyber bullying t<u>o physical violence. Waldman encourages Barresi</u>..." <u>Audio Recording of Phone Call in Video</u>*

15      *Attached to the audio recorded phone call of Mr. Barresi and Mr. Waldman is a ghosted image of Ms. Taft.*

16      *With Mr. Waldman's directions, Mr. Barresi proclaims this as an alleged "fact" under his title of "PI" and "Hollywood Fixer" for Mr. Depp.*

17  306.  Ms. Taft becomes terrified of harm to her and others escalating to violence.

 

---

27  *https://en.wikipedia.org/wiki/Consigliere*. Consigliere can further mean: "The meaning of CONSIGLIERE is a
28  person who serves as an adviser or counselor to the leader of a criminal organization" *See*, *https://www.merriam-webster.com/dictionary/consigliere*

307.   On August 9th, Mr. Brooks continued surveillance of Mr. Barresi, alleged that they were working with federal authorities, and saw that Mr. Barresi went to a California hotel that was gated and owned by someone involved in criminal activities.

Among other videos - he appeared to video himself exercising with weights while looking at the camera.

308.  In August 2023, Mr. Barresi contacted Mr. Albertini to see if Ms. Taft wanted to buy his case files along with slurs about alleged sexual implications.

309.  Approximately August 26, 2023 Mr. Albertini over the phone relays to Ms. Taft about Mr. Barresi's communications with him about her and his case files. Mr. Albertini texts Ms. Taft that he called the investigators at the Department of Consumer Affairs and Mr. Barresi is still calling him.

310. Mr. Barresi posts the SWAT Raid video again among other repeating exploited audios.

311. After the Lahaina, Maui fire August 8th-11th, Ms. Taft is silenced and unable to do any humanitarian work, making her SaveMeNow contract impossible, due to fears of retaliation.

312. On September 15th, Mr Albertini texts Ms. Taft he will be interviewed by the DCA next week.

313. Ms. Taft opens herself to speaking with Mr. Albertini. She admits that despite being told to be silent and increasing coercion since July 2023's payoff, that Mr. Barresi went to Washington DC and on a chartered private jet.

314. Ms. Taft feared withheld testimony and set ups which continued until her interview with the FBI and still continue afterwards.

315. On September 23, 2023, Ms. Berry became afraid that Mr. Barresi hired a hitman after her

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   61

since she was a witness. Ms. Taft reported this to the Dept of Consumer Affairs. This terrified Ms. Taft.

316.  On September 28th, 2023, Mr. Albertini was interviewed by the DCA as texted to Ms. Taft on Sept 27th.

317. In 2023 to 2024, Barresi continued to release audio invading private affairs and email threats to expose information about Ms. Taft and her deceased mother. Former boyfriends of Victoria Taft denounced this. Mr. Kim Haynes, who had gone to Jack Ryan's Bel Air mansion with Victoria when they were dating for 8 months, stated that 'Barresi's allegations of the type of sexual activities he claimed Victoria engaged in were false.'

318. Mr. Barresi, while enabled by Mr. Waldman, started coercing Ms. Taft to flee the country.

319. In demands to Ms. Taft, Mr. Barresi published multiple times that "Taft has fled the country because the FBI is looking for her."

320. Ms. Taft had been afraid to provide more documentation or to call the FBI in relation to this issue for nearly a year.

321. Ms. Taft, as she had about "leaving town," felt compelled to leave the country upon the fixers' directions. She knew fixers like Mr. Barresi and Mr. Waldman were conspiring for Mr. Depp and that can include making fear of a mafia hit.

322. On October 26, 2023, Mr. Barresi with Mr. Waldman's approval for false set ups, "Christina Taft fled the country because the FBI is looking for her. "She attempted to frame Johnny Depp's private investigator, all in the name of Amber Heard." The next statement repeated about her mother Victoria's death.

323.  Attached to the statements by Defendants that Ms. Taft has fled the country is the unconsented use of Taft and Jane Doe's audio recorded phone call.

324. These are false statements that caused Ms. Taft to "flee the country because the FBI is looking for her" by extortionately connecting her to the 'erstwhile client' of Mr. Barresi.

325. Ms. Taft was under the assumption the FBI is truly looking for her due to Mr. Barresi's threats along with co-conspiring with Mr. Waldman trying to set up Ms. Taft and others with the FBI for a false arrest.

326. Ms. Taft is under constant harassment and distress due to false set-ups, death threats, and the actions of Mr. Barresi and Mr. Waldman, with Ms. Taft still under the impression of them attempting to set her up continually.

327. On November 2, 2023, Phenix Investigations' Andrew Simpson and Annie Grey in Indiana began to assist Ms. Taft and Mr. Albertini. They expressed concerns about the California investigators acting as "fixers" with fraud and misrepresentation.

328. Mr. Barresi, with Mr. Waldman's approval, continued infliction of emotional distress centered around demise, "Christina taft is so evil she left her mother to burn alive in the biggest fire in California history."

329. On November 8th, 2023, Ms. Taft ultimately decided to flee to escape coercion, threats, and object and witness interference by Defendants as she bought a flight to Greece.

330.  Before Ms. Taft left in November, she had two friends witness on November 22, 2023 her in-person report to Honolulu police, who stated, as on surveillance video, she should go to the FBI office in-person. They had watched the edited audio video that Mr. Barresi had been releasing with approval of 'agent' Mr. Waldman.

331. Mr. Barresi sent intimidating emails to Ms. Taft again about fearing for her life, fleeing to Hawaii, implicating Ms. Heard, and her mother which Ms. Taft logged to Honolulu police.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   63

332. Mr. Barresi continued harassing, intimidating and defaming Ms. Taft:

> *Nov 29, 2023, 2:41 PM: "Hows this sound to you? Amber Heard's No one obsessed fan Christina Taft **who allegedly fled to Hawaii because she fears for her life** had a mother ..."*

333.  Mr. Barresi manipulatively connected Ms. Taft's mother to actor Warren Beatty and claimed she sued him instead of how she sued Walt Disney Co, et al, for a studio set injury in the early 1990s. Another email claimed withdrawal of her mother's lawsuit by her lawyer due to false medical interrogations and with an article-like writing style mixing in sexual connotations of being an actress. Mr. Joe Triscari, her mother's friend, reacted positively to Mr. Beatty's name and that he saw him with his girlfriend in The Rainbow.

334. Ms. Taft discovered no harm as she traveled to Greece, Italy for the first time, and France. Ms. Taft told her bankers of the scheme by defendants to cause fear, that she did not see the scam of a mafia in Italy, and continued reports related to extortion according to Hawaii laws, in respect to withholding testimony or information of another's legal claim or defense, and threats of false or true information releases.

335. On December 7, 2023 and on his own accord, Mr. Nitrini emailed to Ms. Taft a version of the Ed Shaw, head bouncer of the Viper Room, audio tape that Mr. Barresi had been exploiting to coerce Mr. Albertini with edited out payments.

336.  The coercion suppressed violence done to women in the Viper Room, violence from Schindler, almost needing bulletproof jackets, and they're not mafia. Ms. Taft later provided this to the FBI-LA.

337.  The Audio Tape of Mr. Ed Shaw and Mr. Albertini includes:

**Speaker 1** *(Albertini): [00:05:31.575] Bob Pfeiffer was my business partner... he tried to get his wife killed. **He tried to hire a hitman to take his wife out**. And are you ready for who he tried to hire? And I can tell you this...*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   64

*Speaker 2 (Shaw): [00:05:52.628] Who?*

*Speaker 1 (Albertini): [00:05:53.287] I can tell you this because he's dead, and I don't even know if you know this, Paul Schindler. Paul Schindler.*

*Speaker 2 (Shaw): [crosstalk 00:05:57.495] he tried to get Paul to do it, huh?*

*Speaker 1 (Albertini): [00:09:58.569] And he [Mr. Depp] got drunk, and he got pissed, he got... He was jealous because Kate was hanging out with that girl, and uh, he started punching holes in the walls downstairs, and he grabbed that girl, and he put that cigarette out on her...*

*Speaker 2 (Shaw): [00:11:19.358] Well you know, you know, man, Paul is the reason why I got connected with Johnny.*

*Speaker 1 (Albertini): [00:11:28.592] I know.*

*Speaker 2 (Shaw): [00:11:27.998] He came and got me, you know? He, he...and then he followed me around Hollywood [crosstalk 00:11:34.614] ...*

*"Speaker 2 (Shaw): [00:30:11.510] Bulletproof leather jackets. I told him, I said, tell JD we, we don't need that. We don't need that. We, we want to, we want be...we want to per-, per-, perceive ourselves as professionals. We don't need that. We just ain't, we ain't all... **We not in the mafia**, we don't need to do all that."*

338. Between November 2023 to March 2024, Ms. Taft does a series of Honolulu police citizen reports.

339. In December 2023, Ms. Taft made arrangements to partially have property overseas to escape, as she was deathly afraid of Mr. Waldman's and Mr. Barresi's schemes.

340. A year after Mr. Depp called Barresi, implicating Mr. Waldman's reward before New Years continuous attacks against Ms. Taft in the path of their agenda to "end" Ms. Heard, Mr. Barresi would exploit and threaten Ms. Taft again in coordination to this date, as a year to the day.

341.  This is similar to Mr. Barresi's fascinations with Seuli's death after she did not recant her testimony against actor Mr. Murphy while she was intimidated.[30]

342.  Ms. Taft was terrified of Mr. Barresi's attacks nearly a year to the day after Mr. Depp called to reward him upon Mr. Waldman's suggestion, and reported to the Honolulu police repeatedly.

343.  Ms. Taft's new year was ruined and she nearly became completely silent, frozen in her condo.

344.  Between January to May 2024, Ms. Taft filed multiple reports to the FBI, multiple emails with LA FBI criminal threats, and interviews against Mr. Barresi and Mr. Waldman with FBI agents.

345.  Ms. Taft experienced terror that he was trying to "do her in" along with Mr. Albertini and Ms. Heard, as well as any other witnesses she didn't know about. Ms. Taft saw it as pressuring to end her life.

346. Mr. Barresi continued his conspiracy with Mr. Waldman to "end" witnesses and Ms. Heard by releasing an edited audio tape of Ms. Taft and Mr. Albertini to forcefully implicate them to his "erstwhile" client.

347.  Mr. Barresi quoted from Mr. Waldman's direction that Ms. Taft was a "Bat" multiple times.

348. As of today's date, Mr. Barresi continues to co-conspire with Mr. Waldman against Ms. Taft to "end her."

349.  With an edited audio recording, Mr. Barresi and Mr. Waldman in 2024 try to do the final

---

[30] Ms. Taft reported to the FBI-Los Angeles agent about seeing Mr. Barresi post a screaming sideways thumbnail photo from a video of a *Silence of the Lambs* scene with words referring to "IT" and to this day still disturbs her with continuing re-traumatization.

death blow threats. Mr. Barresi attached the tape on January 3, 2024: "DEAR AMBER HEARD: May your co-conspirators Christina Taft and Richie Albertini Burn in Hell."

350.  Mr. Barresi went after Ms. Taft's deceased mother and audio recordings with exploitative information to cause her intentional emotional distress, threatening her to die, as well as invading private affairs.

351.  As things accelerated, Ms. Taft had to report to the FBI about Mr. Barresi and Mr. Waldman - as it was scaring her about her life and safety. She had to attend the Honolulu FBI Field Division twice with two friends as she had been so heavily coerced to not speak with them.

352. Within a matter of approximately one month, from January to the end of February, Paul Barresi sent over 21 emails to Ms. Taft.

353. In a single day there, on average, there are 9 emails from Mr. Barresi accompanied by the continuing exploitation of edited audio tapes, pressuring harm to Ms. Taft including through manipulation of others.

354. Jan 7, 2024 at 8:11 PM Barresi writes:

> *"Drop dead you ugly little bitch. Your poor mother must be burning alive again and her misguided soul wondering aimlessly in the universe"*

355. On January 7th, 2024 Mr. Barresi uses one of his edited false tapes to do a false call to Honolulu police where Ms. Taft lived, and had fled to, to get them to think she has a gun and to "have their hands on the trigger" to possibly end Ms. Taft's life.

356.  Jan 8, 2024, 4:26 PM: Barresi sent Ms. Taft's address to her and told her he did a false call on her to Honolulu Police. Ms. Taft was relieved she had at least submitted reports to them before he did this. He called her a "bat" again quoting Mr. Waldman and the audio tape with allegedly Mr. Conner. *"Maybe you should've gotten a first floor apartment. "*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   67

357. Ms. Taft was out and was not home. Ms. Taft's building manager told her about the police incident.

358. The next day on January 9, 2024, Mr. Barresi wrote why he did it:

> *"she's filed a complaint against me & Johnny Depp with the police department in Honolulu where she resides."*

359. He emailed Ms. Taft's exact home address in Hawaii to her. A commentator wrote,

> *"so you SWATed someone" and a dispatcher friend of Ms. Taft's in Sacramento since 2018 stated 'it's illegal when he knows you don't have a gun.'*

360. After not succeeding in getting Ms. Taft killed or her life ended, Mr. Barresi emails a barrage of emails to Ms. Taft, with connotations and quoting Mr. Waldman's directions to him. These emails include:

> *Tue, Jan 9, 10:28 AM: "Albertini tried to convince the judge in Pasadena that I was a killer..." In relation to Ms. Taft: "Never a more pathetic human being has ever breathed air. Everyone who hears the telephone recording of you..."*

with the declaration that Ms. Taft should be in prison or jail using the audio tape he obtained of her and Jane Doe.

361. On January 9, 2024, at 11:03 AM: Linking an edited audio tape:

> *"Read what Megan Fox had to say after she saw this video you fucking brain dead idiot."*

The comment claimed "there were no financial transactions."[31]

362. On Tuesday, January 9, 2024, at 11:31 AM, Mr. Barresi claims he spoke with the police with another quote of Mr. Waldman, *"They think you are clearly a fucking bat shit..."*

---

[31] Megan Fox in January played a recording of a phone call during the trial of Depp v Heard with Mr. Albertini. Originally Cooperating Witness Mr. Albertini **wanted to testify** and saw that Ms. Heard was **a victim of extortion and blackmail** by Mr. Barresi. He mistakenly believed that Ms. Taft was a representative of Ms. Heard. Ms. Fox admitted that Mr. Albertini had a lot to say about/against Mr. Depp and that she had hours of audio recordings of his calls. This was with Matthew Lewis who Mr. Albertini reported to law enforcement in 2022 for his intimidation of witnesses.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   68

363. On January 9, 2024 at 11:35 AM: Mr. Barresi again quotes Mr. Waldman with "batshit" and claims to be manipulating his alleged former client to stay silent.

> *"Her security staff are on the lookout for you. I told her lawyers you were in Honolulu and they said Justin said you better stay there."*

364. On January 9, 2024, at 11:41 AM: Mr. Barressi emailed Ms. Taft:

> *"That recording of you... was shortened because in so many places you are so stupid you couldn't even cogently speak a complete sentence. Make no mistake the full recording is intact and in evidence, you fucking dolt."*

This is referring to an audio of Ms. Taft and Jane Doe.

365. On Tuesday, January 9, 2024 at 12:53 PM: Mr. Barresi wrote to Ms. Taft:

> *"fuck off you crazy ugly bitch..." while referring to attempting to incite Ms. Heard's bodyguards against Ms. Taft.*

366. On January 9th, 2024, Ms. Taft stated Mr. Barresi is the one that makes people afraid and to feel the need to have 24/7 security, that he had not named Mr. Brooks and that he was seen in Washington DC to NY boarding a private jet, as well as working for Johnny Depp.

367. On Tuesday, January 9, 2024, at 2:51 PM: Mr. Barresi sends sexually explicit email to Ms. Taft about her mother's alleged sexual activities and indicating that her father could be a porn star and admitting that her alleged father stated he could not be her father. Mr. Barresi insinuates he will release information about her mother and that he has collected private affairs information about them. Attached is a photo of Ms. Taft's mother Victoria Taft with her top off disparaging her.

368. In January 2024, Mr. Barresi emails Ms. Taft threatening her twice with:

> *"THE HOLLYWOOD FIXER THAT WOULD'VE KILLED FOR JOHNNY DEPP" and "THE MAN THAT WOULD'VE KILLED FOR JOHNNY DEPP,"*

While continually threatening exposure about her mother's alleged sexual activities.

369. On January 9, 2024 at 4:11 PM Mr. Barresi writes to Ms. Taft:

*Subject: Excerpt from my book - TITLE: THE HOLLYWOOD FIXER WHO WOULD'VE KILLED FOR JOHNNY DEPP*

370. On January 9, 2024 at 4:15 PM Mr. Barresi writes to Ms. Taft:

*Subject: TITLE: THE MAN WHO WOULD'VE KILLED FOR JOHNNY DEPP*

371. Mr. Barresi told Ms. Taft he "would have killed her for Johnny Depp."

372. Mr. Waldman is aware that Ms. Taft, as he told Mr Albertini previously - would interpret the worst from Mr. Barresi.

373. Barresi's continuous threats and attacks were making Ms. Taft afraid of a "hitman's violin" and afraid for her life.

374. On January 10, 2024, Mr. Barresi admitted Mr. Depp was "the Principle"[32] while naming "Christina Taft" as being unleashed, directing it to alleged former clients: "Dear Amber."

375. On January 11, 2024, Mr. Barresi emails a TAFT ROOF titled image of his posting as a threat to her,

> *"...accused me of being a hitman and throwing a woman off a roof... She's constantly afraid for life...if so afraid of me why have an apartment on the 8th floor."[33] The email contains suffocating pressure to Ms. Taft that Mr. Barresi has recordings of her. Ms. Taft interprets this as a demand to her to die.*

---

[32] Agent-Principle is a concept in business related to "action of the agent is binding upon the principle" i.e., who paid or directed the agent. Witness Mr. Albertini informed Ms. Taft of this concept. Ms. Taft believes Mr. Waldman and Mr. Barresi are aware of this meaning.
[33] The "8th floor" threat to Ms. Taft is similar to Ms. Howell stating "she's on the 10th floor" with photos of a breakin of her apartment using tools. She alleged this started when she agreed to testify as a witness, while in collaboration with defendant Mr. Waldman. She wrote complaints on needing protection of witnesses and emailed alleging conspiracy fears. No articles were written about her complaints of vandalism or her wishes for witness protections.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   70

376. On January 12, 2024, Mr. Barresi writes to Ms. Taft:

> *"Amber: The biological father of Crazy Christina Taft told me she carries a 9MM handgun in her bag. Were you aware she was totting a weapon when this photo was taken? I'm told by unimpeachable source you were."*

Mr. Barresi continued to exploit the unconsented to altered quotes from an edited audio recording of Mr. Conner.

