Christina Taft
Plaintiff in Propria Persona
1700 Ala Moana Blvd Apt 2301
Honolulu, Hawaii 96815
Phone: 0623441766
Ceo.Taft@Rescue-Social.com

FILED

CLERK, U.S. DISTRICT COURT

01/13/2025

CENTRAL DISTRICT OF CALIFORNIA

BY _____AP_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

CHRISTINA TAFT

                                    Plaintiff,

        vs.

PAUL BARRESI, et al,

                                    Defendants.

)
)
)
)
)
)
)
)
)
)

Case No.: 5:24-cv-01930-TJH (DTB)

**OBJECTION TO REPORT AND RECOMMENDATION DENYING PRELIMINARY INJUNCTION**

**OBJECTIONS TO REPORT AND RECOMMENDATION DENYING PRELIMINARY INJUNCTION**

Plaintiff Christina Taft, pro se, strongly objects to Magistrate Judge David T. Bristow's Report and Recommendation dated December 23, 2024, which recommends denying her October 24, 2024 Emergency Motion for Preliminary Injunction. Taft urgently seeks a writ of authority to reply to the defendant's opposition and reconsideration of her request for injunction.

Taft's amended complaint unveils systematic witness intimidation, evidence destruction, and manipulation of judicial proceedings. Adopting the Magistrate Judge's Report without granting Taft the opportunity to reply would constitute a serious procedural error and violate her right to due process. The gravity of these allegations and potential for irreparable harm demand immediate attention. Taft respectfully requests the court to reject the current recommendation, allow her to file a reply, and grant the injunction to ensure a full and fair examination of her claims.

Defendant Barresi was nearly immediately revoked of his license by the Attorney General of California (Exhibit A, 30). He is not safe to contact witnesses without licensed intermediaries. Defendant is a known Hollywood Fixer engaging in manipulative, threatening, coercive, and

harassing conduct resulting in Plaintiff and witnesses to fear for their lives and resultantly withhold evidence related to Defendant's ongoing conduct.

## PROCEDURAL ERRORS AND DENIAL OF DUE PROCESS

The Magistrate Judge's denial of Plaintiff's right to file a reply to Defendants' opposition dated December 13, 2024, constitutes a significant procedural error. A reply is essential to address new arguments and factual inaccuracies presented by Defendants. Additional evidence and witness declarations were not considered with ongoing activity by Defendant Paul Barresi, a "Hollywood Fixer," with the initial action proceeding within claims for relief of elements related to obstruction of justice, tampering with a witness, victim, or informant and supporting equal protection. The November 6, 2024 Memorandum in Support of Plaintiff's Motion to Amend Complaint and Continued Injunction Requests with Points and Authorities and two additional licensed private investigator declarations (Mr. Kountz and Mr. Echler) were not considered in the decision. Three more witnesses (Mr. Herndon, Ms. Beaton, and Mr. Nitrini) come forward in this objection for due process for supporting a writ of authority to protect them, Plaintiff, and family from Defendants' intimidation, threats, and invasions. Witnesses of the Viper Room, including Mr. Albertini, have already been jeopardized by Defendant to withhold and evidence is presented.

## WITNESS DECLARATIONS AND EVIDENCE TO SUPPORT ALLEGATIONS AND CHARACTER OF DEFENDANTS

Plaintiff presents continuing evidence Defendants' ongoing threats against Plaintiff and witnesses, including intimidation tactics involving coercive communication and threats of physical harm, references to organized crime, and systematic efforts to obstruct justice by manipulating testimony and destroying evidence.

Witness Declarations

1   The following are evidentiary Declarations in support of Ms. Taft's request to reject the court's

2   current recommendation, allow her to file a reply, and grant the injunction to ensure a full and fair

3   examination of her claims.

4   **I.    Declaration of Ian Herndon (Exhibit B, 46)**

5   Ian Herndon's declaration paints a disturbing picture of Barresi's behavior. He states

6   unequivocally, "I've witnessed Barresi threaten death, mortality, and danger to people". This stark

7   statement sets the tone for the rest of the declaration, which details Barresi's coercion of Angela

8   Christina Taft, particularly after obtaining an audio recording of their conversation about abuse and

9   violence in 2022. The declaration emphasizes the persistent fear experienced by Christina Taft.

10  Herndon notes with concern, "from 2022 to this very day, I have observed Christina Taft be in

11  constant fear of Paul Barresi, supported by ongoing contact by him using threatening and harassing

12  language". This ongoing intimidation began when Barresi became aware of Taft's support for

13  Amber Heard and other witnesses in 2022. Herndon observed Barresi inciting Richie Albertini to

14  attack Taft and noted that Taft felt unable to help Angela due to the audio tape Barresi had obtained

15  of their conversation.

16  In a particularly alarming incident, Herndon reports, "Angela advised me on numerous

17  occasions that a Hollywood Fixer, believed to be Paul Barresi, was sent to intimidate and silence

18  her, and at one point he showed up where she was in person and pointed a gun at her head". This

19  escalation to physical threats underscores the severity of the situation. The declaration further states

20  that Taft's fear was so intense that she felt compelled to move from California to Hawaii in search

21  of safety from Barresi.

22  Herndon also "observed Barresi inciting Richie Albertini to attack and noted

23  that Taft felt unable to help Angela due to the audio tape Barresi had obtained of their

24  conversation." (Exhibit B, 47.)

**Declaration of Michael Kountz (Exhibit C, 55)**

Michael Kountz is a licensed private investigator in New Mexico who became involved in the case when Plaintiff Christina Taft requested assistance from Superior Court Investigations on May 1, 2023. His role was to locate and interview James Conner regarding an audio recording edited and published by Defendant Paul Barresi. With consideration, licensed private investigator and retired LAPD Mike McCormick's declaration further reveals Barresi's efforts to obstruct justice, including intimidation tactics against witnesses. These tactics included coercion of individuals through audio recordings and spreading fear among potential witnesses. The declaration also details Barresi's intimidating statements, including claims of being a murderer, which instilled fear in Plaintiff. Additionally, McCormick highlights Barresi's connections to Waldman and his actions against witnesses, as well as the harm caused in related cases involving Amber and Anthony Fox. These findings substantiate the deliberate and malicious nature of Defendants' conduct. These actions represent a course of conduct rather than isolated incidents and were directed specifically at Plaintiff.

In declaration number three, Kountz states, "I located and interviewed James Conner in June of 2023. James Conner advised me he was a licensed private investigator. I observed that Conner appeared to be disabled by his own admission." He further states in numbers four and five that he was not aware of the audio recording contained in edited video nor authorized permission for the recording. After the interview, Conner contacted Declarant warning of Barresi. "After leaving the interview with James Conner, I received a phone call from him advising that Paul Barresi was dangerous, and that he was in fear for his life due to his involvement."

Kountz's review of recording provided insight into Barresi's conduct. "I reviewed the audio tape contained in the video by Barresi. Contained in the audio tape done by Paul Barresi of James Conner, are alterations that he was an FBI agent and that her mother Victoria Taft had witnessed a

1  mob murder by the Gottis. It distressed Taft about her mother Victoria Taft and her death. James

2  Conner advised me he was never an FBI agent. The tape showed images of a man dead from the

3  mafia, members of the mafia, and a gun. In the beginning of the tape, Barresi discussed a photo of

4  Amber Heard with Plaintiff Taft to James Conner, that they were arm in arm, yet at the same time

5  indicating danger to life through comparing to an assailant. I have information that Plaintiff is still

6  fearful to this day that this audio tape is either to make someone shoot her or to shoot Amber. Or

7  that a death could occur. I have information that Defendant Barresi acted aggressively to terrify Taft

8  and others contained in the content of the audio tape."

9     In further describes of Mr. Barresi's harassment and states, "On September 05th, 2023, I

10  received an email from Plaintiff Taft containing a screenshot of a text message chain from the

11  phone number (908) 656-5712, which she advised was Defendant Paul Barresi's phone number. I

12  observed the following message, portrayed in the screenshot to have been sent from the above

13  number to Plaintiff Taft on Nov 7, 2022: "Stacy is your sister" and sexual expletives. Taft advised

14  that the text referred to Stacy Hagman in Texas and requested that I interview her. She had

15  compliments for Stacy and was fearful that Barresi could access her. I was able to locate a phone

16  number for Stacy but have not been able to reach her through it."

17  **II.**   **Declaration of Molly Beaton (Exhibit D, 59)**

18     Molly Beaton is a witness who received direct threats from Defendant Barresi, causing her to

19  fear for her life and safety. Contained in Declaration 1 she explains, "Knowing I could be a witness,

20  Defendant Paul Barresi has continued to contact me to this day, and I want his brutal, continual

21  threats and harassment to stop. I am afraid of him, and I haven't told him directly that I am

22  testifying for Plaintiff. I do not want Barresi who acts like a hitman going to my house for being a

23  witness."

24

1   Contained in number 2, she attests, "Since first interacting with witnesses and then Barresi from

2   2021, 2022 to December 2024, I personally have reported that he is a 'hitman' as I provided that to

3   Florida State Police (Case 48-2021-NM-002537). Two witnesses corroborated Barresi's imminent

4   dangerousness to threaten and kill."In number six, she declares, "I continued to see Defendant

5   Barresi harassing and stalking Plaintiff Taft for 2 years. As recent as January 5th, 2024, I saw that

6   Barresi was stalking Taft's location, residency, about her mother's death, all in his alarming efforts

7   as a criminal fixer, and to eliminate witnesses that may have turned to assist Heard."

8   In number 15, she states in part, "…Albertini knew I was supportive of Amber when he was

9   contacting me before and when Barresi was contacting him. I do not want any more instigated

10  harassment by Barresi, and I do not want to be contacted ever again by either of them or threatened.

11  It is a nightmare." She states in number 17, "Defendant Barresi initially contacted me in 2022 in his

12  interests in fighting Richie Albertini, who I know has information against Johnny Depp, although I

13  did not know about the assaults in the Viper Room done by Depp. In the same documentation I sent

14  the Florida police in 2021, Albertini was referencing Amber Heard, who is an assault victim like I

15  am an assault victim. In number 18, she states, "I've seen messages of witness Ian Herndon

16  messaging in 2021 to Roberta Kaplan, who was Amber's attorney, about problems of harming rape

17  victims and monitoring rape victims, with "alleged ties to Johnny Depp, Anthony Pellicano, and

18  Paul Barresi" in the message. Ian was trying to help me. Richie tagged @adam_waldman and

19  @Barresi_paul in many postings attacking me and Amber, after showing me the text from Barresi

20  to Richie of "Hey, that tranny had it coming. If it wasn't me to have done her in, it would've been

21  somebody else."

22  III.   **Declaration of Erik R. Eichler (Exhibit E, 68)**

23  Erik Eichler is a private investigator of Eichler Investigative Services LLC., in South Windsor,

24  CT. On October 29, 2024, Mr. Eichler drove to the residence of Rebecca Berry. Declarant spoke

1  with Ms. Berry and her mother, Joan Berry, in the driveway. Mr. Eichler provided Ms. Berry with a

2  copy of the Complaint in this matter, Christina Taft v. Paul Barresi, 5:24-CV-09130-TJH-DTB. The

3  Declarant provided a letter from Christina Taft requesting a witness declaration in this case. The

4  mother to Ms. Berry stated, "What is this about?" Ms. Berry replied, "Remember that guy [Paul

5  Barresi] who confessed to me about killing people?" Ms. Berry said she would contact Christina

6  Taft or the Declarant at another time and terminated the interview.

7  **IV.    Unsigned Declaration of Withholding Witness**

8          The Declaration provides context for the pattern of intimidation and threats, detailing

9  Barresi's unlawful conduct. It describes ongoing witness intimidation by Barresi and Waldman,

10  utilizing audio recordings to prevent testimony into 2024. The Declarant recounts firsthand

11  experiences of threats and coercion aimed at suppressing testimony against Johnny Depp, as well as

12  eyewitness accounts of violent incidents against both women and men that were instigated by Depp

13  and his associates in the Viper Room.

14          Alarmingly, the Declaration includes claims of death threats and involvement in witness

15  deaths, with assertions that Barresi acts as a "hitman" to manage sensitive matters. The severity of

16  the situation is highlighted by three direct quotes from the Declaration:

17                  a.    *"Barresi threatened to shoot me during the trial of Depp v*
                          *Heard so I wouldn't testify at all."*
18
                    b.    *"I have witnessed Barresi do death threats to Ms. Taft and*
19                        *that she shouldn't be alive."*

20                  c.    *"To this day, Barresi intimidates me and told me to 'Go get*
                          *that bitch' about Plaintiff Taft."*
21
22          The unsigned status of the Declaration is a testament to the climate of fear surrounding this

23  case. This underscores the potential for irreparable harm and emphasizes the critical need for court

24

25

1    intervention, highlighting the necessity of granting Taft's motion for a restraining order to protect

2    witnesses and ensure a fair judicial process.

3    **V.    Nitrini Emails and Social Media Posts (Exhibit F)**

4        Mario Nitrini was threatened with a "mortal danger threat" by Defendant Barresi after

5    Nitrini posted that he was asked for a witness declaration by Plaintiff. On December 9, 2024, Nitrini

6    explained to Taft, "A gang murder took place, and my son testified for the prosecution. Because

7    Paul Barresi posted his post pertaining to my son and me, some very bad people have been looking

8    for me. I'm very seriously contemplating filing a criminal complaint against Paul Barresi for

9    attempted murder. As far as Anthony Fox's disappearance goes, I have my own evidence on whom I

10   believe killed Anthony Fox on Johnny Depp's request…" (Exhibit F, 71). Nitrini responded to a

11   subpoena (Exhibit L, 110) in this case, demonstrating Defendant Barresi interfering with the

12   Ventura police investigation in 2021, after Barresi engaged with Defendant Waldman and years

13   after Detective Furlong first requested assistance to solve Fox's case in July 2019 (Exhibits F, 70).

14   The exhibits suggest that, according to Nitrini, Defendant Barresi pressured Fox's brother Charles

15   and inserted himself into the situation to obscure the possibility of Fox being killed. Barresi also

16   appeared focused on obtaining the contact information of Fox's legal team. Fox's daughter

17   Constance was further interviewed with Barresi's notes to Nitrini showing insertion to cast doubt.

18   Barresi also appeared focused on contacting Fox's legal team where he stated "notice how he is

19   avoiding me" about attorney Cutler. (Exhibits G, 77.)

20       Defendant Barresi and an associate of Barresi are threatening Nitrini that he is a 'non-entity'

21   and for being a witness in Taft's lawsuit (Exhibit H, 79).

22   **VI.    Emails to Taft (Exhibit I)**

23       Furthermore, evidence of ongoing harassment by Defendant Barresi is demonstrated through a

24   series of disturbing emails sent to Plaintiff. On November 19, 2022, Barresi sent an email to

1  Plaintiff attaching a coroner's report of her mother Victoria Taft, making Taft afraid for her life, and

2  accusing her of speaking to the press (Exhibit I, 81). On December 13, 2022, Barresi sent a

3  disturbing email referencing Plaintiff's deceased mother's body parts (Exhibit I, 82). On August 19,

4  2024, Barresi sent an email inflicting pain onto Plaintiff about her mother's death, using Plaintiff's

5  pleading for "mommy mommy mommy," Defendant knowing the cruelty he was inflicting, to turn

6  her mother Victoria into financial worth (Exhibit I, 83). On September 26, 2024, after service of this

7  case, Barresi sent an email to Plaintiff threatening that his lawyers would pursue conservatorship

8  against her. (Exhibit I, 84).

9  **VII.  Barresi's Account Posts (Exhibit J)**

10      a.  On January 1, 2025, Barresi made posted about Taft on X containing false and

11          inflammatory statements about Plaintiff's personal life and family tragedy, further

12          evidencing his continued harassment (Exhibit J, 86).

13      b.  On January 2, 2025, Barresi invaded Plaintiff's location of residency even outside of the

14          country, to inflict a sense of imminent harm and being unsafe, with flight path tracking

15          images between Taft and another victim, and posted, "Christina Taft has allegedly

16          already begun to upset people in France, I am informed" (Exhibit J, 87). The "I am

17          informed" piece by Barresi is to make Taft be apprehensive of the danger that others

18          could be monitoring her relationships even outside of the United States, which

19          Defendant Barresi directed her to flee from, seen in her initial and amended complaint.

20      c.  Another post on January 2, 2025, threatening Taft's mortality states she should have

21          never "ever breathed air" (Exhibit J, 88). Defendant Barresi heightened his monitoring

22          that Taft could speak with another potential witness for due process in this case. With

23          recent changes in legal consultants, Plaintiff, being pro se, again struggles for equal

24          protection.

d.  On January 4, 2025, he taunts Taft with a post applying a crude narrative to her mother's death, mainly to harass and intimidate Plaintiff as well as taint witnesses. (Exhibit J, 89.)

e.  On January 7, 2025, he again taunts Taft, with a post stating, "No her mother was burned to a crisp, nothing left but a few charged bones and most of her heart." (Exhibit J, 90.)

f.  As evidence of Barresi's ongoing harassment and desiring Plaintiff's death, he posted the following on January 12, 2025, "Christina Taft, CEO of Rescue Social, is fucking evil to the core. Not a more evil viscious [sic] human being has ever breathed air."

g.  On page, 140 of Exhibit P, as shown in a post on his X account, Defendant Barresi states, "VICTORIA was a 'Tits & Ass' actress & movie extra who sued Warren Beaty." In this post he attaches records cursing her as a Hollywood Fixer. Such records do not exist in the LA Superior Court docket websites, nor does Plaintiff have any records of this lawsuit of her mother's. Barresi intimidated and pained Taft with these invasions.

h.  Defendant Barresi posts her mother's coroner report in a post noted on page 141 of Exhibit P, with childhood photos of Taft involved, stating "WAS PRECIOUS TIME WASTED TO SAVE HER MOM? Christina Taft told CNN Anderson Cooper…"

i.  Among these postings, including flight tracking photos with finding her address in France, Defendant Barresi repeatedly posted Plaintiff's photo with potential witness Amber Heard, including calling them both "brain dead" and "wrenches" on January 4th, 2025 (Exhibit P, 142). In erratic behavior, Barresi uses a double persona to victimize.

j.  These recent account posts were made just days before this objection was filed.

VIII.  **History of Restraining Orders for Individuals (Exhibit K)**

A Judge issued a restraining order in Burbank, CA, protecting victim Richard Albertini from Barresi's violence. The filing threats of violence by Barresi "working for Johnny Depp," threatening to shoot him, and to hit him across the head substantiated in recording. (Exhibit K, 100). At a

1  hearing on October 19, 2022, for Case No. Albertini v. Barresi, a transcription notes police reports

2  against Barresi then, "I understand sir, but please let me answer that. My colleague who is in

3  possession of the records and files; a woman, she's been receiving death threats from Paul

4  Barresi…She's Scared. Her name is Christina Taft" (Exhibit P).

5  **I.    Threat of Harm to Rebecca Berry (Exhibit O)**

6  As demonstrated in Exhibit O, witness Rebecca Berry describes her concern of Barresi hiring a

7  hitman to kill her. "Christina I think he hired a hitman" and "I'm okay but I think I came really

8  close to being raped and murdered." PI Echler's declaration demonstrates Berry is still afraid.

9  **II.    Violation of California's 2022 Stand Against NDAs Act (Exhibit N)**

10  In response to Plaintiff's plea for an injunction, Defendant Barresi through his lawyers

11  demanded that she withdraw her reports to law enforcement and any other agency in a settlement as

12  well as pay them egregiously $20,000. Meanwhile, attorney Fabricant at their firm repeatedly texted

13  and called the known disbarred legal consultant who hardly communicated with Taft. This violated

14  the law of California's Stand Against Non-Disclosure Agreements Act (SB 331), effective January

15  1, 2022, that prohibits confidentiality agreements in settlement agreements that prevent the

16  disclosure of information about unlawful acts, including harassment, discrimination, or other illegal

17  behavior. Plaintiff cited this law and that FBI Agent Greg recommended Taft to file a lawsuit.

18  Plaintiff's Emergency Motion for Injunctive Relief was based on the urgent need to prevent

19  harm as well as intimidation, harassment, witness interference, and invasions of unauthorized

20  contact information by the Defendants.

21  The Magistrate Judge's Report and Recommendation issued December 24, 2024, fails to

22  adequately address key evidence, procedural fairness, and public interest, resulting in prejudice to

23  the Plaintiff and potential witnesses.

24

25

1  Moreover, the Magistrate Judge erroneously excluded critical supplementary evidence and

2 failed to allow Plaintiff to file a reply to Defendants' opposition, violating principles of procedural

3 fairness. These errors have resulted in a recommendation that, if adopted, would leave Plaintiff and

4 key witnesses vulnerable to continued harassment and intimidation, undermining the integrity of the

5 judicial process.

6  For these reasons, and further detailed below, Plaintiff respectfully requests that the Court reject

7 the Magistrate Judge's Report and Recommendation and grant Plaintiff's Emergency Motion for

8 Preliminary Injunction.

9          **OBJECTIONS**

10 1. <u>Procedural Error Depriving Right to Reply</u>

11  The Court erred in denying Plaintiff the opportunity to file a reply to Defendant's opposition

12 dated December 13, 2024. This denial violates well-established procedural protections afforded by

13 pro se litigants under federal law and constitutes an abuse of discretion.

14  The Supreme Court has long held that pro se pleadings are held to less stringent standards than

15 pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972). This principle

16 ensures that pro se litigants have meaningful access to the courts and are not unfairly disadvantaged

17 by their lack of legal training.

18  Furthermore, the Ninth Circuit has emphasized that courts must provide pro se litigants with

19 meaningful opportunities to present their claims. *McGuckin v. Smith*, 974 F.2d 1050, 1055 (9th Cir.

20 1992). This obligation extends to ensure that pro se litigants have a fair chance to respond to

21 arguments raised by opposing parties.

22  Courts must provide meaningful opportunities for pro se litigants to present their claims. By

23 denying Plaintiff the opportunity to file a reply, the Court deprived her the chance to address critical

24 issues raised in Defendant's Opposition including (1) Mischaracterization of evidence presented in

1    support of the preliminary injunction, (2) Erroneous application of the legal standard for injunctive

2    relief, and (3) New arguments and factual assertions introduced in the opposition.

3    The Supreme Court has recognized that denying procedural opportunities to pro se litigants may

4    result in reversible error. *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005). In this case, the Court's

5    denial of a reply to prejudiced Plaintiff's ability to fully present her case for injunctive relief and

6    respond to Defendant's arguments.

7    2.    <u>Improper Exclusion of Supplementary Evidence</u>

8    The Magistrate Judge erred excluding critical evidence submitted with Plaintiff's Motion to

9    Amend Complaint, including declarations from three licensed private investigators and additional

10    witness statements. This exclusion significantly undermines Plaintiff's ability to demonstrate

11    ongoing intimidation and immediate harm.

12    The Supreme Court has held that courts must consider all evidence relevant to the determination

13    of substantial harm. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). By excluding the supplementary

14    evidence, the Court failed to account for the cumulative threats and intimidation faced by Plaintiff

15    and witnesses, resulting in an incomplete assessment of irreparable harm.

16    Furthermore, the Supreme Court has emphasized the importance of liberally allowing

17    amendments and supplementary filings to ensure justice is served. *Foman v. Davis*, 371 U.S. 178,

18    182 (1962).

19    The Court should review the supplementary evidence in its entirety to accurately assess the

20    full extent of the threats and intimidation, ensuring a fair and comprehensive evaluation of

21    Plaintiff's request for injunctive relief.

22    3.    <u>Failure to Address Harassment and Witness Protection</u>

23

24

25

1    The Magistrate Judge's recommendation downplays Defendant Barresi's repeated and

2  documented harassment of Plaintiff and witnesses, which constitutes actionable misconduct under

3  California law and federal statutes.

4    California Code of Civil Procedure. § 527.6(b)(3) defines harassment as including "a knowing

5  and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses

6  the person, and that serves no legitimate purpose." The evidence presented meets this standard.

