AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| CHRISTINA TAFT | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.   5:24-cv-01930-TJH-DTB |
| PAUL BARRESI, ADAM R WALDMAN, DOES 1-10, inclusive | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                      AMBER HEARD

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: For Any Communications from Defendant Paul Barresi to Personnel of Heards about Witnesses/Plaintiff, any communications from Heard to Personnel or from Personnel to Heard indicating Defendant Barresi's Coercion (Pursuant to Elements of New York Law) (including against Heard & relation to Plaintiff) See ATTACHMENT A

| Place: Email Ceo.taft@Rescue-Social.com  Call 212-718-1003 Mail 1700 Ala Moana Blvd Apt 2301, Honolulu, HI | Date and Time: 04/29/2025 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

                         OR

_____      _____
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Christina Taft
_____ , who issues or requests this subpoena, are:

Pro Se, Christina Taft, +1-212-718-1003, Ceo.Taft@Rescue-Social.com, 1700 Ala Moana Blvd, Honolulu, Hawaii 96815

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.    5:24-cv-01930-TJH-DTB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

```
-------------------------------------------------------------  X
                                                               :
CHRISTINA TAFT,                                                :
                                                               :
                                Plaintiff,                     :        5:24-cv-01930-TJH-
                                                               :        DTB (lead case)
                                                               :
                -v-                                            :
                                                               :
PAUL BARRESI, ADAM R WALDMAN,                                  :
DOES 1-10, inclusive                                           :
                                                               :
                                Defendants.                    :
                                                               :
                                                               :
-------------------------------------------------------------
-------------------------------------------------------------
```

## <u>NOTICE OF CORRECTED SUBPOENA TO WITNESS</u>

### <u>Witness Amber Heard in Madrid, Spain</u>

To Produce Documents, Information, or Objects

Pursuant to FRCP 45, and the Hague Convention on Evidence (1970) for cooperation with the United States, a witness can provide evidence to United States Courts.

1

PLEASE TAKE NOTICE, pursuant to Federal Rule of Civil Procedure 45, that Plaintiff in Propria Persona intends to serve a Subpoena, in the form attached hereto, to **Witness** Amber Heard, within March and April, 2025, or as soon thereafter as service may be effectuated.

Dated: March 25, 2025

Christina Taft
*United States*

Phone for Witnesses:
 +1-212-718-1003 (New York) or +33 0623441766 (France)
E-mail: ceo.taft@rescue-social.com
 *Plaintiff in Propria Persona*

**Attachment A: Subpoena to Witness Amber Heard**

**SUBPOENA TO WITNESS TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS**

**Case Law from:**
*Blake Lively v. Wayfarer Studios LLC et al.*, U.S. District Court for the Southern District of New York (Case No. 1:24-cv-10049-LJL)
and Film, Music, Arts Cases, Former Clients, *People of California v. Confidential Inc and Hollywood Research Inc, et al,* cases.
  **A.  The Subpoenaed and/or Called Witness can modify the request.**

## DEFINITIONS

1. "Actions" means and collectively refers to the following cases entitled (a) *Taft v. Paul Barresi, Adam R Waldman, Does 1-10, inclusive, leading case in U.S. District Court*; (b) "Related Actions" including, but not limited to: *Anthony V. Fox v Safe in Heaven Dead Productions, Inc et al, Case No. SC062176 in Los Angeles Superior Court; appeals and motions; restraining order and preliminary injunction cases (Plaintiffs v Defendants and Witnesses v Defendants); overlapping reporting, related witnesses, notarized declarations of witnesses, personnel, victims, investigations, interviews; communications, responders, business relationships.*

    a. Types of Communication Documents Requested (Received from Defendant Paul Barresi to Personnel, and any indications of intimidation, threats, blackmail and/or coercion against **Witness** Amber Heard): Emails, Messages, Text Messages, Phone Calls, Phone Call Logs, Mail, Audio Recordings, Picture Attachments, Written Attachments, and Attachments to these sources; Personnel Receipt of Emails, Messages, Text Messages, Phone Calls, Phone Call Logs, Mail, Audio Recordings, Picture Attachments, Written Attachments, and Attachments to these traditional sources.

      For access to subpoena materials, see Fed. R. Civ. P. 45(a). Inclusive of related to Plaintiff(s).

2. The terms "all," "any," and "each" shall each be construed as encompassing any and all. *See* Local Civil Rule 26.3.

3. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope all responses that might otherwise be construed to be outside of its scope. *See* Local Civil Rule 26.3.

4. "Barresi" shall refer to Paul Barresi, who is a party and Defendant to the Action by Plaintiff.

5. "Waldman" shall refer to Adam Waldman, who is a party and Defendant to the Action by Plaintiff.

6. "Communication" means the transmittal of information (between two or more people). *See* Local Civil Rule 26.3.

7.    "Taft Complaint" means the operative complaint filed by Christina Taft in *Taft v. Paul Barresi, Adam R. Waldman, Does 1-10, inclusive,* No. 5:24-cv-01930-TJH-DTB, Dkt. No. 1, and any amended complaints filed by Taft in the proceeding.

8.    The "Enforcement, Safety, and Rescue Complaints" means the operative administrative or law enforcement complaints about witness and victims harmed, filed by individuals, with respect to "Hollywood Fixers" to State Departments, Police, FBI, Authorities, between 2022 to the Present.

9.    "Concerning" means relating to, referring to, describing, evidencing, or constituting. *See* Local Civil Rule 26.3.

10.    "Document" or "Documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ.

P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term. *See* Local Civil Rule 26.3.

11.    The "Notary" and "Oath" to "Declare" means, for witnesses, as described in the Taft Complaint.

12.    "Including" means "including, but not limited to," or "including, without limitation," and should not be construed as limiting any request.

13.    "Defendant's Counsel" refers to the law firm serving as counsel for the Barresi Parties in the Action as well as its past or present members, officers, employees, partners, corporate parent, subsidiaries, or affiliates.

14.    "Taft's Professional Business" shall refer possibly to Ms. Taft's affiliated entities, including but not limited to, Cases related to Film/Music/Arts, Public Safety & Victims Alliance, Rescue Social Inc, Save Me Now Inc, Worldie, Aedan, Process Serving, Clients, Paralegal developments, Chicago partnerships, interviews, initiatives and partnerships, individually and collectively, and their past or present members, officers, employees, partners, corporate parent, subsidiaries, or affiliates.

15.    "Ms. Taft" shall refer to Christina Taft, who is a party to this Action.

16.    "Witness & Victim Interference" shall refer to any efforts to suppress, intimidate and/or propose benefits whether financial or otherwise, threats, mortality, abuse, interference with personnel to

increase costs and trepidation, <u>Coercion as defined by the New York Law</u> penal 135.60 of the third to first degrees, including "withhold testimony or information with respect to another's legal claim or defense" and "or another will," as well as no matter if "true or false," as well as commercial advantages and gains, including, but not limited to, using likeness/voice/names of plaintiff, witnesses and/or victims in any solicitation, advertising, promotional, publicity or marketing materials (such as, without limitation, themes, solicitations and being told to not communicate with certain individuals, posts, s o l i c i t i n g , screen, radio, digital or television), as described in Complaint.

17. The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation. *See* Local Civil Rule 26.3.

18. "Person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or associate. *See* Local Civil Rule 26.3.

19. "Obstructions" refers to efforts of the Barresi, Waldman, Does 1-10 parties and/or any affiliates, employees, associates, or subcontractors to communicate information regarding, or the Actions

20. "Relating to" or "Relate to" means, without limitation, assessing, comprising, constituting, concerning, referring to, containing, describing, discussing, embodying, evidencing, identifying, pertaining to, reflecting, stating, supporting, or tending to support or refute, or referring in any other way, directly or indirectly, in whole or in part, to the subject matter specified.

21. "Messaging and Direct Communication Platforms" means any communication source on which persons can submit, communicate, including but not limited to:

      a. Email, Messaging Applications & Direct Communication Platforms – Including, but not limited to, Gmail, Outlook, WhatsApp, Telegram, Signal, Discord, Slack, Facebook Messenger, Instagram DMs, Twitter DMs, or any private messaging feature within a platform. Or audio/photo/video based.

22. "Barresi Parties" refers to Defendants Paul Barresi, related associates, directed associates, Adam Waldman,

and Does 1-10.

23.  "Waldman Parties" shall refer, individually and collectively, refers to Defendants Adam Waldman, Paul Barresi and Does 1-10.

24.  "You," "Your," or "Yours" refers to Personnel and any of its officers, directors, employees, partners, corporate parents, subsidiaries, affiliates, successors, assigns, or any related entity.

## INSTRUCTIONS

1.  In addition to the specific instructions below, these Requests incorporate by reference the instructions set forth in Rule 45 of the Federal Rules of Civil Procedure.

2.  In responding to these Requests, You shall make a diligent search and produce all responsive Documents that are (i) in Your possession, custody, or control, or (ii) in the possession, custody, or control of any of Your personnel, Your witnesses, Your security, legal professionals, associates, or your representatives, or (iii) otherwise available to You. A Document shall be deemed within Your control if You have the right to secure the document or a copy of the Document from another Person having possession, custody, or control of the Document.

3.  Unless otherwise specified, each Request concerns the time period from (a) 2018 to Present, (b) 2019 to Present, (c) 2022 to Present, or (d) modify request, through the present.

4.  In construing these Requests, You should give effect to the Definitions set forth above. Undefined words and terms shall be given their common meaning. If You are unsure of the definition of a particular term or word, use the definition that You believe to be the most accurate and state that definition in Your response.

5.  If You do not clearly understand, or have any questions about the definitions or instructions for any Request, please promptly contact properia persona Ms. Taft for clarification.

6.  These Requests should be construed as broadly as possible with all doubts resolved in favor of production. If you believe a Request is ambiguous, use the broadest reasonable interpretation as permitted under the Federal Rules of Civil Procedure and state the nature of the perceived ambiguity and the interpretation used to resolve it. The words "all," "any," "each,"

"and," and "or" shall be construed conjunctively or disjunctively as necessary to make the Request inclusive rather than exclusive. Except as specifically provided in these Requests, words imparting the singular shall include plural, and vice versa, where appropriate. Except as specifically provided in these Requests, words imparting the present tense shall also include the past and future tense and vice versa, where appropriate.

7.      For any hard copy production, all documents produced shall be produced as kept in the ordinary course, including identification of the applicable file folder and source. The original of each document requested shall be produced, or an identical copy of each document, imprinted with a Bates identification number. Documents attached to other documents or materials shall not be separated. Documents not otherwise responsive to these requests shall be produced if such documents are attached to documents called for by the Requests and constitute routing slips, transmittal memoranda, letters, emails, comments, evaluations, or similar materials, or mention, discuss, refer to, or explain the documents that are called for by the Requests.

8.      For any hard copy production, identical copies of a document need not be produced. Any copy of a document that varies from the original, whether by reason of handwritten or other notation or any omission, or metadata associated with a file, shall constitute a separate document and must be produced, whether or not the original of such a document is within your possession, custody, or control.

9.      If an objection is made to any portion of any Request, (a) state with specificity the objection and legal basis for such objection; (b) state whether any responsive materials are being withheld on the basis of that objection; and (c) answer all remaining portions of the Request to which an objection is not asserted.

10.      If any responsive document was, but no longer is, in Your personnel's or Your possession, custody, or control, state whether it is (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of; and (e) in each instance identify the contents, author(s), date prepared or received, name and address of its current or last known

custodian, and the date and circumstances surrounding such disposition.

11.    To the extent that the native format for transactional or other data responsive to these Requests is not compatible with Microsoft Office products (*e.g.*, Microsoft Excel, Microsoft Word, Microsoft Access, etc.), the data shall be produced in a usable format. If You need assistance in determining what constitutes a usable format, You shall promptly contact Ms. Taft's pro se representation.

12.    These Requests are continuing in nature and all documents coming into Your possession, custody or control which would have been produced had they been available earlier shall be produced forthwith.

13.    Notwithstanding anything else to the contrary herein, each word, term, or phrase is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure.

14.    Review/Analytics: Predictive review shall not be used for the purpose of culling the Documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good cause. Before threading is used to reduce the volume of emails to review, the producing party shall reach out to Ms. Taft's properia persona representation to ensure the process being utilized by the vendor is industry standard. If it is agreed that threading may be used to reduce the volume of documents to produce, the producing party shall produce the Inclusive emails, defined as those emails within an email thread containing all unique content as determined by commonly accepted analytics tools. The requesting party may request the production of a lesser-included email or emails, and any such reasonable request(s) shall not be refused where the Document is available in the producing party's Document collection.

1.    Message Contents: In addition to the fields listed in Section above, Contents for text and chat messages produced will include the following fields of information, to the extent such information exists and can be readily provided through reasonable efforts: Message Thread ID, Message Participants, Message From, Message To, Message DateTime Sent, Message Application Name (*e.g.*, Signal, WhatsApp, etc.)., Message Deleted, Message Deleted on, Message Deleted By,

Message Edited, Message Edited On, Message Edited By.

2.      Attachments: If any part of an email or its attachments is responsive, the entire email and attachments should be produced, except any information to be redacted on the basis of privilege. The parties should meet and confer about whether there is an appropriate basis for withholding a family Document for any reason. The attachments should be produced sequentially after the parent email.

3.      Compressed File Types: Compressed file types should  be decompressed so that the lowest level Document or file is extracted.

4.      Structured Data: To the extent a response to discovery requires production of electronic information stored in a database, the parties should meet and confer regarding methods of production. Parties should consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.

5.      Encryption: To maximize the security of information in transit, any media on which Documents are produced may be encrypted. In such cases, the producing party shall transmit productions via SFTP. If that is not possible, parties should discuss with propria persona Ms. Taft and transmit the encryption key or password to the receiving party, or by phone call or text message, contemporaneously with sending the encrypted media.

6.      Redactions: If excels are to be redacted, redactions must be applied natively. If other Documents that the parties have agreed to produce only in native format need to be redacted, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

**DOCUMENTS TO BE PRODUCED**

**REQUEST FOR PRODUCTION NO. 1:**

All Documents concerning ingoing and outgoing calls, emails, or text messages related to

telephone number 908-656-5712 and email paulbarresi@aol.com **belonging to Paul Barresi**, within the time period of (a) 2019 to the present, (b) April 2020 to the present, and/or (c) 2022 to the present, including but not limited to e m a i l s ,  m e s s a g e s ,  a t t a c h m e n t s , call logs, text logs, data logs, a u d i o  r e c o r d i n g s , and by d e f e n d a n t  t o  p e r s o n n e l : i n d i c a t e d  s e n s i t i v e  a n d / o r  l o c a t i o n  i n f o r m a t i o n , or possibility of d e c l a r i n g  a n d / o r  f r e e l y  l i v i n g , o f  w i t n e s s e s ,  p o t e n t i a l  w i t n e s s e s , v i c t i m s ,  a n d / o r  p l a i n t i f f ( s ) .

### REQUEST FOR PRODUCTION NO. 2:

All Documents concerning ingoing and outgoing calls, emails, or text messages related to telephone number 202-550-4507 and email awaldman@theendeavorgroup.com **belonging to Adam R Waldman**, within the time period (a) 2018 to the present, (b) April 2020 to the present, and/or (c) 2022 to the present, including but not limited to e m a i l s ,  m e s s a g e s , a t t a c h m e n t s , call logs, text logs, data logs, a u d i o  r e c o r d i n g s , and b y d e f e n d a n t ( s )  t o  p e r s o n n e l : any i n d i c a t e d  s e n s i t i v e  a n d / o r  l o c a t i o n  i n f o r m a t i o n , or p o s s i b i l i t y  o f  d e c l a r i n g  a n d / o r  f r e e l y  l i v i n g , o f  w i t n e s s e s ,  p o t e n t i a l  w i t n e s s e s ,  v i c t i m s ,  a n d / o r  p l a i n t i f f ( s ) .

### REQUEST FOR PRODUCTION NO. 3:

All Documents concerning ingoing and outgoing calls, emails, or text messages related to Co-Defendants to telephone numbers (unknown) belonging to Security, within the time period of (a) 2018 to the present, (b) 2020 to the present, and/or (c) 2022 to the present, including but not limited to e m a i l s ,  m e s s a g e s ,  a t t a c h m e n t s , call logs, text logs, data logs, a u d i o  r e c o r d i n g s , and by d e f e n d a n t s  t o  p e r s o n n e l : i n d i c a t e d  s e n s i t i v e  a n d / o r  l o c a t i o n  i n f o r m a t i o n  o f  p o s s i b l e  d e c l a r i n g  a n d / o r  f r e e l y  l i v i n g  w i t n e s s e s  o r  v i c t i m s ,  o f  w i t n e s s e s ,  p o t e n t i a l  w i t n e s s e s ,  v i c t i m s ,

and/or plaintiff(s).

**REQUEST FOR PRODUCTION NO. 4:**

All Documents concerning ingoing and outgoing calls, emails, or text messages related to Co-Defendants to telephone numbers (various and unknown) belonging to Other Personnel, within the time period of (a) 2018 to the present, (b) 2020 to the present, and/or (c) 2022 to the present, including but not limited to emails, messages, attachments, call logs, text logs, data logs, audio recordings, and by defendants to personnel: indicated sensitive and/or location information of possible declaring and/or freely living witnesses or victims, of witnesses, potential witnesses, victims, and/or plaintiff(s).

**REQUEST FOR PRODUCTION NO. 5:**

All Documents concerning ingoing and outgoing calls, emails, or text messages related to Co-Defendants and personnel to the account(s) of JD, within the time period of 2018 or 2019 or 2022 to the present, including but not limited to call logs, text logs, and information, any "related to" defendants, witness(es), plaintiff(s) of the entitled actions.

**REQUEST FOR PRODUCTION NO. 6:**

All Documents and Communications, related to Personnel and/or Ms. Heard declaring or indicating that Defendant Paul Barresi and/or Adam Waldman, Does 1-10, *have intimidated, threatened, or blackmailed Witness Heard and/or Personnel, and any in relation to Plaintiff*, and produced in connection with any Subpoena in any Action, related action, or consolidated action.

# Please Be Advised – There is Corrected Documentation in this Corrected Subpoena to a Witness.        See Exhibits Attached.

## CORRECTION OF SUBPEONA TO WITNESS

With this Subpoena pursuant to FRCP 45 and the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters to a Witness, Amber Heard in Madrid, Spain, are these Documentation, Information, and Objects:

1. April 28, 2022 email of Falsified Interview of Co-Owner of Viper Room ANTHONY FOX'S DAUGHTER CONSTANCE by Defendant Barresi
2. **CORRECTED** Interview of Cooperating Witness Albertini by Plaintiff Taft (highlighted corrected lines by Witness)
   Certified transcription, notarized. (14 pages) (2022 to Present, 2025)
3. Certified transcription of Viper Room bouncer Witness Ed Shaw and Witness Albertini's phone call, notarized. Used by Defendant Barresi. (Notary 31 pages)
4. Certified transcription of phone call with Anthony Fox's Brother Charles Fox with influence/corrupt persuasion by Defendant Barresi. (Notarized 13 pages)
5. Ref Anthony Fox Missing Person Investigation VPD 01-18806 From: Detective Furlong, Patrick <pfurlong@cityofventura.ca.gov> Jul 31, 2019 and Reply over two years later on Dec 9, 2021 by Defendant Barresi.

Through the European Hague Convention on Evidence, which verifies cooperation with the United States, a Witness can provide evidence to United States Courts.
Submitted by a process server in the United States.

**Pursuant to Public Counsel in Los Angeles, California:**

*See, https://publiccounsel.org/services/federal-court/forms-guides-samples*

"Everyone deserves equal access to justice. We work with communities and clients to create a more just society through legal services, advocacy, and civil rights litigation."  *(spacing of font 22.75)*

# <u>Exhibits to Attachment A:</u>

## Subpoena to Witness Amber Heard

## Please be advised that Plaintiff likely cannot obtain an injunction or restraining order without your reply of documentation and/or declaration of a witness.

1:07

# Excerpt from my book - TITLE: THE HOLLYWOOD FIXER WHO WOULD'VE KILLED FOR JOHNNY DEPP  Inbox

paulbarresi@aol.com   Jan 10

Here's an excerpt from my book."That whore of a...

me   Jan 10

to Christina

**Christina Taft**
**Founder**

LinkedIn

• • •



https://en.wikipedia.org/wiki/Bath,_Somerset


-----Original Message-----
From: Furlong, Patrick <pfurlong@cityofventura.ca.gov>
To: paulbarresi@aol.com <paulbarresi@aol.com>
Sent: Wed, Jul 31, 2019 12:40 pm
Subject: Ref Anthony Fox Missing Person Investigation VPD 01-18806


Per our phone conversation, I am reaching out to you to inquire about any information regarding the Missing Person
investigation for Anthony Fox (VPD 01-18806).


Thanks again,


Patrick Furlong

Criminal Investigative Technician
Sex Offender Registration / Missing Persons
Ventura Police Department
1425 Dowell Dr., Ventura, CA 93003
(805) 339-4473 Office


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged
information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is
prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended
recipient, please contact the sender and destroy all copies of the communication.


---

**3 attachments**


Johnny Depp - Charles Fox call_09-36-18_OUT__16699291319017.amr
3001K


Maud Fox Will 1.pdf
528K


Maud Fox Will 2.pdf
30K

11:43





HOLLYWOOD PRIVATE EYE
PAUL BARRESI
ASSISTING VENTURA CALIFORNIA
POLICE DETECTIVES
SINCE 2019
INTERVIEWS ANTHONY FOX'S EX WIFE,
JUDITH FOX

## Description                                                    ✕

## The Mysterious Disappearance of Johnny Depp business partner Anthony Fox -The Unheard Tapes-Part II

 Paul Barresi

| 2 | 10 | Jul 19 |
|---|----|--------|
| Likes | Views | 2023 |

Hollywood Fixer Paul Barresi, who was at the forefront of the Depp v. Heard trial has been assisting the Ventura Police Department its Anthony Fox endangered missing persons case for 3 years. Barresi has uncovered new clues which suggest Fox may still be alive and well.

🔒 youtube.com

6:30

 **YouTube: Watch, Listen, Stream**
Open in the YouTube app

**OPEN**



1:58 / 4:08

## Description

×

 Paul Barresi

| **6** | **67** | **Aug 9** |
|---|---|---|
| Likes | Views | 2023 |

Johnny Depp's consigliere Adam Waldman acknowledges favors role Hollywood Fixer Paul Barresi played for Johnny's side in the Depp v. Heard Waldman also confides to Barresi, who is under attack by obsessed fan Christina Taft, that bad shit crazies like Taft are attacking Johnny's witnesses in a variety of simple and complex ways, from cyber bullying to physical violence. Waldman encourages Barresi to tell his story.



🔒 youtube.com

**Audio File:** Corrected Interview of Cooperating Witness Richard Albertini by Christina Taft from Email by Paul Barresi to Law Firm

**Audio Length at time of Transcription:** [00:31:59]

**Speaker One (1):** Christina Taft

**Speaker Two (2):** Richard Albertini

**Speaker 1 (Taft)** [00:00:00]: All this is (inaudible).

**Speaker 2 (Albertini)** [00:00:01]: Wait, Wait, when that beeped, I didn't hear you start over.

**Speaker 1 (Taft)** [00:00:05]: Albertini alleges as follows Johnny Depp DP physically assaulted actresses Winona Ryder, Carrie Otis, Kate Moss and model Stacey Lopez.

**Speaker 2 (Albertini)** [00:00:15]: Uh, no Stacy Lee Lopez. As a matter of fact, I told you the story about Carrie Otis. Uh, he contacted Carrie Otis insisting that Johnny hit her, and she told Paul Barresi that she didn't even know Johnny. She only met him a couple times, and that was ridiculous. No, I never told him that. Read that one over again. So, who else was in that? Kate Moss and who?

**Speaker 1 (Taft)** [00:00:42]: Winona Ryder.

**Speaker 2 (Albertini)** [00:00:44]: Uh, no I never seen him hit Winona Ryder. Uh, did I know them to fight? Yes. You know, yelling and screaming at each other. Who was the other one? Kate Moss?

**Speaker 1 (Taft)** [00:00:55] Yeah.

**Speaker 2 (Albertini)** [00:00:56]: Uh, yeah, they would fight. I never seen him hit her. Um, it was actually Paul Barresi who… in the initial contact with me and I sent it to you. That's the one from Facebook, where he contacts me saying he wants to know from me what happened at the St. Mark's Hotel in New York that night. And my response was I don't have any idea. And what was that all about? That was a fight between Johnny and and Kate where the hotel got fucked up.

**Speaker 1 (Taft)** [00:01:27]: Alright, met Johnny Depp, DP, through Sal Jenco in 1990.

**Speaker 2 (Albertini)** [00:01:33]: What did you? DP?

**Speaker 1 (Taft)** [00:01:35]: Yeah that's why he's calling, claiming he's DP.

**Speaker 2 (Albertini)** [00:01:39]: Wait, Johnny Depp. . .

**Speaker 1 (Taft)** [00:01:42]: Met Johnny Depp, DP, through Sal Jenco in 1990.

**Speaker 2 (Albertini)** [00:01:47]: Yes, I don't know what the DP means.

**Speaker 1 (Taft)** [00:01:50]: Operated sophisticated money laundering scheme.

**Speaker 2 (Albertini)** [00:01:54]: No, not at the Viper Room AMTech communications I went to prison for it.

**Speaker 1 (Taft)** [00:02:01]: Didn't you say that Richie Beck Mahler was doing money laundering?

**Speaker 2 (Albertini)** [00:02:06]: That has, what does that have to do with me?

**Speaker 1 (Taft)** [00:02:10]: Uh, because money laundering scheme. So oh that's, so you're saying he was talking about you?

R **Speaker 2 (Albertini)** [00:02:16]: Yeah, he's talking about me.

**Speaker 1 (Taft)** [00:02:18]: The Ricky Beck Mahler? Okay.

**Speaker 2 (Albertini)** [00:02:20]: Yeah.

**Speaker 1 (Taft)** [00:02:21] Albertini, oversaw, but you're saying money laundering did or did not happen in or around the Viper Room?

**Speaker 2 (Albertini)** [00:02:28]: Well, again, I gave you some examples of it. It had nothing to do with the Viper Room. That was Johnny's personal assets. You know, years later, you know, we talked about with the art and the guitars and stuff like that. Apples and oranges, two totally separate issues. . . uh two totally separate issues.

**Speaker 1 (Taft)** [00:02:47] Albertini oversaw Viper Room protection fees paid to mob.

**Speaker 2 (Albertini)** [00:02:53]: No, because there were no protection fees paid to the mob. Um, that's part of the recorded tape with me and "Big Ed" Shaw. These want to be mobsters came into the club trying to get protection fees, and we told them to get the hell out of there. That's… We threw them out that night. The next day they came back and put the gun in the guy's mouth and said, get the fuck out of here.

**Speaker 1 (Taft)** [00:03:20] DP has long history of drugs. He's on all kinds of drugs, psychotropic medication in and out of rehab, multiple doctors writing medication.

**Speaker 2 (Albertini)** [00:03:30]: Yes.

**Speaker 1 (Taft)** [00:03:31] DP obsessed with buying up memorabilia of himself paying ridiculous amounts of money.

**Speaker 2 (Albertini)** [00:03:37]: Yes.

**Speaker 1 (Taft)** [00:03:38] Not one person ever said JD was depressed or complaining about his relationship with Amber.

**Speaker 2 (Albertini)** [00:03:45]: Wait back that up again. I told him . . .

**Speaker 1 (Taft)** [00:03:49] You said not one person ever said JD was depressed or complaining about his relationship with Amber.

**Speaker 2 (Albertini)** [00:03:58]: Didn't I just in the statement right before that? Didn't I say that he had a problem with drugs and psychotropic medications? So of course, he was depressed. He was seeing doct... he was seeing doctors from depression.

**Speaker 1 (Taft)** [00:04:12]: But it was not from being in his relationship with Amber.

**Speaker 2 (Albertini)** [00:04:18]: Oh, again, that would be a statement that I couldn't answer that would be a medical statement. Why was he taking... was he...

**Speaker 1 (Taft)** [00:04:27]: Well, well you said earlier that no one complained about her.

**Speaker 2 (Albertini)** [00:04:31]: Oh, I see what you're saying. No, no, no, no, nobody. The friends were not complaining about her until after the separation. When they were first dating or when they first around the time the engagement party, everybody loved her.

**Speaker 1 (Taft)** [00:04:47]: Jonathan Shaw said he witnessed JD hit Amber multiple times but will never admit it to anybody. Because JD is a meat, meal ticket.

**Speaker 2 (Albertini)** [00:04:57]: No, never said that. Did we discuss Jonathan Shaw? Yes. Did I say he would make a terrible witness? Yes. Because I told Paul Barresi not worth reaching out to him. That's Johnny's meal ticket.

**Speaker 1 (Taft)** [00:05:14]: JD financially supports an artist, who a public figure is engaging in various gay sex acts.

**Speaker 2 (Albertini)** [00:05:21]: Isaac Baruch.

**Speaker 1 (Taft)** [00:05:25]: So, he didn't say Isaac Baruch there.

**Speaker 2 (Albertini)** [00:05:27]: Yes, I did; of course I did.

**Speaker 1 (Taft)** [00:05:29]: I mean Barresi didn't though.

**Speaker 2 (Albertini)** [00:05:31]: No, of course not, because that's Johnny's key witness he didn't want to put that out.

**Speaker 1 (Taft)** [00:05:36]: All right. JD extinguished cigarette on model Stacey Lopez's head because he was angry Kate Moss was dancing with her.

**Speaker 2 (Albertini)** [00:05:46]: Uh, that's, that's correct. I told him that.

**Speaker 1 (Taft)** [00:05:50]: JD, uh, DJ Daddy Carlos or Richie Rich witnessed this assault.

**Speaker 2 (Albertini)** [00:05:57]: Uh, no, I never said that. I said those are people he might want to contact because they would have been the DJ. And they could possibly give them an answer.

**Speaker 1 (Taft)** [00:06:07]: Big Ed Shaw witnessed the incident along with other bouncers.

**Speaker 2 (Albertini)** [00:06:12]: Yes, Big Ed Shaw and Paul Schindler.

**Speaker 1 (Taft)** [00:06:15]: They witnessed, so they witnessed Stacey Lee Lopez's assault against her.

**Speaker 2 (Albertini)** [00:06:21]: Yes, it was Paul Schindler that uh pulled her out into the corridor or down into the hallway. Uh, because he was actually he intervened to protect her. And that was the same time Johnny started punching holes in the walls that night screaming and yelling at uh, Paul Schindler that he was going to kill him. Johnny was in one of his rages.

**Speaker 1 (Taft)** [00:06:43]: Interesting. JD played role in shooting up River Phoenix leading to his death.

**Speaker 2 (Albertini)** [00:06:49]: Absolutely not.

**Speaker 1 (Taft)** [00:06:53]: JD is a Satanist. After hours, he held satanic rituals at the Viper Room.

**Speaker 2 (Albertini)** [00:07:00]: (laughing) Um. . . all right, let me see, how do I answer a question like that? Um, so I'm gonna answer it as a Christian. I'm gonna say everything that ever happened inside the Viper Room was a satanic ritual. Nothing, nothing special went on in the after hours. It's just, that's when most of the drugs were being used. And that's when you know, that's when the that's when all the really weird stuff… all the weird people would hang out and the drugs would flow and people would party all night long. But was it a… Was it a, a satanic ceremony per se? Were they like, were there pentagrams and… No, no.

**Speaker 1 (Taft)** [00:07:44]: I see. Albertini will not take part in Olivia Barash's documentary about the Viper Room. She can't move forward without him.

**Speaker 2 (Albertini)** [00:07:54]: Uh, well, yes and no. I mean, yes. Did I tell him that? Absolutely. I told him that I would have no part in her movie. I told him I was not interested. I told him she's a headcase. I told him that, you know, the story that she wants to tell is not the truth. Um, she wanted to make the story about how great the Viper Room and what an influence Johnny was on the music of the era. And I told her absolutely not. Um, as far as her not being able to move forward without me. Absolutely. She could have done anything she wanted to do.
That's where Paul Barresi got. I mean, did I tell her she can't move forward without me? Absolutely. Uh, I told her that I would have no part of it. And that's where Mark Ebner and these guys get involved in it. But no, I told her I said absolutely not you're stupid. This is what Mark Ebner was trying to get me involved in when he wanted me to make a statement about Anthony Fox.

