UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CHRISTINA TAFT,<br><br>Plaintiff,<br><br>v.<br><br>PAUL BARRESI, et al.,<br><br>Defendants. | Case No. 5:24-cv-01930-TJH (DTB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |

This Report and Recommendation is submitted to the Honorable Terry J. Hatter, Jr., United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I.

# BACKGROUND

On September 7, 2024, Plaintiff Christina Taft ("Plaintiff"), proceeding pro se, filed a Complaint ("Complaint"), alleging twelve claims against defendants Paul Barresi ("Barresi") and Adam R. Waldman ("Waldman") (Barresi and Waldman are collectively referred to herein as "Defendants").  (Docket No. 1).[1]  The Complaint alleges that after April 2020 and through September 2024, defendant Barresi, a private investigator, and defendant Waldman, the owner of The Endeavor Group and an agent for John C. Depp,[2] engaged in coercive conduct, intimidation, and threats against Plaintiff and "potential witnesses," "interfered with reports to [the] FBI and with the witnesses to attempt to set up certain individuals, intentionally and negligently, to set up the wrong people, with an attempt to frame them for wrongdoing," utilized interstate communications to further their fraudulent scheme, tampered with evidence "relevant to an ongoing investigation by the FBI and Bureau of Security and Investigation Services through the Department of Consumer Affairs," tampered with witnesses, victims, and informants "with the intent to hinder, delay, or prevent communication to law enforcement authorities," and conspired to invade the privacy of, use the name or likeness of, harass, neglect, and

---

[1] The Complaint alleges the following claims:  (1) Civil conspiracy; (2) obstruction of justice, tampering with a witness, victim or informant (18 U.S.C. § 1512(b)(1) and (b)(2)); (3) invasion of privacy (California Constitution, Article 1, Section 1); (4) use of name or likeness (Cal. Civ. Code § 3344); (5) civil harassment (Cal. Code Civ. P. § 527.6; (6) negligence, civil rights; (7) intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) interstate communications (18 U.S.C. § 875); (10) interstate and foreign travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952); (11) destruction, alteration, or falsification of records (18 U.S.C. § 1519); and (12) Civil RICO Act, racketeering activity (18 U.S.C. §§ 1961, 1962).  (Complaint at 1).

For the parties' pleadings and exhibits, the Court cites to the CM/ECF pagination at the top of each page.

[2] Plaintiff clearly is referring to the actor known as Johnny Depp.

2

intentionally and negligently inflict emotional distress on Plaintiff.  (See Complaint at 6-77).[3]

On September 19, 2024, the Court ordered service of the Summons and Complaint on Defendants.  (Docket No. 6).  On September 26, 2024, Plaintiff served the Summons and Complaint on defendant Barresi.  (Docket No. 7).  On October 16, 2024, Plaintiff filed a motion seeking an order allowing service by publication on defendant Waldman, which the Court denied on the same date.  (Docket Nos. 8-9).[4]

On October 24, 2024, Plaintiff filed an "Emergency Motion for Preliminary Injunction" ("Motion for Preliminary Injunction"), with four supporting exhibits (Docket No. 15).[5]

On November 6, 2024, Plaintiff filed a Motion to Amend the Complaint and Continued Injunction Requests.  (Docket No. 18).  On November 7, 2024, defendant Barresi filed a Motion to Dismiss the Complaint.  (Docket No. 16).  On November 13, 2024, the Court granted Plaintiff's Motion to Amend the Complaint but did not make any determination on Plaintiff's Continued Injunction Requests due to the pendency of the Motion for Preliminary Injunction.  (Docket No. 20).

/ / /

/ / /

/ / /

---

[3] The Complaint contains an extremely lengthy recitation of factual allegations.  (See Complaint at 7-76).

[4] As of March 24, 2025, Plaintiff had not served defendant Waldman with the Summons and First Amended Complaint.  (See Docket No. 54).  Although the Court has extended the time for Plaintiff to serve defendant Waldman and the First Amended Complaint, the Court still has not authorized Plaintiff to serve defendant Waldman by publication.  (Docket No. 62).

[5] The Motion for Preliminary Injunction was specifically referred to the undersigned Magistrate Judge for ruling/processing on November 21, 2024.  (Docket No. 21).

Like defendant Barresi's recent ex parte application for a temporary restraining order and Plaintiff's opposition thereto (see Docket No. 63 at 3), the Motion for Preliminary Injunction does not contain a certificate of compliance regarding the 7,000-word limit set forth in Central District Local Rule 11-6.1, in violation of Central District Local Rule 11-6.2.

On November 30, 2024, Plaintiff filed a First Amended Complaint ("FAC"), alleging nine claims against Defendants. (Docket No. 23).[6] Based on the filing of the FAC, on December 2, 2024, the Court denied defendant Barresi's Motion to Dismiss the Complaint as moot. (Docket No. 24).

On December 13, 2024, defendant Barresi filed an Opposition to Motion for Preliminary Injunction ("Opposition"). (Docket No. 25).[7]

On December 23, 2024, the Court issued a Report and Recommendation. (Docket No. 28). Plaintiff filed an Objection to the Report and Recommendation ("Objection") based, in part, on her lack of an opportunity to file a Reply to the Opposition. (Docket Nos. 33, 34). On January 15, 2025, the Court vacated that Report and Recommendation based on the Objection. (Docket No. 35).[8]

On January 30, 2025 (pursuant to the Court's January 15, 2020 Order, Docket No. 35 at 1), Plaintiff filed a Reply to the Opposition ("Reply") (Docket No. 39 at 1-26), with numerous attached exhibits (Docket No. 39-1).[9] On March 12, 2025 (pursuant to the Court's February 11, 2025 Order, Docket No. 41), defendant Barresi filed a Sur-Reply to the Reply ("Sur-Reply") (Docket No. 51), accompanied by the Declaration of Paul Barresi, dated March 12, 2025 ["Barresi Decl."], with twelve

---

[6] The FAC alleges the following claims: (1) Civil conspiracy; (2) Civil Rights Act (42 U.S.C. § 1983); (3) Civil RICO Act, racketeering activity (18 U.S.C. §§ 1961, 1962); (4) invasion of privacy (California Constitution, Article 1, Section 1, 1800); (5) use of name or likeness (Cal. Civ. Code § 3344); (6) civil harassment (Cal. Code Civ. P. § 527.6); (7) negligence, civil rights; (8) intentional infliction of emotional distress; and (9) negligent infliction of emotional distress. (FAC at 1). The FAC contains allegations which appear to be similar to those in the Complaint. (See FAC at 7-79).

[7] On December 13, 2024, defendant Barresi filed a Motion to Dismiss the FAC. (Docket No. 26). That Motion to Dismiss is under submission.

[8] The Court stated that, since Plaintiff is being given the opportunity to file a Reply to the Opposition, the Court will not consider any statements or arguments in the Objection, or any exhibits attached to the Objection, which concern the merits of the Motion for Preliminary Injunction. (Docket No. 35 at 2).

