UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

CHRISTINA TAFT,

           Plaintiff,

        v.

PAUL BARRESI, et al.,

           Defendants.

Case No. 5:24-cv-01930-TJH (DTB)

**ORDER GRANTING MOTION TO DISMISS COMPLAINT WITH LEAVE TO AMEND**

## I.

## PROCEEDINGS

      On September 7, 2024, Plaintiff Christina Taft ("Plaintiff"), proceeding pro se, filed a Complaint ("Complaint"), alleging twelve claims against defendants Paul Barresi ("Barresi") and Adam R. Waldman ("Waldman") (Barresi and Waldman are collectively referred to herein as "Defendants") and DOES 1 through 10. (Docket No. 1).[1]

---

[1] The Complaint alleges the following claims:  (1) Civil conspiracy; (2) obstruction of justice, tampering with a witness, victim or informant (18 U.S.C. § 1512(b)(1) and (b)(2)); (3) invasion of privacy (California Constitution, Article 1, Section 1); (4) use of name or likeness (Cal. Civ. Code § 3344); (5) civil harassment (Cal. Code Civ. P. § 527.6; (6) negligence, civil rights; (7)

On September 19, 2024, the Court ordered service of the Summons and Complaint on Defendants. (Docket No. 6). On September 26, 2024, Plaintiff served the Summons and Complaint on defendant Barresi. (Docket No. 7).[2]

On October 24, 2024, Plaintiff filed an "Emergency Motion for Preliminary Injunction" ("Motion for Preliminary Injunction"). (Docket No. 15).

On November 6, 2024, Plaintiff filed a Motion to Amend the Complaint and Continued Injunction Requests. (Docket No. 18). On November 7, 2024, defendant Barresi filed a Motion to Dismiss the Complaint based on Plaintiff's failure to state a claim for relief. (Docket No. 16). On November 13, 2024, the Court granted Plaintiff's Motion to Amend the Complaint but did not make any determination on Plaintiff's Continued Injunction Requests due to the pendency of the Motion for Preliminary Injunction. (Docket No. 20).[3]

---

intentional infliction of emotional distress; (8) negligent infliction of emotional distress; (9) interstate communications (18 U.S.C. § 875); (10) interstate and foreign travel or transportation in aid of racketeering enterprises (18 U.S.C. § 1952); (11) destruction, alteration, or falsification of records (18 U.S.C. § 1519); and (12) Civil RICO Act, racketeering activity (18 U.S.C. §§ 1961, 1962). (Complaint at 1). The Complaint contains an extremely lengthy recitation of factual allegations. (See Complaint at 7-76).

For the parties' pleadings and exhibits, the Court cites to the CM/ECF pagination at the top of each page.

[2] On October 16, 2024, Plaintiff filed a motion seeking an order allowing service by publication on defendant Waldman, which the Court denied on the same date. (Docket Nos. 8-9). On March 24, 2025, Plaintiff, who had been given until March 30, 2025 to serve defendant Waldman with the First Amended Complaint (Docket No. 44), requested a second extension of time to serve defendant Waldman with the First Amended Complaint, and alternatively, sought an order authorizing service by publication on defendant Waldman. (Docket No. 54). While the Court granted Plaintiff until May 19, 2025 to serve defendant Waldman with the First Amended Complaint, the Court denied Plaintiff's request to serve defendant Waldman by publication. (Docket No. 62).

[3] On March 26, 2025 (during the pendency of Plaintiff's Motion for Preliminary Injunction), defendant Barresi filed an ex parte application for a temporary restraining against Plaintiff (Docket No. 57), which the district court denied on April 8, 2025. (Docket No. 63).

On April 18, 2025 (following the parties' submissions, see Docket Nos. 25, 39, 51, 52), the Court issued a Report and Recommendation recommending the denial of Plaintiff's Motion for Preliminary Injunction. (Docket No. 64).

On November 30, 2024, Plaintiff filed a First Amended Complaint ("FAC"), naming Defendants and DOES 1 through 10 as defendants. (Docket No. 23). The FAC contains factual allegations similar to those in the Complaint. (See FAC at 7-79). The FAC alleges the following claims against Defendants: (1) Civil conspiracy; (2) Civil Rights Act (42 U.S.C. § 1983); (3) Civil RICO Act, racketeering activity (18 U.S.C. §§ 1961, 1962); (4) invasion of privacy (California Constitution, Article 1, Section 1, CACI No. VF-1800, CACI No. 1801, and CACI No. 1802); (5) use of name or likeness (Cal. Civ. Code § 3344); (6) civil harassment (Cal. Code Civ. P. § 527.6); (7) negligence, civil rights; (8) intentional infliction of emotional distress; and (9) negligent infliction of emotional distress. (FAC at 1, 77-145).

On December 2, 2024, based on the filing of the FAC, the Court denied defendant Barresi's Motion to Dismiss the Complaint as moot. (Docket No. 24).

On December 13, 2024, defendant Barresi filed a Motion to Dismiss the FAC ("Motion to Dismiss"), asserting that eight out of nine claims alleged in the FAC should be dismissed based on Plaintiff's failure to state a claim for relief. (Docket No. 26). Attached to the Motion to Dismiss is the supporting Declaration of Megan S. Mallonee, dated December 13, 2024, with six attached exhibits. (Docket No. 26-1). On January 24, 2025, Plaintiff filed an Opposition to the Motion to Dismiss ("Opposition") (Docket No. 38), accompanied by Plaintiff's supporting Declaration,

/ / /

/ / /

/ / /

/ / /

/ / /

dated January 24, 2025 (Docket No. 38-1), with several attached exhibits (Docket No. 38-2).[4]   On February 7, 2025, defendant Barresi filed a Reply ("Reply"). (Docket No. 40).[5]

Thus, this matter is now ready for decision.  For the reasons discussed below, the Court grants defendant Barresi's Motion to Dismiss.  The claims alleged in the FAC are dismissed without prejudice and with leave to amend.

## II.

## SUMMARY OF FACTUAL ALLEGATIONS[6]

The FAC alleges that after April 2020 and through September 2024, defendant Barresi, a private investigator, and defendant Waldman, the owner of The Endeavor Group and an agent for John C. Depp,[7] engaged in coercive conduct, intimidation, and threats against Plaintiff and "potential witnesses," "interfered with reports to [the] FBI and with the witnesses to attempt to set up certain individuals, intentionally and negligently, to set up the wrong people, with an attempt to frame them for wrongdoing," utilized interstate communications to further their fraudulent scheme, tampered with evidence "relevant to an ongoing investigation by the FBI and Bureau

---

[4] The Court will not consider materials outside of the FAC when ruling on the Motion to Dismiss.  See Branch v. Tunnell, 14 F.3d 449, 453 (9th Cir. 1994) ("Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.") (citation omitted).

[5] The Court concurs with Plaintiff (see Opposition at 5) that some of the aspersions against Plaintiff and others in the Motion to Dismiss are unnecessary and irrelevant to the issue at hand.

[6] The Court has reviewed all of the factual allegations in the FAC.  (See FAC at 7-79). Based on the overly detailed, extraneous, incoherent, and/or rambling allegations in the FAC, the Court is not able to prepare a concise and clear summary of the allegations.  The Court will provide a broad summary of the allegations, and will refer to specific allegations, where necessary.

[7] Plaintiff clearly is referring to the actor known as Johnny Depp.  Many of the allegations in the FAC relate to defendant Barresi's actions in connection with the case of Depp v. Heard. According to defendant Barresi, on or about July 2019, he was hired by Amber Heard's attorneys, in connection with that case, and "[a]fter months of research and interviews, [he] was unable to identify any credible witnesses or legitimate, verifiable claims of wrongdoing by Mr. Depp to support Ms. Heard's case." (Motion to Dismiss at 9).  According to defendant Barresi, the trial in Depp v. Heard took place from April to June 2022.  (Motion to Dismiss at 10).

4

of Security and Investigation Services through the Department of Consumer Affairs," tampered with witnesses, victims, and informants "with the intent to hinder, delay, or prevent communication to law enforcement authorities," and conspired to invade the privacy of, use the name or likeness of, harass, neglect, and intentionally and negligently inflict emotional distress on Plaintiff. (See FAC at 7-79).

Plaintiff is a humanitarian, philanthropist, entrepreneur, videographer, the founder and CEO of Worldie Ltd. and Rescue Social Inc., a Public Safety investor, a coordinator of SaveMeNow, and a former board member of Aedan. (FAC at 7 (¶ 16), 11 (¶¶ 42-43)).[8] Defendant Barresi has served as the "Hollywood Fixer" since the 1990s, was a licensed private investigator from September 2009 until January 2012, when he had his licensed revoked, and has "directly worked for lawyers for many years." (Id. at 8 (¶¶ 20, 24-27)). Defendant Waldman is the owner of The Endeavor Group and is Johnny Depp's agent. (Id. at 7-8 (¶¶ 19, 21-22)).

