Christina Taft
Plaintiff in Propria Persona
1700 Ala Moana Blvd Apt 2301
Honolulu, Hawaii 96815
Phone: 212-718-1003
Ceo.Taft@Rescue-Social.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# EASTERN DIVISION

_____

CHRISTINA TAFT

    Plaintiff,

vs.

PAUL BARRESI, et al,

    Defendants.

_____

Case No.: 5:24-cv-01930-TJH-DTB

**CORRECTED NOTICE OF SUBPOENA TO WITNESS AMBER HEARD TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS – Declaration on causes**

**TO ALL DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEAST TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 45, Plaintiff is issuing the attached subpoena to the following **witness**:

AMBER HEARD

On August 6th, 2025, the Clerk issued the Subpoena to Witness Amber Heard to Produce Documents, Information, or Objects (Issued at Counter). The Clerk R. Young signed it. However, Plaintiff was afraid of Barresi using Justin to harm her if they saw the subpoena to Ms. Heard. Plaintiff had already delivered a positive, optimistic cover letter to Ms. Heard and to Carlos in Spain. Even when Ms. Heard was in Massachusetts for her first artist work since this litigation started, when Plaintiff was in Boston, Plaintiff was too afraid to reach out.

This notice explains the diplomatic (United Nations Human Rights Champion), humanitarian, activist, and charity interests Plaintiff had in Ms.

Heard's work. Specifically, Plaintiff was too afraid to show she had a subpoena to Ms. Heard, or what she wrote in a cover letter to her.

On August 6th, 2025 the Clerk issued the Subpoena to Witnesses Johnny Depp and Witness Isaac Baruch to Produce Documents, Information, or Objects (Issued at Counter). The Clerk R. Young signed it, and the Plaintiff has not tried to serve Johnny or Isaac. Plaintiff states Johnny, Amber, and Adam are witnesses.

*Plaintiff's Initial Interest in Ms. Heard's Humanitarian Work*: Plaintiff at first in 2019 was very happy to see Ms. Heard's interests in the United Nations, Mariana Dahan's charities supposed to help children, Cherie Blair (married to Tony Blair, the former Prime Minister of the UK), and multilateral affairs. The progressive causes were eye-opening to the Plaintiff. Plaintiff was always interested in representatives and causes.

*Shared Experience with Journalist Alexi Mostrous*: In 2023, Ms. Heard and Plaintiff both spoke with journalist Alexi Mostrous. In this interview by email, where Mostrous stated she did not want to be on the telephone, suggesting she didn't want to be recorded, Ms. Heard described an intermediary of an ultra-high-net-worth individual, Musk, falsely accusing that she went to the media. To Plaintiff, this appeared like her way of trying to explain what could be occurring between her and Barresi. Ms. Heard's interview result on Alexi Mostrous's podcast in Oct 2024: https://www.tortoisemedia.com/listen/elons-spies/amber. It's notable that in his narrative, Alexi alleged a principal instead of correctively naming intermediaries (and people have their own autonomy)—this is intensified in the very real extortion tactics by Barresi demonstrated against Plaintiff to take away her freedom—and explains how Barresi gets intermediaries like Justin and lawyers to silence their clients. Barresi's illegal telephone recording practices enforce his interests—when people didn't want to be involved, Barresi requires them to be. Mostrous, however, referred to the first private detective in the world being French, not Italian. Plaintiff was similarly too afraid to go on video or audio with

Mostrous, due to fearing Barresi. According to other witnesses as well, including Howell, these intermediaries appeared to be controlling – Barresi fuels this fire.

*Executive Protectors and Control*: In Plaintiff's own experience, "executive protectors" can become hostile, controlling, and tell alleged 'clients' to "keep a low profile" and stay silent. These individuals may not explain why they have suspicions or their viewpoints, which can be especially confusing to liberal individuals. Further, executive protectors can allegedly track flights and employ a number of other tactics. Barresi's use of Justin to focus on her property, residencies, and so on, while manipulating ultra-high-net-worth individuals while systemically illegally recording their lawyers, has turned Plaintiff's previous advocacy including for UHNW Free Britney for "giving her assets, money, travel, and freedom" on its head. Plaintiff's freedom is removed from her, because she showed sympathy to individuals experiencing manipulation.

