AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| CHRISTINA TAFT | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 5:24-cv-01930-TJH-DTB |
| PAUL BARRESI, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                                CONSTANCE FOX

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

SEE EXHIBIT A ATTACHED FOR WITNESS SUBPOENA: [Anthony Fox of Johnny's Viper Room] Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

| Place: Email: Ceo.Taft@Rescue-Social.com or TaftChristina.Ceo@gmail.com or TaftChristina.Life@gmail.com | Date and Time: 12/15/2025 5:30 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

OR

_____          _____
   *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Plaintiff Christina Taft _____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  5:24-cv-01930-TJH-DTB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____                    _____
                                                         *Server's signature*

                                                         _____
                                                         *Printed name and title*

                                                         _____
                                                         *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## Exhibit A: Draft Notice to Communicate and Explanatory Note to Constance Fox

**Part I: Notice to Communicate**

**Notice to Communicate: Constance Fox**

**From: The Plaintiff**

**Re: Defendant Paul Barresi's Pattern of Illegal Recording, Commercial Exploitation, Anthony Fox and His Family, and Scams against Ultra-High-Net-Worth Individuals**

**RESPONSE DUE DATE:** December 15, 2025

**NOTE: Please note that all of the questions in this notice are voluntary to answer, and nothing is being enforced. Further, can include a new response. You may modify or increase the time to respond.**

**Please note that these questions can be answered in one paragraph, or most questions may not be answered - you can choose your response. Thank you for your time.**

## Background

The Plaintiff is issuing this notice to communicate because Defendant Paul Barresi illegally recorded your family members on the telephone and disclosed recordings without consent. **We extend our deepest sympathy to you and your uncle Charles for the loss of your father.**

**Plaintiff obtained the actual filings from Anthony Fox's lawsuit**, and Barresi harmed the Plaintiff and her family about former Viper Room employees, which informed questions in this notice regarding the allegedly forged Exhibit 77 of an agreement created long after the facts, Trouser Trumpet Inc., and alleged security members.

Barresi illegally recorded Adam Waldman, friend and attorney to ultra-high-net-worth individual Johnny Depp, on the telephone. In this illegal telephone recording, Plaintiff Taft, her family and inheritances, and a former Viper Room employee were discussed. **The Viper Room employee noted in the illegal telephone recording Barresi has of Big Ed Shaw thought of a different suspect involved with Fox's demise, as a person paid related to the Viper Room, and Johnny with his generosity not involved and sympathetic. Olivia Barash and Ed Shaw similarly corroborated.**

**After 2 years of silence, Adam Waldman finally wrote about the exploitation of Johnny without written agreements and claims of individuals being paid by entities involving him without legitimate agreements - then if he wants to not pay them, they can pressure him - in "Scams" against ultra-high-net-worth individuals after Plaintiff's direct communication to Adam to reconcile.** This recording was repeatedly disclosed near Barresi's disclosures of recordings about Anthony Fox and his family, which were inappropriately connected to ultra-high-net-worth individual, Johnny Depp. Mario Nitrini requested Plaintiff's subpoena to provide Barresi's collected information on Fox and not solving Fox's disappearance. Your responses will help establish Barresi's pattern of conduct, which includes extortion, and how this pattern has interfered with justice.

**Anthony Fox and his daughter deserve justice and clarity.**

## General Pattern of Exploitation Involving Anthony Fox, Recordings, and Charity

Barresi has demonstrated a consistent pattern of exploiting wealth and inheritances for commercial purposes rather than seeking truth. He illegally records individuals over the telephone without their consent - including you, your uncle Charles, and attorneys like Adam Waldman - then inappropriately attaches himself to ultra-high-net-worth individuals with famous names. **Barresi's fixation onto ultra-high-net-worth individuals - not only actors - means that lost funds can occur more rapidly, making him and those in concert less discoverable. Hence, Trouser Trumpet and discoveries around your father were ignored as well.**

Your father discovered financial holes with Trouser Trumpet Inc. - an entity that had no employees yet was receiving payments. The allegedly forged agreement was used to create inappropriate pressure onto Johnny while obscuring who was actually receiving the funds through Trouser Trumpet Inc. **By repeating a known-name and ignoring anyone else involved and not interviewing them, a risk of a false set-up is created without proper documentation review (Johnny sought refuge in France for a year after Fox's disappearance, a country more focused on actual records not false accusations of inflammation without evidence). When authorities then fixate on this known name, it adds further pressure to the known name. Sadly, just the involvement of Johnny's name - even if innocent - has been prolonged by Barresi and misused for pressuring rather than justice.**

**Adam Waldman was similarly recorded over the telephone for an unknown number of times by Barresi.** Notably, **Barresi's contact with you and Charles allegedly occurred after Barresi made contact with Adam**, making Barresi's focus on Johnny's wealth, your grandmother's will, inheritance speculation, and **Johnny's giving to you of his shares** even more disturbing. **This pattern mirrors his inquiries about the Plaintiff's mother's situation** - in both cases, Barresi fixates on wealth and inheritances rather than investigating actual wrongdoing. **Rather than having legitimate interest in solving your father's case, Barresi was record-keeping about Johnny's charity.**

Through his recordings, he makes suggestions and uses selective disclosure and out-of-context statements to manufacture false allegations, which heightens exploitation without resolution. He misleads multiple parties about his intentions and the use of recorded conversations.

**A recording of Adam Waldman was disclosed by Barresi about Plaintiff Taft and a former Viper Room employee** - one that was allegedly approached by Andy Tillet at the National Enquirer and Dylan Howard about Anthony Fox's death. This shows how Barresi's illegal recordings are used to manufacture connections and false allegations across multiple parties.

We understand how violating it must have felt to discover that your conversations - about your father's disappearance and your family's tragedy - were recorded without your knowledge or consent. The fact that Barresi also inappropriately records lawyers over the telephone shows this is part of a deliberate pattern, not an isolated incident.

He commercially exploits tragedies and legal disputes by providing recordings to media entities like American Media Inc. Rather than investigating actual wrongdoing, actual defendants, and actual evidence, he focuses obsessively on building records about uninvolved individuals. **Alleged Does involved who do not want discovery benefit from this inappropriate repetition of more known individuals' names, which obscures their own involvement and prevents proper investigation of documented wrongdoing**

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

**and legitimate suspects.** This has affected multiple families, including yours and the Plaintiff's, interfering with the search for truth and justice.

## What Your Father Was Investigating

Your father's lawsuit documented concerns about financial arrangements. According to the court documents, your father's lawsuit addressed payments being made in connection with a purported license agreement. Your father alleged **there was no written contract prior**, and that documentation may have been created after the fact. The lawsuit noted that the entity's **own financial records showed it "had no employees"**, yet **security personnel costs were included in Safe's operating costs**. Your father was investigating a scheme where **people were being paid without being shown as employees** - creating overpayments without proper written contracts. This involved **trademarked items being sold** as part of the arrangement. Your father was trying to discover **who was actually receiving these payments**.

Your father discovered what has been termed **"Hollywood Math"** - a scheme where individuals siphon money from generous people through arrangements that lack proper documentation and accountability.

The court found there was **"a prima facie case of Defendants' direct involvement in aiding and abetting, or covering of, or knowingly profiting from a crime or fraud"** relating to these arrangements.

**Your father disappeared while investigating who was receiving these funds.**

## The Pattern of Barresi's Actions in Your Father's Case

Barresi illegally recorded you and your uncle Charles Fox without consent from California, then commercially used these recordings by providing them to Dylan Howard of American Media Inc. Barresi focused obsessively on Johnny Depp's name despite the actual wrongdoing your father documented involving other parties. This focus prevented investigation of what your father actually documented, who was receiving the funds through these arrangements, individuals like Paul Schindler who were connected to the arrangements, and the court's findings.

## Barresi's Pattern

In your father's case, Barresi focused on Johnny Depp's name, ignored what your father documented about financial arrangements, failed to investigate who was actually receiving the funds, and used recordings for commercial purposes through American Media Inc.

In the Plaintiff's case, Barresi illegally recorded Adam Waldman (Johnny Depp's friend and attorney) **without a written contract**, then illegally disclosed content from that recording about Plaintiff Taft and her family **out of context to manufacture false disputes**. He continued the pattern of attaching himself to cases involving ultra-high-net-worth individuals.

## Purpose of This Notice

Your responses will help establish Barresi's pattern of illegal recording without consent, his method of exploiting well-known names while ignoring actual wrongdoing and actual defendants, how he manufactures disputes through selective disclosure and misleading multiple parties, his commercial exploitation through entities like American Media Inc., how his focus on well-known names interfered with proper investigation

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

of what your father documented, and how allegations about actual suspects (like Paul Schindler) were ignored while Barresi exploited connections to well-known individuals.

**Most importantly:** Your responses will help establish how Barresi's pattern of attaching himself to ultra-high-net-worth individuals, manufacturing disputes, and commercially exploiting cases has prevented proper investigation of documented wrongdoing and interfered with justice.