377. Mr. Barresi attached the unconsented use of the photo of Ms. Taft with Ms. Heard from October 2019. This is directed to his "erstwhile" client.

378. From January 14th to the 17th, 2024, Leilani Gigena, an old friend of Ms. Taft's since college, calls Barresi a "hitman" twice and that he is 'stalking, harassing, extorting, and threatening Ms. Taft's life.' Ms. Gigena saw the recent escalations. Ms. Gigena had witnessed the harm of Mr. Barresi and Mr. Waldman against Ms. Taft for years.

379. On January 17, Ms. Gigena calls into the Honolulu Police Department to try to help Ms. Taft against Mr. Barresi and Mr. Waldman.

380. On January 23, Ms. Taft received an email from Mr. Brooks:

> *Re: Offer from BARRESI 01/23/2024: "I have been told by BARRESI that he has a proposal..."*

381. Approximately January 26, Mr. Barresi. in response to Ms. Taft stating Mr. Depp would be sued, was manipulating Jane Doe to email Ms. Taft after a year and a half. Jane Doe wrote the audio tape of her with Ms. Taft was "illegal" and she "had to pay for it." Ms. Taft emails Mr. Barresi with Jane Doe copied:

> *"HOLLYWOOD FIXER: REMOVE THE AUDIOS OFF THE INTERNET IMMEDIATELY AND CEASE EDITING THEM FOR FABRICATIONS AND COERCION. WE ARE NOT TO BE USED FOR YOUR COMMERCIAL GAINS."*

382. On January 26th, 2024 Ms. Taft reported to the FBI as he claimed he was accused of being a "hitman," that he "threw a woman off a roof," and he stated she was on the "8th floor." Ms.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   71

Taft included that he blackmails witnesses and her during exploitation related to actor Mr. Depp.

383. On Jan 28, 2024 Ms. Taft told Mr. Barresi she submitted a report to the FBI with no details.

384. Jan 28, 2024 at 12:14 PM Mr. Barresi again quotes Mr. Waldman:

> *"Fuck you and your reports you nasty looking sleaze. The FBI already has you flagged as a batshit..."* Mr. Barresi stated he would continue to exploit the audio tapes and *"They are adding up!"*

385. While claiming to be connected to actors and powerful figures, and simultaneously working for Mr. Waldman, potential witnesses seem to believe anything Mr. Barresi claims. Ms. Taft further reported Mr. Waldman as a suspect to the FBI.

386. Mr. Waldman on February 24, 2024 displayed that he is known to be dangerous to intelligence analysts with:

> *"maintaining connections to some of the most dangerous people,"* with the quote, *"That's right Iceman...I am dangerous!' -Maverick, Top Gun."*

387. Commentators send to Mr. Waldman naming Ms. Taft to implicate her to leads, including of social network analysis expert Mr. Zhouhan Chen, of the newly released podcast that interviewed two expert witnesses for Ms. Heard that he was fixated on.

388. Ms. Taft provided this danger admission to the FBI of Mr. Waldman including with fear that Mr. Waldman knew she could be traveling to France.

389. Ms. Taft continued to fear Mr. Waldman and Mr. Barresi that they could end her life.

390. Jan 29, 2:30 PM Mr. Barresi sent to Ms. Taft in response about a lawsuit including Mr. Depp:

> *"Your life should be a living nightmare. You are pure EVIL. I'm traveling at the moment. So fuck off you raunchy dirt bag, and when you DIE, may you burn like your mother in hell for all eternity."*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   72

391. In February 2024, Mr. Barresi continued his actions against Ms. Taft.

392. Ms. Taft managed to have a Cease & Desist letter for "Invasion of Privacy" sent to Mr. Barresi.

393. Ms. Taft's attorney Jonathan Inciong, Esq. from Berver & Jones called her with complaints of the fixer's harassment, alleging obtaining his direct email and phone numbers. After Ms. Taft's attorney was contacted and harassed by Mr. Barresi, the attorney stopped representing Ms. Taft or helping her in any manner.

394. Ms. Taft does another Honolulu citizen police report including but not limited to, the continuing coercion of her momentary law firm. Instead of a court record, coercion commenced to get Ms. Taft into an agreement to recant about Mr. Barresi and his work for Mr. Waldman.

395. From February to March 2024, Ms. Taft emails, speaks over the phone, and is interviewed by the FBI including with documentation and in relation to "withhold testimony or information with respect to another's legal claim or defense."[34] It included the private jet from Washington DC payoff/financial transaction, and the extortionary tactics with blackmailing and coercion she had been put through by Mr. Barresi and Mr. Waldman. At her interview in the Honolulu field

---

[34] "*Hawaii Law includes additional protections from extortionary tactics and protections of witness testimony than does California Law:*
*Hawaiʻi Revised Statutes, extortion (Section 707-764) (1) Obtains, or exerts control over, the property, labor, or services of another with intent to deprive another of property, labor, or services by threatening by word or conduct to: Concealment, Other substantial harm, Testimony*
*(e) Accuse some person of any offense or cause a penal charge to be instituted against some person;*
*(f) Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt, or ridicule, or to impair the threatened person's credit or business repute;*
*(g) Reveal any information sought to be concealed by the person threatened or any other person;*
*(l) Do any other act that would not in itself substantially benefit the defendant but that is calculated to harm substantially some person with respect to the threatened person's health, safety, business, calling, career, financial condition, reputation, or personal relationships;*
*(h) Testify or provide information or **withhold testimony or information with respect to another's legal claim or defense**"*

office, Ms. Taft was told that victim services may contact her.[35]

396. In March 2024, Mr. Barresi continued to intimidate Ms. Taft, Mr. Nitrini, and Mr. Albertini.

397. After Mr. Barresi sees in email there was surveillance of him going onto a chartered private jet and from District of Columbia, on March 7, 2024, Mr. Barresi posts a shadowy rat image to represent Mr. Nitrini, who gave his files to Ms. Taft, that "he does look like a rat" and comments "shoot a photo of that face."

398. Mr. Barresi continues to call Mr. Albertini in 2024. Mr. Albertini withholds testimony.

399. Ms. Taft sends a Cease & Desist email to both Mr. Waldman and Mr. Barresi. In response, Mr. Barresi emails Ms. Taft on Victoria's death, and with intimidation. Mr. Barresi continues to exploit audio tapes.

400. Mr. Barresi continues to wish for Ms. Taft's death for her to be the worst to have "ever breathed air" in his writings attached to the exploited audio tapes implicating to the mafia murder.

401. Defendant Mr. Waldman is known as being dangerously connected and Mr. Barresi has photos connecting himself to the American mafia families Gambino and Gotti which he uses to intimidate potential witnesses and possibly clients or former clients.

402. Ms. Taft sees that Mr. Barresi circled back to a witness that was silenced for 30 years and who knew of surveillance by Hollywood Fixers.[36]

---

[35] Victim Services of the FBI finds importance in witnesses. "VSD is responsible for ensuring that victims of crimes investigated by the FBI are given the opportunity to receive services and notification as required by Federal Law and the Attorney General Guidelines on Victim and Witness Assistance." *See*, https://www.fbi.gov/how-we-can-help-you/victim-services

[36] Mr. Barresi posted below a video about Mr. Depp and investigations with this link. See, April 13, 2024 "OJ Simpson WAS at Nicole Brown and Ron Goldman's murder scene and watched as the Gambino gangsters he hired slaughtered the couple, claims witness who says he stayed silent for 30 years because he feared for his life" that further stated that John Dunton knew that investigator, indicted and imprisoned, Anthony Pellicano was surveilling Nicole Brown before OJ killed her and Goldman. Mr. Barresi worked with Mr. Pellicano for Mr. Simpson, the infamous athlete that had recently perished. https://www.dailymail.co.uk/news/article-13303947/oj-simpson-nicole-

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   74

403. Mr. Barresi claims the witness saw a mob murder by the Gambinos as hitmen hired by an infamous athlete that had just perished. Originally, this witness cooperated with law enforcement.

404. Ms. Taft sends this to BSIS with fear, referring to the false claim of Mr. Barresi about her mother witnessing a mob murder by the Gottis, and that it's with fabrications, and Mr. Barresi continuing to misrepresent his hiring.

405. Mr. Barresi pinned it on Mr. Depp and the investigations above this revelation implying to Ms. Taft that she and anyone else would be silenced for decades or for as long as they live.

406. In May, Mr. Brooks emails Ms. Taft again related to "SUBJECT" Mr. Barresi and posts about a "beauty queen shot dead," which scares Ms. Taft.

407. On May 28th, Ms. Taft reported to the FBI again against Mr. Barresi and Mr. Waldman making it clear in her report that Mr. Barresi wants people to think he is a hitman and that he is actually not part of the mafia. She explains it is extortionary. She refers to witnesses of the Viper Room, surveillance logs from Washington DC and the private jet.

408. The same day, Mr. Barresi continues to re-exploit the audio coercion against Ms. Taft, which could make her think she is at risk of a mafia murder instead of reporting Mr. Depp, Mr. Waldman, or Mr. Barresi. He writes that Ms. Taft, "fled to Hawaii."

409. In June 2024, Mr. Barresi and Mr. Waldman's dangerous conspiracy continued to harm Ms. Taft and her friends for their safety and lives.

---

brown-ron-goldman-murder-scene-witness.html
An email Ms. Taft saw that Mr. Barresi sent to Mr. McCormick stated from April 2022, "As for the Attached tape... I am not sure why Dunton claimed [according to Pellicano] he spotted my x boss in front of Nicole's house the night she was murdered, unless he happened to be stalking her... Is Dunton still alive?"

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   75

410. In Colorado during the night, a man with gloves appeared to follow Ms. Taft and her photographer friend up a high-rise and the front door to the high-rise was broken, which led to the photographer repeating "hitman" multiple times. He knew of the intimidation by the fixers. Mr. Triscari witnessed the incident and fears of bribery of $30,000 by Defendants.

411. Two days later on June 23, Mr. Barresi views Ms. Taft's LinkedIn profile reminding Ms. Taft of his surveillance of her and his recruitment of people to harm her in his course of business.[37]

412. Defendants Mr. Waldman and Mr. Barresi's misrepresentation, coercion, edited audio tapes, and interference against eye-witnesses continues to harm Ms. Taft's life, residency, social relationships, workability, and safety. The Defendants causing Ms. Taft and others to suffer does not end.

413. In July 2024, Mr. Barresi and Mr. Waldman, in their conspiracy, continued to contact potential witnesses of Ms. Taft's, including Mr. Albertini and Jane Doe, to continue withholding testimony, invasions of privacy, coordinated harassment, and interference.

414. On July 31, 2024, Mr. Barresi sent a harassing and intimidating email to Ms. Taft including the audio tape link of him with defendant Mr. Waldman, claiming her mother "TRIED TO SUE WARREN BEATTY," cursing her mother, a title with "YOUR BROTHER" and links to the audio tapes he keeps of her, her alleged parentage, and the Viper Room witness that wanted to testify against "JOHNNY DEPP." Mr. Barresi claims Ms. Taft is communicating with reporters.

---

[37] The FBI agent, when initially responding to the report of Mr. Barresi, accused of being a "hitman" and murder of a woman by throwing her off a building interstate threat, at first noted "cyberstalking and exploitation." Hannu Huttunen had viewed Ms. Taft's profile before Mr. Barresi viewed her profile. Hannu had commented to Mr. Barresi that he wanted to do things to Ms. Taft and others with her.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   76

415.  On August 16, 2024, Mr. Barresi sent a threatening email to Ms. Taft with the words, "will be the death of you," intimidating her for her PI surveilling the July 2023 "private plane" transaction from Mr. Waldman in DC to him, to be "burning in hell" and that she will have death like her mother.

## VI.  CAUSES OF ACTION

416.  Defendants engaged in a scheme and continuous harm to corruptly suppress Plaintiff by continuous coercive conduct, intimidation tactics, obstruction as "Hollywood Fixers," causing a chain of exploitation, to deprive rights, and to threaten life of Plaintiff as well as potential witnesses, and Plaintiff's friends and family, while making false representations to misrepresent purposely. Defendants' coercive conduct included conspiracy violations, civil rights violations and elements of racketeering which occurred through predicate acts, Obstruction of Justice, Tampering with a Witness, Victim, or Informant, 18 U.S.C. § 1512(b)(1) and (2), Destruction, Alteration, and Falsification of Records, 18 U.S.C. § 1519, Interfering and Corrupting Interstate Communications 18 U.S. Code § 875 (Interstate Communications), Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises 18 U.S.C. § 1952,  Civil Rights Act 42 U.S.C. § 1973, elements of Racketeering Activity 18 U.S. Code 1961 & 18 U.S.C. § 1962, the Civil Claims for Relief for Deprivation of Rights, and Obstruction of Justice 18 U.S.C. § 1503. In addition, Invasion of Privacy, California Constitution, Article I, Section 1, CACI No, 1800,. 1801 & 1802, Use of Name or Likeness (Civ. Code, § 3344), Civil Harassment, California Code of Civil Procedure § 527.6, Negligence, Intentional Infliction of Emotional Distress (IIED), and Negligent Infliction of Emotional Distress (NIED).

417.  Defendants Barresi and Waldman continuously furthered their conspiracy as they

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   77

suppressed efficient rescue and public safety improvements during civil deprivation of rights against Plaintiff, witnesses, and others.

418. Defendants Interfered with reports to FBI and with the witnesses to attempt to set up certain individuals, intentionally and negligently, to set up the wrong people, with an attempt to frame them for wrongdoing, which is a direct violation of 18 U.S. Code § 1512.

419. Defendants utilized interstate communications in furtherance of their fraudulent scheme, in violation of 18 U.S. Code § 875.

420. Defendants engaged in conduct to tamper with physical evidence relevant to an ongoing investigation by the FBI and Bureau of Security and Investigation Services through the Department of Consumer Affairs, in violation of 18 U.S. Code § 1519.

421. Defendants engaged in conduct to tamper with multiple witnesses, as well as victims and informants, with the intent to hinder, delay, or prevent communication to law enforcement authorities, causing harm and damages, which is a direct violation of 18 U.S. Code § 1512 as well as 18 U.S.C. § 1512(b)(1) and (2).

422.  Defendants continue threatening the abuse of process and are continuous with extortionary tactics of interstate communications, including Defendants' private commercial interests to force their victims into demise, fear of object tampering, and to prevent communication.

423. Defendants conspired and co-conspired, including but not limited to conspired civilly, invaded privacy of, used name or likeness of, civilly harassed, acted with neglect, intentionally and negligently inflicted emotional distress upon Plaintiff, which are direct violations of  Federal Code 18 U.S.C. § 241, CACI No. 1801 Invasion of Privacy—Intrusion Upon Seclusion, CACI No. 1802 Invasion of Privacy—Public Disclosure of Private Facts, 42 U.S.C. § 1983 Civil Rights Act, and 42 U.S.C. § 1985 Conspiracy to Interfere with Civil Rights.

424. Defendants intentional and negligent behavior towards Plaintiff are further listed in the following Causes of Action:

### FIRST CLAIM FOR RELIEF
### Civil Conspiracy

425. Plaintiff Ms. Taft re-alleges all paragraphs within this lawsuit and incorporates the same by reference as if repeated herein in their entirety.

426. **Definition:**
**Civil Conspiracy** in a legal context refers to an agreement between two or more parties to commit a wrongful act or to achieve a lawful end by unlawful means, causing harm to another person or entity. Civil conspiracy is a basis for a private lawsuit where the harmed party seeks damages or other remedies. The essence of civil conspiracy in common law is that it involves collaboration between conspirators to effectuate a harmful objective, whether or not that objective is inherently illegal.

427. Defendants entered into an agreement, whether explicit or implied, to invade the privacy of, civilly harass, to tamper with, to intentionally and negligently harm, and to inflict emotional distress onto Plaintiff. Mr. Waldman and Mr. Barresi discussed their schemes in telephone calls and in communications about Ms. Taft.

428. Defendants Barresi and Waldman in their conspiracy suppressed efficient rescue and public safety improvements in civil deprivation of rights against Plaintiff, witnesses, and others.

429. Defendants continuously agreed upon, and continue to do so as of today's date, to commit wrongful acts against Plaintiff intentionally, as well as negligently by falsifying and exploiting information to sabotage, and they used their coercive tactics to continuously interfere with eye-witnesses, harass Plaintiff non-stop, contact Plaintiff's security, legal representatives, colleagues, and friends and family, as well as continuously search the location of Plaintiff's residency, her whereabouts, social relationships, workability, and continuously threaten Plaintiff's safety and well-being. Defendants' exploitation included them using audio tapes, fabricating and altering audio tapes and using that to suppress witnesses and Plaintiff.

430.  Defendants caused witness testimonies, security, and legal representation to adhere to Defendants' demands, including but not limited to Police and FBI.

431. Defendants' actions are the sole reason witnesses changed their testimony, by causing exploitation, deception, corrupt persuasion, and to have repeated fear of Defendants, by their continuous threats.

432. Defendants intentionally caused Plaintiff's agents to have false information intentionally, including but not limited to, altered records, and recordings, as well as information to sabotage.

433. Defendants caused failed relationships with Plaintiff by sabotaging them, due to the harassing nature of Defendants against not only Plaintiff, but also witnesses, legal or investigative representatives, colleagues, friends and family, due to the fear of what Defendants will attempt to sabotage in their lives and/or threats to their life, by Defendants.

434. Defendants manipulated evidence and harassed involved parties, including legal representatives and investigators, to silence witnesses and to not represent Plaintiff.

435.  Defendants both agreed to plan, as well as commit wrongdoing against Plaintiff and acted in a behavior and manner that was intentional and negligent.  Defendants' agreements were oral as well as in writing and implied by conduct by both Defendants.

436. Defendants Mr. Barresi and Mr. Waldman intentionally interfered to coerce Ms. Taft as agents in a conspiracy. With an edited audio recording, Mr. Barresi and Mr. Waldman in 2024 tried to do the final death blows, threats to Plaintiff, and finalized to key witnesses. Mr. Barresi correlated his audio recordings for coercive use on January 3, 2024: "DEAR AMBER HEARD: May your co-conspirators Christina Taft and Richie Albertini Burn in Hell."