7  Furthermore, in *Doe v. Fitzgerald*, 2022 WL 423495, at 4 (C.D. Cal.), the Court held that harassing

8  speech falls outside First Amendment protections. This principle is particularly relevant given

9  Barresi's pattern of intimidating communications. The Ninth Circuit has emphasized the importance

10  of protecting witnesses from intimidation. In *United States v. Fulbright*, 105 F.3d 443, 449 (9th Cir.

11  1997), the Court noted that witness intimidation "not only harms the individual but also undermines

12  the judicial process" by discouraging truthful testimony and participation."

13    The recommendation fails to give proper weight to substantial evidence of Defendant Barresi's

14  harassing and intimidating conduct including:

15    a.  The "soft landing" remarks, which carry a clear threat with Defendant's understanding of

16       reports against him for using the death of one of his subjects falling off a roof to convey to

17       witnesses and Plaintiff that the same would occur to them. See Declaration of Mike

18       McCormick (Exhibit C).

19    b.  The "undertaker" comments, threatening mortality and potential violence against witnesses.

20       (Exhibit J, 92-94).

21    c.  Repeated attempts to contact and pressure witnesses even after being instructed to cease

22       such communications.

23    This pattern of behavior demonstrates clear intimidation of witnesses and obstructs justice,

24  directly undermining the integrity of the judicial process. Injunctive relief is not only warranted but

1    necessary to protect witnesses and preserve the integrity of these proceedings. The Magistrate

2    Judge's failure to adequately address this critical issue constitutes a significant oversight that this

3    Court should rectify.

4    4.    <u>Erroneous Application of Preliminary Injunction Standards</u>

5        The Magistrate Judge misapplied the four-part test for preliminary injunctions established in

6    *Winter v. NRDC, 555 U.S. 7, 20 (2008).* A proper application of this test demonstrates that Plaintiff

7    is entitled to injunctive relief.

8        a.    <u>Likelihood of Success on the Merits</u>

9        The Magistrate Judge improperly dismissed substantial evidence of Defendants' harassing

10    conduct. The Supreme Court has held that past misconduct is compelling evidence of future harm.

11    *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). Here, Plaintiff has demonstrated a clear

12    pattern of harassment and intimidation by Defendants, including threats to witnesses and

13    unauthorized contact with Plaintiff's legal consultants. Defendant continues to harass and intimidate

14    the Plaintiff via social media platform, X, as recent as January 12, 2025.

15        Additionally, the Ninth Circuit has held that "serious questions going to the merits" suffice

16    when the balance of hardships tips sharply in the plaintiff's favor. *Alliance for the Wild Rockies v.*

17    *Cottrell*, 632 F. 3d 1127, 1135 (9th Cir. 2011). Given the significant hardships faced by Plaintiff,

18    this lower threshold should apply.

19        b.    <u>Irreparable Harm</u>

20        The Magistrate Judge incorrectly characterized Plaintiff's claims of irreparable harm as

21    speculative. Plaintiff has provided substantial evidence of ongoing harm, including emotional

22    distress and threats to safety of witnesses. The Ninth Circuit has held that irreparable harm must be

23    immediate and significant but need not be certain. *Simula, Inc. v. Autolive, Inc*. 175 F.3d 716, 725

24    (9th Cir. 1999) The evidence presented by Plaintiff clearly meets this standard.

c.  Balance of Equities

The recommendation fails to properly weigh the balance of hardships. Granting the injunction imposes no undue burden on Defendant while preventing significant harm to the Plaintiff. The Ninth Circuit has held that the balance of equities tips sharply in favor of protecting fundamental rights. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Here, Plaintiff's right to safety and access to justice clearly outweighs any minimal inconvenience to Defendant.

d.  Public Interest and Witness Protection

The Magistrate Judge's cursory dismissal of public interest arguments fails to consider the importance of protecting witnesses and preserving judicial integrity. The Ninth Circuit has recognized that the mandatory injunctions serve the public interest when safeguarding fundamental legal protections. *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015).

Granting the injunction supports broader public interests in judicial integrity and the protection of participants in the legal process. Defendant Barresi's conduct jeopardizes these principles, as evidenced by witness fears and documented threats.

The Supreme Court has long recognized the paramount importance of maintaining judicial integrity and protecting the administration of justice. In *United States v. Nixon*, 418 U.S. 683, 709 (1974), the Court emphasized that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." This principle extends to civil proceedings, where the integrity of the judicial process relies on the ability of witnesses to testify freely and without fear of intimidation.

The public interest in protecting witnesses and maintaining the integrity of judicial proceedings is further underscored by the broad support for related cases addressing similar issues. The involvement of over ninety organizations as amici curiae in cases dealing with witness protection

and judicial integrity demonstrates the far-reaching implications of the present matter[1]. The widespread participation by diverse stakeholders highlights the significant public interest in ensuring that the legal system remains free from intimidation and coercion. This aligns with the fundamental public interest in maintaining a fair and accessible justice system, as recognized in numerous federal court decisions.

### STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1), objections to a Magistrate Judge's report and recommendation are reviewed de novo. Under this standard, the District Court must independently evaluate the objected-to portions of the recommendation, considering all relevant evidence and arguments. The reviewing Court may accept, reject, or modify the recommendation in whole or in part.

In cases involving pro se litigants, courts are additionally required to ensure that procedural errors do not prejudice the litigant's substantive rights, as emphasized in *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). This heightened standard of fairness ensures the preservation of due process and equitable access to justice.

The Magistrate Judge erred in applying the four-part test for preliminary injunctions established in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Specifically, the recommendation:

    a.   Improperly dismissed substantial evidence of Defendant Barresi's harassing conduct.

---

[1] Thomas F. Urban II of Fletcher, Heald and Hildreth filed a motion on November 23, 2022, seeking permission to submit an amicus brief to the Virginia appeals court on behalf of press groups, women's advocates, and organizations working with abuse victims. Urban argued that the case has intensified fears about speaking out against powerful individuals, stating: "People, especially those who have been the victims of abuse, are afraid of speaking out against those who have more power and money. The current case has exacerbated that fear with its precedent." The briefs contended that the Virginia case should not have proceeded, given that a prior case in the United Kingdom had already determined Heard's allegations to be true.

(Matthew Renda, "Attorneys see path for Amber Heard's appeal in defamation case," Courthouse News Service, December 5, 2022, https://www.courthousenews.com/attorneys-see-path-for-amber-heards-appeal-in-defamation-case.)

b.  Incorrectly characterized Plaintiff's claims of irreparable harm as speculative.

c.  Failed to properly weigh the balance of equities between the parties; and,

d.  Inadequately considered the public interest in protecting witnesses and maintaining judicial integrity.

**LEGAL ARGUMENTS:**

The Plaintiff presents the following arguments in support of instant objections raised.

5.  <u>Right to Reply as Fundamental Fairness</u>

The denial of Plaintiff's right to reply to the Defendant's Opposition to Plaintiff's Emergency Motion for Preliminary Injunction dated December 13, 2024, undermines Plaintiff's ability to address critical arguments and evidentiary issues. This omission violates the principle of fundamental fairness and procedural due process. In *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), the Supreme Court emphasized that pro se litigants' pleadings and filings must be held to less stringent standards than those of attorneys. By denying Plaintiff the right to reply, the Court failed to account for Plaintiff's limited legal expertise, thus denying Plaintiff a meaningful opportunity to clarify Plaintiff's arguments and respond to mischaracterizations in the opposition.

6.  <u>Denial of Reply Violates Procedural Due Process</u>

The denial of Plaintiff's right to reply also constitutes a violation of procedural due process, which mandates that litigants be given a meaningful opportunity to present their case. In *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), procedural due process requires notice and an opportunity to be heard in a meaningful time and manner. By refusing Plaintiff the right to reply, the Court failed to ensure that Plaintiff's claims were fully and fairly evaluated, especially given the complexity of the legal issues involved.

7.  <u>Courts' Obligation to Ensure Fairness for Pro Se Litigants</u>

1   Pro se litigants are at a disadvantage when navigating complex legal systems. Courts have a

2   duty to mitigate this disadvantage by affording procedural safeguards. In *McGuckin v. Smith*, 974

3   F.2d 1050, 1055 (9th Cir. 1992), the Ninth Circuit recognized that pro se litigants must be given

4   meaningful opportunities to present their claims. This includes procedural accommodation like

5   granting the right to reply, particularly in matters involving complex motions such as requests for

6   preliminary injunctions.

7       8.   Liberal Interpretation of Pro Se Pleadings

8       The Court erred by not liberally construing Plaintiff's filings, including the Motion to Amend

9   Complaint and the Continued Injunction Requests. In *Boag v. MacDougall*, 454 U.S. 364, 365 (1982),

10  the Supreme Court held that courts must interpret pro se filings with leniency, ensuring that

11  procedural technicalities do not obstruct justice. By failing to consider Plaintiff's supplementary

12  filings and arguments, the Court disregarded this principle.

13      9.   Improper Exclusion of Supplementary Evidence

14      The Court's refusal to consider supplementary evidence attached to Plaintiff's Motion to Amend

15  Complaint deprived Plaintiff of the ability to fully substantiate Plaintiff's claims of harassment and

16  irreparable harm. In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court emphasized that

17  amendments and supplementary filings should be freely allowed when justice requires. Plaintiff's

18  supplementary evidence, including investigator declarations and witness statements, directly supports

19  Plaintiff's claims and should have been considered.

20                          **PRELIMINARY INJUNCTION STANDARDS**

21      10. . Likelihood of Success on the Merits

22      Plaintiff demonstrated a strong likelihood of success on Plaintiff's harassment claims, supported

23  by documented threats and witness declarations. In *Winter v. NRDC,* 555 U.S. 7, 20 (2008), the

24  Supreme Court established that the likelihood of success on the merits is a key factor in granting a

preliminary injunction. Plaintiff's detailed evidence of ongoing threats and harassment satisfies this requirement.

11. Serious Questions on the Merits

Even if success on the merits is not certain, Plaintiff raised fundamental questions that justify injunctive relief when balanced against the hardships she faces. In *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The Ninth Circuit allows a "sliding scale" approach where significant questions on the merits, combined with significant hardships, can support a preliminary injunction. Plaintiff's case meets this standard due to the extensive evidence of harassment.

12. Irreparable Harm is Well-Demonstrated

Plaintiff established that she and her witnesses face irreparable harm, including threats to safety, emotional distress, and interference with legal proceedings. In *Simula, Inc. v. Autoliv, Inc*., 175 F.3d 716, 725 (9th Cir. 1999), the Ninth Circuit recognizes that irreparable harm must be immediate and significant. Plaintiff's evidence of threats and intimidation satisfies this requirement.

13. Balance of Hardships Favors Plaintiff

The balance of hardships strongly favors Plaintiff, as the denial of an injunction leaves Plaintiff is vulnerable to continued threats and harassment. In *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), the court recognized that Courts must weigh hardships and favor the party facing greater harm. Here, the risks to Plaintiff's safety and judicial participation outweigh any inconvenience to Defendants.

14. Public Interest Supports Injunction:

Granting the injunction aligns with the public interest by protecting judicial integrity and ensuring witness safety. In *Garcia v. Google, Inc.,* 786 F.3d 733, 740 (9th Cir. 2015), the Ninth

1    Circuit emphasized that injunctions should advance the public interest, particularly in safeguarding

2    participants in the judicial process.

3                          **HARASSMENT AND WITNESS PROTECTION**

4        15. <u>Witness Protection is a Judicial Priority</u>

5        Protecting witnesses from intimidation is essential to maintaining judicial integrity and ensuring

6    fair proceedings. In *United States v. Fulbright*, 105 F.3d 443, 449 (9th Cir. 1997), the Ninth Circuit

7    held that courts must act to prevent witness intimidation, as it directly undermines the

8    administration of justice.

9        16. <u>Defendant's Threats Constitute Harassment:</u>

10        Defendant Barresi's statements, including the "soft landing" remark, meet the legal definition of

11    harassment under California law. Under Cal. Code Civ. Proc. § 527.6(b)(3), harassment includes a

12    willful course of conduct that causes substantial emotional distress without legitimate purpose.

13    Defendant's remarks clearly fall within this definition.

14        17. <u>Unlawful Interference with Witnesses</u>

15        Defendant's conduct interferes with the ability of witnesses to participate in legal proceedings,

16    constituting obstruction. Under 18 U.S.C. § 1512, Federal law prohibits tampering with witnesses

17    through intimidation or threats, underscoring the need for injunctive relief.

18        18. <u>First Amendment Does Not Protect Harassment</u>

19        Defendant's speech, including threats and intimidation, is not protected by the First

20    Amendment. Per *Doe v. Fitzgerald*, 2022 WL 423495, at 4 (C.D. Cal.), harassing speech directed at

21    specific individuals is outside the scope of constitutional protection.

22        19. <u>Past Misconduct Predicts Future Harm</u>

23

24

25

Defendants' history of harassment and threats is indicative of future harm, justifying injunctive relief. Per *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), explains that past conduct is a reliable indicator of probable future violations.

## PUBLIC INTEREST AND BROADER IMPLICATIONS

20.  Judicial Integrity Requires Protection

Allowing harassment of witnesses and participants erodes confidence in the judicial process. In *United States v. Nixon*, 418 U.S. 683, 708 (1974), the Supreme Court emphasized that courts must act to preserve public confidence in judicial proceedings.

21. Witness Safety is a Fundamental Interest

Ensuring witness safety is vital to upholding the integrity of the legal system. In *Taylor v. Illinois*, 484 U.S. 400, 409 (1988), the Supreme Court recognized that protecting witnesses is essential for the truth-seeking function of trials.

## GROUNDS FOR OBJECTION

22.  Denial of the Right to File a Reply Violates Procedural Due Process

The Court's denial of Plaintiff's right to file a reply to Defendant's opposition dated December 13, 2024, constitutes a fundamental procedural error, which deprived Plaintiff of her constitutional right to a fair hearing. In this case, denying Plaintiff the right to reply to obstructed Plaintiff's ability to address Defendant's arguments and evidence, directly prejudicing Plaintiff's ability to advocate for a preliminary injunction.

The Supreme Court has held that procedural due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976). By denying Plaintiff the opportunity to reply, the Court failed to ensure that all issues potentially influencing his decision were fully addressed. A reply is critical in addressing new arguments and evidence raised in opposition and ensuring the Court evaluates the matter based on a

1 | complete and balanced record, and every litigant must be afforded a fair opportunity to present their

2 | case, including responding to material introduced by the opposing party.[2]

3 | 23. Failure to Properly Apply the Four-Part Preliminary Injunction Test

4 | The Magistrate Judge's recommendation reflects a failure to correctly apply the established

5 | four-part test for preliminary injunctions as set forth in *Winter v. NRDC*, 555 U.S. 7, 20 (2008) that a

6 | party seeking a preliminary injunction must establish (a) A likelihood of success on the merits, (b) A

7 | likelihood of irreparable harm in the absence of preliminary relief; (c) The balance of equities tips

8 | in their favor; and, (d) The injunction is in the public interest.

9 | The Judge's analysis of success on the merits applied too high a standard, requiring clear proof

10 | of harassment rather than evaluating whether the plaintiff raised "serious questions going to the

11 | merits" as allowed by the Ninth Circuit precedent.

12 | The Judge's dismissal of Plaintiff's claims of irreparable harm as speculative, citing the delay in

13 | filing the motion as evidence of a lack of urgency. However, this reasoning may not fully account

14 | for ongoing or escalating harm, which can still justify injunctive relief even if there was some delay

15 | in filing.

16 | The judge stated that the court was "unable to find that the balance of hardships weighs in the

17 | Plaintiff's favor." However, this conclusion may not have adequately weighed the potential harm to

18 |

19 |

20 | [2] Procedural and ministerial errors required a writ of mandamus in a related case, "On August 8, 2022, Fletcher, Heald
& Hildreth filed a petition with the Court of Appeals of Virginia for a writ of mandamus directed to the Circuit Court of
21 | Fairfax County, Virginia to compel Judge Penney S. Azcarate to release copies of transcripts relating to the Depp v.
Heard case or to compel the Fairfax County Circuit Court Clerk, John Frey, to furnish copies of the transcripts. The
22 | Court of Appeals concluded that mandamus does lie for the Clerk of Fairfax County Circuit Court..."
"In its Decision, the Virginia Court of Appeals held that it has original jurisdiction to issue writs of mandamus,
23 | prohibition, and habeas corpus in cases in which it would have appellate jurisdiction."
"Therefore, Fletcher, Heald & Hildreth was able to open to the public the courthouse files to allow access to records and
24 | transcripts of court hearings and trials in Virginia."

https://www.commlawblog.com/2022/12/articles/litigation/fhh-files-mandamus-in-depp-v-heard-case

1    the plaintiff (ongoing harassment and intimidation) against the minimal burden on the defendant of

2    refraining from certain communications.

3    The judge briefly dismissed the public interest arguments, stating that granting the injunction

4    would not serve the public interest in protecting witnesses and maintain the integrity of judicial

5    proceedings.

6    The Judge's analysis appears to have focused primarily on the first factor (likelihood of success)

7    without giving equal consideration to the other three factors. This approach may not align with the

8    requirement to consider all four factors collectively, as mandated by *Winter* and subsequent 9th

9    Circuit decisions. This incomplete analysis undermines the fairness and accuracy of the ruling

10    including, leading to an unjustified denial of Plaintiff's motion.

11    24. <u>Exclusion of Supplementary Evidence Constitutes Prejudicial Error</u>

12    The Magistrate Judge erroneously excluded critical evidence submitted with Plaintiff's Motion

13    to Amend Complaint, including declarations from private investigators and witnesses, which were

14    directly relevant to the injunction request. The Supreme Court has held that courts must consider all

15    relevant evidence to evaluate claims of irreparable harm, particularly in cases involving ongoing

16    harm, *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). Relevant evidence must be evaluated in its entirety

17    to assess the necessity of equitable relief. By excluding this evidence, the Court failed to account for

18    the cumulative threats and intimidation faced by Plaintiff and witnesses, resulting in an incomplete

19    assessment of irreparable harm.

20    25. <u>Mischaracterization of Irreparable Harm as Speculative</u>

21    The recommendation incorrectly dismissed Plaintiff's evidence of irreparable harm as

22    speculative, despite documented threats, emotional distress, and interference with witnesses. The

23    Supreme Court clarified that irreparable harm must be "likely," not certain, and that ongoing harm

24    requiring immediate relief satisfies the criterion. *Winter v. NRDC*, 555 U.S. 7, 22 (2008). Harm that

1  is continuous and directly impacts the ability to access justice or safety meets the threshold for

2  irreparable injury. Plaintiff provided substantial evidence, including declarations and documented

3  threats, demonstrating that irreparable harm was not only likely but ongoing, contrary to the Court's

4  conclusion.

5      26. Denial of Witness Protection Undermines Judicial Integrity

6      The Court's refusal to grant an injunction leaves witnesses vulnerable to continued intimidation,

7  jeopardizing their participation and the integrity of the judicial process. The Ninth Circuit has held

8  that witness intimidation not only harms individuals but also undermines the integrity of the judicial

9  process by discouraging truthful testimony and participation. *United States v. Fulbright*, 105 F.3d

10  443, 449 (9th Cir. 1997). Courts have a duty to protect witnesses from threats and intimidation to

11  ensure the integrity of judicial proceedings. Defendant Barresi's ongoing threats, such as the "soft

12  landing" comment and other intimidating statements, directly endanger witnesses, requiring

13  injunctive relief to safeguard judicial integrity.

14      29. Failure to Account for Past Misconduct as a Predictor of Future Harm

15      The Magistrate Judge erred by failing to recognize Defendant Barresi's documented history of

16  harassment as a reliable indicator of future threats, warranting preventative measures.

17                                **LEGAL AUTHORITY**

18      In *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), the Supreme Court emphasized

19  that past misconduct is a strong predictor of future harm and may justify injunctive relief to prevent

20  its recurrence. Courts must consider historical behavior when evaluating the likelihood of continued

21  harm. Here, Defendant's repeated acts of intimidation, including harassing communications and

22  threats against witnesses, establish a pattern requiring judicial intervention to prevent further harm.

23      30. Improper Balancing of Equities

24

1    The recommendation improperly weighed the balance of hardships, prioritizing Defendant's

2    minimal inconvenience over Plaintiff's substantial risks to safety and access to justice. In *Rodriguez*

3    *v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), The Ninth Circuit held that when balancing

4    equities, courts must favor the party facing greater harm, particularly in cases involving

5    fundamental rights. The balance of hardships must prioritize the protection of parties facing

6    immediate and substantial harm over those experiencing minimal inconvenience. Granting an

7    injunction would impose minimal restrictions on Defendant while preventing significant harm to

8    Plaintiff and witnesses, tipping the balance decisively in Plaintiff's favor.

9    31. Public Interest Overwhelmingly Supports Injunction

10    The Magistrate Judge's recommendation fails to adequately consider the public interest in

11    safeguarding judicial integrity, protecting witnesses, and ensuring access to justice.

12    In *Garcia v. Google, Inc*., 786 F.3d 733, 740 (9th Cir. 2015), the Ninth Circuit recognized that

13    injunctions must serve the public interest, particularly in cases involving fundamental legal

14    protections and the integrity of judicial proceedings.

15    32. Mischaracterizations of First Amendment Protections

16    The Court improperly implied that Defendant's harassing statements may be protected by the

17    First Amendment, ignoring well-established exceptions for threats and intimidation. In *Doe v.*

18    *Fitzgerald*, 2022 WL 423495, at 4 (C.D. Cal.), the Court held that harassment and intimidation

19    directed at specific individuals fall outside the scope of First Amendment protection. The First

20    Amendment does not protect speech that constitutes harassment, threats, or intimidation intended to

21    harm others. Defendant's statements, including threats against Plaintiff and witnesses, clearly fall

22    into the category of unprotected speech, justifying injunctive relief.

23    33. Improper Consideration of Delay in Filing

24

The recommendation incorrectly penalized Plaintiff for a perceived delay in seeking injunctive relief, despite the ongoing nature of the harm. In *Miller v. California Pacific Medical Center*, 991 F.2d 536, 544 (9th Cir. 1993), the Ninth Circuit held that delays in seeking relief do not negate irreparable harm when the harm persists or escalates. Courts must evaluate the ongoing nature of harm, rather than focusing exclusively on the timing of the motion. Plaintiff's evidence demonstrates continuous harassment, making the injunction necessary despite any delay in filing.

## PRAYER FOR RELIEF

For the reasons stated, Plaintiff respectfully requests that the Court:

A. Reject the Magistrate Judge's Report and Recommendation.

B. Grant Plaintiff's Emergency Motion for Preliminary Injunction.

C. Consider the supplementary evidence provided with the Continued Injunction Requests.

D. Allow Plaintiff to file a reply to address the opposition's arguments.

E. Issue a Writ of Mandamus, if necessary, to compel appropriate judicial action in the interest of justice.

Dated: January 13, 2025                                   Respectfully Submitted,

CHRISTINA TAFT
*Plaintiff pro se*

## VERIFICATION:

I do hereby verify that the contents of the above Objections to Report and Recommendation Denying Preliminary Injunction are true to the best of my knowledge and belief.

Dated: January 13, 2025                                   Respectfully Submitted,

CHRISTINA TAFT
*Plaintiff pro se*

**PROOF OF SERVICE**

On the date set forth below, I served the foregoing document described as:

1. OBJECTION to Report and Recommendation on Preliminary Injunction
   BY NOT MORE THAN 30 DAYS; via Mail and Email, Local Rules, (L.R. 5-3), on the interested parties in this action as follows:

MELISSA Y. LERNER

Attorneys for Defendant PAUL BARRESI


**By Mail:**
MELISSA Y. LERNER
LAVELY & SINGER PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2049 CENTURY PARK EAST, SUITE 2400
LOS ANGELES, CALIFORNIA 90067-2906

**By Electronic Service:**
mlerner@lavelysinger.com
[X] BY FEDERAL EXPRESS: I am "readily familiar" with the practice of collection and processing correspondence for FedEx. Under that practice it would be deposited with USPS on that same day with all costs fully prepaid in the United States, in the ordinary course of business.
[X] ELECTRONIC SERVICE: I served the on the parties listed via electronic service in accordance with the applicable rules (Local Rule 5-3).