**Speaker 1 (Taft)** [00:08:54]:  I see.

**Speaker 2 (Albertini)** [00:08:55]: I don't know what, I don't know anything about Anthony Fox so there is no statement I can make.

**Speaker 1 (Taft)** [00:08:59]: Oh, other than Paul Schindler. JD punched Carrie Otis, Mickey Rourke's ex-wife in the face.

**Speaker 2 (Albertini)** [00:09:06]: Absolutely.

**Speaker 1 (Taft)** [00:09:07]: She went in and freaked out JD gave her a big black eye.

**Speaker 2 (Albertini)** [00:09:10]: Absolutely, untrue.

**Speaker 1 (Taft)** [00:09:12]: Paparazzi name E.L. Woody got it on film.

**Speaker 2 (Albertini)** [00:09:16]: Absolutely, untrue.

**Speaker 1 (Taft)** [00:09:18]: Albertini saw the bruises on Carrie's face and called the police.

**Speaker 2 (Albertini)** [00:09:22]: Absolutely saw her bruised. Absolutely did not call the police. It was a totally, but you see again. Again. Here he is. He's taken different incidents. Um, Carrie Otis showed up at the Viper Room one night. She had a big black eye. She came to the door and she said that Mickey did it. Um, okay,

whatever. I think we put some ice on her eye or some shit like that. Mickey did not do it. Mickey absolutely did not do it because he was in New York. Again, nothing to do with Johnny; apples and oranges.

**Speaker 1 (Taft)** [00:10:00]: Was she in the club with the bruise or was she at, did it happen at the club? [00:10:05]: No, no, no, no, no, she was at the club. She left. She left with Eileen Getty. Uh, she came back a few hours later she drove her Mercedes up over the sidewalk. And she said Mickey did it. And it was like no, Mickey did not do it. You're high. She was, they were on drugs. She was using drugs and drinking a lot. Johnny had absolutely nothing to do with that.

**Speaker 1 (Taft)** [00:10:29]: Okay, but…

**Speaker 2 (Albertini)** [00:10:30]: You know something? Johnny wasn't even around.

**Speaker 1 (Taft)** [00:10:35]: Right, but did anyone see her without the bruise before she left? Was that. . .

**Speaker 2 (Albertini)** [00:10:42]: Yeah, sure we all did. I did. I knew she had no bruise when she left. I said goodnight to her.

**Speaker 1 (Taft)** [00:10:49]: JD used to beat the hell out of Winona Ryder, he used to torture her. One night she was crying locked out of her car and Johnny would not help. JD beat her up because she was sweet on another man. JD hit her in a jealous rage. JD grabbed her by the throat pushed her up against the wall and smacked her.

**Speaker 2 (Albertini)** [00:11:06]: I absolutely never said that. I told you the story. She called the nightclub one night. She was looking for Johnny. Um, he wasn't there. What's up? I'm locked out of my car. Where are you? I'm in Chicago. Called, call AAA.

**Speaker 1 (Taft)** [00:11:26]: Did you tell him anything else about Winona?

**Speaker 2 (Albertini)** [00:11:29]: I mean, he asked if they fought. Yes, couples fight. You know, Johnny obviously, uh when he fights he gets pretty wild. Um, you know, he he does things he yells and screams and punches holes in walls and he puts cigarettes out on people and he throws coffee cups and beer bottles at people and he verbally assaults practically everybody around him. Uh, yeah, that's stuff I told him.

**Speaker 1 (Taft)** [00:12:02]: Interesting. Albertini took Winona's calls crying after being abused by JD telling him Johnny did this, Johnny did that to her.

**Speaker 2 (Albertini)** [00:12:10]: Never happened.

**Speaker 1 (Taft)** [00:12:12]: Did you tell him about Maria Pfeiffer confiding in you?

**Speaker 2 (Albertini)** [00:12:18]: Uh. . . No, because he wouldn't know anything about Maria Pfeiffer or Bob Pfeiffer. He wouldn't know (inaudible).

**Speaker 1 (Taft)** [00:12:25]: You didn't tell him about her. Okay.

**Speaker 2 (Albertini)** [00:12:27]: No, they wouldn't have… My relationship with Maria was long after the Viper Room when I met her. Um, I met Bob at the Viper Room, but Maria wasn't around. She was still in Prague. He met her years later.

**Speaker 1 (Taft)** [00:12:45]: All right, JD and Kate Moss and knockdown drag out fights.

**Speaker 2 (Albertini)** [00:12:49]: Again, he keeps repeating that. Did they fight? Yes.

**Speaker 1 (Taft)** [00:12:54]: Knockdown drag out fights.

**Speaker 2 (Albertini)** [00:12:57]: Ah, I don't, I don't know. No.

**Speaker 1 (Taft)** [00:13:00]: Lead singer for the Meat Puppets was flirting with Kate and JD got upset and fixed Paul Schindler on him and beat the lead singer up.

**Speaker 2 (Albertini)** [00:13:08]: I don't remember if it was the Meat Puppets, but the guy actually got his head cracked open with the 357 Magnum. It had absolutely nothing to do with Kate. It had more to do with Paul Schindler being jealous and going into a rage when this guy got a little too close to Johnny. Um, Paul Schindler smacked him over the head with a gun. Uh, and then he dragged them down the street and I guess threw him like on the side of the curb.

**Speaker 1 (Taft)** [00:13:36]: But was it… It was uh, Rocky George. Right? Or no?

**Speaker 2 (Albertini)** [00:13:41]: No, that was, I believe that incident happened years later. That was a totally separate incident.

**Speaker 1 (Taft)** [00:13:47]: Right, I think you mention it, the name.

**Speaker 2 (Albertini)** [00:13:49]: Yeah, I was gone by the time that happened. I was long gone.

**Speaker 1 (Taft)** [00:13:53]: Was flirting with Kate Moss. So, the lead singer was flirting with Kate Moss?

**Speaker 2 (Albertini)** [00:13:59]: No, he was just he was just flirting with Johnny I guess. He just, again Paul Schindler was a hothead that would go off the handle in a heartbeat. And when this guy was moving too fast, and again Paul shouldn't hit the guy cause this happened at after hours. This guy was even in the club and unable to get close enough to Johnny he was no threat. But Paul flew off the handle probably, probably drinking and stoned on heroin. Pulled out a gun and split the guy's head.

**Speaker 1 (Taft)** [00:14:30]: JD has one of the worst breakout of genital herpes that anyone could ever imagine.

**Speaker 2 (Albertini)** [00:14:36]: Well, is it the worst? I don't know what's the worst versus the best? I know that when he pulled it out it looked like a salami.

**Speaker 1 (Taft)** [00:14:44]: JD found joy showing people the outbreak of the lesions on his penis.

**Speaker 2 (Albertini)** [00:14:52]: (Laughing) You know something? This is why, this is exactly why Richard Schwartz didn't want to call me. Now you get it. Joy? Joy. . . but you see. .
. no I
should take this back because most of these things we're talking about me and Richard Schwartz talked about before Paul Barresi was even involved. Why do you think there was a text message back and forth where I said something about herpes and Amber replied laughing.

**Speaker 1 (Taft)** [00:15:18]: Alright, JD and Paul Schindler were gay lovers, they grew up together. I know you said that's Barresi's imagination.

**Speaker 2 (Albertini)** [00:15:26]: Um. Well, no, they were not gay lovers. But it was no secret that Paul was gay. Well, he kept it a secret and it was… it was extremely obvious that he was madly in love with Johnny his whole entire life.

**Speaker 1 (Taft)** [00:15:42]: JD had, only had interest in using women for sex.

**Speaker 2 (Albertini)** [00:15:47]: I mean, come on. (Laughing) What kinda statement is that? Um. . . uh it was a nightclub. It was the 90's. Um, okay?

**Speaker 1 (Taft)** [00:16:02]: JD would be so drunk out of his mind the next day he wouldn't remember his own actions.

**Speaker 2 (Albertini)** [00:16:07]: Absolutely true.

**Speaker 1 (Taft)** [00:16:10]: Woman named Jennifer Gray dated JD. She claimed he was abusive.

**Speaker 2 (Albertini)** [00:16:15]: I know he dated Jennifer Gray at some time, but I don't know that she ever accused him of being abusive. I don't know her. I've never met her. That would have been before I even knew Johnny.

**Speaker 1 (Taft)** [00:16:29]: And you, did you ever talk to him about Jennifer Gray?

**Speaker 2 (Albertini)** [00:16:33]: No.

**Speaker 1 (Taft)** [00:16:35]: The Man/Boy Love Association was founded by Allen Ginsberg. He was royalty at the Viper Room.

**Speaker 2 (Albertini)** [00:16:42]: Correct.

**Speaker 1 (Taft)** [00:16:45]: Ginsberg went there looking for young good-looking underage actors, underage actors, boys and girls patronized Viper Room and JD allowed it.

**Speaker 2 (Albertini)** [00:16:54]: Correct.

**Speaker 1 (Taft)** [00:16:56]: JD doesn't like women. He struggles with his own sexual identity.

**Speaker 2 (Albertini)** [00:17:02]: Uh, I never told him that. Oh, oh, oh you know, I know. Oh my God. That was when he asked me, and again this is how this fucking guy twists shit up. You know, Johnny was made those movies like Ed Wood and shit like that. And you know, I guess because Paul's gay and again his sexual fantasies. Uh, Paul had said something to me about Johnny seems to like to dress like a women… woman a lot in the movies. And I was like, I don't know maybe he's a tranny.

**Speaker 1 (Taft)** [00:17:34]: Alright, yeah, I know that's Barresi twisting but. . . (inaudible)

**Speaker 2 (Albertini)** [00:17:37]: Exactly.

**Speaker 1 (Taft)** [00:17:39]: A normal relationship for JD with women is torture.

**Speaker 2 (Albertini)** [00:17:45]: (Laughing) Come on, Christina. This is funny because it, I would have told you all this stuff, had this shit been true.

**Speaker 1 (Taft)** [00:17:35]: JD is still to this day paying for Big Ed Shaw, the bouncer, JD pays for Shaw's, medical expenses, etc.

**Speaker 2 (Albertini)** [00:18:02]: Uh, no, that's not true. That ended when uh, Johnny was sending him money every month. Ed Shaw was in a very, very bad car accident. And he was uh he's I don't know if it's quadriplegic, paraplegic, but he he can't leave his bed. And for several years, he got a check, or I don't know if it was check or cash, but he got money from Johnny. He had never spoken to Johnny. He was no longer in touch with Johnny, but he still got that money every week or every month. It ended when uh, when Johnny filed those lawsuits and he was having that big deal with Tracy Jacobs and those people. He said at that time the checks stopped. And I said well, did you ever call and you know, ask Johnny why? And he said no, man, I never spoke to Johnny again. Johnny is a big fucking movie star he doesn't have time for me. I was just grateful he took care of me as long as he did. And all of this is on that recording, the Big Ed Shaw recording.

**Speaker 1 (Taft)** [00:19:04]: Which they don't give to us. Okay.

**Speaker 2 (Albertini)** [00:19:06]: Right.

**Speaker 1 (Taft)** [00:19:07]: JD had close affiliation with Hells Angels. They did dirty work for JD. Member Gill Monty was JD's guy. They met at a tattoo shop across the street from Viper Room. JD was enamored with the Hells Angels they provided protection.

**Speaker 2 (Albertini)** [00:19:23]: Wow, that's a long statement. Um, Johnny relationship with Hells Angels? Yes, uh Johnny would hang out with them in New York. Uh, did they, did members of the Hells Angels do private bodyguard work for him? Absolutely. Chuck Leto, uh the head of the New York chosen Hells Angels. That's exactly what he does for a living. He's a bodyguard to the movie stars. Nothing strange there. Uh, Gill Monty was not a Hells Angel. He was a Lago and he owned the tattoo shop directly across the street from the Viper Room. We were all friends with these guys. Um Johnny was obviously better friends with them than the rest of us. I, you know, hey, how you guys doing? Gill Monte did some of my tattoos, but uh there was nothing strange about it. We were neighbors, if things got out of control at the Viper Room like there was a big fight of course these guys would run out to help but no these were not paid unless Johnny like I said ever hired any of them privately to do bodyguard work for him.

**Speaker 1 (Taft)** [00:20:27]: All right. River Phoenix death was a planned platonic sacrifice.

**Speaker 2 (Albertini)** [00:20:32]: Yes.

**Speaker 1 (Taft)** [00:20:34]: Alice Cooper can stand up everything Albertini alleges herein.

**Speaker 2 (Albertini)** [00:20:40]: How would I know what Alice Cooper could stand up and allege?

**Speaker 1 (Taft)** [00:20:44]: Did you ever talk to him about Alice Cooper?

**Speaker 2 (Albertini)** [00:20:49]: Uh, just the fact that Bob Pfeifer was Alice Cooper's manager.

**Speaker 1 (Taft)** [00:20:55]: Okay.

**Speaker 1 (Taft)** [00:20:57]: Absolutely illegal high dollar gambling took place at the Viper Room downstairs in the basement. This room was called the crow's nest.

**Speaker 2 (Albertini)** [00:21:07]: Well, yes and no. I mean, yes, there was a bar downstairs and it had a plaque that said the Crow's Nest and the reason for it was because the band The Black Crowes were always down there. Um, years later, uh after I was gone, I don't even think Johnny owned the club anymore. Public Record, Molly's Game took place there. That's not information that he would have gotten from me. That's… They made a movie about it. Molly Bloom.

**Speaker 1 (Taft)** [00:21:36]: Did you tell him about that gambling, or do you think he got it from some other source?

**Speaker 2 (Albertini)** [00:21:41]: No, I think he asked me about it. And I probably shared exactly what I just told
you. Yeah. Maybe years later. You know, that's, that's common. I mean, you could just Google that, that's, you know, that they made a movie about it was a great story.

**Speaker 1 (Taft)** [00:21:56]: An old movie.

**Speaker 2 (Albertini)** [00:21:59]:Yeah, (inaudible 00:21:58) now.

**Speaker 1 (Taft)** [00:22:00]: Yeah. Albertini recruited the hookers and sex for pay girls from the strip clubs to bring back to the Viper Room.

**Speaker 2 (Albertini)** [00:22:09]: (Laughing) Wait, say that again. I liked the way he said it in  the

beginning.

**Speaker 1 (Taft)** [00:22:12]: Albertini recruited the hookers

**Speaker 2 (Albertini)** [00:22:13]: Recruited?

**Speaker 1 (Taft)** [00:22:12]: the sex for pay girls from the strip clubs to bring back to the Viper  Room.

**Speaker 2 (Albertini)** [00:22:20]: That's a pretty loaded statement. No, every Wednesday night, we had a, you know we had a party at the club called the Punk Rock Pajama Party. And what we did was myself, uh, sometimes Sal directly, uh, lots of time, Isaac, we would go out to all the strip clubs all around Los Angeles and we would just, you know what they would call make it rain. We go in there and we would throw 1000s of dollars around. Um, and as these girls would come down to talk to us strippers, strippers, strippers, you know, legal age strippers. Uh, as they would come down to talk to us we would give them invitations to come to the club. It was a business decision. Um, you have a lot of beautiful women in a club. You have a lot of rich men, they spend a lot of money on alcohol.

**Speaker 1 (Taft)** [00:23:15]: Okay. Everybody starves without JD and they also fear him. This is why they will never say a bad thing about him.

**Speaker 2 (Albertini)** [00:23:22]: That's 100% correct.

**Speaker 1 (Taft)** [00:23:25]: JD uses the name Mr. Stench when he checks into a hotel?

**Speaker 2 (Albertini)** [00:23:30]: Absolutely correct. Verified by Amber.

**Speaker 1 (Taft)** [00:23:34]: JD feels he is entitled to hit women.

**Speaker 2 (Albertini)** [00:23:40]: Um, Johnny Depp feels he's entitled to do anything he wants and hit women, men, punch holes in walls. Johnny, you know again, that is uh. . . Again, that's not information. That's not even… Okay, go on. What's next.

**Speaker 1 (Taft)** [00:23:58]: Albertini is willing to come to office for a formal audio tape interview with counsel.

**Speaker 2 (Albertini)** [00:24:05]: Hmm. Actually, that happened, but uh Paul Barresi wasn't invited, and he became furious about it. He didn't even know well, he did know.

**Speaker 1 (Taft)** [00:24:15]: You went to that meeting? And did you do the interview?

**Speaker 2 (Albertini)** [00:24:18]: I went to a meeting with Richard Schwartz on a Sunday afternoon in downtown Los Angeles.

**Speaker 1 (Taft)** [00:24:24]: And you got to the audio tape.

**Speaker 2 (Albertini)** [00:24:27]: I gave him the tape.

**Speaker 1 (Taft)** [00:24:28]: Well, I mean, it says you're willing to come to office for a formal audio tape interview.

**Speaker 2 (Albertini)** [00:24:34]: Yeah, but he's writing this way after it actually happened. **Speaker 1 (Taft)** [00:24:40]: This is from, it is from, July 28, 2019 at 10pm.

**Speaker 2 (Albertini)** [00:24:50]: Oh, okay. Well, maybe Paul Barresi told them that I was willing to and then they cut him out of the actual meeting.

**Speaker 1 (Taft)** [00:24:58]: Okay.

**Speaker 2 (Albertini)** [00:24:59]: So yeah. That's true. So there you go. I never even knew we twisted up all my statements. Cause I never read this.

**Speaker 1 (Taft)** [00:25:08]: We never got this email until June.

**Speaker 2 (Albertini)** [00:25:11]: And who did he send that to? Richard Schwartz?

**Speaker 1 (Taft)** [00:25:14]: He sent it to Richard Schwartz and Eric George.

**Speaker 2 (Albertini)** [00:25:17]: Okay, well Richard Schwartz would have known as soon as he saw that that was all bullshit. Because I discussed all those, most of those things with Richard Schwartz prior to Paul Barresi even being hired. Somebody needs to take a look at Richard Schwartz.

**Speaker 1 (Taft)** [00:25:33]: Did you ever talk to Eric George?

**Speaker 2 (Albertini)** [00:25:36]: Yes, on the phone. Never met him.

**Speaker 1 (Taft)** [00:25:38]: What did you talk about?

**Speaker 2 (Albertini)** [00:25:40]: Just what I knew. He really passed it off to Richard Schwartz. Richard Schwartz was the one I guess doing all the business.

**Speaker 1 (Taft)** [00:25:51]: Okay, and then… Anyways, I think it's interesting about Jennifer Gray and Alice Cooper. And then he didn't mention Isaac Baruch. So, as you, he even denied knowing Marty Singer in your first. . .

**Speaker 2 (Albertini)** [00:26:07]: Absolutely. He said he never heard of Marty Singer.

**Speaker 1 (Taft)** [00:26:10]: Yet, that was a lie.

**Speaker 2 (Albertini)** [00:26:11]: Yeah, because a few days later, he was offering me money from Marty Singer to go bribe a cop.

**Speaker 1 (Taft)** [00:26:17]: Right.

**Speaker 2 (Albertini)** [00:26:22]: Yeah, hm. Wow, and now, those are the statements that he sent to Richard Schwartz. Now Richard Schwartz knew better. Remember something at the time he sent that to Richard Schwartz, I had already reported him to Richard Schwartz, how many times?

**Speaker 1 (Taft)** [00:26:37]: Yeah right, but Barresi is trying to, as you said, make you look inconsistent or bring up people's names that could say that it's not true.

**Speaker 2 (Albertini)** [00:26:46]: Exactly. Exactly. He was trying, he was bringing people that were going to say it was untrue. But again.

**Speaker 1 (Taft)** [00:26:55]: That was Cooper's, isn't he Depp's friend.

**Speaker 2 (Albertini)** [00:26:58]: He's one of Johnny's best friends. He's in a band with Johnny today.

**Speaker 1 (Taft)** [00:27:03]: And we already know about Carrie Otis, and then also the uh, who was it, Jennifer Gray. You never told him that?

**Speaker 2 (Albertini)** [00:27:15]: I don't. . . No, I've never told him that. I absolutely never told him that. That again. Did they date each other? I guess so. That's what the magazines say. Again, it was before I knew the guy. So I didn't know anything about his life other than what you would see in the newspapers he dated a few actresses. Um…

**Speaker 1 (Taft)** [00:27:37]: I didn't even know about Jennifer Gray until like last year.

**Speaker 2 (Albertini)** [00:27:41]: There was Jennifer Gray, and then I guess his other big relationship was with a woman who used to be very beautiful. Last time I saw she wasn't, I don't know what show she was on, but her name was Sherilyn Fenn. And uh, at some point in time he was with her. Actually, I probably did tell the story, do recall talking to him about it about how him and Gibby Haynes. Again, I don't know if this would be

considered a criminal action or abuse but she obviously fell for it. Him and Gibby Haynes kidnapped her the first time he met her. They like went to her house and pulled her out so Johnny could ask her out on a date.

**Speaker 1 (Taft)** [00:28:20]: Gibby Haynes?

**Speaker 2 (Albertini)** [00:28:21]: Yeah, Gibby Haynes from the Butthole Surfers.

**Speaker 1 (Taft)** [00:28:24]: And what was the woman's name again?

**Speaker 2 (Albertini)** [00:28:26]: Sherilyn Fenn. It wasn't an abuse situation. It was a romantic gesture. I mean, they ended up dating each other and I believe they might have even been engaged. I don't know, something I read in one of the magazines back then sittin' in the office.

**Speaker 1 (Taft)** [00:28:41]: Okay, but they met, they told you more about it.

**Speaker 2 (Albertini)** [00:28:45]: No, I think maybe me and Paul Barresi might have like, just… again, everything wasn't, you know, he was trying to play me and he thinks I was stupid. He would start talking to me about something that was in the tabloids and then like, just to kind of ingratiate himself and try to start disputing shit from way back then like he had another source.

But it was all just shit that he was repeating. And then I also found that I forgot. I don't know if I told you this. As I was giving him this information. He was calling Andy Tillit trying to sell it to him. Andy Tillit called me one day and he said you, you really should stop talking to Paul Barresi. And he said Paul Barresi is already trying to broker the shit you're telling him.

**Speaker 1 (Taft)** [00:29:27]: And to twist it into lies and then no one listens to Amber.

**Speaker 2 (Albertini)** [00:29:32]: Exactly.

**Speaker 1 (Taft)** [00:29:35]: In the lawsuit. You know, Sherilyn Fenn joined up and Sherilyn Fenn I never even heard her name before this whole time over three years, and all these people are trying to dig into his past. And I never heard of her.

**Speaker 2 (Albertini)** [00:29:46]: Oh my God, just Google it. You're too young, that's why.

**Speaker 1 (Taft)** [00:29:49]: I do see it. But these people, you know, like they look at articles and no one's mentioned her name for three years.

**Speaker 2 (Albertini)** [00:29:57]: Well, another thing that I saw that just had me a little bit confused because when did Johnny, and again I could be totally wrong. It was probably must have been not that long ago. When was Johnny dating Ellen Barkin?

**Speaker 1 (Taft)** [00:30:11]: Oh, Ellen Barkin, was involved with the case, so that's no.

**Speaker 2 (Albertini)** [00:30:17]: But when were they dating?

**Speaker 1 (Taft)** [00:30:18]: Uh, I think probably during the Viper Room days, I don't know.

**Speaker 2 (Albertini)** [00:30:24]: Nah, na, na, na, she was a drunk that used to come to the Viper Room. She was dating David Arquette.

**Speaker 1 (Taft)** [00:30:30]: Okay, yeah. I don't know when that was.

**Speaker 2 (Albertini)** [00:30:33]: All right. I don't care I just when I saw that, I was like, she was very good friends with Johnny. That's... And she testified against him?

**Speaker 1 (Taft)** [00:30:43]: Yeah, that he was abusive and threw a drink at her, towards her direction.

**Speaker 2 (Albertini)** [00:30:49]: She's credible. She's credible. Because if she would say that about Johnny, one thing I can say about them, this is not evidence for a court case, but this is between me and you, she was very good friends with Johnny. So, for her to say that he, you know, she witnessed him to do something, that's credible.

**Speaker 1 (Taft)** [00:31:09]: It's sad, because they're trying to say that she was just, uh you know, what do you call it uh bitter?

**Speaker 2 (Albertini)** [00:31:16]: Well, she was a drunk. But that doesn't mean she was bitter. I mean, yes, she would get drunk, very drunk. But at the end of the day, who was she getting drunk with? Johnny. So, nah, na, na, if she says that she should, and it's also consistent with what Bruce Corkum said and what I said. He throws glass and throws, throws bottles and shit at people.

**Speaker 1 (Taft)** [00:31:39]: Correct. Right. And...

**Speaker 2 (Albertini)** [00:31:41]: Yeah, Ellen Barkin is telling the truth.

**Speaker 1 (Taft)** [00:31:43]: Yeah. All right.

**Speaker 2 (Albertini)** [00:31:46]: All right, I gotta go smoke. I'll talk to you in a little bit.

**Speaker 1 (Taft)** [00:31:48]: Um, wait, so when you come back we should go over the other, all or you call me and then I'll add (inaudible)

**Speaker 2 (Albertini)** [00:31:57]: That's my girlfriend. So let me call you back.

**Speaker 1 (Taft)** [00:31:58]: All right, great. Bye.

**Transcriber's Certificate**

I, Liridona Etemi, do hereby certify that I have listened to the recording several times carefully of the foregoing; further that the transcript pages one through thirteen (1-13) was reduced to typed form from the digital audio recording; and that the foregoing is an accurate and true record of the digital audio recording above transcribed version in this matter.

**Dated** this 19th day of March 2025.

_____

Transcriptionist: Liridona Etemi

---

**_In an Individual Capacity:_**

Pursuant to Section 117.05(13)(a), Florida Statutes, the following notarial certificate is sufficient for an acknowledgment in an individual capacity.

STATE OF FLORIDA

COUNTY OF _Citrus_

The foregoing instrument was acknowledged before me this _20_ day of _March_, 20_25_, by _Liridona Etemi_ (name of person acknowledging).

Notarized online using audio-video communication

Michelle Peterson
Electronic Notary Public
State of Florida
Commission #: HH445677
Commission Expires: 01/19/2028

Notary Signature: _____

Notary Name: _Michelle Peterson_

Personally Known _____ OR Produced Identification ___✓___

Type of Identification Produced

_____Driver's License Italy_____

---

 Gmail

**Christina Taft <taftchristina.ceo@gmail.com>**

---

## Fwd: Communication from Paul Barresi regarding Christina Taft

**Thomas Urban** <urban@fhhlaw.com>                                      Fri, Feb 10, 2023 at 1:18 AM
To: Christina Taft <taftchristina.ceo@gmail.com>

Here is Elaine's answer.

I also wrote to Ben Rottenborn but he is in vacation.

Tom

Sent from my iPhone

Begin forwarded message:

> **From:** Elaine Bredehoft <ebredehoft@charlsonbredehoft.com>
> **Date:** February 9, 2023 at 6:58:00 AM EST
> **To:** Thomas Urban <urban@fhhlaw.com>
> **Subject: RE: Communication from Paul Barresi regarding Christina Taft**

Tom:  Thanks for checking in.    Barresi has been around since long before my time.   He has popped up on media reports from time to time, and I think he may even have been involved in a UK documentary.   He has reached out to my office on various occasions but we have never communicated with him or given him a platform.   He very possibly has sent me emails (along with the 10s of 1000s I have received), but I would no recall his.

I am relatively certain Ballard Spahr would have ignored him as well – we were still getting a lot of negative email when I came out in August (and I still get them).

I hope this is helpful.  Elaine

Elaine Charlson Bredehoft
Charlson Bredehoft Cohen Brown & Nadelhaft, P.C.
11260 Roger Bacon Drive
Suite 201
Reston, VA  20190
(703) 318-6800

(703) 919-2735 (mobile)
(703) 318-6808 (fax)
www.cbcblaw.com

 Gmail

Shannon Paralegal <amicusappeal@gmail.com>

**Filing of Amicus Completed Today - Heard v Depp Case**
2 messages

**Shannon Paralegal** <amicusappeal@gmail.com>                                    Wed, Nov 23, 2022 at 11:32 AM
To: Thomas Urban <urban@fhhlaw.com>, Mark Malonzo <malonzo@fhhlaw.com>, Antonio Sarabia <asarabia2@gmail.com>
Bcc: govtrel@now.org, lisa.a.sales@outlook.com, martha@marthaburk.org, Caitlin Bradley <cbradley@vsdvalliance.org>, president@vanow.org, Venita Garvin <vgarvin@delawarealliance.org>, Omny Miranda Martone <omny@s-v-p-a.org>, esmeal@feminist.org, rachel@dinahphilly.org, bridgette@nvrdc.org, hiresurvivorshollywood@gmail.com, David Mandel <davidmandel@safeandtogetherinstitute.com>, epayne@caase.org, survivedandpunished@gmail.com, Alisa Bierria <abierria@gmail.com>, jinwoye@systemicdiversity.org, Lauren Nicole <metoomanyvoices@gmail.com>, Kay Brown <kay@four4consent.org>, Brittney Barsotti <brittney@cnpa.com>, Leslie Morgan Steiner <leslie@lesliemorgansteiner.com>, Laura Richards <laurarichards143@gmail.com>, Julie Owens <julieowens@domesticviolenceexpert.org>, Dr Jessica Taylor <jessica@victimfocus.org.uk>, Christine Cocchiola <christine@drcocchiola.com>, Charlotte Proudman <cp@charlotteproudman.com>, Shari Botwin <sharilcsw@comcast.net>

Hello Amici,

We've successfully filed our Amicus Supporting Ms. Amber Heard in a Reversal of the verdicts today on Nov 23 online - shown below.

Thank you so very much again for your support. Thank you for supporting the reversal to get a better outcome not only for her, but for the millions of people, organizations, and precedent harmed by this major case.

Our attorney Tom Urban will be following up with each of you to provide you a full copy.

Our Motion to File is partially below:
"Pursuant to Supreme Court of Virginia Rule 5A:23, undersigned counsel
for the Amicus Curiae listed in Exhibit A, hereby respectfully request that this
Honorable Court grant them leave to file the attached Amicus Brief in support of
Appellant Amber Laura Heard and reversal of the judgment, Exhibit B.
The entities who have signed onto this brief fall into three primary
categories. First, organizations that support a vibrant First Amendment have joined to protect their ability to engage in reporting facts and opinions regarding the important current issues, which is threatened by the verdict in this case. Second, civil rights and women's groups have joined to address the significant diminution of reporting of abuse against women as a result of this verdict. Third, groups assisting persons who have been abused, especially involving intimate partner abuse, have joined to protect their clients from the devastating effect of this verdict. In addition, respected authorities in all three areas have added their voices to the brief..."

Your electronic submission for Heard v. Depp has been successfully transmitted via the
**Virginia Appellate Courts eFiling System (VACES) to the Court of Appeals of Virginia (CAV) on Wednesday, November 23, 2022, at 12:18:20 PM**

The following document(s) were uploaded as part of this submission:

| | |
|---|---|
| Motion for Leave to File Amicus Brief | Motion for Leave to File Amicus Brief.pdf |
| Proposed Order for Motion | Proposed Order.pdf |
| App JJ to NN of Ex B | Appendix JJ - NN.pdf |
| App AA to II of Ex B | Appendix AA - II.pdf |
| App S to Z of Ex B | Appendix S-Z.pdf |
| App J to R of Ex B | Appendix J-R.pdf |
| App B to I of Ex B | Appendix B-I.pdf |
| App A to Ex B | Appendix A Amici.rev 1.pdf |
| Ex B - Amicus Brief | 11.22.2022 Amicus Brief Rev 6.pdf |
| Ex A - List of Amici | Exhibit A List of Amici.pdf |

--
*Paralegal/Legal Assistant for Amicus*

*Please Join to Support Ms. Heard's Appeal by confirming.*
*Our Amicus Lawyer: Tom Urban at Fletcher, Heald & Hildreth*

Nov 12, 2022

Dear Mr. Axelrod,

Amber Heard's acting agent and No. 1 obsessed fan Christina Taft e-mailed me the following false allegations:

Mr. Barresi:

Richie Albertini saw women and men assaulted and abused by Johnny Depp. You continue to target Amber Heard and her witnesses - all on the behalf of Johnny Depp and Adam Waldman.

I have hundreds of postings, emails, texts, 60+ recordings, videos including YOU Targeting Ms. Heard and myself especially the past month onward.

Nearly everything you took was on a lead or reference from Richie Albertini.

You are causing and have caused Amber Heard to struggle - while telling witnesses that you caused the deaths of one or two people - one who refused to recant against an actor. She and other witnesses very likely could have died from your actions.