[9] The Reply contains an "Index of Exhibits (Appendix)" (Docket No. 39 at 27-28) which is confusing and disorganized. Exhibit Numbers in the Appendix are repeated (i.e., Exhibits O and H), and do not totally match Exhibit Numbers referenced in the Reply.

attached exhibits (Docket No. 51-1), the Declaration of Angela Gayle, dated March 12, 2025, with one attached exhibit (Docket No. 51-2),[10] the Declaration of Melissa Y. Lerner, dated March 12, 2025, with twenty-three attached exhibits ("Docket No. 52),[11] and Evidentiary Objections to Exhibits attached to the Reply ("Evidentiary Objections") (Docket No. 51-3).[12]

For the reasons set forth below, the Court recommends that the Motion for Preliminary Injunction be denied.

## II.

## EVIDENTIARY OBJECTIONS

Defendant Barresi asserts evidentiary objections to most of the exhibits submitted in the Reply.  (See Evidentiary Objections at 2-6).

Defendant Barresi initially objects to the exhibits submitted in support of the Reply based on their non-responsiveness to arguments made in the Opposition. (Evidentiary Objections at 2).  Defendant Barresi notes that the Court, in its Order dated January 15, 2025, limited Plaintiff to "rebuttal evidence" in the Reply.  (Id., citing Docket No. 35 at 1 ["Pursuant to Central District Local rule 7-10, Plaintiff's

---

[10] The Declaration of Angela Gayle submitted with the Reply has the same issues as the Declaration of Angela Gayle submitted with defendant Barresi's ex parte application for a temporary restraining order (see Docket No. 63 at 4).  The declaration was not hand-signed by non-party witness Angela Gayle, in violation of Central District Local Rule 5-4.3.4(a)(3), and Angela Gayle is not her full name.

 In any event, the statements in Angela Gayle's Declaration are not particularly helpful to the Court's resolution of the Motion for Preliminary Injunction.

[11] Melissa Y. Lerner, defendant Barresi's counsel of record, still has not notified the Court of her name change (see Docket No. 63 at 3), in violation of Central District Local Rule 83-2.4.

 The numerous exhibits attached to Ms. Lerner's Declaration (Exhibits 1 through 23) are not helpful to the Court's resolution of the Motion for Preliminary Injunction.

[12] The Court will address the Evidentiary Objections in the next section.

 Subsequent to the filing of all pleadings related to the Motion for Preliminary Injunction, defendant Barresi filed an ex parte application for a temporary restraining order against Plaintiff. (Docket No. 57).  On April 8, 2025 (following the filing of opposition papers, see Docket Nos. 58, 61), the district court denied that ex parte application.  (Docket No. 63).

Reply can contain 'declarations and other rebuttal evidence,' which means that any evidence presented not as 'rebuttal evidence' is not permitted."]).

Since certain exhibits submitted with the Reply were also submitted with the Motion for Preliminary Injunction, such as the Declaration of Mike McCormick dated October 24, 2024 (see Motion for Preliminary Injunction at 26-30; Docket No. 39-1 at 22-26) and a social media post by defendant Barresi on October 2, 2024 (see Motion for Preliminary Injunction at 36; Docket No. 39-1 at 45), the Court agrees with defendant Barresi that such exhibits do not constitute rebuttal evidence. Consequently, defendant Barresi's objections to such evidence are SUSTAINED.

However, the remainder of the exhibits submitted with the Reply arguably are responsive to arguments made in the Reply.    Therefore, defendant Barresi's objections to such evidence are OVERRULED.

Defendant Barresi objects to entire exhibits or portions of exhibits, including objections based on improper expert testimony, inadmissible hearsay, relevancy, and lack of foundation under Federal Rules of Evidence 401, 602, 701, 801, 802, and 901, and an objection based on improper opinion under Central District Local Rule 7-7.  (Evidentiary Objections at 2-6).  A district court "may give even inadmissible evidence some weight when to do so serves the purpose of preventing irreparable harm before trial."  Flynt Distrib. Co., Inc. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984) (citation omitted);  see also  New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d 878, 883 (Fed. Cir. 1992) ("Because severe time constraints are usual, the Supreme Court has recognized that a motion for a preliminary injunction must customarily be decided 'on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.'") (quoting University of Texas v. Camenisch, 451 U.S. 390, 395 (1981)). Accordingly, defendant Barresi's objections to such exhibits are OVERRULED, and the Court will give such exhibits such weight as might be warranted.

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## DISCUSSION

### A.    The Motion for Preliminary Injunction Should be Denied.

Plaintiff seeks a preliminary injunction "to protect against ongoing harassment and intimidation from Defendants."[13]    (Motion for Preliminary Injunction at 2; see id. at 3 (alleging a preliminary injunction is being sought "to prevent contact with Plaintiff or legal consultants, stop interference and corrupt persuasion, [] to prevent unauthorized lookups of phone numbers, and to prevent intimidation of Plaintiff, [k]ey [w]itnesses, [p]rivate investigators, individuals, [and] legal consultants"), 5 (alleging that a preliminary injunction preventing improper communication will prevent the potential harm of intimidation and harassment of Plaintiff and witnesses, emotional distress to Plaintiff, increased legal costs to Plaintiff, and delay of legal proceedings), 11 ("Plaintiff respectfully requests an injunction to enforce communication restrictions, as the Defendants are a represented party."); see also Reply at 4 ("Immediate injunctive relief is warranted by the evidence, which illustrates [defendant Barresi's] pattern of coercing and intimidating witnesses."); 17 ("[Defendant Barresi's] actions, which include invasive and blackmail-like tactics, have demonstrably caused individuals to fear for their safety and go into hiding.  Such conduct is not a legitimate or lawful activity but rather a deliberate attempt to intimidate witnesses and victims, warranting judicial intervention."), 24 (alleging that the Court "should consider granting that [defendant] Barresi cannot directly contact potential witnesses and/or victims, and that [defendant Barresi] must employ a licensed intermediary for contacting that is

---

[13] Although Plaintiff seeks a preliminary injunction against Defendants, defendant Waldman has not been served with the Summons and Complaint, as noted above.  Therefore, a preliminary injunction against defendant Waldman would not be appropriate.  In any event, it does not appear that Plaintiff continues to seek a preliminary injunction against defendant Waldman. (See Reply at 4-24).

7

verified as a private investigator by the Department of Public Safety"; and "Plaintiff respectfully requests that [the Court] "grants this protective motion in its entirety and issues a writ to protect witnesses and victims, whether they have come forward voluntarily presently or in the past."). Plaintiff alleges that a preliminary injunction is urgent: "The urgency of this request is underscored by the need to prevent further harm to Plaintiff and key witnesses, including retired LAPD Licensed Private Investigator Mike McCormick, who has already been subjected to intimidation tactics post-service of the lawsuit." (Id. at 2; see also Reply at 4 ("[Defendant Barresi's] intimidation and harassment, during these proceedings enlightening Obstruction of Justice of cases, has escalated and continued, with five witness declarations McCormick, Herndon, Beaton, Kountz, Eicher and two additional witnesses Nitrini and Sarabia in emails (with continuing harassment as recent as January 28, 2025."), 5 ("Licensed private investigators, witnesses, and victims declare urgent need for protection for equitable consideration."), 9 ("Plaintiff presents continuing evidence of [defendant Barresi's] ongoing threats against Plaintiff and witnesses, including intimidation tactics involving coercive communication and threats of physical harm, references to organized crime, and systematic efforts to obstruct justice by manipulating testimony and destroying evidence."), 22 ("In order to prevent further obstruction of justice, immediate injunctive relief is warranted by the urgency of [defendant Barresi's] threats")).