As noted above, the FAC alleges the following claims against Defendants: (1) Civil conspiracy; (2) Civil Rights Act (42 U.S.C. § 1983); (3) Civil RICO Act, racketeering activity (18 U.S.C. §§ 1961, 1962); (4) invasion of privacy (California Constitution, Article 1, Section 1, CACI No. VF-1800, CACI No. 1801, and CACI No. 1802); (5) use of name or likeness (Cal. Civ. Code § 3344); (6) civil harassment (Cal. Code Civ. P. § 527.6); (7) negligence, civil rights; (8) intentional infliction of emotional distress; and (9) negligent infliction of emotional distress. (FAC at 77-145 (¶¶ 416-789)).

/ / /

---

[8] Plaintiff states that she is "a former entrepreneur and ha[s] start-ups for the purpose of rescue within the Field of Public Safety, which includes people in the film, music, and arts as part of the visual and performing arts business," and that after the 2018 fire in Paradise, California (in which her mother died), she "devoted her business and professional projects to solving, mitigating, and improving public safety and to motivate business partners to improve systems of rescue," including the "prevention and detection of disasters and crimes[.]" (FAC at 9-10 (¶ 28)). Plaintiff briefly met Amber Heard at a charity event in October 2019. (FAC at 10 (¶ 39)).

1    The FAC seeks compensatory damages, punitive damages, and injunctive
2    relief. (FAC at 83 (¶¶ 451-53), 91 (¶¶ 491-92), 108 (¶¶ 571-72), 118-19 (¶ 627), 124
3    (¶ 663), 131-32 (¶¶ 707-08), 134 (¶ 720), 139-40 (¶¶ 749-50), 145 (¶¶ 788-89), 145-
4    49)).

## III.

## STANDARD OF REVIEW FOR A MOTION TO DISMISS

7    A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the
8    legal sufficiency of claims alleged in a complaint. A complaint may be dismissed
9    for failure to state a claim for two reasons: (1) Lack of a cognizable legal theory; or
10    (2) insufficient facts under a cognizable legal theory. Mendiondo v. Centinela Hosp.
11    Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). To survive a Rule
12    12(b)(6) motion, a plaintiff must allege facts sufficient to state a claim that is
13    plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A
14    claim is facially plausible when a plaintiff "pleads factual content that allows the
15    court to draw the reasonable inference that the defendant is liable for the misconduct
16    alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at
17    556). Plausibility does not mean probability but does require "more than a sheer
18    possibility that a defendant has acted unlawfully." Iqbal, 566 U.S. at 678. A
19    pleading that offers mere "labels and conclusions" or "a formulaic recitation of a
20    cause of action's elements will not do." Twombly, 550 U.S. at 555; see also
21    Whitaker v. Tesla Motors, Inc., 985 F.3d 1173, 1176 (9th Cir. 2021) ("Taken
22    together, Iqbal and Twombly require well-pleaded facts, not legal conclusions
23    . . . that 'plausibly give rise to an entitlement to relief' . . . . The plausibility of a
24    pleading thus derives from its well-pleaded factual allegations.") (quoting Iqbal, 556
25    U.S. at 679).

26    In considering a motion to dismiss, a court must accept all factual allegations
27    in the complaint as true "and construe the pleadings in the light most favorable to

the nonmoving party." <u>Knievel v. ESPN</u>, 393 F.3d 1068, 1072 (9th Cir. 2005); <u>see
also</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam) (Pleadings by pro se
plaintiffs "however inartfully pleaded, must be held to less stringent standards than
formal pleadings drafted by lawyers.")  (citation omitted).  But the liberal pleading
standard "applies only to a plaintiff's factual allegations." <u>Neitzke v. Williams</u>, 490
U.S. 319, 330 n.9 (1989).  "[T]he tenet that a court must accept as true all of the
allegations contained in a complaint is inapplicable to legal conclusions." <u>Iqbal</u>, 556
U.S. at 678; <u>see also</u> <u>Ileto v. Glock Inc.</u>, 349 F.3d 1191, 1200 (9th Cir. 2003) ("[W]e
do not accept any unreasonable inferences or assume the truth of legal conclusions
cast in the form of factual allegations.").  "[A] liberal interpretation of a civil rights
complaint may not supply essential elements of the claim that were not initially
pled." <u>Bruns v. Nat'l Credit Union Admin.</u>, 122 F.3d 1251, 1257 (9th Cir. 1997)
(citation omitted).

A court may consider exhibits attached to a complaint and incorporated by
reference. <u>See</u> <u>Petrie v. Electronic Game Card, Inc.</u>, 761 F.3d 959, 964 n.6 (9th Cir.
2014).  However, a court is not required to accept as true allegations contradicted by
exhibits attached to a complaint or conclusory allegations, unwarranted deductions
of fact, or unreasonable inferences. <u>Sprewell v. Golden State Warriors</u>, 266 F.3d
979, 988 (9th Cir. 2001).  While on a Rule 12(b)(6) motion a court cannot consider
evidence outside the pleadings, a court may "consider unattached evidence on which
the complaint 'necessarily relies' if: (1) [T]he complaint refers to the document; (2)
the document is central to the plaintiff's claim; and (3) no party questions the
authenticity of the document." <u>United States v. Corinthian Colls.</u>, 655 F.3d 984, 999
(9th Cir. 2011) (citation omitted). [9]

---

[9] Rule 12(b)(6) is read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure
("Rule 8"). <u>Zixiang Li v. Kerry</u>, 710 F.3d 995, 998-99 (9th Cir. 2013).  Rule 8 requires that a
complaint must contain a "short and plain statement of the claim showing that the pleader is

1      If a court finds that a complaint should be dismissed for failure to state a claim,

2   the court has discretion to dismiss with or without leave to amend.  See Lopez v.

3   Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc).  Leave to amend should

4   be granted if it appears possible that the defects in the complaint could be corrected,

5   especially if a plaintiff is pro se.  Id. at 1130-31; see also Cato v. United States, 70

6   F.3d 1103, 1106 (9th Cir. 1995) (noting that "[a] pro se litigant must be given leave

7   to amend his or her complaint, and some notice of its deficiencies, unless it is

8   absolutely clear that the deficiencies of the complaint could not be cured by

9   amendment"); Fed.R.Civ.P. 15(a)(2) ("The court should freely give leave to amend

10  [a pleading] when justice so requires.").  However, if, after careful consideration, it

11  is clear that a complaint cannot be cured by amendment, a court may dismiss without

12  leave to amend.  See Ebner v. Fresh, Inc., 838 F.3d 958, 968 (9th Cir. 2016) (Rule

13  15's liberal amendment policy "does not apply when amendment would be futile");

14  Chaset v. Fleer/Skybox Int'l, 300 F.3d 1083, 1088 (9th Cir. 2002) (holding that

15  "there is no need to prolong the litigation by permitting further amendment" where

16  / / /

17  / / /

18  / / /

19

20

---

21  entitled to relief."  Rule 8(a)(2).  Although Rule 8 does not require detailed factual allegations, a
    complaint must, at a minimum, allege enough specific facts to provide both "fair notice" to a
22  defendant of the particular claim being asserted and "the grounds upon which [that claim] rests."
    Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 & n.3 (2007) (citation omitted); see also Iqbal, 556
23  U.S. at 678 (Rule 8 pleading standard "demands more than an unadorned, the-defendant-
    unlawfully-harmed-me accusation"); Brazil v. U.S. Dep't of Navy, 66 F.3d 193, 199 (9th Cir.
24  1995) (holding even pro se pleadings "must meet some minimum threshold in providing a
    defendant with notice of what it is that it allegedly did wrong"); Schmidt v. Herrmann, 614 F.2d
25  1221, 1224 (9th Cir. 1980) (upholding Rule 8 dismissal of "confusing, distracting, ambiguous, and
26  unintelligible pleadings").

         Although the Motion to Dismiss does not mention Rule 8, it appears to the Court that the
27  FAC is not in compliance with Rule 8.

28

8

the "basic flaw" in the pleading cannot be cured by amendment); <u>see</u> <u>also</u> <u>Miller v.</u> <u>Rykoff-Sexton, Inc.</u>, 845 F.2d 209, 214 (9th Cir. 1988) ("[A] proposed  amendment is futile only if no set of facts can be proved under the amendment that would constitute a valid claim or defense.") (citation omitted).

## IV.

## DISCUSSION

**A**    **The Motion to Dismiss Should be Granted Based on Plaintiff's Failure to State a Plausible Claim for Relief.[10]**

1.    <u>Civil Conspiracy</u>.

The FAC alleges a claim of civil conspiracy under federal law.  (<u>See</u> FAC at 6 (¶ 11)).  The gist of Plaintiff's civil conspiracy claim is that Defendants conspired "to invade the privacy of, to civilly harass, to tamper with, to intentionally and negligently harm, and to inflict emotional distress onto Plaintiff."  (FAC at 79 (¶ 427); <u>see</u> <u>also</u> FAC at 79-83 (¶¶ 428-50).