*Plaintiff's Petition Supporting Ms. Heard's Humanitarian Work*: Plaintiff created a petition[1] in support of Ms. Heard that focused on her humanitarian work, leadership with the United Nations and ACLU, her role as the first American actress named Human Rights Champion to the United Nations Human Rights Office, her charitable work helping children, her advocacy for equal rights, public safety technology, and duty to rescue laws. The petition emphasized Ms. Heard's long-time charity, philanthropy, and activism dating back to age 12, her support of numerous organizations including Born This Way Foundation, GLAAD, Habitat for Humanity, The Trevor Project, Cyber Civil Rights Initiative, and her speaking at global events like the UN Social Good Summit, Global Citizen Festival, and One Young World Conference. The petition referenced general causes and her humanitarian leadership. Plaintiff's interest was in supporting Ms. Heard's positive

---

[1] https://www.change.org/p/support-amber-heard-in-aquaman-2-her-life-and-public-safety-to-save-lives-warner-bros-mera-loreal-united-nations-aclu/u/31538380 – Note: The headline was chosen by the journalist.

advocacy work for equality, public safety innovations, and her role as a leader for progressive causes who should have a voice to continue her humanitarian work.

*Lack of Communication Despite Plaintiff's Support*: Ms. Heard has not shown any politeness, gratitude, or thanks as others have described before what occurred to Plaintiff. Even when her own lawyer Elaine allegedly told Ms. Heard to speak with Plaintiff directly about promoting her career and charitable interests, she did not. The coldness has been shocking, and to some viewpoints, can be a form of abuse. The amicus brief with 32 signers, with Plaintiff actually a far larger editor and writer than outsiders believed, and Plaintiff, until Barresi, could have lawyers and regular representation. Plaintiff regrets being involved and had been warned by Rose McGowan she would not show gratitude, but as stated, she was initially interested in these progressive causes. She wanted to see the good in people, and at first, it was quite exciting and positive.

*Understanding of Ms. Heard's Concerns*: As far as she understands it, a main issue for Ms. Heard were releases of audio recordings and not being able to explain due to the narrative.

*Plaintiff's Regret and Current Situation*: Plaintiff has pleaded multiple times—although she became more progressive and supported civil rights, tech for good, human rights, and equality, the support she gave has ruined and destroyed Plaintiff by Barresi and those in concert with him. She has now had to wonder if there's anywhere in the world that she could survive long-term or be a regular person. The political interests made this completely unclear at first. Further, the brief described it as an Opinion Editorial, and it contained other causes within it. However, this abuse does not end, due to intermediaries feeding and creating more abuse, exploitation, and destruction.

*Barresi's Pattern of Manufacturing and Falsely Attributing Accusations*: The amicus brief, which addressed First Amendment concerns and the ability of Americans to speak out about injustices, demonstrates a critical pattern in Barresi's

conduct that extends beyond this case. The brief, which Plaintiff substantially edited and wrote to support women's rights groups, media organizations, and abuse advocacy organizations, became a target of Barresi's manipulation. Plaintiff adds an exhibit to this notice proving that other writers and editors had a say in the brief's content. Ms. Heard's focus in her humanitarian work was on advocacy to politicians and multilateral affairs, not on reporting abuse—the brief's discussion of reporting impact was about general social effects. Plaintiff actually doubts this reporting impact now, since this was generally about alleged "Hollywood math" rather than the applicability of perjury. It is critical to note that Ms. Heard wrote an Opinion Editorial and was a 'newcomer' to Hollywood, when Defendant Barresi has been involved in these practices of manufacturing accusations longer than her own age.