## Realistic Harm to Anthony Fox and Johnny's Charity

Regarding Johnny's involvement: Johnny's charity, his business together with Anthony Fox and Chuck Weis, and the facts make it illogical to connect Johnny to the incident. Although certainly the perpetrator probably was delusional to claim they allegedly benefited Johnny - therefore to never have consequences yet pressure Johnny at the same time inappropriately in the United States - it does not actually benefit him. Johnny has repeatedly been a crowd favorite, giving to others and expressing warmth. The long-term damage for decades is too great. Facts show that Johnny's circle ostracized the alleged perpetrator.

**We're looking for the truth for justice finally for you, Anthony Fox, and your family. With requests for objectivity for fairness.**

## Part II: Questions for Constance Fox

## CRITICAL: Illegal Recording and Consent

1. Did Paul Barresi tell you he was recording your conversation?

2. Did you give him explicit consent to record you?

3. Were you aware that recording phone conversations without consent is illegal in California?

4. Did he tell you he was calling from California when he recorded you?

5. Did he explain what he planned to do with the recording?

6. Did you know the recording might be made public or used commercially?

7. When did you first learn that your conversation had been recorded?

8. How did you feel when you discovered you had been recorded without proper consent?

9. **How did the disclosures by Barresi of the telephone recordings of your family from 2023 to present impact you?**

10. **Do you find Barresi's disclosures of these recordings about your father's death obscene and offensive?**

11. **Do you wish Defendant Barresi stops his exploitation of your family's tragedy?**

## Your Father's Findings Before His Disappearance

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

**Your father's lawsuit documented his findings before his disappearance about the allegedly forged agreement and his attempts to discover who was being paid through these questionable arrangements.**

12. **Are you aware of the findings your father documented in his lawsuit before his disappearance regarding the allegedly forged agreement?**

13. **Did your father tell you about his discovery that there was no written contract prior to the purported license agreement?**

14. **Did your father discuss with you that documentation (Exhibit 77) appeared to have been created after the fact?**

15. **Did your father tell you he was investigating to discover who was actually being paid through these arrangements?**

16. **Did your father express concerns about people receiving payments without proper documentation?**

17. **Did your father mention discovering that Trouser Trumpet Inc. had no employees despite receiving payments?**

18. **What did your father tell you about his investigation into who was receiving these funds?**

## Your Uncle Charles's Recording - Important Evidence

19. Did Barresi tell your uncle Charles that he was recording him?

20. Did Charles consent to being recorded?

21. Did Charles know Barresi was calling from California?

22. Did you know that Barresi named the recording with Charles with **Johnny Depp's name in the title**?

23. Why do you think he titled it with Johnny's name instead of focusing on **what your father discovered**?

24. Why do you think he titled it with Johnny's name when **the primary defendants were the Viper Room and Trouser Trumpet Inc.**?

25. Does naming the recording with a celebrity's name - instead of with the actual primary defendants and the actual issues - suggest Barresi's investigation was about building a commercial narrative rather than finding truth?

26. How does it make you feel that your uncle's recording - about your father's discovery and his murder - was titled as content about Johnny Depp?

27. Has this approach helped or harmed your family's search for answers about who was receiving the funds through these arrangements?

## The Viper Room Payroll Scheme - Information from Former Viper Room Employee

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

**A Pattern of Exploitation Prior to Your Father's Discovery of Trouser Trumpet Inc. -
And Barresi's Control of This Information**

28. Are you aware of information from a former Viper Room employee about an incident where Viper
Room employees were overpaid with trademark items?

29. Are you aware of information from a former Viper Room employee that fake names were allegedly
placed on the Viper Room payroll?

30. According to this former Viper Room employee's information, did this payroll scheme with fake
names and overpayments occur before your father discovered Trouser Trumpet Inc.?

31. Are you aware of information from a former Viper Room employee that Sal Jenco had issues being
asked to pay taxes for the club due to these payroll irregularities?

32. Did your father tell you about this earlier pattern of financial mismanagement at the Viper Room?

33. Do you see how this earlier incident follows the same pattern of exploitation described in Adam
Waldman's "Hollywood Math" feature from July 2025 - exploiting someone's kindness through
financial mismanagement?

34. Does this earlier payroll scheme with fake names and overpayments show a pattern that continued
with the Trouser Trumpet Inc. arrangement your father later discovered?

35. Do you believe the people behind the earlier payroll scheme with fake names were the same people
involved in the Trouser Trumpet Inc. scheme?

36. **Did Barresi ask you about this earlier payroll scheme or about Sal Jenco's tax issues?**

37. **Is it hurtful that Barresi made claims about "27 freeloaders" to pressure them, Isaac, Johnny
and Adam, with his illegal telephone recordings, rather than to resolve matters and support
documented charity, which obscured solving your father Anthony Fox's demise?**

**CRITICAL: Commercial Use Through Dylan Howard and American Media Inc.**

38. Were you aware that Barresi provided your recording to **Dylan Howard of American Media Inc.**?

39. Did you consent to your recording being given to American Media Inc.?

40. Did you consent to your family's tragedy being commercially used by a media company?

41. Did Barresi tell you he was working with Dylan Howard and American Media Inc.?

42. Did you know your recording would be used for commercial purposes rather than investigating what
your father discovered?

43. How do you feel about your recording being commercially exploited through American Media Inc.
while what your father discovered went uninvestigated?

**CRITICAL: Barresi's Recording of Johnny's Attorney Adam Waldman - The Pattern**

44. Are you aware that Barresi also illegally recorded **Adam Waldman, who is Johnny Depp's friend and attorney**?

45. Did you know that Barresi recorded conversations with Adam Waldman without consent from California?

46. Are you aware that **there was no written contract between Paul Barresi and Adam Waldman**?

47. Were you aware that Barresi **illegally disclosed content from his recording of Adam Waldman** discussing the Plaintiff (Taft) and her family, taking statements **out of context to manufacture false disputes**?

48. **Did you hear any of the allegations Barresi disclosed about Plaintiff Taft and her family?**

49. Does this pattern show that Barresi **exploits and attaches himself to ultra-high-net-worth individuals** while simultaneously manufacturing disputes and misleading multiple parties?

50. Do you see a pattern where Barresi:

    o   Records people without consent

    o   Records attorneys and associates of wealthy individuals to attach himself to them

    o   Illegally discloses content out of context to manufacture false disputes

    o   Misleads multiple parties about his intentions

    o   Titles recordings with celebrity names

    o   Provides recordings to media companies like American Media Inc. while simultaneously corrupting actual investigations by repeating the well-known name and not naming the others involved that he has records of from the witnesses - keeping pressure without truth

    o   Ignores actual wrongdoing and actual defendants

    o   Uses tragedies for commercial purposes rather than assisting actual investigation?

51. Are you aware that Barresi contacted your father's lawyers, putting them at risk of his illegal telephone recording practices?

## Your Father's Investigation: The Financial Arrangements

## What Your Father Discovered

52. Are you aware that your father's lawsuit alleged **there was no written contract prior** to the purported license agreement, and that documentation may have been created after the fact?

53. Are you aware that the financial records showed the entity **"had no employees"**?

54. Are you aware that **security personnel costs were included in Safe's operating costs** - so where were the other payments going?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

55. Did your father tell you he was discovering **people being paid without being shown as employees**?

56. Did your father tell you about discovering the **"Hollywood Math" scheme** - overpayments without written contracts, with trademarked items being sold as part of the arrangement?

57. Did your father tell you he was trying to find out **who was actually receiving these payments**?

58. Did Barresi ask you detailed questions about **what your father discovered**?

59. Or did Barresi ignore these issues and focus on Johnny's name for commercial purposes?

**The Court's Findings**

60. Are you aware that the court found a **"prima facie case of Defendants' direct involvement in aiding and abetting, or covering of, or knowingly profiting from a crime or fraud"**?

61. Did Barresi ask you about the court's findings?

62. Did he ask you who your father believed was profiting from this scheme?

63. Or did he ignore what your father actually documented?

## Your Father's Lawsuit: The Actual Defendants vs. Barresi's Exploitation

## What Your Father's Lawsuit Actually Named

64. Are you aware that your father's lawsuit **named the Viper Room and Trouser Trumpet Inc. as the primary defendants**?

65. Are you aware that **Johnny was named in the lawsuit**, but that **the Does involved in your father's demise were inappropriately attaching themselves to Johnny** to obscure their own involvement?

66. Do you understand that this is **similar to how Defendant Barresi has inappropriately attached himself to Adam Waldman** to improperly bring him into the lawsuit and pressure him?

67. Do you believe that **the Does involved in Fox's demise added pressure** by inappropriately attaching themselves to Johnny, similar to Barresi's pattern?

68. Why do you think Barresi focused obsessively on Johnny's name when **the primary defendants were the Viper Room and Trouser Trumpet Inc.**?