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   80

437. Mr. Barresi edited audio recordings he took of people to edit false claims against Ms. Taft and others while trying to pin Ms. Taft down into a location, relations, audios of her likeness, and inheritances, while in his fraudulent scheme for Mr. Waldman.

438. Defendants are the actual cause of security and investigators to have false information by Defendants by intentionally sabotaging and editing, and tampering information and submitting it to said security and investigators.

439.  Plaintiff asserts a civil conspiracy claim based on Defendants' coordinated efforts to obstruct justice and violate her rights. Defendants' actions to interfere with Plaintiff's rights and intimidate witnesses support this claim. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503 (1994)* affirms liability for joint actions with malicious intent. Plaintiff seeks joint and several liability for damages from Defendants' unlawful acts.

440. Both Defendants are willing participants, and are to be held liable for all acts done, as a whole, wrongful acts "does not necessarily depend upon the active participation in the particular overt acts."  *Spencer v. Mowat, 260 Cal. Rptr. 3d 372, 377 (2020)*.

441. Pursuant to *Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research, 106 N.Y.S.3d 302, 305 (2019),* Defendants are to be held jointly and severally liable for the acts against Plaintiff.

442.  Defendants acted in negligence therefore cannot deny the misconduct against Plaintiff, *Zazzali v. Ellison, 973 F. Supp. 2d 1187, 1199 (D. Idaho 2013) (emphasis added)*, as the law does not permit one co-conspirator to reduce their liability from that of other co-conspirators. Civil conspiracy "fastens liability on those who agree to the plan to commit the wrong as well as those who actually carry it out," *Spencer v. Mowat, 260 Cal. Rptr. 3d 372, 377 (2020)*.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   81

443.  Both Defendants acted with knowledge of all occurrences and with the intent for them to both pursue the same objective.  Since both Defendants had intent to pursue the same objective, they may be charged with preceding acts in furtherance of the conspiracy. *Industrial Building Materials, Inc. v. Interchemical Corp., 437 F.2d 1336, 1343 (9th Cir. 1970)* showed "A participant in the conspiracy 'effectively adopts as his or her own the torts of other co-conspirators within the ambit of the conspiracy.' " *Spencer, 260 Cal.Rptr.3d at 383*.

444.  Defendants clearly acted and had declarations of the conspiracy against Plaintiff in their activities. In this case, Plaintiff has sufficient evidence of both Defendants participating together, interfering and tampering with Plaintiff's privacy and affairs, as well as witnesses, and continuous criminal activity towards Plaintiff. The liability doctrine applies to both Defendants.

445. Under the Privacy Act, Ms. Taft is not required to prove that Mr. Waldman personally committed a wrongful act or that he knew all the details of the agreement or the identities of all the other participants.

446. Defendants had intrusion to coerce with likeness of Plaintiff and others, a chain of exploitation, with interstate threats.

447. Defendants' intent was to harm Plaintiff. They misrepresented, coerced and caused coercion by others joining, edited audio tapes of Plaintiff, interfered with eye-witness accounts, and continue to harm Plaintiff, plot and plan and discover her location, place of residency, interfere with her social relationships, work, and threaten Plaintiff to where she has fear of her life, and continues to suffer and feels no safety.

448. Defendants are the direct cause of Plaintiff's as well as others' suffering.  The Defendants' behavior is continuous, and does not end, to this day.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   82

449. Defendants' intent was to also fabricate all information as to protect their continuous behavior from being released to anyone, including but not limited to, the Police or FBI.

450.  Both Defendants are in furtherance of the conspiracy against Plaintiff, in their tactics of attachment for their 'principle' Depp, with Waldman increasing that connection to Barresi by rewarding Barresi, and ongoing exploitation, with suppression of unwanted testimony, as they both had motive and intent which has been clearly outlined and proven.

451. Both Defendants are liable for all acts done due to their conspiracy since they both effectively adopted their actions as their own. Therefore, both Defendants should be held for damages including treble damages and liability to torts, since they are responsible for conspiracy and co-conspiring against Plaintiff.

452. Therefore, Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated in excess of $2,000,00 for the costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, and to temporarily and permanently enjoin Defendants from oppressing, threatening and intimidating Plaintiff and other persons associated with her across multiple states, and preventing Plaintiff from freely exercising and enjoying her rights and privileges as alleged herein.

453.  Plaintiff also asks the Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   83

## SECOND CLAIM FOR RELIEF
### Civil Rights Act

454. Plaintiff Ms. Taft re-alleges all paragraphs within this lawsuit and incorporates the same by reference as if repeated herein in their entirety, providing foundation for claims of relief under 42 U.S.C. § 1983 for deprivation of constitutional rights, as well as obstruction of justice.

455. **Definitions:**

**a. 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights** is a statute that provides individuals with a civil cause of action against state or local officials who, under color of law, violate their federally protected rights. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**b. Under Civil Deprivation of Rights, with relation to Equal Protection, Obstruction of Justice:  18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion** is also defined as Obstruction of Justice:  18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion is also defined as the intentional interference with the proper administration of justice, specifically by targeting witnesses, victims, or informants through intimidation, threats, or corrupt persuasion. This section criminalizes actions aimed at preventing truthful testimony or cooperation in legal proceedings. Subsection (b)(1) prohibits using intimidation, threats, or corrupt persuasion to influence, delay, or prevent the testimony of any person in an official proceeding. The purpose of this provision is to obstruct or interfere with justice by preventing the truth from coming to light in a judicial, legislative, or other legal forum.  Subsection (b)(2) prohibits engaging in intimidation, threats, or corrupt persuasion to cause someone to withhold testimony or documents or to alter, destroy, or conceal evidence to impair its availability in an official proceeding. The purpose of this provision is to interfere with the collection and presentation of evidence critical to the administration of justice.

456.  Plaintiff asserts that Defendants are mutually in direct violation of 42 U.S.C. § 1983 which violates her civil rights, constitutional rights, to reporting, witnessing, to due process and equal protection under 42 U.S.C. § 1983.  Defendants are also mutually in direct violation of Federal Code 18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice because of their coercion, threats and

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   84

deceit they perpetuated against Plaintiff.  Defendants' conduct, continuously threatening Plaintiff, obstructing justice to falsify information against Plaintiff in an attempt to deceive potential witnesses, including witness tampering, evidence destruction and obstruction, and alteration of records, as well as coercing victims and witnesses from testifying, and from reporting to Police or FBI, deprived Plaintiff of a fair legal process, infringing upon her constitutional rights.

457.  Pursuant to 42 U.S.C. § 1983, any person acting under the color of state law who deprives another of their constitutional or federal rights is liable for damages or other relief.

458.  Defendants, under the guise of lawful authority, committed acts that resulted in the deprivation of Plaintiff's rights to due process, equal protection, and meaningful access to justice.

459.  Defendants acted under the apparent authority of law, intentionally misused their access to information and used this access towards potential witnesses, which is meant for certified personnel with their influence, which then deprived Plaintiff of her rights protected by federal statutes, violating 18 U.S.C. § 242, which outlaws willful rights deprivation under color of law.

460.  Citing *Screws v. United States, 325 U.S. 91 (1945)*, Plaintiff argues that Defendants' actions, taken with malicious intent, unlawfully imposed legal and social burdens on Plaintiff, infringing Plaintiff's due process, access to public safety services and accurate investigation responses, and access to fair proceedings. In addition, these allegations support her § 1983 claims for damages and relief. Plaintiff clearly shows how Defendants' acted with malicious intent in order to prevent accurate investigation responses to facilitate events to favor their desired outcome.

461. Defendants' tactics were to force their victims into demise by persuading, intimidating, and

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   85

using threats, which also included object tampering, and attempts to prevent communication for individuals, which is a direct violation of the law.

462.  Plaintiff also raises claims under *Monell v. Department of Social Services, 436 U.S. 658 (1978)*, which imposes liability when official policies or customs lead to rights violations.

463.  Defendants' repeated and coordinated actions constitute a custom or practice of misconduct, intentionally circumventing judicial processes and targeting her rights, preventing accurate rescue services, systemic coercion and harassment, obstructing Plaintiff's rights and legal claims.

464.  Furthermore, *Monell v. Department of Social Services of New York City* holds that private actors who engage in concerted actions that undermine legal protections can be held liable for civil rights violations under § 1983. By obstructing Plaintiff's access to a fair and impartial proceeding, Defendants' actions amount to a significant violation of her constitutional rights, warranting relief under § 1983.

465.  Defendants intentionally prevented assistance to Plaintiff, witnesses, and former clients, and willfully prevented more accurate, more efficient, and safer rescue responses, public safety, and competition that wants to save lives, to pressure them to not provide their services to people in the United States, especially in relation to arts, film and Hollywood.

466.  Witnesses and Plaintiff went to report to the police, FBI, and Bureau of Security and Investigation Services in order to achieve assistance and protection from Defendants' tactics.

467.  Federal Informant Rauhauser informed client Taft and retired LAPD private investigator that Adam Waldman utilizes his associations with powerful actors, alternating between them, in interest of the government to effectively evade and influence authorities, making directions to not be witnesses against Depp, and using threatening tactics.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   86

468. Defendant Barresi claimed authorities would listen to him, making alterations of records, forcing, withholding or changing of testimony of witnesses, and pressured that his "erstwhile" client, Plaintiff, and witnesses were subjects of the FBI. Meanwhile, Barresi held himself out to be akin to a mafia figure with associations to groups convicted of racketeering and his private interests for the "Hollywood Fixing" Depp enterprise, holding Plaintiff and witnesses with no escape. Taft attempted to protect herself and witnesses with private investigators, as well as reporting the actions taken by Defendants.

469.  As a direct and proximate result of Defendants' conduct, Plaintiff suffered significant economic losses, including the loss of business opportunities, financial resources, and professional partnerships critical to the success of her public safety initiatives. Plaintiff was unable to continue a contractual relationship with former firefighter and rescue instructor Niko Sanchez, who was instrumental in expanding SaveMeNow's Life-Saving Services. SaveMeNow improves communications and accurate reporting for citizens, victims, witnesses, and responders. As a Department of Defense contractor, improving federal responses and security, Aedan's professional relations with Plaintiff were frozen due to Defendants' conduct, exploiting "color of law" and attaching Hollywood.  These disruptions severely impacted the ability of Plaintiff's businesses and partnerships to fulfill their public safety mission.

470.  Protection of Rights to Petition the Government:  Plaintiff's First Amendment right to access the courts for redress of grievances, a right safeguarded under 42 U.S.C. § 1983 is clearly defined in *Bounds v. Smith, 430 U.S. 817, 821 (1977),* as the Court confirmed that denial of meaningful access to the courts constitutes a violation of constitutional rights. In this case, the interference by Defendants reinforced the claims of *Bounds v. Smith* because the rights of Plaintiff were violated, and Plaintiff had a right to report the Defendants, as they were

endangering witnesses and potential witnesses to the Bureau of Security and Investigation Services, FBI, federal authorities, and police, while clarifying the constitutional violations at issue.

471.  The interference by Defendants was intended to obstruct justice for Plaintiff, the witnesses and potential witnesses, and to obstruct the federal authorities viewpoint on matters of fact.

472.  By invoking § 1983, Plaintiff asserts that these Defendants, while acting under the color of law, deprived Plaintiff of federally protected rights, thus justifying a federal cause of action, which allows Plaintiff to seek redress against any person who, through the misuse of authority, infringes upon her rights secured by the United States Constitution and Federal Law.

473. Defendants admitted repeatedly their intent to obstruct investigations and set up witnesses and Plaintiff to be arrested, injured, or flee jurisdictions. Defendants openly discuss fabricating timelines of events for their illegal purposes to falsely set up their targets. Defendants object tampering, specifically audio tapes and statements of people, is directly linked to unlawful and illegal activity.

474.  Defendants conspired to misrepresent the agency of a fixer to a billionaire and actress, and to force any witnesses to be afraid and did so to benefit their Principal, Mr. Depp.

475.  The definition of "under color of state law" within § 1983 was expanded with the landmark case *Monroe v. Pape, 365 U.S. 167 (1961).* It clarified that actions to violate need not be expressly authorized by law to qualify; rather, any misuse of authority granted can suffice.

476.  *Monroe v. Pape* supports Plaintiff's assertion that Defendants' conduct, due to it being unauthorized, falls within § 1983 liability when it involved misused authority. Plaintiff thus establishes that Defendants acted under color of law in depriving Plaintiff of constitutional rights.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   88

477.  The Civil Rights Act under § 1983 ensures accountability for abuses of governmental power, empowering citizens to protect themselves against unlawful conduct by individuals who misuse their "color" of access to governmental authority. This provision is central to claims where Defendants, wielding governmental influence or in connection with government entities, have violated Plaintiff's constitutional rights to due process, equal protection, and freedom of speech. Although Plaintiff contends the illegalities by Defendants, Plaintiff demonstrates the need to address civil rights violations. Defendants Barresi and Waldman are a dangerous combination.

478.  Substantiation of Due Process Violations: The proposed amendments highlight specific due process violations, particularly the lack of fair procedures, constituting a denial of procedural due process under the Fourteenth Amendment. Procedural due process is a cornerstone of the Constitution, ensuring that individuals are granted fair and equitable procedures before being deprived of life, liberty, or property.

479.  In *Mathews v. Eldridge, 424 U.S. 319, 333 (1976),* the Court emphasized that procedural due process requires fair safeguards.: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and the probable value of additional safeguards; and (3) the government's interest, including fiscal and administrative burdens of additional procedural requirements.  These amendments underscore violations such as inadequate notice, denial of a meaningful opportunity to be heard, and biased decision-making processes, all of which compromise the foundational principles of fairness and impartiality. By Defendant's failure to adhere to these principles, the existing framework falls short of constitutional standards, rendering the procedural mechanisms insufficient to protect Plaintiff's rights and interests, as well as all Witnesses and other individuals involved. These

shortcomings not only undermine public trust in the system but also create a significant risk of unjust outcomes.

480.  Defendants' unlawful activities are beyond invasion of privacy and involve them accessing private and sensitive information of individuals.

481.  The destruction, alteration, and falsification of records was done by Defendants knowingly and with purpose.

482.   Defendants pressured witnesses and Plaintiff by providing altered records to federal authorities and security personnel. The records involved are documentary in nature and are material to federal investigations.

483.  The false information by Defendants, over years, intentionally caused security, investigators and personnel to include Defendants' falsified reports, manipulated financial documentation, and recordings.

484.  Defendants intentionally and knowingly and abundantly caused Plaintiff's agents to have false information, including but not limited to, fabricated and/or altered information, and recordings.

485.  Defendants caused agents and attorneys to over-charge and frighten Plaintiff, causing witnesses to change their testimony, causing victims to have continuous fear of Defendants, causing harassment of Plaintiff's attorneys and paralegals, and invading the private affairs of Plaintiff's family relationships.

486. The primary reason federal authorities are in place is to help victims of crime. Interference with these federal authorities constitute a threat to the victims' rights which should be protected under the Constitution.

487.  The Defendants jeopardized our federal authorities by infringing on victims, witnesses, and governmental employee's Constitutional Rights.

488.  Records that Defendants obstructed and/or altered are physical documents, testimonies, and digital records.

489.  Due to Defendants' continuous illegal activities by intentionally destroying records, intentionally modifying records, and intentionally creating false records, and the violations by Rule of Law, under 18 U.S.C. § 1519, Destruction, Alteration, or Falsification of Records Defendants should be held liable for what they perpetrated upon Plaintiff, and Defendants actions resulted in emotional harm upon Plaintiff, and the distress Plaintiff suffers is severe.

490. Defendants caused Ms. Taft and others' suffering, which does not end, to this day.

491. Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated in excess of $2,000,000 for the costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, for violating Federal Code 18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice, Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion and to temporarily and permanently enjoin Defendants from coercing and intimidating Plaintiff, victims and witnesses and from falsifying  information against Plaintiff in an attempt to deceive potential witnesses.

492.  Plaintiff also asks the Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   91

### THIRD CLAIM FOR RELIEF
### Civil RICO Act
### Racketeering Activity

493. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

494. **Definitions:**

**Racketeer Influenced and Corrupt Organizations (RICO) Act,** which is designed to combat organized crime in the United States.  This includes a variety of criminal offenses that fall under State or Federal Laws, such as bribery, extortion, fraud, and certain violent crimes. To demonstrate a pattern of racketeering, predicate acts under CIVIL RICO may include:
**Predicate Acts**
**a. 18 U.S.C. § 1961(1) & 18 U.S.C. § 1962** outlines the prohibited activities under RICO, including the ways in which it is illegal to engage in racketeering activities or to conduct an enterprise through a pattern of racketeering activity. This law makes it unlawful for any person who has received income derived from a pattern of racketeering activity to use or invest that income in the operation of an enterprise engaged in or affecting interstate or foreign commerce.

**b. Obstruction of Justice 18 U.S.C. § 1503** qualifies as one of the predicate acts that can form the basis for a RICO violation. Specifically, it involves corrupt actions intended to interfere with the administration of justice, such as tampering with evidence, intimidating witnesses, or influencing court officials. This offense becomes significant when it is part of a pattern of racketeering activity, meaning it is connected to at least two related predicate acts that occur within a 10-year period. For instance, if obstruction of justice is committed as part of an ongoing scheme by an organization to defraud individuals or businesses, it can provide grounds for a civil RICO claim. Victims may then seek remedies such as treble damages, attorney's fees, and injunctive relief, emphasizing the statute's role in addressing broader corrupt practices that harm public or private interests.
**c. Destruction, Alteration, or Falsification of Records 18 U.S.C. § 1519** addresses the Destruction, Alteration, or Falsification of Records in Federal investigations and bankruptcy proceedings.  The statute criminalizes the act of intentionally destroying records, intentionally modifying records, and intentionally creating false records.
**d. Obstruction of Justice:  18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion** is also defined as the intentional interference with the proper administration of justice, specifically by targeting witnesses, victims, or informants through intimidation, threats, or corrupt persuasion. This section criminalizes actions aimed at preventing truthful testimony or cooperation in legal proceedings. Subsection (b)(1) prohibits using intimidation, threats, or corrupt persuasion to influence, delay, or prevent the testimony of any person in an official proceeding. The purpose of this provision is to obstruct or interfere with justice by preventing the truth from coming to light in a judicial, legislative, or other legal forum.  Subsection (b)(2) prohibits engaging in intimidation, threats, or corrupt persuasion to cause someone to withhold testimony or documents or to alter, destroy, or conceal evidence to impair its availability in an official

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   92

proceeding. The purpose of this provision is to interfere with the collection and presentation of evidence critical to the administration of justice.