Dated: January 13, 2024

*Christina Taft*

Christina Taft in Pro Per

United States

---

1

2

## TABLE OF EXHIBITS

3

**Exhibit A: Consumer Affairs Order** ................................................................. **30**

4

**Exhibit B: Declaration of Ian Hendon** ............................................................ **46**

5

**Exhibit C: Declaration of Michael Kountz** ...................................................... **54**

**Exhibit D: Declaration of Molly Beaton** ......................................................... **59**

6

**Exhibit E: Declaration of Erik Eichler** ............................................................ **67**

7

**Exhibit F: Nitrini Emails** ................................................................................. **70**

8

**Exhibit G: ABA Records** .................................................................................. **76**

**Exhibit H: Threat to Nitrini** ............................................................................ **78**

9

**Exhibit I: Emails to Taft** ................................................................................. **80**

10

**Exhibit J: Barresi Social Media Account Threats** ............................................ **85**

**Exhibit K: Barresi Restraining Order** .............................................................. **95**

11

**Exhibit L: Subpoena to Nitrini** ....................................................................... **110**

12

**Exhibit M: Unsigned Declaration of Withholding Witness** ............................. **122**

13

**Exhibit N: Violation of California's Stand Against NDAs Act** .......................... **134**

**Exhibit O: Harm to Rebecca Berry** ................................................................. **136**

14

**Exhibit P: Death Threat Hearing Transcript, Taunting Family and Potential Witness** ................................ **139**

15

16

17

18

19

20

21

22

23

24

25

Objections To Report and Recommendation Denying Preliminary Injunction

# EXHIBIT A: Department of Consumer Affairs Order dated 12/07/2011

(Page 8 of 170)

Dec 01 11 11:27a     GRAHAM E BERRY                          3107453771          p.8
NOV-28-2011  14:09     ATTY GENERAL OFFICE              2138975320       P.08

## BEFORE THE
## DEPARTMENT OF CONSUMER AFFAIRS
## FOR THE BUREAU OF SECURITY AND INVESTIGATIVE SERVICES
## DEPARTMENT OF CONSUMER
## FOR THE BUREAU OF SECURITY AND INVESTIGATIVE SERVICES
## STATE OF CALIFORNIA

In the Matter of the Accusation Against:          Case No. A1 2010 0805

**PAUL BARRESI DBA HOLLYWOOD**
**CONFIDENTIAL INVESTIGATIONS**
**11660 Church Street, #434**
Rancho Cucamonga, CA 91730
Private Investigator License No. PI 26529

                                    Respondent.

## DECISION AND ORDER

The attached Stipulated Settlement and Disciplinary Order is hereby adopted by the

Director of Consumer Affairs and the Bureau of Security and Investigative Services as the

Decision and Order in the above entitled matter.

This Decision shall become effective on ___January 7, 2012___

It is so ORDERED     DEC 0 7 2011

                    FOR THE DIRECTOR OF CONSUMER AFFAIRS
                    BUREAU OF SECURITY AND INVESTIGATIVE
                    SERVICES

TOTAL P.08

30                                          Exhibit A

(Page 2 of 170)

Dec 01 11 11:26a    GRAHAM E BERRY    310745377.    p.3
NOV-29-2011  14:08    ATTY GENERAL OFFICE    2138975320    P.23    3' 3'

1    KAMALA D. HARRIS
     Attorney General of California
1    KAMALA D. HARRIS
     Attorney General of California
2    MARC D. GREENBAUM
     Supervising Deputy Attorney General
3    SHAWN P. COOK
     Deputy Attorney General
4    State Bar No. 117851
     300 So. Spring Street, Suite 1702
5    Los Angeles, CA 90013
     Telephone: (213) 897-9954
6    Facsimile: (213) 897-2804
     *Attorneys for Complainant*

7

8                           BEFORE THE
                  DEPARTMENT OF CONSUMER AFFAIRS
9      FOR THE BUREAU OF SECURITY AND INVESTIGATIVE SERVICES
                       STATE OF CALIFORNIA
10

11                                          8050
     In the Matter of the Accusation Against:    Case No. A1 2010 0805
12
     PAUL BARRESI DBA HOLLYWOOD              STIPULATED SETTLEMENT AND
13   CONFIDENTIAL INVESTIGATIONS            DISCIPLINARY ORDER
     11660 Church Street, #434
14   Rancho Cucamonga, CA 91730
     Private Investigator License No. PI 26529
15
                                Respondent.
16

17       IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-

18   entitled proceedings that the following matters are true:

19                                PARTIES

20       1.    Connie Bouvia (Complainant) is the Deputy Chief of the Bureau of Security and

21   Investigative Services.  She brought this action solely in her official capacity and is represented in

22   this matter by Kamala D. Harris, Attorney General of the State of California, by Shawn P. Cook,

23   Deputy Attorney General.

24       2.    Respondent Paul Barresi dba Hollywood Confidential Investigations (Respondent) is

25   represented in this proceeding by attorney Graham Berry, Esq., Graham Berry, Esq., whose

26   address is 3384 McLaughlin Ave., Los Angeles, CA 900663.

27       3.    On or about September 2, 2009, the Bureau of Security and Investigative Services

28   issued Private Investigator License No. PI 26529 to Paul Barresi dba Hollywood Confidential

                                    1

                        STIPULATED SETTLEMENT (A1 2010 0805)

Exhibit A

(Page 4 of 170)

1  Investigations (Respondent).  The Private Investigator License was in full force and effect at all

2  times relevant to the charges brought in Accusation No. A1 2010 0805 and expired on September

3  30, 2013, unless renewed.

## JURISDICTION

4      4.    Accusation No. A1 2010 0805 was filed before the Director of Consumer Affairs

5  (Director), for the Bureau of Security and Investigative Services (Bureau), and is currently

6

7  pending against Respondent. The Accusation and all other statutorily required documents were

8  properly served on Respondent on November 16, 2011.  A copy of Accusation No. A1 2010 0805

9  is attached as exhibit A and incorporated herein by reference.

## ADVISEMENT AND WAIVERS

10

11     5.    Respondent has carefully read, fully discussed with counsel, and understands the

12  charges and allegations in Accusation No. A1 2010 0805.  Respondent has also carefully read,

13  fully discussed with counsel, and understands the effects of this Stipulated Settlement and

14  Disciplinary Order.

15     6.    Respondent is fully aware of his legal rights in this matter, including the right to a

16  hearing on the charges and allegations in the Accusation; the right to be represented by counsel at

17  his own expense; the right to confront and cross-examine the witnesses against him; the right to

18  present evidence and to testify on his own behalf; the right to the issuance of subpoenas to compel

19  the attendance of witnesses and the production of documents; the right to reconsideration and

20  court review of an adverse decision; and all other rights accorded by the California

21  Administrative Procedure Act and other applicable laws.

22     7.    Respondent voluntarily, knowingly, and intelligently waives and gives up each and

23  every right set forth above.

## CULPABILITY

24

25     8.    Respondent admits the truth of each and every charge and allegation in Accusation

26  No. A1 2010 0805.

27

28

2

STIPULATED SETTLEMENT (A1 2010 0805)

(Page 5 of 170)

Dec 01 11 11:26a     GRAHAM E BERRY                              3107453771        p.5
NOV-28-2011  14:00        ATTY GENERAL OFFICE              2138975320      P.05

9.   Respondent agrees that his Private Investigator License is subject to discipline and he

~~9.   Respondent agrees that his conditions of discipline as set forth in the Disciplinary Order~~

agrees to be bound by the Director's imposition of discipline as set forth in the Disciplinary Order

below.

### CONTINGENCY

10.   This stipulation shall be subject to approval by the Director of Consumer Affairs or

his designee.  Respondent understands and agrees that counsel for Complainant and the staff of

the Bureau of Security and Investigative Services may communicate directly with the Director

and staff of the Department of Consumer Affairs regarding this stipulation and settlement,

without notice to or participation by Respondent or his counsel.  By signing the stipulation,

Respondent understands and agrees that he may not withdraw his agreement or seek to rescind the

stipulation prior to the time the Director considers and acts upon it.  If the Director fails to adopt

this stipulation as the Decision and Order, the Stipulated Settlement and Disciplinary Order shall

be of no force or effect, except for this paragraph, it shall be inadmissible in any legal action

between the parties, and the Director shall not be disqualified from further action by having

considered this matter.

11.   The parties understand and agree that facsimile copies of this Stipulated Settlement

and Disciplinary Order, including facsimile signatures thereto, shall have the same force and

effect as the originals.

12.   This Stipulated Settlement and Disciplinary Order is intended by the parties to be an

integrated writing representing the complete, final, and exclusive embodiment of their agreement.

It supersedes any and all prior or contemporaneous agreements, understandings, discussions,

negotiations, and commitments (written or oral).  This Stipulated Settlement and Disciplinary

Order may not be altered, amended, modified, supplemented, or otherwise changed except by a

writing executed by an authorized representative of each of the parties.

13.   In consideration of the foregoing admissions and stipulations, the parties agree that

the Director may, without further notice or formal proceeding, issue and enter the following

Disciplinary Order:

///

3

STIPULATED SETTLEMENT (A1 2010 0805)

(Page 7 of 170)

Dec 01 11 11:27a    GRAHAM E BERRY                                3107453771          p.6
    12/05/09   12:08PM    HP LASERJET FAX                                      p.01
        NOV-28-2011  14:09    QTTY GENERAL OFFICE                   2138975328    P.06    T X

## DISCIPLINARY ORDER
## DISCIPLINARY ORDER

IT IS HEREBY ORDERED that Private Investigator License No. PI 26529 issued to Respondent Paul Barresi dba Hollywood Confidential Investigations (Respondent) is revoked.

### ACCEPTANCE

I have carefully read the above Stipulated Settlement and Disciplinary Order and have fully discussed it with my attorney, Graham Berry. I understand the stipulation and the effect it will have on my Private Investigator License. I enter into this Stipulated Settlement and Disciplinary Order voluntarily, knowingly, and intelligently, and agree to be bound by the Decision and Order of the Director of Consumer Affairs.

DATED: _Nov 29, 2011_        _____
                             PAUL BARRESI DBA HOLLYWOOD
                             CONFIDENTIAL INVESTIGATIONS
                             Respondent

I have read and fully discussed with Respondent Paul Barresi dba Hollywood Confidential Investigations the terms and conditions and other matters contained in the above Stipulated Settlement and Disciplinary Order. I approve its form and content.

DATED: _Nov. 30, 2011_        _____
                             Graham Berry
                             Attorney for Respondent

### ENDORSEMENT

The foregoing Stipulated Settlement and Disciplinary Order is hereby respectfully submitted for consideration by the Director of Consumer Affairs.

Dated:                                    Respectfully submitted.

_December 1, 2011_          KAMALA D. HARRIS
                            Attorney General of California
                            MARC D. GREENBAUM
                            Supervising Deputy Attorney General

                            _____
                            SHAWN F. COOK
                            Deputy Attorney General
                            Attorneys for Complainant

LA2011500874

                                                                        4

                                        STIPULATED SETTLEMENT (A1 2010 0805)

Exhibit A

1  KAMALA D. HARRIS
1  KAMALA D. HARRIS
   Attorney General of California
2  MARC D. GREENBAUM
   Supervising Deputy Attorney General
3  SHAWN P. COOK
   Deputy Attorney General
4  State Bar No. 117851
   300 So. Spring Street, Suite 1702
5  Los Angeles, CA 90013
   Telephone: (213) 897-9954
6  Facsimile: (213) 897-2804
   *Attorneys for Complainant*

7
                          BEFORE THE
8               DEPARTMENT OF CONSUMER AFFAIRS
         FOR THE BUREAU OF SECURITY AND INVESTIGATIVE SERVICES
9                      STATE OF CALIFORNIA

10

11  In the Matter of the Accusation Against:    Case No. A1 2010 8050

12  PAUL BARRESI DBA HOLLYWOOD
    CONFIDENTIAL INVESTIGATIONS
13  11660 Church Street, #434                   A C C U S A T I O N AND PETITION TO
    Rancho Cucamonga, CA 91730                  REVOKE PROBATION
14  Private Investigator License No. PI 26529

15                              Respondent.

16

17      Complainant alleges:

18                              PARTIES

19      1.    Connie Trujillo (Complainant) brings this Accusation solely in her official capacity as

20  the Deputy Chief of the Bureau of Security and Investigative Services, Department of Consumer

21  Affairs.

22      2.    On or about September 2, 2009, the Bureau of Security and Investigative Services

23  issued Private Investigator License Number PI 26529 to Paul Barresi dba Hollywood Confidential

24  Investigations (Respondent).  The Private Investigator License was immediately revoked, with

25  revocation stayed, and Respondent placed on three (3) years probation subject to certain terms

26  and conditions.  A true and correct copy of the terms and conditions of probation imposed on

27  Respondent's license are attached hereto as Exhibit A. The Private Investigator License was in

28

                                      1

                                         Accusation and Petition to Revoke Probation

1  full force and effect at all times relevant to the charges brought herein and will expire on

1  full force and effect at all times relevant to the charges brought herein and will expire on

2  September 30, 2012, unless renewed.

3  ## JURISDICTION

4  3.    This Accusation and Petition to Revoke Probation is brought before the Director of

5  Consumer Affairs (Director) for the Bureau of Security and Investigative Services, under the

6  authority of the following laws. All section references are to the Business and Professions Code

7  unless otherwise indicated.

8  4.    Section 22 of the Code states:

9  "(a)  'Board' as used in any provisions of this Code, refers to the board in which the

10  administration of the provision is vested, and unless otherwise expressly provided, shall include

11  'bureau,' 'commission,' 'committee,' 'department,' 'division,' 'examining committee,' 'program,' and

12  'agency.'

13  "(b)  Whenever the regulatory program of a board that is subject to review by the Joint

14  Committee on Boards, Commissions, and Consumer Protection, as provided for in Division 1.2

15  (commencing with Section 473), is taken over by the department, that program shall be

16  designated as a 'bureau.'"

17  5.    Section 118, subdivision (b), of the Code provides that the suspension/ expiration/

18  surrender/ cancellation of a license shall not deprive the Board/Registrar/Director of jurisdiction

19  to proceed with a disciplinary action during the period within which the license may be renewed,

20  restored, reissued or reinstated.

21  6.    Section 150 of the Code states: "The department is under the control of a civil

22  executive officer who is known as the Director of Consumer Affairs."

23  7.    Section 475 of the Code states:

24  "(a)  Notwithstanding any other provisions of this code, the provisions of this division shall

25  govern the denial of licenses on the grounds of:

26  "(1)  Knowingly making a false statement of material fact, or knowingly

27  omitting to state a material fact, in an application for a license.

28  "(2)  Conviction of a crime.

2

Accusation and Petition to Revoke Probation

"(3) Commission of any act involving dishonesty, fraud or deceit with the

"(3) Commission of any act involving dishonesty, fraud or deceit with the

intent to substantially benefit himself or another, or substantially injure another.

"(4) Commission of any act which, if done by a licentiate of the business or

profession in question, would be grounds for suspension or revocation of license.

"(b) Notwithstanding any other provisions of this code, the provisions of this division shall

govern the suspension and revocation of licenses on grounds specified in paragraphs (1) and (2)

of subdivision (a).

"(c) A license shall not be denied, suspended, or revoked on the grounds of a lack of good

moral character or any similar ground relating to an applicant's character, reputation, personality,

or habits."

8.     Section 477 of the Code states:

As used in this division:

"(a) 'Board' includes 'bureau,' 'commission,' 'committee,' 'department,' 'division,'

'examining committee,' 'program,' and 'agency.'

"(b) 'License' includes certificate, registration or other means to engage in a

business or profession regulated by this code."

9.     Section 480 of the Business and Professions Code provides, in pertinent part, that a

board may deny a license if the applicant has been convicted of a crime substantially related to

the qualifications, functions or duties of the business or profession for which application is made,

has committed any act involving dishonesty, fraud or deceit, has committed any act which if done

by a licentiate would be grounds for suspension or revocation of a license, or has knowingly made

a false statement of fact required to be revealed in the application.

10.     Section 490 of the Code provides, in pertinent part, that a board may suspend or

revoke a license on the ground that the licensee has been convicted of a crime substantially

related to the qualifications, functions, or duties of the business or profession for which the

license was issued..

11.     Section 493 of the Code states:

3

Accusation and Petition to Revoke Probation

"Notwithstanding any other provision of law, in a proceeding conducted by a board within

"Notwithstanding any other provision of law, in a proceeding conducted by a board within

the department pursuant to law to deny an application for a license or to suspend or revoke a

license or otherwise take disciplinary action against a person who holds a license, upon the

ground that the applicant or the licensee has been convicted of a crime substantially related to the

qualifications, functions, and duties of the licensee in question, the record of conviction of the

crime shall be conclusive evidence of the fact that the conviction occurred, but only of that fact,

and the board may inquire into the circumstances surrounding the commission of the crime in

order to fix the degree of discipline or to determine if the conviction is substantially related to the

qualifications, functions, and duties of the licensee in question.

"As used in this section, 'license' includes 'certificate,' 'permit,' 'authority,' and

'registration.'"

12.   Section 7512.1 of the Code states that as used in this chapter, "director" means the

Director of Consumer Affairs.

13.   Section 7520 of the Code states that no person shall engage in a business regulated by

this chapter; act or assume to act as, or represent himself or herself to be, a licensee unless he or

she is licensed under this chapter; and no person shall falsely represent that he or she is employed

by a licensee.

14.   Section 7531 of the Code provides that a licensee shall at all times be legally

responsible for the good conduct in the business of each of his or her employees or agents,

including his or her manager.

15.   Section 7538 of the Code states in pertinent part:

"After a hearing the director may deny a license unless the applicant makes a showing

satisfactory to the director that the applicant, if an individual, has not, or if the applicant is a

person other than an individual, that its manager and each of its officers have not:

"(a) Committed any act, which, if committed by a licensee, would be a ground for the

suspension or revocation of a license under this chapter.

"(b) Committed any act constituting dishonesty or fraud.

4

Accusation and Petition to Revoke Probation

"(c) Committed any act or crime constituting grounds for denial of licensure under Section

"(c) Committed any act or crime constituting grounds for denial of licensure under Section 480, including illegally using, carrying, or possessing a deadly weapon.

16.   Section 7539, subd. (b) of the Code states: "No licensee or officer, director, partner, manager, or employee of a licensee shall knowingly make any false report to his or her employer or client for whom information was being obtained."

17.   Section 7561.1 of the Code provides in pertinent part: "The director may deny, suspend, or revoke a license issued under this chapter if he or she determines that the licensee or his or her manager, if an individual, or if the licensee is a person other than an individual, that any of its officers, directors, partners, or its manager, has:

(l) Committed any act which is a ground for denial of an application for a license under this chapter."

18.   Section 7561.4 of the Code provides in pertinent part that the director may suspend or revoke a license issued under this chapter if he or she determines that the licensee or his or her manager, if an individual, or if the licensee is a person other than an individual, that any of its officers, directors, partners, or its manager, has committed any act in the course of the licensee's business constituting dishonesty or fraud.

"'Dishonesty or fraud' as used in this section, includes, in addition to other acts not specifically enumerated herein:

"(a) Knowingly making a false statement relating to evidence or information obtained in the course of employment, or knowingly publishing a slander or a libel in the course of business.

. . . .

"(c) Manufacture of evidence.

19.   Section 7562 of the Code provides that the record of conviction, or a certified copy thereof, shall be conclusive evidence of the conviction as that term is used in this article, or sections 7538 or 480. A plea or verdict of guilty or a conviction following a plea of nolo contendere is deemed  a conviction within the meaning of this article, or sections 7538 or 480.

20.   Section 125.3, subdivision (a), states, in pertinent part: "Except as otherwise provided by law, in any order issued in resolution of a disciplinary proceeding before any board

5

Accusation and Petition to Revoke Probation

Exhibit A

within the department . . . the board may request the administrative law judge to direct a licentiate

within the department . . . the board may request the administrative law judge to direct a licentiate

found to have committed a violation or violations of the licensing act to pay a sum not to exceed

the reasonable costs of the investigation and enforcement of the case."

### ACCUSATION

### FIRST CAUSE FOR DISCIPLINE

(Dishonesty or Fraud-False Statement)

21.    Respondent is subject to disciplinary action under section 7561.4, subd. (a), in that Respondent has knowingly made a false statement relating to evidence or information obtained in the course of employment, or knowingly published a slander or a libel in the course of business. The circumstances are as follows:

22.    In or about April and May, 2010, Respondent, identifying himself as a private investigator, contacted the human resources department at Pomona Valley Hospital Medical Center (PVH) and informed them that he was conducting an investigation against ███████████ ("██████"), who worked at PVH as a registered nurse in the Neo-natal ICU. Thereafter, PVH officials conducted a pharmaceutical inventory check for drugs and controlled substances accessible to ██████ and found no discrepancies and that Respondent's allegations were without merit.

23.    On or about May 11, 2010, Respondent wrote a letter addressed to Pomona Valley Hospital Medical Center (PVH) and the Hesperia, CA police department, with a letterhead stating "PAUL BARRESI STATE OF CALIFORNIA PRIVATE INVESTIGATOR, License No. P126529."   In the letter, Respondent made false statements concerning ████████ (██████), a registered nurse employed at PVH and with whom Respondent had a previous relationship.  Respondent published the following false statements about ██████

a.    ██████ met Respondent's process server at her door on May 11, 2010 holding a glass pipe (controlled substance apparatus) in her hand.

b.    ██████ yelled and screamed uncontrollably at the process server and appeared disoriented.

6

Accusation and Petition to Revoke Probation

24.  By letter dated June 25, 2010, Respondent wrote to the human resources department

24.  By letter dated June 25, 2010, Respondent wrote to the human resources department

at PVH and admitted that the allegations he had made in April and May, 2010 against ▓▓▓

"alleging drug abuse is absolutely false and without fact or basis."  Respondent further admitted

that he "lodged said claims out of retaliation because ▓▓▓ had terminated our relationship" and

stated that ▓▓▓ was "an extremely competent, highly respected, conscientious nurse, at the top

of her field, and not once did she ever demonstrate the slightest indication to the contrary."

25.  On or about May 26, 2010, Respondent  wrote a letter referenced "DRUG ABUSE

COMPLAINT: ▓▓▓▓▓▓▓▓, CA Registered Nurse" addressed to the California Board

of Nursing,  attention "NURSE COMPLAINT EXAMINERS", with a letterhead stating "PAUL

BARRESI CALIFORNIA STATE PRIVATE INVESTIGATOR, LIC. NUM.  P126529."   In the

letter, Respondent published the following false statements concerning Alvarez under penalty of

perjury:

a.      ▓▓▓ filed a petition for TRO against Respondent after Respondent told her that

he intended to report her for "drug abuse (Smoking methamphetamine and use of non-prescribed

prescription drugs.)"

b.      Respondent personally witnessed ▓▓▓ take his "own personal doctor prescribed

medication."

c.      Respondent witnessed ▓▓▓ take on "characteristics and symptoms associated with

methamphetamine abuse, including unexplained rise in her body temperature (low grade fevers),

tweaking, eye twitching, high blood pressure, liver pain, mood swings, weight gain, extreme

weight loss, insomnia, irritability and dilated pupils."

d.      Respondent stated that after he had been "dating" ▓▓▓ for two months, ▓▓▓

asked him to "run a criminal check on" ▓▓▓ male housemate, "confiding that [the

housemate] was not forthcoming with [▓▓▓] on the extent of his drug abuse".

e.      Respondent stated that ▓▓▓ "drug abuse is low intensity and she prefers to smoke

it, the potential harm and possible death she may cause in her profession should not go

uninvestigated."

7

Accusation and Petition to Revoke Probation

f.   Respondent stated that ████ on May 11, 2010, appeared at the door when

f.   Respondent stated that ████ on May 11, 2010, appeared at the door when

Respondent's process server attempted to serve her and that ████ was "disoriented, screaming

at him out of control, and holding a glass pipe (apparatus used for smoking crystal meth)."