You should stop targeting her and stop harassing-racket extorting me.

You are putting Ms. Heard and me into grave danger.

Christina Taft

English (United States)

7:03 🔕

← **Post**

**Paul Barresi** ✓
@PaulBarresi1

**Follow**

Breaking...Johnny Depp consigliere Adam Waldman maliciously targeted in frivolous US lawsuit by Amber Heard obsessed fan Christina Taft.



Last edited 5:55 AM · Feb 22, 2025 · **166** Views

💬 1          ↻          ♡ 14          🔖 2          ⬆️

2:49

**November 30, 2023**
8:44 AM

(no subject)  Inbox

P   **paulbarresi@aol.com** 2:41 AM
to me ⌄

Hows this sound to you?

**Amber Heard's No one obsessed fan Christina Taft who allegedly fled to Hawaii because she fears for her life had a mother she abandoned at Paradise Fire showed off her fake tits, hairy bush, and scrawny ass in"Malibu Hot Summer" But her most notable film was the 1990 film adaptation of the classic comic Dick Tracy where she doubled for Glenn Headly. What you dont know about is she later sued Warren Beatty and Dick Tracy productions cause she was hurt. But when Beatty's lawyers asked the late Victoria Taft to produce evidence to show her vision was not impaired, she dropped the suit.  The soft porn actress was paired up with porn star Paul Barresi in a Playboy adult film however Barresi rejected her.**

7:10



**Twitter**
Open in the Twitter app

OPEN

← **Thread**    Open app

**Paul Barresi**
@PaulBarresi1

CHRISTINA TAFT SENT ME ANOTHER NASTY TEXT ALLEGING SHE HAS PROOF I THREATENED & INTIMIDATED AMBER'S WITNESSES, PREVENTED HER FROM WINNING & JOHNNY DEPP BEATS WOMEN. TO ALL OF YOU WHO'S GOT JOHNNY'S BACK AS I DO, PLEASE ASK HER HERE & NOW PROVE IT OR SHUT THE FUCK UP! @XTinaTaft

3:11 PM · Nov 2, 2022 · Twitter Web App

**26** Retweets   **2** Quote Tweets   **213** Likes



twitter.com

 **Gmail**

**Christina Taft <taftchristina.ceo@gmail.com>**

___

## Fwd: Richard J. Albertini The OJ Simpson Case

**Mario George Nitrini 111** <marionit111@gmail.com>                    Mon, Jan 6, 2025 at 8:09 AM
To: taftchristina.ceo@gmail.com

Christina.
Here is the original email you requested pertaining to Paul Barresi's email to Adam Waldman regarding Richard Albertini with Barresi Cc'ing me.

Mario George Nitrini 111

-----
The OJ Simpson Case

---------- Forwarded message ---------
From: <paulbarresi@aol.com>
Date: Mon, Apr 18, 2022, 1:48 PM
Subject: Richard J. Albertini
To: awaldman@theendeavorgroup.com <awaldman@theendeavorgroup.com>
Cc: marionit111@gmail.com <marionit111@gmail.com>

Dear Adam,

Richard J. Albertini [See Attached] worked at the Viperoom in early 90's as a barrack.  Amber's lawyers suggested I contact him in the summer of 2019 while I was working for her because he had reached out to them claiming had dirt on Johnny.

After talking to him and communicating with him on facebook I deemed him as a  nut case and cut ties with him.  He's been badgering me ever since with crazy nonsense.  His behavior however has escalated out of control so I wanted to give you the heads up.

Albertini is posting nonsense without fact or basis on social media. He has already been booted from facebook and twitter for his antics.

My friend Mario Nitriini who tells me he has corresponded with you brought all this to my attention because beyond facebook, I really don't do social media.

I've asked Mario to forward you whatever Albertini is posting as it pertains to Johnny to you FYI.

Stay well and hope to hear back from you soon.

Sincerely,

Paul Barresi

___

📄 **RICHARD JOHN ALBERTINI III-Comprehensive-Report.pdf**
74K

12:45



← **Tweet**                              Open app

**Paul Barresi**                              ...
@PaulBarresi1

JOHNNY DEPP FANS, I can't do it alone!

Crazy Christina Taft & her criminal conspirators gotta go! While Adam Waldman is exploring ways to cut off the head of the snake I'm open to ideas. Can't imagine Amber not being worried can you?  Here's today's ltr. to her lawyer with Attch



2:38 PM · Nov 16, 2022

**132** Retweets    **13** Quote Tweets    **539** Likes



🔒 twitter.com

 Gmail

Christina Taft <taftchristina.ceo@gmail.com>

---

**Reply from Eric George**

asarabia2 <asarabia2@gmail.com>                                      Thu, Oct 6, 2022 at 10:51 AM
To: Christina Taft <taftchristina.ceo@gmail.com>

Christina,

Here is the reply from Eric George. I think this is what you were seeking.

Regards,

Tony

IP Business Law, Inc.
320 via Pasqual
Redondo Beach, CA 90277
(310)377-5171
www.calrestitution.com

-------- Forwarded Message --------
**Subject:** Re: Amber Heard/Paul Barresi/Amicus Brief in Support of Ms. Heard - Prompt Response Requested
**Date:** Thu, 6 Oct 2022 15:07:15 +0000
**From:** Eric M. George <egeorge@egcfirm.com>
**To:** asarabia2 <asarabia2@gmail.com>
**CC:** Claudia Bonilla <cbonilla@egcfirm.com>

Hi Tony - Your understanding is entirely correct.  Best, Eric

Sent from my iPhone

On Oct 5, 2022, at 2:42 PM, asarabia2 <asarabia2@gmail.com> wrote:

Eric,

This communication is on behalf of my client Christina Taft. Ms. Taft is the principal behind a significant amicus brief being drafted in support of Ms. Heard's Appeal. A number of non-profit organizations will be signatories. The brief focuses on First Amendment/defamation issues and abuse victims' issues. We are in the final stages of drafting that brief to meet the filing deadline. Before we complete that brief, I have an inquiry.

By way of background, I have worked with your firm since its inception, when I was general counsel of Guess?, Inc. Ben Scheibe knows me.

Unfortunately, Ms. Taft has become the focus of a harassment campaign by Mr. Barresi. This campaign includes threatening messages and images.

We know that your firm engaged Mr. Barresi early in its representation of Ms. Heard. Our understanding is that engagement ended quite a while ago and that your firm has absolutely no involvement in his recent conduct toward Ms. Taft. We  request confirmation from you that Mr. Barresi has not been engaged by your firm since June 2019 on any matters related to Amber Heard.

Regards,

Tony Sarabia

(310)377-5171



Antonio R. Sarabia II
320 via Pasqual
Redondo Beach, CA 90277 USA

www.calrestitution.com

2:36



## September 29, 2022
6:41 PM



And Another Admission. I told him about Stacy-Lee & River in the First Conversation. He is Making Our Case.



...d @XanaduForMe

Other way around. Albertini sidled up with Amber's NO 1 fan Christina Taft. When I interviewed him, he could not say enough horrible things about Johnny calling him everything from a murderer to a satanist to a woman abuser who put a cigarette out on a make believe model's head.

6:18 PM · 29 Sep 22 · Twitter Web App

**2** Retweets  **4** Likes

♡        ⟲        ♡              ⩇

Bella🍁 @warnock_smith · 13m
Replying to @PaulBarresi1 @HailsLouis3

He also admits he found someone to Be a Amber witness

RA

   Text Message  



On Tue, Jan 9, 2024 at 12:53 PM paulbarresi@aol.com
<paulbarresi@aol.com> wrote:

> fuck off you crazy ugly bitch Im blocking you.
> Amber's bodyguards are on the look out for
> you nut job.
>
> On Tuesday, January 9, 2024, 02:00:41 PM PST,
> Christina Taft <taftchristina.ceo@gmail.com> wrote:
>
>
> Barresi:
>
> There is no "Justin" with no last name because you are a
> fraud, a scammer, and an extortionist.
>
> You audio record and edit the tapes and what you say.
> Other private investigator firms are onto you and
> interviewed without editing the tapes
>
> On Tue, Jan 9, 2024, 11:35 AM paulbarresi@aol.com
> <paulbarresi@aol.com> wrote:
>
>> By the way Amber thinks you are batshit
>> crazy too. Her security staff are on the
>> lookout for you. I told her lawyers you were
>> in Honolulu and they said Justin said you
>> better stay there.
>>
>> On Tuesday, January 9, 2024, 01:15:28 PM PST,
>> Christina Taft <taftchristina.ceo@gmail.com> wrote:
>>
>>
>> Barresi:
>>
>> You should be in prison if your ex-boss
>> hadn't gone to federal prison for racketeering,
>> blackmail and extortion of clients, ex-
>> spouses, and witnesses which included
>> ILLEGAL background checks on reporting
>> victims. He paid the Los Angeles
>> enforcement to do these illegal lookups.
>>
>> Recording artist did not want her audio stolen

2:53

 



## January 13, 2024
9:01 AM

 

[13h](#)

Replying to
[@anceriz6](#)

Christina Taft is guilt ridden over leaving her poor mother, soft porn actress Victoria Taft, to burn alive in the 2018 Paradise California camp fire. Crazy Christina was already a nut job and this really pushed her over the edge.

• • •

 paulbarresi@aol...    4:10 AM

to me ⌄

I got a great tits and ass video of your dear ole mom coming out soon. Stay tuned bitch.

• • •

On Thursday, January 11, 2024, 11:48:29 PM PST, Christina Taft <[taftchristina.ceo@gmail.com](mailto:taftchristina.ceo@gmail.com)> wrote:

Aloha,

My new email is -

[taftchristina.life@gmail.com](mailto:taftchristina.life@gmail.com)

**Changing email to this due to safety**



 **Gmail**

Christina Taft <taftchristina.ceo@gmail.com>

---

## Fwd: Anthony Fox Missing Person Investigation VPD 01-18806 The OJ Simpson Case

**Mario George Nitrini** <nitrinimario3@gmail.com>                                   Sat, Jan 4, 2025 at 7:30 PM
To: Christina Taft <taftchristina.ceo@gmail.com>

Christina.
Here is the original email that Paul Barresi sent me with his Charles Fox interview and Anthony Fox's mother's will.

Mario George Nitrini 111

-----

The OJ Simpson Case

---------- Forwarded message ---------
From: **Mario George Nitrini 111** <marionit111@gmail.com>
Date: Sat, Jan 4, 2025, 7:25 PM
Subject: Fwd: Anthony Fox Missing Person Investigation VPD 01-18806 The OJ Simpson Case
To: nitrinimario3@gmail.com <nitrinimario3@gmail.com>

Mario George Nitrini 111

-----

The OJ Simpson Case

---------- Forwarded message ---------
From: **Mario George Nitrini 111** <marionit111@gmail.com>
Date: Saturday, April 30, 2022
Subject: Fwd: Anthony Fox Missing Person Investigation VPD 01-18806 The OJ Simpson Case
To: nitrinimario@gmail.com

Mario George Nitrini 111

-----

The OJ Simpson Case

---------- Forwarded message ---------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: Fwd: Anthony Fox Missing Person Investigation VPD 01-18806
To: "marionit111@gmail.com" <marionit111@gmail.com>

CONFIDENTIAL

Mario,  Here is investigative report I sent detectives.  Listen to my interview with Anthony Fox's brother, Charles and read
mother's Will. KEEP FILE for story.

CONFIDENTIAL

-----Original Message-----
From: paulbarresi@aol.com
To: pfurlong@cityofventura.ca.gov <pfurlong@cityofventura.ca.gov>
Cc: amorales@cityofventura.ca.gov <amorales@cityofventura.ca.gov>
Sent: Thu, Dec 9, 2021 4:56 pm
Subject: Anthony Fox Missing Person Investigation VPD 01-18806

Dear Det. Furlong,

I spoke with lead Detective Morales earlier this week. He said he was immersed in a priority kidnap investigation and that he
will contact me to get brought up to

speed on my updated findings re, Anthony Fox's disappearance.

Meanwhile, I now provide you with Anthony Fox's mother Maud Fox's **Will** along with [30 minute] audiotaped interview I conducted with his Anthony's eldest brother

**Charles Fox** this a.m.

Charles stated his mother **Maud Fox**, told him she had received a letter from Anthony just before Christmas 2001.

As you are well aware, Anthony disappeared just before Christmas 2001 on the 19th. Therefore, he wrote the letter which his mother refused to disclose likely days

prior to his disappearance. What makes this even more bizarre is that Charles asked his mother what Anthony said in the letter but she stubbornly refused to tell

him. And when Charles pressed her to tell her what the letter said, she told him she destroyed it.

Following Maud's death, Charles told me that he searched everywhere for the mysterious letter but it was nowhere to be found.

### Maud Fox had a secret she was keeping for her Anthony so worth protecting, she took it to her grave.

As evident in a previous report I sent you, however, this was not the first time Maud covered for Anthony. When he filed for bankruptcy, she helped him fabricate a fraudulent laundry list people and businesses to whom he alleged he owed money and even went so far as to include her own name to the bogus list.

Charles was very surprised to hear that Johnny Depp turned over his interests in the Viperoom to Anthony's daughter. Despite it being widely reported, Charles said he was not aware.

What surprised him even more was to learn that his mother added Anthony's daughter to her Will because his she didn't think too kindly of Constance.

I suspect Anthony's letter to his mom included a plea for her to care for his daughter because his mother's [revised Will] makes generous provisions for her including

10,000 pounds in addition to Anthony's share of the estate, as stipulated in Will, after he is deemed dead in 2006. It appears this date 2006 was just pulled out of the hat which leads to only more suspicion. it is likely Maud wanted to honor her son's wishes that she provide for his daughter.

### Irrespective of what Anthony's letter said, writing the letter only days before his disappearance is suspect.

### Anthony's mom's refusal to say what was in the letter is further suspect.

### To my mind, Anthony vanishing into thin air was not something he didn't see coming.

Charles believes Anthony's daughter Constance knows more than what she has disclosed.

I told Charles that Johnny Depp is a very generous good hearted man and that over the years he has helped many people, paying their rent, bills, medical expenses, etc.

Charles confided that there is a stronger likelihood that Anthony is either still alive and just wanted to create the impression he disappeared or he committed
suicide."

Charles agreed that the possibility of Johnny Depp having anything whatsoever to do with his brother's disappearance is next to zero.

End Report

Paul Barresi
cell no. 908-656-5712

**FYI**
**Charles Fox**, Tel no. 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-312-524 age 75, resides with wife Morna at 8A Catharine Place, Bath, Avon, BA1 2PR-England

-----Original Message-----
From: Furlong, Patrick <pfurlong@cityofventura.ca.gov>
To: paulbarresi@aol.com <paulbarresi@aol.com>
Sent: Wed, Jul 31, 2019 12:40 pm
Subject: Ref Anthony Fox Missing Person Investigation VPD 01-18806


Per our phone conversation, I am reaching out to you to inquire about any information regarding the Missing Person investigation for Anthony Fox (VPD 01-18806).



Thanks again,



Patrick Furlong

Criminal Investigative Technician
Sex Offender Registration / Missing Persons
Ventura Police Department
1425 Dowell Dr., Ventura, CA 93003
(805) 339-4473 Office


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

---

**3 attachments**


**Johnny Depp - Charles Fox call_09-36-18_OUT__16699291319017.amr**
3001K


**Maud Fox Will 1.pdf**
528K


**Maud Fox Will 2.pdf**
30K

3/5/25, 3:48 PM Gmail – Fwd: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.F…

Case 5:24-cv-01930-TJH-DTB Document 55-3 Filed 03/25/25 Page 51 of 137 Page ID #:2480



Christina Taft <taftchristina.ceo@gmail.com>

---

## Fwd: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.FID344226] The OJ Simpson Case

---

**Mario George Nitrini 111** <marionit111@gmail.com>
To: taftchristina.ceo@gmail.com

Sun, Jan 5, 2025 at 6:50 AM

Christina.

Paul Barresi's original email to me pertaining to Richard albertini and the viper room.

Mario George Nitrini 111
----
The OJ Simpson Case

---------- Forwarded message ---------
From: <paulbarresi@aol.com>
Date: Sat, Jun 4, 2022, 4:02 PM
Subject: Fwd: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.FID344226]
To: marionit111@gmail.com <marionit111@gmail.com>


This is what that fuck told me when I first interviewed him

-----Original Message-----
From: Paul Barresi <paulbarresi@aol.com>
To: rschwartz@bgrfirm.com; egeorge@bgrfirm.com
Sent: Sun, Jul 28, 2019 10:04 pm
Subject: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.FID344226]


JULY 28, 2019


RICHIE ALBERTINI III TEL. INTERVIEW


Cell No. 213-302-9688


ALBERTINI alleges as follows:


Johnny Depp "DP" physically assaulted actresses WINONA RYDER, CARRE OTIS, KATE MOSS and model STACEY LOPEZ


Met Johnny Depp "DP" through Sal Jenco in 1990.


Operated sophisticated money laundering scheme


Albertini oversaw Viper Room protection fees paid to mob.

DP has long history of drugs. He's on all kinds of drugs-- psychotropic medications, in and out of rehab, multiple doctors writing medications.

DP obsessed with buying up memorabilia of him self paying ridiculous amounts of money.

Not one person ever said JD was depressed or complaining about his relationship with Amber.

Jonathan Shaw said he witnessed JD hit Amber multiple times but will never admit it to anybody because JD is his meal ticket.

JD financially supports and artist who of public figures engaging in lurid gay sex acts.

JD extinguished cigarette on model Stacy Lopez's head because he was angry Kate Moss was dancing with her.

DJ's Daddy Carlos or Ritchie Rich witnessed this assault.

Big Ed Shaw witnessed the incident along with other bouncers.

JD played role in shooting up River Phoenix leading to his death.

JD is a Satanist. After hours, he held Satanic Rituals at the Viper Room.
Albertini will not take part in Olivia Barish's documentary about the Viper Room. She can't move forward without him.

JD punched Carre Otis, Mickey Roark's x wife, in the face. She went to the club tweaked out.  JD gave her big black eye.

Paparazzi named E.L. Woody got it on film.

Albertini saw the bruises on Carre's face and called the police.

JD used to beat the hell out of Winona Ryder. He used to torture her. One night she was crying locked out of her car and Johnny would not help. JD beat her up because she was sweet on another man. JD hit her in a jealous rage. JD grabbed her by the throat, pushed her up against the wall and smacked her.

Albertini took Winona's calls crying after being abused by JD, telling him, "Johnny did this, Johnny did that to her."

JD and Kate Moss had knock down drag out fights.

Lead singer for the Meat Puppets was flirting with Kate and JD got upset and sicked Paul Shindler on him and beat the lead singer up.

3/5/25, 3:46 AM Gmail - JLB JD Interview with H Corroborating Witness Rich Albertini - Viper Room Investigation [IMG-CSLA.F…

Case 5:24-cv-01930-TJH-DTB    Document 55-3    Filed 03/25/25    Page 53 of 137    Page
ID #:2482

JD has one of the worst out break of genital herpes that anyone could ever imagine.

JD found joy showing people the outbreak of the legions on his penis.

JD and Paul Shindler were gay lovers. They grew up together.

JD only had interest in using women for sex.

JD would be so drunk and out of his mind, the next day he wouldn't remember his own actions.

Woman named Jennifer Gray dated JD. She claimed he was abusive.

The "Man Boy Love Association" was founded by Allen Ginsberg.  He was royalty at the Viper Room.

Ginsberg went there looking for young good looking (underage) actors. Underage actors, boys and girls patronized Viper Room and JP allowed it.

JD doesn't like women. He struggles with his own sexual identity.

A normal relationship for JD with women is torture.

JD is still, to this day, paying for Big Ed Shaw, the bouncer. JD pays for Shaw's medical expenses etc.

JD had close affiliation with Hells Angels. They did dirty work for JD.  Member Bill Monty was JD's guy.  They met at tattoo shop across street from Viper Room. JD was enamored with the Hells Angels. They provided protection.

River Phoenix death was a planned Satanic Sacrifice.

Alice Cooper can stand up everything Albertini alleges herein.

Absolutely illegal high dollar gambling took place at the Viper Room, down stairs in the basement. This room was called the Crows Nest.

Albertini recruited the hookers and sex for pay girls from the strip clubs to bring back to the Viper Room.

Everybody starves without JD and they also fear him. This is why they will never say a bad thing about him.

JD uses the name Mr. Stench when he checks into a hotel.

JD feels he is entitled to hit women.

Albertini is willing to come to office for a formal audio tape interview with council.


END

-----Original Message-----
From: Richard A. Schwartz <rschwartz@bgrfirm.com>
To: Paul Barresi <paulbarresi@aol.com>
Sent: Sat, Jul 27, 2019 1:26 pm
Subject: Viper Room Investigation [IWOV-DOCSLA.FID344226]


Paul,


I spoke with Amber, and she thinks that it would be worth going further into the Viper Room-related dealings, so her wish is my command. Please continue to look into JD's behavior (prioritizing, not to the exclusion of other investigations, incidents where JD was personally involved). One particular lead I can offer on this point is Richie Albertini, who contacted my office some months before you were hired by our firm. He claims to have witnessed JD doing lots of heinous acts (including putting a cigarette out on women), and also knows of another woman (Olivia Barash) who is making a documentary called "Friends of the Viper Room" that might be a good lead into other similar information.


Happy hunting.


**Richard A. Schwartz**

**BROWNE GEORGE ROSS LLP**

Los Angeles • New York • San Francisco

2121 Avenue of the Stars, Suite 2800

Los Angeles, California 90067

Main 310.274.7100 | Fax 310.275.5697

rschwartz@bgrfirm.com

www.bgrfirm.com

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

 **Gmail**

Christina Taft <taftchristina.ceo@gmail.com>

## Fwd: ANTHONY FOX'S DAUGHTER CONSTANCE

**Mario George Nitrini 111** <marionit111@gmail.com>                                        Sat, Jan 4, 2025 at 6:46 PM
To: taftchristina.ceo@gmail.com

The OJ Simpson Case

Paul Barresi sent me this.
It's his interview with Anthony Fox's daughter Constance.

Mario George Nitrini 111

-----
The OJ Simpson Case

---------- Forwarded message ----------
From: <paulbarresi@aol.com>
Date: Thursday, April 28, 2022
Subject: ANTHONY FOX'S DAUGHTER CONSTANCE
To: "marionit111@gmail.com" <marionit111@gmail.com>


CONFIDENTIAL

Mario, Here is my interview with Anthony Fox's daughter Constance.  Read all material sent to you thus far and I want you to take notes on paper and deliver the high points for a story.  There are a lot of people I feel who know something but are keeping very quiet. Paul

DONFIDENTIAL


**Major Piece of Evidence Gone:**
**Anthony Fox's daughter believes letter he wrote to his mother told her of his intentions to disappear.**

**Another Major Piece of Evidence Gone**
**Candace was forced to leave home that she shared with her father so quickly, she abandoned the answering machine filled with many voice messages, likely some from her father, she never got a chance to listen too...**

**Police never took the answering machine, or the voice recordings left on the answering machine into evidence.**

**Candace's unlikely guardians**
**Lawyers suing Johnny Depp on behalf of Anthony Fox of all people cared for their client's daughter, following their client's disappearance.**

CANDADE FOX – CALL – DEC 11 – 9:45 A.M.

Paul:  Good morning

Constance: Hi, how are you?

Paul:  Hi, who is this?

Constance:  Constance Fox

Paul:  I was wondering if you had a chance to look at the Will, but I also wanted to tell you—By the way, how's the little guy doing? It's a little quieter.   Now, my conversation with Charles [Fox]...There are little things—He said he was sorry he couldn't be of more help but often when you talk to people, they recall things that they don't realize the significance of it. And he seems to be as taken aback and absolutely puzzled over Anthony writing a letter either on the day he disappeared or just before he disappeared. He [Charles] was able to figure it out that your grandmother got the letter just before Christmas. The letter probably takes six or seven days to get to London, so it was likely written either just before he disappeared or when he disappeared.  And I want to ask you, why do you suppose your dad wrote your grandma as opposed to another member of the family. I know he was very close to you and I'm curious as to why he didn't write the letter to you.

Constance:  Because I was barely 16 maybe.  I mean my assumption is that he was giving her, you know...

Paul:  Instructions or letting her know…

Constance:  Yeah, what his intention or plans were.

Paul:  That's what we thought too.  He was giving her sort of an account of what his next move.  But the thing is, why do you suppose he would leave so many in pain, especially you. Why would he leave so them in pain unless he told your grandma to let them know that I'll be okay, but she decided not to do it. She went so far as to destroy that letter and that letter is a significant piece and the detectives believe that as well. The letter might have been the answer.

Constance:  Yeah, I mean, the letter for me is something that I did not know about, and it brought up a lot of questions. I need a little more time to process some of this. I also want to speak with Charles. I am trying to figure out a time when I can do that. Given the time difference. I'm with my kid so I would like to try and have that conversation without any distraction.

Paul: I think they are about 9 hours ahead. Now on the Will, did you get a chance to look at it?

Constance:  Not really, I mean honestly, I don't know how these things work, but I would imagine that anything that should have come to me after all this time, it's probably too late.  I don't have a lot of expectations.

Paul:  I understand. The letter that he wrote though, did it give you a little piece of mind? In other words, if the letter is what we think, that it was his plan of what he intended to do, supports your belief that likely, he did go off the grid.

Constance:  Yeah, that's entirely possible.  I can never really say without reading the letter.

Paul: Yeah, we can never really say for sure.  Okay, I will leave you with your thoughts and we can talk in a couple of weeks if you want.

Constance: That sounds good. I am going to speak with Charles. It's been 16 or 17 years since we last spoke. I tried to reach out to him when I went to London after I graduated to sort of pay my respects to my father and find my grandmother's place via my grandmother's lawyer, who was the only person I had a contact number for because he had to give me that money from the Will. I don't know if the message [I gave the lawyer] ever made its way to Charles—This is a lot of personal stuff, I apologize.

Paul:  Well, now you do have Charles' address and his phone number, and you can talk to him. He is an awfully nice guy.

Constance:  Yeah, I know. I remember him, fondly.

Paul:  Final question, I want to ask you. Did you dad ever say to you that he was in fear of his life or that he was in danger?

Constance: I don't know if would have shared that with me honestly if he was.

Paul:  So, he may have been, but he never shared it with you.

Constance:  **No, I mean, I saw in the year leading up to his disappearance, I saw my father lose his temper and become uncollected.  My father was always a very calm, collected, and lovable person.  I saw him suffer more frustration and desperation in that last year than I did many years prior, in my entire childhood. Fear, I never knew my father to be a fearful man.**

Paul: It wasn't like he got any threatening calls or anything like that that you know of.

Constance:  This was way before cell phones. I was a teenage girl, I had to beg him to get a landline. He didn't even have a landline-- An answering machine, I mean.

Paul:  I see

**ANOTHER IMPORTANT PIECE OF EVIDENCE GONE…**

Constance:  **So, this is the other very unfortunate piece**—Whether there was also a letter for me or not, I will never know.  **You know, I had to leave home [after my father went missing] because I was a minor alone. I had my own life, I was self-sufficient, I had a boyfriend, I was working.  He [Anthony Fox] was working.  Point being, [after he disappeared] I left quite suddenly in the middle of night to stay with someone. And when I came back to get my things, it was very much like, we had to get in and get my stuff and get out. So, I didn't really get a chance to do a once over. When I went to the answering machine there were so**

many messages.  The mailbox was full, [but it may have well been empty] because I didn't get to look at anything so whether he [Anthony] called or not, I don't know. We had phone records. I don't know whether anybody [people who went in and cleaned up, missing persons detectives or whomever] looked at these things.

Paul:  Why did you leave abruptly?

Constance:  Because the police came, and then I could not be alone. I literally had just turned 16. I could not be alone.

Paul: Was this after they [the police] found the [Anthony's abandoned] truck and everything?

Constance:  No, this was before the truck.  I went to work, and I thought, 'I haven't seen my dad in a couple of days'. My co-workers were adamant that I call the police.  So, I called the police and reported that I hadn't seen him for a while.

Paul: **Now, before you left abruptly, did the police search the place?**

Constance:  **No, they asked a couple of questions.**  This isn't on record?  None of this is in the?  report?  [Note: Constance should have damn-well gotten a report but never did.]

Paul:  I am more of a provider of information than a receiver of information, but I am sure because you're involved, they [the police detectives looking for your father] will tell you more than they are going to tell me. This works better for the police because whenever an outside investigator is involved, there is another pair of eyes, heart and mind involved, so they prefer rather not to lead me anywhere. Their attitude is, 'Okay if there is new intelligence, something we might have missed, you find it and let us know.  [The many messages left in the answering machine—so many that they filled the answering machine to the limit, for example, is an extraordinary piece of evidence that may have gleaned valuable information as to Anthony's whereabouts.]

Constance:  Do you work with the police department or did someone else hire you?

Paul:  I am assisting the detectives directly.  I keep forgetting that you were a minor at the time. When you called the police was it on the 19th of Dec or before the 19th of Dec [2001]?

Constance: I think it was before the 19th.   What is the significance of the 19th.

Paul: Well because this is the [official] date that was reported when he allegedly disappeared. I thought that when his vehicle was found on Jan 2, [2002] that was the date I went by but when your uncle told me there was a letter, you understand, that gave it a closer timeline. Your uncle said he [Anthony] wrote a letter just before he disappeared. And your grandmother said she received it just before Christmas, that tells me that the 19th or in the middle of December is on or about the time he would have mailed the letter. But if you think you called the police before the 19th that still falls within the timeline even it was on the 14th or 15th of December.

Constance: **My father was going through a legal battle, so I stayed with one of the lawyers. [Note: This 'lawyer' is the 'someone' Constance stated she stayed with after she had to abruptly leave her home.] I stayed with one of [my father's lawyer's because I didn't have a lot of friends, so I stayed with one of the lawyers for like a week or so, I want to say.**

Paul:**  I'm sorry, a lawyer for whom?**

Constance: **For his [Anthony my father's] case. One his lawyers from his team.**

Paul: **You were staying with your father's lawyer?  Do you remember his name?**

Constance:  Jim Goldman, [James L. Goldman, Esq, Pircher, Nichols & Meeks – 1925 Century Park /east, 17th floor, Los Angeles /ca 90067-6077 was the conservator for the Estate of Anthony Fox] So, Brett Curlee [Brett B. Curlee, Esq. 11355 W. Olympic Blvd. Ste 100, Los Angeles, CA 90064 handled Fox's Bankruptcy] [See Exhibits 1 thru 7] was my dad's primary lawyer. [He was the first lawyer on the case. He came to pick me and my dog. And he let me stay with him and his wife.] They just had a baby. Then he let me go stay with my boyfriend's dad and stepmother. And this was all approved by the court. They asked me to stay for Christmas and soon after that my father's truck was found.

**[Note: This is highly suspect. Why of all people, did Constance go with Anthony's lawyers?]**

Paul: Now the case Anthony Fox vs Johnny Depp etc., I looked at this case early on when it was filed. Was your dad close to getting a settlement?

Constance: There was a lot of back and forth on that. The lawyers seemed very perplexed by his disappearance because they felt confident the case was close to nearing an end.

Paul: The court documents were sky-high, and I know your dad hit a couple of brick roads along the way. I did discover on my own that Sal Jenco—I don't know if you know the name.

Constance: Yeah, I do. He was the manager [of the Viperoom].

Paul: He stole.

Constance: Yeah, I knew that.

Paul: He stole, and he ripped-off Johnny and I guess in ripping off Johnny, he ripped off your dad.

Constance: Yes.

Paul: I was trying to get a hold of him because there is a documentary, Johnny vs Amber, but he didn't want to talk, I assume because he knew everyone had already known he was a thief. Did your dad ever indicate to you that Jenco was ripping him off?

Constance: Yeah, that's what part of the legal battle was.

Paul: I mean did he [your dad] ever express any of that to you directly?

Constance: Yes, I went to a couple of the court dates, and I remember meeting Sal. And he was likeable but in a sleazy way. And my dad something. It was a British thing…He was never one to slander someone, but he made it clear to me that Sal was not one to be trusted

Paul: Sal was a bad apple. I think Johnny Depp was in it for the rock and roll because that was his first love, bands and being around bands and he didn't realize, I don't know, maybe he did, I don't know, but people were stealing from him left and right.

Constance: I think he [Johnny Depp] did. They were doing things that were directly misusing the company trademark. It was more than just a misuse of company funds, skimming off the top.

Paul: Do you know who got those tape messages you had to abandon? What if your dad called about fifteen times?