Attached to the Motion for Preliminary Injunction are the following exhibits: (1) A four-page Declaration of Mike McCormick, dated October 24, 2024 ("McCormick Decl."); (2) an email from Melissa Lerner, defendant Barresi's retained attorney, to Plaintiff on October 16, 2024, stating that: "Now that I have been retained by Mr. Barresi, all correspondence related to this matter will be from me or someone else in my office at my direction.;" (3) a document Plaintiff describes as an incoming call which shows "Plaintiff's legal consultant firm's employees were

8

called on October 17th, 2024 through [d]efendant Barresi finding their private phone number with an unauthorized lookup (Motion for Preliminary Injunction at 2; see also id. at 10 (alleging that the incoming call evidences that on October 17, 2024, defendant Barresi "conduct[ed] an unauthorized lookup to find the private phone number of Plaintiff's legal consultants")); and (4) a social media post by defendant Barresi on October 2, 2024 which, after identifying this action, states, in an apparent reference to defendant Waldman, "I'm not a hitman. I don't care what the undertaker says." (See Motion for Preliminary Injunction at 25-36).[14]

Attached to the Reply are the following exhibits (in a different order than presented): (1) An eight-page Declaration of Ian Herndon ("Herndon Decl."), dated January 10, 2025; (2) a seven-page Declaration of Molly Beaton ("Beaton Decl."), dated January 13, 2025, with two attached exhibits; (3) a two-page Declaration of Erik Eichler ("Eichler Decl."), dated November 6, 2024; (4) the four-page Declaration of Mike McCormick, dated October 24, 2024; (5) a four-page Declaration of Michael Kountz ("Kountz Decl."), dated November 4, 2024; (6) an e-mail from Mario Nitrini to Plaintiff, dated January 4, 2025, stating, in part, that: "It is this post of mine (which included an attachment) where I screenshot [defendant] Barresi's post about my son. My son got involved with the wrong crowd. A gang murder took place and my son testified for the prosecution. Because [defendant] Barresi posted his post pertaining to my son and me, some very bad people have been looking for me. I'm very seriously contemplating filing a criminal complaint on [defendant] Barresi for attempted murder." (Docket No. 39-1 at 40). Plaintiff describes that email as follows: "Mario Nitrini has provided evidence of

---

[14] In the Motion for Preliminary Injunction, Plaintiff did not make any attempt to explain how defendant Barresi's October 2, 2024 post supported her argument that defendant Barresi "continued to intimidate witnesses" after being served with the lawsuit. (See Motion for Preliminary Injunction at 3).

Barresi's threats against him and his family, for being a witness in the case and receiving a request for a declaration, including a 'mortal danger threat' related to his involvement in a gang murder case and testifying for the prosecution." (Reply at 15); (7) A Request for Civil Harassment Restraining Orders against defendant Barresi, filed by Richard Albertini in the Los Angeles County Superior Court on September 13, 2022, describing defendant Barresi's harassment as "[h]e called to say he would kill me and showed up a[t] house"; a Notice of Court Hearing filed on September 13, 2022, relating to that restraining order request (a temporary restraining order was partly granted and partly denied on the grounds that the threats were verbal and there was no actual violence); a social media post by defendant Barresi on July 9 of an unspecified year, stating: "Albertini is a reminder we must be careful about who they sidle up with. He was one of the first people I interviewed. It took me two second to realize he has zero credibility. His actions on social media stems from an improper and evil motive, with malice, to do others harm."; messages (texts?) presumably from defendant Barresi to an unknown person on October 16 of an unspecified year, calling the unknown person a "fucking moron" and stating that "[i]f you ever contact me again it will be an Enquirer headline and it will be broadcast as well promise you"; a reply by defendant Barresi to a tweet by Corey Feldman on an unknown date, stating that, "I got that scumbag Richard Albertini where you want him too."; a tweet by defendant Barresi on an unknown date, stating: "Richard Albertini, who Amber Heard fans love, brutally tormented and mentally abused his own sick ailing mother so much, she had to be hospitalized. His allegations against Johnny Depp are as baseless as is he. Not a more cowardly, weakling of a little man has ever breathed air."; and a transcription of an in-person conversation between defendant Barresi and Richard Albertini, which apparently took place on July 1, 2022, in which Mr. Albertini asked defendant Barresi, "Why don't you come in?" and defendant Barresi responded, "I say you want to see a right

hook coming across your fucking ugly head?," to which Mr. Albertini replied, "Well, you're saying you're going to hit me?"  Plaintiff describes that exhibit, which she labels "Exhibit of History of Restraining Orders Against Barresi" (Docket No. 39 at 27), as follows:  "[Richard] Albertini demonstrates a pattern of intimidation and threats, detailing Barresi's unlawful conduct.   It describes ongoing witness intimidation by Barresi and Waldman, utilizing audio recordings to prevent testimony into 2024.  The witness recounts firsthand experiences of threats and coercion aimed at suppressing testimony against Johnny Depp, as well as eyewitness accounts of violent incidents against both women and men that were instigated by Depp and his associates in the Viper Room.   [¶] Judge issued a restraining order in Burbank, CA, protecting victim Richard Albertini from Barresi's violence.   The filing threats of violence by Barresi 'working for Johnny Depp, threatening to shoot him, and to hit him across the head substantiated in recording. (Exhibit Q)."  (Reply at 11);[15] (8) under the description "Barresi's 'Kill' Audio" (Docket No. 39 at 28), a transcription of a portion of an undated audiotape wherein Richie Albertini, who was on trial, when asked about whether he had a copy of a current report in Burbank, responded that:  "My colleague who is in possession of all the records and files, a woman, she's been receiving death threats from Paul Barresi.  She was supposed to be here this morning, but she was unable to make it.  She's scared.  Her name is Christina Taft."; and a social media post by defendant Barresi on December 28, 2024, stating:  "Despite a California State Judge denying [Plaintiff's] cohort Richie Albertini's request for a restraining order in Oct 2022- accusing me of murder, mayhem & worse-two years later, she's got no qualms about selling the same bill of goods to a United States Judge."; (9) two social media posts by defendant Barresi on January 2, 2025.  The first post contains a photograph of Plaintiff with Amber Heard

---

[15] No Exhibit Q is submitted with the Reply.

and an image of a flight path (according to Plaintiff, defendant Barresi "publicly tracked flight paths between Plaintiff's off-record address in Antibes, France to Madrid," Reply at 16), and states that "[Plaintiff] has allegedly already begun to upset people in France, I am informed." According to Plaintiff, "[Defendant] Barresi is controlling who may declare or may not declare and this alerts to of the danger that others could be monitoring Plaintiff's relationships even outside of the United States, which Defendant Barresi directed her to flee from." (Reply at 16). The second post states: "Recording linked is Richie Albertini & [Plaintiff] rehearsing a Lie on Paul Barresi to post on social media but ends with him instructing her how to win Jalee Carder over by convincing Robert Pastorelli's baby mama Barresi is out to kill AH."; (10) an enlarged image of the flight path which was presumably contained in defendant Barresi's first January 2, 2025 social media post discussed above; and a November 2018 coroner's report for Victoria Taft, Plaintiff's mother;[16] (11) a social media post by defendant Barresi on January 2, 2025 (which Plaintiff labeled "Exhibit of Further [A]buse Related to Mother," Docket No. 39 at 27), stating: "I could not agree with you more. You will find very few people on the planet that would disagree with you. To my mind, not a more evil human has ever breathed air. She and her cohorts. All fucking rotten demons." Plaintiff appears to describe defendant Barresi's comments as "inflammatory and deeply personal remarks about [ ] Plaintiff's deceased mother" and "threatening [Plaintiff's] mortality (Reply at 16; (12) a social media post by defendant Barresi on January 4, 2025, stating that "Brain dead people cost lives, or they are so f—kin wrapped up in themselves, they have no concern for other people. Hmmm …Sounds like these two wretches[,]" and accompanied by a photograph of Amber Heard "with lunatic fan [Plaintiff]." Plaintiff states that calling Amber Heard and Plaintiff "brain dead" and

---

[16] Plaintiff does not attempt to tie this exhibit to defendant Barresi's allegedly harassing conduct.