As defendant Barresi asserts (<u>see</u> Motion to Dismiss at 14), Plaintiff's claim is subject to dismissal because the federal conspiracy statute–18 U.S.C. § 371 (Conspiracy to commit offense or to defraud United States)–does not create a private right of action.  <u>See</u> <u>Henry v. Universal Technical Institute</u>, 559 F. App'x 648, 650 (9th Cir. 2014) ("The district court properly dismissed [the plaintiff's] claims under the Family Educational Rights and Privacy Act ("FERPA") and 18 U.S.C. 371 because these statutes do not provide for a private right of action."); <u>Ikeye v.</u> <u>Gardiner</u>, Case No. 2:23-cv-01454-FMO-RAO, 2023 WL 3979488, at *1 (C.D. Cal.

---

[10] Defendant Barresi has moved to dismiss all claims alleged in the FAC except for the negligence claim (FAC at 132-34 (¶¶ 709-21)).  Because, as discussed below, the Court is dismissing without prejudice and with leave to amend all of the other claims alleged in the FAC, Plaintiff should include all allegations related to her negligence claim in an amended complaint, if she chooses to file one.

May 22, 2023) (finding that the plaintiff could not bring a claim under 18 U.S.C. § 371 because it does not give rise to a private cause of action).

In the Opposition, Plaintiff appears to contend that her civil conspiracy claim is brought under 42 U.S.C. § 1985 (Conspiracy to interfere with civil rights). (Opposition at 10-12). While the FAC contains a passing reference to 42 U.S.C. § 1985 in a paragraph prior to the actual civil conspiracy claim (see FAC at 79 (¶ 429)), the FAC does not make it clear that that the civil conspiracy claim is brought under 42 U.S.C. § 1985. Therefore, the Court will not address whether the FAC alleges a viable conspiracy claim under 42 U.S.C. § 1985.[11]

Accordingly, the FAC fails to state a claim for civil conspiracy against defendant Barresi.

2.    Civil Rights Act (42 U.S.C. § 1983).

The FAC alleges a claim under 42 U.S.C. § 1983 ("Section 1983"). (See FAC at 84-91 (¶¶ 454-90)).

To state a claim under Section 1983, a plaintiff must allege that a particular defendant, acting under color of state law, caused a deprivation of the plaintiff's federal rights. West v. Atkins, 487 U.S. 42, 48 (1988). "Section 1983 'excludes from its reach merely private conduct, no matter how discriminatory or wrong.'" Heinke v. Santa Clara Univ., 965 F.3d 1009, 1012 (9th Cir. 2020) (quoting Sutton v. Providence St. Jospeh Med. Ctr., 192 F.3d 826, 835 (9th Cir. 1999)). A Section 1983 plaintiff has the burden to plead and prove that a private party acted "under color of the law." See Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139-40 (9th Cir.

---

[11] Since it also is not clear whether the FAC alleges a claim for conspiracy under California law, the Court will not address Plaintiff's contention that the FAC sufficiently states a claim for conspiracy under California law (see Opposition at 10).

Because, as discussed below, the claims alleged in the FAC are being dismissed with leave to amend, Plaintiff will have another opportunity to allege her conspiracy claim(s) in an amended complaint, if she decides to file one.

2012) (citing <u>Lugar v. Edmonson Oil Company, Inc.</u>, 457 U.S. 922, 937 (1982)). "Only in rare circumstances can a private party be viewed as a 'state actor' for Section 1983 purposes." <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1130 (11th Cir. 1992).

"The state action inquiry boils down to this: Is the challenged conduct that caused the alleged constitutional deprivation 'fairly attributable' to the state?" <u>Belgau v. Inslee</u>, 975 F.3d 940, 946 (9th Cir. 2020) (quoting <u>Naoko Ohno v. Yuko Yasuma</u>, 723 F.3d 984, 993 (9th Cir. 2013)).  The Ninth Circuit has recognized four tests for determining whether particular conduct involving private actors constitutes state action for purposes of stating a claim under Section 1983:  "(1) [P]ublic function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." <u>Rawson v. Recovery Innovations, Inc.</u>, 975 F.3d 742, 747 (9th Cir. 2020) (internal citations and quotations omitted).

"The public function test is satisfied only on a showing that the function at issues is 'both traditionally and exclusively governmental.'" <u>Kirtley v. Rainey</u>, 326 F.3d 1088, 1093 (9th Cir. 2003) (quoting <u>Lee v. Katz</u>, 276 F.3d 550, 555 (9th Cir. 2002)).

"The close nexus and joint action tests may be satisfied where the court finds 'a sufficiently close nexus between the state and the private actor' so that the action of the latter may be fairly treated as that of the state itself," or where the state has 'so far insinuated into a position of interdependence with the [private party] that it was a joint participant in the enterprise.'" <u>Rawson</u>, 975 F.3d at 748 (internal quotations and citations omitted); <u>see also</u> <u>O'Handley v. Weber</u>, 62 F.4th 1145, 1159 (9th Cir. 2023) ("A plaintiff can show joint action either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents.") (internal quotations and citation omitted); <u>Franklin v. Fox</u>, 312 F.3d 423, 445 (9th Cir. 2002) ("Under the joint action test, courts examine whether state officials and private parties have acted in concert in

effecting a particular deprivation of constitutional rights.") (internal quotations and citation omitted).

Finally, as to the governmental compulsion or coercion test, a private actor may be found to act under color of state law where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).

"Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." Rawson, 975 F.3d at 747 (quoting Kirtley, 326 F.3d at 1092).

Here, the FAC does not allege that defendant Barresi was a state actor under Section 1983. (See FAC at 84-91). In the Opposition, Plaintiff contends that the allegations in the FAC are sufficient to satisfy the joint action test. (Opposition at 13). As support, Plaintiff makes the following statements: "[Defendant] Barresi's role in influencing law enforcement decisions to not interview witnesses correctly, to not thoroughly investigate reports by victims and Plaintiff, to not intake more evidence, in multiple jurisdictions, such as South Carolina, Honolulu, and Ventura, was bolstered by state actors who facilitated or acquiesced in his misconduct." (Opposition at 13, citing FAC at 30 (¶ 138), 34 (¶¶ 158-59), 36 (¶ 171), 43 (¶ 205), 44 (¶¶ 209-10), 67-68 (¶¶ 355-59); "Plaintiff alleges Barresi's close relationship with Defendant Waldman in his role as governmental influencer (FAC [at 86] ¶ 467], and a registered foreign agent (Registration No. 5934), having a private-public partnership nexus with Endeavor Group, that analysts and federal informants find to have credibly dangerous connections to influence the decisions of authorities (FAC [at 11, 15-16, 27, 72, 107] ¶¶ 46, 75-76, 126, 386, 388, 565), worsened by his public figure persona." (Opposition at 13-14, footnote omitted); "When Plaintiff and [Richard] Albertini wanted to report witness intimidation and bribery, [defendant]

Waldman threatened to invoke his authorities[.]"  (Opposition at 14, citing FAC at
19-20 (¶¶ 92-95));    "[Defendant] Waldman's influence in the government
enforcement spheres allowed [defendant] Barresi to carry out his obstructive conduct
with greater impunity, further entrenching the conspiracy to deprive Plaintiff of her
constitutional rights.  This symbiotic relationship allowed [defendant] Barresi to
leverage state power to achieve his unlawful goals, including obstructive
investigations and retaliating against Plaintiff."  (Opposition at 14); and "The FAC
further underscores [defendant] Barresi's 'joint action' with state actors by detailing
his communications with the FBI and the manner in which he leveraged his
connections to obstruct investigations and manipulate law enforcement decisions[.]"
(Opposition at 14, citing FAC at 19-20 (¶¶ 19-20)).

Contrary to Plaintiff's assertion, the FAC is devoid of allegations that would
satisfy the joint action test (or any of the other state actor tests).  The allegations in
the FAC on which Plaintiff relies are insufficient to show that defendant Barresi was
a state actor under Section 1983.[12]  The FAC does not include any facts tying
defendant Barresi to any state action such that the Court could find that a Section
1983 claim is sufficiently stated.

Accordingly, the FAC fails to allege a Section 1983 claim against defendant
Barresi.

/ / /

/ / /

/ / /

/ / /

---

[12] The Court finds it unnecessary to address defendant Barresi's assertion that "[t]he cited
paragraphs in the FAC do not comport with Plaintiff's characterization of them, and the allegations
in her Opposition to support this claim are **not** set forth in the FAC" (Reply at 5, emphasis in
original).

1          3.    Civil RICO Act, Racketeering Activity (18 U.S.C. §§ 1961, 1962).

2          The FAC alleges a racketeering claim under the Racketeer Influenced and

3    Corrupt Organizations Act ("RICO").    (See FAC at 92-108 (¶¶ 493-569)).

4          Under RICO, it is unlawful for a person to benefit from a pattern of

5    racketeering activity or the collection of an unlawful debt. 18 U.S.C. § 1961, et seq.