Barresi engages in a systematic approach of illegal telephone recording practices to enforce his interests—when people didn't want to be involved, Barresi requires them to be. He then publishes harmful content that damages reputations, manufactures accusations, falsely attributes responsibility for these allegations to wealthier individuals instead of himself to deplete their resources. This tactic—falsely connecting wealthier individuals to the manufactured content while erasing the role of intermediaries who are actually more related to the issues—allows Barresi to create damaging narratives while obscuring his own role as the actual source and manipulator of information. He makes it appear that the harmful content originated from or is connected to wealthy targets rather than himself. This pattern mirrors the exploitation tactics he used against Isaac Baruch, Adam Waldman, and Plaintiff herself, demonstrating a consistent methodology of creating harm while avoiding accountability for his/Barresi's own actions as the true originator of the damaging content.

The first draft by attorney Tom Urban of this amicus brief showed a rivalry between Elon Musk and Johnny Depp, with a text message demonstrating it. This

was removed from other versions. Barresi obtaining classified information not accessible to lawyers or attorneys suggests Barresi has paid "Justin" to join his fraudulent schemes—while pressuring ultra-high-net-worth individuals. This demonstrates how Barresi's manipulation of intermediaries, while he and the intermediaries go between "multiple sides against the middle," is particularly horrifying and psychologically damaging. Notably, the insertion of the term "intimate partner" throughout the brief was a demand by attorney Sarabia, as Plaintiff preferred the term "domestic abuse." It was Tom Urban's influence that brought women's groups into the brief.

      The Plaintiff believes Ms. Heard may provide testimony regarding:

- Her experiences with intermediaries and executive protectors
- Communications with journalist Alexi Mostrous regarding similar concerns about media manipulation – and Barresi's use of Justin intensifying silence
- Audio recordings and narrative control (Barresi's telephone call recordings)
- The amicus brief and Plaintiff's involvement in supporting progressive causes – and genuinely supporting charitable positive changes
- Barresi's exploitation tactics and methods using intermediaries of UHNWIs
- Plaintiff's genuine interest in progressive and humanitarian causes, and that Plaintiff genuinely wanted to move forward, not backwards

      Paul Barresi deployed these same tactics against another pro se individual—without the protection of a lawyer in between—who when reading their brief, was very much focused on the harm by an intermediary person (who wasn't employed by Musk). The intermediary was focused on destroying Musk, and perhaps was a former employee. The pro se individual's brief was a way to try to find help from UHNW Musk—mentioned far later than the intermediary. Barresi instead published that the pro se litigant's romantic partner died from a heart attack from her brief, which is false upon reading it. (RadarOnline link removed). This

demonstrates Barresi's pattern of misrepresenting content to falsely connect wealthy individuals while obscuring the actual intermediaries involved.

Plaintiff further attaches exhibits showing her positivity to focus on the good humanitarianism and reaching organizations and for American rights. Sadly, Plaintiff has no rights anymore in the United States, and the silence by Amber moved everything to Johnny's circles and to Adam Waldman - who is from the East coast with different facilities on perjury than the West coast, hence Op Ed.

The Plaintiff attaches an email she sent to Mr. Waldman pleading for issues and that she actually saw that both Johnny and Amber were victimized by Barresi (but she was silenced in a way that's not as horrific but similar to Justin). The Plaintiff requests that people can clarify matters away from Barresi's manipulation.

Plaintiff still has hope for peacebuilding in these matters, if the parties can finally remove the exploitation involved. This doesn't have to be an alleged cultural or political issue, if there can be polite communication.

The Plaintiff's Exhibit A to the subpoena is the same as the one given to Johnny—stating they're both victims of Barresi's and requesting information about Justin—which relates to ongoing motions and matters (exploitation amounting to extortion of both men and women – and Plaintiff pleads to "both sides" for help).

The subpoena calls for the production of documents or things specified in the subpoena and the attachment to the subpoena on the date, time, and location indicated in the subpoena. See Attached Exhibit A to Witness Subpoena.

The notice is submitted for correction with the clerk-issued subpoena over the counter.

I declare under penalty of perjury that the foregoing is true and correct.

Date: October 8, 2025, in Cannes, France

*Christina Taft*

Christina Taft - *Plaintiff in Propria Persona*