69. Does it concern you that Barresi focused on Johnny instead of investigating **what your father documented** and **the primary defendants**?

## Barresi's Inappropriate Focus - Ignoring What Your Father Documented

70. Did Barresi ask you detailed questions about **the actual primary defendants** - the Viper Room and Trouser Trumpet Inc.?

71. Did he ask you about **the scheme involving overpayments without written contracts** that your father discovered?

72. Did he ask you about **who was receiving the money**?

73. Did he ask you about the **"Hollywood Math" scheme** your father discovered - people being paid without being shown as employees?

74. Did he ask about **the Does involved who were inappropriately attaching themselves to Johnny**?

75. Or did he focus on Johnny Depp, who was not a primary defendant and who was himself being victimized by those inappropriately attaching themselves to him?

76. Does this show that Barresi was creating commercial content about a celebrity rather than investigating what your father actually discovered and the actual primary defendants?

## The Pattern of Inappropriately Attaching to Johnny While Ignoring Primary Defendants

### Understanding Who the Primary Defendants Were

77. Do you understand that **the primary defendants in your father's lawsuit were the Viper Room and Trouser Trumpet Inc.**, not Johnny?

78. Do you understand that **the Does involved in your father's demise were inappropriately attaching themselves to Johnny** to obscure their own involvement?

79. Do you see the parallel: just as **Does inappropriately attached themselves to Johnny**, so has **Barresi inappropriately attached himself to Adam Waldman** to improperly bring him into the lawsuit and create pressure?

80. Do you believe this pattern of **inappropriately attaching to well-known individuals** serves to:

    o  Obscure the actual wrongdoers

    o  Prevent investigation of the primary defendants

    o  Create pressure on innocent people

    o  Make solving the case impossible?

## How the Fixation on Johnny's Name Prevented Proper Investigation

### The Pressure Johnny Faced and His Need for Relief

81. Are you aware that **Johnny left to France for some relief** from the pressure?

82. Do you believe the pressure came from **Does involved in Fox's demise inappropriately attaching themselves to Johnny**, similar to how Barresi has inappropriately attached himself to Adam Waldman?

83. Is it upsetting to you that **the fixation on Johnny's name made authorities not interview others from the Viper Room or Trouser Trumpet Inc.**?

84. Are you aware that people **who clearly would state Johnny was not involved** - such as Olivia Barash and Richard Albertini, who said Johnny was not involved - were not given proper attention?

85. Do you believe that **because authorities fixated on Johnny's name instead of interviewing multiple people from the Viper Room and Trouser Trumpet Inc.**, your father's case remains unsolved?

## The Loss of Faith in Investigation

86. Do you believe that **no one could have faith in the investigations** due to the repeating of well-known individuals' names instead of interviewing multiple people who were actually involved?

87. Is it frustrating that **authorities repeated Johnny's name** instead of systematically interviewing people from:

   o   The Viper Room

   o   Trouser Trumpet Inc.

   o   Those who were receiving the payments your father discovered

   o   The Does who were inappropriately attaching themselves to Johnny?

88. Do you believe that if authorities had **interviewed multiple people from the Viper Room and Trouser Trumpet Inc.** instead of fixating on Johnny's name, they would have learned:

   o   Johnny was not involved (as Olivia Barash and Richard Albertini stated)

   o   Who the actual perpetrators were

   o   Who was receiving the funds through the scheme?

89. Do you think the fixation on repeating well-known individuals' names **destroyed the possibility of solving your father's case**?

## How Barresi's Exploitation Mirrored and Amplified the Problem

90. Do you see how **Barresi's obsessive focus on Johnny's name** repeated and amplified the same problem that prevented authorities from solving your father's case?

91. Do you believe that by **focusing on Johnny instead of the primary defendants (the Viper Room and Trouser Trumpet Inc.)** and instead of interviewing multiple people involved, Barresi:

   o   Prevented investigation of what your father documented

   o   Prevented investigation of who was receiving the funds

   o   Prevented investigation of the Does who were inappropriately attaching themselves to Johnny

   o   Made it impossible to have faith in any investigation?

92. Is it upsetting that **both authorities and Barresi fixated on a well-known name** instead of doing the systematic work of interviewing multiple people from the Viper Room and Trouser Trumpet Inc. who could have provided actual answers?

## The Consequences of Fixating on Johnny's Name

93. Are you upset that **the fixation on Johnny's name meant authorities did not interview others from the Viper Room or Trouser Trumpet Inc.**?

94. Do you believe that if authorities had **interviewed multiple people instead of fixating on one well-known name**, witnesses like Olivia Barash and Richard Albertini could have clearly stated Johnny was not involved much earlier?

95. Do you believe your **father's case remains unsolved** because authorities fixated on repeating Johnny's name instead of doing systematic interviews?

96. Do you believe **no one could have faith in the investigations** when they see authorities repeating well-known names instead of interviewing multiple people who were actually connected to the Viper Room and Trouser Trumpet Inc.?

97. Is it frustrating that both authorities and Barresi have **destroyed public faith in the investigation** by focusing on celebrity names rather than on systematic interviewing of witnesses?

## Johnny's Need to Leave for Relief

98. Does it concern you that **Johnny had to leave to France for some relief** from the pressure created by Does inappropriately attaching themselves to him?

99. Do you see how **inappropriately attaching to Johnny's name** - whether by the Does involved in your father's demise or by Barresi for commercial purposes - has:

   o Created pressure on an innocent person

   o Prevented proper investigation

   o Allowed actual perpetrators to avoid scrutiny

   o Made your father's case unsolvable?

## What Should Have Been Done Instead

100.    Do you believe that instead of fixating on Johnny's name, investigators should have:

   o Focused on **the primary defendants: the Viper Room and Trouser Trumpet Inc.**

   o Interviewed **multiple people from the Viper Room**

   o Interviewed **multiple people connected to Trouser Trumpet Inc.**

   o Investigated **who was receiving the funds** your father discovered

   o Investigated **the Does who were inappropriately attaching themselves to Johnny**?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

101.      Do you believe that if this proper investigation had been done, your father's case would have been solved?

102.      Do you believe that **systematic interviews of multiple people from the Viper Room and Trouser Trumpet Inc.** would have quickly established that Johnny was not involved and identified who the actual perpetrators were?

## What Barresi Didn't Tell You About Other Viper Room Employees

### Information Barresi Withheld From You

103.      Did Barresi tell you that he had recordings with other Viper Room employees - including Olivia Barash, Ed Shaw, and Richard Albertini?

104.      Did Barresi tell you that **Olivia Barash, Ed Shaw, and Richard Albertini all stated that Johnny was not involved in your father's death**?

105.      Did Barresi explain to you that multiple Viper Room employees had exonerated Johnny?

106.      Why do you think Barresi withheld this information from you while focusing his questions on Johnny's wealth and your inheritance?

### What These Employees Said About Paul Schindler

107.      Did Barresi tell you that these same Viper Room employees **mentioned violence by Schindler**?

108.      Did he tell you that they described **Schindler's obsession with Johnny**?

109.      Did he tell you that Schindler **threatened Johnny and his circle for ignoring and outcasting him**?

110.      Why do you think Barresi focused on Johnny - who multiple employees said was not involved - instead of on Schindler, who employees described as violent and obsessed?

111.      Does it concern you that Barresi had recordings where employees exonerated Johnny and implicated Schindler, but still focused his investigation and commercial content on Johnny's name?

112.      Do you believe Barresi deliberately withheld information that would have shown Johnny was not involved in order to maintain his commercial narrative?

113.      If Barresi had told you that multiple Viper Room employees said Johnny was not involved and that Schindler was violent and obsessed with Johnny, would that have changed how you answered his questions about Johnny's generosity to you?

## The Pattern: Exploiting Ultra-High-Net-Worth Individuals While Ignoring Documented Wrongdoing

114.      Do you see a pattern where Barresi:

- Inserts himself into sensitive situations documenting actual wrongdoing with actual defendants

- Ignores what was actually documented and the actual defendants

- Exploits and attaches himself to ultra-high-net-worth individuals by inappropriately connecting their names

- Uses those connections for commercial exploitation

- Manufactures disputes through selective disclosure

- Misleads multiple parties about his intentions

- Withholds exculpatory information about ultra-high-net-worth individuals

- Prevents investigation of what was actually documented and actual perpetrators?

115.     Has this pattern harmed your family's ability to find justice and discover who was receiving the funds?

## How Barresi's Exploitation Interfered with Finding Who Harmed Your Father

116.     Do you believe that Barresi's obsessive focus on Johnny Depp's name - instead of on **what your father documented** and **the primary defendants - interfered with proper investigation** into who actually harmed your father?