**e. Interstate communications**, **18 U.S. Code § 875** is defined as "whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person *or* any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

**f. Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952, The Travel Act** criminalizes the use of interstate or foreign travel or transportation to facilitate or further illegal activities. The statute specifically targets activities related to racketeering, including organized crime. The statute covers the use of travel or transportation across state or international lines with the intent to promote or facilitate criminal activities. For Racketeering, the crimes covered include any offenses related to racketeering, which generally involves engaging in illegal business activities, such as bribery, extortion, and other forms of organized crime. The statute makes it a crime to use travel or transportation to promote or facilitate, engage in or facilitate criminal conduct that is punishable under State or Federal Laws, particularly crimes related to racketeering or organized crime or to conduct or operate a business that is in itself illegal or that is used to further illegal activities. The statute also criminalizes conspiracy to commit or attempt to commit offenses covered by the Travel Act. This means that even if the actual criminal activity has not occurred, planning or attempting to engage in such conduct is punishable.

These claims underscore the necessary continuity and connection between Defendants' actions, satisfying the standards for a pattern of racketeering activity as outlined in *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989).*

495. Defendants, doing suppressive activities, are mutually in direct violation of Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S. Code § 1961 and 18 U.S. Code § 1962, Obstruction of Justice 18 U.S.C. § 1503, Destruction, Alteration, or Falsification of Records 18 U.S.C. § 1519, 18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion, Interstate communications, 18 U.S. Code § 875, and Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952, The Travel Act, because of their coercion, threats, obstruction of justice to falsify information, deceit they perpetuated against Plaintiff and witnesses, as well as coercing victims and witnesses from testifying to Police and FBI. Defendants Barresi and Waldman are managing and operating the enterprise. Defendants intentionally and knowingly and abundantly caused Plaintiff's agents to have false information, including but not limited to,

fabricated and/or altered records and recordings, altered information, intentionally causing

security and investigators to have such false information including falsifying reports and

recordings, causing agents and attorneys to over-charge and frighten Plaintiff, causing witnesses

to change their testimony, causing victims to have continuous fear of Defendants, causing

harassment of Plaintiff's attorneys and paralegals, and invading the private affairs of Plaintiff's

family relationships.

496.  Defendants' tactics were to intentionally force their victims into demise by persuading,

intimidating, exploitation, and use of threats, which also included object tampering, and attempts

to prevent communication for individuals, which is a direct violation of the law.

497.  *Arthur Andersen LLP v. United States, 544 U.S. 696 (2005),* highlights "corrupt

persuasion" of witnesses, while *United States v. Kelner, 534 F.2d 1020 (2d Cir. 1976)* confirms

that interstate threats are predicate acts.  In addition, *Rewis v. United States, 401 U.S. 808 (1971)*

establishes that interstate travel for an illegal enterprise is a predicate act. These acts support a

pattern of racketeering activity, as required by *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S.*

*229, 239 (1989)*, which calls for continuity and relatedness in racketeering claims.

498.   Plaintiff asserts that Defendants have engaged in a coordinated campaign to obstruct

justice through intimidation, coercion, and evidence tampering, violating federal statutes,

including 18 U.S.C. § 1512 (witness tampering) and § 1519 (alteration of records), 18 U.S.C. §

1503, as well as RICO provisions under 18 U.S.C. § 1961–1962.

499.  Plaintiff cites *U.S. v. Aguilar, 515 U.S. 593 (1995),* where the Supreme Court held that

obstruction statutes cover acts intended to disrupt judicial proceedings with a clear link to justice.

Plaintiff argues that Defendants' deliberate actions to discourage witness cooperation and

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   94

obstruct court proceedings show a willful disregard for the integrity of the judicial process, supporting her claims for relief under both obstruction and RICO statutes.

500.  **Multiple Victims, Relationship and Continuity of Acts**: The predicate acts are not isolated; they are linked by common purposes and participants, demonstrating both relationship and continuity.  *Beck v. Prupis, 529 U.S. 494 (2000)* addressed the need for related predicate acts over time, not isolated incidents. Plaintiff shows Defendants' actions are related and are recurring tactics, evidencing relationship and continuity. Defendants have continued their tactics repeatedly over 5 years, with Defendant Barresi proclaiming "hundreds" of people to Witness Berry in relation to "fixing" for Depp, Consigliere Waldman conveyed his years long interest to Barresi in their recorded phone call, and to Plaintiff Taft over two and a half years to this day.

501.  Each predicate act by Defendants shares similar methods and goals, evidencing an orchestrated pattern of unlawful behavior. Defendant's tactics repeatedly correlate with the elements of the *Coercion Law of New York (Penal Law Section 135.60-65),* including to coerce others into joining their scheme, and that needs adjoining in California.

502.  In *United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989),* the Second Circuit clarified that a pattern of racketeering exists where acts are similar in method, victim, and participant.

503. Over 20 potential witness names, that Defendants suppressed and prevented information on, were given to Taft by Albertini and Nitrini. Witnesses suppressed and coerced by the activities of Defendants included ones who have witnessed and/or been victims of assaults and abuse, threats to kill them, violence, and crucial testimony that is critical to federal, criminal, and civil investigations against the principal of Defendants, Depp. Some witnesses have information and testimony, including names of others who can attest to the Viper Room, to coercive use of tapes,

of activities to suppress, including against those involved as potential witnesses, related to the film business, and others who can be crucial to stopping coercion.

504.  Plaintiff contends that Defendants systematically harassed and intimidated witnesses through threats and coercion to suppress testimony, obstructing the fair adjudication of her claims. These actions violate 18 U.S.C. § 1512(b)(1), which criminalizes witness tampering, and 18 U.S.C. § 1503, which prohibits interference with judicial proceedings. Plaintiff claims these instances of intimidation, occurring over a prolonged period and involving multiple individuals, demonstrate continuity and specific intent—which are key elements of a RICO violation under 18 U.S.C. § 1961(5).

505.  Tactics of interference against people, Plaintiff, and recordings exploited for coercion in Plaintiff's case, fulfill *Sussman v. ABC, Inc., 186 F.3d 1200, 1202–03 (9th Cir. 1999)*, with implication to other cases in interest of Defendants Waldman and Barresi. Defendant Barresi is familiar with creating "mile-long lists" of victims, exemplified by a case involving journalist Anita Busch, where 500 victims pursued a class action suit. See *Busch v. Gorry, Meyer & Rudd LLP, No. B260081 (Cal. Ct. App. Dec. 18, 2015).* Additionally, *United States v. AT&T Inc.*, *Civil Case No. 17-2511 (RJL) (D.D.C. Jun. 12, 2018),* applies to grievances arising from Defendants' audio recordings from Pellicano Investigations Ltd, that Defendant Barresi was a coworker in, and convicted of racketeering, *United States v. Pellicano, No. 04-50043 (9th Cir. Jul. 18, 2005).*

506. Defendants operated as an "enterprise" under 18 U.S.C. § 1962(c), orchestrating a scheme to further their illicit goals through intimidation and manipulation of judicial processes. Citing *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)*, Plaintiff highlights that a RICO claim requires evidence of a pattern of racketeering that directly harms the Plaintiff. Plaintiff refers to Barresi, who conspired with Adam Waldman (Johnny Depp's consigliere) to intimidate

witnesses and opponents, engaging in "complex and elaborate" interference. Barresi also made statements of "take it to the bank," and noted his recordings, which Plaintiff and witnesses attest he exploited.  This is accompanied by a continuous series of predicate acts including intimidation and corrupt persuasion. The case *Sedima, S.P.R.L. v. Imrex Co.* noted the goal to deter organized crime by allowing private suits. Plaintiff's case, she argues, fits within this framework, as the misconduct of Defendants constitutes a calculated series of actions specifically intended to impair her legal rights and evade justice.

507. Plaintiff shows consistent tactics used by the same actors.

508. 18 U.S.C. § 1962(b) prohibits any person from acquiring or maintaining an interest in or control of an enterprise through a pattern of racketeering activity. In other words, it makes it illegal to use racketeering activity to gain control over an enterprise. 18 U.S.C. § 1962(c) makes it unlawful for any person to conduct or participate, directly *or* indirectly, in the conduct of the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) addresses conspiracy to commit any of the above violations. It makes it illegal to conspire to violate any of the provisions of § 1962(b), (c), or (d).

509.  The Defendants have violated 18 U.S.C. § 1962 in multiple ways. First, they have unlawfully used and invested income derived from a pattern of racketeering activity in the operation of an enterprise engaged in or affecting interstate or foreign commerce, in violation of § 1962(a). This investment of racketeering proceeds into the enterprise is explicitly prohibited. Second, Defendants have acquired and maintained control of the enterprise through a pattern of racketeering activity, contrary to § 1962(b), which bars the use of such activity to gain or sustain control over an enterprise or an individual. Third, the Defendants have conducted and participated in the operation of the enterprise through a pattern of racketeering activity, in breach

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   97

of § 1962(c), which prohibits the use of racketeering to direct the affairs of an enterprise. Additionally, the Defendants have conspired to commit these violations, as evidenced by their actions and agreements, in violation of § 1962(d), which criminalizes conspiracies to engage in any of the prohibited activities outlined in § 1962(a), (b), or (c), therefore satisfying all of the elements required under this Law.

510.  Defendants' offenses included upon preponderance of the evidence, such as witness tampering, as they continuously intimidated witnesses with being aggressive including multiple tactics and informing witnesses of their whereabouts or their trips; this included corrupt persuasion and threats to witnesses. Defendant Barresi keeps audio tapes of potential witnesses for intimidation and leverage.  Defendants' offenses also include interstate communications, bribery, fraud, tampering with official records by destruction, and alteration and falsification of records. Defendants' deliberately caused security and investigators to have false information by intentionally sabotaging and editing records, and tampering information and submitting it to said security and investigators. Defendants were well aware that this information was to be used by the Police and FBI.  Defendants' other offenses include transportation in aid of racketeering.

511. Mr. Barresi has admitted that Mr. Waldman is the "Consigliere," as defined to be related to criminal enterprises, that he communicates with for these activities, including in direct relation to harm to Ms. Taft and witnesses.  Defendants in their association have repeated their racketeering activities, for their common purpose, for approximately five years, and two years to Ms. Taft.

512. Defendants admitted to the overt correlation and with being "dangerous" and involved in Racketeering Enterprises, specifically being 'fixers,' in this matter for the association to cover-up for Mr. Depp.

513.  Defendants' enterprises and associations are in the common purpose of harming Plaintiff and Witnesses while violating Federal Laws of witness tampering, record fabricating and alterations, interstate communications and concealment of their scheme across states with preponderance of the evidence.

514.  The Defendant's pattern of racketeering activity includes a series of related predicates extending over several years involving multiple predicate acts and is currently an open-ended continuity which by its nature projects into the future with a threat of repetition.   The pattern of Defendants' behavior has spanned from 2019 to present and is continuous to this day, with multiple victims, *H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 238 (1989).*  The Defendant's methods and patterns of racketeering activity were numerous in itself, see *Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 495 (1985).*

515.  Defendants are part of an associated-in-fact enterprise which includes a group of persons associated together for a common purpose of engaging in a course of conduct, please see *Boyle v. United States, 556 U.S. 938, 945-46 (2009), quoting United States v. Turkette, 452 U.S. 576, 580 (1981).*

516.  The Predicate acts by Defendants can be proved by a preponderance amount of the evidence in this Verified Complaint, *Wilcox v. First Interstate Bank, 815 F.2d 522, 531-32 (9th Cir. 1987),* which include acts of racketeering, related to a fraudulent scheme, as part of an ongoing criminal enterprise.

517.  *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)* recognized that RICO claims must affect interstate commerce, and Plaintiff shows that the Defendants' enterprise affects interstate commerce, an essential element for RICO claims. Plaintiff details Defendants' enterprise activities that crossed state lines, with witnesses, and Plaintiff in multiple states, as

well as records and observations by investigators, establishing jurisdiction under the anti-racketeering act. Defendants' actions, including witness intimidation and financial coercion, disrupt competition and undermine the legal system. Barresi's admissions and references to former clients show the scope of the harm, affecting businesses, investigators, litigants, and experts.

518.  Defendants conduct is criminal in nature, as both Defendant Barresi and Defendant Waldman have been involved in federal investigations as suspects (FBI Agents Metcalf, Tdoblach, Taghdis, Turner, Hood and observed by witnesses, investigators) and as interested subjects (admitted by Barresi and Waldman).

519.  From February to March 2024, Plaintiff Ms. Taft emailed, spoke over the phone, and was interviewed by the FBI, including with documentation, and in relation to "withhold testimony or information with respect to another's legal claim or defense." It included the private jet from Washington DC payoff/financial transaction, and the extortionary tactics with blackmailing and coercion she had been put through by Mr. Barresi and Mr. Waldman. At her interview in the Honolulu field office, Ms. Taft was told that victim services may contact her.

520. In 2024, Plaintiff had to report to 5 FBI agents a detailed timeline report including files, these threats, and travel by Defendants.

521.  Defendants furthered their criminal conduct as they continued similar acts on purpose, with anticipation to have the same results with different victims, and methods of commission are interrelated by distinguished characteristics and they are not isolated events, *H.J., Inc., 492 U.S. at 240.*

522.  The crimes perpetrated by Defendants, specifically the interstate threatening communications included both Defendants sending Plaintiff her address which was a way to

inform her they know where she lives; and Defendant Mr. Barresi continuously discussing with Defendant Mr. Waldman their desires regarding break ins/vandalism against witnesses. Plaintiff feared it happening to her and she reported this evidence as part of her interviews for the 'Timeline Report of blackmailing Ms. Taft' specifically under the FBI Tip for Violent Crimes Committed, including Interstate Threatening Communications.

523. Plaintiff reported Defendants to federal authorities, to inform them how Defendants used a tape including a mafia murder, with their attempts to persuade witnesses to interfere with facts given to authorities, as it was Defendants' goals to set up Plaintiff, potential witnesses, and their opposition.

524. Ms. Taft reported the threat, "accusing being a hitman & killing a woman by throwing her off a roof. Now she says she lives in constant fear for her life" and exploitation in relation to "withhold testimony or information with respect to another's legal claim or defense."

**Consistency in Participants and Victims**

525.  Defendant's behavior was repetitive and continuous for years, as they repeatedly targeted Plaintiff, using consistent tactics and participants, in their schemes as "Hollywood Fixers" to eliminate potential witnesses, testimonies, and reporting victims, thus establishing a recognizable pattern.

526.  Defendants edited audio recordings to allege a mafia murder, edited records on protection fees, and of witnessing hiring to kill others.

527. Defendants conspired to make Plaintiff and potential witnesses be in fear of their lives from hitmen and instead of stopping harassment related to the film business, fear of mafia hits. As known by Private Investigator Echlor, Defendant Barresi confessed to killing people to Rebecca Berry, who was worried about a former client in crisis that both Defendants wanted "ended."

528.  Defendants altered audio and made threats to force this fear. Defendants connected $10 million to Plaintiff and the worth of witnesses.

529.  Defendants with their intimidation with death desired of her made Plaintiff afraid of dangers to her safety when they obtained her address, including of break-ins, vandalism discussed between Defendant Waldman and Defendant Barresi. "Even to physical violence" was added to the correlation by Defendants while using her ghosted image and cursing her with her family.  This was reported as part of the timeline given for FBI victim interviews.

530.  An enterprise in the anti-racketeering statute is a group with a purpose, relationships among those associated, and longevity sufficient for the purpose, *Boyle v. United States, 556 U.S. 938 (2009).* Plaintiff establishes these elements, showing an organized enterprise with sustained structure and goals.

531.  The Defendants' communication was made with intent to transmit the threat across state lines, and Plaintiff has valid proof that the communication was sent and received across state boundaries.

532.  Defendant's relatedness of the conduct is proven, as they both conspired in the audio recordings tampering and repeated actions, *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc., 833 F.2d 1360, 1363 (9th Cir. 1987).*

533. Defendants knowingly engaged in conduct to tamper with witnesses and victims, intending to hinder, delay, or prevent communication to law enforcement authorities, causing harm and damages.

534.  Defendants are the sole cause for the withholding of witness testimonies, and investigators and legal representatives of Plaintiff not providing their testimonies, including but not limited to Police and FBI, through intimidation, threats, and corrupt persuasion.

535. Defendants' actions are the sole reason witnesses changed their testimony, by causing them to have continuous fear of Defendants by their continuous threats.

536. Defendant fabricated all information in an attempt to protect their continuous behavior from being released to anyone, including but not limited to, the Police or FBI.

537. Defendants' falsifying recordings were not solely based on content in said recordings, but also for intended use of illegal purposes to further their goals and agendas against Plaintiff and to corrupt accurate information given to Police and FBI.

538.  Defendants altered audio tapes, emails, documents, statements of potential witnesses, and records in order to harm Plaintiff and others in their scheme. Defendants' access to information and people is inherently dangerous.

539. Defendants altered the purposes of financial transactions and contracts, and did so to obscure their agency and illegal purposes.

540. Defendants acted with the specific intent to obstruct, impede, or influence the federal investigations and proceedings, and the destruction, alteration, or falsification was done knowingly and deliberately to interfere with the process.

541. Defendants destroyed, altered and falsified records with the purpose being intentional to mislead, misguide and redirect the investigation to protect themselves.

542. The destruction, alteration, and falsification of records was done by Defendants knowingly, willingly, and with purpose.

543. Under Actus Reus (Criminal Act), the Defendants engaged in one or more of these acts concerning records and continuously and intentionally destroyed, altered, and falsified documentary evidence.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   103

544. The records involved are documentary in nature and material to federal investigations and hold significance and relevance to the matters being investigated and adjudicated.

545. Said records are physical documents, testimonies, and digital records.

546. Defendants both did know the records were being altered.

547. Defendants utilized interstate travel and communications to cover up their agency through hiding financial transactions. Surveillance by private investigators with JCB International Security and consulting includes accounts by Federal Agents.