26.   By letter dated July 2, 2010, Respondent wrote to the Department of Consumer

Affairs, Board of Registered Nursing ("Board"), and admitted that the allegations he had made in

his complaint that the filed with the Board against ████, alleging drug abuse "was without fact

or basis and is completely and utterly false." Respondent further admitted that he "lodged said

complaint" alleging drug use "from an evil and improper motive on my part, for no reason other

than to retaliate against her for having broken off a year long relationship I had with her. . . . The

truth is that I have never seen her take a controlled substance of any kind whatsoever, prescription

drugs or otherwise."

<div align="center">

SECOND CAUSE FOR DISCIPLINE

(Slander/or Libel in the Course of Business)

</div>

27.   Respondent is subject to disciplinary action under section 7561.4, subd. (a), in that

Respondent has knowingly published a slander or a libel in the course of business. The

circumstances are as alleged in the preceding paragraphs 22 through 26 and all subparts, which

are incorporated here by this reference.

<div align="center">

THIRD CAUSE FOR DISCIPLINE

(Manufacturing Evidence)

</div>

28.   Respondent is subject to disciplinary action under section 7561.4, subd. (c), in that

Respondent has manufactured evidence. The circumstances are as alleged in the preceding

paragraphs 22 through 26 and all subparts, which are incorporated here by this reference.

<div align="center">

FOURTH CAUSE FOR DISCIPLINE

(Making False Report)

</div>

29.   Respondent is subject to disciplinary action under section 7539 subd. (b), in that

Respondent made a false report.   The circumstances are as alleged in the preceding paragraphs

25, subpart (d) and 26.

///

<div align="center">

8

</div>

Accusation and Petition to Revoke Probation

(Page)

### FIFTH CAUSE FOR DISCIPLINE
FIFTH CAUSE FOR DISCIPLINE

(Acts that Would be Grounds for Denial)

30.    Respondent is subject to disciplinary action under section 7561, subd. (l) in conjunction with sections 7538, subdivisions (a) through (c), and 480. The circumstances are as alleged in the preceding paragraphs 22 through 26 and all subparts, which are incorporated here by this reference.

### PETITION TO REVOKE PROBATION

### FIRST CAUSE FOR REVOCATION

(Obey All Laws)

31.    Respondent's probation with the Bureau contained as Condition Six, the requirement that Respondent "[s]hall obey all federal, state and local laws and all rule and regulations governing the programs regulated by the Bureau."

32.    Respondent has violated the term and condition of his probation that he obey all laws. The circumstances are as alleged in the preceding paragraphs 22 through 26 and all subparts, which are incorporated here by this reference.

Accusation and Petition to Revoke Probation

Exhibit A

1

2

3

4

5

6

7

8

PRAYER

9   WHEREFORE, Complainant requests that a hearing be held on the matters herein alleged,

10   and that following the hearing, the Director of Consumer Affairs issue a decision:

11   1.   Revoking or suspending Private Investigator License Number PI 26529, issued to

12   Paul Barresi dba Hollywood Confidential Investigations;

13   2.   Ordering Paul Barresi to pay the Bureau of Security and Investigative Services the

14   reasonable costs of the investigation and enforcement of this case, pursuant to Business and

15   Professions Code section 125.3;

16   3.   Lifting the stay of revocation imposed under Paul Barresi's existing probation with

17   the Bureau and revoking Private Investigator License Number PI 26529, issued to Paul Barresi

18   dba Hollywood Confidential Investigations, and

19   4.   Taking such other and further action as deemed necessary and proper.

20

21   DATED: _July 7, 2011_          _Connie Trujillo_
                                     CONNIE TRUJILLO
22                                   Deputy Chief
                                     Bureau of Security and Investigative Services
23                                   Department of Consumer Affairs
                                     State of California
24                                   *Complainant*

25   LA2011500874
     accusation.rtf
26

27

28

10

Accusation and Petition to Revoke Probation

Exhibit A

# Exhibit B: Declaration of Ian Herndon

## DECLARATION OF IAN HERNDON

**STATE OF FLORIDA**

**COUNTY OF PINELLAS**

Ian Herndon, being duly sworn, deposes and says:

I am a Witness in the matters of Case 5:24-cv-01930-TJH-DTB (Taft v. Paul Barresi, Adam R. Waldman, and Does 1-10), currently pending in the U.S. District Court of the Central District of California.

I am above the age of 18 and reside in Florida.  At the time of these events, I resided in Florida

The facts stated in this affidavit are true and correct to the best of my knowledge and belief. I have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.

I am competent to testify as the facts stated herein in a court of law and will so testify if called upon.

1. I am a witness that has personal knowledge of Defendants Paul Barresi and Adam Waldman of their continuous harm, harassment, threats to kill, threats to assault, and maliciousness against Witnesses, Victims of Assaults, and Taft with intimidating and dangerous activities to interfere to obstruct reports to law enforcement and testimony for cases.

2. I first became aware of Paul Barresi through Richard Albertini. Albertini appeared to be in communication with Barresi at the time, and manipulated and provoked by him. I've witnessed Barresi threaten death, mortality, and danger to people.

3. I witnessed the coercion caused by Barresi against Angela and Plaintiff Taft when he obtained an audio recording of their conversation speaking of abuse and violence in 2022. Angela completely shifted after Barresi communicated with her after he became aware of her and I being in contact. To this day, and between 2022

to 2025, I observed that Angela and Taft are being coerced by Barresi. I witnessed the death threats of Barresi towards Angela and his intent to signal Taft to fear mortality and personal danger.

4. Richie and I met when he was having a dispute with Corey Feldman about Johnny Depp's Viper Room. Approximately 2019 to 2020, Richie and I went back and forth.

5. Richie Albertini introduced me to Angela, who is Jane Doe in Plaintiff Taft's lawsuit, and advised me that Angela was a victim of a famous actor who wasn't going to speak out about it, and Richie didn't want to talk with her any longer.

6. Richie gave me Angela's contact information and upon making contact with her first. Angela, though a victim of assault by Marton Csokas, was in contact with Richie and Richie was angry because of Johnny Depp. Back then he was affirmatively against Johnny Depp. I did not approve of the way he was treating her. Angela told me that Richie criticized her experience with Marton and other past abusive circumstances.

7. From that moment forward, Angela talked to me directly about having been abused by Marton Csokas. After getting to know each other over a period of months, they made plans to finally meet in person in Louisiana, during the 2015 filming season 2 of the Badlands.

8. On November 25, 2020, Angela and I spoke with each other directly by phone for hours multiple nights in a row. Angela told me she first communicated with Marton Csokas online, then eventually met him in New Orleans in 2015, and was drugged and kept for days to torture and sexually assault her. Angela advised that she had to be taken to the hospital, and also provided graphic photos to depict her injuries.

9. Angela sent me photos of injuries to depict how she was tortured by Martin, and I have knowledge of a letter that was threatening her.

Page 2

WITNESS DECLARATION OF IAN HERNDON

10. Paul Barresi silenced what Marton did to Angela for years by making her afraid of retaliation.

11. Angela told me over the phone that a man named Paul Barresi showed up at locations she was at and in one instance pointed a gun at her face.

12. Angela told me on multiple occasions there are about ten women who are also victims of Csokas, and how one was in the middle of a Court case in Italy with Marton at the time. Angela said the custody court case was after the young woman had been raped by Marton and had a child.

13. Angela stated to me she is afraid to pursue anything criminally against Marton related to raping or torturing her, over a period of multiple days, and is afraid to pursue anything against or about Paul Barresi.

14. On November 25, 2020 at 1:27pm, Angela forwarded a copy of a letter, an email from Eric Hessler (hessler.law@gmail.com, attorney at law from New Orleans, Louisiana to Richie Albertini. The original email date stamp was April 21st 2015 at 1:32pm with the email subject titled Marton Csokas. – In summary it states: The author of the letter has been contacted by Marton Csokas regarding a possible police investigation by the New Orleans Police Department regarding reports of false imprisonment and sexual torture. The author of this letter references Marton Csokas and Eric Hessler as if they are not the authors of this letter and instead a third individual is.

15. The letter further advises with "unyielding advice" for Angela to not move forward in any way regarding Marton Csokas and the New Orleans Police.

16. Furthermore, the letter also states that attorney Erirc J Hessler is aware of the criminal report of torture & assault, and if Angela moves forward with her police case actions, Eric Hessler will charge Angela.

17. In this same letter, Angela was also instructed that Eric Hessler would be checking Angela's phone on a regular basis to *illegally* identify her location and/or scare Angela into believing she could be located at any time.

Page 3

WITNESS DECLARATION OF IAN HERNDON

18. Additionally, the letter states if Marton Csokas name is released in the media, not only should Angela be afraid of the police, but she should be afraid of the author of this letter because as stated *"I myself will come and find you and the consequences of that will be dire"*

19. Angela advised me on numerous occasions that a Hollywood Fixer, believed to be Paul Barresi, was sent to intimidate and silence her, and at one point he showed up where she was in person and pointed a gun at her head.

20. After some time speaking with Angela, it became clear she was far too scared to expose anything about what happened to her in 2015 at the hands of Marton Csokas.

21. Not long after learning about this letter, Richie Albertini started repeatedly posting copies of her medical injury photos publicly on Twitter. This action by Richie Albertini immediately alarmed and worried Angela, because she stated to me she was deathly afraid of Paul Barresi thinking she is talking about what Marton Csokas did to her in 2015.

22. Richie Albertini provided my personal contact info as well as my wife's, directly to Paul Barresi.

23. Paul Barresi having my name and contact # was immediately concerning to me due to me already hearing directly from Angela what he has done to her.

24. Paul Barresi called my wife and said "Your husband needs to stop". I have knowledge that she told Barresi, 'I have no clue what you are talking about' and hung up.

25. While fact checking Richard Albertini on the things he stated previously about his past affiliation with Johnny Depp's club named 'The Viper Room' as well as various acquaintances Richie claimed to know, I contacted Olivia Barash on July 24, 2021 at 2:02PM and asked if she can confirm that Richie Albertini ever worked at The Viper Room.

Page 4

WITNESS DECLARATION OF IAN HERNDON

26. Olivia responded quickly, just a day later on July 25 at 1:20pm, and asked stated "Whats up? The timing of your inquiry, is odd. Are you making a Viper Room documentary, too? Lol Can you give me some more info"

27. In my next response to Olivia, I clarified that I am not making a documentary, and instead I was threatened by Richard Albertini that I would be highlighted in some documentary he is part of regarding the Viper Room.

28. Olivia never responded to me again after her first response, but later I received a copy of a text message from Olivia to Richie Albertini, advising him that Olivia was offered $20k by Barresi regarding her involvement in a documentary about the Viper Room.

29. These events surrounding Olivia and a documentary led me to believe there is clear coercion and attempts to silence individuals who worked at the Viper Room and/or around Johnny Depp.

30. After losing contact with Olivia via LinkedIn, Richard Albertini, still provoked by Defendant Paul Barresi and Defendant Adam Waldman, began targeting other female victims of assault.

31. Based on my time interacting with Richie Albertini since 2020, I believe he and Paul Barresi were collaborating. What I have seen regarding Paul Barresi and Richie Albertini, shows indications of individuals who are trying to silence victims of famous individuals.

32. Sometime between 2021 and 2023, Paul Barresi personally produced a copy of the letter with the header for Eric Hessler law, and that letter has Paul Barresi's name removed from it.

33. Paul claims the letter is fake, purely by producing a second version that is identical except for Paul's name being removed.

34. Paul admitted to not only being aware of the letter in 2020 after Angela had shared it with Richie and myself, but that he also possessed his very own copy of it (although conveniently with his name missing).

Page 5

WITNESS DECLARATION OF IAN HERNDON

35. Paul did not realize that despite refuting the authenticity of the letter as a whole, he accidentally validated the authenticity of her claims and the remarks of the letter from 2015 the moment he produced a copy himself. Paul's name not being included on the letter changes nothing about the facts contained within the letter, such as the repeated threatening remarks.

36. The email address Angela received the threatening letter from, Hessler.law@gmail.com needs data from it subpoenaed for any account activity the month prior, during, and after Angela received the email from that address: March 2015, April 2015, and May 2015.

37. I observed in 2022 when Paul Barresi became aware of Christina Taft's support for Amber Heard and Witnesses, including Richie Albertini, that he began targeting Taft.

38. I observed that Barresi was inciting Albertini to attack Taft, as I observed of their behavior prior. Christina stated to me she felt unable to help Angela due to the audio tape Barresi obtained of them speaking together and exploiting them.

39. I observed that Taft did not retract that Richie was a witness against Depp and that Angela was victimized by Csokas despite coercion and manipulation by Defendants Barresi and Waldman.

40. In the last 2 years I have known Christina Taft, she has been afraid for her life, and concerned Paul Barresi is going to find her or send someone to harm her. At one point she told me she had to move out of the state of California all the way to Hawaii just for some sense of safety from Paul Barresi.

41. Roberta Kaplan told me on the phone that when she joined the legal team, she removed Barresi off Amber's case.

42. From 2022 to this very day, I have observed Christina Taft be in constant fear of Paul Barresi, supported by ongoing contact by him using threatening and

Page 6

WITNESS DECLARATION OF IAN HERNDON

harassing language. I fully support Taft getting a restraining order and injunctions against Defendants and Barresi being restrained from contacting witnesses to harass them or invade their privacy.

43. I have observed Paul Barresi obtaining commercial gain through reputational enhancement. I saw his book titled, "Johnny Depp's Accidental Fixer" and many different articles with him that he can solve any problem without any boundaries up to and including murder. High profile people are seeing his association with Johnny Depp, and in turn it portrays that he is valuable to them as a 'fixer.'

44. Based on my personal witness interactions with Paul Barresi and witnesses manipulated by Barresi, including Richie Albertini, I am afraid of them and others should be too. My exposure to Paul and potential witnesses he manipulates has shown me they are exploitative of other individuals living through complex and difficult criminal situations.

I attest that lines 207, and 267, of the lawsuit of Plaintiff Taft are true and correct; and all lines in the footnotes of the lawsuit referencing myself are true and correct.

I have additional knowledge and information I can declare and attest to, inclusive of defendants ongoing activities.

I, Ian Herndon, as a declaring witness to testify if so called upon, do hereby declare under penalty of perjury that the information provided herein is true and accurate to the best of my knowledge. This declaration has been verified and is made in good faith.

Page 7

WITNESS DECLARATION OF IAN HERNDON

1

2

3  DATED this <u>10th</u> day of <u>January</u>, 2025.

4

5  Signed: _____

6  Name:  Ian Travis Herndon

7  State of Texas
   County of Brazoria

8

9  **SUBSCRIBED and SWORN to before me**

   **this** <u>10th</u> **of** <u>January</u>, **2025.** By Ian Travis Herndon.

10  _Linda F. Peeples_, Online Notary Public

11

12  **NOTARY PUBLIC in and for said State,**

13  **in the United States of America**

14  **OFFICIAL SEAL**

15
   ┌─────────────────────────────┐
   │  LINDA F. PEEPLES           │   This notarial act was an online notarization via
16 │  Notary ID #132579084       │   two-way webcam and audiovisual technology.
   │  My Commission Expires      │
   │  July 21, 2028              │
17 └─────────────────────────────┘

18  Produced <u>Florida Driver License</u> as identification along with multi-factor KBA authentication.

19

20

21

22

23

24

25

26

27

28

<div align="center">Page 8

WITNESS DECLARATION OF IAN HERNDON</div>

# Exhibit C: Declaration of Michael Kountz

**DECLARATION OF MICHAEL KOUNTZ**

**STATE OF NEW MEXICO**        )
                              ) **SS:**
**COUNTY OF BERNALILLO**    )

Michael Kountz, being duly sworn, deposes and says:

I am a Witness in the matters of Case 5:24-cv-01930-TJH-DTB (Taft v. Paul Barresi, Adam R. Waldman, and Does 1-10), currently pending in the U.S. District Court of the Central District of California.

I am above the age of 18 and reside in New Mexico. At the time of these events, I resided in New Mexico.

The facts stated in this affidavit are true and correct to the best of my knowledge and belief. I have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.

**Events**

1. I am a licensed private investigator in New Mexico. Plaintiff Taft requested help from Superior Investigations on May 1, 2023 to locate and interview James Conner regarding an audio recording contained in an edited video by Paul Barresi which claimed to portray a phone call between Paul Barresi and James Conner. Taft understood that we adhere to legal practices, that we have witnesses feel safe to speak, and she was in fear from the coercion by Defendants. Plaintiff Taft was exploited by this tape for some time. I have knowledge there were fearful voicemails left to Superior Investigations and Auriella, while she was in Colorado while visiting witness Joe Triscari.

2. It is my belief that the audio by Paul Barresi was exploited on purpose to be used to facilitate tactics similar to blackmail, and use of the audio, inclusive of either with influence on the witness and/or edits, was essential for him to do this.

3. I located and interviewed James Conner in June of 2023. James Conner advised me he was a licensed private investigator. I observed that Conner appeared to be disabled by his own admission.

PAGE **1** OF **4**

4. James Conner advised that he was not aware of the audio recording contained in edited videos by defendant Paul Barresi, which contained allegedly James Conner speaking about Plaintiff Christina Taft. James Conner advised that he did not know he was being recorded by Defendant Barresi during a phone call to him by Barresi.

5. James Conner advised that he did not give permission to be recorded by Barresi.

6. James Conner advised me that the audio was taken out of context. He further advised me that the audio did not reflect the actual nature of the conversation in which Conner had with Defendant Barresi.

7. James Conner advised me that he did not consent to the use of his voice in that manner and desired help in having the audio and the videos removed.

8. James Conner further advised me that the things he was portrayed as saying in the call regarding Plaintiff Taft were hearsay.

9. After leaving the interview with James Conner, I received a phone call from him advising me that Paul Barresi was dangerous, and that he was in fear for his life due to his involvement.

10. James Conner then advised that he was flying to his property in Alaska out of fear of reprisal from Barresi, and that I should be careful about my involvement with Defendant Barresi, as I could face reprisal as well.

11. I reviewed the audio tape contained in the video by Barresi. Contained in the audio tape done by Paul Barresi of purportedly James Conner, are alterations that he was an FBI agent and that her mother Victoria Taft had witnessed a mob murder by the Gottis. It distressed Taft about her mother Victoria Taft and her death. James Conner advised me he was never an FBI agent. The tape showed images of a man dead allegedly from the mafia, members of the mafia, and a gun. In the beginning of the tape, Barresi discussed a photo of Amber Heard with Plaintiff Taft to James Conner, that they were arm in arm, yet at the same time indicating danger to life through comparing to an assailant. I have information that Plaintiff is still fearful to this day that this audio tape is either to make someone shoot her or to shoot Amber. Or that a death could occur. I have information that Defendant Barresi acted aggressively to terrify Taft and others contained in the content of the audio tape.

12. I was informed by Taft that she had an "Executive Protector PI" Juan Brooks for multiple months in 2023 with continuing fear and activities by Defendants.

PAGE **2** OF **4**

13. Taft stated her mother had connections to Hollywood and although she'd been in social circles, never had any relation to these groups. Taft feared this was an underlying threat to her constantly, that she should be afraid of a murder of her or other people. James did not mention Gotti to me. Taft showed a photo that Barresi released referring to her and other witnesses of himself with Victoria Gotti where he wrote "Gambino family gathering" and Johnny Depp within the context. While I was on a call with Auriella, Auriella asked Taft if this had to do with Depp, and she was hesitant to say a case connection.

14. I have personal knowledge that Aurelia Barajas and I had a telephone interview with Jesse Adams at the Department of Consumer Affairs against Barresi's coercion. Mr. Adams accepted our report.

15. On September 05th, 2023, I received an email from Plaintiff Taft containing a screenshot of a text message chain from the phone number (908) 656-5712, which she advised was Defendant Paul Barresi's phone number. I observed the following message, portrayed in the screenshot to have been sent from the above number to Plaintiff Taft on Nov 7, 2022: "Stacy is your sister" and sexual expletives. Taft advised that the text referred to Stacy Hagman in Texas and requested that I interview her. She had compliments for Stacy and was fearful that Barresi could access her. I was able to locate a phone number for Stacy, but have not been able to reach her through it.

16. On October 19th, 2023, I spoke with a sister of James Conner, who previously owned Argus Private Investigations and Security Agency in Texas. She did not want interference with her brother, and approved that Barresi should not be licensed and that he was under investigation. In October 2023, I supported that Taft should have a restraining order against Barresi and I still support that she should have a restraining order. I have knowledge that Taft lives in Hawaii for her safety.

17. Plaintiff Taft advised in emails to me that Defendant Barresi continued to harass her during 2024, sending an email stating "Your Brother is a Monster," referring to probably Sean Conner, who may be Taft's half brother. I have knowledge that this email contained audio tapes that Barresi has, including one with Defendant Adam Waldman. I had previously tried reaching out to Sean Conner but was unable to make contact.

PAGE **3** OF **4**

18.  Plaintiff Taft advised that she sent this email of Barresi to Jesse Adams at the Department of Consumer Affairs in California, but received no response.

I attest that lines 270, 271, 272, 275, 276, 288, of the lawsuit of Plaintiff Taft are true and correct.

I have additional knowledge and information I can declare and attest to, inclusive of defendants ongoing activities.  I assert that I can provide said evidence to the facts stated above.

I, Michael Kountz, as a declaring witness to testify if so called upon, do hereby declare under penalty of perjury that the information provided herein is true and accurate to the best of my knowledge. This declaration has been verified and is made in good faith.

DATED this _4th_ day of _November_, 2024.

Signed: _____
Name: Michael Kountz

SUBSCRIBED and SWORN to before me
this ___4TH Day___ of ___November___ , 2024.

NOTARY PUBLIC in and for said State,
in the United States of America

OFFICIAL SEAL

DUSTIN MILLS
Notary Public
State of New Mexico
Comm. # 1128727
My Comm. Exp. May 26, 2028

PAGE **4** OF **4**

Exhibit C

# Exhibit D: Exhibit of Molly Beaton

# DECLARATION OF MOLLY BEATON

**STATE OF FLORIDA**

**COUNTY OF ORANGE**

Molly Moreen Skye Beaton, being duly sworn, deposes and says:

I am a Witness in the matters of Case 5:24-cv-01930-TJH-DTB (Taft v. Paul Barresi, Adam R. Waldman, and Does 1-10), currently pending in the U.S. District Court of the Central District of California.

I am above the age of 18 and reside in Florida. At the time of these events, I resided in Florida.

The facts stated in this affidavit are true and correct to the best of my knowledge and belief. I have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.

I am competent to testify as the facts stated herein in a court of law and will so testify if called upon.

1. Knowing I could be a witness, Defendant Paul Barresi has continued to contact me to this day, and I want his brutal, continual threats and harassment to stop. I am afraid of him and I haven't told directly that I am testifying for Plaintiff. I do not want Barresi who acts like a hitman going to my house for being a witness.

2. Since first interacting with witnesses and then Barresi from 2021, 2022 to December 2024, I personally have reported that he is a 'hitman' as I provided that to Florida State Police (Case 48-2021-NM-002537). Two witnesses corroborated Barresi's imminent dangerousness to threaten and kill.

3. Barresi has tried to make me provide information about Plaintiff Christina Taft and described Angela, who is Jane Doe in Plaintiff's lawsuit, a "non-entity," which I find disturbing. She is absolutely an 'entity' that is important. I find Barresi's description disturbing because I have observed Barresi's credible threats and behaviors leading me to believe he is an erratic criminal for hire and dangerous.

4. As recent as December 28, Defendant Barresi has contacted me which I see as harassing, dangerous, invasion of privacy, threatening, and malicious. His emails are eerily intimidating, manipulative, and controlling. He was trying to force me to say or do things I do not agree with. I'm an innocent victim that was brought in related to victims of sexual assault. Barresi is a criminal stalker.

5. Plaintiff Taft first contacted me in 2022, and I witnessed escalations of intimidation towards her by Defendants Barresi and Waldman. I witnessed escalations of vandalism, TROs filed, and that "witnesses are still being harassed" discussed between Barresi and Waldman as they wanted to "END" Amber Heard and as a result, endanger anyone nonsensibly who did not agree with him.

6. I continued to see Defendant Barresi harassing and stalking Plaintiff Taft for 2 years. As recent as January 5th, 2024, I saw that Barresi was stalking Taft's location, residency, about her mother's death, all in his alarming efforts as a criminal fixer, and to eliminate witnesses that may have turned to assist Heard.