Constance: That's something I will never know.

Paul: Maybe you can ask your guardian what became of it. **[The notion that the police didn't take the message tape recorder that might have very well contained recorded messages from Anthony, into evidence, is crazy as the old lady destroying Anthony's letter.]**

Constance: My dad didn't have a lot of material attachment. He was the type to take whatever you need in a backpack and leave everything else behind. Move out and get the security deposit back, that was it.

Paul: He was a minimalist which is good for a people that like to just Up and Go, right?

Constance: My dad was very much an Up and Go person. He was very much a wonderer. Prior to having me, he traveled the whole world with his first wife, and he could his whole life in that existence. I know he loved being a parent. He fought very hard in his custody battle for me when I was a child. He was a good father.

End

**Audio File:** Johnny Depp - Charles Fox call_09-36-18_OUT__16699291319017

**Audio Length at time of Transcription:** [00:32:00]

**Speaker One (1):** Paul Barresi

**Speaker Two (2):** Charles Fox

**Speaker Three (3):** Mrs. Fox


**Speaker 1 (Barresi):** [00:00:10] Come on, man, pick up.

**Speaker 2 (Fox):** [00:00:31] Hello?

**Speaker 1 (Barresi):** [00:00:33] Hello, Charles?

**Speaker 2 (Fox):** [00:00:34] Hello.

**Speaker 1 (Barresi):** [00:00:36] Charles, I'm glad you sound so cheerful. This is, uh, Paul Barresi. I'm calling from the United States. Uh, I'm a, uh, private investigator. I, I work for Amber Heard, who was married to Johnny Depp, until she...

**Speaker 2 (Fox):** [00:00:51] Yes.

**Speaker 1 (Barresi):** [00:00:51] ...until she fired me. And there, there...

**Speaker 2 (Fox):** [00:00:55] Uh-huh.

**Speaker 1 (Barresi):** [00:00:55] ...and there's been all of these conspiracy theories, uh, regarding your brother, Anthony. And I was wondering if you might be able to, um, give me some updates on what, what the latest is of what you know, what you heard.

**Speaker 2 (Fox):** [00:01:13] Um, well, uh, I'm...I...I'm, I'm afraid I, I, I don't know anything. Um, uh, um, my brother seems to have completely disappeared. Um, I don't know whether there's any connection with, um, uh, Johnny Depp, um, about his disappearance, um, or whether he's just, um, moved, and not, um, uh, told me, um, where he, um, where he is.

**Speaker 1 (Barresi):** [00:01:51] Well, I spoke with his wife, Judy, whom I, I understand you and your wife met years ago.

**Speaker 2 (Fox):** [00:01:58] Yes. Yes, we did.

**Speaker 1 (Barresi):** [00:01:59] And... and she indicated that, um, his plan was that if, uh, he couldn't find work in the United States, he had dual citizenship, so his plan was that he would return to England. But I know he was in dire straits financially...

**Speaker 2 (Fox):** [00:02:19] Yeah.

**Speaker 1 (Barresi):** [00:02:20] ...and he, he didn't, uh, fare well with his lawsuit against Johnny Depp. But um, there are so many...

**Speaker 2 (Fox):** [00:02:28] Good. Naturally enough not.

**Speaker 1 (Barresi):** [00:02:31] Yes. Right, yes. And so, we, uh... The, the investigation with the Ventura Police Department, who I'm working with closely...

**Speaker 2 (Fox):** [00:02:42] Mm-hmm.

**Speaker 1 (Barresi):** [00:02:42] Because Anthony is still on the endangered missing persons list after all these years. So it's a...

**Speaker 2 (Fox):** [00:02:49] Yes, I know.

**Speaker 1 (Barresi):** [00:02:51] It's as much a mystery here as it is there. I thought that perhaps, um, since your beloved mother, uh, passed away in 2004, I thought that maybe he might resurface. But you have heard nothing to that effect?

**Speaker 2 (Fox):** [00:03:09] Ab-, absolutely nothing. Um, you know, no- nothing, um, at all. We, um... It's a, um, uh, uh... As far as I'm concerned, it's a, um, a total mystery.

**Speaker 1 (Barresi):** [00:03:24] Yeah, it's still a total mystery.

**Speaker 2 (Fox):** [00:03:24] And he, he, he...he seems to have just disappeared.

**Speaker 1 (Barresi):** [00:03:29] Right. What was your mother's feeling about it, uh, before she passed? Did she ever confide to you her heartfelt, uh, feelings or opinion as to what might have happened to her son?

**Speaker 2 (Fox):** [00:03:43] Um, no. Um, she, um, uh, was um, obviously rather shocked, um, and um, uh, that was, um, just about all she, um, she said. I tried to find out, um, what she knew, but um, uh, she wasn't, um, telling me anything.

**Speaker 1 (Barresi):** [00:04:09] I understand.

**Speaker 2 (Fox):** [00:04:10] Um, which was, um, uh, uh, not, not much help, really. Um, I tried to, um, uh, get her to explain, because she said she'd had, uh, a, a letter from him, and I asked her whether I could possibly see the letter, and she said, oh, no, I got rid of it. Um, and um, when I was, um, uh, helping to clear out her, um, her flat, I could find no trace of it at all.

**Speaker 1 (Barresi):** [00:04:47] I see.

**Speaker 2 (Fox):** [00:04:47] So, um, obviously, she threw it out.

**Speaker 1 (Barresi):** [00:04:50] And this letter, uh, do, do, do you believe that this letter might have been some indication of what his plan was, or what he wanted to do?

**Speaker 2 (Fox):** [00:05:01] It... I honestly don't know. Um, it's quite possible. Um, but uh, as I say, I, I really, I really don't know.

**Speaker 1 (Barresi):** [00:05:11] Now, when was this letter, uh, written? Do you know when she got the letter?

**Speaker 2 (Fox):** [00:05:16] It was, um, it was just before Christmas, um, uh, when um, uh, Tony disappeared. Um, uh, because I was, um, uh, saying to my mother that, um, I'm rather, um, uh, uh, upset with Tony because, um, we haven't had a Christmas card from him. And um, his um, subsequent disappearance, um, obviously, um, explained that one.

**Speaker 1 (Barresi):** [00:05:52] Well, that's, uh, that's just, uh, more of a mystery now, isn't it?

**Speaker 2 (Fox):** [00:05:56] It is.

**Speaker 1 (Barresi):** [00:05:58] And I'm just...

**Speaker 2 (Fox):** [00:05:58] It is indeed.

**Speaker 1 (Barresi):** [00:05:59] I'm curious, as are you, I'm sure, and the family, as to why Mom didn't, um, confide to you, uh, what was in the letter, and, or...and, and also, why she was, uh, keeping its contents from you. That's what's so curious.

**Speaker 2 (Fox):** [00:06:15] Yeah, I, I...I know. Well, um, she um, uh, has, has always been, um, rather sort of, um, uh, secretive, shall we say, and um, I think as she got, um, older, um, she got, um, more so. Um, you know, that's, that's… that's really all I can say.

**Speaker 1 (Barresi):** [00:06:44] Yeah, that's, uh, that's in accordance with what Judy told me. Judy found it curious that, uh, your mom, when, when she and Anthony visited years ago, and I think that was around the time they met you, she ...

**Speaker 2 (Fox):** [00:07:00] Sure [crosstalk 00:07:00]

**Speaker 1 (Barresi):** [00:07:00] ...she, she didn't really invite them in. Uh, they, they kind of met outside, and went to restaurants outside, and...

**Speaker 2 (Fox):** [00:07:08] Yeah. Yeah, well, um, my, um, uh, uh, mother had, um... I, I don't think she, um, um, approved of the idea of Tony moving to the States. Um, sorry about that. Um, and um, I, I, I think, um, she, um, almost appeared to me to, um, accept his, uh, disappearance. Um, although she did say she wished she'd, um, helped him more, um, financially. Um, I think she helped him, um, uh, quite a lot. But um, obviously, if you're up against somebody like, um, Depp, um, who's got, um, pretty much unlimited amount of money, uh, you're, um, in a no-win situation.

**Speaker 1 (Barresi):** [00:08:23] Well, being up against Johnny Depp, and then of course being a man, and just, uh, uh, you know, fending for himself, and doing his best with what he's got...

**Speaker 2 (Fox):** [00:08:33] Yeah.

**Speaker 1 (Barresi):** [00:08:35] Um, your mom said that she wished she could have done more. Was this before the letter that she received, or after? Because I'm thinking...

**Speaker 2 (Fox):** [00:08:43] Um, it was, it was after. Um, when I went to, um, visit her, um, she, um, uh, uh, told me that, and um, got, uh, very upset. Um, there was a big discussion with, um, uh, some of my, um, uh, one of my relatives, who said, um, you know, uh, shall we, um, uh, tell your mother about, um, Tony disappearing? And I said, well, we've bloody got to. Uh, there's, there's no, um, doubt about that, and it, um, fell to me, as her, um, uh, her eldest son to, um, to tell her, which wasn't much fun.

Uh, but um, anyway, um, she seemed to get over it, um, fairly quickly, uh, and that's, that's really all I can tell you.

**Speaker 1 (Barresi):** [00:09:50] I understand. Do you think there's, uh, something she knew before she died, that the rest of the family never knew, or were not aware of?

**Speaker 2 (Fox):** [00:10:01] I think, I, I, I think that's ext-...highly possible. Um, I did try, um, as gently as I could to, um, press her a bit, um, but um, she, um, uh, clammed up, and uh, wouldn't tell me what, um, he'd written in

his letters, uh, before he disappeared. Uh, and um, I'm sorry to be so, um, uh, vague, but um, that's really all I know.

**Speaker 1 (Barresi):** [00:10:37] No, no, not at all. You've, you've given me a great deal to, uh, to, to think about. The, uh... You know, Anthony, uh, he disappeared in January, the, the first week of January, I believe, in 2002. But before...

**Speaker 2 (Fox):** [00:10:53] That's [inaudible 00:10:53]

**Speaker 1 (Barresi):** [00:10:53] ...but before he disappeared, he wrote your mother the, the letter, the mysterious letter, which...

**Speaker 2 (Fox):** [00:11:01] That's right.

**Speaker 1 (Barresi):** [00:11:02] ...which your mom would not confide to you about, or tell you its contents, uh...

**Speaker 2 (Fox):** [00:11:08] Right.

**Speaker 1 (Barresi):** [00:11:08] ...just before Christmas. So, we're talking a matter of weeks. And I'm thinking...

**Speaker 2 (Fox):** [00:11:14] That's right.

**Speaker 1 (Barresi):** [00:11:14] So this is my own thinking in my mind, is that he did reach out to her for something. What that something is we, we don't know.

**Speaker 2 (Fox):** [00:11:29] We don't know, no.

**Speaker 1 (Barresi):** [00:11:31] And uh, and you think it might be possible that she could have, uh, sent him some money, and set him up, and helped him make his exodus out of the United States, since you said she didn't want him to be there in the first place?

**Speaker 2 (Fox):** [00:11:47] I... I honestly don't know. Of course, it's possible. Um, but um, if she, if, um, uh, my mother did, um, she didn't, um, say anything to me about it.

**Speaker 1 (Barresi):** [00:12:04] There's just so much conspiracy theory here, Charles, as I'm sure you can appreciate, that, uh, th- there's a lot of culpability or responsibility or, uh, rumor that Johnny Depp, uh, facilitated or orchestrated his disappearance. And, and...

**Speaker 2 (Fox):** [00:12:24] Uh, that's, that's what...that's precisely what I've been wondering myself. Um...

**Speaker 1 (Barresi):** [00:12:30] I understand. But, but if you weigh that against this, uh, this letter, where he reached out to her, um...

**Speaker 2 (Fox):** [00:12:39] Yeah.

**Speaker 1 (Barresi):** [00:12:39] I would... I mean, I'm just assuming now that it was probably, um, a letter asking for some help.

**Speaker 2 (Fox):** [00:12:50] Uh, possibly. Um, uh, but I'm, I, I really don't know.

**Speaker 1 (Barresi):** [00:13:00] Well, you know Constance, um, Anthony's daughter, uh, Johnny turned over the...his share of the Viper Room to her, and I don't know how...

**Speaker 2 (Fox):** [00:13:12] Oh, did he? I didn't know that.

**Speaker 1 (Barresi):** [00:13:15] Yes, he did. And I think Constance knows more than, uh, what she's telling us. Um, also, I, I guess your mom and Constance were in touch, weren't they?

**Speaker 2 (Fox):** [00:13:29] Um, I don't know. Um, I don't think, um, uh, my mother's feelings towards her were, um, um, particularly, um, uh, kind, shall we say.

**Speaker 1 (Barresi):** [00:13:44] I didn't think so either. Which, which makes me wonder, uh, why did your mom, uh, consider her, her by, uh, giving her £10,000? She bequeathed £10,000 to her directly.

**Speaker 2 (Fox):** [inaudible 00:14:04]

**Speaker 1 (Barresi):** [00:14:04] And why did she make that, uh, provision? Do you know?

**Speaker 2 (Fox):** [00:14:09] I have no idea.

**Speaker 1 (Barresi):** [00:14:10] And I'm sure you read the will, right?

**Speaker 2 (Fox):** [00:14:13] Yes, I did.

**Speaker 1 (Barresi):** [00:14:16] And so that was the big question I had for you, is that... I, I didn't, uh... And when I talked to Judy, I understood that your mother and Constance were estranged.

**Speaker 2 (Fox):** [00:14:26] Yeah.

**Speaker 1 (Barresi):** [00:14:27] Uh, she was somewhat estranged from her own father, so she had to be at least, uh, even further removed from your mom, but yet your mom left her £10,000.

**Speaker 2 (Fox):** [00:14:42] Hmm.

**Speaker 1 (Barresi):** [00:14:42] And then, I think there was also a provision in there that, uh, in 2006, if Anthony was deemed, uh...didn't emerge, then he would be deemed dead, and therefore, um, further, uh, provisions, uh, that she bequeathed would be divided, right, and Constance would get more money, uh, on that end as well. Am I correct?

**Speaker 2 (Fox):** [00:15:09] I see. No, I didn't know that.

**Speaker 1 (Barresi):** [00:15:12] I... It's my understanding that there was some... Uh, the will indicated that if by 2006 Anthony is not found, then his share would go to you, and if I'm not mistaken, uh, Constance, his daughter.

**Speaker 2 (Fox):** [00:15:36] Yeah. Ah...

**Speaker 1 (Barresi):** [00:15:37] And so the executor...

**Speaker 2 (Fox):** [00:15:37] I see.

**Speaker 1 (Barresi):** [00:15:38] ...the executor, who was the niece, uh, and also her name is Skinner, is it?

**Speaker 2 (Fox):** [00:15:46] That's right.

**Speaker 1 (Barresi):** [00:15:47] Is it Bonnie Skinner?

**Speaker 2 (Fox):** [00:15:49] Uh, Barbara.

**Speaker 1 (Barresi):** [00:15:50] Barbara Skinner was bequeathed, uh, £100,000. She was the...

**Speaker 2 (Fox):** [00:15:55] Yes, that's...

**Speaker 1 (Barresi):** [00:15:55] And she was the executor.

**Speaker 2 (Fox):** [00:15:57] Yes.

**Speaker 1 (Barresi):** [00:15:58] And then, I don't know how it's done in London, but I would assume in, in 2006, she would have had to allocate, or see to it that you got additional, um, uh, I don't know, I want to say things, or additional monies. Did that not happen?

**Speaker 2 (Fox):** [00:16:18] Uh, yes, I think it did.

**Speaker 1 (Barresi):** [00:16:20] Okay. So, then Constance got, got her fair share as well.

**Speaker 2 (Fox):** [00:16:27] Ah, I see.

**Speaker 1 (Barresi):** [00:16:28] Uh, if I'm not mistaken. I, I... The, the will, as you know, is public record. Uh...

**Speaker 2 (Fox):** [00:16:34] Yeah.

**Speaker 1 (Barresi):** [00:16:34] And so, I was trying to, uh... I read it through a few

times, and I wasn't quite sure. I know your mother indicated if Anthony is still alive, then he will get this or that or the other, but if he's not found by 2006, then additional funds will be further, um, distributed.

I find it fascinating that your grandfather, uh, was uh, he was the, uh, horticulture, uh...he was the horticulture guy for the King? Or the, uh, the person, the...

**Speaker 2 (Fox):** [00:17:18] Uh, yeah. Well, he...yes, yes, he, he, he did, um, um, uh, go to, um, Buckingham Palace to, um, uh, advise the King on, um, uh, what, um, trees he should plant, and where, and... absolutely.

**Speaker 1 (Barresi):** [00:17:37] Yeah, the...the, the gardens, which is...I thought was fascinating...

**Speaker 2 (Fox):** [00:17:42] Yes.

**Speaker 1 (Barresi):** [00:17:43] No, I really do. I don't know why that element has never been, uh, connected. But I don't know if this will give you any peace of mind, Charles, but uh, you know, um, it, it's kind of ironic, because Amber Heard, Johnny Depp's ex-wife...

**Speaker 2 (Fox):** [00:18:00] Mm.

**Speaker 1 (Barresi):** [00:18:01] ...hired me to look into his follies and vices, going way back to the Viper Room days.

**Speaker 2 (Fox):** [00:18:08] Yeah.

**Speaker 1 (Barresi):** [00:18:09] And the, the irony is that I couldn't find one person to say one deprecating thing about him, and...

**Speaker 2 (Fox):** [00:18:19] Ah.

**Speaker 1 (Barresi):** [00:18:20] ...but he was, he was a genuinely good, goodhearted man. He... In fact, uh, a number of people, uh, I spoke with, uh, he paid their rent, he paid their medical expenses, he paid their legal fees.

**Speaker 2 (Fox):** [00:18:38] Hmm.

**Speaker 1 (Barresi):** [00:18:38] I mean, he was just an overly generous, goodhearted individual. I don't know if this gives you any peace of mind in knowing that, but, but uh...

**Speaker 2 (Fox):** [00:18:47] Yeah. Well, I mean...yes, I... Uh, yes, yes, it does. Um, I think, um, in that case, it's highly unlikely that it has anything to do with, um, Tony's, um, disappearance.

**Speaker 1 (Barresi):** [00:19:03] Yeah, I have a sense that, uh, in, in the back of your mind, you probably thought that the, the likelihood of him having something to do with, uh, Anthony's disappearance is, is uh, next to zero, or close to zero.

**Speaker 2 (Fox):** [00:19:22] Mm-hmm.

**Speaker 1 (Barresi):** [00:19:22] Um, I'm just trying to understand... I wish we knew

a little more about that darn letter.

**Speaker 2 (Fox):** [00:19:29] Yeah, um, we're so...well, so do I. But it's, um...

**Speaker 1 (Barresi):** [00:19:33] Did, uh...yeah. Does Miss...

**Speaker 2 (Fox):** [00:19:35] I, I think my mother destroyed it, and threw it away.

**Speaker 1 (Barresi):** [00:19:38] Does Barbara know anything more than you, do you think? Uh, or uh...

**Speaker 2 (Fox):** [00:19:42] No, I'm sure she doesn't. Um, uh, she was the one who, um, told me, um, that, um, Tony had disappeared, um, and um, uh, it was agreed that, um, um, I should be the, um, the one to tell my mother.

**Speaker 1 (Barresi):** [00:20:07] Yeah, and when, and when did you tell your mom? Right after, immediately after he disappeared, like in January? Or was it some time...

**Speaker 2 (Fox):** [00:20:13] Yes. Yeah...yeah, oh, yes. Yes, yeah. Um, when I went up to see her, it was, um, sometime just after Christmas. And um, I said I'm very, um, annoyed with Tony because, uh, I haven't had a, um, a Christmas card from him or anything, and um, uh, she said, oh, I, I, I, I've had this letter from him, and um, I said, oh, what's it say, and um, she, um, changed the subject. So, um...

**Speaker 1 (Barresi):** [00:20:50] Oh, so you went to tell her that he disappeared, and then she, um, she indicated she had a letter?

**Speaker 2 (Fox):** [00:20:59] Yep. That's right.

**Speaker 1 (Barresi):** [00:21:00] And she, did she seem, uh, concerned or alarmed? Or what, uh...

**Speaker 2 (Fox):** [00:21:06] Uh, well, um, when I told her that he'd, um, disappeared, yes, she was, um, upset, as one would expect.

**Speaker 1 (Barresi):** [00:21:18] And that's when she told you she wished she had done more for him?

**Speaker 2 (Fox):** [00:21:21] Yeah, that's right.

**Speaker 1 (Barresi):** [00:21:23] Well, I wonder if maybe that was a letter from him, saying help me, I need some money, and maybe she didn't.

**Speaker 2 (Fox):** [00:21:31] Um, maybe. Maybe. It's quite possible that she felt she'd done enough. Um, what more she could have done, that I don't know. I mean, we're hardly in the, um, same, um, financial, um, situation as, um, Johnny Depp. Um, you know, I'm afraid that's really all I can tell you.

**Speaker 1 (Barresi):** [00:21:55] No, no, I understand. I'm, I'm thinking of my brother. Uh, my older brother, Tom, just passed away a year ago, and there were things about him I was able to tell his son just because Tom and I grew up together.

**Speaker 2 (Fox):** [00:22:11] Yeah.

**Speaker 1 (Barresi):** [00:22:11] And I'm, I'm glad I got a chance to talk to you, his brother, because you, you two grew up together, and I think brothers know one another.

**Speaker 2 (Fox):** [00:22:19] Yes.

**Speaker 1 (Barresi):** [00:22:20] They often feel things, uh, the same way, and they, they...their mannerisms, and the way they speak, and how...

**Speaker 2 (Fox):** [00:22:28] Yes. Well, um, uh, Tony and I certainly had the same sort of sense of humor, um, ridiculous as that may seem, uh, to other people. Um, and um... All right, as children, uh, we used to, um, argue quite a bit.

**Speaker 1 (Barresi):** [00:22:48] Right.

**Speaker 2 (Fox):** [00:22:49] Um, and uh, but um, apart from that, we, um, we, we seemed to get on pretty well.

**Speaker 1 (Barresi):** [00:22:57] Yeah, of course. Do you think... Um, this is a hard question, Charles, but I, I just, before we say goodbye, I have to ask. Do you think that there's a possibility he may have, uh, committed suicide?

**Speaker 2 (Fox):** [00:23:11] Um, it's possible. Um, all, um...

**Speaker 1 (Barresi):** [00:23:16] The reason I ask is, is there anything in his, in his childhood that, that would... You, you say it's possible. What makes you think that?

**Speaker 2 (Fox):** [00:23:27] Um...I don't really know. I mean, I think, uh, that there are...that there are sort of three possibilities. Um, either he did kill himself, or, um, he um, just, uh, ran away, or he was killed by someone else.

**Speaker 1 (Barresi):** [00:23:57] Right.

**Speaker 2 (Fox):** [00:23:57] Um, which one of those, I'm sorry I can't help you with. But um, if you, um, do find anything, um, about him, um, could you please, um, let me know?

**Speaker 1 (Barresi):** [00:24:16] Yes, and that's what I wanted to ask you. Because, because this case is open-ended, and it's, uh, an ongoing, uh, endangered missing persons case, uh, that, um... And by the way, I, I've worked with people, uh, in Scotland, Scotland Yard, and through Interpol, and a lot of the, the prevalent standard by which missing persons is handled in the United States is very much the same in London.

**Speaker 2 (Fox):** [00:24:46] Uh-huh. Uh-huh.

**Speaker 1 (Barresi):** [00:24:48] And so...and so I, I will, of course, uh, keep you abreast. And I wanted to, to ask if it would be okay if I could pass on everything that you and I discussed, uh, to the investigating detectives.

They're, uh, Detective Furlong, F-U-R-L-O-N-G, and Detective Morales. He's the lead detective, Morales, whom I'm going to have some conversation with next week. And I want to pass, I want to pass...

**Speaker 2 (Fox):** [00:25:20] Yeah, it is [crosstalk 00:25:22]

**Speaker 1 (Barresi):** [00:25:23] Yes, I want to pass on your information so that from, from, from here forward, uh, beyond the intelligence, whatever I gather, and of course I'll always be in touch and keep you posted, uh, they, they can also be in touch with you as well. And I'm sure they're gonna wanna hear about the, um, the, um, letter. I, I know that there's nothing more you can add. Do you think Barbara Skinner might be able to offer something on what the contents of...?

**Speaker 2 (Fox):** [00:25:54] I, I, I, I really don't know. Um, I suppose it's possible. Um, I seem to have rather lost, um, lost touch with her. Um...

**Speaker 1 (Barresi):** [00:26:10] Really?

**Speaker 2 (Fox):** [00:26:11] Unfortunately.

**Speaker 1 (Barresi):** [00:26:12] Well, I think I have, uh, I think I have a current, uh, address.

**Speaker 2 (Fox):** [00:26:17] Oh, fine [crosstalk 00:26:18].

**Speaker 1 (Barresi):** [00:26:18] I might, I might have her current, I might have her current... Now, was she the, um... I thought that she, uh, she was a niece, your mother's niece. Correct?

**Speaker 2 (Fox):** [00:26:28] Um, well, um, uh...uh, not exactly. Um, she was, um, married to my, um, uh, mother's nephew.

**Speaker 1 (Barresi):** [00:26:41] Oh, she was married to your mother's nephew. I see.

**Speaker 2 (Fox):** [00:26:45] Nephew.

**Speaker 1 (Barresi):** [00:26:46] I see. Because she must have really loved her, because she, uh, she left her I would say a pretty nice sizable amount of, uh, of money [crosstalk 00:27:03].

**Speaker 2 (Fox):** [00:27:03] Uh, yes. I was a bit, um, annoyed about that (laughs).

**Speaker 1 (Barresi):** [00:27:07] Well, I, I was looking at it, and I said this can't be right. Charles should be on the top. There must...

**Speaker 2 (Fox):** [00:27:13] Yeah.

**Speaker 1 (Barresi):** [00:27:14] ...there must be some reason. What was it that made them so close, do you think?

**Speaker 2 (Fox):** [00:27:19] I don't know. Um, I think, um, she, um, uh, was, um, uh, rather, um, helpful for...to my mother whenever she, um, uh, came over to England. They were, um, living in, um, uh, France at the time, and um, uh, whenever she came over to, um, England, um, she always, um, visited my mother, and um, helped sort of run the house, and this, that, and the other.

**Speaker 1 (Barresi):**  [00:28:01] Yeah, I see. Yeah, my mom, my mom and dad

were the same way. I wasn't close, but...geographically. Uh, I was living in, in uh, Southern California. My other brother, Mark, was right there, two miles away from her.

**Speaker 2 (Fox):** [00:28:16] Ah.

**Speaker 1 (Barresi):** [00:28:16] So after she passed, my father had died, and then after my mom passed, she left, uh, the lion's share of everything to my brother, who was close, because he was always there to, you know, run errands and help out. That's...

**Speaker 2 (Fox):** [00:28:32] Yeah.

**Speaker 1 (Barresi):** [00:28:33] ...that's the old school way of, way of thinking, I suppose. But uh...

**Speaker 2 (Fox):** [00:28:37] Yes. Yes, I, I, I, I, uh, I, I do understand, understand that, yeah.

**Speaker 1 (Barresi):** [00:28:42] Do you have an email address, Charles?

**Speaker 2 (Fox):** [00:28:46] No, I'm afraid I don't.

**Speaker 1 (Barresi):** [00:28:48] You're one of those old...you're an old-fashioned guy. You're a dinosaur, like me. I'm 70, I'll be 73.

**Speaker 2 (Fox):** [00:28:55] Ah? Ah. Oh, right. Yeah, I'm, um...

**Speaker 1 (Barresi):** [00:29:00] 75.

**Speaker 2 (Fox):** [00:29:02] 75, yeah, that's it.

**Speaker 1 (Barresi):** [00:29:04] That's right. Well, you're still young.

**Speaker 2 (Fox):** [00:29:07] Yeah.

**Speaker 1 (Barresi):** [00:29:08] Well, you don't have an email, but, but the best way, I guess, to reach you would be, uh, over the phone. Are you still working these days?

**Speaker 2 (Fox):** [00:29:15] No, I'm not.

**Speaker 1 (Barresi):** [00:29:17] Ah. Well, good for you. You can enjoy a little bit... And how's Mrs. Fox?

**Speaker 2 (Fox):** [00:29:24] Yes, indeed.

**Speaker 1 (Barresi):** [00:29:25] Oh, well, she's doing well?

**Speaker 2 (Fox):** [00:29:27] Yep, yep, fine.

**Speaker 1 (Barresi):** [00:29:29] Okay. That's good.

**Speaker 3 (Mrs. Fox):** [inaudible 00:29:30]

**Speaker 1 (Barresi):** [00:29:30] What did she say?

**Speaker 2 (Fox):** [00:29:33] That's all right. Nothing.

**Speaker 1 (Barresi):** [00:29:37] Okay. Charles, you've been great. It's been great to, uh...talking to you. Um, is there anything else that, uh, you want to ask me, um, before we hang up, or...

**Speaker 2 (Fox):** [00:29:48] I don't...I don't think so, honestly. Um, obviously, I've been, um, thinking about this for some time, but um, um...no, I can't think of anything else. I think I've told you everything I know. Um...

**Speaker 1 (Barresi):** [00:30:08] I'm surprised...

**Speaker 2 (Fox):** [00:30:09] Not that it's really much.

**Speaker 1 (Barresi):** [00:30:11] Well, it's such... It actually, what you gave me was, uh, was quite a bit, and, and I, I think it's, I think it's gonna be helpful. Uh, I, I would like to, to, to... It would be nice to put rumors to rest. But, um...

**Speaker 2 (Fox):** [00:30:26] Yeah. Yeah [crosstalk 00:30:27]

**Speaker 1 (Barresi):** [00:30:27] But you know, people, people are gonna form their own opinion, one way or another.

**Speaker 2 (Fox):** [00:30:31] Yeah.

**Speaker 1 (Barresi):** [00:30:32] Why do you suppose you haven't been... Uh, uh, no one's ever gotten a hold of you from the press, or any...or the The Mirror Group, or any of those, uh, great, great papers?

**Speaker 2 (Fox):** [00:30:43] No. Uh, no, nothing at all.

**Speaker 1 (Barresi):** [00:30:47] Nothing at all.

**Speaker 3 (Mrs. Fox):** [00:30:47] No.

**Speaker 1 (Barresi):** [00:30:50] Does...

**Speaker 2 (Fox):** [00:30:50] Yeah.

**Speaker 1 (Barresi):** [00:30:51] Does, uh, your wife have something to say? I'm sorry.

**Speaker 2 (Fox):** [00:30:54] No, no, no.

**Speaker 1 (Barresi):** [00:30:55] Okay.

**Speaker 2 (Fox):** [00:30:55] Not at all.

**Speaker 1 (Barresi):** [00:30:56] She wants you to get off the phone.

**Speaker 2 (Fox):** [00:30:58] Yes.

**Speaker 1 (Barresi):** [00:31:00] All right. You better listen. All right. Well, you...
We'll keep the door ajar, Charles. And thank you again. Uh, I'm gonna pass on this information to the detectives. Uh, there's, uh, no email for me to communicate with you that way, but uh, I'll...

**Speaker 2 (Fox):** [00:31:17] Yeah.

**Speaker 1 (Barresi):** [00:31:18] ...I'll certainly pick up the phone and, and call you if there's anything new. And vice versa, please.

**Speaker 2 (Fox):** [00:31:26] Okay, fine. Right you are. Well, thank you very much indeed for phoning. It's been nice to talk to you.

**Speaker 1 (Barresi):** [00:31:32] Thank you, sir. You're a gentleman.

**Speaker 2 (Fox):** [00:31:33] And um, I'll, um, look forward to hearing from you if you have any further information.

**Speaker 1 (Barresi):** [00:31:41] Yes, sir. Absolutely. Thank you so much.

**Speaker 2 (Fox):** [00:31:43] Okay, splendid. Right. Goodbye.

**Speaker 2 (Fox):** [00:31:47] Goodbye. Bye-bye.

**Speaker 3 (Mrs. Fox):** [00:31:48] Charles, are you all right?

**Speaker 2 (Fox):** [00:31:50] Yeah, I'm fine.

**Speaker 3 (Mrs. Fox):** [00:31:52] Wait 'til I get this, put up, and...

**Speaker 2 (Fox):** [00:31:54] Okay [inaudible 00:31:54]

**Transcriber's Certificate**

I, Liridona Etemi, do hereby certify that I have listened to the recording several times carefully of the foregoing; further that the transcript pages one through twelve (1-12) was reduced to typed form from the digital audio recording; and that the foregoing is an accurate and true record of the digital audio recording above transcribed version in this matter.