"wrenches" "clearly aims to intimidate and harass." (Reply at 17); (13) a social media post by defendant Barresi on December 19, 2024, stating: "Cowards. Every fucking one of them[,]" which Plaintiff states was "in reference to documents he obtained regarding [Plaintiff's] mother, Victoria's lawsuit against Walt Disney Co., et al." and "made in conjunction with his unauthorized access to litigation records, underscores [defendant Barresi's] pattern of intimidation and coercive conduct" (Reply at 17); (14) the social media "undertaker" post by defendant Barresi on October 2, 2024. According to Plaintiff, "'undertaker' in contemporary usage denotes a coroner or an individual who is responsible for the deceased," defendant Barresi "is effectively trivializing the fears of those speaking out and reinforcing the impending threat of violence or retaliation by saying, 'I don't care what the undertaker says,' thereby dismissing concerns about life and death," and "I'm not a hitman," which is an "alteration of Al Capone's infamous denial of murder—'I'm not a killer,'" "is an unmistakable reference to organized crime, contract murders, and suppression of opposition," and "conveys a calculated message of power, dread, and potential consequences for those involved in this case, rather than mere defiance." (Reply at 17-18); (15) an email from Mike McCormick to Plaintiff on October 17, 2024, stating: "You might want to talk to your attorney regarding the voice mails left for me by Barresi. You can probably file a complaint for 'intimidating/threatening a witness (me).'"; (16) a portion of an undated text message from Rebecca Berry to Plaintiff, stating in pertinent part: "[Plaintiff] I think he hired a hitman to kill me[.] [I]'m serious[.] [I] may be paranoid but [I] don't think so[.] Call me when you can[.] [Paul] Barresi. [S]omething really fucking weird and terrifying just happened to me[.] [I]'m ok but I think I came very close to being raped and murdering[,] murdered, and [I] just freaked out[.]"; (17) an email from Antonio Sarabia, Plaintiff's former attorney, to Plaintiff on January 27, 2025, stating: "Barresi just called me. He had questions about communications with Paul

George.  I said I had been your lawyer and was not going to answer any of his questions.  He did not like that and said he would talk to me face to face.  [¶] Even if he comes to my office, I will not be answering any questions or holding a conversation with him."  According to Plaintiff, defendant Barresi's behavior was "an apparent attempt to intimidate through an escalation to demand an involuntary face-to-face meeting" (Reply at 7) and "demonstrates escalating and ongoing threat of intimidating behavior and aggression to prevent legal aid to [defendant] Barresi's victims" (Reply at 16); (18) Plaintiff's "Petition for Ex Parte Temporary Restraining Order and for Injunction," filed in the District Court of the Third Circuit in Hawaii on January 21, 2025; and the District Court's Temporary Restraining Order Against Harassment, dated January 22, 2025, finding there was probable cause to believe that defendant Barresi engaged in recent or past acts of harassment, and ordering, among other things, that defendant Barresi and anyone acting on his behalf not to contact, threaten, or physically harass Plaintiff or anybody residing at Plaintiff's residence, not to telephone Plaintiff, and not to enter or visit Plaintiff's residence or place of employment; and (19) An "Accusation and Petition to Revoke Probation," dated July 7, 2011, filed with the Department of  Consumer Affairs for the Bureau of Security and Investigative Services in the State of California, alleging that in the course of business in April and/or May 2010, defendant Barresi, among other things, made false statements, published a slander or a libel in the course of business, manufactured evidence, and made a false report, and seeking the revocation of defendant Barresi's investigator license issued on  September 2, 2009; and a Decision and Order, dated December 7, 2011 and effective on January 7, 2012 adopting a Stipulated Settlement and Disciplinary Order admitting all charges against defendant Barresi and revoking defendant Barresi's private investigator license.  (Docket No. 39-1).

/ / /

1        1.    <u>Applicable Law.</u>

2        A preliminary injunction is "an extraordinary and drastic remedy, one that

3    should not be granted unless the movant, *by a clear showing*, carries the burden of

4    persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (per curiam) (citation

5    omitted; italics in original); <u>see also</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S.

6    7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded

7    as of right.") (citation omitted).  "A plaintiff seeking a preliminary injunction must

8    establish that he is likely to succeed on the merits, that he is likely to suffer

9    irreparable harm in the absence of preliminary relief, that the balance of equities tips

10    in his favor, and that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20;

11    <u>see</u> <u>Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.</u>, 609 F.3d 975, 982

12    9th Cir. 2010) (citing <u>Winter</u>, 555 U.S. at 20).[17]  The same standard applies to both

13    preliminary injunctions and temporary restraining orders.  <u>Niu v. United States</u>, 821

14    F. Supp. 2d 1164, 1167 (C.D. Cal. 2011); <u>see also</u> <u>Stuhlbarg Int'l Sales Co., Inc. v.</u>

15    <u>John D. Brush & Co., Inc.</u>, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (the standards for

16    issuing a preliminary injunction are "substantially identical" to the standards for

17    issuing a temporary restraining order).  A plaintiff must "make a showing on all four

18

19

20        [17] The Ninth Circuit has provided an alternative formulation:  If the moving party "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest," he

21    or she may demonstrate his or her right to a preliminary injunction by establishing "'serious

22    questions going to the merits' and a balance of hardships that tips sharply [in his or her favor]."

23    <u>Farris v. Seabrook</u>, 677 F.3d 858, 864 (9th Cir. 2012) (as amended) (quoting <u>Alliance for the Wild</u> <u>Rockies v. Cottrell</u>, 632 F.3d 1127, 1135 (9th Cir. 2011)).  "Some district courts have observed

24    that <u>Cottrell</u> may be in tension with the Supreme Court's decision in <u>Winter</u>, as well as the Ninth Circuit's adoption of <u>Winter</u>[.]"  <u>P.P. v. Compton Unified. Sch. Dist.</u>, 135 F. Supp. 3d 1126, 1135

25    (C.D. Cal. 2015) (citations omitted).  In any event, even under a "sliding scale" analysis, the

26    moving party must, at a minimum, demonstrate some chance of success on the merits.  <u>See</u> <u>Ass'n</u> <u>des Eleveurs de Canards et d'Oies du Quebec v. Harris</u>, 729 F.3d 937, 944 (9th Cir. 2013); <u>Global</u>

27    <u>Horizons, Inc. v. U.S. Dep't of Labor</u>, 510 F.3d 1054, 1058 (9th Cir. 2007).