6    The elements of a civil RICO claim are "(1) conduct (2) of an enterprise (3) through

7    a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury

8    to plaintiff's 'business or property.'"    Living Designs, Inc. v. E.I. DuPont de

9    Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (citation omitted); see also

10   Eclectic Properties East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th

11   Cir. 2014).  To show the existence of an enterprise, a plaintiff "must plead that the

12   enterprise has (A) a common purpose, (B) a structure or organization, and (C)

13   longevity necessary to accomplish the purpose." Eclectic Properties East, LLC, 751

14   F.3d at 997 (citation omitted).  "In addition, the conduct must be [ ] the  proximate

15   cause of harm to the victim."    Eclectic Properties East, LLC, supra (citation

16   omitted).

17         In the Opposition, Plaintiff argues that the "FAC presents a comprehensive

18   timeline of how [Defendants] are part of an ongoing association-in-fact-enterprise

19   with a common purpose[.]"  (Opposition at 15; see also id. at 15 ["The relatedness

20   of Defendants' conduct is evident by conspiring to tamper with audio recordings in

21   repeated  coordination  actions."; and  "Plaintiff's  complaint  provide  detailed

22   allegations of Defendants' coordinated efforts and overt acts, demonstrating that

23   they operated as an enterprise."], 16 ["Together, they operated as a cohesive

24   enterprise with the shared goal of silencing Plaintiff and sustaining their mutual

25   interests."]), 20 ["The FAC pleads that, over the course of several years, Defendants

26   Barresi and Waldman engaged in a pattern of continuous and related criminal acts,

27   demonstrating  both  the  continuity  and  common  purpose  required  to  satisfy  the

28

1    RICO statute."]).    As support, Plaintiff cites to numerous allegations in the FAC.
2    (See Opposition at 15, citing FAC at 13-14 (¶¶ 59-61), 17-19 (¶¶ 87-91), 22 (¶¶
3    102-03), 23 (¶ 107), 24 (¶¶ 111, 113), 26 (¶ 118), 28 (¶¶ 128-29), 30 (¶¶ 140-141),
4    31 (¶ 144), 56 (¶ 283), 64-65 (¶¶ 335-37)).

5          Plaintiff further argues that: (1) Defendants' "continuous conduct [FAC ¶¶
6    10, 14] included clearly defined roles (FAC ¶¶ 192-193) within an organized
7    structure that has persisted for years (FAC ¶ 194)."  (Opposition at 15-16); (2) "The
8    enterprise displayed a structured decision-making hierarchy, with Waldman and
9    Barresi directing the activities of unnamed individuals (['DOES'), who executed
10   tactics such as vandalism, break-ins, and threats of physical violence, aiming at and
11   naming Plaintiff to attack (FAC ¶¶ 305-306)."  (Opposition at 16); (3) "Barresi
12   played a key role by hunting witnesses and whistleblowers to obstruct justice, while
13   Waldman approved and awarded these cover ups (FAC ¶ 117)."  (Opposition at 16);
14   (4) "Defendants' pattern of racketeering has continuing and relatedness with
15   consistency in participants and victims, with Barresi's recorded admission to Ms.
16   Berry that there are 'hundreds' of people he interfered with and accessed their
17   financial information (FAC ¶¶ 137, 97, 154)."  (Opposition at 16); (5) "In addition,
18   [defendant Barresi] admitted to sending a check to pay for audio tapes of [Plaintiff]
19   with witness Albertini as they prepared for interviewing witnesses of the Viper
20   Room (FAC ¶ 154)."  (Opposition at 16); and (6) "The FAC details [Defendants]
21   coordinated efforts to intimidate witnesses, tamper with evidence, and obstruct
22   justice over a sustained period, demonstrating structure, organization, and a shared
23   goal of silencing Plaintiff and protecting their interests (FAC ¶¶ 192-193, 305-306,
24   390-395)."  (Opposition at 21).
25         Plaintiff's attempt to allege the existence of an enterprise based on
26   conclusory statements, hearsay statements, and speculation is insufficient.
27
28

Moreover, as defendant Barresi asserts (<u>see</u> Reply at 6), many of the FAC's allegations cited by Plaintiff do not support her arguments.

In addition, Plaintiff has not sufficiently alleged injury to her business or property. In the FAC, Plaintiff alleges in a conclusory fashion that she suffered economic injury as a result of Defendants' RICO violations. (<u>See</u> FAC at 107 (¶ 566) ("Defendants caused injury to Plaintiff and her business and property by their conduct with continuous violations . . . . The activities by Defendant caused debilitating high costs of security, competing private investigators, maintaining witnesses, legal consulting, protecting Plaintiff and Plaintiff's relatives, and ending of Plaintiff's public safety work with AEDAN and SaveMeNow."), 108 (¶ 570) ("Plaintiff respectfully requests this Court issue an injunction against the Defendants, to address and prevent further harm resulting from the Defendants' conduct, including but not limited to, racketeering conduct, which has caused Plaintiff significant emotional distress and significant financial damages.")). Although Plaintiff contends that she suffered economic damages, including loss of professional opportunities with AEDAN/TurnKeyCapital/SaveMeNow and in public safety work, as a result of Defendants' racketeering activities (Opposition at 21, citing FAC at 11 (¶¶ 42-43), 31 (¶¶ 145-46), 52 (¶¶ 253-55), and although Plaintiff contends that defendant Barresi was "fixated on Plaintiff's finances and business" (Opposition at 22, citing FAC at 32 (¶¶ 151-52), 48 (¶ 236), 49-50 (¶ 241)), the allegations in the FAC are insufficient to show that the alleged racketeering activities caused economic injury to Plaintiff.

To the extent that Plaintiff alleges that she experienced fear as a result of Defendants' racketeering activities (Opposition at 19, 22), her fear does not satisfy the need for her to sufficiently plead economic injury.

/ / /

/ / /

16

Accordingly, the allegations in the FAC do not give rise to a plausible RICO claim against defendant Barresi.[13]

4.    <u>Invasion of Privacy (California Constitution, Article 1, Section 1, CACI No. VF-1800, CACI No. 1801, CACI No. 1802)</u>.

The FAC alleges a claim for invasion of privacy.    (<u>See</u> FAC at 109-19 (¶¶ 573-611)).

The California Constitution, Article 1, Section 1 provides that:  "All people are by nature free and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."  <u>See</u> <u>Hill v. National Collegiate Athletic Assn.</u>, 7 Cal.4th 1, 15 (1994).

In California, there are two separate claims for invasion of privacy, namely, "(1) public disclosure of private facts, and (2) intrusion into private places, conversations or other matters."  <u>Shulman v. Group W Productions, Inc.</u>, 18 Cal.4th 200, 214 (1998) (citations omitted).  The elements of public disclosure of private facts are:  "(1) [P]ublic disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern."  <u>Id.</u> (citations omitted).  The elements of intrusion are "(1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person."  <u>Id.</u> at 231.[14]

///

---

[13] Defendant Barresi makes the conclusory assertion that the FAC does not sufficiently plead the existence of predicate acts.  (<u>See</u> Motion to Dismiss at 16; Reply at 5-6).  Since defendant Barresi clearly focuses on Plaintiff's failure to sufficiently allege the existence of an enterprise and economic injury to Plaintiff, the Court has only addressed those elements.

[14] Based on the allegations in the FAC, as discussed below, it appears to the Court that Plaintiff is only attempting to allege a claim against defendant Barresi for the intrusion into private places, conversations or other matters.  (<u>See</u> <u>also</u> Opposition at 22-26).  If Plaintiff decides to file an amended complaint, Plaintiff should make it clear which invasion of privacy claim she is pursuing.

The FAC contains numerous allegations involving invasion of privacy based on intrusion into private affairs, including:  "Defendants continuously accessed Plaintiff's data and conversations, since approximately 2000 with continuous invasion of her privacy up to the present date, as of the date of the filing of this Complaint.  Defendants systematically intruded upon Plaintiff's private affairs by identifying her physical location, accessing sensitive personal data without consent, and persistently monitoring her activities."  (FAC at 110 (¶ 576)); "Defendants specifically intruded into Plaintiff['s] private affairs and communications, by using illegitimate methods, with unauthorized access to data and use of said data, to violate her seclusion and exploit the information." . . . Defendant's intrusions upon Plaintiff's privacy by use of certain means included a form of investigating Plaintiff, her whereabouts, and examining her from a place in which Plaintiff was in a private matter handling private affairs."  (FAC at 112 (¶¶ 590-91)); "Defendants continuously invaded Plaintiff['s] privacy by emailing to Plaintiff her deceased Mother Victor's coroner report and body connected to title 'THE HOLLYWOOD FIXER THAT WOULD'VE KILLED FOR JOHHNY DEPP[.]"  (FAC at 113 (¶ 596)); "Defendants negligently and intentionally invaded the privacy of Victoria's personal information (intrusion on relationships and sexual matters) and disseminated imagery of the coroner report[.]"  (FAC at 113 (¶ 597)); "Defendants invaded Plaintiff[']s Constitutional Rights since they emailed and texted and have alleged sexualized activities of Plaintiff's mother from recording(s) of Conner, a licensed private investigator in New Mexico. [] The Private Affairs ranging between 2022 to 2024, where Plaintiff was invaded by Defendants, includes obscene information, i.e., two former boyfriends of Plaintiff's mother attest on how they have seen what has been done to Plaintiff and family."  (FAC at 113 (¶¶ 598-99)); "Defendants release an edited audio by Barresi, on October 26-Dec. 16, 2022 and other edited recordings up to 2024, of audio of [Plaintiff] and Jane Doe.  The edited