117.     Do you believe that by focusing on celebrity content for commercial purposes, Barresi **prevented investigation of**:

- The overpayment scheme

- Who was receiving those funds

- The "Hollywood Math" scheme - people being paid without being shown as employees

- Paul Schindler and others who were paid through these arrangements

- The primary defendants: the Viper Room and Trouser Trumpet Inc.

- The Does who were inappropriately attaching themselves to Johnny

- What your father actually discovered?

118.     Are you aware of allegations that **Paul Schindler removed your father**?

119.     Do you believe these allegations about Paul Schindler have been **lost among Barresi's exploitation** of Johnny's name?

120.     Do you believe that if your father was getting close to discovering **who was receiving the funds**, and if that discovery threatened to expose wrongdoing, that person had motive to harm him?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

121.    If Barresi had focused on investigating **what your father documented and who was receiving the funds** instead of exploiting Johnny's name, do you think your family might have gotten answers?

## Barresi's Financial Obsession - But Ignoring What Your Father Actually Discovered

## Focusing on Johnny's Wealth Instead of the Documented Scheme

122.    Did Barresi spend significant time asking about Johnny Depp's wealth and generosity?

123.    Did he ask about your father being "in dire straits financially"?

124.    Did he focus on the wealth disparity between your father and Johnny?

125.    Did he ask about Johnny giving you his Viper Room shares and money?

126.    Did he frame Johnny's generosity to you as suspicious?

127.    Did he focus on speculation about your grandmother's will and inheritance?

## What Barresi DIDN'T Ask About: What Your Father Actually Discovered

128.    Did Barresi ask detailed questions about **the overpayments** your father discovered?

129.    Did Barresi ask about **the lack of written contracts prior** and documentation being created after the fact?

130.    Did he ask about **who was receiving the money**?

131.    Did he ask about **the "Hollywood Math" concept** - people being paid without being shown as employees, creating overpayments without written contracts, siphoning money from generous individuals?

132.    Did he ask about the scheme your father discovered where **people were defrauding Johnny** rather than Johnny himself doing anything wrong?

133.    Did he ask about **specific individuals who were receiving the funds**?

## What Your Father Actually Discovered

## About the Scheme - The Overpayments

134.    What did your father tell you about what he discovered?

135.    Did he mention finding that payments were being made to an entity with **no employees**?

136.    Did he mention discovering the **"Hollywood Math" scheme** - people being paid without being shown as employees?

137.    Did he mention trying to discover **who was actually receiving these funds**?

138.     Did he tell you about the lack of written contracts and documentation being created after the fact?

139.     Did he tell you about confronting anyone about the payments?

140.     Did Barresi ask you substantive questions about **what your father discovered**?

141.     Or did he focus on Johnny's wealth and your family's financial situation for his commercial content while ignoring what your father actually found?

## "Hollywood Math" - The Exploitation Scheme

142.     Are you familiar with the concept of **"Hollywood Math"** - exploitation schemes where people are paid without being shown as employees, creating overpayments without written contracts, targeting generous wealthy individuals?

143.     Did Barresi discuss with you the concept that **generous people attract exploiters** who create schemes to siphon money?

144.     Did he ask whether there were individuals around the Viper Room who were **defrauding Johnny through these arrangements**?

145.     Did he ask about individuals whose **income depended on these payments continuing**?

146.     Did he ask about anyone who might have had motive to harm your father **when your father started discovering where the funds were going**?

## People Being Paid - The Actual Perpetrators

147.     Did Barresi ask about individuals like Paul Schindler who were employed as security through these arrangements?

148.     Did he ask about **cash payments** that weren't documented?

149.     Did he ask about people who were **receiving the funds**?

150.     Did he ask about individuals who had **financial motive** to want your father's investigation to stop?

## Paul Schindler - The Violent Suspect Connected to the Scheme

## The Violent Suspect Who Was Fixated on Johnny and Receiving Funds

151.     Are you aware of **allegations that Paul Schindler removed your father, Anthony Fox**?

152.     When did you first hear allegations about Paul Schindler's involvement?

153.     Are you aware that people who worked at the Viper Room knew that **Paul Schindler was violent**?

154.     Are you aware that they knew **Schindler threatened Johnny and his circle**?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

155.    **Did Barresi tell you that Viper Room employees - including Olivia Barash, Ed Shaw, and Richard Albertini - mentioned Schindler's violence and his obsession with Johnny to the point of threatening Johnny and his circle for ignoring and outcasting him**?

156.    Was Paul Schindler one of the people being paid through the arrangements that your father was investigating?

157.    Was Paul Schindler **fixated on Johnny** and positioning himself close to him?

158.    Do you believe Paul Schindler might have been one of the people **receiving the funds**?

159.    Did Barresi ask you substantive questions about Paul Schindler's connection to what your father discovered?

160.    Did Barresi ask you about Schindler's violent behavior and threats?

161.    Did Barresi ask you about the allegations that Schindler removed your father?

## Why Was the Scheme Ignored While Johnny Was Exploited?

162.    If your father was getting close to exposing who obtained funds through questionable arrangements, could that have **enraged the involved individuals**?

163.    If your father discovered **overpayments through these arrangements**, and if there are allegations that **Paul Schindler - who was paid through these arrangements and fixated on Johnny - removed your father**, why do you think Barresi focused on Johnny Depp instead?

164.    **Why do you think Barresi focused on Johnny when he had recordings of Viper Room employees stating Johnny was not involved and describing Schindler's violence and obsession**?

165.    Do you think Barresi's focus on Johnny's name for commercial purposes through American Media Inc. **prevented investigation of**:

   o   What your father discovered

   o   Who was receiving the funds

   o   The "Hollywood Math" scheme

   o   Paul Schindler and others paid through these arrangements

   o   The primary defendants: the Viper Room and Trouser Trumpet Inc.

   o   The Does who were inappropriately attaching themselves to Johnny

   o   Individuals whose activities your father was documenting?

166.    Do you believe the allegations about Paul Schindler have been **lost among Barresi's exploitation** of Johnny's name?

167.    If Barresi had investigated **what your father documented and who was receiving the funds** instead of creating commercial content about Johnny, do you think justice might have been served?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

## About Schindler and the Scheme

168.    What do you know about Paul Schindler's relationship to the security operation?

169.    Did your father ever mention Paul Schindler in connection with the payments?

170.    Did your father express concerns about Schindler?

171.    Do you know if Barresi has recordings about Schindler's violent behavior and threats?

172.    Was Schindler someone who was **receiving money through these arrangements**?

173.    Was Schindler someone whose **financial arrangement your father was investigating**?

174.    Was Schindler someone who was **fixated on Johnny** and threatening to Johnny's circle?

175.    Was Schindler someone whose behavior led to **social ostracization by Johnny's circle**?

176.    Do you think Schindler harmed your father because the investigation was getting close to exposing **who was receiving the funds**?

177.    **Does it concern you that Barresi had information from Viper Room employees about Schindler's violence and obsession with Johnny, but focused his commercial narrative on Johnny instead**?

## How Including Johnny's Name Obscures Investigation

## The Problem with Focusing on the Main Named Person

178.    Are you aware that **including Johnny's name in the allegedly forged agreement** could obscure investigation?

179.    Do you understand that when investigators focus only on **the main named person** (Johnny), they may **ignore other entities** like Trouser Trumpet Inc. and non-repeated names?

180.    Do you believe that focusing on Johnny's name prevents investigation of:

   o    **The primary defendants: the Viper Room and Trouser Trumpet Inc.**

   o    **Other individuals whose names don't repeat** in the documents

   o    **Does involved that were not named** in the lawsuit?

181.    Did Barresi ask you about **entities and individuals who were not prominently named** but were involved in receiving funds?

182.    Did he ask about **Does involved that were not named** in your father's lawsuit?

183.    Do you think that by focusing on Johnny's famous name, Barresi allowed **the actual entities and individuals receiving funds** to avoid investigation?

## Communications and Phone Records - Evidence of Lack of Investigation

## What Wasn't Investigated About Your Father's Communications

184. **Did Barresi ask substantive questions about your father's communications and phone records**?

185. Did he ask who had access to your father's phone records after he disappeared?

186. Did he ask what the police did or didn't do to analyze your father's communications?

187. Did he ask about the phone records and whether they were thoroughly analyzed to see who your father was communicating with about what he discovered?

188. Or did he move on to other topics, particularly financial speculation?

189. **Does the fact that your father's communications were not properly investigated show that there wasn't a proper investigation into who your father was in contact with regarding his discoveries**?

190. **Do you believe that a proper investigation would have prioritized understanding who your father was communicating with about the Trouser Trumpet scheme and the overpayments he discovered**?

191. Which seems more important to finding out what happened to your father:

    o **Financial speculation** about letters and inheritances?

    o Or **concrete investigation** of your father's communications and phone records to understand who he was in contact with regarding his discoveries?

192. **Do you think analyzing your father's communications would have revealed who he had confronted about the overpayments and who might have had motive to harm him**?