548.  Defendants released audio of family members of murdered Anthony Fox before and after surveilled financial negotiations in Washington DC and a financial transaction between DC and New York. Defendants conspired to destroy Plaintiff for communicating with witness Albertini, who knew Paul Schindler, the confessed murderer of Mr. Fox and was heavily involved in the Viper Room with dedication to Mr. Depp. Defendant Barresi in email to retired LAPD McCormick, sent emails on Mr. Fox, and discussed Lombardo in Chicago, who prosecutors in the Chicago Family Secrets Operation stated was responsible for a 'hit' of a man in interest of testifying, *U.S. v. Calabrese, No. 02 CR 1050 - 2, 3, 4, 10 (N.D. Ill. Sep. 10, 2008).*  Defendants Waldman and Barresi conspired to suppress witnesses.

549.  Defendants did so to benefit their Principal, Mr. Depp.

550. Defendants Mr. Waldman and Mr. Barresi knew Mr. Barresi worked for indicted Mr. Pellicano, as shown in evidence of telephone conversations, in a racketeering enterprise. Tactics learned from these federal crimes, with 110 indictments against Mr. Pellicano, were exploited by Mr. Waldman and Mr. Barresi.

551. The Defendants traveled and obscured services across state lines.

552.  One of these tactics is hiding financial transactions and assets of the agency.

553.  Defendants' behavior shows the extortionate tactics to implicate billionaire financing and financial transactions to threats.

554. Defendants directly obscured and fabricated evidence through crossing state lines to attempt to implicate such said financing and financial transactions to further their threats against Plaintiff as well as potential witnesses, and individuals in federal agencies.

555. Defendants had the specific intent to further or facilitate said unlawful activity as their actions were aimed at aiding the illegal activities as well as furthering their tactics.

556.  Defendant's travel was directly connected to the illegal activity.

557.  The Defendants used and transported said funds across state lines to aid the illegal activities.

558. Defendants' behavior was directly done with the intent to promote, manage, establish, and carry on said unlawful activities, and to conceal and disguise the nature, location, source, ownership, and control of their unlawful activities which include, but are not limited to, bribery, and coercive tactics, as the money transfer was from the principal to Defendants.

559.  Evidence demonstrates that Defendants were organized in a manner consistent with a RICO enterprise, each playing a specific role in furtherance of the scheme. A RICO enterprise could consist of individuals working together toward a common purpose, *United States v. Turkette, 452 U.S. 576 (1981).* Plaintiff's evidence supports this structure, demonstrating specific roles each Defendant played between "Bagman" Barresi and "Consigliere" Waldman. An enterprise has a distinct existence beyond predicate acts, *Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001).* Plaintiff's complaint details Defendants' coordinated actions and overt acts, showing how Defendants operated as an enterprise. A structured decision-making hierarchy is revealed within the enterprise, from Waldman and Barresi to unnamed Does

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   105

enacting tactics, including intimidation, record alterations, and vandalism against perceived

opponents, victims, Plaintiff, and witnesses to benefit the associated enterprise, indicating

systematic collaboration between Defendants.

560.  Plaintiff emphasizes the three essential elements of a RICO enterprise: a common purpose,

an organized structure, and a continuous operational framework. The enterprise is shown to

operate with a clear purpose distinct from its predicate acts, thus fulfilling RICO

requirements.  Defendants are managing and operating an enterprise across state lines for Depp

where they facilitate together in situations that are perceived in opposition to their enterprise, so

they facilitate activities in order to retrieve their desired outcome, including facilitating harm on

any individual in the process.

561.  Plaintiff was harmed directly for this conspiracy scheme across state lines.

562.  Defendants caused Ms. Taft and others' suffering, which does not end, to this day.

563.  Plaintiff has the full ability to provide evidence supporting each of these elements to prove

the Defendant's guilt under Rule of Law and that the enterprise is through a pattern of

racketeering activity.

564.  Due to Defendants continuous illegal activities across state lines which establish the

violations by Rule of Law, under 18 U.S.C. § 1952, Interstate and Foreign Travel or

Transportation in Aid of Racketeering Enterprises, Defendants should be held liable for what

they perpetrated upon Plaintiff, due to their conduct being negligent in nature. Defendants

promoted and facilitated illegal activities, using interstate travel and communication to engage in

and further their criminal activities, such as their committing violent crimes to further their

unlawful acts, inclusive of extortion and bribery and by their coercive tactics towards Plaintiff,

Witnesses and employees of Federal Agencies, and carrying out their unlawful transactions.

565.  Defendants are accustomed to being involved and trained in racketeering. Defendant Barresi with Pellicano from the 1990s onward, final conviction including racketeering victims in Hollywood in the 2000s, admitted association with American mafia enterprises, and Defendant Waldman with being an agent of suspected organized criminals, including in federal interest of the select committee on election tampering and by congress -- as evidence will show Defendant in interest of authorities as a registered foreign agent, *H.J., Inc., 492 U.S. at 242.*

566.  Defendants caused injury to Plaintiff and her business and property by their conduct with continuous violations, *Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005).* The activities by Defendants caused debilitating high costs of security, competing private investigators, maintaining witnesses, legal consulting, protecting Plaintiff and Plaintiff's relatives, and ending of Plaintiff's public safety work with AEDAN and SaveMeNow.

567.  In relation to Plaintiff's business and stock offers, AEDAN is now worth hundreds of millions with an estimation of future value of over 1 billion and on the stock exchange as TurnKey Capital Inc, and SaveMeNow with former firefighter and rescue instructor Niko Sanchez had a contract to Taft offering 5% for each sale with discontinuance of presentations to NGA911 and EaglePoint Federal Funding. Taft, perceived as a competitor to Defendants in Public Safety, was removed from the board and had no ability to continue, to protect businesses and executives, during intimidation and coercion implicating 10 million by Barresi on recording. Plaintiff's businesses Worldie Ltd and Rescue Social Inc, being startups that adapted to assist people related to arts and film, have languished. The attacks by, deception, and attachment of Defendants to Prolong Crisis has caused permanent damage.

568.  Defendants are in direct violation of 18 U.S.C. § 1512, 18 U.S.C. § 875, 18 U.S.C. § 1952, 18 U.S.C. § 1519, 18 U.S.C. § 1961, 18 U.S.C. § 1962, and 18 U.S.C. § 1503.

569.  Therefore Plaintiff respectfully requests that this Court take the following actions to hold the Defendants accountable for their continuous illegal activities, and provide appropriate relief in this matter for violations of the Civil RICO Act, since Defendants have violated federal statutes under Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S. Code § 1961 and 18 U.S. Code § 1962, Obstruction of Justice 18 U.S.C. § 1503, Destruction, Alteration, or Falsification of Records 18 U.S.C. § 1519, 18 U.S.C. § 1512(b)(1) and (2) Obstruction of Justice Witness Tampering Through Intimidation, Threats, or Corrupt Persuasion, Interstate communications, 18 U.S. Code § 875, and Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952, The Travel Act, which addresses racketeering activities and unlawful enterprises.

570.  Plaintiff respectfully requests this Court issue an injunction against the Defendants, to address and prevent further harm resulting from the Defendants' conduct, including but not limited to, racketeering conduct, which has caused Plaintiff significant emotional distress and significant financial damages.

571. Therefore, Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated to be in excess of $2,000,000 in costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, and to temporarily and permanently enjoin Defendants from engaging in criminal conduct against Plaintiff through interstate travel as alleged herein.

572.  Plaintiff also asks the Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   108

## FOURTH CLAIM OF RELIEF
**Invasion of Privacy**
**California Constitution, Article I, Section 1,**
**Privacy - Intrusion Into Private Affairs, CACI No. VF-1800**
**CACI No. 1801 & CACI No. 1802**

573. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

574. **Definition:**
**California Constitution, Article I, Section 1** is a fundamental provision that establishes the inalienable rights of individuals within the state. It states:

*"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."*

California Constitution Article I, Section 1 is a declaration of rights, affirming the principles of personal freedom and the protection of individual liberties. It underlines that these rights are inherent and cannot be surrendered or taken away, emphasizing the state's commitment to safeguarding the fundamental freedoms and well-being of its residents.

**Privacy - Intrusion Into Private Affairs, CACI No. VF-1800** refers to the legal claim that someone intentionally intruded into another person's private affairs or solitude in a way that would be highly offensive to a reasonable person. This intrusion could involve actions such as eavesdropping, or other forms of unauthorized access to personal matters.

**CACI No. 1801 & CACI No. 1802** refers to the unlawful and highly offensive intrusion into a person's private affairs or solitude, such as unauthorized surveillance without consent and involves the public disclosure of private information about a person that is not of legitimate public concern and would be highly offensive to a reasonable person.

**Plaintiff's Invasion of Privacy:**

575. Defendants are in direct violation of the California Constitution, Article I, Section 1, Privacy - Intrusion Into Private Affairs, CACI No. VF-1800, as well as intrusion upon seclusion and intrusion into private affairs CACI No. 1801, and CACI No. 1802, because their actions have directly violated the Plaintiff's fundamental rights.

576. Defendants intruded upon Plaintiff's private affairs, with plenty of evidence of them identifying Plaintiff's physical area, physical location, Plaintiff's sensibility, privacy and private

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   109

data. Defendants continuously accessed Plaintiff's data and conversations, since approximately September 2022 with continuous invasion of her privacy up to present date, as of the date of the filing of this Complaint. Defendants systematically intruded upon Plaintiff's private affairs by identifying her physical location, accessing sensitive personal data without consent, and persistently monitoring her activities. These actions, conducted despite the plaintiff's reasonable expectation of privacy and repeated requests to cease, demonstrate a flagrant disregard for legal and ethical boundaries.

577. Plaintiff has a reasonable expectation of privacy under Rule of Law, specifically California Constitution Article I, Section 1.

578. Defendants' invasion against Plaintiff was in a manner which is highly offensive towards Plaintiff.

579. Defendants do not have consent from Plaintiff for all actions they perpetuated against Plaintiff, to act in such a manner to invade her privacy.

580. Defendants were sent a Cease-and-Desist letter and reported multiple times to stop invading the private affairs of Plaintiff.

581. Defendants don't have conditional privilege to Plaintiffs private affairs.

582. Defendants were not stating an opinion of Plaintiff, rather they had intent to threaten her, and attempt to ruin her social affairs and her life, indefinitely.

583. Mr. Waldman was aware that Mr. Barresi did intrude upon Plaintiff's privacy and planned in accordance to and with Mr. Barresi to invade privacy, harass, and inflict emotional distress upon Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   110

584. Defendants continued their threatening abuse of process to invade the privacy of Plaintiff with extortionary tactics of interstate communications for Defendants' private commercial interests in order to further their motives.

585. Mr. Waldman agreed with Mr. Barresi and intended the invasion of privacy, harassment, interstate communications, and infliction of emotional distress upon Plaintiff, and that all invasion of privacy is to be committed to benefit Mr. Depp.

586. Plaintiff Ms. Taft is not required to prove that Mr. Waldman personally committed a wrongful act or that he knew all the details of the agreement or the identities of all the other participants.

587. Defendants had intrusion, in name of likeness of Plaintiff, with public disclosure and dissemination to others of private affairs.

588. Attached to the unconsented use of Taft and Jane Doe's audio recorded phone call, Defendants made false statements that Ms. Taft had to "flee the country because the FBI is looking for her" by extortionately connecting her to the 'erstwhile client' of Mr. Barresi.

589. In *Shulman v. Group Productions, Inc. (1998) 18 Cal.4th 200, 230*, the relevant Federal Law that applies is the Electronic Communications Privacy Act (ECPA). The ECPA, codified at 18 U.S.C. § 2510-2522, provides protection against unauthorized interception and access to electronic communications and data.  Defendants had unauthorized interception of Plaintiff Ms. Taft's communication continuously.

590. Legal precedents such as *Shulman v. Group Productions, Inc., Cain v. State Farm Mut Auto Ins Co,* and *Montali v. Catanzariti* are cited to support claims that the Defendants' actions constitute invasion of privacy torts. Defendants specifically intruded into Plaintiff Ms. Taft's

private affairs and communications, by using illegitimate methods, with unauthorized access to data and use of said data, to violate her seclusion and exploit the information.

591. In this situation, the Defendants' intrusions upon Plaintiff's privacy by use of certain means included a form of investigating Plaintiff, her whereabouts, and examining her from a place in which Plaintiff was in a private matter handling private affairs.  Defendants' intrusions are egregious breaches of social norms, and are highly offensive to an ordinary, reasonable person.  Defendants' actions have caused significant emotional harm, meeting the legal criteria established in cases like *Hernandez v. Hillside, Inc., Sanders v. Arn Broadcasting Corp., and Marich v. MGMG/UA Telecommunications Inc.* In summary, where the Plaintiff contends that the Defendants' actions constitute unlawful intrusion upon her privacy, harassment, and emotional distress, supported by evidence and legal precedents in California and Federal courts.

592. Mr. Waldman, in collaboration with Mr. Barresi, knowingly planned and participated in actions to invade the Plaintiff's privacy, harass her, and cause emotional distress, for the benefit of Mr. Depp.

593.  Moreover, the Defendants' collaboration and intent to harm the Plaintiff for purported gain further underscore their culpability in this privacy infringement.

594. Through their persistent intrusion and dissemination of false information, the Defendants have inflicted significant emotional distress and violated the Plaintiff's fundamental rights to privacy and personal autonomy.

595.  The Defendants' actions represent a clear violation of the Plaintiff's privacy rights under California Constitution, Article I, Section 1.

**Plaintiff's Mother's Invasion of Privacy:**

596. Defendants continuously invaded Plaintiffs privacy by emailing to Plaintiff her deceased Mother Victoria's coroner report and body connected to title "THE HOLLYWOOD FIXER THAT WOULD'VE KILLED FOR JOHNNY DEPP" meant to scare while threatening exposure about Plaintiff's mother is extremely distressing to Plaintiff.

597.  The Ninth Circuit in *Marsh v. County of San Diego, 680 F.3d 1148 (9th Cir. 2012)* recognized a constitutionally protected privacy interest for surviving family members regarding the control of images or information about deceased relatives. The court held that the unauthorized public dissemination of such materials constituted a serious privacy violation. Defendants negligently and intentionally invaded the privacy of Victoria's personal information (intrusion on relationships and sexual matters) and disseminated imagery of the coroner report in aggression to cause emotional harm.

598. Defendants invaded Plaintiffs Constitutional Rights since they emailed and texted and have alleged sexualized activities of Plaintiff's mother from recording(s) of Conner, a licensed private investigator in New Mexico.

599. The Private Affairs ranging between 2022 to 2024, where Plaintiff was invaded by Defendants, includes obscene information, i.e. two former boyfriends of Plaintiff's mother attest on how they have seen what has been done to Plaintiff and family.  Witnesses indicated Defendants actions are distressing, and the type of sexual activities are not true/fabricated by Defendants.

600.  Privacy extends to sensitive personal details, including those related to an individual's living situation, residency, and personal identity as well as what a reasonable expectation for privacy may be identified as, *Hill v. National Collegiate Athletic Association, 7 Cal. 4th 1*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   113

*(1994).* Plaintiff's allegations regarding intrusion into her residency, location, and personal affairs, including sensitive characteristics like sexuality or family relationships, meet the elements outlined in *Hill*, as Plaintiff demonstrated a reasonable expectation of privacy to Defendants when she asked them to stop their harassment, and Defendants impact of invasion of her family's privacy constituted significant intrusion.

601. Defendants released an edited audio by Barresi, on October 26-Dec 16, 2022 and other edited recordings up to 2024, of audio of Taft and Jane Doe. The edited audio shows the commercial purpose of implication to exploit Plaintiff, which enhance Defendants' marketing as fixers, and to invade privacy of conversations on sexual matters.

602. The Ninth Circuit ruled that secretly recording private conversations in non-public settings and publicly disseminating those recordings constituted a significant invasion of privacy, *Planned Parenthood Federation of America, Inc. v. Center for Medical Progress, et al., 890 F.3d 828 (9th Cir. 2018).* The court reasoned that people participating in private conversations in non-public venues have a reasonable expectation that their discussions will remain confidential. The court found that the exploitation of the recordings further exacerbated the harm to the Plaintiff.

603. Mr. Barresi obtained information on alleged car accidents and half siblings of Plaintiff's.

604. Superior PI in New Mexico solved this issue by interviewing Mr. Conner to corroborate that it is an intrusion into Private Affairs (alleged paternity, alleged marriage, alleged sexualities) and also Commercial Gain/financial sections. For said interview, Mr. Conner additionally stated he would be using an Alaska phone number. Further, Mr. Conner says it's not even him saying what it was edited into. Mr. Conner did not want to be involved with Mr. Barresi, nor the video there. James Conner, licensed PI, states he didn't want his audio published due to the fact the

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   114

Defendants are committing a crime across state lines, and the Defendants are invading people's privacy.

605. In retrospect, *CACI No. VF-1800. Privacy - Intrusion Into Private Affairs*, the Judicial Council of California Civil Jury Instructions (2024 edition) identifies the application of Invasion or Intrusion into Private Affairs. Specifically, Section 1800 Intrusion into Private Affairs applies to the invasion of privacy for Plaintiff by Defendants because Mr. Barresi and Mr. Waldman violated her right to privacy.

606. Ms. Taft had a reasonable expectation of privacy in private affairs related to mother's death and wealth inheritances, audio recordings of her conversations with Jane Doe, her location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality.

607. Mr. Barresi intentionally intruded in her mother's death and wealth inheritances, audio recordings of her conversations with Jane Doe, her location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality.

608. Audio recordings of Plaintiff's conversations with Jane Doe were released by Defendants of Plaintiff's location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality, among other factors, the following are true:

(i) The identity of Mr. Barresi and Mr. Waldman is identified.
(ii) The extent to which Defendants had access to her mother's death and wealth inheritances, audio recordings of her conversations with Jane Doe, her location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality and could see or hear Ms. Taft are intrusive by nature; and
(iii) The intrusion occurred unauthorized and unconsented to, including access to audio recordings and data.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   115

609.  Plaintiff's intrusion is highly offensive to any reasonable person. The extent of the intrusion has been continuous and still ongoing, and Mr. Barresi and Mr. Waldman's motives and goals were to harass and threaten and put Plaintiff in a state of panic at all times, and the setting in which the intrusion occurred was multiple locations on a daily basis.

610.  The Defendants did not stop although receiving a Cease-and-Desist letter by Plaintiff.

611.  The Defendants' actions against the Plaintiff starkly illustrate a severe invasion of privacy on multiple fronts.  Defendants continued intentionally and negligently, to invade the Plaintiff's privacy by emailing her deceased mother's coroner report with disturbing intimidating directions and subsequently publishing imagery of the report. These acts caused extreme distress to the Plaintiff.  By unlawfully obtaining and disseminating sensitive personal information—including intimate details about her family and personal life and her deceased mother's coroner report—the Defendants egregiously violated the Plaintiff's right to privacy. Defendants disseminated sensitive information for their own gains. These intrusions were not only intentional and highly offensive but also caused profound emotional distress and harm to the Plaintiff.