7. Barresi is orchestrating people to attack Taft repeatedly, as a paid fixer and obsession with her, to control, and to make people perceive her the way he wants. Barresi uses her mother to try to make her die, which is what a fixer does.

8. I saw disturbing activities after Barresi first contacted me, uninvited, through a social media account in 2022. He later called me September 28, 2022 and I was not comfortable talking with him. Barresi keeps focusing irrationally on me, witnesses, Taft, and a letter he is obsessed with that witness Mario Nitrini sent to me.

9. Angela is in an audio recording with Taft. I've seen Paul Barresi maliciously exploit their private telephone call to intimidate and coerce them for years now.

<div align="center">Page 2 of  7</div>

<div align="center">WITNESS DECLARATION OF MOLLY BEATON</div>

10. Angela personally communicated to me that a Hollywood Fixer, believed at the time to be Paul Barresi, put a gun to her head on a hiking trial in Lake Mary, Florida, to silence her from ever successfully reporting or talking about the sexual assault of her by actor Marton Csokas. We bonded by being victims of assault and in the industry.

11. Angela first reached out to me on July 8th, 2021. She wanted me to email about her to a celebrity, Tygh Runyan, from a television show. I barely knew her, the email was embellished to promote her, I didn't like it, and I didn't send it. I was making a show for broadway. She wanted me to get in touch with Johnny Depp's agent about a song she wrote about him and I think Depp is an abuser.

12. A week later, I helped Angela, Jane Doe, with her music video and stayed with her in Tennessee at her house. Angela paid for my flight ticket and not for assisting her work. I saw that she had large scars on her legs and body that were from her surviving days long torturous attacks from Actor Marton Csokas.

13. We disagreed about compensation and argued, however, still communicated on well-being, safety, and music production. We were concerned about Barresi as a hitman and Richie who changed sides to harass us. Originally Richie convinced me that he wanted to help us, alerting that Barresi was a hitman and a Hollywood Fixer, and then he started to torment escalating to needing police intervention. 2021, I asked Mario Nitrini, about Barresi and Richie "he confessed to murder"

14. Angela was afraid for her life from "fixers" acting to benefit Actor Csokas when her name is used. I sent to the police in their investigation a text message from Angela on September 14, 2021 stating, "My police officers actually already warned him. He putting my life in danger every time he says my name." Angela asked me, "Have you tried the fbi?"

15. Since April of 2022 and since Taft showed Albertini that Barresi was oppressing him with Waldman to benefit Depp with documentation, he has stopped contacting me for two years. Albertini knew I was supportive of Amber when he

was contacting me before and when Barresi was contacting him. I do not want anymore instigated harassment by Barresi and I do not want to be contacted ever again by either of them or threatened. It is a nightmare.

16. In May 2022, Angel for Artists was harassing people supporting me, talking about "an actor and his goons" harming her, making up stories about the letter, how documents were obtained, photos, and making up stories about me. I corrected the stories in text messages to Angela and Angela replied strangely.

17. Defendant Barresi initially contacted me in 2022 in his interests in fighting Richie Albertini, who I know has information against Johnny Depp, although I did not know about the assaults in the Viper Room done by Depp. In the same documentation I sent the Florida police in 2021, Albertini was referencing Amber Heard, who is an assault victim like I am an assault victim.

18. I've seen messages of witness Ian Herndon messaging in 2021 to Roberta Kaplan, who was Amber's attorney, about problems of harming rape victims and monitoring rape victims, with "alleged ties to Johnny Depp, Anthony Pellicano, and Paul Barresi" in the message. Ian was trying to help me. Richie tagged @adam_waldman and @Barresi_paul in many postings attacking me and Amber, after showing me the text from Barresi to Richie of "Hey, that tranny had it coming. If it wasn't me to have done her in, it would've been somebody else."

19. Instead of productive activities by Richie, who kept being instigated by Barresi, he decided to be a witness for my abuser Dargan Watts for a film/modeling related job, who I have a civil court case with after he provided false pretense that I would be his employee, and assaulted me in his home. I'm here to help Taft not Richie.

20. I've witnessed from this nightmare related to cases that Defendant Barresi manipulates people to conspire with him to attack anyone who complains about the powerful, while those who don't agree with him are then ominously harmed.

Page 4 of  7

WITNESS DECLARATION OF MOLLY BEATON

21. I am requesting that this court issues injunctions and restraining orders against Paul Barresi, to protect witnesses like me and Taft from his intimidation, stalking, and relentless pursuit to crush witnesses, even if they die as a result of his pursuit. I and others will have imminent and continuing harm, as well as severe emotional distress from Defendant Barresi's continuing harassment, invasions, and threats.

22. In my personal observations, Paul Barresi is erratic, psychopathic, and a danger to anyone around him. I'm afraid of what he'll do next.

23. For reports to the Florida police I sent: "hit man Paul Baressi attacking survivors of elite sex crimes" on September 14, 2021 at 3:27:33 PM EDT To: cestep@maitlandpd.org (Case number: 48-2021-NM-002537) and again "hit man Paul Barresi and survivor Angela" September 14, 2021 at 3:28:53 PM EDT To: cestep@maitlandpd.org as well as images of postings by Mario Nitrini "People connected to Johnny Depp" a sexual attack allegation was made re: actor Marton Csokas and "Porn actor Paul Barresi sent me several 'messages' (Despicable)" Another image related to Angela showed representing brutal injuries to her.

24. Barresi disturbs me in his activities as a criminal for hire fixer. On October 22, 2024 at 5:26:43 PM EDT Barresi emailed me, "The alleged victim or aka Jane Doe is really a non entity. Evidence shows Taft and Albertini partnered in a scheme to accuse me of heinous felonious acts including death threats." Barresi emailed me Oct 21, 2024 during his stalking activities and obsessions with Richie and Taft.

25. Paul Barresi emailed me unwantingly at Sat, Dec 28, 2024 at 12:51 PM claiming Christina Taft "She invokes your name in her lawsuit. [Attached]" where Barresi highlighted multiple lines on Obstruction of Justice and Witness, Victim, and Object Tampering, coercion, threatening to kill, and "fixing" for Depp.

Page 5 of 7

WITNESS DECLARATION OF MOLLY BEATON

Defendant Barresi thinks I am a witness that could testify for Taft. I find Barresi is vengeful, manipulative, and controlling and any contact by him is very alarming.

26. Highlighted by Barresi while he's trying to control and manipulate me to say things I don't agree with in his pursuit: "Plaintiff aims to prevent coercion and protect individuals from being subjected to such unlawful and oppressive conduct in California, ensuring alignment with fundamental principles of justice and constitutional rights. In addition, Plaintiff addresses elements related to Obstruction of Justice as outlined in 18 U.S.C. § 1512(b)(1) and (2), which prohibit witness tampering through intimidation, threats, and corrupt persuasion. These provisions are designed to protect the integrity of the justice system by preventing any attempts to unduly influence witnesses or hinder their ability to testify in legal proceedings… Defendants conspired, co-conspired, and continue to conspire and co-conspire as of today's date, by threatening to kill, continuously mentioning harm towards, civilly harass, invade privacy of, and intentionally and negligently inflicting emotional distress to Plaintiff Ms. Taft, as well as to multiple individuals... Defendants, in their "fixing" activities to benefit Mr. Depp, engaged in conduct to tamper with physical evidence relevant to investigations and potential investigations by the Police, Federal Authorities, and the FBI."

27. I do not want anymore chaos, harassment, assaults, manipulation, or intimidation in my life, initiated by Paul Barresi in his evil schemes.

28. I have faith that the court and honorable judge can consider restraining Defendant Barresi and issuing a writ of authority to protect witnesses.

29. A true and correct copy of Defendant Barresi's harassing email to me on December 28th, 2024 is attached to my Declaration as Exhibit 1.

30. A true and correct copy of Angela's text to me on September 14, 2021 is attached to my Declaration as Exhibit 2.

Page 6 of  7

WITNESS DECLARATION OF MOLLY BEATON

31. A true and correct copy of Defendant Barresi's intimidating email to me on October 22, 2024 is attached to my Declaration as Exhibit 3.

32. A true and correct copy of Defendant Barresi's message to me to get on a phone call with him on September 28, 2022 is attached to my Declaration as Exhibit 4.

I have additional knowledge and information I can declare and attest to, inclusive of defendants ongoing activities.

I, Molly Moreen Skye Beaton, as a declaring witness to testify if so called upon, do hereby declare under penalty of perjury that the information provided herein is true and accurate to the best of my knowledge. This declaration has been verified and is made in good faith.

DATED this __13th__ day of January, 2025.

Signed: _____  *Molly-Moreen Beaton*

Name:    Molly - Moreen Beaton

State of Florida
County of Miami-Dade
Sworn to affirmed and subscribed before me on this 13th day of January 2025
by Molly-Moreen Beaton who appeared by means of online notarization and
produced a Drivers License as identification.

*Andrew Nadal* _____    Andrew Nadal

NOTARY PUBLIC in and for said State,

in the United States of America    This notarial act was an online notarization.

OFFICIAL SEAL

ANDREW NADAL
Notary Public - State of Florida
Commission # HH 131969
My Comm. Expires May 21, 2025

Page 7 of 7

WITNESS DECLARATION OF MOLLY BEATON

# Exhibit E: Declaration of Erik Eichler

## STATE OF CONNECTICUT

| | | |
|---|---|---|
| 5:24-CV-01930-TJH-DTB | \| | UNITED STATES |
| TAFT, CHRISTINA | \| | DISTRICT COURT OF |
| V. | \| | CENTRAL CALIFORNIA |
| BARRESI, PAUL, | \| | EASTERN DIVISION |
| WALDMAN, ADAM R. | | November 5, 2024 |

The undersigned, being duly sworn, deposes and states:

1.    My name is Erik R. Eichler, and I am over eighteen years of age.

2.    I believe in the obligation of oath and am competent to testify to the matter stated herein.

3.    I am a Private Investigator employed by Eichler Investigative Services, LLC., in South Windsor, CT, according to the Connecticut Department of Public Safety License # A-2834.

4.    On October 29, 2024, at approximately 2:00 p.m., I traveled to the residence of an individual known as Rebecca M. Berry, located at ███████████████ ██████.

5.    On that date, I spoke with Rebecca M. Berry and her mother, Joan Berry, in the driveway at that location.

6.    I provided Rebecca M. Berry with a copy of the United States District Court complaint, *Christina Taft v. Paul Barresi and Adam R. Walkman, 5:24-CV-01930-TJH-DTB*.

7.    I provided Rebecca M. Berry with a letter from Christina Taft requesting a Witness Declaration for the above-said case.

8.    Ms. Joan Berry asked Rebecca M. Berry, "What is this about?"

Exhibit E

9.     At that time, I witnessed Rebecca Berry respond, "Remember that guy [Paul Barresi] who confessed to me about killing people?"

10.    Rebecca M. Berry said she would contact Christina Taft or this investigator later and terminated the interview.

7.     That I have read the above affidavit and understand it completely.


_____

Erik Eichler
Private Investigator
Eichler Investigative Services, LLC.



Subscribed and sworn to before me on this ___10___ day of ___NOVEMBER___, 2024.


_____

Notary Public
My Commission Expires: 4/30/29


ALMERY G LOPEZ
NOTARY PUBLIC
CONNECTICUT
MY COMMISSION EXPIRES 04-30-2029

Exhibit E

# Exhibit F: Nitrini Emails

 **Christina Taft <taftchristina.ceo@gmail.com>**

---

## Motion - Explain "Mortal Danger Threat"

**Mario George Nitrini** <nitrinimario3@gmail.com>                    Mon, Dec 9, 2024 at 5:22 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

It's in this post of mine


https://x.com/nitrini1950/status/1864465838755205489
W
where I screenshot Paul Barresi's post about my son.
My son got involved with the wrong crowd. A gang murder took place and my son testified for the prosecution.
Because Paul Barresi posted his post pertaining to my son and me, some very bad people have been looking for me.
I'm very seriously contemplating filing a criminal complaint on Paul Barresi for attempted murder.

As far as Anthony Fox's disappearance goes, I have my own evidence on whom I believe killed Anthony Fox on Johnny Depp's request. It's hearsay, but these people who I talked to are "in the know."

Mario George Nitrini 111
------
The OJ Simpson Case
[Quoted text hidden]

 **Gmail**

**Christina Taft <taftchristina.ceo@gmail.com>**

## Motion - Explain "Mortal Danger Threat"

**Mario George Nitrini** <nitrinimario3@gmail.com>          Mon, Dec 9, 2024 at 5:29 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

You're welcome Christina.
I'll keep you posted regarding how I'm going to go about filing a criminal complaint on Paul Barresi.

Mario George Nitrini 111
------
The OJ Simpson Case
[Quoted text hidden]

 Gmail

Christina Taft <taftchristina.ceo@gmail.com>

## Fwd: Anthony Fox Missing Person Investigation VPD 01-18806

**Mario George Nitrini 111** <marionit111@gmail.com>                    Sat, Jan 4, 2025 at 4:42 PM
To: taftchristina.ceo@gmail.com

Christina.

This is the email that Paul Barresi sent me pertaining to his emails to the Ventura County Sheriff's Department, and Maud Fox's will pertaining to the subpoena I received regarding your federal lawsuit case against Paul Barresi & Adam Waldman.

Barresi's last sentence is very telling trying to coerce the Ventura County detective's that Johnny Depp had nothing to do with the disappearance of Anthony Fox


"Charles agreed that the possibility of Johnny Depp having anything whatsoever to do with his brother's disappearance is next to zero"


Mario George Nitrini 111
------
The OJ Simpson Case

---------- Forwarded message ----------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: Fwd: Anthony Fox Missing Person Investigation VPD 01-18806
To: "marionit111@gmail.com" <marionit111@gmail.com>


CONFIDENTIAL

Mario,  Here is investigative report I sent detectives.  Listen to my interview with Anthony Fox's brother, Charles and read mother's Will. KEEP FILE for story.

CONFIDENTIAL

-----Original Message-----
From: paulbarresi@aol.com
To: pfurlong@cityofventura.ca.gov <pfurlong@cityofventura.ca.gov>
Cc: amorales@cityofventura.ca.gov <amorales@cityofventura.ca.gov>
Sent: Thu, Dec 9, 2021 4:56 pm
Subject: Anthony Fox Missing Person Investigation VPD 01-18806

Dear Det. Furlong,

I spoke with lead Detective Morales earlier this week. He said he was immersed in a priority kidnap investigation and that he will contact me to get brought up to

speed on my updated findings re, Anthony Fox's disappearance.

Meanwhile, I now provide you with Anthony Fox's mother Maud Fox's **Will** along with [30 minute] audiotaped interview I conducted with his Anthony's eldest brother

**Charles Fox** this a.m.

Charles stated his mother **Maud Fox**, told him she had received a letter from Anthony just before Christmas 2001.

As you are well aware, Anthony disappeared just before Christmas 2001 on the 19th.  Therefore, he wrote the letter which his mother refused to disclose likely days

prior to his disappearance.  What makes this even more bizarre is that Charles asked his mother what Anthony said in the letter but she stubbornly refused to tell

him. And when Charles pressed her to tell her what the letter said, she told him she destroyed it.

Following Maud's death, Charles told me that he searched everywhere for the mysterious letter but it was nowhere to be found.

**Maud Fox had a secret she was keeping for her Anthony so worth protecting, she took it to her grave.**

As evident in a previous report I sent you, however, this was not the first time Maud covered for Anthony. When he filed for bankruptcy, she helped him fabricate a fraudulent laundry list people and businesses to whom he alleged he owed money and even went so far as to include her own name to the bogus list.

Charles was very surprised to hear that Johnny Depp turned over his interests in the Viperoom to Anthony's daughter. Despite it being widely reported, Charles said he was not aware.

What surprised him even more was to learn that his mother added Anthony's daughter to her Will because his son didn't think too kindly of Constance.

I suspect Anthony's letter to his mom included a plea for her to care for his daughter because his mother's [revised Will] makes generous provisions for her including

10,000 pounds in addition to Anthony's share of the estate, as stipulated in Will,  after he is deemed dead in 2006.  It appears this date 2006  was just pulled out of the hat which leads to only more suspicion. it is likely Maud wanted to honor her son's wishes that she provide for his daughter.

**Irrespective of what Anthony's letter said, writing the letter only days before his disappearance is suspect.**

**Anthony's mom's refusal to say what was in the letter is further suspect.**

**To my mind, Anthony vanishing into thin air was not something he didn't see coming.**

Charles believes Anthony's daughter Constance knows more than what she has disclosed.

I told Charles that Johnny Depp is a very generous good hearted man and that over the years he has helped many people, paying their rent, bills, medical expenses, etc.

Charles confided that there is a stronger likelihood that Anthony is either still alive and just  wanted to create the impression he disappeared or he committed
suicide."

Charles agreed that the possibility of Johnny Depp having anything whatsoever to do with his brother's disappearance is next to zero.


End Report

Paul Barresi
cell no. 908-656-5712


**FYI**
**Charles Fox**, Tel no. 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-312-524 age 75, resides with wife Morna at 8A Catharine Place, Bath, Avon, BA1 2PR-  England
https://en.wikipedia.org/wiki/Bath,_Somerset

-----Original Message-----
From: Furlong, Patrick <pfurlong@cityofventura.ca.gov>
To: paulbarresi@aol.com <paulbarresi@aol.com>
Sent: Wed, Jul 31, 2019 12:40 pm
Subject: Ref Anthony Fox Missing Person Investigation VPD 01-18806

Per our phone conversation, I am reaching out to you to inquire about any information regarding the Missing Person investigation for Anthony Fox (VPD 01-18806).

Thanks again,

Patrick Furlong

Criminal Investigative Technician
Sex Offender Registration / Missing Persons
Ventura Police Department
1425 Dowell Dr., Ventura, CA 93003
(805) 339-4473 Office

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**3 attachments**


**Johnny Depp - Charles Fox call_09-36-18_OUT__16699291319017.amr**
3001K


**Maud Fox Will 1.pdf**
528K


**Maud Fox Will 2.pdf**
30K

Exhibit F

# Exhibit G: No record of Fox's Legal Team

 The State Bar *of California*

**State Bar number: 151058**

Information about individual licensees is only provided for those who are active, inactive, disbarred, resigned, or not entitled. Limited information is provided for judges and deceased licensees. See the license status definitions for more information.

Copyright © 2025 The State Bar of California

  

Exhibit G

# Exhibit H: Nitrini Non-Entity Threat



**The OJ Simpson Case**

Yesterday, I received a request to fill-out a ...

**Hannu Huttunen** Follow
@hannuhu

Your name on Taft's delusional lawsuit. WOW, you've really made it big time! Her lawsuit is as dead as OJ, whose name you're riding on. It's easy to ride a dead horse, isn't it?

8:21 PM · Dec 18, 2024 · **39** Views

**Paul Barresi** ✔ @PaulBarresi1 · 22h

That ugly bastard is a non entity. He has zero to do with the preceding. He is a homeless, mentally ill convicted felon-- The quintessential loser in life. He sired a loser son who became accomplice in covering up a murder.  Anybody with a face like this has got to be a loser.



🔒 x.com

79                                                                     Exhibit H

# Exhibit I: Emails to Taft

Exhibit I

 **Christina Taft <taftchristina.ceo@gmail.com>**

---

# (no subject)

---

**paulbarresi@aol.com** <paulbarresi@aol.com>                Sat, Nov 19, 2022 at 5:27 PM

Reply-To: paulbarresi@aol.com
To: "taftchristina.ceo@gmail.com" <taftchristina.ceo@gmail.com>

What you told the press and why the coroner report says conflict bitch. Did you leave you mom to die?

---

 **Vitoria Taft Cornoner Report .pdf**
525K

 Gmail

**Christina Taft <taftchristina.ceo@gmail.com>**

---

**(no subject)**

---

**paulbarresi@aol.com** <paulbarresi@aol.com>    Tue, Dec 13, 2022 at 12:58 PM
Reply-To: paulbarresi@aol.com
To: "taftchristina.ceo@gmail.com" <taftchristina.ceo@gmail.com>

## INTACT HEART, FRAGMENTED BONES & TEETH.

## ALL THAT WAS LEFT OF YOUR POOR MOM.

## BUT YOU MADE SURE YOU GOT AWAY WITH ALL YOUR BELONGINGS DIDN'T YOU WITCH?

## HOW CAN YOU LIVE WITH YOURSELF?

Exhibit I

 Gmail

**Christina Taft <taftchristina.ceo@gmail.com>**

---

**mommy, mommy, im sorry mommy, im sorry.....**

---

**paulbarresi@aol.com** <paulbarresi@aol.com>                          Mon, Aug 19, 2024 at 10:00 AM
To: Christina Taft <taftchristina.ceo@gmail.com>

When you are lounging on the beach enjoying the sun with the blood money you received for abandoning your mother to suffer unimaginable agony before she struggled to take her last breath, do you ever think of her.

 **Christina Taft <taftchristina.ceo@gmail.com>**

---

**(no subject)**

---

**paulbarresi@aol.com** <paulbarresi@aol.com>                          Thu, Sep 26, 2024 at 11:58 AM
To: Christina Taft <taftchristina.ceo@gmail.com>

My God you are one severely mentally ill, bat shit crazy bitch. My lawyer says you need to be in a conservatorship, and we will do all we can to help you.

Exhibit I

# Exhibit J: Barresi's Social Media Account Posts



### Paul Barresi ✓
@PaulBarresi1

Follow

In Nov 2018 Christina Taft packed up the car & drove off leaving her blind & fragile mom to die in the Paradise CA campfire. When she returned, all that was left of her weak & disabled mom were her teeth, charged bones & a near intact heart. Christina was awarded a fortune in a wrongful death suit. Today, she uses the money not to honor her mother but to cast a vail of shadow over her memory.



Last edited 3:28 PM · Jan 1, 2025 · **759** Views

🔒 x.com

Exhibit J

8:08

Show more



💬 9    🔁 6    ❤️ 37    📊 1.6K    🔖    ⬆️

**VeritasNumquamP** @vernumquamp · 6h  •••
Ugh, we don't want her in France thanks 😑😭

💬    🔁    ❤️ 1    📊 25    🔖    ⬆️

**Paul Barresi** ✔️    [ Follow ]  •••
@PaulBarresi1

Christina Taft has allegedly already begun to upset people in France, I am informed.

4:35 AM · Jan 2, 2025 · **17** Views

💬    🔁    ❤️ 1    🔖    ⬆️



🔒 x.com

    Exhibit J



💬 4          ↻ 7          ♡ 46          📊 1.2K          🔖          ⬆️



You're unable to view this Post because this account owner limits who can view their Posts. Learn more

**Paul Barresi** ✔️
@PaulBarresi1

**Follow**

I could not agree with you more. You will find very few people on the planet that would disagree with you.  To my mind, not a more evil human has ever breathed air.  She and her cohorts. All fuckin'  rotten demons.

11:38 AM · Jan 2, 2025 · **34** Views

💬          ↻          ♡ 1          🔖          ⬆️

Exhibit J



**Xayide27** @Xayide2_07 · Jan 4    •••

I don't know.
Somewhere i read that the mother refused to leave and that her daughter "respected her choice".

 1        ♡     32    🔖    ⬆



**Paul Barresi** ✓    [ Follow ]  𝕏  •••
@PaulBarresi1

Leaving your mother to burn to death is no expression of respect by any stretch of the imagination.

11:43 AM · Jan 4, 2025 · **29** Views

 2    ↻    ♡ 3    🔖    ⬆

Exhibit J



Exhibit J

 **Paul Barresi** ✔️
@PaulBarresi1

 **Follow**

Christina Taft, CEO of Rescue Social, is fucking evil to the core. Not a more evil viscious human being has ever breathed air.

5:31 AM · Jan 12, 2025 · **171** Views

💬 1        🔁 1        ♡ 5        🔖        ⬆️



**Laura B** @LauraB99737382 · Jan 12

Amber Heard? 😂

💬 1        🔁        ♡ 5        📊 96        🔖        ⬆️

Exhibit J



**Post**

**Paul Barresi** ✓
@PaulBarresi1

Follow · · ·

Christina Taft v. Adam Waldman/Paul Barresi

I'm not a hitman. I don't care what the undertaker says. youtube.com/watch?
v=_PlvUG...



that Mr. Waldman is the "Consigli
communicates with for these activiti
in their association have repeated t
proximately five years, and two yea
tion of 18 U.S.C. § 1512, 18 U.S.C.
61 and 18 U.S.C. § 1962.