**Dated** this 19th day of March 2025.

Transcriptionist: Liridona Etemi

___

*__In an Individual Capacity:__*

Pursuant to Section 117.05(13)(a), Florida Statutes, the following notarial certificate is sufficient for an acknowledgment in an individual capacity.

STATE OF FLORIDA

COUNTY OF Citrus

The foregoing instrument was acknowledged before me this 20 day of March, 20 25, by Liridona Etemi (name of person acknowledging).

Notarized online using audio-video communication

Michelle Peterson
Electronic Notary Public
State of Florida
Commission #: HH445677
Commission Expires: 01/19/2028

Notary Signature:
Notary Name: Michelle Peterson

Personally Known _____ OR Produced Identification __✓__

Type of Identification Produced
_____ Driver's License Italy _____

 Gmail

Christina Taft <taftchristina.ceo@gmail.com>

## Fwd: ANTHONY FOX The OJ Simpson Case. Paul Barresi trashing the Ventura County Sheriff's Department

**Mario George Nitrini 111** <marionit111@gmail.com>                    Sun, Jan 5, 2025 at 6:26 AM
To: taftchristina.ceo@gmail.com

Christina.
Paul Barresi's original email to me with Barresi trashing the Ventura County Sheriff's Department pertaining to Anthony Fox.

Mario George Nitrini 111
------
The OJ Simpson Case

---------- Forwarded message ---------
From: <paulbarresi@aol.com>
Date: Wed, Apr 20, 2022, 5:45 PM
Subject: ANTHONY FOX
To: marionit111@gmail.com <marionit111@gmail.com>

MARIO, Read these stories. Let's lay out some foundation for the next tweet. STUDY THIS CLOSELY.

HOLLYWOOD FIXER PAUL BARRESI HELPS VENTURA POLICE INVESTIGATE DISAPPEARANCE OF JOHNNY DEPP'S FORMER VIPEROOM BUSINESS PARTNER

UPDATE: Much to my shock and dismay, the Ventura Police missing persons detectives have allegedly been looking for ANTHONY FOX for two decades yet, they never spoke with his mother before her death. They never spoke with his eldest brother Charles and they have never spoke to his daughter. They never looked at Fox's mother's Will. They never retrieved the telephone answering machine, according to his minor child which was filled with messages. They knew nothing about the letter Anthony wrote to his mother on the day he disappeared which prompted her to rewrite her Will. They are not aware that his mother refused to tell Anthony's eldest brother Charles or anybody else what was in the letter. She took it to her grave. Anthony Fox's, to this day, remains on the endangered missing persons list, however, the detectives are doing nothing to find him. I have done more in the past year than the cops have done in the past twenty.

https://radaronline.com/p/viper-room-curse-johnny-depp-ex-business-partner-missing/

https://www.pressreader.com/usa/national-enquirer/20200615/282063394178770

https://www.enstarz.com/articles/224361/20211224/johnny-depp-something-disappearance-former-business-partner-anthony-fox-20.htm



1:53

← **Tweet**    Open app

💬 7          ⟲ 34          ♡ 203          ⬆

**Jennifer Rogers** @jjrogershorses · Apr 5    •••
Replying to @PaulBarresi1
So interesting what you are finding :) I hope
Johnny is following you.

💬 1          ⟲          ♡ 2          ⬆

**Paul Barresi**
@PaulBarresi1                                    •••

Replying to @jjrogershorses

Johnny tells me he reads everything I put out
there. lol

1:00 PM · Apr 5, 2023 · **100** Views

**5 Likes**

💬          ⟲          ♡          🔖          ⬆

Tweet your reply                    Reply

🏠          🔍          🔔          ✉

AA          🔒 twitter.com          ↻

‹          ›          ⬆          📖          ⧉

11:55

← **Adam Waldman**
450 Tweets

**Follow**

💬 26    🔁 65    ♡ 417    ⬆️

**Adam Wald...** @adam_w... · Jun 14, 2020    ···

In memoriam

> Begin forwarded message:
>
> **From:** Comment Calls <~~c████████.com~~>
> **Date:** July 30, 2019 at 2:05:50 PM PDT
> **To:** ~~████████████~~ ~~Robin~~ ~~████~~
> ~~m~~>
> **Cc:** "Dolan, Dan" <~~d█████████~~
> **Subject: National Enquirer Comment Request: Johnny Depp**
>
> To Whom It May Concern,
>
> The National Enquirer intends to publish an article reporting Amber Heard has recruited a Private Investigator who is compiling a dossier of evidence against Johnny Depp for evidence to be used in court about his past drug use and various crimes including violent behavior and ties to at least one murder.
>
> If you would like to comment please do so by 1PM tomorrow, Wednesday, July 31, directly to this

🗑️    📁    ↩️    ✏️

💬 44    🔁 105    ♡ 485    ⬆️

**Adam Wald...** @adam_w... · Jun 15, 2020    ···

@RachelAbramsNY you know the only difference between the @NationalEnqui... the @nytimes? The @NationalEnquir had the sense not to publish a fake story like this

🏠    🔍    🔔    ✉️


🔒 twitter.com

11:55

← **Tweet**    Open app


**Adam Waldman**
@adam_waldman                    •••

# In memoriam



Everything I know about Amber Heard, however (and it's plenty), strongly supports the many allegations that she is a lying, two-faced, bottom-feeding fame grubbing harpy, who lives by the old Hollywood code of "hurray for me and f[___] you!"

In my opinion, her absurd allegations about Johnny's behavior are nothing but a pathetic and desperate attempt to extort money from my dear little brother. Period. — with Jonathan Shaw Works

dailymail.co.uk
Amber Heard hired private investigator to dig up dirt on Johnny Depp

4:18 PM · Jun 14, 2020

**130** Retweets    **24** Quote Tweets    **669** Likes

💬        🔁        ♡        ⬆️


Tweet your reply        **Reply**

👑 **JOHNNY DE...** @fuc... · Jun 14, 2020    •••
Replying to @adam_waldman

🏠        🔍        🔔        ✉️

11:49

← **Adam Waldman**
450 Tweets
[Follow]

💬 26          ⟲ 136          ♡ 603          ⬆

**Adam Wald...** @adam_wal... · Jul 17, 2020    •••
In Memoriam



July 17, 2020 5:20AM PDT

ADVERTISEMENT

**Fantastic Amazon offer**
Atseuromaster.co.uk

(Press Association) Tesla founder Elon Musk regularly visited Amber Heard late at night at Johnny Depp's Los Angeles penthouse, it has been claimed.

Alejandro Romero, a concierge at the Eastern Columbia Building, said in a written witness statement as part of Depp's libel trial with The Sun, that the actress, 34, gave

💬 47          ⟲ 233          ♡ 845          

 **Adam Wald...** @adam_wa... · Jul 16, 20
In Memoriam. Every story starts somew...
@people this story started with you.

                              

🔒 twitter.com

← **Tweet**



**Paul Barresi**
@PaulBarresi1

...

Amber Heard stalker Christina Taft who left her blind,
mentally ill mom to burn alive in worst fire in CA
history, but not before saving her belongings, still
insists I was working on Johnny's behalf while working
for AH fm Jul to Sept 2019. This email is proof she's
DEAD WRONG.

-----Original Message-----

From: Adam Waldman@xxxxx
To: Paul Barresi@xxxxx
Sent: Thu, Apr 9, 2020 11:33 am
Subject: Re:

Dear Mr. Barresi

Mr. Depp appreciates that you came clean about him,

in the Daily Mail and actually so do I.

If you want to litigate the truth with me, which is what

a defamation lawsuit is, I am game. It opens a whole

new avenue of discovery in our case against your

erstwhile client [Amber Heard].

Sincerely,

**Adam Waldman**

1:07 PM · Dec 12, 2022

**20** Retweets   **123** Likes

      

8:46

← **Tweet**                    Open app



**Paul Barresi**                    •••
@PaulBarresi1

Adam Waldman breaks silence in one on one with me calling out attacks on JD witnesses after trial who AH has a particular grudge against youtube.com/watch?v=V95ByP...



7:30 PM · Dec 15, 2022



🔒 twitter.com



| ılıl 49.4K | 148 | ↑⇂ 363 | ♡ 2,351 | ⬆ |

**Ellena** 🏴󠁧󠁢 💜 @jeffers_ellena · Dec 30, 2022 ...
Replying to @PaulBarresi1
Sound advice. Straight from the horse's mouth. So to speak 😂

| ılıl 2,453 | 1 | ↑⇂ 3 | ♡ 76 | ⬆ |

**Paul Barresi** ...
@PaulBarresi1

Replying to @jeffers_ellena

Johnny was gracious enough to confide that it was Adam Waldman who nudged him suggesting that he reach out to me. Thanks Adam. What a way to bring into the New Year! "He [Adam] always has been one to give credit where credit is due," Johnny said.

11:58 AM · Dec 30, 2022

**2,953** Views   **16** Retweets   **1** Quote Tweet   **275** Likes



8:24    📶 5G 🔋28

← **Tweet**    [ Open app ]



**JustaJerseyGirl** @RiannNJ · 7h    ...
Replying to @Nebuchoronus and @PaulBarresi1
I wouldn't be surprised considering the timing of the break in which occurred days before her deposition.

💬 1          ⟳          ♡ 5          ⬆️

**Paul Barresi**    ...
@PaulBarresi1

Replying to @RiannNJ and @Nebuchoronus

Adam Waldman's voice and the stuff he alleged about J witnesses being harassed and attacked in simple and complex ways was credible. I think it made the fuzzy back hairs rise on Amber's neck. She should thank Christina Taft before they take that crazy witch to the loony bin.

5:24 PM · Dec 20, 2022

**4** Likes



🏠          🔍          🔔          ✉️

AA          🔒 twitter.com          ↻

‹          ›          ⬆️          📖          ⧉

8:49

← **Post**



**Paul Barresi**
@PaulBarresi1                    **Follow**    ···

He does look like a Rat.



11:52 AM · Mar 2, 2024 · **57** Views

💬 1          ⟲          ♡ 2          🔖          ⬆️

Show additional replies, including
those that may contain offensive        **Show**
content

🏠          🔍          ⬜          🔔          ✉️

AA          🔒 twitter.com          ↻

‹          ›          ⬆️          📖          ⧉

**Audio File:** Audio of Call Between Cooperating Witness Richie Albertini and Witness Big Ed Shaw from 2019

(From Nitrini Dec 7, 2023 and Defendant Barresi)

**Audio Length at time of Transcription:** [01:02:39]

**Speaker One (1):** Richie Albertini

**Speaker Two (2):** Big Ed Shaw


**Speaker 1 (Albertini):** [00:00:11.300] Is this Big Ed Shaw? Hello?

**Speaker 2 (Shaw):** [00:00:15.119] Hello?

**Speaker 1 (Albertini):** [00:00:16.857] Is this Big Ed Shaw?

**Speaker 2 (Shaw):** [00:00:19.404] Who's calling?

**Speaker 1 (Albertini):** [00:00:21.701] Oh, come on. Listen to my voice for a minute and tell me if you can remember it.

**Speaker 2 (Shaw):** [00:00:25.154] (laughs) [inaudible 00:00:29.602]

**Speaker 1 (Albertini):** [00:00:30.230] You haven't seen me, bro, you haven't seen or talked to me in probably 20 years.

**Speaker 2 (Shaw):** [00:00:35.684] Okay, keep talking.  Keep telling, let me listen some more. Let me hear, let me try to get it.

**Speaker 1 (Albertini):** [00:00:43.109] Welcome to Mr. Fats Royal Martini Club.

**Speaker 2 (Shaw):** [00:00:46.873] (laughs) Mr. Fats Royal Martini Club... [crosstalk 00:00:51.583]

**Speaker 1 (Albertini):** [00:00:52.273] Bro...bro, it's Ri-...it's Richie.

**Speaker 2 (Shaw):** [00:00:54.742] Ohh... What's going on, Richie?

**Speaker 1 (Albertini):** [00:00:59.040] Ed, you tell me. Who...

**Speaker 2 (Shaw):** [00:01:05.022] What is it, man? What are you calling me for? What's going on?

**Speaker 1 (Albertini):** [00:01:07.148] Who is this private investigator?

**Speaker 2 (Shaw):** [00:01:11.040] I don't know.

**Speaker 1 (Albertini):** [00:01:13.316] What does he want?

**Speaker 2 (Shaw):** [00:01:14.796] Did you talk to him?

**Speaker 1 (Albertini):** [00:01:17.310] I told him to go fuck himself.

**Speaker 2 (Shaw):** [00:01:18.856] Well, that's, that's basically, uh, that's basically what I told him. I didn't even give him your information. I didn't even know your information [crosstalk 00:01:27.221]

**Speaker 1 (Albertini):** [00:01:27.221] No, exactly. Because he's a private investigator. I guess he might have mentioned my name or something, "Oh, Richie's a good guy." So next thing I know, I'm getting... You know, you know where I've been right?

**Speaker 2 (Shaw):** [00:01:37.267] No.

**Speaker 1 (Albertini):** [00:01:39.086] I've been in the feds, bro.

**Speaker 2 (Shaw):** [00:01:42.533] You was in the, you was in jail?

**Speaker 1 (Albertini):** [00:01:44.504] I've been in federal prison.

**Speaker 2 (Shaw):** [00:01:48.275] For what?

**Speaker 1 (Albertini):** [00:01:48.458] You see, again, after I left you guys, nobody seen or heard from me for so long because I... You know, when I left there, it was because of the craziness, bro. And uh, I ended up going into the medical marijuana business, and I had three shops in Holly-, I had...well, I had two shops in Hollywood, and I had one in the Valley. And 2012 I got busted. You'll never guess who...

**Speaker 2 (Shaw):** [00:02:17.280] Damn.

**Speaker 1 (Albertini):** [00:02:17.280] You'll never guess who my next-door neighbor was at the time.

**Speaker 2 (Shaw):** [00:02:21.495] Who?

**Speaker 1 (Albertini):** [00:02:22.653] Sal.

**Speaker 2 (Shaw):** [00:02:27.085] What, you mean you lived next door to him?

**Speaker 1 (Albertini):** [00:02:29.302] Yeah, I lived in the house next door to him, on Genesee.

**Speaker 2 (Shaw):** [00:02:32.572] Oh, okay.

**Speaker 1 (Albertini):** [00:02:33.845] That's where they raided me. They didn't even raid my shops. I'm sitting in my living room, these guys come running up the driveway, helicopters, through my walls, through my doors, ripping the house apart. I did, uh, just under, I did just under five years.

**Speaker 2 (Shaw):** [00:02:51.842] And now, and now it's supposed to be legal.

**Speaker 1 (Albertini):** [00:02:54.862] Ed, it was legal when I was doing it, for a medical marijuana patient. Hey, by the way, how is your health?

**Speaker 2 (Shaw):** [00:03:00.416] I'm okay. I, I just, you know, I, I got in an accident. You know that.

**Speaker 1 (Albertini):** [00:03:05.411] No, I didn't know you had an accident.

**Speaker 2 (Shaw):** [00:03:08.469] Yeah, man, I can't walk or nothing.

**Speaker 1 (Albertini):** [00:03:10.768] You gotta be kidding me. You're in a wheelchair?

**Speaker 2 (Shaw):** [00:03:12.998] Yeah.

**Speaker 1 (Albertini):** [00:03:14.308] Oh, my God. Ed, I'm so sorry.

**Speaker 2 (Shaw):** [00:03:16.964] Hey, man...2006.

**Speaker 1 (Albertini):** [00:03:22.567] What, was it a car accident?

**Speaker 2 (Shaw):** [00:03:24.581] Yeah.

**Speaker 1 (Albertini):** [00:03:26.302] You fell asleep, huh?

**Speaker 2 (Shaw):** [00:03:29.131] I think so, because I don't remember anything.

**Speaker 1 (Albertini):** [00:03:32.080] You still have that narcolepsy.

**Speaker 2 (Shaw):** [00:03:35.415] Yeah, you, you remem-, you remember that, huh?

**Speaker 1 (Albertini):** [00:03:37.868] Bro, I remember you'd be standing there, and you'd be snoring.

**Speaker 2 (Shaw):** [00:03:42.464] Yeah.

**Speaker 1 (Albertini):** [00:03:44.361] All right. So anyway, here... I think this is why this whole thing is happening. Have you been in any kind of contact with Olivia?

**Speaker 2 (Shaw):** [00:03:53.160] No.

**Speaker 1 (Albertini):** [00:03:55.476] All right. Here's what I... here's the gist that I'm gathering from this, and I think this is why this PI is reaching out to us. Olivia is making a movie, and everybody's in it. Everybody from the club is in it. It's called "The Friends of the Viper Room," and it's a documentary about the club, and everybody's being interviewed. The only person that I know is, like, not part of the project is Sal, and it's because from what my understanding was, Sal left everybody on very uncomfortable terms. Apparently, nobody got paid because of him. And I didn't know the whole story, I just heard bits and pieces of it through Ricky, because by that time I wasn't even in contact with anybody. So, it was like, wow. So [crosstalk 00:04:41.947] **Speaker 2 (Shaw):** [00:04:41.947] Is, is John-, is, is Johnny involved in it?

**Speaker 1 (Albertini):** [00:04:45.060] I don't know. I have not spoken to Johnny... The last time I talked to Johnny was when I came home from prison, and that was a few years ago. And Ed, I'm...

**Speaker 2 (Shaw):** [00:04:55.456] Because if, if Johnny and, and Sal's not involved in it, then it ain't no Viper Room story [crosstalk 00:05:03.611]

**Speaker 1 (Albertini):** [00:05:03.611] Well, that's why, that's why they've been...

**Speaker 2 (Shaw):** [00:05:05.759] Because Johnny, Johnny and Sal started the Viper Room together.

**Speaker 1 (Albertini):** [00:05:08.356] I get that, Al...Al. (laughs) I'm calling you Al. Um, Ed, I get that. But what they're tr-, what Olivia is trying to do, is she was harassing me, she wants me in the movie. They got all the celebs, they got all the bands, they got everybody. Dude, you're not gonna believe who I was in prison with. You remember Bob Pfeiffer?

**Speaker 2 (Shaw):** [00:05:30.558] Yeah.

**Speaker 1 (Albertini):** [00:05:31.575] Bob Pfeiffer was my business partner in my pot shops.

**Speaker 2 (Shaw):** [00:05:36.775] Oh. (laughs)

**Speaker 1 (Albertini):** [00:05:38.111] And what happened to him is he didn't get busted in, uh, in the pot case. He tried to get his wife killed. He tried to hire a hitman to take his wife out. And are you ready for who he tried to hire? And I can tell you this...

**Speaker 2 (Shaw):** [00:05:52.628] Who?

**Speaker 1 (Albertini):** [00:05:53.287] I can tell you this because he's dead, and I don't even know if you know this, Paul Schindler. Paul Schindler.

**Speaker 2 (Shaw):** [crosstalk 00:05:57.495] he tried to get Paul to do it, huh?

**Speaker 1 (Albertini):** [00:06:02.270] You just hit the nail right on the head.

**Speaker 2 (Shaw):** [00:06:04.820] Yeah.

**Speaker 1 (Albertini):** [00:06:07.004] And you know, Paul is dead, so (laughs) you know, that's another... Listen, did... I didn't even know Anthony Fox. And...

**Speaker 2 (Shaw):** [00:06:15.445] Did Paul, did Paul get in trouble because of that, or...

**Speaker 1 (Albertini):** [00:06:18.522] No. No, Paul... Paul ended up, uh, a dropout of society. He ended up... And, and basically, Paul is what really cut my ties with everybody, because Paul ended up so sick and dying it wasn't even funny. He, he, he wasted away to about 75 pounds, you know he came into a boatload of money when his mom died, and he holed up in a little motel in North Hollywood, and just used heroin until, until he died.

But because of what he was doing, and because of the way he was tormenting Johnny, Sal, Ricky, Isaac, he was threatening to come and kill all these guys He was talking about Johnny fucked everybody over, and Johnny destroyed his life, and you know, he's got that Johnny Depp 'til Death tattoo on his neck, and uh, he felt so betrayed by everybody that he was threatening to kill everybody. Nobody wanted anything to do with him, bro. I felt so bad for Paul Schindler.

Now, this is when I just got home from prison. I didn't have a pot to piss in, or a window to throw it out. I was basically homeless. So when I found out that Paul was so sick, I still kinda liked him a little bit, so I went to try to help him out. But what was happening there was just completely outrageous. He was just stuck in the Viper Room, he was stuck in all the stories, he was stuck in hitting that guy in the head with the gun that night, he was stuck in... you know, he was stuck in the issues that this private investigator is asking about. And uh, I would just tell him to go talk to Paul, (laughs) but Paul's dead. This guy's asking questions about River, this guy's asking questions about poker games... What did you say? You just said no?

**Speaker 2 (Shaw):** [00:08:17.030] Who, me?

**Speaker 1 (Albertini):** [00:08:17.912] Yeah. Does this guy have pictures of us or anything?

**Speaker 2 (Shaw):** [00:08:23.036] Nah, man. He called... I don't know how he got my number. But uh, he, he called me, and uh, and I don't even remember what I... You know what I said to him? I said something, he... He asked me, uh, questions about Johnny. I was like, man, he would never hit a woman. I don't know what the fuck somebody said, but they don't know him.

**Speaker 1 (Albertini):** [00:08:44.548] Ed...

**Speaker 2 (Shaw):** [00:08:46.424] Because if they think that he would hit a woman, they're, they, they're out of their fuckin' mind. He would never do that [crosstalk 00:08:50.714]

**Speaker 1 (Albertini):** [00:08:50.714] Ed...Ed, you're talking to me. Come on now.

**Speaker 2 (Shaw):** [00:08:58.941] What?

**Speaker 1 (Albertini):** [00:08:59.962] Stacy Lee Lopez, Kate...come on now.

**Speaker 2 (Shaw):** [00:09:05.332] I didn't...I never seen him do nothing bad to 'em.

**Speaker 1 (Albertini):** [00:09:09.681] Okay. This is just me and you talking, and this never goes any further than this conversation, Ed. Were you not...

**Speaker 2 (Shaw):** [00:09:17.172] Yeah, yeah...

**Speaker 1 (Albertini):** [00:09:17.384] Were you not there the night that Kate and that model...

**Speaker 2 (Shaw):** [00:09:20.739] I was there all the, I was there all the nights. You ain't gotta say nothing.

**Speaker 1 (Albertini):** [00:09:25.960] All right. So again, this is, this goes to the grave with me, bro. You know me, I'm a shut up...

**Speaker 2 (Shaw):** [00:09:33.950] So what, well, what was, what was, what are tal-, what, what was there, where...All right, so what are you talking about? Just tell me.

**Speaker 1 (Albertini):** [00:09:39.228] The night when Johnny was drinking, and it was after [crosstalk 00:09:42.523] it was after hours, and...

**Speaker 2 (Shaw):** [00:09:45.356] Okay.

**Speaker 1 (Albertini):** [00:09:45.503] And that girl, that model was dancing with Kate, and Johnny got pissed, and he started pun-...

**Speaker 2 (Shaw):** [00:09:52.039] When Naomi, when Naomi Campbell was there?

**Speaker 1 (Albertini):** [00:09:53.923] Yes.

**Speaker 2 (Shaw):** [00:09:58.187] And?

**Speaker 1 (Albertini):** [00:09:58.569] And he got drunk, and he got pissed, he got... He was jealous because Kate was hanging out with that girl, and uh, he started punching holes in the walls downstairs, and he grabbed that girl, and he put that cigarette out on her.

**Speaker 2 (Shaw):** [00:10:16.922] Grabbed what girl?

**Speaker 1 (Albertini):** [00:10:19.209] Her name was Stacy.

**Speaker 2 (Shaw):** [00:10:23.574] So what did Stacy do to get the cigarette put on her?

**Speaker 1 (Albertini):** [00:10:28.892] She was dancing with Kate.

**Speaker 2 (Shaw):** [00:10:31.219] Oh.

**Speaker 1 (Albertini):** [00:10:33.553] You know? His hothead jealous temper when drank.

Ed, you know, I, I'll tell you something. You know how I felt about Johnny, and you know, I, I don't...I haven't seen him, I don't know how he's doing. Um, they all had a falling out with me because I was still running around and trying to help Paul Schindler out. Everyone told me, if you talk to Paul Schindler again, if you ever mention his name again, we're done with you. And uh, that's what ended up happening. Uh, I was on the phone with Ricky one night, and some nonsense started cracking off with Paul Schindler, and he heard Paul Schindler on the phone, and at that point forward he told me don't ever call me again.

**Speaker 2 (Shaw):** [00:11:19.358] Well you know, you know, man, Paul is the reason why I got connected with Johnny.

**Speaker 1 (Albertini):** [00:11:28.592] I know.

**Speaker 2 (Shaw):** [00:11:27.998] He came and got me, you know? He, he...and then he followed me around Hollywood [crosstalk 00:11:34.614]

**Speaker 1 (Albertini):** [00:11:34.614] Didn't he, didn't he find you at a...didn't he find you at a strip club or something?

**Speaker 2 (Shaw):** [00:11:38.297] Well, he went everywhere I worked, man, and he finally, he finally found me, and so I finally gave in. I finally said, okay, fuck it, I'll do it. I'll meet with him. I didn't know that Johnny was goin' hire me on the spot like that, and... you know, because we connected and all that, so [crosstalk 00:12:00.656]

**Speaker 1 (Albertini):** [00:12:00.656] Oh, bro, Johnny loved...Johnny, Johnny loved you. I think Johnny's two favorite people were you and Sean G.

**Speaker 2 (Shaw):** [00:12:06.946] And that's the only...you, you know? But you know, Paul hooked me up with him.

**Speaker 1 (Albertini):** [00:12:11.424] Right.

**Speaker 2 (Shaw):** [00:12:11.621] So I always was grateful to Paul for that, but and I also, you know, I also had to fire Paul also [crosstalk 00:12:20.963]

**Speaker 1 (Albertini):** [00:12:20.963] Yeah, the, the night, the night that he got his gun taken away.

**Speaker 2 (Shaw):** [00:12:24.483] You know, but come on. You know all the stuff Paul was doing.

**Speaker 1 (Albertini):** [00:12:28.644] Yeah.

**Speaker 2 (Shaw):** [00:12:29.481] Paul was gonna, Paul was gonna... Paul almost got killed there. We had to risk our lives to save him.

**Speaker 1 (Albertini):** [00:12:36.669] Ed, do you remember...

**Speaker 2 (Shaw):** [crosstalk 00:12:38.070]

**Speaker 1 (Albertini):** [00:12:38.070] ...do you remember who shut that down? It was those wise guys. And I got on the phone with New York, and then the guy showed up at that...that night, and the guys from back East said do whatever you gotta do to him. And he pulled up in his car, I was standing right behind you, you walked

up, you had your gun, pulling it out of your waistband, and the guy took off. I remember that night. Sal at the time was in the private room, in the secret room with Traci Lords, and he got up...

**Speaker 2 (Shaw):** [00:13:09.229] Who had...

**Speaker 1 (Albertini):** [00:13:10.081] You don't remember...

**Speaker 2 (Shaw):** [00:13:10.560] Who, who had the gun?

**Speaker 1 (Albertini):** [00:13:14.689] Ed...

**Speaker 2 (Shaw):** [00:13:14.431] (laughs)

**Speaker 1 (Albertini):** [00:13:15.811] Ha, ha, ha, exactly.

**Speaker 2 (Shaw):** [00:13:18.043] (laughs)

**Speaker 1 (Albertini):** [00:13:19.620] But, but rem-...we got per-...

**Speaker 2 (Shaw):** [00:13:20.820] Oh, man [crosstalk 00:13:21.134]

**Speaker 1 (Albertini):** [00:13:21.134] We, we got permission. Ed, we got permission from New York to do that.

**Speaker 2 (Shaw):** [00:13:26.629] Hey, hey, but the only thing is, is that you're not supposed to be saying all this stuff, Richie. You're supposed to forget about it, man.

**Speaker 1 (Albertini):** [00:13:35.839] How am I supposed to...

**Speaker 2 (Shaw):** [00:13:36.621] Forget... Hey, you know... Hey, let me tell something, what you're doing to me. You know I was in an accident in 2006.

**Speaker 1 (Albertini):** [00:13:47.770] Right.

**Speaker 2 (Shaw):** [00:13:49.266] I was in a coma for many days.

**Speaker 1 (Albertini):** [00:13:51.692] You gotta be kidding me.

**Speaker 2 (Shaw):** [00:13:54.171] I forgot everything. You're refreshing... What you're saying to me is refreshing my mind. I know... I have no... Uh, you're making me remember old things, you know? You're bringing my mind back.

**Speaker 1 (Albertini):** [00:14:10.227] That's a good thing.

**Speaker 2 (Shaw):** [00:14:11.450] I don't know about what this is. (laughs)

**Speaker 1 (Albertini):** [00:14:13.999] That's a good thing. Okay, I'm gonna hit you with probably the biggest one that this guy asked me about, and I'm gonna tell you something. He knows. You know who he asked me about, right?

**Speaker 2 (Shaw):** [00:14:28.495] Who?

**Speaker 1 (Albertini):** [00:14:28.620] Frusciante.

**Speaker 2 (Shaw):** [00:14:34.058] Asking about who?

**Speaker 1 (Albertini):** [00:14:35.657] John Frusciante.

**Speaker 2 (Shaw):** [00:14:37.372] John Frusciante...

**Speaker 1 (Albertini):** [00:14:40.105] Chili Peppers, went and picked up River.

**Speaker 2 (Shaw):** [00:14:46.189] Yeah.

**Speaker 1 (Albertini):** [00:14:47.773] Yeah. This guy knows.

**Speaker 2 (Shaw):** [00:14:49.844] The one that...the one that, the one that brought him to the club?

**Speaker 1 (Albertini):** [00:14:55.679] Yeah, he brought him to the club.

**Speaker 2 (Shaw):** [00:14:59.042] Yeah, I didn't know it was him, though.

**Speaker 1 (Albertini):** [00:14:59.962] Oh.

**Speaker 2 (Shaw):** [00:15:00.877] Because I remember he was with Shannon McManus, and uh...

**Speaker 1 (Albertini):** [00:15:04.285] Flea.

**Speaker 2 (Shaw):** [00:15:06.566] It was, it was, uh...there was a bunch of 'em.

**Speaker 1 (Albertini):** [00:15:09.603] I know. It was Halloween night. I came there...

**Speaker 2 (Shaw):** [00:15:12.412] Yeah.

**Speaker 1 (Albertini):** [00:15:13.102] I got a phone call that I needed to get down there ten minutes after it happened. And then everybody went up to Johnny's house, and then, the next day everybody was out of town.

**Speaker 2 (Shaw):** [00:15:24.747] Yeah [crosstalk 00:15:26.309]

**Speaker 1 (Albertini):** [00:15:26.309] How does...how does this guy know all that?

**Speaker 2 (Shaw):** [00:15:29.888] I have no idea, but they don't know... I mean, but they don't know it's that... I'm the only person that... I'm the one that dealt with River that night. You know that.

**Speaker 1 (Albertini):** [00:15:40.996] Yes, of course I know that.

**Speaker 2 (Shaw):** [00:15:41.860] You don't, and you, and...and, and you know, I'm no, you know...I ain't never said nothing to nobody.

**Speaker 1 (Albertini):** [00:15:48.273] Me either. Believe me, Ed, with the things that ended up happening in my life, and all the trouble I ended up getting into, believe me, I almost didn't remember any of this. You know? And I, I, I gotta tell you something, Ed, and I gotta tell you the best part of all of this. Ask me who I run with today.

**Speaker 2 (Shaw):** [00:16:11.955] I don't know.

**Speaker 1 (Albertini):** [00:16:14.650] Jesus Christ.

**Speaker 2 (Shaw):** [00:16:15.217] Oh, okay.

**Speaker 1 (Albertini):** [00:16:17.486] I became a born-again Christian, uh, I'm studying to be a pastor, and, um, amen, brother. I'm gonna keep you in prayer, now that I know what's up with you.

**Speaker 2 (Shaw):** [00:16:27.886] So what about... So, you stopped selling the bud, huh?

**Speaker 1 (Albertini):** [00:16:31.382] I got out of the bud game... Oh, after I left The Viper Room, bro, shit got even deeper than ever. I went to work with the mob, we were in the porn industry, I got... My first case I got caught up in was a $60 million bank swindle, and we got away with it. We almost got away with it. Because Bob Pfeiffer got busted in his case, and this cat named Anthony Pelicano, this other wise guy, I don't know if you remember him, he used to come to the club once in a while, and um, uh, he got caught up in a case that got me caught up in a white collar case, just guilty by association. But I managed...