28

prongs." Cottrell, 632 F.3d at 1135; see also DISH Network Corp. v. F.C.C., 653 F.3d 771, 776 (9th Cir. 2011) ("To warrant a preliminary injunction, DISH must demonstrate that it meets all four of the elements of the preliminary injunction test established in Winter . . . .").

Additionally, where "a plaintiff seeks a mandatory preliminary injunction that goes beyond maintaining the status quo *pendente lite*, 'courts should be extremely cautious' about issuing a preliminary injunction and should not grant such relief unless the facts and law clearly favor the plaintiff." Comm. of Cent. Am. Refugees v. INS, 795 F.2d 1434, 1441 (9th Cir. 1986) (citations omitted), amended by 807 F.2d 769 (9th Cir. 1987); see also Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("Because [the plaintiff] seeks a mandatory injunction, she must establish the law and facts *clearly favor* her position, not simply that she is likely to succeed.") (italics in original).

 2. Analysis.

  a. Likelihood of success on the merits.

Where a plaintiff is seeking a preliminary injunction based on harassment, such as here, the "merits" does not refer to the plaintiff's underlying claims but rather to the plaintiff's "ability to establish harassment that justifies injunctive relief." Jeffrey Katz Chiropractic, Inc. v. iBeat, Inc., Case No. 20-cv-02097-RS, 2020 WL 4459122, at *2 (N.D. Cal. May 26, 2020) (citing United Artists Corp. v. United Artist Studios, LLC, Case No. 2:19-cv-00828-MWF-MAA, 2019 WL 6917918, at *8 (C.D. Calk. Oct. 17, 2019). "[H]arassing speech is not protected [First Amendment] speech." Doe v. Fitzgerald, Case No. 2:20-cv-10713-MWF-RAO, 2022 WL 423495, at *4 (C.D. Feb. 2, 2022). "'When determining whether to enjoin a litigant's harassing conduct, federal district courts may look to state substantive law on harassment but apply the federal procedural rules under Federal Rule of Civil Procedure 65.'" Fitzgerald, 2022 WL 423495 at *4 (quoting Katz Chiropractic,

16

2020 WL 4459122, at *2).  Under California law, harassment is defined as follows: "[U]nlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose.  The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."  Cal. Code Civ. P. § 527.6(b)(3).

As proof of defendant Barresi's harassing conduct, Plaintiff, in the Motion for Preliminary Injunction, essentially relies on two instances.  (See Motion for Preliminary Injunction at 1-2, 10-11).  First, on September 30, 2024, after defendant Barresi was served with the lawsuit, defendant Barresi left Mike McCormick, Plaintiff's former private investigator (on June 16, 2022 Plaintiff "requested that [he] be her private investigator related to witnesses being harmed as she was alarmed to," McCormick Decl. at 1), "an aggressive voicemail in which defendant Barresi "cursed [at him] several times stating 'that PI Juan Brooks,' and claimed that 'there could have been a soft landing.'"  (McCormick Decl. at 2).  Mr. McCormick perceived defendant Barresi's comments as "a direct threat to him, a threat to other private investigators, a threat to witness, and to" Plaintiff.  (Id.).  Second, although, on October 16, 2024, Plaintiff "received reassurance from [defendant Barresi's] own [c]ounsel that all correspondence would be directed to her, and/or someone else at Lavely and Singer's office, at her direction" (Motion for Preliminary Injunction at 2, citing Motion for Preliminary Injunction at 32 [October 16, 2024 email from Melissa Lerner to Plaintiff which states in pertinent part, "Now that I have been retained by Mr. Barresi all correspondent related to this matter will be from me or someone else in my office at my direction."]), on October 17, 2024, based on defendant Barresi's unauthorized lookup of Plaintiff's legal consultants' telephone number, Plaintiff's legal consultant firm's employees were called (Motion for

Preliminary Injunction at 2, 10, citing Motion for Preliminary Injunction at 34 [an undated, alleged incoming call]).

With respect to Mr. McCormick's allegation about the September 30, 2024 voicemail, it is not clear that defendant Barresi's statements and curses were threats. Mr. McCormick does not provide any context or meaning to defendant Barresi's curses regarding private investigator Juan Brooks or to defendant Barresi's claim there "could have been a soft landing." Moreover, the last voicemail left by defendant Barresi for Mr. McCormick apparently was approximately one month before Mr. McCormick's Declaration (and approximately two months prior to the filing of the Motion for Preliminary Injunction). In addition, while Plaintiff asserts that Mr. "McCormick has knowledge and information of over 20 potential witnesses within his more than two years related to these matters" and that Mr. McCormick "identifies the harassment and threatening nature of Defendants" (Motion for Preliminary Injunction at 1-2; see also Reply at 5-8 (extensively quoting and citing to Mr. McCormick's Declaration), Mr. McCormick's Declaration is replete with conclusory, non-specific, unfocused, and hearsay statements regarding defendant Barresi's alleged harassing and intimidating conduct. Mr. McCormick's Declaration describes events which appear to have occurred two or more years before the filing of the Motion for Preliminary Injunction. (See McCormick Declaration at 1-3). Although Plaintiff relies on Mr. McCormick's October 17, 2024 email to Plaintiff to support her assertion that Mr. "McCormick received multiple voicemails, calls, and emails spanning more than two years of [defendant] Barresi's intimidation campaign, not only one" (Reply at 21, citing Docket No. 39-1), that email does not provide specific information about defendant Barresi's allegedly intimidating and/or threatening voicemails to Mr. McCormick, and that email does not resolve the problems, as noted above, with Mr. McCormick's Declaration regarding defendant Barresi's allegedly harassing and intimidating conduct towards others.

As to Plaintiff's alleged unauthorized lookup of Plaintiff's legal consultants' telephone number, it is not clear that defendant Barresi did anything improper. The image of the incoming call to Plaintiff's legal consulting firm does not indicate who made or received the call or even when the call was made, nor does it show that defendant Barresi was involved in the unauthorized lookup of a private telephone number. (See Motion for Preliminary Injunction at 34). Moreover, although Plaintiff contends that defendant Barresi has "directly contacted" Plaintiff's legal consulting firm, despite explicit instructions from his counsel to refrain from such communication (Motion for Preliminary Injunction at 4; see also id. at 10 ("[The October 16, 2024] statement illustrates the understanding and intent of [defendant Barresi's] lawyer to restrict communications through appropriate channels. [Defendant Barresi] blatantly did not comply with his lawyer's intent.")), the October 16, 2024 email from Plaintiff's retained counsel to Plaintiff did not contain instructions for defendant Barresi to refrain from directly contacting Plaintiff's legal consulting firm (see Motion for Preliminary Injunction at 32), and Plaintiff has not pointed to any other evidence which prevented defendant Barresi from contacting or attempting to contact Plaintiff's legal consulting firm or anybody else associated with this case.[18]

/ / /

---

[18] Although defendant Barresi provides an explanation for the phone call to Lucy Hana, the identified "Media Contact" (see Sur-Reply at 6 n.1, citing Barresi's Decl. at ¶¶ 27, 29, Docket No. 51-1 at 123-24) to support his assertion that he "never intended to contact a 'legal representative' for [Plaintiff] and never harassed Ms. Hana" (Sur-Reply at 6), the Court, without considering defendant Barresi's explanation, does not find that defendant Barresi's phone call constituted harassing conduct. Indeed, defendant Barresi's statements about his social media posts, his involvement in the litigation between Amber Heard and Johnny Depp, Plaintiff's alleged "harassment" of him "through frivolous litigation," Plaintiff's false allegations against him in this action, and the false allegations against him in the evidence submitted with the Reply (see Barresi Decl. at 4-16) are not particularly helpful to the Court's resolution of the Motion for Preliminary Injunction.