audio shows the commercial purpose of implication to exploit Plaintiff, which enhance Defendants' marketing as fixers, and to invade privacy of conversations on sexual matters." (FAC at 114 (¶ 601)); "Mr. Barresi intentionally intruded into her mother's death and wealth inheritances, audio recordings of her conversations with Jane Doe, her location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality. [] Audio recordings of Plaintiff's conversations with Jane Doe were released by Defendants of Plaintiff's location and address, alleged paternity, alleged sexual relations of her deceased mother, alleged half siblings, and alleged sexuality, among other factors[.]" (FAC at 115 (¶ 609)); "Defendants continued intentionally and negligently, to invade [] Plaintiff's privacy by emailing her deceased mother's coroner report with disturbing intimidating directions and subsequently publishing imagery of the report." (FAC at 116 (¶ 611)).

In the Opposition, Plaintiff argues that "[t]he FAC thoroughly details multiple instances of [defendant Barresi's] unlawful actions, including unauthorized access to Plaintiff's private communications and personal data," "the unauthorized dissemination of Plaintiff's personal information for financial gain," and "fabricated information and information of the coroner's report related to Plaintiff's mother." (Opposition at 22-24). As support, Plaintiff cites to FAC at 31 (¶ 142 ["Mr. Barresi breaches the Temporary Restraining Order by looking for Mr. Albertini and Plaintiff[']s location. This search by him included questioning her alleged sexuality. Mr. Albertini and Ms. Berry report this to the police. On September 26, another 'ever breathed air' death threat showed from Mr. Barresi."]), 34 (¶ 162 ["This [October 10, 2022 text between defendant Barresi and Ms. Newsome] frightened [Plaintiff] because Mr. Waldman and Mr. Barresi focused on her, specifically her location, and that they knew she lived in West Los Angeles. Defendants treated Plaintiff as if she was a subject of theirs as well."]), 36 (¶ 167 ["[Plaintiff] was

19

alarmed by Mr. Barresi's response to Ms. Gilmore implying he knew she lived in West Los Angeles."], 37 (¶ 175 ["Mr. Barresi attempted to get [Plaintiff] to meet with him and contacted Ms. Newsome to attempt that arrangement.  Mr. Barresi demanded Ms. Newsome to tell him where [Plaintiff] was and her address."], 41 (¶ 195 ["Mr. Barresi violated private affairs by forging 'investigative findings' about Plaintiff's mother Victoria Taft's death, wealth transfer, alleged sexual activities, and coroner report to coerce [Plaintiff]."], 67 (¶ 356 ["Jan. 8, 2024, 4:26 PM: [Defendant] Barresi sent [Plaintiff's] address to her and told her he did a false call on her to Honolulu Police. . . .  [Defendant Barresi] called her a 'bat' again quoting Mr. Waldman and the audio tape with allegedly Mr. Conner.  *'Maybe you should've gotten a first floor apartment.'*"; emphasis in original]), 74 (¶ 399 [Plaintiff] sends a Cease & Desist email to both Mr. Waldman and Mr. Barresi.  In response, Mr. Barresi emails [Plaintiff] on [Plaintiff's mother's] death, and with intimidation.  Mr. Barresi continues to exploit audio tapes."]).  (Opposition at 22-24).

Plaintiff further argues that "Defendants intruded into Plaintiff's death and wealth inheritances, audio recordings of Plaintiff's conversations and private matters involving Plaintiff's location, address, alleged sexual relations of her deceased mother, alleged half-siblings, and alleged sexuality (private affairs, seclusion)[.]" (Opposition at 23, citing inter alia FAC at 39-40 (¶¶ 190-91), 41-44 (¶¶ 195-209), 46 (¶ 225), 49-50 (¶ 241), 53 (¶ 261), 60 (¶ 305), 62 (¶ 317), 63 (¶ 328), 67 (¶¶ 350, 354), 72 (¶ 390), 75-76 (¶ 404), 76 (¶¶ 414-15), 114 (¶ 600); see also Opposition at 25, citing FAC at 39 (¶¶ 189, 188)).

To the extent that the FAC alleges that defendant Barresi's actions constituted an invasion of Plaintiff's mother's privacy (see FAC at 113), the Court concurs with defendant Barresi (see Motion to Dismiss at 21; Reply at 9) that Plaintiff lacks standing to assert such a claim on her mother's behalf.  See TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (a plaintiff has standing to sue by showing "(i)

that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief") (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

Moreover, as defendant Barresi notes (<u>see</u> Reply at 9-10), Plaintiff's reliance on <u>Marsh v. County of San Diego</u>, 680 F.3d 1148 (9th Cir. 2012) as support for her ability to bring an invasion of privacy claim for the unauthorized dissemination of the images of her deceased mother (<u>see</u> FAC at 113 (¶ 597); Opposition at 24) is unwarranted.    In <u>Marsh</u>, the Ninth Circuit held that the plaintiff had a federal constitutional right of privacy in the images of a deceased relative within the context of a Section 1983 claim, not an invasion of privacy claim.    <u>See</u> 680 F.3d at 1152-55, 1158-60.

Moreover, as defendant Barresi notes (<u>see</u> Motion to Dismiss at 21), Plaintiff's allegation that defendant Barresi violated California Penal Code §§ 630-638 (FAC at 118 (¶ 625)) does not provide Plaintiff a private cause of action for invasion of privacy.    Although Plaintiff makes a conclusory assertion about defendant Barresi's liability under California Civil Code § 1708 (FAC at 118 (¶ 625)), Plaintiff makes no attempt to explain its applicability to this case.

The allegations in the FAC simply are too conclusory and disorganized to satisfy the first element of the intrusion claim.[15]    Accordingly, the FAC fails to allege a plausible invasion of privacy claim against defendant Barresi.

/ / /

/ / /

---

[15] While defendant Barresi asserts that the allegations are insufficient to satisfy the second element of the intrusion claim because Plaintiff does not have a reasonable expectation of privacy in the information about herself and her mother (<u>see</u> Motion to Dismiss at 21; Reply at 9), the Court declines to make a determination on that issue at this time.

5.    <u>Use of Name or Likeness (Cal. Civ. Code § 3344)</u>.

The FAC alleges a claim concerning the unauthorized use of name or likeness for commercial purposes.  (<u>See</u> FAC at 119-25 (¶¶ 628-64)).

Cal. Civ. Code § 3344(a) provides in pertinent part that:  "Any person who knowingly uses another's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without such person's prior consent, . . . shall be liable for any damages sustained by the person . . . injured a result thereof."

The statute "encompass[es] any unauthorized use 'on or in products, merchandise, or goods . . . .'  (Stats. 1984, ch. 1704, § 2, p. 6172.)  Accordingly, the statute no longer requires that the unauthorized use occur in a product advertisement or endorsement or other such solicitation of purchase."  <u>KNB Enterprises v. Matthews</u>, 78 Cal.App.4th 362, 367, n.5 (2000).  Under the statute, a plaintiff "must allege a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose."  <u>Downing v. Abercrombie v. Fitch</u>, 265 F.3d 994, 1001 (9th Cir. 2001) (citation omitted).  The apparent goal of the statute is to protect an economic right.  <u>See</u> <u>Comedy III Productions, Inc. v. Gary Saderup, Inc.</u>, 25 Cal.4th 387, 403 (2001) (". . . [T]he right of publicity is essentially an economic right.  What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity.") (citation omitted); <u>see also</u> <u>KNB Enterprises</u>, 78 Cal.App.4th at 366 ("What may have originated as a concern for the right to be left alone has become a tool to control the commercial use and, thus, protect the economic value of one's name, voice, signature, photograph, or likeness.").