## Individuals Not Properly Interviewed

193. Are you aware that **critical individuals connected to what your father discovered appear to have not been properly interviewed** about your father's disappearance?

194. Do you know if anyone conducted thorough interviews with people who were receiving payments through these arrangements?

195. Do you know if anyone systematically interviewed **multiple people from the Viper Room and Trouser Trumpet Inc.**?

196. **Are you aware that Viper Room employees like Olivia Barash, Ed Shaw, and Richard Albertini - who stated Johnny was not involved and mentioned Schindler's violence - should have been prioritized witnesses**?

197. Do you know if anyone investigated **Does involved that were not named** in the lawsuit?

198. Did Barresi ask you about **individuals who might have been unstable or dangerous**?

199. Did he ask about people who had **histories of violence or threatening behavior**?

200.    Did he ask about anyone who had been **removed from Johnny's circle** and why?

201.    Did he ask about people who might have been **cash-paid** rather than on regular payroll?

202.    Do you think Barresi's focus on commercial content about Johnny - instead of investigating what your father documented - prevented proper investigation of who was receiving the funds?

203.    **Do you think Barresi's withholding of information from Viper Room employees who exonerated Johnny and implicated Schindler shows he was more interested in commercial exploitation than finding truth**?

## Your Father's Actual Lawsuit and What He Documented

204.    Did you receive copies of your father's lawsuit documents from Barresi - including the sections about what he discovered?

205.    Or did you have to obtain those documents yourself?

206.    Did Barresi help you understand the specific issues your father documented?

207.    Did he focus on investigating those issues, or on creating content about Johnny for commercial purposes?

208.    Did Barresi ask you substantive questions about **what your father actually discovered** in his investigation?

209.    Did he ask about **specific people or arrangements** your father mentioned?

210.    Did he ask about **who your father might have confronted** with his findings?

211.    Did he ask about **who stood to lose** if your father's allegations were proven?

212.    Or did the conversation stay more general and focused on wealth and Johnny Depp?

## The Celebrity Focus That Prevented Investigation

## How One Famous Name Affects Everything

213.    How much of Barresi's interview focused specifically on Johnny Depp - who was not a primary defendant and who was himself being victimized by Does inappropriately attaching themselves to him?

214.    Did it feel like he was trying to understand **what your father discovered**?

215.    Or did it feel like he was building commercial content about a celebrity while ignoring what your father actually found?

216.    Do you believe the obsessive focus on Johnny's name - instead of on **what your father documented** and **the primary defendants - interfered with finding who actually harmed your father**?

217.    Do you believe this interference prevented proper investigation of Paul Schindler and others who were receiving the funds?

218.    Do you think having **Johnny Depp's name attached to your father's case** has:

- o    **Helped** bring attention that led to answers?

- o    **Hurt** by overshadowing the actual facts?

- o    **Complicated** things in ways that made truth harder to find?

219.    If your father's case had been investigated with **less focus on one famous name** and **more focus on the specific financial arrangements he was questioning** and **the primary defendants (the Viper Room and Trouser Trumpet Inc.)**, do you think different questions would have been asked, different evidence would have been prioritized, and different theories would have been explored?

## About Johnny's Actual Actions - Evidence He Was Also a Victim

## The Generosity Question

220.    How do you interpret Johnny giving you his Viper Room shares?

221.    How do you interpret Johnny giving you money after your father disappeared?

222.    Did that feel like someone hiding guilt or someone showing compassion?

223.    When someone has a **documented history of helping people**, how should that be viewed in an investigation - as suspicious behavior, as evidence of their character, or as context for understanding their actions?

224.    Do you think Johnny's actions show that he was also a victim - that people were defrauding him just as they defrauded your father?

225.    Did Barresi ask how YOU interpreted Johnny's actions?

226.    Or had he already decided what those actions meant for his commercial narrative?

227.    When someone is known for extraordinary generosity, and when **people are defrauding that person through schemes using "Hollywood Math"**, and when that person **was not a primary defendant in your father's lawsuit**, how should their actions be viewed?

## About Generosity and Exploitation

228.    When someone is known to be very generous, does that make them:

- o    **More likely to be targeted** by people who want to exploit that generosity?

- o    **More vulnerable** to being around people who might not have good intentions?

- o    **More likely to have odd individuals** in their circle who are there because of the financial support?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

229.    Did Barresi ask you about **whether there were people who might have been taking advantage** of Johnny's generosity?

230.    Did he ask whether your father's financial investigation might have **threatened anyone** from loose financial arrangements?

231.    Or did the focus stay on Johnny himself rather than on **people who might have been exploiting the situation**?

**Who Really Harmed Your Father?**

232.    Were there individuals like Paul Schindler who were **receiving funds through these arrangements** and **fixated on Johnny**?

233.    Were these people threatened when your father's investigation was getting close to exposing **who was receiving the money**?

234.    Did Barresi ask about people whose activities your father was documenting?

235.    Did he ask about individuals who had **their financial arrangements, reputations, and connection to their alleged 'principle' at risk of exposure** if your father's investigation revealed where the funds were going - which would soon lead back to them instead?

236.    Do you think someone violent like Paul Schindler, who was receiving money through these arrangements and fixated on Johnny, harmed your father when the investigation threatened to expose the scheme?

## About Using Famous Names to Cover Up Wrongdoing

237.    Could someone involved in this scheme have thought they could **use Johnny's famous name** as cover for their crimes?

238.    Could the **Does involved in your father's demise have inappropriately attached themselves to Johnny** to deflect attention from their own involvement?

239.    Could someone violent like Paul Schindler have thought that **suspicion would fall on the celebrity** rather than on the people actually committing wrongdoing?

240.    Do you understand that **including Johnny's name in the allegedly forged agreement obscures investigation** because investigators focus only on the main named person and **ignore the primary defendants (the Viper Room and Trouser Trumpet Inc.), non-repeated names, and Does involved that were not named**?

241.    Do you think people committing these acts - and known to be violent - harmed your father to stop him from exposing who was receiving the funds?

242.    Do you think Barresi's focus on Johnny's name has allowed the actual perpetrators to avoid investigation?

## What Your Father Was Actually Investigating

243.    What specifically was your father investigating about the overpayments?

244.    Who did your father's investigation threaten?

245.    Did he tell you about anyone who reacted badly to his questions about where the money was going?

246.    Did he mention confronting anyone about the funds?

247.    Did he express concern about anyone specific connected to receiving the payments?

248.    Could that person have been Paul Schindler?

249.    Did Barresi ask you about **who your father might have upset** by asking these questions?

250.    Did he ask about **individuals whose financial arrangements** your father was investigating?

## About Evidence Priorities and Investigation Approach

### What Gets Prioritized

251.    Looking at how Barresi spent his interview time creating content about Johnny for American Media Inc. instead of investigating what your father documented, do you think his priorities were about finding truth or making money?

252.    Looking at how Barresi spent his time in the interview with you, do you think his **priorities were right** for finding truth?

### Following the Evidence vs. Following a Theory

253.    When you spoke with Barresi, did it feel like:

  o  He was trying to **understand what happened to your father**?

  o  He was trying to **gather information for a specific theory he already had**?

  o  He was trying to **gather material for some other purpose**?

254.    Did you feel that your answers were being used to:

  o  **Explore multiple possibilities**?

  o  **Support a predetermined narrative**?

255.    Did Barresi present you with **different theories** about what might have happened?

256.    Did he discuss **alternative suspects or scenarios**?

257.    Or did the investigation seem to focus primarily on **one person or one theory**?

258.    Did you feel he was **open to different explanations**?

259.    Or did you feel he already **knew what story he wanted to tell**?

## About the Obvious Questions Not Asked

260.    Were there **obvious questions** that Barresi didn't ask you?

261.    Were there topics from your father's actual lawsuit that should have been discussed but weren't?

262.    Looking back, are there things you would have liked to talk about that didn't come up because of how Barresi directed the conversation?

## About the Commercial Exploitation Through American Media Inc.

### What You Were Told

263.    Did Barresi explain to you **what he was investigating** and why?

264.    Did he tell you about **other people he had interviewed** and what he learned?

265.    Did he explain **what would happen** with the recording of your conversation?

266.    Did you know at the time that your recording might be:

- o   Shared with others?

- o   Used in any commercial projects or publications?

- o   Made public in any way?

### The Projects

267.    When you agreed to speak with Barresi, what did you think the **purpose** was - to help find out what happened to your father, to provide information for some kind of investigation, or something else?

268.    What did you think would **happen** with the information you provided?

269.    Did you know that Barresi had created projects called **"Depp Declassified"** and **"Cinderella Man"**?

270.    When you agreed to speak with Barresi, did you think your recording would be given to Dylan Howard of American Media Inc. for commercial use?

271.    Did you know about "Depp Declassified"?

272.    Did Barresi disclose he was creating commercial content instead of investigating what your father discovered?

273.    Did he disclose he was working with American Media Inc.?

274.    How do you feel about your interview being commercially exploited through a media company while **what your father discovered went completely uninvestigated**?