612.  Moreover, the Defendants' exploitation of private recordings and personal data for commercial gain underscores the malicious nature of their actions. Defendants clarified their commercial interests while intruding as 'fixers' repeatedly. In sum, the continuous and unauthorized invasion into the Plaintiff's private affairs represents a clear and egregious breach of privacy, warranting accountability under the law.

613.  Defendants leveraged Plaintiff's identity to enhance their marketing as "fixers," gaining financial and reputational advantages. Plaintiff has explicitly alleged that Defendants exploited private materials and intruded private affairs for their commercial benefit. *Comedy III Prods.,*

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   116

*Inc. v. Gary Saderup, Inc., 25 Cal. 4th 387 (2001),* defined "commercial use" to include promotional activities that benefit the defendants financially or reputationally.

614. Defendants' actions do constitute a clear violation of the Plaintiff's privacy rights and have caused significant emotional harm and distress to Plaintiff.

615. Mr. Barresi and Mr. Waldman's intrusion would be highly offensive to a reasonable person.

616. Ms. Taft was harmed.

617. Defendant's conduct was a substantial factor in causing Ms. Taft's harm.

618. Defendant's don't have conditional privilege.

619. Defendants were not stating an opinion.

620. Defendants did not have consent of Plaintiff for all actions they perpetuated against Plaintiff.

621. Since Ms. Taft had a reasonable expectation of privacy in her mother's death and wealth inheritances, Defendants need to be held responsible.

622. Defendants should be held liable for violating Plaintiffs privacy, specifically California Constitution, Article I, Section 1, Privacy - Intrusion Into Private Affairs, CACI No. VF-1800, as well as intrusion upon seclusion and intrusion into private affairs CACI No. 1801, and CACI No. 1802, which provides a constitutional right to privacy to Plaintiff, protecting her from invasions of her personal space and information.

623. These rights are inherent, cannot be surrendered, and cannot be taken away. The Plaintiff did not consent to the Defendants' conduct but, rather, repeatedly asked them to stop their harmful behaviors, including harassment and invasion of privacy, and even sent a Cease and Desist Notice. Despite these efforts, Defendants made false statements about the Plaintiff,

linking her to criminal investigations, and used her private audio recordings without consent, further exacerbating the invasion of her privacy. The Defendants' actions, including the nature of their misconduct, their relationship to the Plaintiff, and the unjustifiable interests behind their acts, are in violation of the California Constitution, Article I, Section 1.

624. Furthermore, the Defendants have intentionally invaded the Plaintiff's privacy by intruding upon her private affairs in a highly offensive manner, as referenced in CACI No. 1801, which pertains to intrusion upon seclusion. Additionally, the Defendants have publicly disclosed private facts about the Plaintiff that were not of legitimate public concern, as referenced in CACI No. 1802, which governs the tort of invasion of privacy through public disclosure of private information. These actions have caused significant harm to the Plaintiff's privacy and emotional well-being. Through this lawsuit, the Plaintiff seeks appropriate relief for these wrongful invasions of privacy and seeks to prevent further harm.

625. Due to Defendants' unauthorized interception, recording of communications, and unauthorized surveillance, without Plaintiff's consent, Defendants should be held liable under California Penal Code Sections 630-638 and California Invasion of Privacy Act (CIPA), and California Civil Code Section 1708.8.

626. Plaintiff respectfully requests that this Court issue an injunction to prevent further invasion of Plaintiff's privacy by the Defendants. This request is made pursuant to Plaintiff's right to privacy as guaranteed under Article I, Section 1 of the California Constitution.

627. Plaintiff is entitled to remedies under California Penal Code Section 637.2, and reimbursement of legal costs and therefore Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated in excess of $2,000,000 for the costs to Plaintiff, including corrections with

investigations and security during an ongoing co-conspiracy between Defendants, and to temporarily and permanently enjoin Defendants from invading Plaintiff's privacy rights as alleged herein. Plaintiff also asks the Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

### FIFTH CLAIM FOR RELIEF
**Use of Name or Likeness**
**Civil Code § 3344**

628. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

629. **Definition:**
**California Civil Code section 3344.** This section deals with the unauthorized use of a person's name or likeness for commercial purposes and addresses the elements required to prove a claim for the unauthorized use of name or likeness including Defendants use, for commercial purpose, and not having consent.  It prohibits the use of an individual's identity for commercial gain without their prior consent. The statute allows individuals to seek damages and other legal remedies if their name or likeness has been used without authorization, particularly if such use has resulted in financial gain to the Defendant.  Civil Code § 3344 also covers situations where a person's identity is used in a misleading or damaging manner, potentially causing harm to their privacy.

630. Defendants are in direct violation of Use of Name or Likeness (Civ. Code, § 3344) because they used Plaintiff's name and likeness, including voice, audio tapes and written documentation, for falsifying statements of her likeness, taking her identity and testimony from her, and for commercial purposes without Plaintiff's permission, and with no consent. They did this as "Hollywood Fixers." The Plaintiff suffered harm and damages as a result of Defendants' unauthorized use.

631.  Mr. Barresi and Mr. Waldman exploited name/voice/likeness to eliminate and suppress Plaintiff, potential witnesses, key witnesses, reporting victims and perceived opponents. The use of the likeness was for misrepresentation and coercion, while obtaining commercial gains.

632.  The name/voice/likeness that Defendants obtained was used by them to cause coercion and exploitation of Plaintiff and others, which Defendants took control of, as they were silenced from reporting, testifying, and communicating.

633.  Defendant Mr. Waldman knew the value of audio recordings and influencing witnesses or falsifying their likeness when he communicated with Mr. Barresi and rewarded him for Mr. Barresi's distributed misrepresentations of the likeness of Plaintiff, witnesses, potential witnesses, and reporting victims.

634.  Defendant Mr. Barresi had a "package deal" with Defendant Mr. Waldman, as admitted to Plaintiff, that included audio recordings of Plaintiff, key witnesses, potential witnesses, and relatives of victims, including of Plaintiff's.

635.  Plaintiff and witnesses did not give consent to "Hollywood Fixers" taking their likeness, especially audio tapes, for misrepresentation, exploitation and coercion purposes.

636.  Mr. Barresi and Mr. Waldman knowingly utilized Ms. Taft's name, voice, and likeness in promotional materials profiling her and in marketing as a "Hollywood Fixer," directly linking it to their commercial endeavors.

637.  Defendants repeatedly showed Plaintiff and others that they no longer had control over their likeness, as the Hollywood Fixers had control over them and that the Defendants had the upper hand, in order to manipulate, frighten, misrepresent, and intimidate them to compliance.

638.  Mr. Barresi knew the value of audio recordings with the likeness of Plaintiff, key witnesses, potential witnesses, victims, when he offered financial value and a check to witness Ms. Berry for audio recordings of Plaintiff, with a key witness who saw assaults, abuse, and liabilities done by Depp in the Viper Room against men and women. This key witness further communicated to Plaintiff that Paul Schindler bragged about killing co-owner of the Viper Room

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   120

Anthony Fox and Schindler had financial links with being paid cash by Depp.

639. Defendants Mr. Barresi and Mr. Waldman's use of Ms. Taft's name/voice/likeness was directly connected to Mr. Barresi and Mr. Waldman's commercial purposes causing Plaintiff loss of relationships and safety while profiling her directly linking it to their commercial endeavors.

640. Defendant's Mr. Barresi and Mr. Waldman did not have Ms. Taft's consent, as Ms. Taft did not consent to her audio, including with potential witnesses or victims of assaults, being used for commercial purposes. Defendants exploited unauthorized use of audio recordings discussing sensitive personal matters. Mr. Barresi's and Mr. Waldman's intent of using Ms. Taft's likeness to manipulate perception, including of their "principle" to retaliate against Ms. Taft, to cause witnesses and victims to spread fear to Ms. Taft, to cause retaliation from any investigative authorities, and to "fix" cases involving Mr. Depp, by disseminating these materials, that further exacerbated the harm caused to Ms. Taft.

641. Mr. Barresi knowingly and without consent, express or implied, used Ms. Taft's name/voice/likeness on files to advertise and sell to Mr. Waldman and Mr. Depp, in which they purchased the entire content, in the amount of $500,000 USD, as part of being profiled as a person to suppress for the role of "Hollywood Fixer." A minimum of one financial transaction took place in approximately July 2023, which was surveilled by a Private Investigator.

642. Defendant Mr. Barresi stated, "and you can take that to the bank" when admitting that Defendant Mr. Waldman directed Mr. Barresi to "fix" in his distributions and gave praise for his marketing to claim that witnesses do not exist and/or misrepresent their likeness.

643. Mr. Barresi had financial negotiations and a transaction, after distributing more audio tapes in Defendants' "fixing" endeavors, and in Washington DC, where Mr. Waldman resided for decades, as known by surveillance by former Diplomatic Security Specialists and Private

Investigators, to the boarding of a Chartered Private Jet between DC and New York, to New York, to other states, and internationally.

644.  In Mr. Barresi's drafting for American Media Inc. and Dylan Howard, including with altered records, he has the strategy and knowledge that altering witness statements can have high worth. The "missing" case of Anthony Fox can be directly worth at least $100,000. The Key Witness, that Plaintiff Taft verified and communicated with, was offered $100,000 by Andy Tillet, of AMI, to erase the Middleman situation of Paul Schindler likely being the murderer of Anthony Fox, and directly link Depp.

645.  Mr. Barresi valued the $10 million worth of Plaintiff and key witnesses to witness Berry, who he was offering checks and financial value to for obtaining audio tapes of Plaintiff. Mr. Barresi further valued that some individuals he markets to make $250K a week, and minimized to Berry, who worried for victims and those Barresi misrepresented, that he makes over $250K a year on his business.

646. Mr. Waldman, Mr. Barresi, and Defendants Does 1-10 had financial negotiations, including related to Plaintiff's identity and likeness, as known by witnesses and documentation.

647. Defendant Waldman and Defendant Barresi conspired to withhold financial transactions in their 'deal' of exploiting likeness to evade detection by victims, authorities and opposition, and to misrepresent their purpose to witnesses, reporting victims, and records.

648.  Defendant Mr. Barresi with intent of "fixing" sent the likeness of Ms. Taft to agents of Mr. Depp, including Defendant Mr. Waldman, publicists, security, and of items that contain the content of audios, to others for commercial use and to cause retaliation.

649. Defendants altered written documentation of and records of likeness of Plaintiff and others including emails, text messages, and altered investigative materials.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   122

650. Ms. Taft was harmed by Defendants by causing fear of violence and retaliation towards her. Defendants had commercial gain, without Plaintiff's consent and caused her detriment.

651. The identity and likeness of Plaintiff was exploited by Defendants for commercial gains and marketing. Materials of the likeness and identity of Plaintiff were used for influence intentionally.

652. Defendants taking telephone calls and communications has a severe distressing and silencing impact to Plaintiff and others contained, or related to the communications.

653. Defendants falsifying identity and likeness to profile and to market to individuals is severely distressing and violating to Plaintiff.

654. Defendants taking and using Plaintiff's name/voice/likeness and identity caused suffering, severe distress, fear, and manipulation to Plaintiff and others associated.

655. Defendant's Mr. Barresi and Mr. Waldman's conduct was a substantial factor in causing Ms. Taft's harm.

656. Consequently, the Defendants' intentional exploitation of Ms. Taft's identity for commercial gain constitutes a clear violation of her privacy rights, causing substantial harm and distress.

657. Under Use of Name or Likeness (Civ. Code, § 3344), Plaintiff is entitled to a right to control and protect her name, voice, signatures, photographs, or likeness for Plaintiff's own commercial purposes.

658. Under Use of Name or Likeness (Civ. Code, § 3344), Plaintiff has the right to prohibit the use of her individual's identity for commercial gain without their prior consent. In *Abdul-Jabbar v. Gen. Motors Corp., 85 F.3d 407, 409 (9th Cir. 1996)*, Civil Code § 3344 prohibits the unauthorized commercial use of an individual's likeness, especially in cases where the Plaintiff's image, voice, or identity was used for promotional or marketing purposes. Defendants' use of

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   123

Plaintiff's likeness to promote their suppression activities as "Hollywood Fixers" constitutes commercial exploitation. Defendants utilized Plaintiff's recordings to bolster their reputation and market themselves, aligning closely with prohibited commercial use under *Abdul-Jabbar*.

659. The rights to Plaintiff's name/voice/likeness belongs to Plaintiff, solely.

660. The Defendants' use of Ms. Taft's name and likeness for commercial gain, without her consent and to her detriment, clearly constitutes a violation of her rights under Constitutional Law and California Law.

661.  These actions underscore a breach of privacy and a disregard for her legal protections against unauthorized commercial exploitation of her identity. Defendants should be held liable for violating Plaintiffs rights.

662. Defendants acted intentionally and negligently towards Plaintiff.

663. Defendants should be held liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated in excess of $2,000,000 for the costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, for violating Plaintiffs privacy, specifically under Use of Name or Likeness (Civ. Code, § 3344), as their actions were intentional and negligent by nature, and they used Plaintiff's name, likeness, photographs and other materials for commercial purposes, without consent of Plaintiff, and the Court should temporarily and permanently enjoin Defendants from using Plaintiff's name and likeness as alleged herein. Plaintiff also asks this Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

664.  Plaintiff respectfully requests this Court issue an injunction against the Defendants, to prevent further unauthorized use of Plaintiff's name, likeness, and/or other personal attributes for

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   124

commercial purposes. This request is made pursuant to Civil Code Section 3344, which protects

individuals from the unauthorized commercial exploitation of their identity.

### SIXTH CLAIM FOR RELIEF
**Civil Harassment**
**California Code of Civil Procedure § 527.6**

665. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and

incorporates the same by reference as though fully set forth herein at length.

666. **Definition:**
**California Code of Civil Procedure § 527.6** defines "harassment" as unlawful violence, a
credible threat of violence, or a pattern of conduct that seriously alarms, annoys, or harasses
another person, and that serves no legitimate purpose. It is *"an intentional or knowing course of
conduct directed at an individual."* The conduct must be such that it would cause a reasonable
person to suffer substantial emotional distress. This statute allows individuals who are suffering
from harassment to obtain a restraining order to prevent further contact from the harasser. The
goal is to protect the victim from ongoing harassment that causes substantial emotional distress.

667. Defendants are in direct violation of California Code of Civil Procedure § 527.6 because

from the moment Plaintiff spoke with and discovered witnesses of the Viper Room, she was

declared as someone to suppress and has been subjected to a series of acts of harassment by

Defendants and Defendants' agents, as they and others directed and enacted intimidation and

invaded Plaintiff's personal and professional spaces, as outlined comprehensively in preceding

statements.

668. Defendants escalated to Plaintiff to cause apprehension of injury to others and Plaintiff,

including being shot, killed, or die, to coerce Plaintiff directly to this day. Private investigators

and witnesses attest to the severity.

669. Defendant Waldman and Defendant Barresi's enacted to end their opponents no matter

who was in their path or the chaos that ensued. It resulted in prolonged "suffering" with focus on

no "air," "burning" and that Barresi told Plaintiff that she should be in "a nightmare."

Defendants attached Plaintiff to others they would cause to suffer, and made Taft have to
FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL  125

visualize graphic demises of them, not limited to her family and witnesses.

670.   Defendants' harassment is continuous towards Plaintiff, other victims, and potential witnesses.  They consistently invade the privacy of Plaintiff and her mother's privacy, repeating incessant attacks to cause grief.

671.   Defendants' harassment repeated towards Plaintiff, included locating Plaintiff and constantly searching to know her whereabouts, making it clear to Plaintiff that Defendants want her compliance, and including Plaintiff's friends, coworkers, potential witnesses, and associates being harassed and invaded at the behest of Defendants.

672.   Defendants have repeatedly threatened Ms. Taft, and said to her that she "should die" and that "she's dead," and they acted with the intent to communicate said threats towards Plaintiff.

673.   Defendants are circling other cases, security personnel, potential allies, and potential witnesses of Taft's, and have been repeatedly contacted, harassed and told them to not be witnesses for Taft.

674.   The Defendants' threats including direct intimidation has caused Plaintiff to have a consistent fear for her life. To Defendant Waldman's knowledge and to witnesses' knowledge, Defendant Barresi confessed to killing people, as substantiated on recordings.

675.   Plaintiff has endured outrageous threatening behaviors and direct implications of violence, instilling fear for her safety and that of her friends, relatives, and associates.

676.   Defendants' harassment is designed to cause compliance, distress, isolation, and fear.

677.   Defendants' course of conduct includes, but is not limited to, harassing Ms. Taft about her mother's death, invading family information, sending harassing correspondence to Plaintiff and to others with threats, including business associates and possible partners of Plaintiff.  Defendants have engaged in sending harassing communications to the Plaintiff and

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   126

others associated with her professional and personal circles.

678.   Defendants have used tapes and repeatedly dictated to Taft that Waldman, Barresi, Depp, and Depp's personnel want her compliance and approve of the harassment and threats against her.

679.   Defendants repeatedly conspired to prevent assistance of Plaintiff and witnesses from police and authorities, by escalating pressure repeatedly, and circling them during vulnerable time periods.

680.  Defendants invoked that Plaintiff and others, including potential witnesses and family members, can be victimized by the mafia. Plaintiff had private investigators and security to attempt to protect herself and others, at great costs to her. Defendants proceeded to intimidate and manipulate these personnel for years, in order to cause distress and higher costs.

681.  Defendants have harassingly used names of others to invoke fear in Taft that Defendants are "pulling both ends" to cause serious distress. Defendants harass Taft that others know her location, information, and residency, that Defendants are contacting to tell them.

682.  Defendants harassed using the names of former clients that Defendants have debilitating information on that they can exploit in their harassment towards Taft, allies, and potential allies of Tafts.

683.   Defendants interfere with witnesses and alter records to prevent reporting against them.

684.  Defendants have harassed witnesses, key witnesses, and Plaintiff on property damage, vandalism, breakins, and targeted attacks and on finances, making Taft fear for her life, property, residency, and location.

685.  Despite lacking any legitimate purpose, these actions have persisted for over two years,

documented and ongoing, causing significant emotional distress and harm to the Plaintiff.