11:05 AM · Oct 2, 2024 · **118** Views

💬          ↻          ♡ 4          🔖          ⬆

🏠          🔍          ▣          🔔          ✉          👥

AA          🔒 x.com          ↻

Exhibit J



Exhibit J



# Exhibit K: History of Restraining Orders

**CH-109**  **Notice of Court Hearing**

Clerk stamps date here when form is filed.

**FILED**
Superior Court Of California
County Of Los Angeles

SEP 13 2022

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Wendy Delgado

(1) **Person Seeking Protection**

a.  Your Full Name:

Richard Albertini

Your Lawyer *(if you have one for this case):*

Name: _____  State Bar No.: _____

Firm Name: _____

b.  Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or email.)*

Address: 1510 N Pass Ave

City: Burbank  State: CA Zip: 91505

Telephone: 213-302-9588 Fax: _____

Email Address: Richie Albertini 306 GCMD

Fill in court name and street address:

Superior Court of California, County of

LASC-NORTH CENTRAL DISTRICT
BURBANK COURTHOUSE
300 EAST OLIVE AVENUE
BURBANK, CA 91502

Court fills in case number when form is filed.

Case Number:
22PDRO01308

(2) **Person From Whom Protection Is Sought**

Full Name: Paul Garresi

*The court will complete the rest of this form.*

(3) **Notice of Hearing**

**A court hearing is scheduled on the request for restraining orders against the person in** (2):

**Hearing Date** → Date: OCT 0 5 2022 Time: 8:30AM
Dept.: 5  Room: _____

Name and address of court if different from above:

~~LOS ANGELES SUPERIOR COURT~~
~~NORTHEAST DISTRICT - PASADENA~~
~~300 EAST WALNUT STREET~~
~~PASADENA, CA 91101~~

(4) **Temporary Restraining Orders** *(Any orders granted are on form CH-110, served with this notice.)*

a.  Temporary Restraining Orders for personal conduct and stay-away orders as requested in form CH-100, *Request for Civil Harassment Restraining Orders,* are *(check only one box below):*

(1) ☐ All **GRANTED** until the court hearing.

(2) ☐ All **DENIED** until the court hearing. *(Specify reasons for denial in b, below.)*

(3) ☑ Partly **GRANTED** and partly **DENIED** until the court hearing. *(Specify reasons for denial in b, below.)*

Judicial Council of California, *www.courts.ca.gov*
Rev. September 1, 2022, Mandatory Form
Code of Civil Procedure, § 527.6
Approved by DOJ

**Notice of Court Hearing**
**(Civil Harassment Prevention)**

**CH-109**, Page 1 of 3
→

96

Case Number:

**2 2 P D R 0 0 1 3 0 8**

b. Reasons for denial of some or all of those personal conduct and stay-away orders as requested in form CH-100, *Request for Civil Harassment Restraining Orders,* are:

(1) ☐ The facts as stated in form CH-100 do not sufficiently show acts of violence, threats of violence, or a course of conduct that seriously alarmed, annoyed, or harassed the person in ① and caused substantial emotional distress.

(2) ☑ Other *(specify):* ☐ As set forth on Attachment 4b.

*All threats are verbal. No actual violence.*

⑤ **Confidential Information Regarding Minor**

a. ☐ A *Request to Keep Minor's Information Confidential* (form CH-160) was made and **GRANTED**. (*See form CH-165, Order on Request to Keep Minor's Information Confidential, served with this form.*)

b. **If the request was granted, the information described in item ⑦ on the order (form CH-165) must be kept CONFIDENTIAL. The disclosure or misuse of the information is punishable as a sanction, with a fine of up to $1,000 or other court penalities.**

⑥ **Service of Documents for the Person in ①**

**At least ☑ five ☐ _____ days before the hearing,** someone age 18 or older—**not you or anyone to be protected**—must personally give (serve) a court's file-stamped copy of this form CH-109 to the person in ② along with a copy of all the forms indicated below:

a. CH-100, *Request for Civil Harassment Restraining Orders* (file-stamped)

b. ☑ CH-110, *Temporary Restraining Order* (file-stamped) **IF GRANTED**

c. CH-120, *Response to Request for Civil Harassment Restraining Orders* (blank form)

d. CH-120-INFO, *How Can I Respond to a Request for Civil Harassment Restraining Orders?*

e. CH-250, *Proof of Service by Mail* (blank form)

f. ☐ CH-170, *Notice of Order Protecting Information of Minor* and CH-165, *Order on Request to Keep Minor's Information Confidential* (file-stamped) **IF GRANTED**

g. ☐ Other *(specify):* _____

Date: **SEP 1 2 2022** _____

*Judicial Officer* **JOHN KRALIK, JUDGE**

**EXHIBIT K**

Case Number: 2 2 P D R 0 0 1 3 0 8

## To the Person in ① :

- The court cannot make the restraining orders after the court hearing unless the person in ② has been personally given (served) a copy of your request and any temporary orders. To show that the person in ② has been served, the person who served the forms must fill out a proof of service form. Form CH-200, *Proof of Personal Service,* may be used.

- For information about service, read form CH-200-INFO, *What Is "Proof of Personal Service"?*

- If you are unable to serve the person in ② in time, you may ask for more time to serve the documents. Use form CH-115, *Request to Continue Court Hearing and to Reissue Temporary Restraining Order.*

## To the Person in ② :

- If you want to respond to the request for orders in writing, file form CH-120, *Response to Request for Civil Harassment Restraining Orders,* and have someone age 18 or older—**not you or anyone to be protected**—mail it to the person in ① .

- The person who mailed the form must fill out a proof of service form. Form CH-250, *Proof of Service by Mail,* may be used. File the completed form with the court before the hearing and bring a copy with you to the court hearing.

- Whether or not you respond in writing, go to the hearing if you want the judge to hear from you before making an order. You may tell the judge why you agree or disagree with the orders requested.

- You may bring witnesses and other evidence.

- At the hearing, the judge may make restraining orders against you that could last up to five years and may order you to turn in to law enforcement, or sell to or store with a licensed gun dealer, any firearms that you own or possess.



### Request for Accommodations

Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the hearing. Contact the clerk's office or go to *www.courts.ca.gov/forms* for *Disability Accommodation Request* (form MC-410). (Civ. Code, § 54.8.)

*(Clerk will fill out this part.)*

### —Clerk's Certificate—

I certify that this *Notice of Court Hearing* is a true and correct copy of the original on file in the court.

*Clerk's Certificate*
*[seal]*

Date: _____

Clerk, by _____, Deputy

**Notice of Court Hearing**
**(Civil Harassment Prevention)**

**CH-109,** Page 3 of 3

**EXHIBIT K**

**CH-100**

## Request for Civil Harassment Restraining Orders

Read *Can a Civil Harassment Restraining Order Help Me? (form CH-100-INFO)* before completing this form. Also fill out *Confidential CLETS Information (form CLETS-001)* with as much information as you know.

Clerk stamps date here when form is filed.

**FILED**
Superior Court Of California
County Of Los Angeles

**SEP 13 2022**

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Wendy Delgado

**① Person Seeking Protection**

a. Your Full Name: Richard Alberini    Age: 57

Your Lawyer *(if you have one for this case)*
Name: _____ State Bar No.: _____
Firm Name: _____

b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or e-mail.)*

Address: 1510 N Pass
City: Burbank    State: CA   Zip: 91505
Telephone: 213-302-9688   Fax: _____
E-Mail Address: _____

Fill in court name and street address:

**Superior Court of California, County of**

LASC-NORTH CENTRAL DISTRICT
BURBANK COURTHOUSE
300 EAST OLIVE AVENUE
BURBANK, CA 91502

Court fills in case number when form is filed.

**Case Number:**
2 2 P D R 0 0 1 3 0 8

**② Person From Whom Protection Is Sought**

Full Name: Paul Baffesi    Age: 73
Address *(if known):* 12994 Claret
City: Rancho Cucamonga   State: CA  Zip: 91739

**③ Additional Protected Persons**

a. Are you asking for protection for any other family or household members? ☐ Yes ☐ No   *If yes, list them:*

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |

☐ *Check here if there are more persons. Attach a sheet of paper and write "Attachment 3a—Additional Protected Persons" for a title. You may use form MC-025, Attachment.*

b. Why do these people need protection? *(Explain below):*
☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 3b—Why Others Need Protection" for a title.*

_____
_____
_____
_____

**This is not a Court Order.**

Judicial Council of California, *www.courts.ca.gov*
Revised January 1, 2018, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9

**Request for Civil Harassment Restraining Orders**
**(Civil Harassment Prevention)**

CH-100, Page 1 of 6


99                                                                    EXHIBIT K

Case Number: 2 2 P D R O O 1 3 0 8

**(4) Relationship of Parties**

How do you know the person in **(2)**? *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 4—Relationship of Parties" for a title.*

He is a Private Investigator for Johnny Depp

**(5) Venue**

Why are you filing in this county? *(Check all that apply):*

a. ☐ The person in **(2)** lives in this county.

b. ☐ I was harassed by the person in **(2)** in this county.

c. ☑ Other *(specify):* I Like Here

**(6) Other Court Cases**

a. Have you or any of the persons named in **(3)** been involved in another court case with the person in **(2)**?

☐ Yes ☐ No *(If yes, check each kind of case and indicate where and when each was filed.)*

| | Kind of Case | Filed in *(County/State)* | Year Filed | Case Number *(if known)* |
|---|---|---|---|---|
| (1) ☐ | Civil Harassment | | | |
| (2) ☐ | Domestic Violence | | | |
| (3) ☐ | Divorce, Nullity, Legal Separation | | | |
| (4) ☐ | Paternity, Parentage, Child Custody | | | |
| (5) ☐ | Elder or Dependent Adult Abuse | | | |
| (6) ☐ | Eviction | | | |
| (7) ☐ | Guardianship | | | |
| (8) ☐ | Workplace Violence | | | |
| (9) ☐ | Small Claims | | | |
| (10) ☐ | Criminal | | | |
| (11) ☑ | Other *(specify):* | Depp vs Heard 2019 | | |

b. Are there now any protective or restraining orders in effect relating to you or any of the persons in **(3)** and the person in **(2)**? ☑ No ☐ Yes *(If yes, attach a copy if you have one.)*

**(7) Description of Harassment**

Harassment means violence or threats of violence against you, or a course of conduct that seriously alarmed, annoyed, or harassed you and caused you substantial emotional distress. A course of conduct is more than one act.

a. Tell the court about the last time the person in **(2)** harassed you. He Called to say He would

(1) When did it happen? *(provide date or estimated date):* Kill me + Showed up at House

(2) Who else was there? Ruben Palomares
Shannon Torres

**This is not a Court Order.**

Case Number: 22PDRD01308

(7) a. (3) How did the person in (2) harass you? *(Explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and wri* "*Attachment 7a(3)—Describe Harassment" for a title.*

1 Threats- 2. Inciting violence 3- Slander
4- Black Mail 5-? 6
Telephone threats - Recordings
Showed up at my former home
after calling to say He was going to shoot me

(4) Did the person in (2) use or threaten to use a gun or any other weapon?

☑ Yes ☐ No *(If yes, explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 7a(4)—Use of Weapons" for a title.*

He said He Had a gun
He is a P.I. Working for Sonny
Depp

(5) Were you harmed or injured because of the harassment?

☑ Yes ☐ No *(If yes, explain below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 7a(5)—Harm or Injury" for a title.*

Mentally

(6) Did the police come? ☐ Yes ☑ No

If yes, did they give you or the person in (2) an Emergency Protective Order? ☐ Yes ☐ No

If yes, the order protects *(check all that apply):*

☐ Me    ☐ The person in (2)    ☐ The persons in (3).

*(Attach a copy of the order if you have one.)*

b. Has the person in (2) harassed you at other times?

☑ Yes ☐ No  *(If yes, describe prior incidents and provide dates of harassment below):*

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 7b—Previous Harassment" for a title.*

Since 2019

**This is not a Court Order.**

Revised January 1, 2018    **Request for Civil Harassment Restraining Orders**
(Civil Harassment Prevention)    **CH-100**, Page 3 of 6 →

101    EXHIBIT K

Case Number: 2 2 P D R 0 0 1 3 0 8

*Check the orders you want.*  ☑

⑧ ☐ **Personal Conduct Orders**

I ask the court to order the person in ② **not** to do any of the following things to me or to any person to be protected listed in ③:

a. ☐ Harass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of the person.

b. ☐ Contact the person, either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.

c. ☐ Other *(specify):*
   ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 8c—Other Personal Conduct Orders," for a title.*

   _____
   _____
   _____

*The person in ② will be ordered not to take any action to get the addresses or locations of any protected person unless the court finds good cause not to make the order.*

⑨ ☐ **Stay-Away Orders**

a. I ask the court to order the person in ② to stay at least / ᴏ ᴏ / yards away from *(check all that apply):*

   (1) ☐ Me.                                    (8) ☑ My vehicle.
   (2) ☐ The other persons listed in ③.          (9) ☐ Other *(specify):*
   (3) ☐ My home.                               _____
   (4) ☐ My job or workplace.                   _____
   (5) ☐ My school.                             _____
   (6) ☐ My children's school.                  _____
   (7) ☐ My children's place of child care.     _____

b. If the court orders the person in ② to stay away from all the places listed above, will he or she still be able to get to his or her home, school, or job?  ☐ Yes  ☐ No   *(If no, explain below):*

   ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 9b—Stay-Away Orders," for a title.*

   _____
   _____

⑩ **Guns or Other Firearms and Ammunition**

Does the person in ② own or possess any guns or other firearms?    ☑ Yes  ☐ No  ☐ I don't know

*If the judge grants a protective order, the person in ② will be prohibited from owning, possessing, purchasing, receiving, or attempting to purchase or receive a gun, other firearm, and ammunition while the protective order is in effect. The person in ② will also be ordered to turn in to law enforcement, or sell to or store with a licensed gun dealer, any guns or firearms within his or her immediate possession or control.*

**This is not a Court Order.**

Revised January 1, 2018                    **Request for Civil Harassment Restraining Orders**                    CH-100, Page 4 of 6
                                              **(Civil Harassment Prevention)**                                              →

102

EXHIBIT K

Case Number:

2 2 P D R 0 0 1 3 0 0

⑪ ☐ **Temporary Restraining Order**

I request that a Temporary Restraining Order (TRO) be issued against the person in ② to last until the hearing. I am presenting form  CH-110, *Temporary Restraining Order,* for the court's signature together with this *Request.*

Has the person in ② been told that you were going to go to court to seek a TRO against him/her?

☑ Yes  ☐ No  *(If you answered no, explain why below):*

☐  *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 11—Temporary Restraining Order" for a title.*

_____    _____
_____
_____

⑫ ☐ **Request to Give Less Than Five Days' Notice of Hearing**

*You must have your papers personally served on the person in ② at least five days before the hearing, unless the court orders a shorter time for service. (Form CH-200-INFO explains* What Is "Proof of Personal Service"? *Form CH-200,* Proof of Personal Service, *may be used to show the court that the papers have been served.)*

If you want there to be fewer than five days between service and the hearing, explain why below:

☐  *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 12—Request to Give Less Than Five Days' Notice" for a title.*

_____
_____
_____
_____

⑬ ☐ **No Fee for Filing or Service**

a.  ☐ There should be no filing fee because the person in ② has used or threatened to use violence against me, has stalked me, or has acted or spoken in some other way that makes me reasonably fear violence.

b.  ☐ The sheriff or marshal should serve (notify) the person in ② about the orders for free because my request for orders is based on unlawful violence, a credible threat of violence, or stalking.

c.  ☐ There should be no filing fee and the sheriff or marshal should serve the person in ② for free because I am entitled to a fee waiver. *(You must complete and file form FW-001,* Application for Waiver of Court Fees and Costs *.)*

⑭ ☐ **Lawyer's Fees and Costs**

I ask the court to order payment of my  ☐  lawyer's fees    ☐  Court costs.

The amounts requested are:

| Item | Amount | Item | Amount |
|---|---|---|---|
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |

☐  *Check here if there are more items. Put the items and amounts on the attached sheet of paper or form MC-025 and write "Attachment 14—Lawyer's Fees and Costs" for a title.*

**This is not a Court Order.**

Revised January 1, 2018    **Request for Civil Harassment Restraining Orders**    CH-100, Page 5 of 6
(Civil Harassment Prevention)    →

103    EXHIBIT K

Case Number: 2 2 P D R O O 1 3 0 8

**(15)** ☐ **Possession and Protection of Animals**

I ask the court to order the following:

a. ☐ That I be given the sole possession, care, and control of the animals listed below, which I own, possess, lease, keep, or hold, or which reside in my household.
   *(Identify animals by, e.g., type, breed, name, color, sex.)*

   _____

   _____

   I request sole possession of the animals because *(specify good cause for granting order)*:
   ☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 15a—Possession of Animals" for a title.*

   _____

   _____

   _____

b. ☐ That the person in ②must stay at least_____yards away from, and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of, the animals listed above.

**(16)** ☐ **Additional Orders Requested**

I ask the court to make the following additional orders *(specify)*:

☐ *Check here if there is not enough space for your answer. Put your complete answer on the attached sheet of paper or form MC-025 and write "Attachment 16—Additional Orders Requested," for a title.*

_____

_____

_____

**(17)** Number of pages attached to this form, if any: 5

Date: 9-13-2022

_____    ▶ _____
*Lawyer's name (if any)*                  *Lawyer's signature*

I declare under penalty of perjury under the laws of the State of California that the information above and on all attachments is true and correct.

Date: 9-13-2022

RICHARD ALBERTINI          ▶ *[signature]*
*Type or print your name*              *Sign your name*

**This is not a Court Order.**

**Request for Civil Harassment Restraining Orders**          CH-100, Page 6 of 6
                                    **(Civil Harassment Prevention)**

**EXHIBIT K**

22PDRO01308

TFW Wi-Fi 3:48 PM

3

Describe Harrassment

Search Twitter

Attachment To CH-100

Log in Sign up

Movies & TV + | Fashion + | Micl

Keanu Reeves + | Popular videos + | Coo

**Paul Barresi** @PaulBarresi1 · Jul 9

Replying to @HailsLouis3

Albertini is a reminder we must be careful about who they sidle up with. He was one of the first people I interviewed. It took me two seconds to realize he has zero credibility. His actions on social media stems from an improper and evil motive, with malice, to do others harm.

3 | 12

**Paul Barresi** @PaulBarresi1 · Jul 8

Replying to @ThatUmbrella

Barresi is approachable anytime by calling 908-656-5712 directly.

1 | 1 | 4

AA twitter.com

22 PDR 0 0 1 3 0 8

4

*Describt HARRASment*
*Attachment to*
*Ch-100*

⚠ ◖◖ 📞 🔌 ⊞                    🔵 📶 75% 🔋 9:22 AM

←  **Paul Barresi**          📞   🗑   ⋮
   +1 908-656-5712

Fri, Oct 16

Ⓟ   I still got that taped
    conversation of you and Big
    Ed.  The one where you do
    your damndest to try and
    get him to say horrible lies
    about Johnny Depp. Hmmm, I
    wonder what I should do with
    it you fucking moron
                              1:11 PM

        Anything you want.. That is old
        news you old fag.
    1:11 PM

Ⓟ   If you ever contact me again
    it will be a Enquirer headline
    and it will be broadcast as
    well promise you
                              1:13 PM

        You know Paul that sounds like
        Blackmail. You should stop
        drinking.. Your a silly old fag.
        Enquirer Lol.. I'll send it to Andy
        Tillit Now.
    1:14 PM

Enter message                    📎    Send

◁         ○         □

**EXHIBIT K**

Describe HARMS
Attachment
To CH-MAN PD
100




**Paul Barresi**
49 Tweets

Tweets    **Tweets & replies**    Media


**Paul Barresi** @PaulB... · 18m
Replying to @Corey_Feldman
I got that scumbag Richie Albertini where you want him too.  Been trying to reach you.  Call 908-656-5712


**Angenette Levy** ✓ @... · 4d
NEW INFO: @radar_online reporting talks underway to settle lawsuit between Rocky Brooks and #JohnnyDepp. I heard from a source earlier this week that talks were underway. Hoped to get more info to report yesterday but didn't.
radaronline.com/p/johnny-depp-...... (cont)
@LawCrimeNetwork





EXHIBIT K

107

Barresi posts vs Richie in black and white and a health hazreg

22 PDR001308

ATTACHMENT
CH-100)



← **Paul Barresi**
   79 Tweets

eets    **Tweets & replies**    Media    Like



**Paul Barresi** @PaulBa... · 4h ⋮

Richie Albertini, who Amber Heard fans love, brutally tormented and mentally abused his own sick ailing mother so much, she had to be hospitalized. His allegations against Johnny Depp are as baseless as is he.  Not a more cowardly, weakling of a little man has ever breathed air.

 

💬 4     🔁 12     ♡ 23



**Paul Barresi** @PaulB...
US ARMY GREEN BERET SGT.

**108**

https://drive.google.com/drive/u/0/folders/1IR0lLnbYJKOUNI8QVkym5FvEzocGnHUi

**EXHIBIT K**

1/1

*Describe Harrassent* (handwritten)

# 1 Barresi Threatens Richie to Hit Him July 1 2022

1c20220701023025n+1 908-656-5712_0.amr.m4a *Attachment* (handwritten)

**Speaker1 (Barresi):** [00:00:00] Now, if I did. If I did, it was an accident.

**Speaker 2 (Albertini):** [00:00:03] All right, well, stop having so many accidents. I mean, unless you've got something to say.

**Speaker1 (Barresi):** [00:00:11] I told you, I got nothing. Oh, I got something to say. What's up with that lazy eye, left eye man? You got lazy eye and your big old potbelly.

**Speaker 2 (Albertini):** [00:00:19] Yeah.

**Speaker1 (Barresi):** [00:00:20] What's up with that?

**Speaker 2 (Albertini):** [00:00:20] I don't know. Why don't you come in?

**Speaker1 (Barresi):** [00:00:25] I say you want to see a right hook coming across your fucking ugly head?

**Speaker 2 (Albertini):** [00:00:29] Well, you're saying you're going to hit me?

# Exhibit L: Subpoena to Nitrini

Exhibit L



**Christina Taft <taftchristina.ceo@gmail.com>**

---

## Motion - Explain "Mortal Danger Threat"

---

**Mario George Nitrini** <nitrinimario3@gmail.com>          Mon, Dec 9, 2024 at 5:29 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

You're welcome Christina.
I'll keep you posted regarding how I'm going to go about filing a criminal complaint on Paul Barresi.

Mario George Nitrini 111
------
The OJ Simpson Case
[Quoted text hidden]

    **Christina Taft <taftchristina.ceo@gmail.com>**

---

# Motion - Explain "Mortal Danger Threat"

**Mario George Nitrini** <nitrinimario3@gmail.com>                  Mon, Dec 9, 2024 at 5:22 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

It's in this post of mine

https://x.com/nitrini1950/status/1864465838755205489
W
where I screenshot Paul Barresi's post about my son.
My son got involved with the wrong crowd. A gang murder took place and my son testified for the prosection.
Because Paul Barresi posted his post pertaining to my son and me, some very bad people have been looking for me.
I'm very seriously contemplating filing a criminal complaint on Paul Barresi for attempted murder.

As far as Anthony Fox's disappearance goes, I have my own evidence on whom I believe killed Anthony Fox on Johnny Depp's request. It's hearsay, but these people who I talked to are "in the know."

Mario George Nitrini 111
------
The OJ Simpson Case
[Quoted text hidden]

Exhibit L

Gmail - Fwd: ANTHONY FOX - ENDANGERED MISSING PERSO...          https://mail.google.com/mail/u/1/?ik=fcf2a400f0&view=pt&search=all...