**Speaker 2 (Shaw):** [00:17:11.145] Oh, yeah?

**Speaker 1 (Albertini):** [00:17:11.694] I managed to do no prison time on that. And my second case was my pot... Well, my first case was actually a big RICO case. There were a whole bunch of cases involved in it, everything from Rampart Crash, to Biggie Smalls...I mean, I was mixed up in all of it. The entire Rampart Crash division was on my payroll. I... When I left the club, I went on to become the president and CEO of one of the largest adult, uh, ent-, uh, adult entertainment companies in the country.

**Speaker 2 (Shaw):** [00:17:42.884] Yeah.

**Speaker 1 (Albertini):** [00:17:44.892] And that got me in deep, bro. That got me in deep, and I was running with guys, bro... I was thinking about somebody. I was thinking about somebody. There was a guy that worked at the club, and if I'm not mistaken, he was a friend of yours, and I'm not talking about Tim. I remember Tim. He worked there in the very early days, and he kind of had dreadlocks, and I want to say he was, like, maybe a Jamaican. Do you remember him?

**Speaker 2 (Shaw):** [00:18:15.376] Nah.

**Speaker 1 (Albertini):** [00:18:16.300] Yeah, I was trying to remember that guy's name. Are you in touch with anybody?

**Speaker 2 (Shaw):** [00:18:24.899] Nope.

**Speaker 1 (Albertini):** [00:18:26.111] You haven't talked to anyone?

**Speaker 2 (Shaw):** [00:18:29.401] Only... I mean, no, man. I mean, not for a while.

**Speaker 1 (Albertini):** [00:18:35.469] Wow. How'd you find out Paul was dead?

**Speaker 2 (Shaw):** [00:18:40.432] You just told me.

**Speaker 1 (Albertini):** [00:18:42.412] This is the first time you became aware of that?

**Speaker 2 (Shaw):** [00:18:44.910] Well, this is the first time that I know it's true, because I've seen it on FaceBlock.

**Speaker 1 (Albertini):** [00:18:51.458] You gotta be kidding me.

**Speaker 2 (Shaw):** [00:18:54.044] Yeah, this is the... You're the first person to actually tell me that that's what happened.

**Speaker 1 (Albertini):** [00:18:58.628] Well, that's because nobody really knew. Nobody cared. Um, but like I said, he was calling Johnny every night, telling him, "Johnny, I'm coming to kill you." "Sal, I'm coming to kill you." "Ricky..."

**Speaker 2 (Shaw):** [00:19:10.901] So, what...so, how did he die?

**Speaker 1 (Albertini):** [00:19:13.797] You know he always had all of his problems and he died a drug addict.

**Speaker 2 (Shaw):** [00:19:18.963] Yeah.

**Speaker 1 (Albertini):** [00:19:19.331] And he died with his heroin, y-, you know? He died with his insanity, you know? Look at all the problems that guy caused. You know?

**Speaker 2 (Shaw):** [00:19:27.930] Yeah.

**Speaker 1 (Albertini):** [00:19:27.998] He, he... Here he is, he meets Pfeiffer, and he ends up talking craziness with Pfeiffer. I told Pfeiffer right from the beginning, you're talking to the wrong guy. Schindler is not the guy. Schindler is all mouth. I told him that. I told Pfeiffer that.

**Speaker 2 (Shaw):** [00:19:42.997] Yeah, yeah.

**Speaker 1 (Albertini):** [00:19:44.162] I said he's all bark, and no bite. And uh, look what happened to Pfeiffer. Now, he ended up getting out because he turned rat on Anthony Pelicano. He ended up doing no time. He did... Uh, I think we were together for maybe... I think we were together for maybe four months.

**Speaker 2 (Shaw):** [00:20:02.122] Well, you know Bobby ain't [inaudible 00:20:04.381] to go to jail.

**Speaker 1 (Albertini):** [00:20:06.241] Who?

**Speaker 2 (Shaw):** [00:20:08.565] You know Bobby's not a person that would like to go to jail.

**Speaker 1 (Albertini):** [00:20:11.196] Oh, of course not. Of course not. And you know, I'll tell you what happened when he got there. I knew he was going to be scared. I knew he was going to be terrified. I knew he was coming, and I was already there. So what happened was they put him in, uh, what do they call it? They put him in, like, uh, segregation because he was a rat, and in the...

**Speaker 2 (Shaw):** [00:20:31.275] Yeah.

**Speaker 1 (Albertini):** [00:20:31.275] ...in the federal prison, when you put somebody in segregation, they go into the psych ward. They put you in the psychiatric floor because it's safe there. So I'm in prison, I find out he's there, I go to the...I go to the CO and I tell him I'm going to commit suicide. As soon as I said that, what do they do, they wrap me up, and they bring me down and put me in the psych ward. So now I'm there with Bob. What is he doing? He's doing that same, you remember, magic, and all the, the light candles and Santeria and voodoo?

**Speaker 2 (Shaw):** [00:21:05.051] Yeah.

**Speaker 1 (Albertini):** [00:21:05.106] He's doing the same thing in prison, and he's putting spells on people. And he hooks up in prison with this, like, little Mexican cartel guy who's even more into it, and it was all that witchcraft shit. Same shit they did at the club. I, it... You know, I don't... Olivia is crazy for making this movie.

**Speaker 2 (Shaw):** [00:21:30.085] Yeah, what the fuck? Is she trying to be some kind of star or something, or whatever? What is, why is she... I mean, it's like she's getting into the wrong bucket, man.

**Speaker 1 (Albertini):** [00:21:39.050] Bro...

**Speaker 2 (Shaw):** [00:21:39.050] Why is she doing that?

**Speaker 1 (Albertini):** [00:21:40.531] Ed...

**Speaker 2 (Shaw):** [00:21:41.426] If everybody is not on board, if Johnny is not on board... I mean, you know, I guess she's trying to make some money, man.

**Speaker 1 (Albertini):** [00:21:49.371] Hey, listen, let, let me tell you the last thing I heard about Johnny. I don't know if you've seen him since...in the last few years. I don't know when the last time you saw him was. But after the last time I saw him, we were out of communication. It was down at the loft. Um, Isaac was living there, Johnny was there... You know about Isaac, right? Making all that art and everything?

**Speaker 2 (Shaw):** [00:22:12.827] No.

**Speaker 1 (Albertini):** [00:22:13.545] Yeah, Johnny put him up in a loft in downtown Los Angeles, he pays for everything. Isaac doesn't have to work. Johnny bought him a car, he's got him in the loft, he pays for all his food, and all Isaac is supposed to do is paint. And once they've got a big enough collection, uh, they're gonna sell it. The only problem is five years of, of uh, Isaac painting, and all he did was paint pictures of men having sex with men.

**Speaker 2 (Shaw):** [00:22:40.449] Oh.

**Speaker 1 (Albertini):** [00:22:41.390] Yeah. So... (laughs) So, you know, because you know, Isaac is like, 100% gay now.

**Speaker 2 (Shaw):** [00:22:51.077] So you talking about... Oh, my goodness. Oh, really?

**Speaker 1 (Albertini):** [00:22:53.895] Yeah, Isaac.

**Speaker 2 (Shaw):** [crosstalk 00:22:53.895] Whatever he...hey, whatever he likes.

**Speaker 1 (Albertini):** [00:22:58.250] Hey, whatever floats his boats.

**Speaker 2 (Shaw):** [00:23:00.323] Yeah.

**Speaker 1 (Albertini):** [00:23:00.651] Hey, tell, tell me something else. Does everybody still hang out at The Three of Clubs?

**Speaker 2 (Shaw):** [00:23:06.471] I know nothing about it, man.

**Speaker 1 (Albertini):** [00:23:09.793] Come on. You don't remember The Three of Clubs?

**Speaker 2 (Shaw):** [00:23:11.859] Of course I know, I remember The Three of Clubs. But I don't know where nobody hangs out, you know? Everybody's old now.

**Speaker 1 (Albertini):** [00:23:19.161] Yeah, I know. We're all old. I'm 53, bro.

**Speaker 2 (Shaw):** [00:23:22.245] That's what I'm saying. We old now.

**Speaker 1 (Albertini):** [00:23:25.288] (laughs) Right? We are, huh?

**Speaker 2 (Shaw):** [00:23:28.384] Yeah, so don't nobody go... I stopped going to the clubs way back, you know? When I, when I quit, that was it. I never went to another club.

**Speaker 1 (Albertini):** [00:23:37.462] So were you still there in the end, when everybody got burned for money?

**Speaker 2 (Shaw):** [00:23:43.000] Who got burned...? I mean, I remember... What do you mean, everybody got burned for money? What's...what? Who are you talking about?

**Speaker 1 (Albertini):** [00:23:49.188] I don't...I was long gone, bro, so all I knew is the few people that I saw once in a while, that I'd run into, most...

**Speaker 2 (Shaw):** [inaudible 00:23:55.405] the only time was like, when uh...about the money was, uh, you talking about when, uh, Bobby got fired, when they talk about he was stealing and all that?

**Speaker 1 (Albertini):** [00:24:08.919] No, when it was Sal.

**Speaker 2 (Shaw):** [00:24:12.195] Yeah, well, Sal was the in.

**Speaker 1 (Albertini):** [00:24:13.638] He was what?

**Speaker 2 (Shaw):** [00:24:14.358] Sal was the real...Sal was the real one taking the money. It wasn't nobody else but him.

**Speaker 1 (Albertini):** [00:24:20.890] Who are you saying, Bobby DeLeon?

**Speaker 2 (Shaw):** [00:24:22.632] Yeah. Yeah, Sal had fired him for stealing.

**Speaker 1 (Albertini):** [00:24:26.949] You know he works for...you know he works for Johnny today.

**Speaker 2 (Shaw):** [00:24:30.668] Ex-, exactly. I'm the one that got him his job back.

**Speaker 1 (Albertini):** [00:24:36.751] How could Bobby have had any access to any money?

**Speaker 2 (Shaw):** [00:24:41.483] He was the manager. He counted the money every night.

**Speaker 1 (Albertini):** [00:24:44.495] Oh, this is, this is after I'm gone.

**Speaker 2 (Shaw):** [00:24:48.282] Oh, yeah, he... How do you think he got the manager's job? That's another thing that I did. (laughs)

**Speaker 1 (Albertini):** [00:24:54.509] Right, right. I get it now.

**Speaker 2 (Shaw):** [00:24:56.322] He was trying, he was trying to hire somebody, he was trying to hire somebody from Atlanta, somebody did the clubs in Atlanta. I was like, hey, you mean in a country town? I said, this is Hollywood. You trying to bring somebody from Atlanta out here, and you want us to accept him? And he doesn't even know nobody?

**Speaker 1 (Albertini):** [00:25:15.691] (laughs)

**Speaker 2 (Shaw):** [00:25:16.819] I said, we got the... I said we need a pretty manager of one of these guys, these handsome guys that can relate to the customers, that already know the people. I mean, we got the manager right here. What are you doing? The manager's working right here. Ask one of them just to step up.

**Speaker 1 (Albertini):** [00:25:36.610] There you go.

**Speaker 2 (Shaw):** [00:25:37.212] And he did, and that's what happened.

**Speaker 1 (Albertini):** [00:25:40.678] There you go. So for the last I heard of Bobby Deleon was from Ricky, and he told me that Bobby is now the guy that runs everything for Johnny.

**Speaker 2 (Shaw):** [00:25:50.532] Well, he...yeah, he's in that pr-...he runs his production company.

**Speaker 1 (Albertini):** [00:25:54.725] Ohh... And Sean G is working for Rick Rubin.

**Speaker 2 (Shaw):** [00:26:00.473] He's been there for, for years. I haven't heard from my buddy Sean G in years.

**Speaker 1 (Albertini):** [00:26:06.053] I, I...

**Speaker 2 (Shaw):** [00:26:06.053] But the last I knew it, he was at Rick Rubin's house.

**Speaker 1 (Albertini):** [00:26:09.610] Yeah. And I guess they were taking, you know, those pervert trips to India.

**Speaker 2 (Shaw):** [00:26:16.172] Pervert trips? (laughs)

**Speaker 1 (Albertini):** [00:26:18.366] Come on, Rick Rubin? (laughs)

**Speaker 2 (Shaw):** [00:26:23.424] But you call it...why do you call it pervert trips?

**Speaker 1 (Albertini):** [00:26:26.405] Because they used to go there looking for those little girls.

**Speaker 2 (Shaw):** [00:26:30.365] Ohh, ohh...oh, oh, okay, now I know [crosstalk 00:26:33.384]

**Speaker 1 (Albertini):** [00:26:33.384] Yeah. (laughs) Just like at the club, look for the littlest ones. The younger they are, the better they are.

**Speaker 2 (Shaw):** [00:26:41.409] Yeah, they...yeah, they got...yeah, they, they...they can't do it out here now, so they gotta go out there, and anywhere else to do it.

**Speaker 1 (Albertini):** [00:26:49.017] Yeah, exactly. And you know, that was the stuff, Ed. I wasn't a Christian back then, I left the club, and I ended up going, you know, going into the porn business, but I just felt like things were getting so dirty, you know? Things were just...

**Speaker 2 (Shaw):** [00:27:02.820] Well, I mean, when you go into the porn business, that's the dirtiest of the dirty.

**Speaker 1 (Albertini):** [00:27:07.895] I know. (laughs)

**Speaker 2 (Shaw):** [00:27:09.080] So when you're working around that, when you can smell cum and spunk all day and all that, and then you go around, of course, you-, you-, your mind starts moving in a way like... Especially if you go to jail, and your mind goes all the way back down to zero, and, and you start really thinking, and real out-thinking your life, and what you've done, and what you should have done...

**Speaker 1 (Albertini):** [00:27:30.506] Right. (laughs)

**Speaker 2 (Shaw):** [00:27:31.058] And then all of a sudden, it's like, bam, like, dude, this is wrong. I see it. But, but when you're moving fast, and you're trying to make it, you know, your mind is...and you're fast, and you're trying to get there, and trying to seize all the opportunities that you can to get...you know, to take care of yourself, that's just how it goes, man.

**Speaker 1 (Albertini):** [00:27:49.478] I get it. I gotcha. I gotcha.

**Speaker 2 (Shaw):** [00:27:52.775] yeah.

**Speaker 1 (Albertini):** [00:27:53.602] I just, like I said... I'm trying to think who the last person I spoke to was, just to kind of trip you out. I think the last person I spoke to was probably Ricky, and he's kind of boring, you know? (laughs) Ricky has a, you know Ricky owns, uh, a bar with Shannon McManus and Jennifer Black.

**Speaker 2 (Shaw):** [00:28:14.271] Oh, uh, Ricky's part of that?

**Speaker 1 (Albertini):** [00:28:15.987] Yeah, Ricky's part of that. And Ricky's also got another place in downtown LA with some other people that I, I don't... Br-, uh, remember Brian Rabin?

**Speaker 2 (Shaw):** [00:28:26.172] Yeah.

**Speaker 1 (Albertini):** [00:28:27.067] They got a place in downtown LA. It's called The Wolves, and it's like the hottest [crosstalk 00:28:30.641] it's like the hottest, trendiest place in LA right now. And yeah, and I mean, you know something, bro? Ricky came up big time at The Viper room. When Ricky first started working there, he was a minimum wage employee, and his job was to put the beers in the refrigerator.

**Speaker 2 (Shaw):** [00:28:45.646] Yeah.

**Speaker 1 (Albertini):** [00:28:46.568] He ended up starting to sell a little bit of, you know, music gear, guitars and stuff, and then he ended up picking up this stuff, and suddenly he sold one guitar, dude, to Johnny for $750,000. One guitar. **Speaker 2 (Shaw):** [00:29:02.268] Well, whose guitar was it?

**Speaker 1 (Albertini):** [00:29:03.141] It was some-...I don't remember. And it was also a real old vintage guitar. It was a very...

**Speaker 2 (Shaw):** [00:29:08.527] Okay.

**Speaker 1 (Albertini):** [00:29:09.249] It was a very, very rare model. But when Ricky tells me that, it's like, just a few days before Ricky's telling me that, you know, Johnny's buying this guitar from him, he's telling me how broke Johnny is. And I'm like, how could Johnny be broke and buy a $750,000 guitar? Beyond that, how could Johnny be broke? I mean, I can guess. You could probably guess. We know how he spent money. The rings... Um, Sal stopped him that night, (laughs) He wanted me to buy everybody, uh, Viper Room leather jackets, that said The Viper Room on them so we could wear them outside. And...

**Speaker 2 (Shaw):** [00:29:51.579] Yeah.

**Speaker 1 (Albertini):** [00:29:51.932] ...and uh, now, Johnny was telling me, "Order them," and Sal was saying, "No, don't order them." (laughs). And I'm, and I'm like, dude, what do you guys want me to do? And, yeah...

**Speaker 2 (Shaw):** [00:30:00.380] Well, you know...well, you know who stopped them from ordering them? Johnny didn't want leather jackets, he wanted us to have bulletproof jackets.

**Speaker 1 (Albertini):** [00:30:08.384] Right, exactly. That's what they were, they were bulletproof jackets that said...

**Speaker 2 (Shaw):** [00:30:11.510] Bulletproof leather jackets. I told him, I said, tell JD we, we don't need that. We don't need that. We, we want to, we want to be...we want to per-, per-, perceive ourselves as professionals. We don't need that. We just ain't, we ain't all... We not in the mafia, we don't need to do all that.

**Speaker 1 (Albertini):** [00:30:31.597] Right.

**Speaker 2 (Shaw):** [00:30:31.837] Just, just calm it all the way down. We just gonna work here at the club, we're gonna love the people, we're gonna love the customers, we're gonna respect everybody. Everybody's gonna be treated fairly, we're not beating up on nobody. We're not doing all that. If we need to take care of ourselves, we can do it. But we're not gonna present, and have people thinking they come to the club when we...because we gotta wear bulletproof jackets and shit like that. No.

**Speaker 1 (Albertini):** [00:30:57.093] Right. Right. I get it.

**Speaker 2 (Shaw):** [00:30:58.737] Nah, man. We're gonna be...we're gonna wear our suits and ties, we're gonna look good, and we're gonna prese-...we're gonna be class around here.

**Speaker 1 (Albertini):** [00:31:05.657] Yeah, but poker nights, dude, it wouldn't have been a bad idea to have a jacket.

**Speaker 2 (Shaw):** [00:31:10.218] Yeah, I understand. But if Johnny wanted to just do that on his own, and then gave it to us, that's different.

**Speaker 1 (Albertini):** [00:31:17.884] Right.

**Speaker 2 (Shaw):** [00:31:18.608] When you ask us, and put...and, and Sal, like, put me on the spot, like...you know, like come on, Ed, help me out here, you guys gonna...I was like, no, we don't need that. I mean, so I went on ahead and told him, man, just squash it, man. Don't worry about all that.

**Speaker 1 (Albertini):** [00:31:33.678] Right.

**Speaker 2 (Shaw):** [00:31:34.553] You know? But hell yeah, we would have took the jackets with Viper Room on it. I mean, we'd have been...it would have been cool. But I didn't want to get into that partner business. Do you even have one single Viper Room shirt left?

**Speaker 2 (Shaw):** [00:31:49.845] Hey, hey, hey, Richie, I got a, I got, I got...I don't know if they...I think they're small or medium, or something like that, but I got a whole box of them, a whole crate of them.

**Speaker 1 (Albertini):** [00:32:00.378] We're gonna keep in touch, because I need a couple of those shirts, bro.

**Speaker 2 (Shaw):** [00:32:04.322] I got shirts, I got jackets, like bomber jackets...

**Speaker 1 (Albertini):** [00:32:08.248] Oh, you still have some... do you have any beanies?

**Speaker 2 (Shaw):** [00:32:13.139] No beanies.

**Speaker 1 (Albertini):** [00:32:14.760] Baseball caps?

**Speaker 2 (Shaw):** [00:32:16.475] No caps.

**Speaker 1 (Albertini):** [00:32:18.057] Cigarette lighters?

**Speaker 2 (Shaw):** [00:32:19.809] None of them. I might be able to find one. I might be able to find one or two of those.

**Speaker 1 (Albertini):** [00:32:23.810] Bro, I'd love to have that stuff. I have nothing from the club. You know what I do have? And I gotta find it. A...

**Speaker 2 (Shaw):** [00:32:30.185] You got a tattoo.

**Speaker 1 (Albertini):** [00:32:31.413] I got a tattoo, (laughs) and I got a, uh, I got one of my old business cards. Other than that, I don't have anything. I, I just...

**Speaker 2 (Shaw):** [inaudible 00:32:41.745]

**Speaker 1 (Albertini):** [00:32:43.072] I lost it all. I lost it through moving, uh....

**Speaker 2 (Shaw):** [00:32:47.270] Well, I got... I don't... Like I said, I don't know if the shirts gonna fit you, but I got some shirts, man.

**Speaker 1 (Albertini):** [00:32:52.784] Oh, Ed, I don't even wanna wear it. I wanna put it away. I wanna save it.

**Speaker 2 (Shaw):** [00:32:57.316] Oh sure, sure. Sure.

**Speaker 1 (Albertini):** [00:32:58.613] I just want a... you know, as a piece... I got the tattoo, (laughs) now all I need is a shirt. So uh, yeah, you got it.

**Speaker 2 (Shaw):** [00:33:05.945] Okay. Where do you, where do live now?

**Speaker 1 (Albertini):** [00:33:08.402] I'm staying in Palmdale right now, but I'm getting ready to move. I'm getting ready... You know, I'm going into full-time ministry, and uh, I don't really know exactly where I'm gonna be going yet. I'm gonna know in the next few days, and I'm gonna move in the next few days. But right now, right now I'm planted in Palmdale, because that's where the church is that I'm a member of, and I'm gonna be going off to start a new church somewhere.

**Speaker 2 (Shaw):** [00:33:31.910] All right. Well, let me know.

**Speaker 1 (Albertini):** [00:33:32.988] Yeah. Oh, it's...I'm gonna be close.

**Speaker 2 (Shaw):** [00:33:34.205] If you, you, you...you send me the, the address...

**Speaker 1 (Albertini):** [00:33:37.632] Where are you? Still down in LA?

**Speaker 2 (Shaw):** [00:33:40.341] Yeah, I'm still down in LA, baby.

**Speaker 1 (Albertini):** [00:33:43.245] Do you see people? Do you have visitors, and... I'd love to see you.

**Speaker 2 (Shaw):** [00:33:47.201] Okay.

**Speaker 1 (Albertini):** [00:33:49.143] We could shoot, we could shoot the shit some more

about old times, and bring your memory back. We had a lot, we had a lot of fun.

**Speaker 2 (Shaw):** [00:33:58.621] Yeah, I know.

**Speaker 1 (Albertini):** [00:33:59.955] We had a lot of...

**Speaker 2 (Shaw):** [crosstalk 00:34:00.615] We get...we do our own Viper Room show then, our own personal one, and, and leave it at that.

**Speaker 1 (Albertini):** [00:34:08.223] Right. Were you at that Viper Room reunion party a few years ago?

**Speaker 2 (Shaw):** [00:34:14.659] I didn't make it. I would have went, but I didn't make it.

**Speaker 1 (Albertini):** [00:34:18.268] I got invited at the very last minute, and the reason they invited me at the very last minute, was they was afraid I was gonna bring Paul Schindler. (laughs) Hey...

**Speaker 2 (Shaw):** [00:34:29.200] If that was their deal, I mean, whatever.

**Speaker 1 (Albertini):** [00:34:30.199] Ed...Ed, nobody, nobody wanted anything to do with him. Because all he was doing is calling everybody 24 hours a day, telling them how sick and dying he was, and he was sick, but he wasn't really... But he wasn't...

**Speaker 2 (Shaw):** [00:34:43.667] He was sick...he was sick, he was dying. When I saw him, he, he came to the club, uh, he came to the club, I let him in. He came into the club, he drank, he said he was sick, he said he was dying. I said, you know, I always gave him positive thoughts, and [crosstalk 00:35:05.369]

**Speaker 1 (Albertini):** [00:35:05.369] No, I know. Ed, listen, uh...uh, Ed, Ed, let me tell you something.

**Speaker 2 (Shaw):** [inaudible 00:35:07.903]

**Speaker 1 (Albertini):** [00:35:09.508] Let me tell you something about you. Paul Schindler loved you. You're the one person that Paul Schindler, I never heard him say a bad word about. I know that there were times, after he was gone from the Viper Room, when he was broke, and he kinda, he told me. The only person he could go see was you, and you'd slip him a $20, you'd slip him a $50, you'd slip him whatever you had. And...

**Speaker 2 (Shaw):** [00:35:31.282] Yeah.

**Speaker 1 (Albertini):** [00:35:32.096] And, and Ed, I don't know...I always knew you had that heart. You know? You're really just a big teddy bear. And I'll tell you something I remember one time. You know how big you are? Do you remember the night the guys from the Boo-Yaa T.R.I.B.E. came into the club? Between you and those guys, you blocked the entire hallway.

**Speaker 2 (Shaw):** [00:35:52.526] Yeah.

**Speaker 1 (Albertini):** [00:35:53.277] That's how big you guys were.

**Speaker 2 (Shaw):** [00:35:55.699] Yeah.

**Speaker 1 (Albertini):** [00:35:57.142] Man, I wish we could have one more night, bro.

**Speaker 2 (Shaw):** [00:36:00.894] Shit.

**Speaker 1 (Albertini):** [00:36:02.953] And if I had to pick a night, it would be Wednesday night.

**Speaker 2 (Shaw):** [00:36:06.389] Yeah.

**Speaker 1 (Albertini):** [00:36:07.868] Definitely not Tuesday. I hated Bolthouse night.

**Speaker 2 (Shaw):** [00:36:10.308] Well, that's why they mad at Sal, because, you know, he, he took that all away from us.

**Speaker 1 (Albertini):** [00:36:16.858] Right. Exactly. Exactly.

**Speaker 2 (Shaw):** [00:36:19.347] We was wondering, we was wondering... But see, you had quit.

**Speaker 1 (Albertini):** [00:36:22.169] Right.

**Speaker 2 (Shaw):** [00:36:24.520] You had quit, you was doing your own thing, but you still could have been able to come back.

**Speaker 1 (Albertini):** [00:36:29.136] Oh, Ed, I was…yeah, I was there a million times, Ed. I came back and visited. In the beginning I was back.

**Speaker 2 (Shaw):** [crosstalk 00:36:33.815] you know, it's like, I don't know how you feel going up there now. How do you feel?

**Speaker 1 (Albertini):** [00:36:40.198] I don't even think it's there anymore. I heard they were tearing the whole street down. I, I don't know if it's... It might not be torn down yet, but they're tearing down the liquor store, they're tearing down the club... They're tearing down that whole block, and they're putting up a big high-rise building.

**Speaker 2 (Shaw):** [00:36:56.474] Oh, really?

**Speaker 1 (Albertini):** [00:36:57.363] Yeah. Hey, let me ask you a question.

**Speaker 2 (Shaw):** [00:37:01.260] I thought that was down on the other end they was doing that.

**Speaker 1 (Albertini):** [00:37:04.305] No, they're tear-, they're tearing down 8852 Sunset Boulevard. They're tearing that...

**Speaker 2 (Shaw):** Right.

**Speaker 1 (Albertini):** [00:37:10.984] They're tearing that whole thing down.

Dude, this is a crazy question. Did Schindler whack Fox?

**Speaker 2 (Shaw):** [00:37:21.792] Say it again?

**Speaker 1 (Albertini):** [00:37:22.911] Did Schindler whack Fox?

**Speaker 2 (Shaw):** [00:37:26.349] Schindler, I don't know....

**Speaker 1 (Albertini):** [00:37:28.354] Did Paul, did Paul Schindler take Anthony Fox out? Ant-...you remember Anthony? Ed?

**Speaker 2 (Shaw):** [00:37:42.579] Huh?

**Speaker 1 (Albertini):** [00:37:44.107] Do you remember Anthony?

**Speaker 2 (Shaw):** [00:37:46.671] Uh, no.

**Speaker 1 (Albertini):** [00:37:49.634] Oh. Yeah, he wasn't around. He was actually a partner at the club. And he disappeared. You know...

**Speaker 2 (Shaw):** [00:37:56.467] I don't know what you're talking about.

**Speaker 1 (Albertini):** [00:37:57.866] The club never had a liquor license. Nobody at the club could get a liquor license. Kathy Duncan was supposed to get the liquor license. She was the only one with a clean enough background. But because we never had a liquor license, we had to pay Tony Fox to continue using his liquor license. We were leasing it from him. And then...

**Speaker 2 (Shaw):** [00:38:16.464] Yeah, I know.

**Speaker 1 (Albertini):** [00:38:17.199] And then I guess something happened, he disappeared, some people say he's not even dead. And then his daughter goes and she sues Johnny...

**Speaker 2 (Shaw):** [00:38:26.664] Yeah.

**Speaker 1 (Albertini):** [00:38:27.351] ...and she takes the club back.

**Speaker 2 (Shaw):** [00:38:30.261] Right.

**Speaker 1 (Albertini):** [00:38:32.510] I don't see how that could happen.

**Speaker 2 (Shaw):** [00:38:35.021] That's 'cause they didn't pay that $2.8 million.

**Speaker 1 (Albertini):** [00:38:38.472] Ohh... That's what it was?

**Speaker 2 (Shaw):** [00:38:44.515] Yeah.

**Speaker 1 (Albertini):** [00:38:46.813] Gotcha. Gotcha. So she got the club. Now it makes sense. Now it all makes sense. Wow. Hoo wee.

**Speaker 2 (Shaw):** [00:39:00.736] And I believe, and I believe that she and Johnny was partners for a while.

**Speaker 1 (Albertini):** [00:39:07.853] Right. Right. Right. But by that time, there was nobody around anymore. Nobody was coming around. That's, there...there were no more celebrities there. That wasn't, that wasn't a hot spot anymore by that time. That club, I...that's club's...

**Speaker 2 (Shaw):** [00:39:20.503] Nah [crosstalk 00:39:22.262] And I think after a while, they might have built it up a little bit.

**Speaker 1 (Albertini):** [00:39:27.133] Yeah, but they turned it into more like a rock club.

**Speaker 2 (Shaw):** [00:39:30.924] Yeah. You know that guy, uh, that used to play in the rock band, Tommy Black?

**Speaker 1 (Albertini):** [00:39:36.119] Of course.

**Speaker 2 (Shaw):** [00:39:37.662] Well, he's a general manager.

**Speaker 1 (Albertini):** [00:39:40.916] Oh... Well, I know Dayle Gloria was over there for a while, I think even Jennifer and Brent were over there for a while. But I, I don't...

**Speaker 2 (Shaw):** [00:39:50.413] Yeah.

**Speaker 1 (Albertini):** [00:39:51.553] Yeah. I stopped coming around, I think the last time I came around was right after the remodel, when the club was remodeled, and they did all the...and I think that was the last time I was there. And uh, so that's how long...

**Speaker 2 (Shaw):** [00:40:06.584] Oh, when...you mean after they painted the hallway with all that bullshit?

**Speaker 1 (Albertini):** [00:40:10.304] Yeah, and after they changed all the black and green, and put all the colorful stuff.

**Speaker 2 (Shaw):** [00:40:15.820] Yeah.

**Speaker 1 (Albertini):** [00:40:17.080] That was probably the last... I went there, I, I was in the neighborhood, and I was rolling by there with Ricky, and we just stopped in, and you know, there was really nobody around. Yeah, maybe Dayle Gloria or somebody. (laughs) And you know, it was like, all right, let's get outta here, so we took off.

**Speaker 2 (Shaw):** [00:40:32.094] What year was that?

**Speaker 1 (Albertini):** [00:40:34.274] I can't...I couldn't tell you. It was literally right... Uh, listen, my memory's not so good either. I'm a big pothead. But it was right after the remodel. It was right after. Sean G still worked there, and I don't even remember who else.

I was in contact with Sean G a few years ago. That's how I found out he, that's how I found out he was with Rick Rubin. Uh, he contacted me...

**Speaker 2 (Shaw):** [crosstalk 00:40:58.609]

**Speaker 1 (Albertini):** [00:40:58.609] ...he contacted me through Facebook.

**Speaker 2 (Shaw):** [00:41:01.964] Oh, really?

**Speaker 1 (Albertini):** [00:41:02.919] Yeah. He found me on Facebook, and he sent me a friend request, like hi, how are you, we talked for a couple days, and I never heard from him again.