19

The Court will now turn its attention to the evidence submitted with the Reply, except for Mr. McCormick's Declaration, which the Court has already addressed. As discussed above, even if some exhibits submitted with the Reply may suffer evidentiary/admissibility issues, the Court will consider them for purposes of ruling on the merits of the Motion for Preliminary Injunction.

Similar to Mike McCormick's Declaration, the Declarations of Ian Herndon and Molly Beaton contain conclusory, non-specific, unfocused, and hearsay statements regarding defendant Barresi's alleged harassing and intimidating conduct. (See Docket No. 39-1 at 1-8, 9-15). Moreover, their Declarations describe events that occurred years before the filing of the Motion for Preliminary Injunction. (See id.).

The majority of the statements in Mr. Herndon's Declaration appear to be directed to allegedly harassing and intimidating conduct by defendant Barresi toward someone named Angela, who Mr. Herndon does not identify, and apparently is not a named witness in this case. (See Docket No. 39-1 at 1-6). Other than stating that Angela told him "on numerous occasions that a Hollywood Fixer, believed to be [defendant] Barresi, was sent to intimidate and silence her, and at one point he showed up where she was in person and pointed a gun at her" (id. at ¶ 19)[19], Mr. Herndon has not provided sufficient information about defendant Barresi's conduct toward Angela. While Mr. Herndon states that he has "witnessed [defendant] Barresi threaten death, mortality, and danger to people" (id. at ¶ 2), that starting in 2022 he observed defendant Barresi begin to "target" Plaintiff (id. at ¶ 37), and that he observed defendant Barresi incite Richard Albertini to "attack" Plaintiff (Docket

---

[19] For what it is worth, to the extent that the person referred to as "Angela" in Mr. Herndon's Declaration is Angela Gayle, Angela Gayle denies being harassed and/or being threatened by defendant Barresi in writing and with a gun, and she also denies telling Mr. Herndon or Molly Beaton that defendant Barresi harassed and intimidated her and pulled a gun on her. (Docket No. 51-2 at ¶¶ 2, 10).

No. 39-1 at ¶ 38), Mr. Herndon does not sufficiently describe defendant Barresi's conduct toward Plaintiff.  Moreover, Mr. Herndon's conclusory statements that Plaintiff has been in constant fear of defendant Barresi from 2022 to January 2025 (see id. at ¶ 40 ("In the last 2 years I have known [Plaintiff], she has been afraid for her life, and concerned [defendant] Barresi is going to find her or send someone to harm her.  At one point she told me she had to move out of the state of California all the way to Hawaii just for some sense of safety from [defendant] Barresi."), ¶ 42 ("From 2022 to this very day, I have observed [Plaintiff] be in constant fear of [defendant] Barresi, supported by ongoing contact by him using threatening and harassing language.")), do not support a finding that defendant Barresi engaged in harassing and intimidating conduct toward Plaintiff.

In her Declaration, Molly Beaton states that defendant Barresi continues to threaten and harass her, as evidenced by an email defendant Barresi sent her on December 28, 2024.  (Docket No. 39-1 at ¶ 1; id. at ¶ 4 ("As recent as December 28, [d]efendant Barresi has contacted me which I see as harassing, dangerous, invasion of privacy, threatening, and malicious.  His emails are eerily intimidating manipulative, and controlling.  He was trying to force me to say or do things I do not agree with.  I'm an innocent victim that was brought in related to victims of sexual assault.  [Defendant] Barresi is a criminal stalker.")).[20]  Although Ms. Beaton attempts to describe that email (see id. at ¶ 25), the Court, without the actual email, is not able to understand its contents or find that it showed that defendant Barresi engaged in threating and harassing conduct toward her.  Attached to Ms. Beaton's Declaration is an October 22, 2024 email from defendant Barresi to Molly Brown (presumably Molly Beaton) in which defendant Barresi stated:  "The alleged victim

---

[20] Although Ms. Beaton states that copies of defendant Barresi's "harassing email to [her] on December 28, 2024" and a text Angela sent to her on September 14, 2021 are attached to her Declaration (Docket No. 39-1 at ¶¶ 29-30), those documents are not attached to her Declaration.

or aka Jane Doe is really a nonentity.  Evidence shows [Plaintiff] and Albertini partnered in a scheme to accuse me of heinous felonious acts including death threats. Do you know how Albertini or [Plaintiff] came to know Jane Doe?  Whatever information you can provide to shed light on this malicious scheme is appreciated." (Docket 39-1 at 16).  While Ms. Beaton describes that email as "intimidating" (id. at ¶ 31), there is nothing in that email indicating that defendant Barresi engaged in threatening and harassing conduct toward her.

In his Declaration, Erik Eichler, a private investigator in Connecticut, states that on October 29, 2024, he drove to the residence of Rebecca M. Berry, spoke to Ms. Berry and Ms. Berry's mother in the driveway, provided Ms. Berry with a copy of the Complaint in this case and with a letter from Plaintiff requesting a Witness Declaration, that Ms. Berry's mother asked Ms. Berry, "What is this about?," to which Ms. Berry responded, "Remember that guy [Paul Barresi] who confessed to me about killing people?", and that Ms. Berry said she would contact Plaintiff or Mr. Eichler later and ended the interview.  (Docket No. 39-1 at 20-21).

Plaintiff ascribes the following meaning to Mr. Eichler's Declaration: "[Defendant] Barresi's confession about killing people serves as a clear example of how [defendant] Barresi has intentionally fostered an atmosphere of fear and danger, leading witnesses to believe they could be in physical danger if they cooperate with any legal proceedings. . . .  This strategy effectively suppresses witnesses, as they are left fearing for their lives, thus removing their ability to provide credible testimony or aid in investigation.  Rebecca Berry's reluctance to provide a formal declaration stems from her ongoing fear of [defendant Barresi]."  (Reply at 12-13). The contents of Mr. Eichler's Declaration do not support a finding that defendant Barresi has threatened or harassed Ms. Berry or anybody else.  Plaintiff simply speculates that Ms. Berry's statement about defendant Barresi's confession about killing people, as well as the text message from Ms. Berry to Plaintiff that named

defendant Barresi and stated that somebody hired a hit man to kill her and that she came close to being raped and murdered (Docket No. 39-1 at 46), shows that Ms. Berry is reluctant to provide a declaration based on Ms. Berry's fear of defendant Barresi.  (See Reply at 12-13).