22

In the Opposition, Plaintiff contends that the following allegations in the FAC (mostly in the order presented in the Opposition) "satisfy the commercial purpose requirement" of Cal. Civ. Code § 3344 and show that "Defendants here exploited Plaintiff's identity for financial and professional gain": (1) "Mr. Barresi and Mr. Waldman knowingly utilized [Plaintiff's] name, voice, and likeness in promotional materials profiling her and in marketing as a 'Hollywood Fixer,' directly linking it to their commercial endeavors." (FAC at 120 (¶ 636)); (2) "Defendants repeatedly showed Plaintiff and others that they no longer had control over their likeness, as the Hollywood Fixers had control over them and that the Defendants had the upper hand, in order to manipulate, frighten, misrepresent, and intimidate them to compliance." (FAC at 120 (¶ 637)); (3) "Mr. Barresi knew the value of audio recordings with the likeness of Plaintiff, key witnesses, potential witnesses, victims, when he offered financial value and a check to witness Ms. Berry for audio recordings of Plaintiff, with a key witness who saw assaults, abuse, and liabilities done by Depp in the Viper Room against men and women." (FAC at 120 (¶ 638)); (4) "Defendants Mr. Barresi and Mr. Waldman's use of [Plaintiff's] name/voice/likeness was directly connected to Mr. Barresi and Mr. Waldman's commercial purposes causing Plaintiff loss of relationships and safety while profiling her directly linking it to their commercial endeavors." (FAC at 121 (¶ 639)); (5) "Defendant[]s Mr. Barresi and Mr. Waldman did not have [Plaintiff's] consent, as [Plaintiff] did not consent to her audio, including with potential witnesses or victims of assaults, being used for commercial purposes. Defendants exploited unauthorized use of audio recordings discussing sensitive personal matters. Mr. Barresi's and Mr. Waldman's intent of using [Plaintiff's] likeness to manipulate perception, including of the 'principle' to retaliate against [Plaintiff], to cause witnesses and victims to spread fear to [Plaintiff], to cause retaliation from any investigative authorities, and to 'fix' cases involving Mr. Depp, by disseminating these materials, that further exacerbated the harm caused to

[Plaintiff]."  (FAC at 121 (¶ 641)); (6) "Mr. Barresi knowingly and without consent, express or implied, used [Plaintiff's] name/voice/likeness on files to advertise and sell to Mr. Waldman and Mr. Depp, in which they purchased the entire content, in the amount of $500,000 USD, as part of being profiled as a person to suppress for the role of 'Hollywood Fixer.'  A minimum of one financial transaction took place in approximately July 2023, which was surveilled by a Private Investigator."  (FAC at 121 (¶ 641); (7) "Mr. Barresi edited their audio [referring to an audio recording of a conversation between Plaintiff and Jane Doe] to force accusations in his interpretations, which he sent to publicity agents and lawyers of the actor Mr. Depp, and sent to alarm his erstwhile client's lawyers and security.  Mr. Barresi privately tested [Plaintiff] about sending it to allege security and did exposure.  In his shortened edited audio, he implicated Mr. Depp and Mr. Waldman."  (FAC at 34 (¶ 158)); (8) "On [Plaintiff's] mother's birthday on November 11, Mr. Barresi revealed an exploitative audio recording using [Plaintiff's] former hyphenated legal name with the threats of 'lawyers & publicists WARNED' and 'FBI ON HIGH ALERT!'" (FAC at 44 (¶ 209)); (9); "Mr. Barresi claims in this audio recording [between defendant Barresi and Ms. Berry] that the women, Stacy Lee Lopez and Donna, that Mr. Albertini saw assaulted by Mr. Depp in the Viper Room are irrelevant and may not exist.  Mr. Barresi asked potential witness Jalee Carder about Mr. Depp, not Donna."  (FAC at 33 (¶ 153)); (10) "On October 25th, an audio surfaces of [Plaintiff] speaking with Mr. Albertini as obtained by Mr. Barresi for commercial purposes to pressure into no witnesses of assault by Mr. Depp of women, including Donna, known by Jaylee Carter."  (FAC at 36 (¶ 169)); (11) "On July 31, 2024, Mr. Barresi sent a harassing and intimidating email to [Plaintiff] including the audio tape link of him with defendant Mr. Waldman, claiming her mother 'TRIED TO SUE WARREN BEATTY,' cursing her mother, a title with 'YOUR BROTHER' and links to the audio tapes he keeps of her, her alleged parentage, and the Viper Room witness that

wanted to testify against 'JOHNNY DEPP.'  Mr. Barresi claims [Plaintiff] is communicating with reports."  (FAC at 76 ("On October 25th, an audio surfaces of [Plaintiff] speaking with Mr. Albertini as obtained by Mr. Barresi for commercial purposes to pressure into no witnesses of assault by Mr. Depp of women, including Donna, known by Jaylee Carter."  (FAC at 36 (¶ 416)); (13) "Then hours later Mr. Barresi admitted he was not on the payroll of previous clients: 'ended Sept 21 2019 where is your proof to the contrary[.]'"  Unlike to Mr. McCormick, Mr. Brummitt, and to potential witnesses, Mr. Barresi admitted to [Plaintiff] that he was no longer under lawyers of Ms. Heard's case."  (FAC at 40 (¶ 191)); (14) "On November 5, 2022, Mr. Barresi emailed [Plaintiff] that he could not go to New York as he had planned, and tried to persuade [Plaintiff] into a meeting in California, to which [Plaintiff] resisted stating her favorite lounge is in the Hays Adams in DC.  Mr. Barresi mentions in emails in addition to his texts about a 'deal,' which is a word [Plaintiff] never used.  "And what do you mean when you say, 'package deal' like Waldman did in LA--[.]"  (FAC at 40 (¶ 192)); (15) "Mr. Barresi sent quotes highlighting the audio tape he had of [Plaintiff] speaking with Jane Doe referring to 'report drop offs,' as he linked it to Mr. Waldman, and reiterated 'PACKAGE DEAL' in his title."  (FAC at 40 (¶ 193)); (16) "After highlighted audio tapes to pressure [Plaintiff], and forced to respond that "spun 'Deals'" to trap witnesses are not legitimate between private parties, [Plaintiff] wrote to Mr. Barresi that she suspected that Mr. Albertini told numerous witnesses he was intimidating and he knew the director of the City of Lies.  Mr. Barresi then wrote to [Plaintiff] in email, 'Brad Furman is the director of City of Lies.  I have him on tape for an hour.'"  (FAC at 40-41 (¶ 194)); (17) "In the same recording, Mr. Barresi offers money to Ms. Berry for audio recordings of [Plaintiff] and Mr. Albertini, while stating Ms. Berry won't be implicated if she complies.  Mr. Barresi claimed he spoke with 'hundreds of people' and/or accessed their information over the years.  Mr. Barresi states, 'Some people

25

make $250,000 a week.'  In another recording, Mr. Barresi states he 'mailed her a check.'"  (FAC at 33 (¶ 33)); (18) "On December 20, Mr. Barresi boasted about his abilities as the Hollywood Fixer to thwart the judicial process with intimidations."  (FAC at 51 (¶ 247)); (19) "Mr. Barresi and Mr. Waldman continue to invade [Plaintiff's] privacy of private affairs by searching for her location and exploiting audio tapes."  (FAC at 60 (¶ 305)); (20) "In January 2024, Mr. Barresi emails Ms. Taft threatening her twice with:  *THE HOLLYWOOD FIXER THAT WOULD'VE KILLED FOR JOHNNY DEPP' and 'THE MAN THAT WOULD'VE KILLED FOR JOHNNY DEPP,'* [w]hile continually threatening exposure about her mother's alleged sexual activities."  (FAC at 69-70 (¶ 368)); (21) "On January 9, 2024 at 4:11 PM Mr. Barresi writes to [Plaintiff]: *Subject: Excerpt from my book – TITLE:  THE HOLLYWOOD FIXER WHO WOULD'VE KILLED FOR JOHNNY DEPP*[.]"  (FAC at 70 (¶ 369)); (22) "On October 15, 2022, Mr. Barresi confirms Mr. Waldman told him words – from his phone calls with him, 'He said the words word for word.  And you can take that to the bank.  That's all you need to know.'"  (FAC at 36 (¶ 168)), (23) "On July 24, 2023, Defendant Paul Barresi states Johnny Depp listens to him, including on donations and no more handouts.  Defendant Paul Barresi also states Johnny Depp listens to his advice, 27 freeloaders he found, take to the bank."  (FAC at 58 (¶ 295)); (24) "Defendant Mr. Barresi stated, 'and you can take that to the bank' when admitting that Defendant Mr. Waldman directed Mr. Barresi to 'fix' in his distributions and gave praise for his marketing to claim that witnesses do not exist and/or misrepresent their likeness."  (FAC at 121 (¶ 642)); (25) "Approximately September to October 2022, Mr. Barresi obtained the audio recording of [Plaintiff] and Jane Doe."  (FAC at 33 (¶ 157); (26) "Approximately January 26, Mr. Barresi, in response to [Plaintiff] stating Mr. Depp would be sued, was manipulating Jane Doe to email [Plaintiff] after a year and a half.  Jane Doe wrote the audio tape of her with [Plaintiff] was 'illegal' and she 'had to pay for it.'"  (FAC at 71 (¶ 381)); and (27)

"In July 2024, Mr. Barresi and Mr. Waldman, in their conspiracy, continued to
contact potential witnesses of [Plaintiff's], including Mr. Albertini and Jane Doe, to
continue withholding testimony, invasions of privacy, coordinated harassment, and
interference."  (FAC at 76 (¶ 413)).  (Opposition at 27-29).