275.    If you had known your interview might be used for **commercial purposes**, would that have changed whether you agreed to the interview, how you answered questions, or what you shared?

276.    How do you feel about your interview - about your father's disappearance - potentially being used in a **commercial project**?

## Your Family's Tragedy

277.    Do you feel that Barresi's work has treated your family's tragedy with **respect and appropriate seriousness**, or has it been used as **material for commercial purposes**?

278.    Has the attention Barresi has brought to the case **helped you get answers** about your father, or **made things more difficult** by creating narratives that may not serve truth?

## What Has Actually Resulted - Interference with Justice

279.    Has Barresi's work led to investigation of Paul Schindler and the allegations he removed your father?

280.    Has it led to investigation of **who was receiving the funds**?

281.    Has it led to investigation of **what your father documented**?

282.    Has it led to proper interviews of individuals who were receiving payments?

283.    Has it led to investigation of **Does involved that were not named**?

284.    Has Barresi's investigation led to **new leads** about your father, **better understanding** of what happened, or **movement toward answers** or justice?

285.    Or has it led to **more focus on one famous person's name**, **more public attention** without new information, or **commercial content** about your family's tragedy?

286.    Looking back, do you feel that speaking with Barresi **helped the search for truth** about your father?

287.    Did the interview help you or harm you in your search for answers about your father?

288.    Or has it only led to:

- o    Commercial content through American Media Inc. about Johnny
- o    Exploitation of your family's tragedy
- o    **Complete failure to investigate what your father discovered**
- o    **Interference with proper findings of who harmed your father**?

## About Your Uncle Charles

289.    Did Charles consent to being recorded?

290.    Did he know what the recording would be used for?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

291.　　Did Barresi ask Charles substantive questions about:

- ○　Specific individuals your father was investigating?

- ○　Who might have been involved in the financial arrangements your father questioned?

- ○　Threats or dangers your father might have faced?

292.　　Or did the conversation focus mainly on the letter to your grandmother and financial speculation?

293.　　Has the way Charles's interview was conducted and used been helpful or harmful to your family?

## About the Recordings Barresi Has

294.　　Did Barresi ever mention to you that he had **recordings with other people** who might have relevant information?

295.　　Did he discuss what those other people said?

296.　　Did he explain why certain information from those recordings was or wasn't relevant?

297.　　Or did you only hear about information that related to one particular narrative?

## The Central Question: How Commercial Exploitation Prevented Investigation

298.　　Do you believe that Barresi's pattern of:

- ○　Illegally recording your family

- ○　Illegally recording Johnny's attorney Adam Waldman without a written contract

- ○　Illegally disclosing content about Plaintiff Taft and her family out of context to manufacture false disputes

- ○　Exploiting and attaching himself to ultra-high-net-worth individuals

- ○　Manufacturing disputes and misleading multiple parties

- ○　Titling recordings with Johnny's name instead of focusing on what your father documented

- ○　Providing recordings to American Media Inc. for commercial use

- ○　Focusing on celebrity content instead of investigating what your father discovered

- ○　Ignoring the court's findings

Has **interfered with proper findings of who harmed your father, Anthony Fox**?

299.　　Do you believe that **what your father documented - and allegations that Paul Schindler removed your father - have been lost** among Barresi's exploitation of Johnny's name?

300.　　If the investigation had focused on:

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

- o  What your father documented

- o  The overpayments without written contracts

- o  The "Hollywood Math" scheme - people being paid without being shown as employees

- o  Who was actually receiving these payments

- o  Paul Schindler and others paid through these arrangements who were fixated on Johnny

- o  Individuals approaching a risk of exposure

- o  Does involved that were not named

- o  Other entities like Trouser Trumpet Inc. and non-repeated names

- o  The primary defendants and the court's findings

Instead of creating commercial celebrity content about Johnny, do you think your family would have gotten justice?

## About Barresi's Pattern of Exploiting Well-Known Names

301.    Does it concern you that Barresi's pattern is:

- o  Illegally record people without consent (you, your uncle, Johnny's attorney Adam Waldman)

- o  Illegally disclose content out of context to manufacture false disputes

- o  Exploit and attach himself to ultra-high-net-worth individuals by inappropriately connecting their names

- o  Mislead multiple parties about his intentions

- o  Ignore what was actually documented and the actual defendants

- o  Provide recordings to media companies like American Media Inc.

- o  Ignore evidence about actual suspects like Paul Schindler

- o  Focus on the main named person (Johnny) while ignoring other entities, non-repeated names, and Does involved that were not named

- o  **Interfere with proper investigation in multiple sensitive situations**?

302.    Do you think someone who knows what your father documented, who knows about allegations that Paul Schindler removed your father, but who focuses on Johnny instead for commercial purposes - despite Johnny not even being a primary defendant - is trying to help find truth or preventing justice?

## Final Questions About Justice

303.    What do you think really happened to your father?

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

304.    Do you believe Paul Schindler harmed your father?

305.    Do you believe Paul Schindler was one of the people **receiving the funds**?

306.    Do you believe your father was harmed because he was getting close to exposing **who was receiving these funds**?

307.    Do you believe Barresi's exploitation of Johnny's name - instead of investigating what your father discovered - has **prevented investigation** of who was actually committing wrongdoing and receiving the money?

308.    Do you believe Barresi's commercial exploitation through American Media Inc. has **interfered with justice** in your father's case by preventing investigation of what he documented?

309.    What would you want people to understand about the difference between:

   o    Investigating what your father actually discovered - including Does involved that were not named, other entities like Trouser Trumpet Inc., and violent individuals like Schindler who were receiving that money and fixated on Johnny

   o    And falsely connecting Johnny's name to your father's death for commercial profit - despite Johnny being a victim and not even being a primary defendant?

310.    Has any of Barresi's work actually assisted in finding who harmed your father and who was receiving the funds, or has it only **interfered with proper investigation** while exploiting your family's tragedy for profit?

**This notice to communicate is issued to establish Defendant Barresi's pattern of illegal telephone recordings, disclosures of content in telephone calls,**

**commercial exploitation through entities like American Media Inc., inappropriate connection of Ultra-High-Net-Worth Individuals' names while ignoring actual wrongdoing and actual defendants,**

**and interference with justice by preventing investigation of documented schemes (including the overpayment arrangements your father discovered, Does involved that were not named, and other entities that were obscured by focusing only on the main named person) and actual suspects like Paul Schindler - a pattern that has harmed both your family and the Plaintiff's family.**

**Please note that these questions can be answered in one paragraph, or most questions may not be answered - you can choose your response. Thank you for your time.**

**Again, all questions are voluntary to answer, and nothing is being enforced.**

**RESPONSE DUE DATE:** December 15, 2025

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

## Plaintiff's Desire for Resolution

Plaintiff would like to resolve this for those exploited in these matters, missing Anthony Fox, Anthony Fox's family (If his daughter Constance volunteers), and Plaintiff's family for being brought into this. She feels sympathy as her mother Victoria was repeatedly brought into this unwillingly. She's confident that Adam Waldman further would like to resolve this for Johnny, with courtesy, as well after this long of time.

Plaintiff extends hope for reconciliation, communication, and peace for all parties affected by this matter. We seek truth, justice, and closure so that everyone can move forward.

For more information about the exploitation scheme your father documented, please see Adam Waldman's writing on "Hollywood Math": https://open.substack.com/pub/adamwaldman/p/hollywood-math

### Exhibits from Anthony Fox's Lawsuit

The following exhibits are from Anthony V. Fox vs. Safe In Heaven Dead Productions, Inc. et al., Superior Court of California, County of Los Angeles, Case No. SC062176, retrieved from PlainSite on April 1, 2025 at the request of Plaintiff Taft in this matter:

https://www.plainsite.org/dockets/2z6l26sm6/superior-court-of-california-county-of-los-angeles/anthony-v-fox-vs-safe-in-heaven-dead-productionsincet-al/

- **Exhibit 1**: Court document detailing testimony that Trouser Trumpet Inc. was supposed to provide security guards for the Viper Room Club, but "it never did so." The document confirms that Trouser Trumpet's financial records showed it "had no employees" and that "the cost of security personnel was included in Safe's operating costs." This evidence demonstrates the scheme your father was investigating - payments being made to an entity with no employees while security costs were separately accounted for in Safe's operating expenses.

- **Exhibit 2**: Court document discussing Exhibit 77, a purported license agreement directing Safe to make payments to Trouser Trumpet. The document notes that "Depp has yet to offer any excuse for Trouser having retained the payments received from Safe" and discusses that the signature on Exhibit 77 appeared to be forged. This shows the allegedly forged agreement your father questioned.