Defendants continuously harass Plaintiff to this day.

686. Defendants' pattern of conduct was conducted with the intent to harass Plaintiff, and it was criminal in nature. *Harris v. Stampolis, 248 Cal. App. 4th 484 (2016),* upheld a harassment claim based on persistent and intimidating conduct. Defendant's sustained threats and harassment against Plaintiff are comparable in severity.

687.  Said threats continued even when Plaintiff sent a Cease-and-Desist letter.  Defendants' communication was made with the purpose of causing fear and apprehension of harm to Plaintiff.

688.  Defendants made written, oral, verbal and electronic threats across multiple state lines, against multiple victims and potential witnesses, and potential attorneys of Plaintiff, as well as against Plaintiff's life.

689.  Defendants' communication contained multiple threats. Their messages conveyed a threat of violence and harm to Plaintiff and her associates.

690. Defendants' interstate communication was not only a threat but also caused harm and damages towards Plaintiff, and Plaintiff suffered as a result of the threatening communication, including but not limited to emotional distress and other damages.

691. Plaintiff also experienced scores of incidents of threats and implications of violence, placing Plaintiff in fear for her own safety and the safety of her friends and associates. Ms. Taft was 'to be' in fear for her life. These threats could not, and did not, serve any legitimate purpose.  This conduct has alarmed and harassed Plaintiff, without any legitimate purpose other than to cause her harm.

692.  When Defendants' conduct of coercion, threats, harassment and invasions escalated to

terrorize Plaintiff, Defendant Barresi proclaimed their illegitimate purpose to assert that Plaintiff can never stop the harm by Defendants, to claim Plaintiff, *"she's filed a complaint against me & Johnny Depp with the police department in Honolulu where she resides."* At the start Defendants conspired against Taft, with their years-long activities that witnesses did an FBI report, police report, and a restraining order against Defendants, where Depp was suspected.

693. Defendants incessant calls, emails, voicemails, messaging, audio recordings to contact Plaintiff, associates, relatives, and potential witnesses, including licensed private investigators which were protecting witnesses and Plaintiff, was to intimidate, corruptly persuade, and/or bribe them to compliance. This behavior by Defendants is done to consistently keep Plaintiff and others in panic, under their harassment and attempts at suppressive control.

694.  Defendants sending Plaintiff's mother's coroners report, including on repeating correspondence of Plaintiff's mother Victoria and key witnesses which were against Barresi, Depp and Defendant Waldman, of demise and suffering, that they were causing them to experience or expect to experience soon after, which was cruel and harassing.

695. The Ninth Circuit has recognized that pervasive and relentless contact, particularly when designed to cause distress, qualifies as harassment. In *People v. Zackery, 147 Cal.App.4th 380 (2007),* the court identified that sustained patterns of contact, especially those aimed at instilling fear, does amount to harassment. Likewise, *Kaiser v. Tracy, 47 Cal.App.4th 884 (1996),* emphasized that harassing conduct need not be limited to direct contact with the plaintiff but can include persistent contact with associates to create distress.

696.  Defendants' continual malicious contacts with Plaintiff and her associates, intimidation tactics to enforce silence, mirrors the elements of harassment in Zackery and Kaiser. This repeated interference not only targeted Plaintiff directly but also involved her family and friends.

697.  The harassing correspondence, emails, invasions of privacy into private affairs by using unconsented audio recordings, and actions by Defendants would justify Ms. Taft in seeking and obtaining a restraining order for harassment. Plaintiff was unable to file for a Temporary Restraining Order (TRO) under California Code of Civil Procedure § 527.6 due to coercion and significant barriers placed by Defendants such as their harassing and threatening her potential attorneys, by first identifying who Plaintiff has been in communication with, and who Plaintiff was planning to retain for legal aid, and then wanting to file a CHRO from the Court.

698.  Pressure on former clients, and altered records by Defendants, terrified Taft of retaliation and worsening harm, during the repeated harassment.

699.  Defendants prevented court access by Taft and witnesses, and Defendants conspired, while citing that "They burdened JD financially, & a few even got him sued," "27 freeloaders," and a case of a man suing the Viper Room et al. As stated, "withholding testimony and information with respect to anothers legal claim or defense" is Coercion in New York *(New York Penal Law §135.60 (Coercion in the Second-Third Degree)*, where Defendants did travel to, and is extortionary in Hawaii, where Taft resides *(Hawaiian Revised Statutes (HRS) §707-764).*

700.  Defendants attached themselves, to Hollywood, to Depp and to coerce former clients to not report them, and made certain that Plaintiff could not have the Witness Declarations, prepared by legal assistance, that she needed to stop their harassment.

701.  The conduct by Defendants halted Plaintiff's career, work prospects, and educational studies due to their continuous harassment and retaliation, including towards wealthier individuals and potentially employers of Plaintiff, and the distress it caused Plaintiff.

702.  The conduct of Defendants is at such a level as to cause a reasonable person to suffer substantial emotional distress as has been suffered by Ms. Taft.

703. The conduct has cost Plaintiff thousands of dollars to travel anytime she felt threatened, to flee her residence and her Country. Defendants directed Taft to flee.

704.  Courts have also found that harassment claims are bolstered when defendants attempt to control or manipulate the victim's actions through fear and coercion. In *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 129 Cal.App.4th 1228 (2005),* the court determined that coercion and intimidation, particularly with threats and manipulative tactics, support a harassment claim. The defendants in Huntingdon used repeated confrontational tactics to force compliance and silence, conduct parallel to Defendants' here, who have allegedly threatened Plaintiff and manipulated those close to her to maintain control.

705.  Defendants' conduct designed to isolate Plaintiff, silence her, and frighten witnesses aligns with the coercive conduct described in *Huntingdon*, which justifies the assertion of harassment.

706. The Defendants' persistent harassment warrants legal intervention to protect her rights and safety.

707. Defendants should be held liable for violating Plaintiffs rights and for taking measures to ensure that not one attorney will aid Plaintiff in pursuing her legal rights. Therefore Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated at an excess of $2,000,000 for the costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, and to temporarily and permanently enjoin Defendants from harassing Plaintiff as alleged herein. Plaintiff also asks this Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff.

708.  Plaintiff respectfully requests that this Court issue an injunction against the Defendants, to protect her from ongoing civil harassment. This request is made pursuant to California Code of Civil Procedure Section 527.6.

## SEVENTH CLAIM FOR RELIEF
### Negligence, Civil Rights

709. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

710. **Definition:**
**Negligence** in the context of civil rights violations refers to a legal claim where an individual or entity is alleged to have failed to exercise the level of care that a reasonable person would in similar circumstances, resulting in harm or deprivation of civil rights.

711. Defendants are in direct violation of Plaintiff's Civil Rights and are negligent, failing to exercise a Duty of Care toward Plaintiff by infringing on her rights and rights of

others.  Defendants acted in multiple ways which fell short of a standard of care towards another human being. Defendants infringed on Plaintiff's rights in multiple ways including negligently continuously threatening her, violating her personal rights, and interfering with and tampering of evidence. Defendants failed to exercise a Duty of Care, acted in a way that falls short of the standard of care expected, breached their duty, and are the direct cause of causing Plaintiff to suffer harm.

712. Defendant Mr. Waldman knew fully the liabilities of using Mr. Barresi as early as 2019. Mr. Waldman knew that Barresi can lie while he intimidates people, that he damages people, and death can result with his use. Defendant Wadman acted negligently by continuing to direct, communicate with, and reward Mr. Barresi despite being aware of his propensity for dishonesty and intimidation tactics as early as 2019. Mr. Waldman, fully aware of the risks associated with Mr. Barresi's behavior, ignored warnings and continued his association, even after specific

warnings about Mr. Barresi's potential for criminal behavior and harmful intentions towards Ms. Taft. For instance, witness Richard Albertini alerted Mr. Waldman's co-counsel in November 2020 about Mr. Barresi's tendencies towards blackmail and threats, which were apparently corroborated by subsequent actions in 2022 when Mr. Barresi obtained and edited an audio tape of Ms. Taft, then published it without consent. Mr. Barresi's statement indicating he works under the supervision of lawyers further implies a level of oversight that, if negligent, could contribute to the harm caused. As a result of these actions and omissions, Ms. Taft suffered harm, and Mr. Waldman and Mr. Barresi's negligence is a significant factor in causing her distress and injury.

713. Defendant Mr. Waldman continued to direct, communicate with, and reward Mr. Barresi after and before his attacks towards Plaintiff Ms. Taft.  Repeatedly, Defendant Mr. Barresi was informed of the harms to be perpetuated onto Ms. Taft.

714. Before Defendant Mr. Barresi harmed Plaintiff Ms. Taft, Mr. Waldman's co-counsel Mr. Ben Chew was told in November 2020 by witness Richard Albertini warnings that 'Barresi goes to implications of blackmail, extortion, and has tendencies to wish death upon his subjects'.  Mr. Barresi stated to Mr. Chew that he had a deal with Mr. Waldman. However, their conspiracy with each other continued. Mr. Barresi obtained an audio tape, edited it, and published it.

715. Defendant Mr. Barresi told Plaintiff Ms. Taft, in an email, that he "works directly for lawyers" - either directly under their license - or another investigator's license, meaning he has to have some supervision capacity over him.

716. Plaintiff Ms. Taft asserts that she suffered harm due to the negligent actions of Defendants Mr. Waldman and Mr. Barresi.

717. Defendants Mr. Waldman and Mr. Barresi acted in a negligent manner.  Mr. Waldman and Mr. Barresi's negligence was a substantial factor in causing Ms. Taft's harm.

718.  Defendant Barresi admitted to Plaintiff's licensed retired LAPD private investigator Defendants' strategy and knowledge to prolong crises, "The more you prolong a crisis the bigger pay day is how it works," in decades long history of swindling, to inflict damage onto Plaintiff, former clients, witnesses, and others.

719.  Both Defendants Barresi and Waldman are in clear violation of the Civil Rights Law, since both acted with negligence.

720. Plaintiff asks this Court to hold Defendants accountable, and hold them liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, currently estimated in excess of $2,000,000 in costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, because they harmed Plaintiff, and they failed to exercise reasonable care and to temporarily and permanently enjoin Defendants from violating Plaintiff's civil rights as alleged herein. They acted negligently and violated both Federal and state laws within the state of California.

721. Plaintiff respectfully requests this Court issue an injunction against the Defendants, due to the Defendant's negligence which has resulted in a violation of Plaintiff's civil rights. This request is made pursuant to Plaintiff's claims of negligence and civil rights violations.

## EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress (IIED)

722. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

723. **Definition:**
**Intentional Infliction of Emotional Distress (IIED)** is a legal claim in tort law where a Plaintiff seeks damages for severe emotional suffering caused by the Defendant's extreme and outrageous conduct.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   134

724. The Defendants had outrageous conduct towards Plaintiff, was exceeding the bounds of decency that society would tolerate, *Cochran v. Cochran, 65 Cal.App.4th 488, 499 (1998),* since Defendant's level of coercion, exploitation, intrusion, violations of rights and their intent and reckless nature of harassing Plaintiff did cause her severe emotional distress, and their actions were the direct cause of IIED towards Plaintiff.

725. Defendants mutually caused Intentional Infliction of Emotional Distress (IIED) because their conduct is harmful, and it shocks the conscience and they caused significant emotional suffering to Plaintiff, and caused her significant emotional harm through their egregious conduct. Defendants committed wrongful acts against Plaintiff intentionally, as well as against civil rights by obstructing, targeting Plaintiff, suppressing witnesses, exploiting audio tapes, interfering with eye-witnesses, harassing Plaintiff non-stop, contacting Plaintiff's security, legal representatives, colleagues, and friends and family, as well as continuous search of the location of Plaintiff's residency, her whereabouts, social relationships, workability, and continuous threats to Plaintiff's safety and well-being.

726.  Defendants' conduct is against the bounds of a civilized society and outrageous to cause distress. The California Supreme Court explained in *Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009),* "outrageous" conduct is conduct that "so extreme as to exceed all bounds of that usually tolerated in a civilized society." Defendants engaged in behavior that was not only intentional but calculated to cause severe emotional distress to Plaintiff, exploiting Plaintiff's vulnerability and unique circumstances.

727. Defendants purposefully prevent rescue, public safety responses, and assistance to Plaintiff, their targets, perceived competitors, and potential witnesses that could be against them and/or their principal, while their conduct is outside the bounds of a civilized society.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   135

728.  Ms. Taft has repeatedly been traumatized about death, killing, and murder from Defendants, as well as harm towards herself and others. The constant hypervigilance, coercion, threats, and terrorization by Defendants has seriously impacted Taft's health.

729.  Defendants intentionally repeated their circling of Plaintiff, in years-long never-ending continuity, and their targets to force distress, cause actions under duress, and prolong coercion.

730.  Defendants exploited the death of Plaintiff's mother and deaths of others to cause severe distress to Plaintiff as Defendants knew the distress these actions would cause, by repeating graphic depictions of death and body parts.

731.  Defendants' actions were of such a shocking and egregious nature that any reasonable member of the community would regard them as utterly intolerable. As a direct result, Plaintiff suffered severe emotional and psychological harm, warranting relief under the standards articulated by the court in *Cochran*.

732. Witnesses attest that Defendants increase danger of killing and death, including some attesting directly by them, worsening from intimidation, exploitation, and coercion. Defendant Barresi has told Plaintiff and witnesses he kills and would kill as a Hollywood Fixer. Defendant Waldman stated multiple times his interests in the demise of opponents and witnesses. Plaintiff was told to die and witnessed the directions that she herself, and others, should no longer "ever had air."

733.  Defendants purposefully attack during vulnerable time periods and look for pressure points to cause serious distress.

734.  Additionally, California courts have recognized that extreme and outrageous conduct includes repeated coercion, harassment, threats, and public humiliation.  Here, Defendant's ongoing threats and attempts to harm Plaintiff and Plaintiff's business are sufficiently extreme to

support a claim for IIED. 554. Further, in *Kelly-Zurian v. Wohl Shoe Co., 22 Cal. App. 4th 397 (1994),* the court held that repeated harassment and intimidation could be sufficiently "outrageous" to meet the IIED standard.

735. Defendants' actions included exploiting Ms. Taft and her deceased mother, using audio recordings to coerce, invade her privacy and likeness for profit, and making both direct and indirect threats of harm and danger, including by criminal elements related to obstruction, which outlines the outrageous conduct as stated in *Hughes v. Pair.* Defendant's both targeted Ms. Taft's associates and potential allies, attributing all negative consequences to her, thereby intimidating her social and professional relationships. This campaign of harassment and intimidation disrupted her daily life and personal relationships, instilling fear and preventing her from functioning normally without duress. The conduct of Mr. Barresi, in particular, is described as outrageous and intended to inflict emotional distress upon Ms. Taft.

736. Mr. Barresi told Ms. Taft his conduct would cause her and others to be 'dead silent,' 'dead,' 'not live' and even hospitalized. Defendants told Taft what would happen to her if she did not comply to their demands. Mr. Waldman's reckless disregard for the foreseeable emotional harm to Ms. Taft, coupled with his awareness of the ongoing distress caused by their actions, further supports the claim of severe emotional distress suffered by Ms. Taft. Mr. Waldman knew that Mr. Barresi can cause death. Ultimately, Ms. Taft contends that the conduct of both Defendants was a significant contributing factor in causing her severe emotional distress.

737. Defendants' conduct has caused Plaintiff's health to deteriorate, especially when Plaintiff is closer in proximity to being under their authority. Plaintiff has been commanded by Defendants to have severe distress and at times has fallen to their directions, with a prolonged deterioration under pressure. Escalations of Defendants' conduct caused heart issues, as Defendants

themselves focus on the heart issues of distressed opponents, potential witnesses, family, and hearts of loved ones. Plaintiff has tried to maintain health, mainly by flight reactions to atone for the freezing reactions and trauma caused by Defendants graphic wishes for death, destruction, and suffering.

738.  Witnessing that targets of Defendants, including Taft's associates and potential witnesses, had to be hospitalized as they nearly died during "dead silence," have teeth removed, and physically deteriorate, including in isolation, is distressing to Taft and as Defendants tell Plaintiff that demise is constant and imminent as well.

739.  The fight-or-flight or the fight-flight-freeze-or-fawn, hyperarousal or acute stress response, affecting Plaintiff is a physiological reaction, which can be commonly experienced by public safety personnel and victims of crimes.

740.  Due to Defendants continuous threats against Plaintiff, which establish the violations by Rule of Law, under 18 U.S. Code § 875 - Interstate communications and under California Civil Code, Defendants should be held liable for what they perpetrated upon Plaintiff, due to their conduct being foreseeable in nature.

741.  Defendant Waldman has a vested interest in conducting harm towards Plaintiff.

742.  The exploitation of audio tapes by Defendants was to invade private affairs and likeness of Plaintiff in order to sell, and to directly implicate death and danger, including by directed individuals, the mob and mafia, and by Defendants, which included their attacks on associates or potential associates of Plaintiff; while all harm is implicated to Ms. Taft, including but not limited to intimidating her friends, partners, and relations.

743. Defendants Mr. Barresi and Mr. Waldman terrorized Ms. Taft and potential opposition (to Defendants) and terrorized Plaintiff's witnesses, preventing their testimony and preventing Plaintiff from having normal daily functioning and relationships.

744. Plaintiff is harmed due to the brutal harms by Defendants exploiting her and her deceased mother Victoria.

745. Defendant Mr. Barresi's conduct was outrageous and extreme, by nature.

746. Defendant Mr. Waldman acted with reckless disregard of the probability that Ms. Taft would suffer emotional distress, knowing that Ms. Taft was present when the conduct occurred and that the conduct was towards Plaintiff with intent and negligence.

747. Defendants collectively and intentionally caused infliction of emotional distress upon Plaintiff, and both Defendants should be held liable for violating the Federal Laws and state of California laws, ensuring that Plaintiff can seek legal redress due to having suffered severe emotional distress due to the outrageous conduct of Defendants.

748. Defendants Mr. Barresi and Mr. Waldman's direct conduct is what caused Plaintiff to suffer severe emotional distress, including regular fight-freeze-flight trauma, and severe sadness.

749. Plaintiff respectfully asks this Court to hold Defendants accountable, and therefore hold them liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial, due to them causing Intentional Infliction of Emotional Distress (IIED) towards Plaintiff. Plaintiff also asks this Court to enter an award of punitive damages against Defendants for their fraud, oppression and malice toward Plaintiff. Under California Civil Code, Plaintiff is entitled to file a tort claim since the conduct of Defendants is extreme and outrageous, in nature, and the distress Plaintiff suffers is severe.