 **Gmail**

Christina Taft <taftchristina.ceo@gmail.com>

---

## Fwd: ANTHONY FOX - ENDANGERED MISSING PERSONS INVESTIGATION, NO. VPD 01-18806

**Mario George Nitrini 111** <marionit111@gmail.com>                                    Sat, Jan 4, 2025 at 4:50 PM
To: taftchristina.ceo@gmail.com

The OJ Simpson Case

The transcript of what Paul Barresi sent me pertaining to his interview with Anthony Fox's lawyer Brett Curlee.

Mario George Nitrini 111
-----
The OJ Simpson Case

---------- Forwarded message ----------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: ANTHONY FOX - ENDANGERED MISSING PERSONS INVESTIGATION, NO. VPD 01-18806
To: "marionit111@gmail.com" <marionit111@gmail.com>

**CONFIDENTIAL**

Mario, This is transcript of my interview with Anthony Fox's lawyer Brett Curlee which I forwarded to detectives.  Notice how he is avoiding me.

**CONFIDENTIAL**

-----Original Message-----
From: <paulbarresi@aol.com>
To: pfurlong@cityofventura.ca.gov <pfurlong@cityofventura.ca.gov>; amorales@cityofventura.ca.gov <amorales@cityofventura.ca.gov>
Sent: Mon, Dec 13, 2021 5:49 pm
Subject: ANTHONY FOX - ENDANGERED MISSING PERSONS INVESTIGATION, NO. VPD 01-18806

Dec 13, 2021

**VENTURA POLICE DEPARTMENT**
**Endangered Missing Persons Division**
**1425 Dowell Dr., Ventura, CA 93003**

**DETECTIVE CPL. A. MORALES and**
**DETECTIVE PATRICK FURLONG**

**Investigative Report**

**ANTHONY FOX - ENDANGERED MISSING PERSONS INVESTIGATION, NO. VPD 01-18806**

**Dear Detectives Morales and Furlong,**

**I spoke with Anthony Fox's estate lawyer, James Goldman and his wife Laura, today.**

**I told him about the letter Anthony Fox wrote to his mother before he disappeared. He said he knew nothing**

**about it. And when I told him the endangered missing person's case remains open on Fox, he was very**

**surprised.  Then he put me on the phone with his wife Laura.**

**Laura Goldman stated that after Anthony's disappearance, although Constance Fox was originally going to**

**stay with Brett Curlee, [lawyer handling Anthony's lawsuit against Johnny Depp and others] she**

---

1/9/2025, 3:59 PM

Exhibit L

ended up

going with the Goldman's who took care of her until arrangements could be made for her to move into her

boyfriend's parents' home sometime after Christmas [2001].

Neither Jim Goldman nor Laura Goldman knew what became of the answering machine.

Laura said, "Losing her father was a very dramatic experience for Constance. She was just a kid--

understandable  how she confused which one of her father's lawyers took her in."

I also spoke with Anthony Fox's former lawyer, Brett Curlee, [who eventually put a lien on Fox's estate],

However, he was not as forthcoming as the Goldman's.

I asked Mr. Curlee if he knew what became of the answering machine but he would not say one way or

the other. He used the excuse that it was a long time ago.

I told Mr. Curlee that a crucial piece of evidence that might potentially hold the key to Anthony Fox's

disappearance, I don't think is something that could be so easily forgotten.

continuing...

Paul: Have you spoken with the detectives investigation Fox's disappearance?

Curlee:  They contacted me but it's been a long while.

Paul:  Are you aware that Anthony wrote a letter to his mother just before he disappeared?

Curlee:  I'm not at liberty to talk about anything involving the case.

Paul:  May I know whether you ever spoke with Detective Furlong?

Curlee:  No, someone else, I can't recall the name.  Just have the detectives call me. Sorry I can't be of more

help but just have them call me.

End Call

**Contact information:**
**James Goldman, Esq.** https://lawyers.usnews.com/lawyers/james-l-goldman/90137092.  **Home no. 805-320-6587**

**Brett Curlee, Esq.** https://apps.calbar.ca.gov/attorney/Licensee/Detail/151058

**End Report**

Exhibit L



Christina Taft <taftchristina.ceo@gmail.com>

---

## Fwd: Anthony Fox Missing Person Investigation VPD 01-18806

**Mario George Nitrini 111** <marionit111@gmail.com>                                    Sat, Jan 4, 2025 at 4:42 PM
To: taftchristina.ceo@gmail.com

Christina.

This is the email that Paul Barresi sent me pertaining to his emails to the Ventura County Sheriff's Department, and Maud Fox's will pertaining to the subpoena I received regarding your federal lawsuit case against Paul Barresi & Adam Waldman.

Barresi's last sentence is very telling trying to coerce the Ventura County detective's that Johnny Depp had nothing to do with the disappearance of Anthony Fox

"Charles agreed that the possibility of Johnny Depp having anything whatsoever to do with his brother's disappearance is next to zero"

Mario George Nitrini 111
------
The OJ Simpson Case

---------- Forwarded message ----------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: Fwd: Anthony Fox Missing Person Investigation VPD 01-18806
To: "marionit111@gmail.com" <marionit111@gmail.com>


CONFIDENTIAL

Mario,  Here is investigative report I sent detectives.  Listen to my interview with Anthony Fox's brother, Charles and read mother's Will. KEEP FILE for story.

CONFIDENTIAL

-----Original Message-----
From: paulbarresi@aol.com
To: pfurlong@cityofventura.ca.gov <pfurlong@cityofventura.ca.gov>
Cc: amorales@cityofventura.ca.gov <amorales@cityofventura.ca.gov>
Sent: Thu, Dec 9, 2021 4:56 pm
Subject: Anthony Fox Missing Person Investigation VPD 01-18806

Dear Det. Furlong,

I spoke with lead Detective Morales earlier this week. He said he was immersed in a priority kidnap investigation and that he will contact me to get brought up to

speed on my updated findings re, Anthony Fox's disappearance.

Meanwhile, I now provide you with Anthony Fox's mother Maud Fox's **Will** along with [30 minute] audiotaped interview I conducted with his Anthony's eldest brother

**Charles Fox** this a.m.

Charles stated his mother **Maud Fox**, told him she had received a letter from Anthony just before Christmas 2001.

As you are well aware, Anthony disappeared just before Christmas 2001 on the 19th.  Therefore, he wrote the letter which his mother refused to disclose likely days

prior to his disappearance.  What makes this even more bizarre is that Charles asked his mother what Anthony said in the letter but she stubbornly refused to tell

him. And when Charles pressed her to tell her what the letter said, she told him she destroyed it.

Following Maud's death, Charles told me that he searched everywhere for the mysterious letter but it was nowhere to be found.

**Maud Fox had a secret she was keeping for her Anthony so worth protecting, she took it to her grave.**

As evident in a previous report I sent you, however, this was not the first time Maud covered for Anthony. When he filed for bankruptcy, she helped him fabricate a fraudulent laundry list people and businesses to whom he alleged he owed money and even went so far as to include her own name to the bogus list.

Charles was very surprised to hear that Johnny Depp turned over his interests in the Viperoom to Anthony's daughter. Despite it being widely reported, Charles said he was not aware.

What surprised him even more was to learn that his mother added Anthony's daughter to her Will because his she didn't think too kindly of Constance.

I suspect Anthony's letter to his mom included a plea for her to care for his daughter because his mother's [revised Will] makes generous provisions for her including

10,000 pounds in addition to Anthony's share of the estate, as stipulated in Will,  after he is deemed dead in 2006.  It appears this date 2006  was just pulled out of the hat which leads to only more suspicion. it is likely Maud wanted to honor her son's wishes that she provide for his daughter.

**Irrespective of what Anthony's letter said, writing the letter only days before his disappearance is suspect.**

**Anthony's mom's refusal to say what was in the letter is further suspect.**

**To my mind, Anthony vanishing into thin air was not something he didn't see coming.**

Charles believes Anthony's daughter Constance knows more than what she has disclosed.

I told Charles that Johnny Depp is a very generous good hearted man and that over the years he has helped many people, paying their rent, bills, medical expenses, etc.

Charles confided that there is a stronger likelihood that Anthony is either still alive and just  wanted to create the impression he disappeared or he committed suicide."

Charles agreed that the possibility of Johnny Depp having anything whatsoever to do with his brother's disappearance is next to zero.


End Report

Paul Barresi
cell no. 908-656-5712


**FYI**
**Charles Fox**, Tel no. 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-312-524 age 75, resides with wife Morna at 8A Catharine Place, Bath, Avon, BA1 2PR-  England
https://en.wikipedia.org/wiki/Bath,_Somerset

-----Original Message-----
From: Furlong, Patrick <pfurlong@cityofventura.ca.gov>
To: paulbarresi@aol.com <paulbarresi@aol.com>
Sent: Wed, Jul 31, 2019 12:40 pm
Subject: Ref Anthony Fox Missing Person Investigation VPD 01-18806


Per our phone conversation, I am reaching out to you to inquire about any information regarding the Missing Person investigation for Anthony Fox (VPD 01-18806).


Thanks again,


Patrick Furlong

Criminal Investigative Technician
Sex Offender Registration / Missing Persons
Ventura Police Department
1425 Dowell Dr., Ventura, CA 93003
(805) 339-4473 Office


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**3 attachments**

 **Johnny Depp - Charles Fox call_09-36-18_OUT__16699291319017.amr**
3001K

 **Maud Fox Will 1.pdf**
528K

**Maud Fox Will 2.pdf**
30K

Exhibit L

 Gmail

**Christina Taft <taftchristina.ceo@gmail.com>**

_____

## Fwd: ANTHONY FOX'S DAUGHTER CONSTANCE

**Mario George Nitrini 111** <marionit111@gmail.com>                    Sat, Jan 4, 2025 at 4:46 PM
To: taftchristina.ceo@gmail.com

The OJ Simpson Case

Paul Barresi sent me this.
It's his interview with Anthony Fox's daughter Constance.

Mario George Nitrini 111
-----
The OJ Simpson Case

---------- Forwarded message ----------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: ANTHONY FOX'S DAUGHTER CONSTANCE
To: "marionit111@gmail.com" <marionit111@gmail.com>

CONFIDENTIAL

Mario, Here is my interview with Anthony Fox's daughter Constance.  Read all material sent to you thus far and I want you to take notes on paper and deliver the high points for a story.  There are a lot of people I feel who know something but are keeping very quiet. Paul

DONFIDENTIAL


**Major Piece of Evidence Gone:**
**Anthony Fox's daughter believes letter he wrote to his mother told her of his intentions to disappear.**

**Another Major Piece of Evidence Gone**
**Candace was forced to leave home that she shared with her father so quickly, she abandoned the answering machine filled with many voice messages, likely some from her father, she never got a chance to listen too…**

**Police never took the answering machine, or the voice recordings left on the answering machine into evidence.**

**Candace's unlikely guardians**
**Lawyers suing Johnny Depp on behalf of Anthony Fox of all people cared for their client's daughter, following their client's disappearance.**

CANDADE FOX – CALL – DEC 11 – 9:45 A.M.

Paul:  Good morning

Constance: Hi, how are you?

Paul:  Hi, who is this?

Constance:  Constance Fox

Paul:  I was wondering if you had a chance to look at the Will, but I also wanted to tell you—By the way, how's the little guy doing? It's a little quieter.   Now, my conversation with Charles [Fox]…There are little things—He said he was sorry he couldn't be of more help but often when you talk to people, they recall things that they don't realize the significance of it. And he seems to be as taken aback and absolutely puzzled over Anthony writing a letter either on the day he disappeared or just before he disappeared. He [Charles] was able to figure it out that your grandmother got the letter just before Christmas. The letter probably takes six or seven days to get to London, so it was likely written either just before he disappeared or when he disappeared.  And I want to ask you, why do you suppose your dad wrote your grandma as opposed to another member of the family. I know he was very close to you and I'm curious as to why he didn't write the letter to you.

Constance:  Because I was barely 16 maybe.  I mean my assumption is that he was giving her, you know…

Paul:  Instructions or letting her know…

Constance:  Yeah, what his intention or plans were.

Paul:  That's what we thought too.  He was giving her sort of an account of what his next move.  But the thing is, why do you suppose he would leave so many in pain, especially you. Why would he leave so them in pain unless he told your grandma to let them know that I'll be okay, but she decided not to do it. She went so far as to destroy that letter and that letter is a significant piece and the detectives believe that as well. The letter might have been the answer.

Constance:  Yeah, I mean, the letter for me is something that I did not know about, and it brought up a lot of questions. I need a little more time to process some of this. I also want to speak with Charles. I am trying to figure out a time when I can do that. Given the time difference. I'm with my kid so I would like to try and have that conversation without any distraction.

Paul: I think they are about 9 hours ahead. Now on the Will, did you get a chance to look at it?

Constance:   Not really, I mean honestly, I don't know how these things work, but I would imagine that anything that should have come to me after all this time, it's probably too late.  I don't have a lot of expectations.

Paul:  I understand. The letter that he wrote though, did it give you a little piece of mind? In other words, if the letter is what we think, that it was his plan of what he intended to do, supports your belief that likely, he did go off the grid.

Constance:  Yeah, that's entirely possible.  I can never really say without reading the letter.

Paul: Yeah, we can never really say for sure.  Okay, I will leave you with your thoughts and we can talk in a couple of weeks if you want.

Constance: That sounds good. I am going to speak with Charles. It's been 16 or 17 years since we last spoke. I tried to reach out to him when I went to London after I graduated to sort of pay my respects to my father and find my grandmother's place via my grandmother's lawyer, who was the only person I had a contact number for because he had to give me that money from the Will. I don't know if the message [I gave the lawyer] ever made its way to Charles—This is a lot of personal stuff, I apologize.

Paul:  Well, now you do have Charles' address and his phone number, and you can talk to him. He is an awfully nice guy.

Constance:  Yeah, I know. I remember him, fondly.

Paul:  Final question, I want to ask you. Did you dad ever say to you that he was in fear of his life or that he was in danger?

Constance: I don't know if would have shared that with me honestly if he was.

Paul:  So, he may have been, but he never shared it with you.

Constance:  **No, I mean, I saw in the year leading up to his disappearance, I saw my father lose his temper and become uncollected.  My father was always a very calm, collected, and lovable person.  I saw him suffer more frustration and desperation in that last year than I did many years prior, in my entire childhood. Fear, I never knew my father to be a fearful man.**

Paul: It wasn't like he got any threatening calls or anything like that that you know of.

Constance:  This was way before cell phones. I was a teenage girl, I had to beg him to get a landline. He didn't even have a landline-- An answering machine, I mean.

Paul:  I see

**ANOTHER IMPORTANT PIECE OF EVIDENCE GONE…**

Constance:  **So, this is the other very unfortunate piece**—Whether there was also a letter for me or not, I will never know.  **You know, I had to leave home [after my father went missing] because I was a minor alone. I had my own life, I was self-sufficient, I had a boyfriend, I was working.  He [Anthony Fox] was working.  Point being, [after he disappeared] I left quite suddenly in the middle of night to stay with someone. And when I came back to get my things, it was very much like, we had to get in and get my stuff and get out. So, I didn't really get a chance to do a once over. When I went to the answering machine there were so many messages.  The mailbox was full, [but it may have well been empty] because I didn't get to look at anything so whether he [Anthony] called or not, I don't know. We had phone records. I don't know whether anybody [people who went in and cleaned up, missing persons detectives or whomever] looked at these things.**

Exhibit L

Paul:  Why did you leave abruptly?

Constance:  Because the police came, and then I could not be alone. I literally had just turned 16. I could not be alone.

Paul: Was this after they [the police] found the [Anthony's abandoned] truck and everything?

Constance:  No, this was before the truck.  I went to work, and I thought, 'I haven't seen my dad in a couple of days'. My co-workers were adamant that I call the police.  So, I called the police and reported that I hadn't seen him for a while.

Paul: **Now, before you left abruptly, did the police search the place?**

Constance:  **No, they asked a couple of questions.**  This isn't on record?  None of this is in the?  report?  [Note: Constance should have damn-well gotten a report but never did.]

Paul:  I am more of a provider of information than a receiver of information, but I am sure because you're involved, they [the police detectives looking for your father] will tell you more than they are going to tell me. This works better for the police because whenever an outside investigator is involved, there is another pair of eyes, heart and mind involved, so they prefer rather not to lead me anywhere. Their attitude is, 'Okay if there is new intelligence, something we might have missed, you find it and let us know.  [The many messages left in the answering machine—so many that they filled the answering machine to the limit, for example, is an extraordinary piece of evidence that may have gleaned valuable information as to Anthony's whereabouts.]

Constance:  Do you work with the police department or did someone else hire you.

Paul:  I am assisting the detectives directly.  I keep forgetting that you were a minor at the time. When you called the police was it on the 19th of Dec or before the 19th of Dec [2001]?

Constance: I think it was before the 19th.   What is the significance of the 19th.

Paul: Well because this is the [official] date that was reported when he allegedly disappeared. I thought that when his vehicle was found on Jan 2, [2002] that was the date I went by but when your uncle told me there was a letter, you understand, that gave it a closer timeline. Your uncle said he [Anthony] wrote a letter just before he disappeared. And your grandmother said she received it just before Christmas, that tells me that the 19th or in the middle of December is on or about the time he would have mailed the letter. But if you think you called the police before the 19th that still falls within the timeline even it was on the 14th or 15th of December.

Constance: **My father was going through a legal battle, so I stayed with one of the lawyers. [Note: This 'lawyer' is the 'someone' Constance stated she stayed with after she had to abruptly leave her home.] I stayed with one of [my father's lawyer's because I didn't have a lot of friends, so I stayed with one of the lawyers for like a week or so, I want to say.**

Paul: **I'm sorry, a lawyer for whom?**

Constance: **For his [Anthony my father's] case. One his lawyers from his team.**

Paul: **You were staying with your father's lawyer?  Do you remember his name?**

Constance: **Jim Goldman, [James L. Goldman, Esq, Pircher, Nichols & Meeks – 1925 Century Park /east, 17th floor, Los Angeles /ca 90067-6077 was the conservator for the Estate of Anthony Fox] So, Brett Curlee [Brett B. Curlee, Esq. 11355 W. Olympic Blvd. Ste 100, Los Angeles, CA 90064 handled Fox's Bankruptcy] [See Exhibits 1 thru 7] was my dad's primary lawyer. [He was the first lawyer on the case. He came to pick me and my dog. And he let me stay with him and his wife.** They just had a baby. Then he let me go stay with my boyfriend's dad and stepmother. And this was all approved by the court. They asked me to stay for Christmas and soon after that my father's truck was found.

**[Note: This is highly suspect. Why of all people, did Constance go with Anthony's lawyers?]**

Paul: Now the case Anthony Fox vs Johnny Depp etc., I looked at this case early on when it was filed. Was your dad close to getting a settlement?

Constance: There was a lot of back and forth on that. The lawyers seemed very perplexed by his disappearance because they felt confident the case was close to nearing an end.

Paul: The court documents were sky-high, and I know your dad hit a couple of brick roads along the way. I did discover on my own that Sal Jenco—I don't know if you know the name.

Constance: Yeah, I do. He was the manager [of the Viperoom].

Paul: He stole.

Constance: Yeah, I knew that.

Paul: He stole, and he ripped-off Johnny and I guess in ripping off Johnny, he ripped off your dad.

Constance: Yes.

Paul: I was trying to get a hold of him because there is a documentary, Johnny vs Amber, but he didn't want to talk, I assume because he knew everyone had already known he was a thief. Did your dad ever indicate to you that Jenco was ripping him off?

Constance: Yeah, that's what part of the legal battle was.

Paul: I mean did he [your dad] ever express any of that to you directly.

Constance: Yes, I went to a couple of the court dates, and I remember meeting Sal. And he was likeable but in a sleazy way. And my dad something. It was a British thing…He was never one to slander someone, but he made it clear to me that Sal was not one to be trusted

Paul: Sal was a bad apple. I think Johnny Depp was in it for the rock and roll because that was his first love, bands and being around bands and he didn't realize, I don't know, maybe he did, I don't know, but people were stealing from him left and right.

Constance: I think he [Johnny Depp] did. They were doing things that were directly misusing the company trademark. It was more than just a misuse of company funds, skimming off the top.

Paul: Do you know who got those tape messages you had to abandon? What if your dad called about fifteen times?

Constance: That's something I will never know.

Paul: Maybe you can ask your guardian what became of it. **[The notion that the police didn't take the message tape recorder that might have very well contained recorded messages from Anthony, into evidence, is crazy as the old lady destroying Anthony's letter.]**

Constance: My dad didn't have a lot of material attachment. He was the type to take whatever you need in a backpack and leave everything else behind. Move out and get the security deposit back, that was it.

Paul: He was a minimalist which is good for a people that like to just Up and Go, right?

Constance: My dad was very much an Up and Go person. He was very much a wonderer. Prior to having me, he traveled the whole world with his first wife, and he could his whole life in that existence. I know he loved being a parent. He fought very hard in his custody battle for me when I was a child. He was a good father.

End

Exhibit L

# Exhibit M: Unsigned Declaration of Witholding Witness

**DECLARATION OF RICHARD ALBERTINI**

**STATE OF CALIFORNIA**      )
                          ) SS:
**COUNTY OF LOS ANGELES**    )

Richard Albertini, being duly sworn, deposes and says:

I am a Witness in the matters of Case 5:24-cv-01930-TJH-DTB (Taft v. Paul Barresi, Adam R. Waldman, and Does 1-10), currently pending in the U.S. District Court of the Central District of California.

I am above the age of 18 and reside in California. At the time of these events, I have repeatedly changed my residency, and primarily resided in California and South Carolina.

The facts stated in this affidavit are true and correct to the best of my knowledge and belief. I have personal knowledge of the facts stated herein, except for those stated upon information and belief, and as to those, I believe them to be true.

I am competent to testify as the facts stated herein in a court of law and will so testify if called upon.

**Relevant Facts**

1.    I am a Witness and I have observed events of the Viper Room and assaults that Johnny Depp did to men and women. I have a witness list of approximately over 20 witnesses, that includes numerous named individuals involved in the Viper Room nightclub.

2.    Approximately July to September, I discussed with Plaintiff Taft, who I have known since May 2022, the friendships I had in the Viper Room and afterwards with Chris Stanco, Bruce Witkin, Tracy Jacobs, Bruce Corkum, and others related to these social circles. I continued to know Johnny's circle of friends for decades after employment at the Viper Room nightclub.

3.    I have information as to how Paul Barresi started using the tapes to coerce individuals, including myself, and Adam Waldman facilitated with knowing the danger increasing, continually, to reward and direct him. This is continuous and ongoing into 2024.

4.    Defendants Barresi and Waldman continue to use the audio tape of me and potential witness Ed Shaw and other audio recordings to prevent witness testimonies into 2024.

PAGE **1** OF **10**

5.    Between May 2022 to August 2022, Plaintiff Taft verified that I was a witness and I am a key witness that wanted to testify. In my knowledge and observation, Defendants Barresi and Waldman aggressively suppressed me, other witnesses, and Plaintiff.

6.    I was first intimidated by Defendant Paul Barresi when I wanted to testify against Johnny Depp, who I was friends with. Approximately 1992 I became friends with Ricky Beck Mahler and Isaac Baruch.

7.    Through Ricky and Isaac I was introduced to Johnny and to work at the Viper Room Nightclub in West Hollywood beginning in 1993. I have knowledge of former friends of Depp, Isaac Baruch, Ricky Beck Mahler, Paul Schindler, and Robert Pfeiffer.

8.    In April 2019, I was a cooperating witness to testify for Amber Heard through the Law Firm of Browne George Ross LLP, whose lawyers had her as a client. For months, I was still a witness against Johnny Depp.

9.    I communicated to Plaintiff Taft what had happened to me which caused me to withhold my testimony and information from Heard's case against Johnny Depp. Defendants threatened me, corruptly persuaded and deceived me.

10.    I introduced Plaintiff Taft to Claudia Jamison in July 2022 who was from the Viper Room nightclub and had moved to New York and was my ex-girlfriend. She tried to open up Bruce Corkum and Jack the bartender to being open to speaking.

11.    I was interviewed by Plaintiff Taft with all of my witnessing related to me wanting to testify. I witnessed Taft be intimidated by Defendants for this.