**Speaker 2 (Shaw):** [00:41:12.432] Oh, okay.

**Speaker 1 (Albertini):** [00:41:14.039] So... All right, bro, listen, I gotta make some dinner. I haven't even eaten today. I just wanted to call you, and holler at you, telling you what the fuck you giving a private investigator my phone number for?

**Speaker 2 (Shaw):** [00:41:24.570] I never gave him your phone number.

**Speaker 1 (Albertini):** [00:41:25.925] You... Oh, I g-...I know... Dude, I know exactly what he did. He mentioned my name?

**Speaker 2 (Shaw):** [00:41:33.748] Yeah, he mentioned your name.

**Speaker 1 (Albertini):** [00:41:35.486] If he mentioned my name, what happened is...and when you had a reaction to it, it confirmed that I had anything to do with something. Because he had...he would not have known who I was.

**Speaker 2 (Shaw):** [00:41:46.670] No, he asked me who you was. He was like, "How do I get in contact with Richie Albertini?" I said, "I don't know, man." I said, "I only see him on FaceBlock."

**Speaker 1 (Albertini):** [00:41:55.973] Right. All right.

**Speaker 2 (Shaw):** [00:41:58.898] And that was it. I was wondering how he got my fucking phone number.

**Speaker 1 (Albertini):** [00:42:02.281] They're PIs, bro. what do you think they are? They're all ex-cops. They all got access to this crap, and uh, you know, I just hope the guy doesn't start...

Listen, do we need to contact Johnny?

**Speaker 2 (Shaw**): [00:42:18.218] Uh, no, I don't think so. Because, because as far as I'm concerned, if, if he was worried about it, he would have contacted us.

**Speaker 1 (Albertini):** [00:42:28.981] Does he know?

**Speaker 2 (Shaw):** [00:42:31.932] Uh, I would, I would think so. I mean, he's right there, firm in the entertainment business. I mean, somebody that he knows around there... If we know, he knows.

**Speaker 1 (Albertini):** [00:42:43.550] Right.

**Speaker 2 (Shaw):** [00:42:44.409] He been knowing.

**Speaker 1 (Albertini):** [00:42:46.644] Right.

**Speaker 2 (Shaw):** [00:42:47.420] And he's probably saying he doesn't give a fuck, let them do it.

**Speaker 1 (Albertini):** [00:42:51.111] There's a lot of money involved. It's $100 million, bro.

**Speaker 2 (Shaw):** [00:42:55.043] What, what do you mean? $100 million for what?

**Speaker 1 (Albertini):** [00:43:00.041] Oh, man, you really are out of the loop. You don't watch TV, do you?

**Speaker 2 (Shaw):** [00:43:03.704] Yeah, I watch TV all the time.

**Speaker 1 (Albertini):** [00:43:06.654] Amber sued him. I never even met Amber in my life. (laughs). That's the other thing I told this guy. Who?

**Speaker 2 (Shaw):** [00:43:12.904] Yeah [crosstalk 00:43:13.257]

**Speaker 1 (Albertini):** [00:43:13.784] Amber?

**Speaker 2 (Shaw):** [00:43:14.466] Yeah...well, yeah, I seen that one, Amber sued him, and, and, uh...

**Speaker 1 (Albertini**): [00:43:19.421] And she got $50 million. So instead of him paying her, he now sued her for $100 million. And that's what this whole thing is really about. But they're digging up dirt about River, they're digging up dirt about Flea...

**Speaker 2 (Shaw):** [00:43:33.683] No, no, I thought she only got $7 million.

**Speaker 1 (Albertini):** [00:43:37.211] I don't know. I, I was told it was $50 million.

**Speaker 2 (Shaw):** [00:43:40.015] Nah, man, $7 million.

**Speaker 1 (Albertini): [**00:43:41.480] That's it? Johnny could shit $7 million.

**Speaker 2 (Shaw):** [00:43:46.962] That's what I'm saying, he shitted it right out to her.

**Speaker 1 (Albertini):** [00:43:50.300] Ohh... Then how...

**Speaker 2 (Shaw):** [00:43:52.690] And then, she been... And so she did something that she wasn't supposed to, and he want the fucking money back.

**Speaker 1 (Albertini):** [00:44:03.096] Yeah well...

**Speaker 2 (Shaw):** [inaudible 00:44:03.114] But the thing is, is that the guy asked me, you know, about, you know, Johnny's character and shit like that, and then I told him, I don't know who the fuck you're talking about, because I only can go about what I know.

**Speaker 1 (Albertini):** [00:44:18.414] Exactly.

**Speaker 2 (Shaw):** [00:44:18.448] And how he was to me.

**Speaker 1 (Albertini):** [00:44:20.690] Right. Exactly. Hey, if he wants to ask me about Johnny's character, I'm gonna tell him go see, uh, "Benny & Joon." (laughs)

**Speaker 2 (Shaw):** [00:44:29.518] Yeah.

**Speaker 1 (Albertini):** [00:44:31.340] Go watch one of his...go watch one of his movies. If you want to know what his character's like, go watch him on the movie screen.

**Speaker 2 (Shaw):** [00:44:37.596] So you didn't...so you didn't talk to the guy?

**Speaker 1 (Albertini):** [00:44:39.105] I, I listened to him for about 30 seconds, because I actually thought it was a joke. I almost thought that maybe, like, you somehow found my phone number, and you were calling me up as, like, a joke. I didn't...I knew it wasn't your voice, but I thought it maybe was you, and somebody from the club hanging out, and calling me up and busting my balls. So, for about the...

**Speaker 2 (Shaw):** [00:44:57.801] Nah.

**Speaker 1 (Albertini):** [00:44:58.557] So for about the first three or four minutes, I was like, playing with the guy. I wasn't saying anything to him, he, he was like stupid... "Hey, man, how you been," you know, "How you doin'? Remember me from The Viper Room?" I said, what? Who is this? And then all of a sudden, he introduces himself, I don't even remember his name, and he starts...he tells me he's with some law firm, and he wants to know a bunch of questions. He has a bunch of questions. He wants to know if I ever witnessed Johnny Depp hit Amber Heard. I said, "I don't know Amber Heard. I've never met Amber Heard in my life. I was long gone before Johnny met Amber."

How you doing?

So that was my answer to that. And then all of a sudden he starts rifling off names, and he starts rifling off questions, and at that point I'm like, whoa, whoa, whoa, whoa, whoa, dude...dude, who are you? And he explained it to me again, and he told me he works for some law firm, and it's about this litigation, but they're trying to file criminal charges. They want people to go to jail, bro. It's that whole...

**Speaker 2 (Shaw):** [00:46:03.027] They want Johnny to go to jail?

**Speaker 1 (Albertini):** [00:46:04.748] No. It's that whole fucking River Phoenix thing.

**Speaker 2 (Shaw):** [00:46:09.587] What about the River Phoenix thing?

**Speaker 1 (Albertini):** [00:46:12.256] John Frusciante and Flea.

**Speaker 2 (Shaw):** [00:46:16.152] Okay. So, what, what do...who do they want to go to jail after 25, damn near 30 years?

**Speaker 1 (Albertini):** [00:46:22.271] Exactly. But I guess they're saying that this was part of the ritual, and it was the party for the night, and that's what happened.

**Speaker 2 (Shaw):** [00:46:34.801] Okay. Well...That's...And he did it.

**Speaker 1 (Albertini):** [00:46:41.931] I know. I know. I got it. And...

**Speaker 2 (Shaw):** [00:46:47.147] He was supposed to, he was supposed to go on stage, man. He was sat next to me, ready to go on stage.

**Speaker 1 (Albertini):** [00:46:52.527] I know.

**Speaker 2 (Shaw):** [00:46:53.085] He was holding his guitar.

**Speaker 1 (Albertini):** [00:46:54.597] I know. I wasn't there that night. I came after the fact, but uh, I knew the whole story.

**Speaker 2 (Shaw):** [00:47:02.873] Yeah, 'cause I told you.

**Speaker 1 (Albertini):** [00:47:05.852] Well, no, you didn't tell me. Sal told me. Sal was the one who called me.

**Speaker 2 (Shaw):** [00:47:09.461] But you know I, uh...You was standing right there. Y'all was...y'all was around me. I didn't say it but one time...I only told you, I didn't tell the story that...only but one time. That was it.

**Speaker 1 (Albertini):** [00:47:21.993] Were you up at Johnny's?

**Speaker 2 (Shaw):** [00:47:24.395] No.

**Speaker 1 (Albertini):** [00:47:25.682] You never...

**Speaker 2 (Shaw):** [00:47:25.716] I didn't go to Johnny's house. I went home.

**Speaker 1 (Albertini):** [00:47:28.279] Ohh... Ohh...I didn't know that.

**Speaker 2 (Shaw):** [00:47:32.936] I don't remember...I don't remember goin' Johnny's house.

**Speaker 1 (Albertini):** [00:47:36.101] Gotcha. I gotcha. They...no, they all ended up up at Johnny's house because everybody was like, freaking out about what to do. So, they all went up there, River was gone in the ambulance, the club was closed, and everybody just went to Johnny's. And it was like, okay, what are we doing...

**Speaker 2 (Shaw):** [00:47:52.805] You know what I told JD? I said, "JD..."

**Speaker 1 (Albertini):** [00:47:55.384] What's that?

**Speaker 2 (Shaw):** [00:47:56.563] I said, I said, "JD, well, you just let me know what you want me to do." You know? That was it.

**Speaker 1 (Albertini):** [00:48:03.866] Hmm.

**Speaker 2 (Shaw):** [inaudible 00:48:04.352] And that was it.

**Speaker 1 (Albertini):** [00:48:06.722] What did he say? Just go home?

**Speaker 2 (Shaw):** [00:48:08.313] I was like, "You think the dude's gonna be all right?" He said, "I don't know, man." "I don't know." He said, "I don't know, dude, but the way he looked, I knew something was wrong."

**Speaker 1 (Albertini):** [00:48:21.244] They did it on purpose, Ed.

**Speaker 2 (Shaw):** [00:48:25.705] Who did it on purpose?

**Speaker 1 (Albertini):** [00:48:28.912] Who went and picked him up?

**Speaker 2 (Shaw):** [00:48:32.403] I mean, but he took the stuff.

**Speaker 1 (Albertini):** [00:48:36.352] That kid didn't use drugs, Ed.

**Speaker 2 (Shaw):** [00:48:39.701] Oh, I didn't...I don't know about all that.

**Speaker 1 (Albertini):** [00:48:41.726] Yeah, I... Did you know him before that night?

**Speaker 2 (Shaw):** [00:48:44.956] I didn't even know who he was when I was dealing with him.

**Speaker 1 (Albertini):** [00:48:48.277] Ohh...

**Speaker 2 (Shaw):** [00:48:49.183] But Christina told me who he was, Christina Applegate.

**Speaker 1 (Albertini):** [00:48:52.436] Ri-... Yeah, she went up to Johnny's. Because what happened was the next... I got the phone call, and then I was told what was happening, I was told there was gonna be a meeting at Johnny's house. I don't know who the lawyer was, they had a lawyer up there. It might've been Peter Nichols. And uh, they had, uh, the next morning, by the next morning, everybody was out of town. Nobody stayed in town. And it's like we had the press...you saw what it was like out there, everybody taking pictures, they were leaving flowers, people were driving...

**Speaker 2 (Shaw):** [00:49:24.400] The club was closed, yeah.

**Speaker 1 (Albertini):** [00:49:26.371] Yeah. And...

**Speaker 2 (Shaw):** [00:49:28.149] It was closed for days.

**Speaker 1 (Albertini):** [00:49:29.497] I know! But...because everybody was out of town! And the only people who were, who were even bothering us were the tabloids. The, the...thank God.

**Speaker 2 (Shaw):** [00:49:42.928] Yeah, because...yeah, 'cause Woody told me, he was giving me, he said, "Can you get the tape?" I was like, "I don't know what you're..." I said, "There ain't no tape, man. I don't know what you're talking about." He was like, come on, Ed. I'll give you $25,000.

**Speaker 1 (Albertini):** [00:49:57.591] That tape would have been worth $1 million.

**Speaker 2 (Shaw):** [00:50:00.718] Right.

**Speaker 1 (Albertini):** [00:50:01.987] Exactly.

**Speaker 2 (Shaw):** [00:50:02.550] The tape was, the tape was gone, man. I don't...I... yeah, I think, uh, Mike took the tape and got rid of it, or...

**Speaker 1 (Albertini):** [00:50:08.800] Who, Mike Farrell?

**Speaker 2 (Shaw):** [00:50:11.653] I think either Mike Farrell, or maybe Sal got it. I don't know, 'cause [crosstalk 00:50:15.361]

**Speaker 1 (Albertini):** [00:50:15.361] I, I would...listen, I would say Sal.

**Speaker 2 (Shaw):** [00:50:18.561] Because I know I told Sal, I said hey, somebody need to get the tape.

**Speaker 1 (Albertini):** [00:50:23.724] Yeah.

**Speaker 2 (Shaw):** [00:50:24.996] Because I'm on the tape, and I don't, I... you know [crosstalk 00:50:27.075]

**Speaker 1 (Albertini):** [00:50:27.075] Yeah, no, I got it. I got it. I got it. I get it. I... You know...

**Speaker 2 (Shaw):** [crosstalk 00:50:31.622]

**Speaker 1 (Albertini):** [00:50:33.259] Ed, that was the best night of my life, only for the fact that I wasn't there.

**Speaker 2 (Shaw):** [00:50:38.624] Yeah.

**Speaker 1 (Albertini):** [00:50:39.262] (laughs) I mean, everybody else... Pfeiffer was there, Eisner was there, P was there, uh, um...everybody was there. It was a party. It was a celebration.

**Speaker 2 (Shaw):** [00:50:55.329] It was crowded like a mothafucka, though.

**Speaker 1 (Albertini):** [00:50:57.252] I know (laughs). I know it was. And you know what? It might have been the worst night in Viper Room history, but I was just so glad I wasn't around. I was so glad I wasn't around. Because...

And you know what else I was glad about? Dude, not one time, at least me, not one single cop, not one single detective, not one single anybody ever asked a question. So...

**Speaker 2 (Shaw):** [00:51:22.701] Nobody asked me shit either.

**Speaker 1 (Albertini):** [00:51:24.313] I never even seen a cop. So, whatever happened up at Johnny's house that night, they shut it all down.

**Speaker 2 (Shaw):** [00:51:31.845] Yep. [inaudible 00:51:33.355] nobody got... 'cause what shut it down was the club was closed.

**Speaker 1 (Albertini):** [00:51:40.207] Right. Right.

**Speaker 2 (Shaw):** [00:51:42.104] When nobody was there, you wasn't able to get to nobody, nobody's...everybody's information was sealed...

**Speaker 1 (Albertini):** [00:51:48.846] Exactly.

**Speaker 2 (Shaw):** [crosstalk 00:51:48.992] … and it was not no property, and it was not no goddamn... You know, the agents back then, it was hard to get in contact with people.

**Speaker 1 (Albertini):** [00:51:57.880] Right. No I know. I was a ghost. Nobody ever knew where I was. Nobody... I mean, my friends knew. You guys knew where I was. But I'm talking about anybody from outside the club. Dude, I was always old school like that. I never wanted anybody to know anything about me.

**Speaker 2 (Shaw):** [00:52:12.695] There wasn't no internet, there wasn't no...

**Speaker 1 (Albertini):** [00:52:15.656] Exactly. Exactly.

**Speaker 2 (Shaw):** [00:52:18.136] They called me, they, they...Sal called me, and told me to go. He told me, I'll let you know, I was like, okay, that was it, you know? I went on doing what I was doing, and then I got my call saying, hey, we're gonna open back up.

**Speaker 1 (Albertini):** [00:52:34.016] Right.

**Speaker 2 (Shaw):** [00:52:34.532] You know?

**Speaker 1 (Albertini):** [00:52:35.589] Right.

**Speaker 2 (Shaw):** [00:52:36.186] This and that... I said okay, let's go.

**Speaker 1 (Albertini):** [00:52:42.320] All right...

**Speaker 2 (Shaw):** [00:52:44.856] But business changed. The club changed.

**Speaker 1 (Albertini):** [00:52:46.604] All right. I'm gonna think what to do here, because I don't want this guy coming around. And I don't know if this guy has my address, I don't know what he knows. So I'm just going...

**Speaker 2 (Shaw):** [00:52:58.455] If you didn't, you didn't...if you didn't give him no information, it's a waste of his time.

**Speaker 1 (Albertini):** [00:53:02.897] Oh, all right. All right.

**Speaker 2 (Shaw):** [00:53:07.112] You know, uh, I don't...you know, but what, what's going on with... What does Olivia and them got to do with this?

**Speaker 1 (Albertini):** [00:53:13.757] Okay, here's how I believe they found me. They're making this movie about The Viper Room. So, what is, what is Kristen...uh, not Kristen.
Wha...well, Kristen's in it. Kristen's even being interviewed. She's talking. They're all talking, Ed.

Now, here's what happens. The...

**Speaker 2 (Shaw):** [00:53:31.053] I mean, everybody can...anybody can talk, but is it the truth?

**Speaker 1 (Albertini):** [00:53:37.878] I see what you're saying.

**Speaker 2 (Shaw):** [00:53:41.041] Anybody can talk, but is it the truth?

**Speaker 1 (Albertini):** [00:53:43.938] That's true. But...

**Speaker 2 (Shaw):** [crosstalk 00:53:45.271]

**Speaker 1 (Albertini):** [00:53:46.663] But here's what I'm saying. Every...

**Speaker 2 (Shaw):** [00:53:48.593] Has Bobby got anything to do with it?

**Speaker 1 (Albertini):** [00:53:50.884] No. It's mostly the celebrities. It's the rock stars, it's the...
If you want, if you're good with the internet, go to YouTube and punch in "Friends of the Viper Room trailer," and you're gonna see, it's about a five-minute trailer, everybody is in it. Chucky is in it, Olivia, Kristen, Norwood Fisher, every band, every person that ever hung out at the club is in this movie. And even the ones that are not in the little five-minute video, there's a list of names of people that are gonna make appearances in this. So, Olivia's trying to grab her little piece of the pie because her acting career sucked, she never made any money, so she's gonna capitalize on the fact that she worked at the club.

Now, they're not telling bad stories. They're not getting into, like, what happened. They're not getting into anything from that night. But they do briefly to-, touch on River Phoenix, and who are they talking to about River Phoenix? They're talking to, uh, Chucky. And Chucky just sits there and says, hey, things happen.

So, what's happening is, because of the way people responded, because of the way Chucky...Chucky shouldn't have had that kind of attitude, like, oh, well... So now what happens is these people are trying to create a criminal case, they're trying to make everybody look bad, so they take little things like that, and they say, look, this is Chuck E. Weiss, and look at his attitude. We're, we're, we're talking about a kid that died at the club, and he said, oh, well. I, I mean, everybody from Hole is in this thing, Morty is in it, Norwood's in it...I mean, Tom...uh, not Tom Petty, Benmont is in it, um...

I mean, I think the only people that were not on that list, they couldn't put me on the list because I kept refusing to do it. And Olivia was bugging me, dude, for months, and I kept telling her, no, I'm not interested. It's just, that's not my thing. (laughs) I don't wanna be in no freaking movie. What do I got to say? Ooh, boy, we had fun.

And, and then, check this out. Ed, you wanna know how she wanted...and I swear to God, I still got the email. You know, the screens that you stand behind where you can't see a person's face, and they use one of those voice changers?

**Speaker 2 (Shaw):** [00:56:06.952] Yeah.

**Speaker 1 (Albertini):** [00:56:07.820] That's how she wanted to interview me. Now again, this isn't about... It wasn't a story about the bad stuff. I mean, obviously you can't make a movie about The Viper Room and not at least touch on River Phoenix, you know? You gotta say something about it. You can't make a documentary about the club, and leave that out now. Now, I don't know how big of a part of this movie it might actually be. It can't be more than a couple minutes, because there's gotta be 50, 60 people in this movie. So...

And I know Johnny, his name is not anywhere on there, and I know Sal's name is not anywhere on there, because everybody in this movie hates Sal. Sal ended it for everybody. Sal ended it. He ended it for those Disney guys. They didn't have a place to come hang out no more. He ended it for Spielberg. He ended it for these people, so everybody hates Sal. I... The last I heard, he didn't have a friend in the world. He got married, he was living in a little apartment someplace on the Fountain, and he had a kid. And you know, I tried to reach out to him a couple times. I don't know exactly what Sal got pissed at me about.

Oh, I know why he got pissed at me. I know exactly, (laughs) I remember what he got pissed at me about. It was three days before New Year's Eve, and we still didn't have a band, and I decided that I was going into rehab, and he felt like I left him in a lurch, I left him high and dry. So, I said, sorry, bro, I gotta go to rehab, (laughs) and I went to rehab. And you know who paid for my rehab? Johnny.

**Speaker 2 (Shaw):** [00:57:46.457] That's cool.

**Speaker 1 (Albertini):** [00:57:47.777] Well, come on, he paid for everybody's rehab.

**Speaker 2 (Shaw):** [00:57:50.107] Hey, you know, I, I heard that uh, uh, that uh, Johnny was taking care of Sal.

**Speaker 1 (Albertini):** [00:57:58.227] That's what I heard, too. Because Johnny felt so bad that he wasn't taking care of him the way he used to, but he was still putting some food in his mouth. I mean...

**Speaker 2 (Shaw):** [00:58:08.186] I heard he was living in the loft, his loft and all that stuff.

**Speaker 1 (Albertini):** [00:58:12.020] Oh, I didn't know...I didn't know that much.

What, you got another call? Hey, listen, I gotta make, I gotta make some food. Let me give you a call tomorrow, bro.

**Speaker 2 (Shaw):** [00:58:21.805] Okay.

**Speaker 1 (Albertini):** [00:58:22.876] All right, buddy. And I wanna hook up with you. I wanna come, uh...I don't know, if you can't get out, I'll bring you some lunch.

**Speaker 2 (Shaw):** [00:58:31.045] All right.

**Speaker 1 (Albertini):** [00:58:31.851] All right, buddy. We'll talk soon.

I remember that bouncer's name. I don't know if you remember him. You might have came after. His name was Bernard.

**Speaker 2 (Shaw):** [00:58:41.653] Bernard? We, we all started at the same time.

**Speaker 1 (Albertini):** [00:58:44.489] Okay.

**Speaker 2 (Shaw):** [00:58:45.153] And, and Bernard was the first one to get his ass... He had to go, man. [crosstalk 00:58:50.279]

**Speaker 1 (Albertini):** [00:58:50.279] He was crazy.

**Speaker 2 (Shaw):** [00:58:52.379] He was stupid.

**Speaker 1 (Albertini):** [00:58:53.142] I know he was. I didn't, I didn't want to pay him, I... You know what, Ed? I didn't like that guy being around me.

**Speaker 2 (Shaw):** [00:59:00.241] I was like, I don't know where you got him from... But Paul got him too, so...

**Speaker 1 (Albertini):** [00:59:04.982] Ohh, he was another Paul guy?

**Speaker 2 (Shaw):** [00:59:07.566] Yeah. Mike Farrell, me...no me, me, Mike X...

**Speaker 1 (Albertini):** [00:59:11.971] Mikey X.

**Speaker 2 (Shaw):** [00:59:13.103] ...and Bernard.

**Speaker 1 (Albertini):** [00:59:15.635] Ohh... I wonder what ever happened to Mikey.

**Speaker 2 (Shaw):** [00:59:20.757] Who, Mike X?

**Speaker 1 (Albertini):** [00:59:21.737] Yeah.

**Speaker 2 (Shaw):** [00:59:23.455] I don't know.

**Speaker 1 (Albertini):** [00:59:25.488] Uh, you know, I did talk to Farrell a few years ago, and uh, he was like, I think he was like a yoga instructor, and he was into selling, like, natural foods and stuff.

**Speaker 2 (Shaw):** [00:59:36.815] Oh, yeah?

**Speaker 1 (Albertini):** [00:59:37.893] Yeah. I talked to him for a minute, and it was because he actually found me for some marijuana thing. And he saw me, because, you know, marijuana's another one of these natural things, and he somehow saw me and he found my phone number. But that was like...

**Speaker 2 (Shaw):** [00:59:50.247] Oh, yeah?

**Speaker 1 (Albertini):** [00:59:52.424] Yeah, that was probably three years ago.

All right, bro...

**Speaker 2 (Shaw):** [00:59:55.006] So what did he...

**Speaker 1 (Albertini):** [00:59:56.309] Hmm?

**Speaker 2 (Shaw):** [00:59:56.688] So do you do the...do you do the cannabis festivals and all that?

**Speaker 1 (Albertini):** [01:00:01.203] I used to. I...

**Speaker 2 (Shaw):** [01:00:03.381] But you're not no more?

**Speaker 1 (Albertini):** [01:00:04.373] Nah, dude, I'm totally out of that game. I mean, I still smoke a lot of it. I go to festivals once in a while just to have fun, but I don't, uh...I'm not involved in the business anymore.

**Speaker 2 (Shaw):** [01:00:14.785] You don't grow none?

**Speaker 1 (Albertini):** [01:00:16.664] No. I was never a grower. I was never a... I was never able to grow.

I know who you gotta still be in touch with, 'cause wasn't he your cousin? Tim.

**Speaker 2 (Shaw):** [01:00:29.681] Nah, man.

**Speaker 1 (Albertini):** [01:00:29.981] Really? I thought you guys were related.

**Speaker 2 (Shaw):** [01:00:33.246] Well, you know, that...all that doesn't matter, man. I got... Once I got hurt, and then...and I wasn't getting all those jobs, and getting all them jobs and stuff, they stopped talking to me.

**Speaker 1 (Albertini):** [01:00:44.810] Exactly.

**Speaker 2 (Shaw):** [01:00:47.056] They used my, they used my injury against me, man.

**Speaker 1 (Albertini):** [01:00:50.607] How did JD stop talking to you? Or how did you and JD stop talking?

**Speaker 2 (Shaw):** [01:00:55.553] Well, once I stopped working at the club, uh...

**Speaker 1 (Albertini):** [01:01:00.523] You just fell outta touch?

**Speaker 2 (Shaw):** [01:01:02.327] Yeah, you know what I mean? It was just like, you know, he's a, he's a... he's a movie star, man. He ain't got no... you know?

**Speaker 1 (Albertini):** [01:01:08.687] No, I know. Everybody told me that. I mean, Ricky would leave him a message, it would take him six months to return the call.

**Speaker 2 (Shaw):** [01:01:16.213] And I didn't have nothing...you know, I never called him, and... The only person that I would call was, uh, the business managers, and...

**Speaker 1 (Albertini):** [01:01:23.967] Right.

**Speaker 2 (Shaw):** [01:01:24.037] ...you know, they tried to help. They tried to help me. They gave, they gave me money, so I guess, you know, he gave me money.

**Speaker 1 (Albertini):** [01:01:30.918] Right.

**Speaker 2 (Shaw):** [01:01:31.262] Uh, and uh, you know, they tried to help me as much as they can. But then I seen that he was suing them, so that number stopped for me.

**Speaker 1 (Albertini):** [01:01:42.098] Right. Gotcha.

**Speaker 2 (Shaw):** [01:01:43.188] 'Cause he, he was suing them for doing something wrong to him, so I was like, damn. So now my number got cut off, and now I don't have no number to him now. I would have to get, uh, Josh Richman's number, or something like that, or...

**Speaker 1 (Albertini):** [01:01:59.012] Is Richman, is that guy still even around?

**Speaker 2 (Shaw):** [01:02:02.134] I don't know, man.

**Speaker 1 (Albertini):** [01:02:03.480] Oh, my God. I can't believe you even mentioned him. Josh Richman, oh, my God.

**Speaker 2 (Shaw):** [01:02:11.462] Yeah.

**Speaker 1 (Albertini):** [01:02:11.947] That dude was totally...that dude was so burnt out. (laughs) He was so funny, man.

**Speaker 2 (Shaw):** [01:02:16.600] He knew everybody, he did, he was into everything, and...

**Speaker 1 (Albertini):** [01:02:20.885] Exactly. Exactly. Josh was a good guy. I hope I run into him someday. That's somebody I'd like to run into.

All right, man, I'm gonna make some dinner. I'll call you tomorrow or the next day.

**Speaker 2 (Shaw):** [01:02:33.596] All right, bro.

**Speaker 1 (Albertini):** [01:02:34.254] Peace.

**Speaker 2 (Shaw):** [01:02:35.419] Yeah.

**Transcriber's Certificate**

I, Liridona Etemi, do hereby certify that I have listened to the recording several times carefully of the foregoing; further that the transcript pages one through thirty (1-30) was reduced to typed form from the digital audio recording; and that the foregoing is an accurate and true record of the digital audio recording above transcribed version in this matter.

**Dated** this 19th day of March 2025.

_____

Transcriptionist: Liridona Etemi

---

## *In an Individual Capacity:*

Pursuant to Section 117.05(13)(a), Florida Statutes, the following notarial certificate is sufficient for an acknowledgment in an individual capacity.

STATE OF FLORIDA

COUNTY OF __Citrus___

The foregoing instrument was acknowledged before me this _20__ day of _March_ , 20_25_ , by __Liridona Etemi_____ (name of person acknowledging).

Notarized online using audio-video communication

ELECTRONIC NOTARY PUBLIC
STATE OF FLORIDA
Michelle Peterson
Electronic Notary Public
State of Florida
Commission #: HH445677
Commission Expires: 01/19/2028

Notary Signature: _____

Notary Name: ____Michelle Peterson____

Personally Known _____ OR Produced Identification ___✓___

Type of Identification Produced

_____Driver's License Italy_____

8:18

Amber Depp   Jul 27, 2022

Mike McCor...    Jul 28, 2022
to me

| From | Mike McCormick mikemcminvestigations@gmail.com |
| To | Christina Taft   taftchristina.ceo@gmail.com |
| Date | Jul 28, 2022 at 7:03 AM |
| 🔒 | Standard encryption (TLS) Learn more |

Christina

Attached is a brief conversation with Paul Barressi this morning.

Mike

• • •

Taft.Paul
Baressesi call 7....
🔊 Audio

↩ Reply        ➔ Forward

← **Adam Wald…**
+1 202-550-4507

getting suspended but I do have a new one. It would appear Amber Probably

View all

10:38 PM

— Today —

You Know Adam, Draga is a Clown. I don't Know what Kinda Game You are Running but I am Done. You Need to Get that Fucking Paul Barresi & Mario Nitrini and Who Ever the Fuck Tug is Under Control Tonight.

3:36 AM

Enter message                    Send

8:00

S Denise Newsome

Paralegal C...    Sep 19, 2022
to S, me, Richie, Aaron

Attached are the email and the three screenshots referenced in it between Baressi and Waldman.

12:47 PM    ↓LTE

🔒 mail.google.com/    +    3

Starred

and twitter for his antics.

My friend Mario Nitriini who tells me he has corresponded with you brought all this to my attention because beyond facebook, I really don't do social media.

I've asked Mario to forward you whatever Albertini is posting as it pertains to Johnny to you FYI.

Stay well and hope to hear back from you soon.

Sincerely,

Paul Barresi

7:54

On Fri, Jun 10, 2022 at 7:13 PM Mario Nitrini
<nitrinimario@gmail.com> wrote:

Cristina. I do not have a printer or computer. I only use my phone. I don't have those capabilities.
I have copied and pasted it. Hope that works.

Mario George Nitrini 111
-----
The OJ Simpson Case

Fwd: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.FID344226]



**paulbarresi@aol.com**
to me
6 days ago  Details



This is what that fuck told me when I first interviewed him

-----Original Message-----
From: Paul Barresi <paulbarresi@aol.com>
To: rschwartz@bgrfirm.com; egeorge@bgrfirm.com
Sent: Sun, Jul 28, 2019 10:04 pm
Subject: INTERVIEW WITH COOPERATING WITNESS RICHIE J. ALBERTINI III - Viper Room Investigation [IWOV-DOCSLA.FID344226]

JULY 28, 2019

RICHIE ALBERTINI III TEL. INTERVIEW

Cell No. 213-302-9688

ALBERTINI alleges as follows:

 twitter.com/nitrini   

← Post

**Mario Nitrini**
@nitrini958

The OJ Simpson Case

No doubt in my mind if Amber Heard would have had access to this audio
tape recording of Johnny Depp's head-of-security Big Ed Shaw

youtu.be/NN1Yk7wCWrE?si...
(And photo below),
Depp would have withdrawn his civil lawsuit against her.