The Declaration of Michael Kountz, a licensed private investigator in New Mexico, suffers from some of the same issues as the Declarations of Mike McCormick, Ian Herndon, and Molly Beaton.  (See Docket No. 39-1 at 27-30).  Mr. Kountz states that on May 1, 2023, Plaintiff contacted his company to "interview James Conner[21] regarding an audio recording contained in an edited video by [defendant] Barresi which claimed to portray a phone call between [defendant] Barresi and James Conner," and that in June 2023 he interviewed James Conner, during which James Conner stated that he was not aware he was being recorded during the phone call, that the audiotape was taken out of context, and that he did not give consent to the use of the audio recording.  (Id. at ¶¶ 1, 3-7).  Mr. Kountz further states that after the interview James Conner called to tell him that defendant Barresi was "dangerous" and that James Conner was "in fear for his life due to his involvement" and "was flying to his property in Alaska out of fear of reprisal from [defendant] Barresi[.]"  (Id. at ¶¶ 9-10).  Mr. Kountz also states the audio recording, which Mr. Kountz reviewed, contains alterations that "James Conner was an FBI agent" (James Conner said he was never an FBI agent) and that Plaintiff's mother "had witnessed a mob murder by the Gottis" and has [defendant] Barresi "discuss[ing] a photo of Amber Heard with Plaintiff [ ] to James Conner, that they were arm in arm, yet at the same time indicating danger to life through comparing to an assailant," and that "I have information that Plaintiff is still fearful to this day that this audio tape is either to make someone shoot her or shoot Amber."  (Id. at ¶

---

[21] Defendant Barresi identifies James Conner as Plaintiff's father.  (See Sur-Reply at 9).

23

11). Mr. Kountz further states that he believed that the "audio by [defendant] Barresi was exploited on purpose to be used to facilitate tactics similar to blackmail, and use of the audio, inclusive of either with fluence on the witness and/or edits, was essential for [defendant Barresi] to do this." (Id. at ¶ 2). In addition, Mr. Kountz states that on September 5, 2023, he received an email from Plaintiff containing a screenshot of a text message to Plaintiff (purportedly sent by defendant Barresi) on November 7, 2022 that stated "'Stacy is your sister' and sexual expletives," and that Plaintiff asked that he interview Stacy Hagman in Texas (who Plaintiff said was the Stacy in the text message), as Plaintiff "was fearful that [defendant Barresi] could access her." (Id. at ¶ 15). Finally, Mr. Kountz states that Plaintiff sent him emails stating that defendant Barresi "continued to harass [Plaintiff] during 2024," with one email stating 'Your Brother is a Monster,' referring probably to Sean Conner, who may be [Plaintiff's] half brother," and containing audio tapes, including a conversation between defendant Barresi and defendant Adam Waldman. (Id. at ¶ 17).

Relying on Michael Kountz's statements, Plaintiff makes the following assertions: "The audio appeared to serve a tool for intimidation, targeting Plaintiff with threats of violence, including a possible murder or harm." (Reply at 15); and "[Defendant] Barresi's use of imagery, coupled with mafia death threats and false claims about Plaintiff's mother, Victoria, being an actress who allegedly witnessed a mob hit, shows a deliberate attempt to manipulate." (Reply at 15). Plaintiff's assertions are conclusory and speculative. Moreover, Plaintiff's assertion that she "still fears for her safety due to the content of the tape, which she believes could incite someone to act violently against her" (Reply at 15) does not serve to establish that defendant Barresi engaged in harassing conduct toward Plaintiff.

Plaintiff's apparent reliance on the District Court of the Third Circuit in Hawaii's grant of Petitioner's Petition for Ex Parte Temporary Restraining Order

against defendant Barresi (see Docket No. 39-1 at 35-37) falls short of showing harassing and intimidating conduct by defendant Barresi in this case.[22]    That Temporary Restraining Order was granted "[b]ased upon the Petition for Ex Parte Temporary Restraining Order and Declaration of Petitioner(s)[.]" (Id. at 35). That Petition for Ex Parte Temporary Restraining Order contains Plaintiff's supporting Declaration, wherein Plaintiff provided minimum information about defendant Barresi's recent or past acts of harassment and/or threats of harassment, and did not provide any supporting evidence. (See id. at 47-48). While the district court's grant of that Temporary Restraining Order against defendant Barresi may be, at best, minimally relevant to the issue at hand, it is insufficient to establish harassing conduct by defendant Barresi for purposes of the preliminary injunction being sought by Plaintiff in this Court.

Finally, the remainder of the exhibits -- the December 9, 2024 email from Mario Nitrini to Plaintiff (Docket No. 39-1 at 40); documents related to Richard Albertini's September 13, 2022 application for a temporary restraining order against defendant Barresi (id. at 78-86); defendant Barresi's undated social media statements and/or messages about Mr. Albertini and/or defendant Barresi's July 1, 2022 in-person statements to Mr. Albertini (id. at 87-91); Mr. Albertini's undated in-court statement about Plaintiff's fear of defendant Barresi (id. at 18); defendant Barresi's December 28, 2024 social media post (id. at 19); defendant Barresi's two January 2, 2025 social media posts (id. at 32, 38); the enlarged image of the flight path presumably contained in one of defendant Barresi's January 2, 2025 social media posts (id. at 63); November 2018 coroner's report for Plaintiff's mother (id.

---

[22] Although Defendant states that Plaintiff's prior ex parte applications for a temporary restraining order and for an injunction against harassment, filed in the District Court of the First Circuit in Hawaii on October 23, 2023 and January 12, 2024, were denied (Sur-Reply at 16, citing Docket No. 52 at 204-05, 207-08), the dockets in those cases do not show that those applications were denied on the merits.

at 64); defendant Barresi's January 2, 2025 social media post (id. at 31); defendant Barresi's January 4, 2025 social media post (id. at 33); defendant Barresi's December 19, 2024 social media post (id. at 34); defendant Barresi's October 2, 2024 social media "undertaker" post (id. at 45); Mike McCormick's October 17, 2024 email to Plaintiff (id. at 39); Rebecca Berry's undated text message to Plaintiff (id. at 46); Antonio Sarabia's January 27, 2025 email to Plaintiff (id. at 44); and documents related to the January 2012 revocation of defendant Barresi's private investigator license (id. at 65-75), are insufficient to show that defendant Barresi engaged in a pattern of harassing and intimidating conduct against Plaintiff and other witnesses. Like much of the evidence discussed above, several of these exhibits concern events which took place long before the filing of the Motion for Preliminary Injunction. While defendant Barresi's social media posts may have been aggressive in tone, they voiced his complaints about people and can be characterized as "rants," rather than as harassment. Plaintiff's use of such exhibits to create a narrative of defendant Barresi's harassing conduct is based on sheer speculation and imaginative thought.

Plaintiff has not put forth sufficient evidence to show that defendant Barresi has engaged in harassing conduct.[23]  Therefore, Plaintiff has not shown either "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person" or a course of conduct "which would cause a reasonable person to suffer substantial emotional distress." See Cal. Code Civ. P. § 527.6(b)(3).

/ / /

/ / /

/ / /

---

[23] The Court is not stating that defendant Barresi did not engage in harassing conduct. Rather, the Court is stating that Plaintiff has made an insufficient showing.