The conclusory and disjointed allegations in the FAC on which Plaintiff relies
do not clearly and sufficiently state what was it that defendant Barresi unauthorizedly
used for a commercial purpose and/or what was defendant Barresi's commercial
purpose.  There are no allegations in the FAC that the audio recordings of Plaintiff's
voice which defendant Barresi allegedly edited (the primary focus of Plaintiff's
unauthorized use of name or likeness for commercial purposes claim) was "on or in
products, merchandise, or goods" or "for purposes of advertising or selling, or
soliciting purchases of, products, merchandise, goods, or services."

In the Opposition, Plaintiff attempts to meet the "commercial purpose"
requirement by characterizing the allegations in the FAC.  (See, e.g., Opposition at
27 ["Plaintiff alleges that the Defendants utilized her name, voice, and likeness in
promotional materials intended for publicists and agents in order to gain
commercially[.]"; "Defendants intentionally recorded and disseminated Plaintiff's
name, image, voice and likeness. . . . "[O]n October 25, 2022, an audio recording of
Plaintiff speaking with Mr. Albertini was obtained and disseminated by Mr. Barresi
for commercial purposes to suppress witnesses of assault by Mr. Depp[.] . . .
Defendant Barresi manipulated commercial gains by intimidating Plaintiff from
speaking with reporters and exploiting her likeness and voice[.]"; "Defendant
Waldman collaborated with Defendant Barresi, who marketed these recordings as
part of a monetized 'package deal' to publicists and agents of their principal[.] . . .
These recordings were exploited for commercial gains, including promotional
materials profiling Plaintiff and marketing Defendants' services as 'Hollywood
Fixers.'"; id. at 28 ["Defendant Barresi emphasized his financial gain from the use of

Plaintiff's voice/likeness by repeatedly exclaiming 'take it to the bank,' referencing Waldman praising his work, while exploiting Plaintiff's voice/likeness, of no witnesses appearing, including in articles[.] . . . Defendant [Barresi] provided financial worth to audio recordings of Plaintiff with other witnesses[.]"; ". . . Defendants intentionally misappropriated Plaintiff's identity and testimony, related to Viper Room witnesses and Jane Doe, to falsify statements, manipulate public perception, and further their commercial endeavors[.]"; "The Defendants used Plaintiff's voice and likeness in promotional materials aimed at enhancing their services and attracting high-profile clients."]; <u>id.</u> at 29 ["Defendant Barresi's efforts to commercialize Plaintiff's private information, such as through his claims of influencing Mr. Depp's financial decisions and strategy to monetize Plaintiff's identity and conversations."]). However, Plaintiff's creative and convoluted packaging of the FAC's allegations do not fix the issues with Plaintiff's claim.

Accordingly, the FAC fails to allege a plausible unauthorized use of name or likeness for commercial purposes claim against defendant Barresi.

6.  <u>Civil Harassment (Cal. Code Civ. P. § 527.6).</u>

The FAC alleges a claim of civil harassment. (<u>See</u> FAC at 125-32 (¶¶ 628-64)).

Harassment, as defined by Cal. Code Civ. P. § 527.6, is defined as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purposes." Cal. Code Civ. P. § 527.6(b)(3). "Course of conduct" is defined as follows: "[A] pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondent to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email."

28

Id. § 527.6(b)(1).  "The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner."  Id. § 527.6(b)(3).

In the Opposition, Plaintiff contends that allegations in the FAC sufficiently allege harassment by defendant Barresi.  (See Opposition at 30-33).[16]  As support, Plaintiff cites to numerous allegations in the FAC, specifically, FAC at 30 (¶ 137) ["On September 22, 2022, the first complaint was submitted to the Department of Consumer Affairs Bureau of Security and Investigative Services with several contributors related to witness interference and 'thwarting the judicial process.'"], 31 (¶ 142, discussed above), 31-32 (¶ 147) ["On October 5, 2022 Mr. Barresi wrote, *"I DON'T CARE WHAT THE UNDERTAKER SAYS" after IM NOT A HITMAN." Mr. Barresi then wrote referring to a friend of [Plaintiff's] texting him with an image of a girl tied up in a room. [Plaintiff] didn't know which friend."*; single spacing omitted], 32 (¶ 148) ["[Plaintiff] tried to report the threatening image.  She was still afraid to go into timeline details to LAPD officer Thomas #43990 at the Pacific Division of Culver City due to him asking if Amber was her friend after looking at the full posting of the photo.  Next to Amber Heard's name is '*DIE HARD.*' *She stated 'no' and was advised to get a restraining order.*"], 33 (¶ 154, discussed above), 34 (¶ 158, discussed above), 37 (¶ 174) ["On October 22, 2022, [Plaintiff saw Mr. Barresi proclaim,  '*ANOTHER JOHN DEPP TARGETED ATTACK.  The Criminal Plot to Takedown A Hollywood Fixer.  Gambino family gathering.  Paul Barresi & Victoria Gotti.  Al incite va il bottino.*'  *Attached is a photo of Mr. Barresi and allegedly Ms. Gotti.  Ms. Taft is alerted by this mafia family implication, is*

---

[16] To the extent that Plaintiff relies on evidence not attached to the FAC or incorporated by reference, including the Hawaiian district court's January 22, 2025 grant of her temporary restraining order against defendant Barresi and statements contained in the Declarations of Mike McCormick and Eric R. Eichler (see Opposition at 30, 32-33), the Court will not consider them.

*intimidated by it, and sees it as a threat to her 'Incite Al Gambino' when read quickly by an English speaker.  The same day, Mr. Barresi does a death threat about [Plaintiff], 'HAS EVER BREATHED AIR,' with an old photo of her attached."*; footnote and single spacing omitted], 37 (¶ 178) ["Mr. Barresi sent 65 text messages and 17 emails to [Plaintiff] between November to December 2022."], 39 (¶ 189) ["Two hours later, Mr. Barresi sends [Plaintiff] threatening text messages regarding her mother, Victoria Taft, and the Gotti mafia family.  This includes risks of exposure and about death."], 39-40 (¶ 190) ["On November 2, in Mr. Barresi's first text to [Plaintiff], he claimed 'Victoria Gotti told me your mother claimed she witnessed a mob hit.'  [Plaintiff] took this as a possible threat to her that she could be at risk of a possible mob murder.  He 'got 8mm tapes and recordings to your crazy bitch.'"], 44 (¶ 213) ["A shadowy unnamed detective figure, representing Mr. Conner, in the audio claims that Victoria Taft witnessed a mob murder by the Gottis.  Images of a dead man on the ground and three alleged men of the Gotti family are shown by Mr. Barresi."; footnote omitted], 46 (¶ 225) ["November 15 2022: Mr. Barresi wrote, 'Anyone notice Richie Albertini's **dead silence**. . . Where oh where is that little coward . . .'"], 47 (¶ 227) ["Mr. Barresi sends a visually disturbing and distressing email to [Plaintiff] about her mother's death.  Sun, Nov 20, 2022, 4:38 PM: 'You have a hole in your heart Christina.  Your mother was wrong to think that she could fill it with all the love she held for you in hers.  Even after death Victoria did not stop believing it because after the fire her heart remained intact. . .'"], 62 (¶ 321) ["[Plaintiff], as she had about 'leaving town,' felt compelled to leave the country upon the fixers' directions.  She knew fixers like Mr. Barresi and Mr. Waldman were conspiring for Mr. Depp and that can including making fear of a mafia hit."], 62 (¶ 322) ["On October 26, 2023, Mr. Barresi with Mr. Waldman's approval for false set ups, '[Plaintiff] fled the country because the FBI is looking for her. []She attempted to frame Johnny Depp's private investigator, all in the name of Amber Heard.'  The

next statement repeated about her mother Victoria's death."], 63 (¶ 328) ["Mr.
Barresi, with Mr. Waldman's approval, continued infliction of emotional distress
centered around demise, '[Plaintiff] is so evil she left her mother to burn alive in the
biggest fire in California history.'"], 67 (¶ 354) [January 7, 2024 at 8:11 PM Barresi
writes: *'Drop dead you ugly little bitch. Your poor mother must be burning alive
again and her misguided soul wondering aimlessly in the universe[.]'*"; single
spacing omitted], 70 (¶ 373) ["Barresi's continuous threats and attacks were making
[Plaintiff] afraid of a 'hitman's violin' and afraid for her life."], 70 (¶ 375) [On
January 11, 2024, Mr. Barresi emails a TAFT ROOF titled image of his posting as a
threat to her, *'. . . accused me of being a hitman and throwing a woman off a roof . .
. She's constantly afraid for life . . . if so afraid of me why have an apartment on the
8th floor.' The email contains suffocating pressure to [Plaintiff] that Mr. Barresi has
recordings of her. [Plaintiff] interprets this as a demand to her to die."*; footnote
and single spacing omitted], 71 (¶ 382) ["On January 26th, 2024 [Plaintiff] reported
to the FBI as he claimed he was accused of being a 'hitman,' that he 'threw a woman
off a roof,' and he stated she was on the '8th floor.' [Plaintiff] included that he
blackmails witnesses and her during exploitation related to actor Mr. Depp."], 74 (¶
400) ["Mr. Barresi continues to wish for [Plaintiff's] death for her to be the worst to
have 'ever breathed air' in his writings attached to the exploited audio tapes
implicating to the mafia murder."], 74 (¶ 401) ["Defendant Waldman is known as
being dangerously connected and Mr. Barresi has photos connecting himself to the
American mafia families Gambino and Gotti which he uses to intimidate potential
witnesses and possibly clients or former clients."], 75 (¶ 403) ["Mr. Barresi claims
the witness saw a mob murder by the Gambinos as hitmen hired by an infamous
athlete that had just perished. Originally, this witness cooperated with law
enforcement."], 74 (¶ 404) ["[Plaintiff] sends this to BSIS with fear, referring to the
false claim of Mr. Barresi about her mother witnessing a mob murder by the Gottis,