- **Exhibit 3**: Court conclusion finding "a prima facie case of Defendants' direct involvement in aiding and abetting, or covering of, or knowingly profiting from a crime or fraud relating to the procurement by Trouser of a trademark registration for the 'Viper Room' name, the purported ownership of that name by Trouser Trumpet, and the purported license agreement and payments made by Safe pursuant thereto." This establishes the court's finding of fraud related to the arrangements your father was investigating before his disappearance.
  -- **Exhibit 4**: Witness Adam Waldman publishing "Hollywood Math" in "Scams" on July 23, 2025

## There can be reconciliation and peace for all individuals affected by this matter.

Exhibit A: Communication Regarding Ultra-High-Net-Worth Scams and Barresi's Telephone Recordings Exploitation

statement of mind — that is, that they knew full well that Trouser had no legitimate claim to the "Viper Room" name or related marks and trade dress. Brett Curlee has testified that, after noticing an accrual in Safe's financial statement relating to Trouser, he inquired about Trouser at the September 11, 1996 meeting. He further testified that he was told by Nichols and Tivoli, in response to his inquiry about Trouser, that Trouser provided the security guards for the Club. In his Declaration of August 15, 2001 (Exhibit 84 at 4:17-18), Tivoli confirmed that, at the September 11, 1996 meeting, he told Curlee and his co-counsel, Daniel McCarthy, "that the security and body guards for the Club were employed exclusively through a separate corporate entity called Trouser Trumpet, Inc." Tivoli confirmed at trial, however, that, although the original plan was for Trouser to provide security guards, *it never did so*! (At trial, Tivoli knew that he had to tell the truth because, if he had testified that Trouser employed the security personnel, he could have been impeached by Safe's and Trouser's financial records, which had already been received in evidence and which clearly reflected that Trouser had no employees and that the cost of security personnel was included in Safe's operating costs.) Why would Tivoli have lied or attempted to mislead Curlee and McCarthy at the September 11, 1996

during discovery, and that he did nothing about it. *Depp has yet to offer any excuse for Trouser having retained the payments received from Safe!* In addition, there is substantial evidence in the record that is consistent with Depp having known what was going on all along: There is the written consent signed by Depp authorizing the execution, delivery and filing of the license agreement (Exhibit 70), as well as a notice to Safe directing it to make payments under the license agreement to Trouser (Exhibit 77). As the Court will recall, there was surprising testimony regarding Exhibit 77. After his counsel agreed, prior to trial, that there would be no foundational objection to this Exhibit, Depp suggested, at trial, that his signature was forged on it. The Exhibit was ultimately received, over Depp's objection, when Tivoli, evidently not wanting to be the fall guy, made a point of the fact that he had personally witnessed Depp's signature to numerous documents and that the signature on Exhibit 77 appeared to be Depp's. However, for present purposes, the point is not really whether Depp signed this document or even whether Depp knew about the license agreement and payments to Safe. Rather, the point is that either Depp *or one of his representatives* signed Exhibit 77, and that person had to have known that there was no basis for having Safe make any payments to Trouser – as the evidence

## IV.    CONCLUSION

For the foregoing reasons, the Court should find that there is a prima facie case of Defendants' direct involvement in aiding and abetting, or covering of, or knowingly profiting from a crime or fraud relating to the procurement by Trouser of a trademark registration for the "Viper Room" name, the purported ownership of that name by Trouser Trumpet, and the purported license agreement and payments made by Safe pursuant thereto and, therefore, that the communications between them and the Lichter firm relating to the "Viper Room" trademark are subject to inquiry at trial.

*Respectfully submitted,*

DATED:  November 12, 2001

PIRCHER, NICHOLS & MEEKS

LAW OFFICES OF BRETT B. CURLEE

LAW OFFICES OF JAY R. STEIN

# Hollywood Math



ADAM WALDMAN

JUL 23, 2025

❤ 326    💬 193    🔁 31    Share    ⋯

*"You've got a lot of nerve*

*To say you are my friend."*

*-Bob Dylan*

Two days later, on Friday, November 4, 2016, I set up office in a shaded corner booth at the Beverly Hills Hotel pool. Larry Leavitt from Ed White's office called and breathlessly said, "Joel Mandel filed to foreclose on Johnny's home!" "Johnny's home" actually meant four luxury properties in West Hollywood that he had acquired over the years, including his castle that I had just visited. This action came out of nowhere. I asked Larry to send me the papers.

In all that came next, it would never be remembered that Johnny hadn't even launched the wars. The fuses were lit from the start by his opponents.

And when I received the filing, the Mandels claimed they had loaned Johnny $5 million. This raised doubts in my mind. If there were any financial improprieties, why would they be loaning Johnny money?

I called Johnny and told him his home was being foreclosed on. He was shocked to speechlessness. I filled the silence: "why did the Mandels loan you $5 million?"

"Huh?"

He said he had no idea that they had loaned him anything. Frankly, at that moment, I did not believe him. This made zero sense.

But I now needed to hire some California real estate lawyers to defend against the foreclosure. This accelerated matters considerably with the Mandels. I had planned to call Mandel to establish the facts, but I wanted to do more digging first. Now I would have to rush ahead with the call. I texted Johnny for permission to approach Mandel.

Johnny texted me November 10: "Hey, Adam … Good hearing from you!!! I've been worried that Joel is gonna catch us with our pants down!!! As to question 1 – YES, PLEASE!!! BY ALL MEANS, CALL MANDEL AND CONVEY TO HIM THAT WE ARE GOING TO HAND HIM HIS ASS!!!!! Respect … Johnny D."

I remembered the Stalin statue in Johnny's office. Did Mandel know when he gave it to Johnny that Stalin killed all of his advisors?

For the moment, the ass-handing was coming our way. To Johnny, the foreclosure action was a direct attack on his children and their future ownership of the home they grew up in. I wrote back proposing a different strategy for the Mandel call, opting instead to put Mandel at ease and hear his story. Johnny approved: "If you feel that is the way to approach him … fine. I'm not so sure that the guy has anything to rely on but the wind from his own bad breath against a fortified sandcastle!!!!!"

It took a few more days to obtain the papers. But when I did, the worm turned in my mind again. The Mandel brothers' loan of $5 million was secured by more than $60 million worth of Johnny's houses. Johnny never received the independent legal advice about the "loan" required by law for business managers and especially lawyers to loan money to their client. Johnny had the most powerful lawyers in Hollywood working for him. How was it possible that this multi-million dollar loan, with his homes as collateral, had not been reviewed by any of them? How could the Mandels have given him so much money without mentioning it to him? Why would they? Another odd feature of the loan was that it had language saying if Johnny ever fired or sued the Mandels, it would accelerate the loan and make it immediately due and payable. It appeared the

Mandels had borrowed the money themselves from City National Bank, before loaning it to Johnny. What was going on here?

On November 10, 2016, sitting in an armchair at the Crosby Hotel in New York, I left a voicemail on Joel Mandel's cell phone that I was Johnny Depp's lawyer, and I was interested in discussing his situation and claims against Johnny. I put the phone in my lap and stared straight ahead. It took 90 seconds for my phone to ring.

It began friendly and remained that way until it wasn't. I told Mandel that I was a fixer, not a fighter. A deal lawyer, not a litigator. I was calling to see what the problems were between him and Johnny, and to see if I could help find a resolution. "If there is a deal to be done, I'm here to help make it," was the message. Then I let greed and the hustle take over.

Hearing what he wanted, Joel Mandel assumed I was there to negotiate a settlement of his threats. With his opening monologue, he began to dig his own grave.

Joel Mandel's basic cover story was that Johnny didn't make as much as he spent. He said, "Let me give you some Hollywood math," and must have liked that turn of phrase because he repeated "Hollywood math" constantly. Mandel proceeded to explain how Johnny had "over 40 employees" (he had 12), flew everywhere on private planes (generally paid for by the Hollywood studios as part of his movie contracts), had a massive security apparatus, recklessly bought luxury real estate and fine art (just before luxury real estate and fine art markets skyrocketed in value) and was an impulsive wastrel. I understood this to be a defensive narrative, a victim-blaming "cover story." I wanted to determine quickly whether there was a contract.

After an hour where Mandel did 95% of the talking, I said "we don't need to solve this in one phone call." I wanted to keep him at the card table. I asked him nonchalantly to help me prepare for our next discussion and get up to speed by sending me a few of the key documents just to get my bearings. For example,

could he shoot me Mandel's, Johnny's agent Tracey Jacobs' and Jake Bloom's contracts? I held my breath.

"We never had any contract with Johnny."

"None of you? Not even his lawyer Jake Bloom?"

"No. Never. That's not how it's done in Hollywood," he sneered.

"Any chance Jake Bloom had a contract with Johnny that you didn't know about?"

He laughed: "No chance. I deal with Jake Bloom almost every day. For decades. We have clients in common. Jake's a close friend. We talk constantly. He's great." Mandel wasn't interested in my contract question, he wanted to get back to talking about "his" money. "Johnny owes me $5 million and I want my money. Jake has his hands on everything, and he knows about everything. You should talk to Jake. He knew I was going to foreclose on Johnny's home, but there was nothing he could do. That idiot new business manager Ed White refused to pay."