750.  Furthermore, Plaintiff respectfully requests this Court issue an injunction against the Defendants, to prevent further harm resulting from the Defendants' actions constituting Intentional Infliction of Emotional Distress (IIED). This request seeks to address and mitigate the ongoing severe emotional distress caused by the Defendant's conduct.

**NINTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress (NIED)**

751. Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

752. **Definition:**
**Negligent Infliction of Emotional Distress (NIED)** is a legal claim where a Plaintiff seeks damages for emotional suffering caused by the Defendant's negligent conduct. Unlike Intentional Infliction of Emotional Distress (IIED), NIED does not require the Defendant's conduct to be outrageous or intentional, but rather focuses on the Defendant's failure to exercise reasonable care.

753. Defendants are liable for Negligent Infliction of Emotional Distress (NIED) because they caused Plaintiff to suffer significant emotional distress due to their negligent conduct by continuous harassment, invading her privacy, and threatening her life.  Defendants failed to exercise a duty of care, failed to act with the level of care that a reasonable person would under similar circumstances towards another human being, are the direct cause of Plaintiff's suffering, and Plaintiff has suffered severe emotional distress due to the Defendants' negligence.

754. Defendant Mr. Waldman hired and used Defendant Mr. Barresi to work for him with knowledge of Mr. Barresi's prior work, with the intent of using Barresi's conduct to inflict harm upon Plaintiff.  Defendant Waldman knew and was well aware of the dangers posed by Defendant Mr. Barresi's conduct due to prior actions towards other victims caused by Mr. Barresi.

755.  Defendant Waldman has a vested interest in conducting harm towards Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   140

756. Defendant Mr. Waldman directed and rewarded Defendant Mr. Barresi, including how to inflict harm and further such said infliction of harm upon victims including upon Plaintiff Ms. Taft. His intent was to direct and supervise Defendant Barresi to continue such behavior of NIED towards Plaintiff, which was reckless by nature.

757. Defendant Mr. Waldman's behaviors included lack of proper direction and management in actions towards Plaintiff.  Therefore, Defendant Mr. Waldman's actions, as well as direct supervision of Mr. Barresi's actions, are what led to both Defendants being negligent towards Plaintiff and causing NIED towards Plaintiff.

758. Plaintiff is informed and thereon alleges Defendant Mr. Waldman should have known that his failure to exercise due care in hiring and using Defendant Mr. Barresi while supervising Mr. Barresi, and lack of maintaining a safe environment, would put Plaintiff in danger.

759.  Mr. Waldman knew and was told that Mr. Barresi was unlicensed, harming people, and threatening people. Witnesses would call him after Mr. Barresi had contact with them. The Attorney General revoked Barresi's license and Barresi was on probation nearly immediately after he applied for a license after his coworker Pellicano was imprisoned for racketeering, intimidation and exploitation, during which former clients testified.

760.  Plaintiff Ms. Taft requested that Mr. Waldman stop his invasion of her privacy.

761. Defendant Mr. Waldman ignored Plaintiff's request to stop invading her privacy.

762. Mr. Waldman's directives and rewards to Mr. Barresi continued, with full knowledge of Mr. Barresi's harmful conduct towards Plaintiff.

763. Defendants continued invading Plaintiffs privacy.

764. Defendants continued inflicting NIED upon Plaintiff.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   141

765.  Defendants' tactics, to intimidate Plaintiff through graphic threats, combined with repeated messaging about "suffering" and "death," substantiate the emotional distress claim.

766. Mr. Waldman's failure to control Mr. Barresi's conduct after April 2020 and after September 2022, and with continuing conduct, caused Plaintiff to suffer pain, humiliation, severe emotional distress, and mental suffering. Plaintiff's emotional distress was severe and a direct result of the Defendant's negligence, and it was reasonably foreseeable given the circumstances.

767. Furthermore, Mr. Waldman's directions and rewards to Mr. Barresi persuaded him to continue with said such behavior, with knowledge of his conduct causing Plaintiff to suffer more so, including continuous humiliation, severe emotional distress and mental suffering.

768. Plaintiff asserts that Mr. Waldman's negligent conduct was the proximate cause of her severe emotional distress, humiliation, and mental suffering.

769. Defendants have a duty to exercise care towards individuals, including Plaintiff, under California Civil Code Section 1714. The Department of Consumer Affairs, as Plaintiff and several witnesses reported Defendants to, sees advertising and commercial interests as requiring a duty to professional codes.

770.  Defendants advertised themselves to be used in cases, either as private investigators or representatives to assist those in the field or seeking help, including advertised themselves as working for lawyers.  Defendants therefore should have a duty to not cause harm to individuals or Plaintiff, or witnesses, or anyone that could help former clients.  Defendants failed to do so, and rather used that profession to direct, intimidate, exploit, and coerce individuals to direct them to an alternate outcome, to the interests of Defendants or their principal.

771.  Defendants are responsible for causing and prolonging crises, including to Plaintiff.

772.  Defendants had foreseeability to the harm and danger they would cause.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   142

773.  Both Defendants Waldman and Barresi discussed on telephone calls, in context to multiple people doing reports against and related to them, that Plaintiff allegedly had emotional distress problems that are foreseeable, in interest to pressure witnesses.

774.  Defendant Barresi told Plaintiff he was the "Hollywood Fixer That Would Kill For Johnny Depp" and told witnesses he goes to such extremes as bragging that subjects of his 'die'.

775.  Defendant Waldman knew of Barresi bragging to cause subjects of his to experience death, even to the point of screaming and suffering, in his interests as a 'fixer' and Waldman knows, including in relation to potential witnesses, '*he's trying to make you interpret, you know, the worst.*'

776.  Barresi did a profile on Taft's emotional weaknesses and informed Mr. Depp's personnel and Waldman. Further on a recorded call, using directions against Plaintiff and others, Barresi has repeated to Plaintiff when he contacts her and associates, it is in order to cause severe distress and pressure.

777.  Barresi did a lookup on Taft's alleged relatives in order to collect information to exploit. Barresi audio recorded a phone call of an alleged relative alleging information that Taft had emotional problems, and reviewed news articles on the grief she had from losing her mother.

778.  Barresi sent correspondence on Plaintiff's alleged emotional profiling to personnel of Browne George Ross LLP's former client, that Plaintiff asserted to him that witness Albertini saw assaults and violence against both men and women by Depp, and to intimidate them to not communicate with each other.

779.  Defendant Barresi repeatedly told Plaintiff for over two years that he would cause Plaintiff to be distressed, that she should be dead, that she should be in a nightmare, and be hospitalized, and that she has distress.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   143

780. When Defendant Barresi thought Plaintiff would report Johnny Depp and him to the police in 2024, he did a false call on her to enact his punishment and attempted to put her into a hospital by using information from phone calls, which he used to exploit and coerce Plaintiff and others.

781. Defendant Barresi has repeatedly stated Plaintiff and potential witnesses against Depp should not "ever had air" and Defendant Waldman has stated "in memoriam" of witnesses.

782. Courts have found that when a defendant explicitly acknowledges the harm their actions will cause, this further substantiates a claim for emotional distress. In *Molien v. Kaiser Foundation Hospitals, 27 Cal.3d 916, 923 (1980)*, the court held that foreseeability of harm, along with the defendant's acknowledgment of the likely distress, supports the emotional distress claim. Similarly, in *Fletcher v. Western National Life Ins. Co., 10 Cal.App.3d 376, 397 (1970)*, the court found that a defendant's intentional statements acknowledging harm to the plaintiff's health reinforced the claim's viability.

783. Defendants knew or should have known their conduct, including threats, intimidating statements, and tactics to induce trauma, would cause Plaintiff severe emotional distress.

784. Plaintiff has suffered severe emotional trauma from Defendants' conduct of wanting to cause 'dead silence,' fleeing, and death to Plaintiff and others repeatedly and continuously.

785. Defendants both failed to exercise such said duty towards Plaintiff, which is required and further actions from Defendants highlighted their failure to prevent the harm Plaintiff endured.

786. Defendants collectively and intentionally, were negligent and their actions were a direct cause of negligent infliction of emotional distress upon Plaintiff and both Defendants should be held liable for violating the Federal Laws and state of California, ensuring that Plaintiff can seek legal redress due to having suffered severe emotional distress due to the outrageous conduct of Defendants.

787.  Due to Defendants reckless behavior in causing Negligent intentional Infliction of Emotional Distress (NIED), and under California Civil Code, Defendants should be held liable for emotional distress perpetuated upon Plaintiff, due to their conduct being negligent in nature, and Defendants actions resulted in emotional harm upon Plaintiff, and the distress Plaintiff suffers is severe.

788. Therefore, Plaintiff asks this Court to hold Defendants liable for damages, both jointly and severally, as allowed by Law, in an amount to be proven at trial.

789.  Furthermore, Plaintiff respectfully requests this Court issue an injunction against the Defendants, to address and prevent further harm resulting from the Defendant's negligent conduct, which has caused Plaintiff significant emotional distress. This request is made pursuant to Plaintiff's claim of Negligent Infliction of Emotional Distress (NIED).

## **DAMAGES**

Plaintiff hereby re-alleges all paragraphs contained in the foregoing Verified Complaint and incorporates the same by reference as though fully set forth herein at length.

**General Damages:** Plaintiff seeks General Damages from Defendants for their direct and continuous liabilities for multiple legal claims. Defendants' actions have caused Plaintiff significant harm, including severe emotional suffering and loss of enjoyment of life. The ongoing conspiracy against Plaintiff, threats to her safety, and persistent harassment have exacerbated this harm. Plaintiff requests this Court to award General Damages for the prolonged and ongoing nature of her emotional distress, which has persisted for several years and continues to this day. Defendants' conduct—encompassing conspiracy, obstruction of justice, witness tampering, intimidation, invasion of privacy, misuse of name or likeness, civil harassment, negligence, Intentional Infliction of Emotional Distress (IIED), and Negligent Infliction of

Emotional Distress (NIED)—has had a profoundly detrimental impact on Plaintiff's life. Plaintiff seeks compensation for the actual losses suffered and requests this Court to hold Defendants jointly and severally liable for General Damages, including the costs incurred in bringing this claim.

**Specific Damages:**  Plaintiff also seeks Specific Damages for the direct economic losses caused by Defendants. These damages encompass the financial impact of Defendants' actions on Plaintiff's workplace and personal and business relationships. The harmful actions of the Defendants, which include conspiracy, obstruction of justice, witness tampering, intimidation, invasion of privacy, misuse of name or likeness, civil harassment, negligence, intentional infliction of emotional distress (IIED), and negligent infliction of emotional distress (NIED), have caused substantial economic detriment to Plaintiff. Additionally, the Defendants' coercive conduct involved violations related to conspiracy, civil rights, and racketeering. These violations include civil rights violations under 42 U.S.C. § 1973, racketeering activity under 18 U.S.C. § 1961 & § 1962, and predicate acts of obstruction of justice under 18 U.S.C. § 1503, witness tampering under 18 U.S.C. § 1512(b)(1) and (2), destruction, alteration, and falsification of records under 18 U.S.C. § 1519, interference with and corruption of interstate communications under 18 U.S.C. § 875, and interstate and foreign travel in aid of racketeering under 18 U.S.C. § 1952.  These actions further contravened civil claims for relief for deprivation of rights, including violations of the California Constitution, Article I, Section 1, and California Civil Code § 3344 (Use of Name or Likeness). As a result of these unlawful acts, Plaintiff has suffered significant emotional distress, and financial damages, and seeks redress for civil harassment under California Code of Civil Procedure § 527.6, negligence, IIED, and NIED. The Court is requested to award Specific Damages for these actual losses, taking into account the significant

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   146

impact on Plaintiff's life and the prolonged nature of her suffering. Plaintiff seeks compensation for the specific economic harm caused by Defendants and the costs incurred in pursuing this claim.

**Punitive Damages:** Plaintiff seeks Punitive Damages against Defendants for their malicious, reckless, and harmful conduct. Defendants' actions—including conspiracy, privacy invasion, obstruction of justice, witness tampering, intimidation, misuse of name or likeness, civil harassment, and IIED—reflect a deliberate disregard for Plaintiff's rights and well-being. The Court is requested to award Punitive Damages to punish Defendants and deter similar future misconduct. This request is based on the egregious nature of Defendants' actions, which have caused prolonged emotional suffering and significant impact on Plaintiff's life. Plaintiff seeks Punitive Damages, to be awarded jointly and severally, and requests that the Court order Defendants to compensate her for the costs incurred in bringing this claim.

### Prayer for Relief

WHEREFORE, Plaintiff asks this Court to enter judgment as follows:

**1. Civil Conspiracy:** An award of compensatory and punitive damages, along with any other equitable relief that the Court deems appropriate, in an amount to be determined at trial, for the damages and losses incurred as a result of the Defendants' conspiracy to infringe upon the plaintiff's constitutional rights.

**2. Civil Rights Act, 42 U.S.C. § 1983 – Civil Action for Deprivation of Rights:** An award for compensatory damages to cover actual harm, including economic losses. An award for punitive damages due to the egregious and malicious conduct by Defendants, and deter future violations.
**a. Equal Protection and Petitioning the Government, Public Safety Reporting:** An award of compensatory damages for harms caused by the discriminatory treatment. An award of punitive damages for Defendants' malicious and reckless violations.
**b. Obstruction of Justice, 18 U.S.C. § 1512(b)(1) and (2):** An award of compensatory and punitive damages for the harm and injury sustained due to the Defendants' obstruction of justice, including witness tampering through intimidation, threats, or corrupt persuasion, in an amount to be proven at trial.

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   147

**3. Civil RICO Act, Racketeering Activity, 18 U.S. Code 1961 & 18 U.S.C. § 1962:** An award of compensatory and punitive damages in an amount to be proven at trial, for the harm and financial loss suffered as a result of the Defendants' violations.

**a. Obstruction of Justice 18 U.S.C. § 1503 Influence, Obstruct & Impede on Witnesses and Court Proceeding:** An award or order of restitution to compensate for financial losses related to the obstructive conduct.

**b. Interstate Communications, 18 U.S.C. § 875:** An award of compensatory and punitive damages in an amount to be proven at trial, for the harm and injury sustained as a result of the Defendant's violations.

**c. Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises, 18 U.S.C. § 1952:** An award of compensatory and punitive damages in an amount to be proven at trial, for the harm and financial loss suffered as a result of the Defendants' violations.

**d. Destruction, Alteration, or Falsification of Records, 18 U.S.C. § 1519:** An award of compensatory and punitive damages in an amount to be proven at trial, for the harm and financial loss suffered as a result of the Defendants' violations.

**e. Obstruction of Justice 18 U.S.C. § 1503:** An award or order of restitution to compensate for financial losses related to the obstructive conduct.

**4. Invasion of Privacy, California Constitution, Article I, Section 1:** An award of compensatory and punitive damages for the invasion of privacy, including any emotional distress or harm suffered as a result of the Defendants' unlawful conduct in an amount to be proven at trial.

**a. Privacy - Intrusion Into Private Affairs, CACI No. VF-1800, Intrusion Upon Seclusion and Intrusion Into Private Affairs CACI No. 1801, and CACI No. 1802:** An award of compensatory damages in an amount to be proven at trial, statutory and punitive, and any additional relief deemed appropriate by the Court for the harm perpetuated upon Plaintiff.

**5. Use of Name or Likeness, Civil Code § 3344:** An award of compensatory damages in an amount to be proven at trial, statutory damages, and any additional relief deemed appropriate by the Court for the unauthorized use of the Plaintiff's name or likeness.

**6. Civil Harassment, California Code of Civil Procedure § 527.6:** An order for injunctive relief to prevent further harassment, along with compensatory and punitive damages in an amount to be proven at trial for the emotional and psychological harm suffered due to the Defendants' actions.

**7. Negligence, Civil Rights Violations:** An award of compensatory damages in an amount to be proven at trial, for the harm and injury caused by the Defendants' negligence in the violation of the Plaintiff's civil rights.

**8. For Emotional Distress Claims:**

**a. Intentional Infliction of Emotional Distress, IIED:** An award of compensatory and punitive damages in an amount to be proven at trial for severe emotional distress caused by the Defendants' outrageous and intentional conduct.

**b. Negligent Infliction of Emotional Distress, NIED:** An award of compensatory damages in an amount to be proven at trial for emotional distress resulting from the Defendants' negligent conduct.

**9. Restraining Orders:** In addition to the relief requested above, Plaintiff further petitions the Court for temporary and permanent injunctive relief against Defendants as alleged herein.

**10. Additional Relief on All Claims:**

**a. Attorney's Fees and Costs:** Plaintiff requests that the Court award legal costs and attorney's fees incurred in bringing this action. This relief is necessary to cover the expenses associated with pursuing justice and holding the Defendants accountable for their unlawful actions.

**b. Pre- and Post-Judgment Interest:** An award of interest on any damages awarded, both before and after judgment, as permitted by law.

**c. Other Relief:** Such other and further relief as the Court may deem just and proper, including equitable relief such as a restraining order or declaratory judgment.

On all claims granting relief, an award of compensatory damages in an amount to be proven at trial, in excess of $2,000,000 for the costs to Plaintiff, including corrections with investigations and security during an ongoing co-conspiracy between Defendants, and treble damages as permitted by law.

## Jury Demand

Plaintiff hereby demands a trial by jury on all issues so triable.

_Christina Taft_

_____

Christina Taft
Plaintiff – Pro Se

FIRST AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL   149

## VERIFICATION

**UNITED STATES DISTRICT COURT }**

**CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION }**

*Christina Taft, being duly sworn, deposes and says:*

*I, Christina Taft, the Plaintiff and deponent in this matter, under the Laws of the United States of America, have read and reviewed this First Amended Verified Complaint and know the contents thereof; that the same is true upon the deponent's own knowledge except those matters therein stated to be alleged upon information and belief, and as to those matters, the deponent believes them to be true. I declare under the penalty of perjury that all facts stated are accurate, correct and true to my knowledge and information.*

_____
Christina Taft, Plaintiff

State of New York, County of New York ss:
Sworn to before me this _30th_
Day of November, 2024

_____
Notary Public - Oleg Smirnov

**Oleg Smirnov**
Notary Public for the State of New York
No. 01SM0023248
Qualified in New York County
My Commission Expires 04/05/2028