12.    I have witnessed and have personal knowledge Johnny screams and yells at people, and punches holes in the walls. I saw him put cigarettes out on people, throw coffee cups and beer bottles at people, and verbally assault practically everyone around him.

13.    I was an eye witness to how aggressive and violent Johnny Depp can get, as the time he got violently abusive, pulled her hair back, put a cigarette out on Stacy Lee Lopez's head when she was dancing with Kate Moss. I observed Kate Moss pushed by Johnny Depp before Depp attacked Stacy. I saw my friend Paul Schindler pull Stacy Lee Lopez away from Johnny Depp. Schindler was dating Stacy's friend Nina.

14.    I have knowledge of how Johnny Depp would start talks with individuals and then Paul Schindler would jump on the person and drag them outside.

PAGE **2** OF **10**

15.  I know that Amber Heard had a case that she was assaulted by Johnny Depp.

16.  At the time, Richard Schwartz was speaking with witnesses who wanted to testify for his client Heard's litigation. I told him immediately that Johnny Depp put the cigarette out on a model, Stacy Lee Lopez in an attempt to discuss how dangerous Johnny Depp is. I spoke to Schwartz about Anthony Fox.

17.  I observed Johnny Depp threaten to kill Paul Schindler for pulling Stacy out of his way and how he got violent punching holes in the walls.

18.  I have knowledge of how Sal Jenco spoke with Seven McDonald to make this story go away so no corporations or modeling agencies knew to dry up the pool of models.  I have knowledge of Johnny Depp drinking and using and is under the influence.

19.  I was then intimidated by Defendant Paul Barresi, after wanting to testify against Depp.

20.  In July 2019, Barresi started to intimidate me, and coerced me into giving him an audio recording with Big Ed Shaw of the Viper Room. Big Ed Shaw was a friend of mine. Barresi starting using the tape and blackmailing me.

21.  I've been damaged by Barresi. I gave him many names of friends and former employees of the Viper Room to be witnesses. I didn't want him to intimidate them or for Waldman to conspire with Barresi.

22.  I told him a friend of mine, Paul Schindler, admitted to me that he killed missing co-owner Fox and I didn't want to tell the tabloids that Johnny had anything to do with it. Barresi threatened me to release the audio tape of me with Ed Shaw with edits.

23.  I wanted to testify on assaults and abuse of women and men that I saw Johnny do. I told Ed Shaw that Schindler was dangerous, that Bob Pfeiffer wanted to use Schindler as a hitman against his wife Maria. Ed Shaw agreed with me that he was violent in his observations. I asked Ed Shaw if he knew if Schindler took out/killed Anthony Fox. Defendant Barresi took this tape and coerced us with this tape to never again testify.

24.  Barresi told me he killed Shalimar Seuli, who wanted to testify. He texted me and confessed to me. He admitted an individual ended up dead, one who would not recant about a celebrity.

PAGE **3** OF **10**

25.    2019 ongoing, I told other potential witnesses that there's a hitman, defendant Barresi, put after me for being a witness against Johnny Depp.

26.    I have information and knowledge that Defendant Barresi being and/or acting as a hitman. Barresi told me he was a hitman in his conduct, behavior, and his fascination with death of potential witnesses.

27.    After a restraining order was filed on Mr. Barresi he started looking for our location.

28.    I fear for my life and I have been afraid of my location being found, hence it caused me to move multiple times.

29.    I told Defendant Adam Waldman about the audio tape and that Barresi is a hitman that worked with Pellicano and at first I believed Johnny's lawyer would assist me.

30.    Adam told me witnesses would call him after Barresi intimidated them.

31.    Adam Waldman did a deal with Barresi approximately in 2020. I have knowledge that Mr. Waldman and Mr. Barresi had financial negotiations and a "Deal."

32.    I warned Johnny's counsel Ben Chew. Barresi kept lying to me that he wasn't doing this for Johnny so that I would never testify.

33.    Barriesi threatened to shoot me during the trial of Depp v Heard so I wouldn't testify at all.

34.    Adam Waldman was communicating with Barresi to silence me from testifying, which led me to file a police report.  I have observed documentation of their communications to stop me from testifying against Depp.

35.    In July 2022, I reported that Waldman had financial transactions with Barresi to "fix" for Depp. I reported to the FBI and there were FBI agents assigned to the first South Carolina police report.

36.    I have knowledge that Paul Schindler confessed to killing missing co-owner Fox and bragged about it.

37.    I witnessed Paul Schindler crack someone's head open with a 357 magnum because the guy was bothering Johnny and Johnny asked Paul to handle it.

PAGE **4** OF **10**

38.    I observed that Johnny Depp would send Paul Schindler to handle matters for him.

39.    I have knowledge that Paul's job was to handle matters that Johnny and the nightclub did not want to get sued for. I witnessed Paul hurting individuals in order to handle matters at the Viper Room for Depp. I know that Paul was paid cash on purpose and was not on payroll so that it can allow him to handle all these matters for Johnny Depp, going unnoticed.

40.    Bob Pfeiffer was friends with Johnny Depp and was Alice Cooper's Manager. I know that my former friend Bob Pfeiffer, President of Hollywood Records, hired Anthony Pellicano to collect and use audio recordings of a woman, Maria. I have knowledge of when she wanted to leave Bob, he threatened to kill her.  He then invited Paul Schindler and Michael Dewey and wanted them to kill Maria. I have knowledge that Paul and Michael both said yes to the request.

41.    I witnessed Mickey Rourke ask Paul Schindler if he would kill Christian Slater and Carre Otis. Paul was ready to do it. I witnessed individuals go to Paul Schindler when they wanted to ask him to kill someone for them.

42.    I have knowledge that my friends Bob Pfeiffer and David Nicherie used Pellicano, who worked with Defendant Barresi, to harm people both in business and in their relationships. The federal government had me be a witness and informant. Barresi took information from Bert Field's Office against the lawyer's client Shafir to Nicherie.

43.    I have knowledge that Defendant Barresi was put after me for being a witness against Johnny Depp. I have knowledge of how Barresi intimidated witnesses.

44.    I have knowledge of how many individuals were intimidated by Defendant Paul Barresi and Defendant Adam Waldman.

45.    I observed other notes by Barresi of me when I was a cooperating witness where my statements were changed, including those with potential criminal and civil liabilities.

46.    I have observed Defendant Paul Barresi constantly embellishing and changing statements.

47.    I have knowledge of how several individuals wanted to put Johnny in rehab, but they dont due to him being the one who pays everyone's bills.

48.    Ray O'Hagen has been missing, he disappeared for a while. He was Johnny Depp's sponsor in Alcoholics Anonymous.

PAGE 5 OF 10

49.    I know Johnny Depp sends bouncers on people to intimidate them and for other means.

50.    My friend Bruce Corkum and former assistant of Depp got angry at me after I was intimidated by Barresi and I started to say things for Johnny. Bruce wanted me to be a witness against Depp.

51.    I know Johnny Depp hired an attorney to handle the embezzlement allegations against Sal Jenco in ownership of the Viper Room.

52.    I have information from Adam Waldman that Richard Schwartz and Eric George wanted to be disconnected from ties to Barresi.

53.   I have information of how Paul Barresi contacted Jalee Carter - who knew Donna from the modeling circuits and brought Donna to stay at the house. Bobby Pastorelli was Jalee's husband. I have knowledge that Donna wanted to meet Johnny again and in order to see Johnny again she had to do sexually lewd acts to his friends in order to see Johnny again.

54.    I have seen Johnny Depp push Donna after saying they're both from Kentucky and Johnny then had Ed Shaw mangle and physically abuse Donna and throw her out of the club.

55.    Paul Barresi brought up Jalee Carter and then intimidated Plaintiff and I for wanting to re-interview her.

56.    I have knowledge of individuals in the film business that end up recanting their stories due to Paul Barresi.

57.    I have information as to how Paul Schindler had a list of names for kill, Schindler's list, which included a list of names that are for kill that will be claimed as death by suicide. Schindler had a tattoo 'Johnny Depp Til Death.'

58.    Paul Schindler had an inheritance and he wanted to hire a hitman to be at his funeral to kill Johnny, Ricky, Isaac, and Sal. He was angry at Johnny for ignoring him. Johnny wore a skull ring that represented 'Death Is Certain.'

59.    I have knowledge that other bodyguards and individuals such as Hunter who worked for Leonardo DiCaprio are also trained to stay out of situations no matter what they witness or see. Schindler was hired to be Leonardo's bodyguard in Mexico and he was fired.

PAGE **6** OF **10**

60.    I have information how Johnny Depp had Paul Schindler work off books to do threats, or coercive acts to individuals, and used Schindler until he was done doing so.

61.    I have knowledge that Barresi used a check to pay Olivia Barash.

62.    I observed many people in the Viper Room, including Maria McKee, friend Seven McDonald, Hunter Thompson, Aileen Getty, Josh Richmond, Brent Bolthouse, Jennifer Akari, Olivia, Chris, Ricky Beck Mahler.

63.    There were children who were in the Viper Room. Alan Ginsburg, to my belief, was there to look for children.

64.    I have seen Eileen Grund being underage, at the Viper Room, being used.

65.    I witnessed Carre's face bruised outside the Viper Room one night.

66.    I observed that Johnny Depp used art and guitars with Ricky Beck Mahler, and other overpriced items, to hide his assets by transferring worth to his friends. I have knowledge that my former friend Ricky has the stock corp Chud King Inc, that in my belief is a shell corp, and another associate owns The Wolves business in downtown Los Angeles. I told Plaintiff that Isaac Baruch's house on Sweetzer given by Johnny used to be Betty Sue's house. I've been to the Eastern Columbia loft for dinner although Amber was not there.

67.    I observed that the Viper Room had additional fake names on the payroll like Joey Woodpecker to increase our pay, and this got the club into tax trouble, that was paid off by Johnny. I observed ways of more sophisticated money laundering later in life.

68.    I have information on how Johnny Depp fabricated that Bruce Witkin, Tracy Jacobs, and Peter Nichols embezzled and stole his money.

69.    I have information as to how Johnny Depp uses individuals to his benefit, who will do what he says and who will keep his secrets, and how he gets rid of them once he finalizes using that individual.

70.    I witnessed Johnny being abusive to his girlfriends, yelling, screaming threats towards them.

71.    I witnessed Johnny get violent and hit men.

PAGE **7** OF **10**

72.    I have knowledge of how fixers, publicists and lawyers determine outcomes.

73.    I have knowledge of how individuals turn on others due to nepotism, and bribery, such as setting people up with their own nightclubs to own or manage.

74.    I have knowledge that Johnny Depp required women to perform lewd acts or have sexual intercourse with Big Ed Shaw before Johnny allows the women to talk to him or accompany him.

75.    I observed that Chris Jenco is afraid of Johnny Depp and to his belief, he feared that Johnny Depp tried to have Big Ed Shaw killed because he knew too much, and knew that Big Ed Shaw was going to start talking.  Big Ed Shaw was in an accident which left him a quadrapalegic a couple years later. Johnny gave payments to Ed Shaw for years after the accident until allegations of his friends stealing.

76.    I believe Paul Schindler killed his best friend, he was arrested for killing him but due to extenuating circumstances he got out of the case and no charges filed, claimed it was an accident.

77.    I have information as to how Paul Schindler was Johnny Depp's personal assistant and worked as his bodyguard at the Viper Room, and he took credit that he killed Anthony Fox.

78.    I witnessed Paul Schindler pull out his gun and take two shots at an individual.

79.    I have knowledge that Barresi denied, when he approached me when I was a witness to testify against Johnny Depp, of him knowing Marty Singer, which I know was a lie.

80.    A few days after that, I was allegedly offered money from Barresi where he claimed the money would come from Marty Singer, to go bribe a cop about evidence from Shalimar's death.

81.    I witnessed Barresi was trying to make me look inconsistent when he falsified information to others about what I actually said.

82.    In my observation, Ricky and Isaac knew that Johnny needed rehab and he was self-destructive. I had been invited to the engagement party for Johnny and Amber, and I did not attend. Back then my social circles, including inner circles of Johnny's, had nothing bad to say about Amber prior to the lawsuit involving Adam Waldman, as Johnny's attorney.  When they were first dating or when they first came around the time of the engagement party, everybody loved her; and the friends were not complaining about Amber until after the separation.

**PAGE 8 OF 10**

83.    I explained to Plaintiff Taft about my knowledge of a night of violence against Amber that my friends knew of that happened in the Eastern Columbia building and about the scene that Isaac kept claiming about.

84.    I have many additional observations on my former friend Isaac Baruch, some observations that I unfortunately told Defendant Paul Barresi who then exploited the information.

85.    I have witnessed Barresi do death threats to Ms. Taft and that she shouldn't be alive.

86.    I was and still am afraid for the life of Plaintiff Taft and Amber Heard's life.

87.    I have also been afraid for my own life since 2022 onward while observing the escalations between Defendants Barresi and Waldman. I nearly lost my life in October of 2022 from Barresi and Waldman during the time Barresi stated I was "dead silent" and should not have "air."

88.    During my interviews with Ms. Taft, I told her all my observations and everything I witnessed with Johnny Depp, Paul Barresi and Adam Waldman.

89.    I would have attested for other cases against Johnny Depp, not only in Amber Heard's Case. Rocky Brooks was another case. I told his lawyer Pat Harris, I would testify for him and additional witnessing that I saw relevant to violence from Depp and film sets.

90.    Into 2024, Mr. Barresi regularly contacts me to make me withhold my testimony as being a witness against Mr. Depp, and wanted me to not have accurate interviews by the Department of Consumer Affairs, and to no longer report to the FBI.

91.    To this day, Barresi intimidates me and told me to "Go get that bitch" about Plaintiff Taft.

92.    To this day, Barresi continues to contact me, call me, and to intimidate me and Plaintiff Taft.

I attest that lines 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 70, 72, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 109, 110, 111, 112, 116, 117, 120, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 143, 149, 152, 153, 164, 168, 172, 184, 187, 193, 207, 215, 216, 218, 219, 220, 229, 235, 240, 258,  269, 307, 308, 311, 312, 315, 326, 334, 335, 336, 344, 345, 348, 359, 371, 395, 397, 412, 433,540, and 542, and I attest to all the footnotes referencing my witnessing in the lawsuit of Plaintiff Taft are true and correct.

PAGE **9** OF **10**

I have additional knowledge and information I can declare and attest to, inclusive of defendants ongoing activities. I assert that I can provide said evidence to the facts stated above.

I, Richard Albertini, as a declaring witness to testify if so called upon, do hereby declare under penalty of perjury that the information provided herein is true and accurate to the best of my knowledge. This declaration has been verified and is made in good faith.

DATED this ___ day of _____, 2024.


Signed: _____
Name: Richard Albertini


SUBSCRIBED and SWORN to before me
this _____ of _____, 2024.


_____
NOTARY PUBLIC in and for said State,
in the United States of America
OFFICIAL SEAL

**PAGE 10 OF 10**

# EXHIBIT N: VIOLATION OF CALIFORNIA'S STAND AGAINST NDAs ACT

M Gmail

Christina Taft <taftchristina.ceo@gmail.com>

## Taft v. Barresi, et al. (Case No. 5:24-cv-01930)

Christina Taft <taftchristina.ceo@gmail.com>
To: Melissa Lerner <mlerner@lavelysinger.com>
Cc: Lucy Hanna <legalstructureconsulting@gmail.com>, Mel Sue H <melodyesue@gmail.com>, "ceo.taft@rescue-social.com" <ceo.taft@rescue-social.com>, "
<taft.christina@yahoo.com>, Roya Hassas <rhassas@lavelysinger.com>, Max Fabricant <mfabricant@lavelysinger.com>

Ms. Lerner:

**For the Judge's Consideration, Exception (b) - The Answer is "No" to these demands**

**The demand to "withdraw any complaints or reports made with any other authority or agency" violates statutes:**

- **California Code of Civil Procedure § 1001 and Stand Against NDAs SB 331**: Prohibits agreements or actions aimed at silencing individuals from
- **Federal Whistleblower Protection Laws**: Protect individuals from retaliation when reporting illegal activity to federal agencies.

To Lavely & Singer - In consideration of former clients of law firms that may report against 'fixers' and witnesses reporting:

- During Defendant Waldman and Defendant Barresi escalating attacks against Plaintiff Taft and reporting witnesses, a very crucial redaction of a former
- **Former clients and attached clients of Barresi _can be_ exploited and intimidated, including to not report him to authorities, and to be silenced** forceful attachment by Defendant Barresi obstructs investigations and from stopping his exploitation.
- A 10 year old, 2006 article from ABC reported that "Barresi collected dirt on Sylvester Stallone" (while still claiming to 'work' for him) was redacted.
    - "Barresi said that Pellicano hired him to "get dirt on" Sylvester Stallone" (original report from 2006 retrieved in early 2022) _the repor_ _exploitation with no notation of redaction_ (2022 redacted onward).

### Violation of 2022 California Law on No NDAs Silencing Criminal or Unlawful Conduct

- **Law Violation,** California's **Stand Against Non-Disclosure Agreements Act** (SB 331), effective January 1, 2022, **prohibits c settlement agreements that prevent the disclosure of information about unlawful acts, including harassment, discrim behavior.**
    - California Code of Civil Procedure § 1001. Protects whistleblowers and victims from being silenced about unlawful activiti

### Violation of Rule 3.10 of California Bar Association Codes of Conduct:

- **Rule 3.10**: Lawyers are prohibited from threatening criminal, administrative, or disciplinary charges <u>solely to obtain an advantage in a</u> **In violation of Rule 3.10, the 3 years licensed Max Fabricant escalated to threaten after repeatedly calling and text me** Florida Melodye Haynes for allegedly Writing/Editing legal pleadings of Plaintiff, for providing legal consulting to Plaintiff, and for Hay comply to settle (accompanying violation of the 2022 California Law that confidentiality agreements cannot stop reporting unlawful activity). https://apps.calbar.ca.gov/attorney/Licensee/Detail/333859
    - Attached Two Exhibits of Text Messages
    - _After Plaintiff already wrote there was no authorization to contact Haynes_

### Federal Authorities Encourage Court Access and Equal Protection:

- **FBI agent Greg suggested that a lawsuit would be helpful at our interview.**
- **Reports under oath cannot be revoked and my lawsuit is under oath to prevent revocation**
- **Plaintiff Keeps Rights and Rule of Law from the Federal US Law against witness, victim, and informant tampering.**

**Intimidation or Threats by Lawyers - Potential Violations:**

- **18 U.S.C. § 1512 (Witness Tampering)**: Includes intimidating or threatening witnesses to prevent lawful reporting or participation in legal proceedings.
- **California Penal Code § 136.1**: Criminalizes preventing or dissuading a witness or victim from making a report to law enforcement or other authorities.
- **Threatening civil, administrative, or criminal consequences to discourage complaints violates California Rule of Professional Conduct 3.10.**

**You should tell your supervisor, Marty Singer.**

- **(b) Exceptions.** The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a con **an effort to obstruct a criminal investigation or prosecution.**

Regards,
Christina Taft

_Founder & Entrepreneur | Innovator | Egalitarian, Humanitarian, American_
_LinkedIn_

On Tue, Nov 26, 2024 at 7:01 PM Melissa Lerner <mlerner@lavelysinger.com> wrote:

CONFIDENTIAL AND PRIVILEGED SETTLEMENT COMMUNICATION (FRE 408)

134                                                                    EXHIBIT N

Gmail    christina.taft <taftchristina@gmail.com>

**Taft v. Barresi, et al. (Case No. 5:24-cv-01930)**

**Christina Taft** <taftchristina.ceo@gmail.com>                                    Thu, Jan 9, 2025 at 12:57 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

---------- Forwarded message ----------
From: **Melissa Lerner** <mlerner@lavelysinger.com>
Date: Tue, Nov 26, 2024 at 7:01 PM
Subject: Re: Taft v. Barresi, et al. (Case No. 5:24-cv-01930)
To: Christina Taft <taftchristina.ceo@gmail.com>
Cc: Lucy Hanna <legalstructureconsulting@gmail.com>, Mel Sue H <melodyesue@gmail.com>, ceo.taft@rescue-social.com <ceo.taft@rescue-social.com>, taft.christina@yahoo.com
<taft.christina@yahoo.com>, Roya Hassas <rhassas@lavelysinger.com>, Max Fabricant <mfabricant@lavelysinger.com>


CONFIDENTIAL AND PRIVILEGED SETTLEMENT COMMUNICATION (FRE 408)


Ms. Taft,

To avoid incurring further attorneys' fees and costs and in order to resolve this matter without additional motion practice before the Court, we propose the following terms for
settlement.


1. Mutual releases of all claims, known or unknown, existing at effective date of settlement agreement (with customary Civil Code 1542 waiver)
2. Mutual non-disparagement
3. Mutual non-contact
4. Takedowns
   a. Provision requiring that, within 7 days after execution of agreement, each Party take down any material (videos, articles, blogs, tweets, etc.) that he/she (or his/her
      representatives or agents) has publicly posted about the other Party and submit requests to any other site/company where such material has been published
   b. Within 10 days after execution of agreement, Parties must sign and return to each other signed and notarized statements attesting under oath that all material
      about the other Party has been removed from the Internet (from sites under the parties' control and/or that of their agents/representatives) and attaching copies of
      letters sent to any other sites/companies/publications requesting removal of such material
   c. Provision prohibiting the parties and their agents/representatives from posting about the other Party or discussing one another in any context or any way
5. Any breaches of the non-disparagement, non-contact or takedown provisions to constitute material breach to be resolved via expedited procedures at JAMS in Los
   Angeles, CA
6. Taft to withdraw any complaints or reports made against Barresi with any other authority or agency
7. Taft to dismiss with prejudice the action pending in federal court no later than 10 days after execution of the agreement
8. Taft to pay $20,000 to Barresi (c/o Lavely & Singer Client Trust Account) for his attorneys' fees and costs incurred in this action
9. Confidentiality of agreement and payment terms


Please provide your response before the Thanksgiving holiday. It would be in the parties' best interest to resolve this matter.


My client's rights and remedies are reserved.


Sincerely,

Melissa Lerner


From: Melissa Lerner <mlerner@lavelysinger.com>
Date: Wednesday, November 6, 2024 at 3:15 PM
To: Christina Taft <taftchristina.ceo@gmail.com>
Cc: Lucy Hanna <legalstructureconsulting@gmail.com>, Mel Sue H <melodyesue@gmail.com>, ceo.taft@rescue-social.com <ceo.taft@rescue-social.com>, taft.christina@yahoo.com
<taft.christina@yahoo.com>, Roya Hassas <rhassas@lavelysinger.com>, Max Fabricant <mfabricant@lavelysinger.com>
Subject: Re: Taft v. Barresi, et al. (Case No. 5:24-cv-01930)

Hi Ms. Taft,


The allegations against Mr. Barresi, Lavely & Singer P.C. ("L&S"), my colleagues and me and/or clients of L&S contained in your emails dated November 1-2, 5 and 6 and Ms. Hanna's October 31 email are denied in
full.


I do not agree that your filing a motion for a preliminary injunction is relevant to the issue of a response date to the operative complaint or that it belongs in a stipulation on the subject, but you are certainly able to
propose changes to what I sent you in Word format. Instead, I understand your email to mean that you received advice from your legal consultants, Lucy Hanna and Melodye Sue Hannes, to reject the proposal of
entering into a stipulation. Unless you indicate that this understanding is mistaken, we will be proceeding with our motion to dismiss the Complaint pursuant to FRCP 12(b).


All of my client's rights, remedies, claims and defenses, whether arising in law or in equity, remain expressly reserved.

**135**                                                                                    **EXHIBIT N**

Sincerely,

# EXHIBIT O: HARM TO REBECCA BERRY

EXHIBIT O



**Rebecca Berry**

2:29 PM

christina i think he hired a hitman

to kill me i'm serious

i may be paranoid but

i don't think so

call me when you can

paul baressi

something really fucking weird and terrifying just happened to me i'm ok but i think i came very close to being raped and murdering 😢

murdered

and i just freaked out the girl i'm trying to become friends with's

Text message

137

EXHIBIT O

# EXHIBIT P: DEATH THREAT TRANSCRIPT

EXHIBIT P