And I got more tapes



1:57 PM

← ☐ ☆ ⋮

**Description** ✕

**The OJ Simpson Case. Audio recording of
Johnny Depp's head-of-security Big Ed
Shaw. MGN3**

| 0 | 7 | 7h |
|---|---|---|
| Likes | Views | Ago |

The OJ Simpson Case.
Mario George Nitrini 111.

This is an audio tape recording of Johnny Depp's
head-of-security Big Ed Shaw talking about the
night River Phoenix died at the Viper Room. Also
talking about Depp's co-owner of the Viper Room
Anthony Fox who mysteriously disappeared right
before he was to give testimony.......
What does Big Ed Shaw imply?
You be the judge.

No doubt in my mind. if Amber Heard would have
had access to this audio tape recording, Johnny
Depp would have dropped his lawsuit against her

Share    Edit    Lens    Delete

3:00 PM · Dec 10, 2023 · **157** Views

View post engagements

○    ⟲ 1    ♡ 2    ☐    ⬆

○ Post

⌂    ○    ☑    ○    ✉

1:54

← **Tweet**



GIF | ALT

💬 1          ↻          ♡ 2          �archive 146          ↥

**Paul Barresi**                                              •••
@PaulBarresi1

Actually, I uncovered 27 freeloaders. Baruch
however was on the top of the list.

10:57 AM · Jul 24, 2023 · **144** Views

**1** Like

💬          ↻          ♡          🔖          ↥

Tweet your reply!                    Reply

**Freddie Stard...** @FreddieStar9... · Jul 24    •••
No need for info on all 27, just the 5 main ones
from the trial. Why expose Issac but not for

🔒 twitter.com

8:04



**Paul Barresi**
644 Tweets

 Follow

💬 1          🔁          ❤️ 3          📊 114          ⬆️

**Paul Barresi** @PaulBarresi1 · Jul 23                    •••

Based on the majority of responses, when you hear what Isaac Baruch's x wife Darcie had to say about how horribly he treated her during their short lived marriage, you'll lose your shit. CHRIST! While I'm in Italy, I'm gonna give serious thought whether to even publish my book.



💬 36          🔁 5          ❤️ 25          📊 5,857          ⬆️

🔒 twitter.com

4:30

← **Tweet**

was truly grateful for JD's kindness in a time
when he needed it, unfollowing this account

💬 1          ⟲ 1          ♡ 1          ılı 195          ⬆

**Paul Barresi**          ⋯
@PaulBarresi1

It's not about trashing but presenting the facts.
Johnny is generous to a fault. It's proven to his
detriment on many levels. With my
encouragement to be on guard, now he donates
strictly to legitimate charities. As for those
looking for an easy hand out, no more.

8:03 AM · Jul 24, 2023 · **65** Views

**1** Like

💬          ⟲          ♡          🔖          ⬆

Tweet your reply!          **Reply**

☠🖤❤🍪**cookiecrumbs**… @Old… · 7h     ⋯
Yes but it's Johnny's choice not yours and you're
not doing him any favours by causing him more

🔒 twitter.com

4:28

← **Tweet**

It's also a fact that none of us on here have a right to tell Mr. Depp who he should and shouldn't be friends with. That's his business. People already have opinions about what he should and… Show more

💬    ⟲    ♡ 10    📊 697    ⬆️



**Paul Barresi**    ⋯
@PaulBarresi1

JD appreciates my advise & follows it with respect to freeloaders. You wont be seeing a Mooch like Baruch in his life ever again. And you can take that to the bank. As for testing the waters, I never test the waters. If my mind is made up to take the plunge I just do it.

11:13 AM · Jul 24, 2023 · **107** Views

**3** Likes

💬    ⟲    ♡    🔖    ⬆️

Tweet your reply!    Reply

Linda B SLP 💚✅  @MyLampandOil · 4h    ⋯

🏠    🔍    🔔    ✉️

AA    🔒 twitter.com    ↻



🔍 Search Twitter    •••

**Log in**    **Sign up**



**Paul Barresi** @PaulBarresi1 · 3h    •••
GOD BLESS JOHNNY DEPP

💬 1        🔁 5        ♡ 50        ↑

Show this thread



**Paul Barresi** @PaulBarresi1 · 3h    •••
from the Barresi files: JOHNNY DEPP V. AMBER HEARD 08-06-2019 I interviewed former Viper Room employee, child actress, writer, producer Seven Anne McDonald. My daily report to Amber Heard's lawyers offers chapter and verse as to what Seven had to say about Johnny Depp.



  

4:08 PM ⚙                                    LTE ▃▂

🏠    🔒 mail.google.com/    +    □2    ⋮

'Daily'                          📥    🗑    ▾

momentum every day. You are a huge part now

**P**    **paulbarresi@aol.com**
Well Ive already see one article due to social
media.

    **Mario George Nitrini 111**
There's actually another one on YouTube I saw.
Let me see if I can find it.

**P**    **paulbarresi@aol.com**
Eric George is on stand now

    **Mario George Nitrini 111**
Let's see what develope's. (Eric George) The OJ
Simpson Case

**P**    **paulbarresi@aol.com**    ↩
paulbarresi@aol.com
Hide details

To:        marionit111@gmail.com

Date:    May 19, 2022, 3:15 PM

Richard Johnsons editor just called me She loves the
story.




◀    ●    ■



Christina Taft <taftchristina.ceo@gmail.com>

---

**Fwd: Screenshot of shottenborn and the journalists**
1 message

---

**Christina Taft** <taftchristina.ceo@gmail.com>            Fri, Jun 10, 2022 at 10:11 AM
To: jbailey@cbcblaw.com

---------- Forwarded message ---------
From: **Mario Nitrini** <nitrinimario@gmail.com>
Date: Thu, Jun 9, 2022 at 3:16 PM
Subject: Re: The OJ Simpson Case. Screenshot of shottenborn and the journalists
To: Christina Taft <taftchristina.ceo@gmail.com>

Oh yes. Barresi wanted me to email all those people.
I said NO.

Barresi has communicated with all the journalists according to him.
I'll have to look and see if he has email exchanges with any of the journalists.
I believe he does.
Let me see.

I don't know if he has ever communicated with Shottenborn.
But why did he want me to email Shottenborn?
I knew something wasn't right, and that's why I said NO.

No emails on how he obtained their information.

Mario George Nitrini 111
----
The OJ Simpson Case

On Thu, Jun 9, 2022, 3:07 PM Christina Taft <taftchristina.ceo@gmail.com> wrote:
Okay, so Paul Barresi wanted you to email these addresses?

Does Paul Barresi communicate with these people, then? The Lawyer of Amber Heard's Ben Rottenborn, Dylan Howard of AMI, Emily Smith of Ny Post, Chris White of Daily Mail, and Joey Davis of TheGeekBuzz?

Are there emails showing how he has their information?

On Thu, Jun 9, 2022 at 3:00 PM Mario Nitrini <nitrinimario@gmail.com> wrote:
Barresi actually wanted me to email Amber's attorney Ben Shottenborn.
He asked me on the phone.
I said no.

Mario George Nitrini 111
----
The OJ Simpson Case

--
**Christina Taft**
**Founder and CEO of Worldie**
**Social Media for Good**
Rescue Social Tech, AI/ML/Data Science
Book a Meeting - LinkedIn

--
**Christina Taft**
**Founder and CEO of Worldie**
**Social Media for Good**
Rescue Social Tech, AI/ML/Data Science
Book a Meeting - LinkedIn

---



**Screenshot_20220609-145738 (1).png**
340K

# *VIRGINIA:*

*In the Court of Appeals of Virginia on*  **Monday**  *the*  **17th**  *day of*  **October, 2022**.

Fletcher, Heald & Hildreth, PLC,                                                                    Petitioner,

 against              Record No. 1176-22-4

Circuit Court of Fairfax County,                                                                    Respondent.

Upon a Petition for a Writ of Mandamus

Before Judges Malveaux, White and Senior Judge Annunziata

On August 8, 2022, Fletcher, Heald & Hildreth, PLC, ("Petitioner"), filed a petition for writ of mandamus directed to the Circuit Court of Fairfax County.  Petitioner prays that this Court compel Fairfax County Chief Circuit Court Judge Penney S. Azcarate ("Judge Azcarate") to provide consent to release copies of the trial transcripts in and relating to *Depp v. Heard*, 1072-22-4.  Alternatively, Petitioner prays that this Court compel the Office of the Clerk of the Fairfax County Circuit Court ("Clerk") to furnish copies of all such transcripts to Petitioner.  Upon consideration of the verified petition, we conclude that mandamus does lie for the Clerk of Fairfax County Circuit Court but does not as to Judge Azcarate.

As a preliminary matter, Judge Azcarate and the Clerk allege that this Court does not have jurisdiction to issue a writ of mandamus in this matter.  This Court, however, has original jurisdiction to issue writs of mandamus, prohibition, and *habeas corpus* in cases in which it *would have* appellate jurisdiction.  Code § 17.1-404 (emphasis added).  In civil matters, this Court has appellate jurisdiction over "any final judgment, order, or decree of a circuit court in a civil matter" except as provided in subsection B of § 17.1-406.  *Id.*[1] Accordingly, we find that we do have jurisdiction to issue a writ of mandamus.

---

[1] Although this Court has not had occasion to address the scope of our original jurisdiction pertaining to writs of mandamus specifically, in addressing writs of prohibition and *habeas corpus* we have already held that our scope encompasses the "subject matter of the case" where "the issues raised in the petition . . . fall within our subject matter jurisdiction".  *Hoffman P'ship, LLP by Hoffman v. Cir. Ct. of Spotsylvania Cnty.*, 72 Va. App. 206, 213-14 (2020).  *See Also White v. Garraghty*, 2 Va. App. 117 (1986).

"Mandamus is an extraordinary remedy that may be used to compel performance of a purely ministerial duty, but it does not lie to compel the performance of a discretionary duty." *Moreau v. Fuller*, 276 Va. 127, 135 (2008). A ministerial act, our Supreme Court has explained, is "one which a person performs in a given state of facts and prescribed manner in obedience to the mandate of legal authority without regard to, or the exercise of, his own judgment upon the propriety of the act being done." *Richlands Medical Ass'n v. Commonwealth*, 230 Va. 384, 386 (1985). By contrast, "when the act to be performed involves the exercise of judgment or discretion on the part of the court judge, it becomes a judicial act and mandamus will not lie." *In re Commonwealth's Att'y for City of Roanoke*, 265 Va. 313, 318 (2003).

First, Rule 1:3 states in relevant part, "When a reporter takes down any proceeding in a court, any person interested is entitled to obtain a transcript of the proceedings or any part thereof upon terms and conditions to be fixed in each case by the judge." From this language, it is clear that the role of a judge is a discretionary one. *Moreau*, 276 Va. at 139.

Second, in regard to the Clerk, Code § 17.1-208(B) states in relevant part,

> Except as otherwise provided by law, any records that are maintained by the clerks of the circuit courts shall be open to inspection in the office of the clerk by any person and the clerk *shall*, when requested, furnish copies thereof subject to any reasonable fee charged by the clerk pursuant to § 17.1-275. No person shall be permitted to use the clerk's office for the purpose of making copies of records in such manner, or to such extent, as will, in the determination of the clerk, interfere with the business of the office or with its reasonable use by the general public.

(emphasis added).

Additionally, "[r]equests for copies of nonconfidential court records maintained in individual case files *shall* be made to the clerk of the circuit court." Code § 17.1-208(C).[2] The clear purpose of this statute is

---

[2] The Clerk alleges that the line of the statute "[n]o person shall be permitted to use the clerk's office for the purpose of making copies of records in such manner, or to such extent, as will, in the determination of the clerk, interfere with the business of the office or with its reasonable use by the general public" makes his duty a discretionary one, citing *Smith v. Richmond Newspapers, Inc.*, 261 Va. 113 (2001). We disagree. In *Smith*, our Supreme Court held that a circuit court clerk has discretion as to the *means* in which they allowed the petitioner to hear the record, however "that discretion simply does not extend to a complete denial of the

delegating a duty to the clerk.  In the context where a duty is delegated, the use of the term *shall* means that the availability of discretion is absent.  *See SHALL, Black's Law Dictionary* (11th ed. 2019) (defining "shall" as "[h]as a duty to; more broadly, is required to"); *see also Wal-Mart Stores East, LP v. State Corp. Comm'n*, 299 Va. 57, 70 n.5 (2020) (noting that "[t]he traditional, commonly repeated rule is that shall is mandatory and may is permissive") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012)).  Furthermore, mandamus is the appropriate remedy as to the Clerk since such responsibility lies solely with him under Code § 17.1-208.[3]  The potential availability of the trial record from this Court does not ignore the deprivation of petitioner's right to access such records previously nor absolve the Clerk of his ministerial duties.

Therefore, we grant the writ of mandamus as to the Clerk but deny as to Judge Azcarate.  It is so ordered.


A Copy,

Teste:

A. John Vollino, Clerk

By:

Deputy Clerk

---

right to listen." *Id*. 261 Va. at 119. This is further evident by the preceding line of the statute that the clerk "*shall*, when requested, furnish copies."

[3] The proper place for any "interested party" to seek a copy of a transcript of a court proceeding is the circuit court pursuant to Code § 17.1-208 and Rule 1:3. *See Charlottesville Newspapers v. Berry*, 215 Va. 116, 118 (1974) (denying request by intervening parties for copies of transcripts, "without prejudice to their right to request such transcript in the Circuit Court, pursuant to the provisions of Rule 1:3, Rules of Court.").



newsweek.com

YouTuber's videos dragging Amber Heard
may make him up to $64,000 a month

💬 1          ↻ 72          ♡ 223          ↑

**Paul Barresi**    •••
@PaulBarresi1

Replying to @Geekthedog

Amber fought for gender justice
like Joan of Arc fought for
freedoms in England. Joan of Arc
was overtaken by the Burundian
troops like Amber was overtaken
by Johnny Depp's deciples. Joan of
Arc was burned at the stake in
Rouen France like Amber in the
County of Fairfax VA.

2:35 PM · Jun 25, 2022 · Twitter Web App

🔒 twitter.com

← **Tweet**



**Paul Barresi**
@PaulBarresi1                                    ...

Johnny phoned me to wish me a Happy New Year; said
I was a warrior.  Later today, I'll share some highlights
of our talk in which he offered me some very sound,
personal, heartfelt advice. He is a living legend & a true
inspiration. Long live Johnny Depp



6:17 AM · Dec 30, 2022

**70.6K** Views    **311** Retweets    **22** Quote Tweets    **3,436** Likes

Q    🔍

**Rele**



**Wha**

NHL · !
**Coyo**

Celebri
**Chris**
Trendir

Sports
**Trista**
1,861 1

Trendir
**AND**
98.7K 1

Trendir

3:08

## February 27, 2024
4:25 PM



💬 180    🔁 26    ❤️ 140    📊 8.2K    🔖    ⬆️

 **marie poundstone** @KuramaMarie · 3h    •••
If you see her side it's the fact that he was nice. He gave her everything and her freeloading friends everything. With this we can call it atrosaty vs normalement

💬 1    🔁    ❤️ 2    📊 179    🔖    ⬆️

 **Paul Barresi**
@PaulBarresi1          

Fact: Johnny also gave his own freeloading friends everything.

1:23 PM · Feb 27, 2024 · **179** Views

💬 1    🔁 1    ❤️ 9    🔖    ⬆️

4:53

 Oct2023 TRO Taft v Barresi Ha...      Done

page 2 of 3

## DECLARATION OF PETITIONER(S)

Petitioner states the following is true:

☒ Recent or past act(s) of harassment occurred; and/or
☒ Threats of harassment make it probable that acts of harassment may occur soon.
Respondent(s) ☐ own; ☐ possess; or ☐ intend to obtain or possess
☐ firearm(s) and/or ammunition that may be used to threaten or injure Petitioner(s).
Describe the firearm(s)/ammunition: _____
Location of the firearm(s)/ammunition: _____
Date last seen: _____
Street address/ specific location where last seen: _____

(Explain in detail recent or past acts of harassment, using additional sheets, if necessary.)

Dear Honorable Judge, (Attached More Pages)

*Please See Attached*

I am a victim of Paul Barresi scaring and intimidating me with escalations this week numerous times and October 15, 2023 which are more escalations of his acts from a year of ongoing stalking and harassment. I had to hire protection services and I've been endlessly exploited as a result of Paul Barresi. Barresi is referring again to my mother Victoria Taft's coroner's report which he sent to me distressingly in November 2022 in email by Barresi, my mom's death in a wildfire, and again posting edited audios of phone calls of others and me that he obtained in order to intimidate me and any associates of me. He names me with full capital letters and misuses my likeness.

These are not only direct acts of harassment, but also threats of harassment imminent. There is an open DCA/Department of Consumers Affairs investigation over a year now against Paul Barresi continuing to act without using a license after I opened a report against him in October 2022, since then, multiple witnesses interviewed by the DCA have come forward against Barresi. Barresi escalated after a Temporary Restraining Order was filed against him in September 2022 where I was to be a witness against him. On March 11, 2023, Barresi stated he knew where I lived publicly: "Same rapid blinks like that crazy Christina Taft who disappeared. In Hawaii I was told." In Text, services I hired alleged that Barresi was flying to multiple states this summer, he was dangerous and manipulative, right before Barresi posted my likeness and again intimidation. This caused fear that he could fly to Honolulu, Hawaii requiring a contingency plan if he retaliated against me.

On Nov 13, 2022, Barresi stated: "That B.TCH needs to get out of town." I did and out of state. Moreover, I was a Donor to an Amicus Brief of an Appeal of a former client of a law firm that had used Barresi before For Only 3 months in 2019. Barresi however did not stop contacting them despite them rejecting him. 4 lawyers of that woman rejected Barresi when contacted by my lawyers who were trying to help her Appeal. Eric George stated that Barresi's increasing harassment towards me was not related to their law firm or their former client, Amber, in any way since June 2019. Other lawyers of hers in February 2023 rejected Paul Barresi. Oct 14, 2023

CHRISTINA TAFT ABANDONED HER OWN MOTHER TO BURN TO DEATH IN PARADISE CA FIRE

Biological father warns Amber Heard to be careful. His daughter Christina Taft has deep emotional problems, like her mother Victoria Taft who perished in the Paradise California fire after her daughter Christina abandoned her. The coroner report noted that all that was left of her poor mother were bone fragments and her completely intact heart.

He is attacking me about me, my mother, audio tapes he took of recordings of others in order to exploit, audio of me with another woman that was silenced, an audio tape of an estranged biological father that PIs discovered did not know he was
☒ Unless Respondent(s)' wrongful conduct is stopped or prevented by order of the Court, Petitioner(s) will suffer substantial emotional distress.

I have read the Petition and Declaration, know their contents, and verify that the statements contained therein are true to my personal knowledge and belief.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF HAWAI'I THAT THE FACTS AND CIRCUMSTANCES STATED IN THE PETITION AND DECLARATION ARE TRUE AND CORRECT.**

Signature of Petitioner(s): *Christina Taft*

Date: *Oct 23 2023*    Print/Type Name(s): *Christina Amanda Taft*

1D-P-803

HawaConn 506 Certified

---

1 of 40

------------------------

Respondent Paul Barresi is still intimidating, threatening, harassing me and I'm afraid that he will continue to harass me.

He is using gory images as well as referring to death, body parts of my family, vandalism, break-ins, and violence which scares me.
He likely will directly contact me via phone and email as he increases. Fleeing away didn't stop him.
He repeatedly asked others around me where I was located, most recently in August before this recent escalation.

There is an ongoing open BSIS/Department of Consumer Affairs investigation open against Barresi from a report by me last year in which multiple witnesses were interviewed (See Exhibit DCA Investigator Jesse Adams Re Me Reporting to Local Law Enforcement). Although I tried before to report with a witness, I have been too afraid to report to local law enforcement in full as it escalates continually as he uses Reports against him to attack other people he is harming.

Since Paul Barresi flew to other states (See Exhibit Juan Brooks/JCB Security Re Multiple States June-Aug), he could fly to Hawaii to get to me as he becomes more enraged and irrational. I have cameras installed in my condo.
I hired licensed protection services over the past year and he still attacks me.

I truly need help finally getting a Restraining Order against Barresi to Protect me.

I have Attached More Narrative, Exhibits of the Quoted and Referred to Evidence Here.

   

4:54

☰  Jan2023 TRO Taft v Barresi Exh... ⌄     Done

☑ telephoning the Petitioner(s)
☑ entering or visiting Petitioner(s)·     ☑ residence, including yard and garage and     ☑ place of employment.

b. An order of an Injunction not to exceed a period of three (3) years, enjoining Respondent(s) and any other person(s) acting on Respondent(s)' behalf from committing those acts set forth in paragraph 2a. hereof.
c. An order prohibiting Respondent(s) from owning or possessing firearm(s) and/or ammunition.
d. An order awarding reasonable attorney's fees and costs to Petitioner(s) and such further relief as the Court deems just and appropriate.

(continued on reverse side)

Signature of Petitioner(s): *Christina Taft*

Date: 1/12/2024     Print/Type Name(s): *Christina Taft*

TRO.XXX (Effective 7/1/2001)     **SEE REVERSE SIDE**
1D-P-803 (10/03)
☒ RCSP(11/11)

I certify that this is a full, true, and correct copy of the original on file in this office.

Clerk, District Court of the above Circuit, State of Hawai'i

RevaComm 508 Certified

---

page 2 of 3

**DECLARATION OF PETITIONER(S)**

Petitioner states the following is true:

☒ Recent or past act(s) of harassment occurred; and/or
☒ Threats of harassment make it probable that acts of harassment may occur soon.
Respondent(s) ☒ own; ☐ possess; or ☐ intend to obtain or possess
☒ firearm(s) and/or ammunition that may be used to threaten or injure Petitioner(s).
Describe the firearm(s)/ammunition: _____
Location of the firearm(s)/ammunition: _____
Date last seen: _____.
Street address/ specific location when last seen: _____

(Explain in detail recent or past acts or threats of harassment, using additional sheets, if necessary.)
Paul Barresi wants me to be afraid for my life" and on January 10th posted that I live on an 8th floor apartment, mocking that anyone fears him. He wants me dead. On January 7th he threatened "Drop dead bitch" + my mom is burning alive. He wrote "Taft Roof" and edits recordings. He sent me He wrote nude photos of my mother on January 4th. He continues to email me, contact me, and threaten me. On Jan 4th he wrote "fuck you whore" and "OK... rot in hell you wicked witch" linking an edited audio. He doesn't want me to file a lawsuit against an actor. He wants money for me to flee. He wrote I'm "DEAD" for years now. He sent texts that my mom saw a mob hit/murder. He mocks screaming + suffering. He sent texts saying a woman fell off a roof to her death after a year of him intimidating + recording. 2 years of holidays are ruined by him. I attached police reports in Honolulu as I couldn't take it anymore.
☐ Unless Respondent(s)' wrongful conduct is stopped or prevented by order of the Court, Petitioner(s) will suffer substantial emotional distress.

I have read the Petition and Declaration, know their contents, and verify that the statements contained therein are true to my personal knowledge and belief.
**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF HAWAI'I THAT THE FACTS AND CIRCUMSTANCES STATED IN THE PETITION AND DECLARATION ARE TRUE AND CORRECT.**

Signature of Petitioner(s): *Christina Taft*

Date: 1/12/2024     Print/Type Name(s): *Christina Taft*

1D-P-803

RevaComm 508 Certified

 Gmail

Christina Taft <taftchristina.life@gmail.com>

---

## Cease & Desist Legal Stop Notice - ADAM WALDMAN

**Christina Taft** <taftchristina.life@gmail.com>          Fri, Mar 8, 2024 at 6:21 AM
To: awaldman@theendeavorgroup.com
Cc: paulbarresi@aol.com

RE: **DEMAND TO CEASE AND DESIST**

Dear Mr. Adam Waldman and Mr. Paul Barresi:

      We are writing on behalf of Christina Taft (hereinafter "Ms. Taft").

      Ms. Taft has informed our office that you have made false statements that impugn Ms. Taft's reputation and invade her right to privacy. As a result of your actions, Ms. Taft has suffered severe emotional distress and professional embarrassment.

      We are in receipt and in possession of your multiple YouTube videos and postings, which make taunting, egregious, and derogatory comments about Ms. Taft. Your contemptuous actions against Ms. Taft exhibit a clear intrusion of **Ms. Taft's solitude where you have appropriated her name and, or likeness, publicly disclosed Ms. Taft's private information and alleged facts, and committed all against Ms. Taft in a false light.**

      In Hawaii, the State Constitution affords its citizens the right to privacy as well as the right for persons to be secure against an invasion of privacy. Hawaii further recognizes a cause of action for invasion of right of privacy where defendant uses "plaintiff's name or picture **for commercial purposes."** See 50 H. 374, 441 P. 2d 141. See also Fergerstrom v. Hawaiian Ocean View Estates, 441 P.2d 141 (Haw. 1968), which the Hawaii State Supreme Court found that "[t]he use of . . . photographs and the names of the plaintiffs . . . was without the prior knowledge and consent of plaintiffs and constitutes multiple continuing and multifarious violations of plaintiffs' right of privacy, by reason of which plaintiffs have been held up to public exposure and ridicule, their right of privacy has been invaded."

      A corporation is **liable for the violations its employees or agents commit in its interest.** Corporate officers, employees, and agents are individually liable for the violations they commit, for the violations they conspire to commit, for the foreseeable unlawful objectives their coconspirators commit, for the unlawful objectives whose commission they aid and abet, and for the violations whose perpetrators they assist after the fact.

      **Co-Defendants entered into an agreement, whether explicit or implied, to implicate to false facts and the unlawful objectives of edited audio tapes and invasions of privacy.** Co-Defendants' agreement was and is intended to accomplish an unlawful objective.

      Acting in concert, the purpose of Co-Defendants' agreement was and is to harm in furtherance of achieving their avaricious, malicious, and unlawful objectives. Co-Defendants are liable for the actions of themselves and of one another in furtherance of their conspiracy and underlying torts. Co-Defendants' invasions were intentional, malicious and oppressive, and designed specifically to damage Ms. Taft.

     Based upon the aforementioned facts, theses actions may be construed as **deceptive trade practices in violation of the Uniform Deceptive Trade Practices Act**, pursuant to the Hawaii Revised Statutes. Thus, we have advised Ms. Taft of any and all available legal remedies, including

filing a complaint with the State of Hawaii's licensing board at the Department of Commerce and Consumer Affairs, Federal Trade Commission, and pursuing this matter in a court of competent jurisdiction.

Your statements, harassing emails, and actions would justify Ms. Taft in seeking and  obtaining a restraining order for harassment. Harassment is defined by Hawai'i Revised Statutes  as, "an intentional or knowing course of conduct directed at an individual that seriously alarms or  disturbs consistently or continually bothers the individual, and that serves no legitimate purpose;  provided that such course of conduct would cause a reasonable person to suffer emotional distress."

DEMAND IS HEREBY MADE, that you immediately RETRACT and REMOVE all of your published, written, or audio form related to this matter and, furthermore, CEASE and DESIST  from making any and all statements, either oral or writing, in video or audio format, that falsely  defame and, or, harass Ms. Taft in any manner of whatsoever description to include but not limited  to, online or social media formats. In addition, you are to CEASE and AVOID any and all further  contact with Ms. Taft.

Our office has advised Ms. Taft of her legal rights and remedies as discussed in this  correspondence, and should you not comply with this demand and continue with any of the  wrongful conduct referenced in this letter, Ms. Taft is prepared to seek legal action against you.

Thank you for your immediate attention to this matter.

Assisted by Bervar & Jones: Attached Letter



**Cease.Desist_Invasion of Privacy Waldman.pdf**
120K

# BERVAR & JONES

### Attorneys at Law ● A Law Partnership

ALAKEA CORPORATE TOWER

1100 ALAKEA STREET, 20TH FLOOR

HONOLULU, HAWAII  96813

_____

PHONE: (808) 521-7724

TOLL FREE: (800) 699-9016

FAX: (808) 550-4991

## February 8, 2024

Paul Baressi

9648 Nova Pl

Rancho Cucamonga, CA 91730-0982

RE:    **DEMAND TO CEASE AND DESIST**

Dear Mr. Baressi:

We are writing on behalf of Christina Taft (hereinafter "Ms. Taft").

Ms. Taft has informed our office that you have made false statements that impugn Ms. Taft's reputation and invade her right to privacy. As a result of your public and online statements, Ms. Taft has suffered severe emotional distress and professional embarrassment.

We are in receipt and in possession of your multiple YouTube videos and postings, which make taunting, egregious, and derogatory comments about Ms. Taft. Your contemptuous actions against Ms. Taft exhibit a clear intrusion of Ms. Taft's solitude where you have appropriated her name and, or likeness, publicly disclosed Ms. Taft's private information and alleged facts, and committed all against Ms. Taft in a false light. In Hawaii, the State Constitution affords its citizens the right to privacy as well as the right for persons to be secure against an invasion of privacy. Hawaii further recognizes a cause of action for invasion of right of privacy where defendant uses "plaintiff's name or picture for commercial purposes." See 50 H. 374, 441 P. 2d 141. See also Fergerstrom v. Hawaiian Ocean View Estates, 441 P.2d 141 (Haw. 1968), which the Hawaii State Supreme Court found that "[t]he use of . . . photographs and the names of the plaintiffs . . .  was without the prior knowledge and consent of plaintiffs and constitutes multiple continuing and multifarious violations of plaintiffs' right of privacy, by reason of which plaintiffs have been held up to public exposure and ridicule, their right of privacy has been invaded."

Your statements, harassing emails, and actions would justify Ms. Taft in seeking and obtaining a restraining order for harassment. Harassment is defined by Hawai'i Revised Statutes as, "an intentional or knowing course of conduct directed at an individual that seriously alarms or disturbs consistently or continually bothers the individual, and that serves no legitimate purpose; provided that such course of conduct would cause a reasonable person to suffer emotional distress."

DEMAND IS HEREBY MADE, that  you immediately RETRACT and REMOVE all of your social media posts on YouTube and, or on any other online platform, blog, sign or other

published, written, or audio form related to this matter and, furthermore, CEASE and DESIST from making any and all statements, either oral or writing, in video or audio format, that falsely defame and, or, harass Ms. Taft in any manner of whatsoever description to include but not limited to, online or social media formats. In addition, you are to CEASE and AVOID any and all further contact with Ms. Taft.

Our office has advised Ms. Taft of her legal rights and remedies as discussed in this correspondence, and should you not comply with this demand and continue with any of the wrongful conduct referenced in this letter, Ms. Taft is prepared to seek legal action against you.

Thank you for your immediate attention to this matter.


Sincerely,


Jonathan Inciong, Esq.
BERVAR & JONES


cc:    C. Taft (HI-SXP-342)

**PROOF OF SERVICE**

On the date set forth, I served the foregoing document(s) described as:

1. Second EX PARTE APPLICATION AND MEMORANDUM FOR
   EXTENSION OF TIME TO SERVE DEFENDANT ADAM R. WALDMAN
   AND SERVICE BY MAIL AND PUBLICATION PURSUANT TO FRCP
   4(m) AND 6(b); Declaration in Support; Exhibits in Support; [Proposed] Order
   BY NOT MORE THAN 30 DAYS; via Mail and Email, Local Rules, (L.R. 5-
   3), on the interested parties in this action as follows:

MELISSA Y. LERNER
MEGAN MALLONEE
Attorneys for Defendant PAUL BARRESI
**By Mail:**
MELISSA Y. LERNER
MEGAN MALLONEE
LAVELY & SINGER PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
2049 CENTURY PARK EAST, SUITE 2400
LOS ANGELES, CALIFORNIA 90067-2906

**By Electronic Service:**
mlerner@lavelysinger.com, mmallonee@lavelysinger.com
[X] BY FEDERAL EXPRESS: I am "readily familiar" with the practice of
collection and processing correspondence for Federal Express. Under that practice
it would be deposited with FedEx on that same day with all costs fully prepaid in
the United States, in the ordinary course of business.
[X] ELECTRONIC SERVICE: I served the on the parties listed via electronic
service in accordance with the applicable rules (Local Rule 5-3).

Dated: March 24, 2025

*Christina Taft in Propria Persona*

*United States*

_____
1
PROOF OF SERVICE EXTENDING TIME TO SERVE DEFENDANT ADAM WALDMAN FRCP 6(b)