Accordingly, Plaintiff has failed to show a likelihood of success on the merits.[24]

### b.    Irreparable harm.

Plaintiff claims that she will suffer irreparable harm if a preliminary injunction is not issued. (See Motion for Preliminary Injunction at 21 ("The Defendant's actions have created a climate of fear and intimidation, jeopardizing Plaintiff's ability to pursue legal rights."; and "Given the ongoing nature of Defendants' intimidation tactics, immediate injunctive relief is necessary to prevent further harm."); see id. at 5-6 ("If the Defendants engage in improper communications, it may create an atmosphere of intimidation, making it difficult for the Plaintiff and [w]itnesses to participate fully in legal proceedings."; "Any unauthorized communication may also extend to witnesses involved in the case, leading to potential intimidation or coercion."; "Unauthorized contact by the Defendants can cause severe emotional distress to the Plaintiff, particularly if such communications are threatening or harassing in nature."; "Violations of the rules concerning communication can lead to protracted legal battles, requiring the Plaintiff to incur additional legal fees and costs."; and "Unauthorized communications and failure to adhere to proper service protocols can result in unnecessary delays in the legal process."); see also Reply at 22 ("The integrity of judicial proceedings is compromised by the actions of [defendant] Barresi, resulting in irreparable harm. These actions have created a climate of fear that discourages attorneys from representing Plaintiff on the public record, thereby depriving her of her due process

---

[24] Plaintiff asserts that defendant Barresi's communications have violated various rules, including Eastern District of California Local Rule 183 and California Rule of Professional Conduct 2.9. (See Motion for Preliminary Injunction at 10-11, 16-18). Plaintiff also asserts that, because defendant Barresi's private investigator's license was revoked, his actions of contacting and intimidating witnesses violated California Business & Professions Code §§ 7520, et seq. and California Code of Civil Procedure § 527.6. (See Reply at 19-20). However, those rules are irrelevant to whether Plaintiff has shown a likelihood of success on the merits.

rights."; and "[Plaintiff] has shown that the fear and distress of witnesses have already resulted in the withholding [of] vital testimony.  Harm has continued and escalated, threatening irreparable demise of multiple individuals and due process[.]").

"A preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury, irrespective of the magnitude of the injury."  Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999). "Suffering irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction.'"  Fitzgerald, 2022 WL 423495, at *6 (citation omitted).  A party seeking a preliminary injunction must not identify a speculative harm and must show more than the possibility of remote further injury. See Winter, 555 U.S. at 21-22 (rejecting "possibility" standard and holding that the plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (italics in original); Fitzgerald, 2022 WL 423495, at *6 ("Further, the harm identified may not be speculative and Defendant must also show more than the possibility of some remote further injury.") (citing Winter, 555 U.S. at 21-22).

Plaintiff has failed to show she is likely to suffer irreparable harm in the absence of preliminary relief.  Plaintiff did not file the Motion for Preliminary Injunction until more than three weeks after defendant Barresi's last "aggressive voicemail" to Mr. McCormick (and substantially longer for much of the other allegedly harassing and intimidating conduct described by Mr. McCormick), most of the evidence submitted by Plaintiff relates to allegedly harassing and intimidating conduct that took place long before Plaintiff filed the Motion for Preliminary Injunction, and Plaintiff has not submitted competent and credible evidence of harassing and intimidating conduct by defendant Barresi since the filing of the Motion for Preliminary Injunction.  See Miller v. California Pacific Medical Center, 991 F.2d 536, 544 (9th Cir. 1993) ("[A] long delay before seeking a preliminary

injunction implies a lack of urgency and irreparable harm."). Moreover, Plaintiff admits that she is attempting to prevent possible, and not real, harm. (<u>See</u> Motion for Preliminary Injunction at 6 (stating she will suffer "potential harms"); Reply at 5 ("Plaintiff was concerned that witnesses **could be** threatened of abducted for disclosing information to her that exposed [defendant] Barresi's efforts to suppress witness testimony, as evidenced by her sworn declarations."; emphasis added)). Therefore, Plaintiff merely speculates about the harms she will suffer. <u>See</u> <u>Williams v. Green Valley RV, Inc.</u>, Case No. 8:15-cv-01010-ODW-MRW, 2015 WL 4694075, at *2 (C.D. Cal. Aug. 6, 2015) ("A moving party cannot merely produce evidence of 'unsupported and conclusory statements regarding harm [plaintiff] *might* suffer.") (citation omitted; italics in original).[25]

        c.     Balance of equities.

Plaintiff contends that the balance of hardships tips "decisively" in her favor. (Motion for Preliminary Injunction at 22; <u>see</u> <u>also</u> Reply at 23-24). Plaintiff claims that "[g]ranting this injunction will not unduly burden the Defendants, while denying it would leave Plaintiff vulnerable to continued harassment and intimidation." (Motion for Preliminary Injunction at 22; <u>see</u> <u>also</u> Reply at 23 ("[Defendant Barresi's] actions have resulted in substantial damage, whereas an injunction would merely avoid the continuation of unlawful conduct.")).

"In assessing the balance of equities, the court must assess the likely hardship to both the plaintiff and the defendants if the court were to deny the injunction on one hand or grant the injunction on the other." <u>Macnab v. Gahderi</u>, Case No. 2:09-cv-04498-DDP-RZ, 2009 WL 10671026, at *7 (C.D. Cal. July 28, 2009).

/ / /

---

[25] While the Court's finding renders it unnecessary for the Court to address the two other criteria for granting a preliminary injunction under Supreme Court and Ninth Circuit standards, the Court nonetheless will address the two other criteria for the sake of completeness.

Defendant Barresi asserts that granting a preliminary injunction will prevent him from contacting Plaintiff and other witnesses about this case, thereby hindering his investigation of Plaintiff's claims.  (Opposition at 6).

As discussed above, Plaintiff's assertion that without a preliminary injunction she will suffer irreparable harm is speculative.  Indeed, it appears that Plaintiff has already received from the District Court of the Third Circuit in Hawaii at least some of the relief she seeks in the Motion for a Preliminary Injunction, namely, that defendant Barresi is not permitted to contact, threaten, or physically harass Plaintiff (see Docket No. 39-1 at 36).  In contrast, if a preliminary injunction is granted, defendant Barresi's ability to defend himself in this case could be hampered.  Based on the evidence before the Court and the arguments of the parties, the Court is unable to find that the balance of hardships weighs in Plaintiff's favor.

Therefore, Plaintiff has failed to show that the balance of equities tips in her favor.

        d.     Public interest.

Plaintiff argues that a preliminary injunction will serve the public interest for numerous reasons, such as "maintaining the integrity of the judicial process," "safeguarding individuals from intimidation and harassment," and "ensur[ing] that the judicial process remains fair and accessible to all."  (Motion for Preliminary Injunction at 11-12, 18-20; see also Reply at 23).

Plaintiff justifies the granting of a preliminary injunction based on lofty public interest ideals.  However, Plaintiff's attempt to obtain a preliminary injunction appears to be more personal in nature.  The allegations in Plaintiff's pleadings, as well as in defendant Barresi's pleadings, reflect longstanding animosity between Plaintiff and defendant Barresi.  Since Plaintiff has failed to show defendant Barresi engaged in a course of harassment, as discussed above, granting a preliminary injunction in this case would not serve the public interest.

Thus, Plaintiff has not shown that an injunction is in the public interest.

In sum, Plaintiff has failed to satisfy any of the four criteria for obtaining a preliminary injunction.

## III.

## RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) Approving and accepting this Report and Recommendation; and (2) denying Plaintiff's Motion for Preliminary Injunction.

DATED: April 18, 2025

_____
DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE


## NOTICE

Reports and Recommendations may be subject to the right of any party to file Objections as provided in the Local Rules and review by the District Judge whose initials appear in the docket number.

31