and that it's with fabrications, and Mr. Barresi continued to misrepresent his hiring."], 75 (¶ 408) ["The same day, Mr. Barresi continues to re-exploit the audio coercion against [Plaintiff], which could make her think she is at risk of a mafia murder instead of reporting Mr. Depp, Mr. Waldman, or Mr. Barresi.  He writes that [Plaintiff], 'fled to Hawaii.'"], 76 (¶ 414, discussed above), 77 (¶ 415) ["On August 16, 2024, Mr. Barresi sent a threatening email to [Plaintiff] with the words, 'will be the death of you,' intimidating her for her PI surveilling the July 2022 'private plane' transaction from Mr. Waldman in DC to him, to be 'burning in hell' and that she will have death like her mother."], and 127 (¶ 680) ["Defendants invoked that Plaintiff and others, including potential witnesses and family members, can be victimized by the mafia.  Plaintiff had private investigators and security to attempt to protect herself and others, at great costs to her.  Defendants proceeded to intimidate and manipulate these personnel for years, in order to cause distress and higher costs."]).  (See Opposition at 30-33).

Regardless of how Plaintiff characterizes the allegations in the FAC (see Opposition at 30-33), the conclusory, speculative, and rambling allegations in the FAC do not clearly and sufficiently allege that defendant Barresi engaged in "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person[.]"[17]

Accordingly, the FAC fails to allege a plausible claim for civil harassment against defendant Barresi.

/ / /

/ / /

---

[17] At this time, the Court will not address defendant Barresi's argument that his communications would not "cause a reasonable person to suffer substantial emotional distress" (see Motion to Dismiss at 21; Reply at 10).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 7.    Intentional Infliction of Emotional Distress.

The FAC alleges a claim of intentional infliction of emotional distress.  (See FAC at 134-40 (¶¶ 722-750)).

Under California law, the elements of an infliction of emotional distress claim are: "(1) [E]xtreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct[.]" Potter v. Firestone Tire & Rubber Co., 6 Cal.4th 965, 1001 (1993) (citation and internal quotation marks omitted); see also Crouch v. Trinity Christian Center of Santa Ana, Inc., 39 Cal.App.5th 995, 1007 (2019).  For conduct to be outrageous, it "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." Christensen v. Superior Court, 54 Cal.3d 868, 903 (1991) (citation omitted); see also Hughes v. Pair, 46 Cal.4th 1035, 1051 (2009) (stating that a claim for intentional infliction of emotional distress cannot be based on "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities") (citation and internal quotation marks omitted).  Additionally, "[t]he defendant must have engaged in conduct intended to inflict injury or engaged in with the realization that injury will result." (Id.) (citation and internal quotation marks omitted).  "Severe emotional distress means emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." Potter, 6 Cal.4th at 1004 (citation and internal quotation marks omitted).

In the Opposition, Plaintiff contends that the allegations in the FAC related to Defendants' "coordinated efforts to intimidate and harass Plaintiff, invade her privacy, and obstruct justice" describe outrageous conduct.  (Opposition at 33).  As

/ / /

/ / /

/ / /

33

support, Plaintiff specifically cites to numerous allegations in the FAC, including FAC at 9 (¶ 35), 13 (¶ 57), 15 (¶¶ 69, 72-76), 16 (¶¶ 82-83, 86), 17-19 (¶¶ 91-93), 19-20 (¶¶ 94-97), 21-22 (¶¶ 98-102), 23 (¶¶ 108-09), 25 (¶¶ 114-16), 26-27 (¶¶ 118, 122-24, 126) and 28 (¶¶ 128-29).  (See Opposition at 33).

The conclusory (and mostly interpretive) allegations cited by Plaintiff do not sufficiently describe outrageous conduct.  Indeed, Plaintiff, by describing certain actions by defendant Barresi as "aimed to convey," "suggests he is a hitman," and "made references to death, suffering, and violence" (Opposition at 34), minimizes the level of defendant Barresi's conduct.  Moreover, many of the allegations cited by Plaintiff do not describe conduct by defendant Barresi that was directed at Plaintiff.  See Christensen, 54 Cal.3d at 903 ("It is not enough that the conduct be intentional and outrageous.  It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware.").  Therefore, the allegations in the FAC do not sufficiently allege outrageous conduct.[18]

Accordingly, the FAC fails to allege a plausible intentional infliction of emotional distress claim against defendant Barresi.

8.    Negligent Infliction of Emotional Distress.

Finally, the FAC alleges a claim of negligent infliction of emotional distress. (See FAC at 140-45 (¶¶ 751-89)).

/ / /

/ / /

/ / /

/ / /

---

[18] Defendant Barresi asserts that the allegations in the FAC are not sufficient to show that Plaintiff suffered severe or extreme emotional distress as a result of defendant Barresi's conduct. (See Motion to Dismiss at 20-21).  The Court will not address that assertion with respect to Plaintiff's claim of intentional infliction of emotional distress.  However, the Court will address that assertion with respect to Plaintiff's claim of negligent infliction of emotional distress, discussed below.

34

"A cause of action for negligent infliction of emotional distress requires that a plaintiff show '(1) serious emotional distress, (2) actually and proximately caused by (3) wrongful conduct (4) by a defendant who should have foreseen that the conduct would cause such distress.'" <u>Austin v. Terhune</u>, 367 F.3d 1167, 1172 (9th Cir. 2004).

Defendant Barresi contends that the allegations in the FAC are insufficient to satisfy the severe or extreme emotional distress element of her negligent infliction of emotional distress claim. (<u>See</u> Motion to Dismiss at 20-21). Defendant Barresi claims that the emotional distress alleged by Plaintiff in the FAC does not rise to the level of severe or extreme emotional distress. (<u>See</u> Motion to Dismiss at 21 [describing Plaintiff's alleged emotional distress as "generalized anxiety" based on her feeling "fearful" and on her being prevented "from functioning normally"]).

Although Plaintiff claims that as a result of defendant Barresi's conduct she suffered "profound psychological trauma," including "her flight freeze-flight response" and psychological captivity, where her ability to function normally is severely impaired," and debilitating symptoms, including hypervigilance, insomnia, anxiety, humiliation, "a pervasive sense of helplessness" and "a loss of her sense of safety and security" (Opposition at 35-36), none of the allegations cited by Plaintiff describes her emotional distress. (<u>See</u> Opposition at 35-36, citing FAC at 15 (¶ 75), 16 (¶¶ 84-85), 20 (¶ 95), 21-24 (¶¶ 98, 100-01, 102, 104, 106-09), 25 (¶ 117), 26 (¶¶ 119-21, 123), 27 (¶ 125), 28 (¶¶ 128-30)). Moreover, the allegations in the negligent infliction of emotional distress portion of the FAC do not sufficiently describe Plaintiff's emotional distress. (<u>See</u> e.g., FAC at 140-45 (¶¶ 753-87)).

Accordingly, the FAC fails to allege a negligent infliction of emotional distress claim against defendant Barresi.

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.**    **Leave to Amend Should be Granted.**

As discussed above, the Ninth Circuit requires that pro se litigants be given an opportunity to amend unless it is clear that the deficiencies cannot be overcome. <u>Lopez</u>, 203 F.3d at 1130-31.  While the Court is dubious that Plaintiff can state plausible claims against defendant Barresi, the Court cannot at this point conclude that amendment of Plaintiff's claims would be futile.  Therefore, in the interest of justice, and in light of her pro se status, Plaintiff is granted an opportunity to cure the above noted deficiencies in her pleading.

**V.**

**ORDER**

IT IS THEREFORE ORDERED that:  (1) Defendant Barresi's Motion to Dismiss is GRANTED; (2) Plaintiff's claims in the FAC are DISMISSED without prejudice and with leave to amend; and (3) if Plaintiff still desires to pursue her claims, she must file a Second Amended Complaint within thirty (30) days of this Order.

If Plaintiff chooses to file a Second Amended Complaint, it should bear the case number assigned in this case; be labeled "Second Amended Complaint"; and be complete in and of itself without reference to any other pleading, attachment, or document.

DATED:  May 1, 2025

_____

DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

36