"You told Jake Bloom in advance that you were going to foreclose on Johnny's home?"

"Of course. He knows about everything. You should talk to Jake."

This perked up my ears. Johnny's own legendary lawyer Jake Bloom knew in advance Johnny's former business manager was preparing to foreclose and didn't warn him? Why would Jake Bloom hide something like that from a client? It suggested that the terminated business manager was somehow more important to Jake Bloom than his own client Johnny Depp. It didn't make sense.

"You also need to talk to Christi." Christi Dembrowski was Johnny's sister. "Everything came and went through Christi. Christi is Johnny."

I immediately understood where Mandel was going with this. He was working an "alter ego" narrative, trying to suggest that Christi stood in the shoes of Johnny and possessed Johnny's authority. He did not mention that he possessed power of attorney granting him total control over all finances.

Now was the time for the one point I wanted to communicate. "Joel, you have a dispute with Johnny. He also has some concerns with you about a few things. Including that he didn't even know you were loaning him that money that he never asked you for and using his homes as loan collateral. But nobody wants to have a discussion with a gun to their head. You need to put the gun down."

He knew I meant the foreclosure action. "Nah! Forget it! I'm not dropping it. I filed that action so somebody would show up on the other end of the line. And here you are." He added hopefully, "And I'm glad you're here." I made a mental note that he had not disputed Johnny's ignorance about the $5 million loan.

"I would be here anyway. I'm not suggesting you drop anything. I'm suggesting you postpone the foreclosure action while we talk, which you can always pick up again later." The 90-day clock was ticking on the foreclosure itself. Johnny would lose his homes soon. "You will only have lost one business day so far, and you can restart the clock again any time."

"Nah. I'm not dropping it."

"What about the taxes, Joel? We have a report that you didn't pay Johnny's taxes on time for 17 straight years. And that he paid almost $10 million in tax penalties alone as a consequence."

He exploded. "That's bullshit! We always paid his taxes on time!! And to the extent there was ever a late tax payment, that's because he never had enough money to pay the taxes on time!"

"For 17 straight years?"

"Never!"

Hmm. First, he just said it was "bullshit" they didn't pay the taxes. Then he
implied it was sometimes true, with an excuse. Then he admitted that he never
paid the taxes on time. Three different answers in 10 seconds on what turned out
to be at least an $8.3 million issue. His story was that Johnny Depp made $650
million but never had enough to pay his taxes for 17 straight years? How did that
Hollywood Math make sense?

Mandel and I had two more calls over the following few days. I paced around my
house listening to his spin. It was pretty much a carbon copy of the first
discussion, but as Mandel's confidence grew with me, so did his yarns. I would
politely ask him to drop his foreclosure action, and he would refuse.

He peppered our discussion with increasingly picturesque illustrations of
"Hollywood Math," and groused about what a crazed overspender Johnny was. I
thought but didn't say: If you were his business manager, and he was spending
more than he made to the point of depletion over 17 years, you had an obligation
to provide advice and guidance in return for the $35 plus million you paid
yourself as "business manager." So there must have been a lot of email and other
evidence reflecting those interventions. Yet Ed White said there were no files,
that Mandel claimed he kept all the financial files "in my head." If Mandel and
Bloom were in touch with each other every day, what was the dynamic here?
What had happened over those 17 years to $650 million, and what role did these
Hollywood suits - Mandel and Bloom - play?

On November 16 Johnny texted: "I've had a lightbulb go off and I have an idea of a
person who should have quite a LOT of very pertinent information!!! Super
important!!!"

The person Johnny had in mind, a guy who worked at his production company
Infinitum Nihil, didn't turn out to have lots of information. He had one critical
piece.

On November 21, I called this guy, who told me there was a woman named
Janine Rayburn who had worked for Joel Mandel's firm The Management Group

("TMG") on Johnny's account. He thought Janine might have been Johnny's day-to-day account manager. She was frequently complaining about bad practices towards Johnny. He vaguely recollected, although it was misty after a few years, that Janine was fired for these complaints, and might have been paid "hush money" on the way out.

Too good to be true, I thought.

As November 2017 drew to a close, I began to speak with Johnny every day over FaceTime. Sometimes our video calls lasted hours. He was an unusual combination of Bohemian and southern gentleman. He revered his recently passed mother, although she had savagely beaten him (and his father) throughout his childhood, and he said she was "the meanest woman I ever met." He never spoke unkindly about any woman and rhapsodized tenderly about his former partners - from Kate Moss to "Noni" (Winona Ryder) to Vanessa Paradis - in what he termed his "serial monogamy." He had lived an eventful life and he seemed nostalgic for it. He certainly didn't seem to fit the profile of a wifebeater. He was as interesting as a person could be, and I liked everything about him. We were becoming friends.

I was putting the pieces of Johnny together mentally. A shy man who had been beaten and damaged as a child by his violent mother. An accidental movie star who never wanted to be famous. A multi-millionaire with no interest in money or its machinery. Searching and finding in Marlon Brando and Hunter S. Thompson missing father figures, and in Keith Richards a surrogate musical brother. Uncritical judgments about people, to a fault. He seemed to me an easy mark as a victim - inattentive, artistic prey that an apex predator would cut from the pack. He did not metaphorically cut his own lawn nor did he monitor those who did. Infinitely more important than my psychological profile was evidence. I needed to look at his emails and texts. And I understood that a man who had lived most of his life hiding from the public would not like my rummaging through his data. I didn't blame him, but it was necessary.

"I can't help you if I can't see the evidence."

"Only you," he said in agreement. "No one but you."

This was a burden for me. I would have to look at tens of thousands of communications myself, a job usually reserved for young lawyers who catalogue and then flag the most important ones – "hot docs" - for their seniors. But I agreed.

Soon I could see why he was shy about them. There were deeply personal communications from those closest to him. He was certainly guilty of salty language and the purplest of prose. But I did not see any communications that cast him in an unflattering light. People came to him for money, for advice, and for his creative inputs. He always said yes.

A Washington lawyer named Ben Chew had been my closest friend for over 25 years; he had been best man at my wedding and was Godfather to my youngest daughter. Professionally, Ben was going through a rough patch and had bounced around firms. After getting fired from his last firm, he had recently joined a California-based law firm called Manatt Phelps. Ben was a tall, moppy-haired tennis player; an aww shucks kind of Washington, DC native. I played tennis with him a few times a week. He was also my personal lawyer. Because I trusted Ben, I hired him and Manatt Phelps, the third-largest law firm in California, to simply manage the straightforward real-estate aspects of the foreclosure action and to advise me so I could advise Johnny on our real estate issues. Marty Singer, Johnny's other famous Hollywood lawyer, kept trying to push his way into the case. I texted Johnny suggesting we resist this.

In addition to needing his firm to serve as emergency California real estate counsel, I thought Ben might be helpful arms and legs to whatever direction the Mandel matter went. I viewed Ben as a "judge whisperer," the kind of guy who exasperatedly says "goodness!" in court when the other side is being nasty and whom Judges liked, which was a useful advantage in litigation. Above all, I

thought he was loyal and would follow my instructions, as he had done faithfully for decades.

When a great Washington, DC athlete with young children that Ben and I knew was struck and rendered quadriplegic by a car that crushed him against a double-parked UPS truck, Ben took the case against UPS. It was unwinnable. Except Ben was a judge whisperer and UPS' lawyers started lying lies they didn't need to lie. Ben won a settlement that saved the financial security of the victim's family. It made an impression on me.

I brought Ben in on many of my cases over the years. He was a self-described "ham and egg litigator," not a high-profile lawyer. My referrals represented a significant percentage of his book of business. Ben's greatest strength was that I could trust him.

---



**Recommend $CAM$ by Adam Waldman to your readers**

Recommend

---

 326 Likes · 31 Restacks

← Previous

## Discussion about this post

Comments   Restacks



Write a comment...

**Ap175**  Jul 23

♥ Liked by Adam Waldman

This is heartbreaking, but a story that must be told. I feel like you've just lit the wick on an Adam bomb
of epic proportions and I am here for it! Thank you, Mr. Waldman!

♡ LIKE (53)    💬 REPLY                                                                    ⬆ SHA

**Rosie**  Jul 23

♥ Liked by Adam Waldman

Just reading this gives a lot of information to process, never mind the people actually being in
this situation! I can't imagine paying people to run your affairs, thinking they are totally trustworthy, fc
17 years only to find out they were stealing you blind! Unfathomable! Thanks to you and Ed White,
things were starting to change!

♡ LIKE (44)    💬 REPLY                                                                    ⬆ SHA

1 reply

**191 more comments...**

© 2025 Adam Waldman · Privacy · Terms · Collection notice

Substack is the home for great culture